## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UMG RECORDINGS, INC., CAPITOL
RECORDS, LLC, SONY MUSIC
ENTERTAINMENT, ATLANTIC
RECORDING CORPORATION, ATLANTIC
RECORDS GROUP LLC, RHINO
ENTERTAINMENT LLC, THE ALL
BLACKS U.S.A., INC., WARNER MUSIC
INTERNATIONAL SERVICES LIMITED,
and WARNER RECORDS INC.,

                 Plaintiffs,

      v.

SUNO, INC. and JOHN DOES 1-10,

                 Defendant.

Civil Action No. 1:24-cv-11611-FDS

## ANSWER OF DEFENDANT SUNO, INC. TO COMPLAINT

Defendant Suno, Inc. ("Suno"), by and through its undersigned counsel, hereby answers

the complaint filed on June 24, 2024 (the "Complaint") by Plaintiffs UMG Recordings, Inc.,

Capitol Records, LLC, Sony Music Entertainment, Atlantic Recording Corporation, Atlantic

Records Group LLC, Rhino Entertainment LLC, The All Blacks U.S.A., Inc., Warner Music

International Services Limited, and Warner Records Inc. (collectively, "Plaintiffs").

## PRELIMINARY STATEMENT

Suno is an artificial intelligence-powered tool for making new music.  It is designed for

originality, and that is how real people in the real world use it—to create new songs that didn't and

often couldn't previously exist.

Like a human musician, Suno did not develop its capabilities in a vacuum.  It is the product

of extensive analysis and study of the building blocks of music: what various genres and styles

sound like; how songs in those genres and styles are harmonized and structured; the characteristic timbres of the instruments and vocalizations in those genres and styles; and so on.

Those genres and styles—the recognizable sounds of opera, or jazz, or rap music—are not something that anyone owns. Our intellectual property laws have always been carefully calibrated to avoid allowing anyone to monopolize a form of artistic expression, whether a sonnet or a pop song. IP rights can attach to a particular recorded rendition of a song in one of those genres or styles. But not to the genre or style itself.

Notwithstanding those foundational freedoms, the Plaintiffs in this lawsuit seek to shut Suno down. They are a collection of the largest record labels in the world, which collectively dominates the music industry. They frame their concern as one about "copies" of their recordings made in the process of developing the technology—that is, copies never heard or seen by anyone, made solely to analyze the sonic and stylistic patterns of the universe of pre-existing musical expression. But what the major record labels really don't want is competition. Where Suno sees musicians, teachers, and everyday people using a new tool to create original music, the labels see a threat to their market share.

Suno will ultimately prevail in this litigation because the values that copyright law embodies and protects are Suno's values: incentivizing innovation in the service of enabling more expression of more ideas by more people. Plaintiffs' lawsuit reflects the opposite values: an attempt to misuse IP rights to shield incumbents from competition and reduce the universe of people who are equipped to create new expression.

A.     **What Suno Is And How It Works**

Suno offers a new technology that allows people to use plain English descriptions of genres, styles, and other musical elements to create new music. For example, a prompt to Suno to generate a song in the style of early 1980s "new wave" synth-pop, with an upbeat tempo but a

somber feel, will in fact—with some iterative refinements from the user—yield an audio file with the characteristic instrumentation, timbres, and overall gestalt of the category described.  Users can also instruct the tool to incorporate their own original song lyrics, or new lyrics generated by a different artificial intelligence platform, into the auditory output.

The combination of these capabilities makes Suno an engine for effectively limitless creativity.  A dutiful grandson can take his grandfather's poetry and turn it into music whose creation would previously have been out of reach.[1]  A legendary rapper whose vocal chords were damaged in a car crash 35 years ago can recreate his old voice and make new music for the first time in decades.[2]  The opportunities for new artistic output are endless.

The technological foundation of that engine of creation is an underlying model of how music works.  The model is a type of computer program known as a "neural network."  It was constructed by showing the program tens of millions of instances of different kinds of recordings. From analyzing their constitutive elements, the model derived a staggeringly complex collection of statistical insights about the auditory characteristics of those recordings—what types of sounds tend to appear in which kinds of music; what the shape of a pop song tends to look like; how the drum beat typically varies from country to rock to hip-hop; what the guitar tone tends to sound like in those different genres; and so on.

Through extensive further refinements, Suno's engineers were able to provide a tool for virtually anyone to harness the power of that model in the service of generating new music.  To be clear, the model underpinning Suno's service is not a library of pre-existing content, outputting a collage of "samples" stitched together from existing recordings.  Instead, it is a vast store of

---

[1] *See, e.g.*, https://x.com/AlexFurmansky/status/1811462340686282976.

[2] *See, e.g.*, https://www.youtube.com/watch?v=t_pU9Hv-UfY.

information *about* what various musical styles consist of, used to generate altogether new auditory renditions of creations in those styles.

In the design and implementation of its product, Suno has in fact constructed a sweeping set of guardrails to ensure that any given output *will not* resemble too closely a particular recording the model was exposed to in the training process. The tool has been designed not to be able to process requests for new outputs when they are described by reference to a particular artist's name, rather than by reference to a musical style, in general. And while Suno allows people to enter prompts not just with text but also with sample snippets of audio files, it uses industry-standard technology to scan all such inputs and ensure that they are the user's original work, not a commercial recording. In the ordinary course, these measures are highly effective. Plaintiffs' apparent efforts to misuse the tool to generate renditions of pre-existing songs (discussed further below) are both unrepresentative of what real people do with Suno, and a flagrant violation of the rules governing use of the platform.

### B.    Plaintiffs' Sole Claim—That Copies Used In The Training Process, Never Seen Or Heard By Anyone, Are Infringing—And Why The Law Will Ultimately Preclude It

Plaintiffs are a set of record labels that likely controls well over 75% of the recordings that U.S. consumers tend to listen to today. They have filed a lawsuit contending that Suno is liable for copyright infringement just for having developed its service in the first instance. The relationship between many of the facts alleged in the Complaint and the legal theory asserted is, however, at best attenuated and at worst outright confusing. The only act that Plaintiffs contend was unlawful is Suno's allegedly having made a copy of copyrighted sound recordings as part of the process of "training" the model. *See* Compl. ¶ 50. Plaintiffs explicitly disavow any contention that any output ever generated by Suno has ever infringed any right that they own. *Id*. While the Complaint includes a variety of examples of outputs that allegedly resemble certain pre-existing

songs, *id*. ¶¶ 51–67, it goes out of its way to say that the Complaint is *not* alleging that those outputs constitute actionable copyright infringement, *id*. ¶ 50 ("Plaintiffs are not . . . alleging that these outputs themselves infringe the Copyrighted Recordings").

That concession will ultimately prove fatal to Plaintiffs' claims.  It is fair use under copyright law to make a copy of a protected work as part of a back-end technological process, invisible to the public, in the service of creating an ultimately non-infringing new product. Congress enacted the first copyright law in this country in 1791.  In the 233 years since, no case has ever—not one single time—reached a contrary conclusion.  Every single time the question has been presented—and it has been presented over and over and over again—the ultimate conclusion has been that making an "intermediate" copy of a protected work, in the service of generating non-infringing outputs, is permissible, not actionable.  *See*, *e.g.*, *Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) (fair use to copy all of the books in numerous university libraries in order to create a commercial, full-text searchable index of the assembled corpus); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) (fair use to copy essentially all of the images on the open internet and show thumbnail versions to users, in the service of creating image-search functionality); *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630 (4th Cir. 2009) (fair use to copy student papers into a plagiarism detection tool).  The outcome has been no different when the copying has been done in the service of creating an ultimate output that *competes* with the plaintiff copyright owner's own product.  *See, e.g.*, *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992) (fair use to copy copyrighted operating system to create unauthorized but non-infringing video game in direct competition with proprietor's own games); *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1 (2021) (fair use to copy protected aspects of copyrighted computer software to create a directly competing product).

This lawsuit thus seeks a genuinely unprecedented result: a ruling that it is actionable copyright infringement, not fair use, to have copied Plaintiffs' works as part of the process of developing a new technology, *even though* the ultimate outputs of that new technology are themselves non-infringing.

### C.    Why Plaintiffs Can't Contend The Outputs Are Infringing

Let there be no doubt: the outputs here are, as a rule, non-infringing.  The copyright statute speaks to this issue with clarity.  It says:

> The exclusive rights of the owner of copyright in a sound recording . . . do not extend to the making or duplication of another sound recording that consists entirely of an independent fixation of other sounds, even though such sounds imitate or simulate those in the copyrighted sound recording.[3]

Even to the extent that Suno's outputs "imitate or simulate" sounds in the Plaintiffs' recordings, Congress made the public policy choice to immunize such new creations from copyright infringement liability, so long as they do not themselves contain actual snippets of pre-existing recordings.  Which they do not.

Interestingly, the very reason this statutory provision exists is because the record labels wanted it.

Today, there are two different copyrighted works embodied in the recording of a new song—one comprising the notes, chords, and lyrics, which is known as the "musical work" or "musical composition"; and a separate one in the particular recorded rendition of that song captured in an audio format, which is known as the "sound recording."  So when a songwriter today writes a new piece, and it is recorded by two different bands, three copyrights arise: one in the song itself, and another one in each of the recordings.  (As a general matter, the copyrights in

---

[3] 17 U.S.C. § 114(b).  This is, famously, the provision of the Copyright Act that allowed Taylor Swift to re-record her old albums even though someone else owned the rights in the originals.

musical works are owned or administered by *music publishers*, and the copyrights in sound recordings are owned or administered by *record labels*.)

But for the first half of the 20th century, sound recordings were not among the creative works protected by federal copyright law.  The record industry lobbied successfully in the 1950s and 1960s to change that state of affairs, leading to a statutory revision in 1971 that would newly subject recordings to federal copyright protection going forward.[4]  But along the way, the proponents of expanding federal copyright protection to cover sound recordings had to confront a recurring challenge: what the legislative record describes as a "great deal of confusion" as to whether that protection would, as a practical matter, foreclose "imitation or mimicry of a general style or manner of performance."[5]  Essentially, the recording industry very much wanted it to be copyright infringement to make copies of a record and sell them out of the trunk of a car; but many of the same stakeholders had concerns about the prospect of copyright infringement claims arising from a new record in the same general style as a pre-existing one.  Ambiguity around what it would mean for one band's record to sound too much like another band's would subject the industry to a cloud of legal uncertainty that might chill creative expression.

To address those concerns, Congress embraced a compromise.  The 1971 law establishing copyright protection for sound recordings created new exclusive rights to control their reproduction and distribution (subject, of course, to all of the standard limitations and exceptions of copyright law, such as fair use).[6]  But it included a unique restriction on the scope of those rights—one with no analog in any other part of copyright law.  While the rights in a photograph might be infringed by another photograph that simply resembles the original too closely,

---

[4] *See* Pub. L. No. 92-140, 85 Stat. 391 (1971).

[5] *See* Barbara A. Ringer, *The Unauthorized Duplication of Sound Recordings* at 37 & n.354, Copyright Office Study No. 26, 86th Cong. 2d Sess. (1957).

[6] Pub. L. No. 92-140 (1971) at Section (a).

irrespective of whether the infringing photo actually constitutes an identical image of the same captured moment in time, the rights in sound recordings, specifically, would be more narrowly circumscribed.  In the words of the original statute:

> [T]he exclusive right of the owner of a copyright in a sound recording to reproduce it is limited to the right to duplicate the sound recording in a tangible form that directly or indirectly recaptures the actual sounds fixed in the recording.  *Provided further*, That this right does not extend to the making or duplication of another sound recording that is an independent fixation of other sounds, even though such sounds imitate or simulate those in the copyrighted sound recording.[7]

The point, as a contemporaneous commenter noted, was to make it illegal to copy and sell existing records, but at the same time to spare "courts . . . the delicate task of comparing the styles, arrangements and tones of one performer with those of another."[8]  Several years later, that provision was recodified, in modestly slimmed-down form but without substantive alteration, in 17 U.S.C. § 114(b), where it remains in full force and effect today.[9]

Fast-forward to 2024 and the age of generative AI.  The effect of this legislative compromise is that the outputs of tools like Suno, which do not reprise "the actual sounds fixed" in any "recording" owned by any record label, are not and cannot be even *prima facie* copyright infringements.  The outputs generated by Suno are *new* sounds, informed precisely by the "styles, arrangements and tones" of previous ones.  They are *per se* lawful.

### D.     What Suno Was Trained On

It is no secret that the tens of millions of recordings that Suno's model was trained on presumably included recordings whose rights are owned by the Plaintiffs in this case.  As paragraph 9 of the Complaint itself recognizes, an AI tool designed to generate new instances of creative expression in long-established artistic genres must, in its training phase, have encountered

---

[7] *Id.*

[8] *See* Comment, *Performers' Rights and Copyright: The Protection of Sound Recordings from Modern Pirates*, 59 Calif. L. Rev. 548, 571 (1971).

[9] *See* Pub. L. No. 94-553, 90 Stat. 2541, 2560 (1976).

and identified common patterns from prior examples—essentially as many as can be located, many of which Plaintiffs control.  Accordingly, Suno's training data includes essentially all music files of reasonable quality that are accessible on the open Internet, abiding by paywalls, password protections, and the like, combined with similarly available text descriptions.

The Complaint describes fairly elaborate efforts by Plaintiffs to show that the "Copyrighted Recordings"—a term defined to refer to the asserted works-in-suit—were specifically included in the data set that Suno used as the raw material from which its neural network extracted insights regarding how music works.  *See* Compl. ¶ 52.  For example, Plaintiffs evidently inputted the full lyrics from the song "Johnny B. Goode," along with the prompt, "1950s rock and roll, rhythm & blues, 12 bar blues, rockabilly, energetic male vocalist, singer guitarist," and found that the output "replicates the highly distinctive rhythm of the original's chorus, and uses the same melodic shape on the phrases 'go Johnny, go, go.'"  *Id.* ¶ 54.  "These similarities," Plaintiffs contend, "are only possible because Suno copied the Copyrighted Recordings that contain these musical elements." *Id.*

But that conclusion actually does not follow from the investigation that supposedly preceded it.  In fact, even a cursory search on Spotify reveals literally hundreds of different recordings of "Johnny B. Goode" (to say nothing of countless other recordings of similar songs in the same style).  Consequently, Plaintiffs' argument betrays a profound misunderstanding of the technology at issue by suggesting that UMG's particular version must have been in the training set because Suno allegedly generated an output that contains "the highly distinctive rhythm of the original's chorus," along with the "same melodic shape."  So too do countless other recordings of the song.  And to be clear, these are largely features of the *musical composition* "Johnny B. Goode"—the rights to which are apparently owned not by any of the Plaintiffs here, but by two

unrelated music publishers.[10]  So when Plaintiffs' lawyers prompted Suno with the lyrics to the musical composition "Johnny B. Goode," *see* Compl. ¶ 54, they not only flagrantly violated Suno's Terms of Service—which are designed to ensure that the product is used to generate *new* artistic expression[11]—but also apparently committed *prima facie* acts of infringement of those third-party publishers' rights.

More importantly, however, this case is not a "whodunnit."  Irrespective of whether UMG's particular version of "Johnny B. Goode" was in Suno's training data, many UMG recordings probably were given the massive size of the catalog UMG has assembled through decades of M&A transactions.  Plaintiffs will have ample opportunity to comb through the relevant data, all of which has been preserved, once discovery commences.  And when the facts come out, this litigation—or more precisely, the portion of this litigation concerning Suno's conduct, as opposed to the portion of this litigation concerning the record labels' actions—will be about why the law has always permitted comparable uses of copyrighted works, and why this time should be no different.

### E.     The Major Labels' Aversion To Competition

A healthy portion of the Complaint is dedicated to describing Plaintiffs' concern that the outputs of Suno's service will compete with their catalogs of sound recordings.  *See, e.g.*, Compl. ¶ 12 (complaining of the danger of "overrunning the market with AI-generated music"); *id*. ¶ 4 (warning that Suno's "musical outputs could saturate the market with machine-generated content

---

[10] Specifically, BMG Rights Management (US) LLC, and Music Services, Inc., according to publicly available sources.

[11] *See generally* Suno's Terms of Service, https://suno.com/terms ("It is very important that you only upload, post, publish, or display . . . Submissions that you have rights to use and provide hereunder.  By uploading any Submission, you represent and warrant that: you have, or have obtained, all rights, licenses, consents, permissions, power and/or authority necessary to submit and use (and allow us to use) such Submission in connection with the Service, including for the purpose of generating your Output.").

that will directly compete with, cheapen, and ultimately drown out . . . genuine sound recordings"). That is a familiar refrain from incumbents in the music industry.

When records first began to gain commercial traction in the 1930s, musicians aggressively lobbied against their use, warning that replacing orchestras with pre-recorded performances would leave real musicians "on the 'human scrap heap.'"[12]  When synthesizers began to gain popularity in the 1960s, leaders of the American Federation of Musicians passed a resolution banning use of the technology for fear that it would be "used to replace instrumentalists."[13]  In the 1980s, a branch of the U.K. Musicians' Union passed a motion to ban drum machines "in all recording and live work, arguing that such automatons are doing the musicians out of work."[14]

More recently, the major record labels have made a standard practice of seeking to thwart competition from smaller, independent labels—using complex contractual constraints to prevent streaming services from leaning more heavily on smaller labels willing to license at lower rates.[15]  Collectively and individually, the major record labels wield massive market power.[16]  And they have not hesitated to exploit it in fundamentally anticompetitive ways.[17]  This is not speculation—these issues have been adjudicated in regulatory proceedings.

---

[12] *See* Marc Coleman, *Playback: From the Victrola to MP3, 100 Years of Music, Machines, and Money*, New York, Da Capo Press (2003), at 40–41 (quoted in Chris R. Rasmussen, "Lonely Sounds: Recorded Popular Music and American Society, 1949-1979" (2008) at 25, Dissertations, Theses, & Student Research, Department of History, University of Nebraska (available at https://digitalcommons.unl.edu/cgi/viewcontent.cgi?article=1015& context=historydiss).

[13] *See* "An AFM Ban on the Moog Synthesizer?" *Rolling Stone* (Apr. 19, 1969), at 10.

[14] *See* "Robots 2, Unions 0," *The Globe and Mail* (June 4, 1982), at E5.

[15] *See* Copyright Royalty Board, *Determination of Royalty Rates and Terms for Ephemeral Recording and Webcasting Digital Performance of Sound Recordings (Web IV)*, 81 Fed. Reg. 26316, 26373 ("the Majors commonly include anti-steering or MFN clauses in their agreements with the services").

[16] *See Web IV*, 81 Fed. Reg. at 26368 (holding that "the Majors could utilize their combined market power to prevent price competition among them by virtue of their complementary oligopoly power")

[17] *See Johnson v. Copyright Royalty Bd.*, 969 F.3d 363, 382 (D.C. Cir. 2020) (finding that the major labels "have considerable market power vis-à-vis [licensees], and they have leveraged that power to extract excessive royalties.").

In the AI space, the labels have been even more brazen.  On information and belief, they have sought to impose deal terms on a broad array of licensees effectively requiring an across-the-board "no AI" policy—essentially trying to leverage their exclusive rights under copyright law to strong-arm music users into categorically avoiding artificial intelligence products.  With respect to music AI start-ups, specifically, the relevant facts have not yet come fully to light—but there are certainly indications that the labels, through their trade group the Recording Industry Association of America, may have responded to outreach from potential commercial counterparties by engaging in one or more concerted refusals to deal.

This behavior is not just atmospherically relevant to this case.  It goes directly to Plaintiffs' longstanding practice of misusing their aggregated copyrights to gain unfair advantage in the marketplace, well beyond what copyright law itself allows.  The defense of copyright misuse "is often applied when a defendant can prove either (1) a violation of the antitrust laws; (2) that the copyright owner otherwise illegally extended its monopoly; or (3) that the copyright owner violated the public policies underlying the copyright laws."  *Omega S.A. v. Costco Wholesale Corp.*, 776 F.3d 692, 700 (9th Cir. 2015) (Wardlaw, J., concurring).  The effect of a finding of copyright misuse is to preclude enforcement of the copyright or copyrights at issue during the period of misuse.  *Prac. Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 520 n.9 (9th Cir. 1997).  "[T]he defense of copyright misuse is available even if the defendants themselves have not been injured by the misuse."  *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 979 (4th Cir. 1990).  With the benefit of discovery, Suno will show that even setting the fair use issue aside, Plaintiffs' pervasive copyright misuse bars their claims altogether.

### F.      Conclusion

No one owns musical styles.[18]  Developing a tool to empower many more people to create music, by scrupulously analyzing what the building blocks of different styles consist of, is a quintessential fair use under longstanding and unbroken copyright doctrine.  Plaintiffs' contrary vision is fundamentally inconsistent with the law and its underlying values.

### **RESPONSES TO SPECIFIC ALLEGATIONS**

### **NATURE OF THE ACTION**[19]

1.      Suno admits that artificial intelligence ("AI") and machine learning are the next frontier of technological development and present significant future opportunities.  Suno denies the remaining allegations of this paragraph.

2.      Suno admits that AI companies, like all other enterprises, must abide by the laws that protect human creativity and ingenuity.  The remaining allegations in this paragraph contain legal conclusions to which no response is required.[20]  Suno denies that this lawsuit seeks to enforce any valid claim under applicable law.

3.      Suno admits that generative AI tools assist humans in creating new and innovative music.  The remaining allegations in this paragraph contain legal conclusions to which no response is required.

4.      Suno admits that its generative AI tool allows users to generate, among other things, digital music files in response to basic inputs.  Suno admits that its model was constructed by

---

[18] *See, e.g.*, *Cortes v. Universal Music Latino*, 477 F. Supp. 3d 1290, 1301 (S.D. Fla. 2020) (rejecting claim of protection "for the musical genre of 'Reggaeton'"); *Peters v. West*, 692 F.3d 629, 636 (7th Cir. 2012) ("[N]o poet can claim copyright protection in the form of a sonnet or a limerick.").

[19] The various headings and subheadings of the Complaint are not allegations and thus do not require a response.  Suno reproduces them in this Answer solely for convenience.  To the extent a response is required, Suno denies any allegations contained in the headings and subheadings of the Complaint.

[20] To the extent a response to any legal conclusion herein is required, Suno denies the allegation.

showing the program a vast amount of different kinds of sound recordings in order to derive statistical insights about those recordings.  Suno denies the remaining allegations of this paragraph.

5.      The allegations in this paragraph contain legal conclusions to which no response is required.

6.      Suno lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

7.      Suno admits that it offers a generative AI tool that creates digital music files within seconds of receiving a user's prompts.  Suno further admits that constructing its generative AI tool required showing the program massive amounts of data in order to derive statistical insights about that data.  Suno also admits that it charges many of its users monthly fees to use its product and produce digital files.  Suno denies any remaining allegations of this paragraph.

8.      Suno admits that constructing its generative AI tool required showing the program tens of millions of different kinds of recordings in order to derive statistical insights about them. Suno admits that the quoted language appears in an August 3, 2023 post from the @georg Discord account.  Suno further admits that the quoted language appears in Rachel Metz, *The AI Music Era Is Here.  Not Everyone Is a Fan*, Bloomberg (May 6, 2024), available at https://www.bloomberg.com/news/articles/2024-05-06/suno-udio-and-more-the-ai-music-era-is-here-not-everyone-is-a-fan.  Suno also admits that the quoted language appears in Brian Hiatt, *A ChatGPT for Music is Here. Inside Suno, the Startup Changing Everything*, Rolling Stone (Mar. 17, 2024), available at https://www.rollingstone.com/music/music-features/suno-ai-chatgpt-for-music-1234982307/.  To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with the full text, Suno denies those allegations.  Suno denies any remaining allegations of this paragraph.

9.     Suno admits that constructing its generative AI tool required showing the program tens of millions of instances of different kinds of recordings sources in order to derive statistical insights about them.  Suno lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis denies them.

10.     Suno admits that the selectively quoted language appears in a pre-litigation correspondence between Suno and Plaintiffs, the full text of which speaks for itself.  Suno also admits that it stated in that correspondence that "on the facts" the RIAA "suggest[ed]" the development of generative AI tools would be fair use.  To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with the full text of Suno's correspondence, Suno denies those allegations.  To the extent that the allegations in this paragraph contain legal conclusions, no response is required.  Suno denies any remaining allegations of this paragraph.

11.     To the extent the allegations in this paragraph contain legal conclusions, no response is required.  To the extent a response is required, Suno lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

12.     Suno admits that over 10,000,000 users have generated music files using its product.  To the extent the allegations in this paragraph contain legal conclusions, no response is required.  To the extent the allegations in this paragraph purport to quote from portions of a publicly available comment, the full text of the comment speaks for itself.  Suno lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, including stream counts associated with unidentified "outputs" referenced therein, and on that basis denies them.

13.     Suno admits that it offers a subscription plan, "Premier," available for $24 per month.  Suno further admits that its latest funding round raised $125 million.  Suno admits that it has been successful in its fundraising efforts, which have attracted prominent investors.  Suno lacks knowledge or information sufficient to form a belief as to the truth of the unattributed company valuation in this paragraph.  Suno denies any remaining allegations of this paragraph.

14.     The allegations in this paragraph contain legal conclusions to which no response is required.  Suno denies the remaining allegations of this paragraph.

15.     The allegations in this paragraph contain legal conclusions to which no response is required.  Suno denies the remaining allegations of this paragraph.

16.     The allegations in this paragraph contain legal conclusions to which no response is required.

## THE PARTIES

17.     Suno lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

18.     Suno lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

19.     Suno lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and Exhibit A, and on that basis denies them.

20.     Suno lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and Exhibit A, and on that basis denies them.

21.     Suno lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

22.     Suno lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

23.     Suno lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

24.     Suno lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

25.     Suno lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

26.     Suno lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and Exhibit A, and on that basis denies them.

27.     To the extent the allegations in this paragraph contain legal conclusions, no response is required.  To the extent a response is required, Suno lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and Exhibit A, and on that basis denies them.

28.     Suno admits that Suno, Inc. is a Delaware corporation with its current principal place of business at 17 Dunster Street, Cambridge, Massachusetts 02138.

29.     The allegations of this paragraph are directed at unknown parties, and Suno lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph about the unknown parties, and on that basis denies them.  The remaining allegations against Suno are legal conclusions to which no response is required.

## JURISDICTION AND VENUE

30.     For purposes of this action, Suno does not contest subject matter jurisdiction.  The paragraph otherwise contains legal conclusions to which no response is required.

31.     For purposes of this action, Suno does not contest personal jurisdiction.  The paragraph otherwise contains legal conclusions to which no response is required.

32.     For purposes of this action, Suno does not contest venue.  The paragraph otherwise contains legal conclusions to which no response is required.

### FACTUAL BACKGROUND

33.     To the extent the allegations in this paragraph contain legal conclusions, no response is required.  To the extent a response is required, Suno lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

34.     To the extent the allegations in this paragraph contain legal conclusions, no response is required.  To the extent a response is required, Suno lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

35.     Suno admits that a beta version of its music generation tool was launched in July 2023.  Suno further admits that the quoted language appears in Suno, About, available at https://suno.com/about.

36.     Suno admits that it initially engaged users to generate AI music files through its channel on the social media website Discord, and later rolled out a web interface to expand the reach of its music generation product.  Suno further admits that in December 2023, it announced a partnership with Microsoft through which Suno's tool would be integrated into Microsoft's AI chatbot Copilot.

37.     Suno admits that its product allows users to enter text prompts to generate digital music files.  Suno further admits that users can enter prompts using Suno's website interface or Microsoft's Copilot.  Suno also admits that users can prompt Suno's tool with a description of the music they want to generate, which can include specifying the genre, lyrics, story direction, and themes to serve as inspiration.  Suno admits that its tool processes the user's prompt and generates

digital music files within seconds.  Suno further admits that its website generates two files per prompt, and Copilot's Suno plug-in generates one.  Suno also admits that its tool's customization options allow users to adjust elements of the files, including tempo, mood, and genre.

38.     Suno admits that it offers both free and paid versions of its product.  Suno admits that under the free plan, users are given 50 credits per day, equivalent to 10 music files.  Suno admits that under its Terms of Service, free users can "only use Outputs generated from Submissions made . . . through the Service" for "lawful, internal, personal and non-commercial purposes."  Suno admits that users can subscribe to the Pro and Premier plans for monthly fees of $8 and $24, respectively.  Suno admits that the Pro plan gives users 2,500 credits per day.  Suno admits that 2,500 credits allow users to create 500 music files.  Suno admits that the Premier plan gives users 10,000 credits per day.  Suno admits that 10,000 credits allow users to create 2,000 music files.  Suno admits that, per its Terms of Service, Suno assigns to users "all of its right, title and interest in and to any Output owned by Suno and generated from Submissions made by users through the Service during the term of their paid-tier subscription."  To the extent the allegations in this paragraph contain legal conclusions, no response is required.  Suno denies any remaining allegations of this paragraph.

39.     Suno admits that on March 21, 2024, Suno launched a new version of its tool, named "v3."  Suno further admits that the quoted language appears in Suno Blog, *Introducing v3* (Mar. 21, 2024), available at https://suno.com/blog/v3.  Suno also admits that v3 enables all users, free or paid, to generate digital music files up to two minutes in length virtually instantaneously.

40.     Suno admits that on May 30, 2024, Suno launched another version of its tool, named "v3.5."  Suno further admits that it described v3.5 as an updated version of v3.  Suno admits that v3.5 enables all users, free or paid, to generate digital music files up to four minutes in length virtually instantaneously.  Suno admits that it has announced that its next version, "v4," is in

development.  Suno admits that the quoted language appears in a March 24, 2024 post from the @suno_ai_ X account, available at https://x.com/suno_ai_/status/1794145852723777559.  To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with it, Suno denies those allegations.

41.   Suno admits that its model is based on a machine learning model.  Suno further admits that its model produces audio.  Suno also admits that its model is a type of computer program known as a "neural network," which was constructed by showing the program tens of millions of instances of different kinds of recordings gathered from publicly available sources.  By analyzing their constitutive elements, the model derived a complex collection of statistical insights about the auditory characteristics of those recordings.  Suno admits that its training process includes additional further technical refinements.  Suno lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis denies them.

42.   Suno admits that the quoted language appears in Brian Hiatt, *A ChatGPT for Music is Here. Inside Suno, the Startup Changing Everything*, Rolling Stone (Mar. 17, 2024), available at https://www.rollingstone.com/music/music-features/suno-ai-chatgpt-for-music-1234982307/. To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with it, Suno denies those allegations.  Suno lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis denies them.

43.   Suno admits that its model is a type of computer program known as a "neural network," which was constructed by showing the program tens of millions of instances of different kinds of recordings gathered from publicly available sources.  By analyzing their constitutive elements, the model derived a complex collection of statistical insights about the auditory

characteristics of those recordings.  Suno admits that its training process includes additional further technical refinements.  Suno denies the remaining allegations of this paragraph.

44.     Suno admits its model generates new music in existing musical styles using a complex collection of statistical insights regarding those styles that it has derived from tens of millions of sound recordings.  Suno denies the remaining allegations of this paragraph.

45.     Suno denies the allegations of this paragraph.

46.     Suno admits that constructing its generative AI tool required showing the program tens of millions of instances of different kinds of recordings in order to derive statistical insights about them.  Suno lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis denies them.

47.     Suno admits that the quoted language appears in Brian Hiatt, *A ChatGPT for Music is Here. Inside Suno, the Startup Changing Everything*, Rolling Stone (Mar. 17, 2024), available at https://www.rollingstone.com/music/music-features/suno-ai-chatgpt-for-music-1234982307/. To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with the quoted language, Suno denies those allegations.  Suno denies any remaining allegations of this paragraph.

48.     The allegations in this paragraph contain legal conclusions to which no response is required.  Suno also lacks knowledge or information sufficient to admit or deny the allegations of this paragraph about "casual observers," and on that basis denies them.

- Suno admits that the quoted language appears in Brian Hiatt, *AI-Music Arms Race: Meet Suno, the Other ChatGPT for Music*, Rolling Stone (Apr. 10, 2024).  To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with the quoted language, Suno denies those allegations.

- Suno admits that the quoted language appears in Sharon Goldman, *AI Music May be Having a Moment, But Human Songwriters Would Like a Word*, Fortune (May 17, 2024).  To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with the quoted language, Suno denies those allegations.

- Suno admits that the quoted language appears in Mike Wheatley, *Generative AI Music Maker Startup Suno Raises $125M in Funding*, SiliconANGLE (May 21, 2024).  To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with the quoted language, Suno denies those allegations.

- Suno admits that the quoted language appears in Daniel Tencer, *Suno Could Get Sued By The Record Business. Who's Backing it With $125M?*, Music Business Worldwide (May 28, 2024).  To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with the quoted language, Suno denies those allegations.

49.    Suno admits that the selectively quoted language appears in pre-litigation correspondence between Suno and Plaintiffs, the full text of which speaks for itself.  To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with the full text of that correspondence, Suno denies those allegations.

50.    Suno admits that Plaintiffs do not appear to be alleging that the outputs of Suno's model "infringe the Copyrighted Recordings."  Consistent with its Preliminary Statement, Suno denies the allegation that "the fact that Suno's product generates digital music files that mimic readily identifiable features of the Copyrighted Recordings supports the conclusion that Suno is using the Copyrighted Recordings in training its AI model."

51.     Consistent with its Preliminary Statement, Suno denies that any alleged similarities between model output and Plaintiffs' Copyrighted Recordings "betray that the model was trained on Copyrighted Recordings."  Suno lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis denies them.

52.     Suno lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph regarding Plaintiffs' "test," and on that basis denies them. Consistent with its Preliminary Statement, Suno denies that the results of that "test" "confirm that Suno has copied for training purposes the Copyrighted Recordings, because this degree of similarity in output would be impossible if Suno were not training on the Copyrighted Recordings."

53.     Suno denies this allegation.

54.     Suno denies that any alleged similarities between model output and Plaintiffs' Copyrighted Recordings "are only possible because Suno copied the Copyrighted Recordings that contain these musical elements."  Suno lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph and footnote 14, including with respect to Plaintiff UMG's copyright ownership, and on that basis denies them.

55.     Suno lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, including with respect to Plaintiff UMG's copyright ownership, and on that basis denies them.

56.     Suno lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, including with respect to Plaintiff UMG's copyright ownership, and on that basis denies them.

57.     Suno lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and Exhibit B and on that basis denies them.

58.     Suno lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, including concerning Plaintiff UMG's copyright ownership, and on that basis denies them.

59.     Suno lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, including concerning Plaintiff UMG's copyright ownership, and on that basis denies them.

60.     Suno lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, including concerning Plaintiff UMG's copyright ownership, and on that basis denies them.

61.     Suno lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, including concerning Warner Records Inc.'s copyright ownership, and on that basis denies them.

62.     Suno lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

63.     Suno lacks knowledge or information sufficient to admit or deny the allegations of this paragraph about "producer tags," and on that basis denies them.

64.     Suno lacks knowledge or information sufficient to admit or deny the allegations of this paragraph about "producer tags," and on that basis denies them.

65.     Suno lacks knowledge or information sufficient to admit or deny the allegations of this paragraph about "tags," or about Plaintiffs' copyrighted sound recordings, and on that basis denies them.

66.     To the extent the allegations in this paragraph purport to reference portions of a publicly available video posted on March 8, 2024 on X by @mignano, the full video speaks for itself.  To the extent the allegations in this paragraph purport to summarize or characterize or are

inconsistent with it, Suno denies those allegations.  Suno admits that the quoted language in footnote 17 appears in Joe Coscarelli, *An A.I. Hit of Fake 'Drake' and 'The Weeknd' Rattles the Music World*, N.Y. Times (Apr. 19, 2023), available at https://www.nytimes.com/2023/04/19/arts/music/ai-drake-the-weeknd-fake.html.   To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with it, Suno denies those allegations.  Suno further admits that the quoted language in footnote 17 appears in Jem Aswad, *What Would It Take for an AI-Generated Song to Qualify for a Grammy?*, Variety (Oct. 17, 2023), available at https://variety.com/2023/music/news/grammys-ai-drake-weeknd-awards-1235758275/.   To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with it, Suno denies those allegations.

67.     Suno lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph or Exhibit B, and on that basis denies them.

68.     Suno admits that the parties engaged in correspondence prior to Plaintiffs filing this lawsuit, the full text of which speaks for itself.  Suno admits that it stated in that correspondence that "on the facts" the RIAA "suggest[ed]" the development of generative AI tools would be fair use.  To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with the full text, Suno denies those allegations.  The remaining allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Suno denies the allegations of this paragraph.

69.     The allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Suno denies the allegations of this paragraph.

70.     The allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Suno denies the allegations of this paragraph.

71.     The allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Suno denies the allegations of this paragraph.

72.     The allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Suno denies the allegations of this paragraph.

73.     Suno admits that the quoted language appears in Suno Blog, *Introducing v3* (Mar. 21, 2024), available at https://suno.com/blog/v3.  Suno further admits that the quoted language appears in an October 1, 2023 post from the @keenan Discord account.  Suno admits that constructing its generative AI tool required showing the program tens of millions of instances of different kinds of recordings sources in order to derive statistical insights about them.  Suno lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis denies them.

74.     The allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Suno denies the allegations of this paragraph.

75.     The allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Suno denies the allegations of this paragraph.

76.     The allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Suno denies the allegations of this paragraph.

77.     The allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Suno denies the allegations of this paragraph.

78.     Suno admits that over 10,000,000 people have created digital music files using the Suno tool.  Suno lacks knowledge or information sufficient to admit or deny the allegations of this paragraph about "users," and on that basis denies them.  Suno admits that, per its Terms of Service, Suno assigns to users "all of its right, title and interest in and to any Output owned by Suno and generated from Submissions made by users through the Service during the term of their paid-tier

subscription." The remaining allegations in this paragraph contain legal conclusions to which no response is required. To the extent a response is required, Suno lacks knowledge or information sufficient to admit or deny the allegations of this paragraph, and on that basis denies those allegations.

79. Suno admits that the quoted language appears in the letter available at https://artistrightsnow.medium.com/200-artists-urge-tech-platforms-stop-devaluing-music-559fb109bbac. The remaining allegations of this paragraph contain legal conclusions to which no response is required. To the extent a response is required, Suno denies the remaining allegations.

80. The allegations in this paragraph contain legal conclusions to which no response is required. To the extent a response is required, Suno denies these allegations.

81. Suno admits that there is room for AI and human creators to forge a sustainable, complementary relationship that promotes human creativity and facilitates the human creations that shape culture, excite the public, and resonate with consumers. The remaining allegations in this paragraph contain legal conclusions to which no response is required. To the extent a response is required, Suno denies these allegations.

82. The allegations in this paragraph contain legal conclusions to which no response is required. To the extent a response is required, Suno denies these allegations.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (Direct Copyright Infringement of Post-1972 Copyrighted Recordings)

83. Suno incorporates by reference its responses to all allegations set forth in paragraphs 1–82 as if fully set forth herein.

84. The allegations in this paragraph contain legal conclusions to which no response is required. To the extent a response is required, Suno lacks knowledge or information sufficient to

admit or deny the allegations of this paragraph concerning Plaintiffs' copyrighted sound recordings, and on that basis denies those allegations. Suno otherwise denies the remaining allegations of this paragraph.

85.     The allegations in this paragraph contain legal conclusions to which no response is required. To the extent a response is required, Suno lacks knowledge or information sufficient to admit or deny the allegations of this paragraph concerning Plaintiffs' copyrighted sound recordings, and on that basis denies those allegations. Suno otherwise denies the remaining allegations of this paragraph.

86.     The allegations in this paragraph contain legal conclusions to which no response is required. To the extent a response is required, Suno lacks knowledge or information sufficient to admit or deny the allegations of this paragraph concerning Plaintiffs' copyrighted sound recordings, and on that basis denies those allegations. Suno otherwise denies the remaining allegations of this paragraph.

87.     The allegations in this paragraph contain legal conclusions to which no response is required. To the extent a response is required, Suno lacks knowledge or information sufficient to admit or deny the allegations of this paragraph concerning Plaintiffs' copyrighted sound recordings, and on that basis denies those allegations. Suno otherwise denies the remaining allegations of this paragraph.

88.     The allegations in this paragraph contain legal conclusions to which no response is required. To the extent a response is required, Suno lacks knowledge or information sufficient to admit or deny the allegations of this paragraph concerning Plaintiffs' copyrighted sound recordings, and on that basis denies those allegations. Suno otherwise denies the remaining allegations of this paragraph.

89.     The allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Suno lacks knowledge or information sufficient to admit or deny the allegations of this paragraph concerning Plaintiffs' copyrighted sound recordings, and on that basis denies those allegations.  Suno otherwise denies the remaining allegations of this paragraph.

90.     The allegations in this paragraph contain legal conclusions to which no response is required.

91.     The allegations in this paragraph contain legal conclusions to which no response is required.

## SECOND CAUSE OF ACTION

### (Direct Copyright Infringement of Pre-1972 Copyrighted Recordings)

92.     Suno incorporates by reference its responses to all allegations set forth in paragraphs 1–82 as if fully set forth herein.

93.     The allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Suno lacks knowledge or information sufficient to admit or deny the allegations of this paragraph concerning Plaintiffs' copyrighted sound recordings, and on that basis denies those allegations.  Suno otherwise denies the remaining allegations of this paragraph.

94.     The allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Suno lacks knowledge or information sufficient to admit or deny the allegations of this paragraph concerning Plaintiffs' copyrighted sound recordings, and on that basis denies those allegations.  Suno otherwise denies the remaining allegations of this paragraph.

95.     To the extent that the allegations in this paragraph contain legal conclusions, no response is required.  To the extent a response is required, Suno lacks knowledge or information sufficient to admit or deny the allegations of this paragraph concerning Plaintiffs' copyrighted sound recordings, and on that basis denies those allegations.  Suno otherwise denies the remaining allegations of this paragraph.

96.     The allegations in this paragraph contain legal conclusions to which no response is required.

97.     The allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Suno lacks knowledge or information sufficient to admit or deny the allegations of this paragraph concerning Plaintiffs' copyrighted sound recordings, and on that basis denies those allegations.  Suno otherwise denies the remaining allegations of this paragraph.

98.     To the extent that the allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Suno lacks knowledge or information sufficient to admit or deny the allegations of this paragraph concerning Plaintiffs' copyrighted sound recordings, and on that basis denies those allegations.  Suno otherwise denies the remaining allegations of this paragraph.

99.     The allegations in this paragraph contain legal conclusions to which no response is required.

100.     The allegations in this paragraph contain legal conclusions to which no response is required.

## **PRAYER FOR RELIEF**

In response to the Prayer for Relief, Suno denies that Plaintiffs are entitled to the requested relief, or to any relief whatsoever.

A.      In response to the Prayer for Relief, Suno denies that Plaintiffs are entitled to the
requested relief, or to any relief whatsoever.

B.      In response to the Prayer for Relief, Suno denies that Plaintiffs are entitled to the
requested relief, or to any relief whatsoever.

C.      In response to the Prayer for Relief, Suno denies that Plaintiffs are entitled to the
requested relief, or to any relief whatsoever.

D.      In response to the Prayer for Relief, Suno denies that Plaintiffs are entitled to the
requested relief, or to any relief whatsoever.

E.      In response to the Prayer for Relief, Suno denies that Plaintiffs are entitled to the
requested relief, or to any relief whatsoever.

F.      In response to the Prayer for Relief, Suno denies that Plaintiffs are entitled to the
requested relief, or to any relief whatsoever.

## JURY DEMAND

With respect to the jury demand contained in Plaintiffs' Complaint, Suno states that no response is required.  To the extent a response is deemed required, Suno denies that all of Plaintiffs' claims are properly triable to a jury.

## AFFIRMATIVE DEFENSES

In further answer to the allegations made by Plaintiffs in the Complaint, Suno asserts the following affirmative defenses, incorporating by reference all of the preceding material, including without limitation the Preliminary Statement above.  Suno does not concede that it has the burden of proof on the defenses listed below.

## FIRST AFFIRMATIVE DEFENSE

To the extent there is copying of copyrightable expression, that copying constitutes fair use pursuant to 17 U.S.C. § 107.  Suno's AI tool uses a back-end technological process, invisible to

31

the public, in the service of creating an ultimately non-infringing new product.   This is quintessential fair use.

## SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrines of copyright misuse and unclean hands.  The defense of copyright misuse applies when a defendant can prove one of the following: (1) a violation of the antitrust laws; (2) that the copyright owner otherwise illegally extended its monopoly; or (3) that the copyright owner violated the public policies underlying the copyright laws.  The effect of a finding of copyright misuse is to preclude enforcement of the copyright or copyrights at issue during the period of misuse, and the defense is available even if the defendant has not itself been injured by the misuse.  On information and belief, Plaintiffs have engaged in anticompetitive activities that extend an unlawful monopoly over the production and commercialization of music, which by itself and/or in connection with other conduct satisfies each of the three alternative prongs above.

## THIRD AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by one or more other equitable doctrines, such as waiver, estoppel, and laches.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiffs' claims fail in whole or in part because the complained-of use was validly licensed by express or implied license.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs do not own or hold exclusive rights under 17 U.S.C. § 106 or any copyright law over each work that was allegedly infringed by Suno, including without limitation because some or all of the materials over which Plaintiffs claim copyright are in the public domain.

## SIXTH AFFIRMATIVE DEFENSE

To the extent there is copying of copyrightable expression, that copying is de minimis.

## SEVENTH AFFIRMATIVE DEFENSE

To the extent Plaintiffs establish any act of infringement, that infringement was innocent, allowing for the Court to reduce any award of statutory damages to an amount as low as $200 per work infringed.  17 U.S.C. § 504(c)(2).

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' remedies are barred at least in part by the applicable statutes of limitations.

## NINTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have suffered no provable injury as a result of Suno's alleged copying.

## TENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims for injunctive relief are barred, in whole or in part, because Plaintiffs have failed to state facts sufficient to support a claim for injunctive relief, and there is an adequate remedy at law.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because the copyright registrations purporting to cover some or all of the works in dispute are invalid and do not satisfy the requirements of 17 U.S.C. §§ 411–412.

## ADDITIONAL AFFIRMATIVE DEFENSES

Suno has not knowingly or intentionally waived any applicable defenses and reserves the right to assert and rely on other applicable defenses as may become available or apparent during discovery in this matter.  Suno reserves the right to amend this Answer and/or its affirmative defenses.

**REQUEST FOR RELIEF**

WHEREFORE, Suno respectfully requests that this Court:

1.      Enter judgment in Suno's favor and against Plaintiffs;

2.      Dismiss all claims by Plaintiffs with prejudice;

3.      Award Suno its attorneys' fees and costs to the extent permitted by law; and

4.      Grant Suno such other and further relief as this Court deems just and proper.


Dated: August 1, 2024                    Respectfully submitted,

*/s/ Shlomo Fellig*
Shlomo Fellig (BBO# 699643)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
shlomo.fellig@lw.com

Andrew M. Gass (*pro hac vice*)
Brittany N. Lovejoy (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
andrew.gass@lw.com
brittany.lovejoy@lw.com

Steven N. Feldman (*pro hac vice*)
Nathan Taylor (*pro hac vice*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
steve.feldman@lw.com
nathan.taylor@lw.com

Sarang V. Damle (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
sy.damle@lw.com

*Counsel for Defendant Suno, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent August 1, 2024 to those identified as non-registered participants.

*/s/ Shlomo Fellig*
Shlomo Fellig