## SIUNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UMG RECORDINGS, INC., CAPITOL RECORDS, LLC, SONY MUSIC ENTERTAINMENT, ATLANTIC RECORDING CORPORATION, ATLANTIC RECORDS GROUP LLC, RHINO ENTERTAINMENT LLC, THE ALL BLACKS U.S.A., INC., WARNER MUSIC INTERNATIONAL SERVICES LIMITED, and WARNER RECORDS INC., | Case No. 1:24-cv-11611-FDS |

         Plaintiffs,

vs.

SUNO, INC., and JOHN DOES 1-10,

         Defendant.

## JOINT STATEMENT

Pursuant to Rule 26(f) of the Federal Rules of Civil Procedure, Local Rule 16.1, and the Court's Notice of Scheduling Conference (ECF 38), the parties hereby submit this Joint Statement to the Court in anticipation of the Scheduling Conference set for October 16, 2024.

## I.    PROPOSED DISCOVERY PLAN

The parties have a material disagreement regarding the sequencing of discovery. Reflecting this dispute, Plaintiffs' proposed scheduling order is attached as **Exhibit A**, and Defendant's proposed scheduling order is attached as **Exhibit B**.

### 1.    Plaintiffs' Position

Defendant's Answer in this case has clarified what is and what is not in dispute. Suno admits that this case is not a "whodunnit," as it concedes that "the tens of millions of recordings that Suno's model was trained on presumably included recordings whose rights are owned by the Plaintiffs in this case." Answer (ECF No. 28) at 8,10; *see also id.* at 9 ("Suno's training data

includes essentially all music files of reasonable quality that are accessible on the open Internet"). Thus, this case will not turn on whether Plaintiffs own or control the rights to numerous copyrighted sound recordings (they do) or whether Defendant copied many of those copyrighted works (it did). The heart of this dispute is whether Defendant's copying of those sound recordings constitutes fair use. *Compare* Complaint (ECF No. 1) ¶ 14 ("Suno cannot avoid liability for its willful infringement by claiming fair use.") *with* Answer (ECF No. 28) at 13 ("Developing a tool to empower many more people to create music, by scrupulously analyzing what the building blocks of different styles consist of, is a quintessential fair use under longstanding and unbroken copyright doctrine."). Indeed, Suno made its reliance on this defense abundantly clear even prior to the filing of the Complaint. Complaint (ECF No. 1) ¶ 10 (referencing Suno's pre-litigation correspondence claiming "that its large-scale copying of sound recordings is 'fair use'"). Thus, in the interests of judicial economy, limiting expense, and speeding resolution, Plaintiffs' respectfully ask the Court to adopt their proposal to sequence discovery to focus first on fair use, which is the central issue of liability.

Courts presiding over matters involving similar copyright infringement claims have acknowledged the centrality of the fair use defense and the wisdom in accelerating its resolution. For example, in a putative class action that authors filed against Meta for allegedly using their literary works to train an AI model, the court summarized an analogous scenario warranting expedited motion practice regarding "fair use":

> Based on previous filings, the Court has been under the impression that there's no real dispute about whether Meta fed copyrighted works to its AI programs without authorization, and that the only real legal question to be presented at summary judgment is whether doing so constituted "fair use" within the meaning of copyright law. If that's correct, it's difficult to understand why adjudication of that issue at summary judgment should be delayed[.]

*Kadrey et al v. Meta Platforms, Inc.*, Case No. 3:23-cv-03417-VC, ECF 74 (N.D. Cal. Sept. 18, 2024).[1]  So too here: there is no real dispute regarding whether Suno copied and utilized Plaintiffs' copyrighted work, so judicial economy and efficiency considerations counsel in favor of first focusing discovery and motion practice on "fair use."

This is an archetypal case for bifurcation of discovery.  The four fair use factors—(1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the work used; and (4) the effect of the use on the potential market for or value of the copyrighted work—require inquiry into matters that are largely distinct from areas that necessitate more burdensome and costly discovery.  To the extent there is potential overlap between fair use discovery and other issues in the case, such as damages, that does not counsel against bifurcation, and Defendant's cited authority is not to the contrary.  Defendant cites two cases for the proposition that bifurcation is inappropriate where there is overlap between the issues to be separated, but those cases discuss the propriety of bifurcation in the context of requests for separate trials.  *See Mellor v. JetBlue Airways Corp.*, 2023 WL 8653730, at *1 (D. Mass. Dec. 14, 2023) (resolving motion to bifurcate trial of liability and damages); *Momenta Pharms., Inc. v. Amphastar Pharms., Inc.*, 2017 WL 2818985, at *1 (D. Mass. June 29, 2017) (resolving request to address equitable defenses in a separate hearing after trial).  Plaintiffs here do not propose circumscribing the issues to be heard at trial; rather, they seek only that discovery be sequenced to

---

[1] Other courts have recognized that fair use is the type of discrete issue that is appropriate for bifurcated discovery and expedited resolution.  *See, e.g., OSHO Int'l Found. v. Chapman Way*, 2019 WL 12379558, at *2 (C.D. Cal. Sept. 11, 2019) (granting request for bifurcation where "Defendants' liability for copyright infringement relies on a determination of whether Defendants' use is protected under the fair use doctrine"); *see also Nook Industries, Inc. v. Barnes & Noble, Inc.*, 2011 WL 486157, at *2 (N.D. Oh. Feb. 7, 2011) (ordering bifurcated discovery of liability and damages in copyright infringement case to "promote judicial economy and efficiency, particularly because . . . if Plaintiff's claims do not withstand scrutiny at the dispositive motion stage, discovery relating to damages would be unnecessary").

tee up the core issue in the case as fast as possible for summary judgment.  Assuming the Court rules against the application of fair use, the parties will remain able to use relevant information disclosed during the first phase of discovery for any relevant purpose.

The impetus for Plaintiffs' bifurcation proposal is to resolve this matter as efficiently as possible, without getting sidetracked by Defendant's attempts to prolong the proceedings and delay the production of critical evidence.  While Defendant claims to have "serious doubts about Plaintiffs' ability to prove that they own every work in suit," there can be no serious dispute that Plaintiffs hold rights in the vast majority of the sound recordings asserted in the Complaint. Notwithstanding the supposed legal questions Defendant apparently intends to raise as to the ownership of particular works, the question of fair use indisputably remains for the numerous recordings for which there is no colorable basis to contest ownership.  In fact, the number of asserted works is likely to grow substantially, as Defendant has acknowledged that Plaintiffs "do[ ] not know what particular works are or *are not* among its voluminous training data."  Because this information is uniquely within Defendant's control, Plaintiffs have indicated their intent to amend their pleading "to provide an expanded list of works that Suno has infringed" once they learn the full scope of Defendant's infringing conduct.  Complaint (ECF No. 1) ¶ 27.

This reality underscores the efficiencies to be gained from Plaintiffs' bifurcation proposal, as discovery into Plaintiffs' ownership of each and every asserted work at the outset would undoubtedly require a significant undertaking involving voluminous materials that would be rendered entirely unnecessary by a finding of fair use in the Defendant's favor.  *See Shamraev v. Tiktok Inc*., 2022 WL 17882129, at *3 (C.D. Cal. Oct. 12, 2022) (bifurcating discovery into liability and damages phases in copyright infringement suit where "damages discovery will be particularly burdensome given the nature and scope of the alleged violation").  Plaintiffs, of course,

intend to carry their burden on the elements of their asserted claims, but it would be inefficient and inexpedient to undertake such burdensome discovery when a more limited set of discovery in the first instance might fully dispose of the case.  Though Defendant attempts to paint these as "one-sided 'efficiencies,'" that is not the case.  It would require significant resources on the part of both parties, as well as the Court, if Defendant seriously intends to cast doubt on the ownership of "every work in suit."  Bifurcation will decrease the burdens of both offensive and defensive discovery for all.

In conclusion, the contrast between the two proposals in this case lays bare exactly why bifurcation is appropriate here.  Plaintiffs' proposal reflects that key elements of Defendant's liability are not in dispute, and it prioritizes discovery and adjudication of the most significant outstanding issue, which can be accomplished in accelerated fashion.  Defendant's proposal would require both sides to spend significant amounts of time and money on discovery that would only be required if Defendant's fair use defense is rejected.  It would be a waste of the parties' and the Court's resources to engage in costly discovery into issues, including but not limited to Plaintiffs' extensive damages claims, that could be mooted by a finding of fair use.  The Court should thus accept Plaintiffs' proposal to bifurcate discovery and structure the case to tee up the dispositive issue in the case by the spring of next year.

### 2.  Defendant's Position

Bifurcation is "the exception and not the rule."  *Hewlett-Packard Co. v. Genrad, Inc.*, 882 F. Supp. 1141, 1158 (D. Mass. 1995); *see also Abbott Biotechnology Ltd. v. Centocor Ortho Biotech, Inc.*, 55 F. Supp. 3d 221, 223 (D. Mass. 2014) (Saylor, J.) (same).  Plaintiffs' proposal here is both unprecedented and unjustified.  There are several dozen currently pending cases asserting copyright claims against AI companies and Plaintiffs' proposed schedule tracks none of

5

them.  *Compare, e.g.*, *New York Times v. Microsoft*, No. 23-cv-08292, Dkt. Nos. 112, 243 (S.D.N.Y. Jan. 31, 2024); *Lehrman v. Lovo, Inc.*, No. 24-cv-03770, Dkt. Nos. 21, 24 (S.D.N.Y. Aug. 12, 2024).  Plaintiffs' schedule instead proposes bifurcating Suno's fair use defense, and then affords the parties meaningfully less time to litigate the case to summary judgment than courts have allowed in analogous cases.  *Compare id.*  And it does so without good cause.  That is why a court in the Southern District of New York overseeing a similar suit by the same Plaintiffs, represented by the same law firm, against a different music generative AI company **rejected the exact same bifurcation proposal that Plaintiffs offer here.**  *See UMG Recordings et al. v. Uncharted Labs, Inc., d/b/a Udio.com et al.*, No. 24-cv-04777, Dkt. No. 39, 8/21/24 Hr'g Tr. at 15:14-18 (S.D.N.Y. filed June 24, 2024) (Hellerstein, J.: "It's not a good use of time.  It's not efficient.  In order for me to make any intelligent rulings, I'll need a longer perspective than just an abstract issue of fair use.  So we're not going to have a limitation in discovery.").

To be clear: no court overseeing the three dozen or so AI-related copyright cases pending across the country has bifurcated a defendant's fair use defense from the remainder of the case. Despite Plaintiffs' misleading framing, the Northern District of California court in *Kadrey* did *not* bifurcate Meta's fair use defense.  To the contrary, in fact, counsel for Meta has now twice confirmed that its summary judgment motion, which will be filed after the close of discovery into all merits issues in the case, is likely to cover topics beyond fair use.  *Kadrey v. Meta Platforms, Inc.*, No. 23-cv-03417, Dkt. No. 177, 9/20/24 Hr'g Tr. at 41:23-42:3, 43:8-44:4 & Dkt. No. 214 (N.D. Cal. filed July 7, 2023).   Nor has *Kadrey's* progress to summary judgment been "expedited"—the fact discovery deadline in that case was recently extended to 526 days after the filing of the complaint (*id.* Dkt. No. 211)—a vastly longer discovery period than Suno is proposing here.  *See infra* at 10–11.

Precedent aside and considering the substance alone, Plaintiffs' proposal is inequitable, inefficient, and prejudicial. Plaintiffs ask the Court to effectively assume liability and allow them to skip discovery into all of the threshold matters over which *they* bear the burden of proof, and proceed straight to resolution of a single asserted defense of *Plaintiffs'* choosing. Plaintiffs do not explain why they should be permitted to unilaterally dictate how Suno defends itself in this litigation by selecting one affirmative defense, from among several that Suno has asserted, for early resolution. *See* Dkt. No. 28 (asserting eleven defenses, including copyright misuse and unclean hands). As Suno's Answer makes clear, fair use is just one of a number of asserted defenses that have the potential to materially impact the outcome of this litigation. A copyright misuse finding, for example, would preclude Plaintiffs entirely from asserting their copyrights during the entire period of misuse. *See* Dkt. No. 28; *see also Prac. Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 520 n.9 (9th Cir. 1997). This defense (as well as the several others Suno has pleaded) will therefore significantly influence this litigation, including its potential for its settlement. *See* Scheduling Order (Dkt. No. 38-1); *see also* D. Mass. L.R. 26.3. Plaintiffs are simply incorrect that resolution of Suno's fair use alone would "fully dispose of the case." *Supra* at 5.

At bottom, Plaintiffs' proposed schedule—which denies Suno discovery into all but one of its affirmative defenses for the first year of the litigation—would disrupt the balance of the adversarial process and prejudice Suno's ability to control its defense. Notably, the primary case Plaintiffs cite in support of their proposal is one in which bifurcation was requested by the *defendants*—and, in that case, the court merely bifurcated *damages* from liability (including all asserted defenses), *not* a particular defense from the entirety of the case. *See Shamraev v. TikTok Inc.*, No. 22-cv-1811, 2022 WL 17882129, at *1–2 (C.D. Cal. Oct. 12, 2022). None of the cases

Plaintiffs cite "recognize[s] that fair use is the type of discrete issue that is appropriate for bifurcated discovery."[2] *Supra* at 3 n.1.

Plaintiffs offer no compelling reason for why the Court should bifurcate Suno's fair use defense over its objection. *See Abbott Biotechnology Ltd.*, 55 F. Supp. 3d at 223 (denying motion for bifurcation where the defendant failed to show any "unique" circumstances or "compelling need" that would trigger an exception to the normal procedures). Plaintiffs cannot show that their proposed bifurcation would further "convenience, avoid prejudice, or expedite and economize" the proceedings. *Echavarria v. Roach*, No. 16-cv-11118-ADB, 2022 WL 279609, at *1 (D. Mass. Jan. 31, 2022) (quoting Fed. R. Civ. P. 42(b)) (cleaned up). In fact, Plaintiffs identify no meaningful economies to be gained from bifurcation beyond simply delaying Plaintiffs' obligation to establish the prima facie elements of their infringement claims—namely, showing that they own each of the works at issue, and that each of the asserted works was in fact copied. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) ("To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original"). And, in this case in particular, Suno has serious doubts about Plaintiffs' ability to prove that they own every work in suit (a task the RIAA itself called "a legal abyss of uncertainty," *Comments of RIAA in the Matter of Federal Copyright Protection of Sound Recordings Fixed Before February 15, 1972*, at 5)—particularly given the complexities that result from the manner in which the Classics Act, 17 U.S.C. § 1401, which governs pre-1972 sound

---

[2] The other two cases Plaintiffs cite similarly bifurcated copyright liability from copyright damages. *See OSHO Int'l Found. v. Chapman Way*, No. 19-cv-00753, 2019 WL 12379558, at *1 (C.D. Cal. Sept. 11, 2019) (granting *the defendants'* motion to bifurcate liability and damages discovery), and *Nook Indus., Inc. v. Barnes & Noble, Inc.*, No. 10-cv-265, 2011 WL 486157, at *2 (N.D. Oh. Feb. 7, 2011) (granting *the defendants'* motion to bifurcate liability and damages discovery, with no mention of fair use at all).

recordings, has been incorporated into state law.  Further, contrary to Plaintiffs' representations, Suno has not admitted that each of Plaintiffs' asserted works are in its training data.  As counsel for Suno has repeatedly explained to Plaintiffs' counsel, while Suno does not contest the *possibility* that Plaintiffs' asserted works may be among the millions of sound recordings its model was trained on given the breadth of Plaintiffs' catalogs, it certainly does not know what particular works are or *are not* among its voluminous training data.  Plaintiffs should be held to the burden of proof on each element of their copyright infringement claims.  Plaintiffs cite no case that supports their request to simply bypass the prima facie elements of their copyright claims merely because proving them up would be a "significant undertaking" (*supra* at 4).

Plaintiffs' plan is also inefficient.  Given the significant overlap in discovery between and among Plaintiffs' direct infringement claim and Suno's defenses, Plaintiffs' plan runs the risk of leading to disputes regarding the appropriate scope of discovery at each proposed phase.  *See, e.g.*, *Mellor v. JetBlue Airways Corp.*, No. 21-cv-10319-IT, 2023 WL 8653730, at *2 (D. Mass. Dec. 14, 2023) ("Generally, bifurcation is disfavored in cases where 'there is a distinct possibility' that issues . . . will overlap'" (internal citation omitted)); *Momenta Pharms., Inc. v. Amphastar Pharms., Inc.*, No. 11-cv-11681-NMG, 2017 WL 2818985, at *1–2 (D. Mass. June 29, 2017) (bifurcation is warranted where claims and defenses "are distinct and without commonality either as claims or in a relation to the underlying fact issues" but not "when there is overlapping of evidence on all issues"; denying the plaintiffs' motion).  For example, both Plaintiffs' direct infringement claim and factor one Suno's fair use defense will require discovery into the design and technical specifications of Suno's generative AI tool.  For Plaintiffs, this information may shed light on whether Suno actually copied any of the asserted works, whereas for Suno it will be relevant to whether any use of the asserted works was transformative—factor one of the fair use

defense.  17 U.S.C. § 107; *see also, e.g.*, *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 29–31 (2021) (explaining that the "purpose or character of the use" includes a determination of whether the "purpose and character" of any copying was transformative).  In addition, discovery into Plaintiffs' licensing practices, including whether Plaintiffs have licensed their works as training data for generative AI models—and if not, why—will likely be necessary for multiple disputed issues. This discovery will not only be relevant to whether Suno's alleged use has had an effect on the market for such licensing—factor four of the fair use defense (*see Google*, 593 U.S. at 38)—but also to Plaintiffs' claim for damages and to Suno's copyright misuse defense.

The Court should reject Plaintiffs' plan and adopt Suno's proposed schedule, which aligns with the schedules of other generative AI cases across the country, each of which requires similarly complex technical discovery.  In fact, Suno's schedule has a similar pacing to what Plaintiffs ultimately agreed to in the Southern District of New York[3]—that is, after that court rejected Plaintiffs' bifurcation proposal.  And Suno's schedule proposes a *faster* timeline than that of many other AI cases—under a year from the June 24, 2024 filing of the complaint and the proposed close of fact discovery.  *Compare* Suno's Proposed Deadlines (fact discovery completion deadline 345 days after filing of complaint), *with Kadrey v. Meta Platforms, Inc.*, No. 23-cv-03417, Dkt. Nos. 87, 211 (N.D. Cal. Jan. 23, 2024) (fact discovery completion initial deadline of 452 days after filing of complaint and extended deadline of 526 days after filing of complaint), *and Doe 1 v. GitHub, Inc.*, No. 22-cv-06823, Dkt. No. 130 (N.D. Cal. July 11, 2023) (fact discovery completion deadline 478 days after filing of complaint), *and Lehrman v. Lovo, Inc.*, No. 24-cv-03770, Dkt.

---

[3] *Compare UMG Recordings et al. v. Uncharted Labs, Inc., d/b/a Udio.com et al.*, No. 24-cv-04777, Dkt. No. 43 (S.D.N.Y. Aug. 22, 2024) (close of fact discovery—with the exception of depositions and third-party discovery—April 18, 2025), *with* Exhibit B (close of fact discovery—*including depositions* and third-party discovery—June 3, 2025, 46 days after April 18, 2025).

No. 21 (S.D.N.Y. Aug. 12, 2024) (fact discovery completion deadline 411 days after filing of complaint), *and Shaffer v. Boston Sci. Corp.*, No. 21-cv-12136-FDS, Dkt. Nos. 1, 26 (D. Mass. Dec. 20, 2022) (fact discovery completion deadline 459 days after filing of complaint).  Suno respectfully requests that the Court adopt its proposed schedule.

## II.   PROPOSED PROTECTIVE ORDER

The parties agree on substantial portions of the protective order; however, material disputes remain with respect to the following provisions.  Reflecting these disputes, Plaintiffs' proposed protective order is attached as **Exhibit C**, and Defendant's proposed protective order is attached as **Exhibit D**.

### *Disputed Provisions*

### A.  Provision Regarding a Potential Protocol for Inspection of Source Code

#### 1.  Plaintiffs' Position

Defendant proposes including a paragraph stating, "The Parties will separately negotiate a protocol for the inspection of source code . . . to the extent such a protocol becomes necessary." *See* Ex. D ¶ 7.  Plaintiffs oppose the inclusion of Defendant's proposed paragraph regarding a source code protocol because they cannot agree that they will negotiate such a protocol without having any understanding of what that protocol would include.  Moreover, Plaintiffs object to any attempt by Defendant to use the absence of such a protocol as the basis for avoiding or delaying permissible discovery.  Evidencing Plaintiffs' concern, Defendant has already indicated in response to Plaintiffs' first set of request for production an intent to withhold certain information relating to the operation of its AI service, including the source code that underpins various iterations of its AI model.  Still, both sides recognize that the claims at issue necessitate inspection of Defendant's source code to understand the inner workings of its service and AI model (indeed,

Defendant proposed the inclusion of a special confidentiality designation for such material in the protective order), and Defendant could have made any specific proposals in that regard prior to this submission.

### 2. Defendant's Position

Suno's Protective Order proposes that the Parties commit to negotiate in good faith a protocol governing the inspection of source code.  *See* Proposed Protective Order Ex. D ¶ 7. Suno's source code is among its most highly confidential and sensitive assets.  Prior to any inspection of Suno's source code, the Parties will need to agree upon protocols that ensure that the inspection is conducted in a secure manner that is carefully designed to prevent any intentional or accidental disclosure of code.

However, at this early stage of the litigation, when the parties have only just begun exchanging discovery positions and it is not yet clear what exact source code materials Suno will be obligated to produce, it is premature to set parameters governing source code inspection.  How any disputes are resolved may significantly affect the terms of the source code inspection protocol, including such technical terms as what software should be loaded onto the source code review computer and how many pages of physical printouts might be appropriate in relation to the overall volume of code.  Suno commits to begin discussions with Plaintiffs' counsel regarding an appropriate inspection protocol once the Parties have a meeting of the minds on what, exactly, is being inspected—and its proposed Protective Order captures that commitment.

### B. Limitations on In-House Counsel Who May Receive Highly Confidential Information

### 1. Plaintiffs' Position

To balance the complexity and volume of information likely to be produced in this matter with the parties' interests in protecting their competitively sensitive information, Plaintiffs propose

that the parties be allowed to disclose "Highly Confidential Information" to up to five (5) designated in-house attorneys to whom disclosure is reasonably necessary for this litigation, provided such person has first executed the agreed-upon non-disclosure agreement annexed to the protective order.  Ex. C ¶ 13(b).  Defendant, by contrast, would restrict this number to just two (2) in-house attorneys, provided that such attorneys do not have any role in "Competitive Decision-Making."  Defendant defines "Competitive Decision-Making" to include, among other things,

> the action or process of making a business decision or resolving a non-legal question relating to a competitor, potential competitor, licensee, distribution partner, artist, or other business partner regarding licensing, contracts, marketing, pricing, product or service, development or design, research and development, mergers and acquisitions, acquisition, funding, or enforcement of intellectual property.

Ex. D ¶ 14 n.1.

Defendant's attempt to exclude in-house attorneys involved in what it terms "Competitive Decision-Making" from reviewing protected materials is plainly designed for the actual purpose of hindering Plaintiffs' ability to prosecute this litigation.  Indeed, Defendant's broad definition— which encompasses Plaintiffs' routine business activities—effectively sweeps in most, if not all, of Plaintiffs' in-house attorneys and would bar them from reviewing the protected material.  Thus, Defendant's proposal is unworkable, as it risks blocking in-house attorneys managing this litigation from reviewing information critical to the claims asserted in this case and would arbitrarily handcuff their ability to manage the litigation.

Defendant's proposed restriction is also unnecessary.  Defendant argues that sharing Highly Confidential Information with Plaintiffs' in-house counsel risks competitive harm, but this is speculative and unfounded.  Under both parties' proposals, any in-house attorney reviewing protected material would first need to agree to be bound by the express limitations on how those

materials may be used—i.e., "solely for the prosecution or defense of this action and not for any other purpose." Ex. C. ¶ 1. This use restriction guards against the supposed harm of which Defendant is concerned, as Plaintiffs are expressly prohibited from utilizing Protected Discovery Material as part of any non-legal, business decision divorced from this case. There is no merit to Defendant's suggestion that Plaintiffs' designated in-house counsel would simply disregard these obligations. Moreover, under Plaintiffs' proposal, the parties still would only be permitted to share Highly Confidential Information with attorneys "reasonably necessary" for the prosecution of this litigation.

The Court should thus accept Plaintiffs' proposal regarding in-house counsel's access to Highly Confidential Information.

### 2. Defendant's Position

Suno's Protective Order proposes a two-tier confidentiality structure that, even under the highest confidentiality tier, allows two designated in-house attorneys for each party to view the most sensitive information in the case.[4] *See* Proposed Protective Order Ex. D ¶ 14(b). The only limitation Suno places on such disclosure is that designated in-house attorneys not be involved in "Competitive Decision-Making"—*i.e.*, core business decisions in which the opposing party's confidential information could be leveraged, even inadvertently, to gain competitive or commercial advantage. *See id.* This safeguard is critical to maintaining the competitive integrity of the parties. *See W.N. Motors, Inc. v. Nissan N. Am., Inc.*, No. 21-cv-11266-ADB, 2022 WL 1568443, at *2 (D. Mass. May 18, 2022) (noting the "propriety of issuing protective orders to limit" the disclosure of sensitive information among competitors and collecting cases). The

---

[4] The Parties agree, however, that such in-house attorneys may not view "Highly Confidential – Source Code." *See* Proposed Protective Order Exs. C ¶ 13(b) & D ¶ 14(b).

Protective Order's limitation on scope of use is not alone sufficient.  Once someone with adverse business interests learns of another's highly confidential information, he or she cannot simply "forget" that information—the bell cannot be unrung.  *See Trs. of Boston Univ. v. Everlight Elecs. Co., Ltd.*, No. 12-cv-11935-PBS, Dkt. No. 636 at 7–8 (D. Mass. July 8, 2014) ("Although the Court does not question [the plaintiff's employee's] intentions, it nonetheless question[s] his human ability during future years of research to separate the applications he has extrapolated from [Defendants'] documents from those he develops from his own ideas.'" (citation omitted)); *see also Anderson News, L.L.C. v. Am. Media, Inc.*, No. 09-cv-2227, 2014 WL 129046, at * 1 (S.D.N.Y. Jan. 14, 2014) ("Once privileged information is given to a competitor . . . the damage is already done).  In fact, courts have recognized that the risk of inadvertent disclosure is higher for in-house counsel than outside counsel because compartmentalization of protected information is "a feat beyond the compass of ordinary minds" and "an individual cannot rid himself of the knowledge he has gained; he cannot perform a prefrontal lobotomy on himself."  *F.T.C. v. Advoc. Health Care Network*, 162 F. Supp. 3d 666, 669–70 (N.D. Ill. 2016) (citations and quotation marks omitted).

This risk is not merely theoretical given the types of discovery likely to be exchanged in this case.  For instance, in the probable event that a party in this case discloses information about its licensing practices or confidential deal terms, under Plaintiffs' proposal, a designated in-house counsel that negotiates the other party's licenses could view that material.  This would create unfair information asymmetries in potential future negotiations.  Similarly, under Plaintiffs' proposal, a designated in-house attorney involved in product development could access Suno's most sensitive product design plans and technical specifications.

Courts in this Circuit have recognized the harm that can result from disclosure of highly sensitive information to in-house attorneys with competitive decision-making power, and have resolved that risk of harm—as Suno's proposal does—by excluding such individuals from scope of access. *See L.L. Bean, Inc. v. Bank of Am. Corp*., No. 08-cv-177-PH, 2009 WL 10730643, at *4 (D. Me. Aug. 20, 2009) (denying access to highly confidential documents for in-house counsel who may have been involved in competitive decision making); *see also Voice Domain Techs., LLC v. Apple, Inc.*, No. 13-cv-40138-TSH, 2014 WL 5106413, at *4–5 (D. Mass. Oct. 8, 2014) (excluding the plaintiff's sole employee from accessing highly sensitive material because, as a competitive decision maker, he was "especially situated to take positions directly harmful and antagonistic" to the defendant (internal quotations omitted)).  Plaintiffs' concern that Suno's proposal would hinder Plaintiffs' ability to prosecute this litigation is overblown.  *See supra* at X. Plaintiffs notably do not represent that there is no in-house attorney at each record label that would meet Suno's proposed criteria for access.  And, regardless, courts have recognized that in-house counsel can still effectively manage litigation without access to highly confidential information. *See F.T.C. v. Sysco Corp*., 83 F. Supp. 3d 1, 4 (D.D.C. 2015) (noting in-house counsel was "still able to assist outside counsel and advise [his employer] on litigation strategy" even though he was not permitted to access opposing party's highly confidential information).

## C.  Advance Disclosure of Experts Who Receive Highly Confidential Information

### 1.  Plaintiffs' Position[5]

As an end-run around the Federal Rules' expert disclosure provisions, Defendant proposes that a party who seeks to disclose to a testifying or consulting expert any Highly Confidential

---

[5] The parties agreed to a schedule for the drafting of this Joint Statement requiring that initial position statements regarding the disputed issues would be jointly exchanged at 5 p.m. (ET) on

Information must first disclose the identity of the expert who is to receive such information and provide an opportunity for the opposing party to object to such disclosure. *See* Ex. D ¶ 16. The party disclosing the expert would also need to provide "a list of all other cases in which the witness testified as an expert at trial or by deposition during the previous four (4) years." *Id.* This procedure would operate as a one-way mechanism for Defendant to obtain early disclosure of and discovery regarding Plaintiffs' experts. Though Defendant frames this as a "marginal litigation disadvantage," it hardly can be considered such given the importance of expert testimony in this case.

By way of example, Defendant is certain to produce source code (designated Highly Confidential under both parties' proposed protective orders) that will require of expert analysis. But, under Defendant's proposal, only Plaintiffs would have to disclose their source code expert, while Defendant would be free to withhold the identity of any such expert of their own to whom they could voluntarily disclose the same Highly Confidential Information. Given the level of technical complexity inherent to this case, the same issue is likely to repeat itself with respect to experts the Plaintiffs may retain to analyze specific aspects of Defendant's AI model. These experts would need to be disclosed to Defendant regardless of whether they have *any* business interests, competing or not. Moreover, Plaintiffs would need to identify and disclose the experts

---

October 8 and that the parties would then be able to incorporate revisions to address the other sides' arguments prior to a final exchange at 3:30 p.m. (ET) on October 9. Though both sides provided their initial exchanges in a timely manner, Defendant did not provide its final exchange until 3:51 p.m. (ET). Then, at 5:30 p.m. (ET)—just 30 minutes prior to the Court's filing deadline—Defendant provided a further revised draft of its position, incorporating further substantive edits responding to Plaintiffs' position. When Plaintiffs stated that they would not incorporate those edits given that they fell outside the agreed-upon schedule and would require a further response, Defendant refused to provide consent to file this Joint Statement unless it was permitted to add a footnote, *see infra* note 7, complaining about its inability to make further substantive edits after the final exchange.

even if they were only operating in a consulting role.  This directly impedes on well-enshrined protections against discovery into consulting experts.  *See Doe v. Lahey Health Sys., Inc.*, 2020 WL 13561720, at *6 (D. Mass. Aug. 12, 2020) ("[C]ourts typically find that a party may not discover the identity of, facts known by, or opinions held by an informally consulted expert."); *see also Petrosyan v. Maserati N. Am., Inc.,* 2021 WL 9649730, at *2 (D. Mass. Feb. 17, 2021) ("Petrosyan has not cited to any authority requiring MNA to disclose the identity of its consulting experts.").  The Court should not sanction a procedure that, as a practical matter, stands to provide one party the advantage of one-way discovery, not otherwise available under the Federal Rules of Civil Procedure, at the other's expense.

To the extent that Defendant has any legitimate concern about competitive harm, that is adequately addressed by other provisions in the protective order.  Again, any such expert would first need to agree to use protected material "solely for the prosecution or defense of this action and not for any other purpose."  Ex. C ¶ 1.  They would also need to agree that they would not use protected material "for any business, commercial, or competitive purpose."  *Id.* ¶ 17.  Those protections, coupled with the potential sanction of being held in contempt of court, are significant and are routinely relied on by courts.[6]

### 2.  Defendant's Position

Suno's Protective Order proposes a provision that requires a party to identify any expert that it wishes to show another party's "Highly Confidential – Attorneys' Eyes Only" or "Highly Confidential – Source Code," and provide the opposing party opportunity to object before such

---

[6] Plaintiffs would also be amenable to the inclusion of language requiring any expert to attest that they are not presently employed by a direct competitor to the producing party.  Again, such a step would further any legitimate purpose underlying Defendant's proposal without disproportionately prejudicing Plaintiffs.

highly confidential material may be disclosed to the expert.  *See* Proposed Protective Order Ex. D ¶ 16.  Plaintiffs' proposal would instead allow for the disclosure of highly confidential information to an expert without the other party's knowledge—let alone ability to object prior to the disclosure. That will not work.  The Parties must be able to evaluate whether an expert might have an affiliation with a competitor prior to their business-sensitive information being disclosed.  "Courts have recognized the propriety of issuing protective orders to limit the disclosure of such sensitive commercial information among competitors."  *W.N. Motors*, 2022 WL 1568443, at *2.

Suno's proposal protects both Parties from the disclosure of highly confidential information to an expert who may have meaningful competitive or business interests adverse to the producing party.  A potential artificial intelligence expert could be an employee or consultant or otherwise be involved with one of Suno's competitors.  Suno anticipates that it may be required to produce some of its most closely guarded proprietary technical information during this litigation.  The disclosure of such information to an expert with an interest in a competitor would expose Suno to significant harm.  Likewise, a potential music-industry expert might be an employee or consultant of a record label or distributor that might compete with Plaintiffs.  Surely Plaintiffs would be equally harmed were Suno to hand over their most highly confidential information to such a competitor.  Plaintiffs attempt to minimize these harms by pointing to use limitations provided in the Protective Order, but these limitations are insufficient: just as outside counsel cannot unsee highly confidential information they may be exposed to through this litigation, *see supra*, neither can experts.  Any marginal litigation disadvantage flowing from the "early" disclosure of experts is substantially outweighed by the risk of competitive harm to both litigants should the Court adopt Plaintiffs' proposal.  And such disclosure would not "impede[]

on" work product protections, as Plaintiffs claim: under Suno's proposal, only the identity of the expert would be disclosed, not that expert's work product.[7]

## III.   **ELECTRONICALLY STORED INFORMATION**

The parties agree on substantially all of the ESI protocol, except for a single provision relating to the logging of attorney-client communications that post-date the filing of the complaint on a privilege log.  Plaintiffs' version of the proposed ESI protocol order is attached as **Exhibit E**; Defendant's version of the proposed ESI protocol is attached as **Exhibit F**.

### 1.   **Plaintiffs' Position**

Plaintiffs propose that privileged communications involving a party's counsel that post-date the filing of the complaint need not be placed on a privilege log.  Ex. E ¶ 17.  This is a routine provision that permits the parties to avoid the burden and expense of having to catalog privileged communications that that are temporally disconnected from the events that form the basis of the parties' claims and defenses.

Defendant's only objection to this provision is a non-specific concern regarding the possibility of unilateral privilege decisions that cannot be vetted via a privilege log.  However, this articulated concern does not counsel in favor of imposing the substantial burden of logging ongoing privileged communications with counsel in complex litigation of this sort.  The reason parties generally agree not to log such communications is because there is a reasonable presumption that the privilege applies and an understanding that any disclosure of such information, even though limited, may still intrude on work product protection.  Defendant supplies no reason to believe that this case differs from those norms.

---

[7] At 3:33 pm ET on the day of the filing Plaintiffs changed their joint statement to no longer reference "work product," added the new authority they cite above, and refused to accept Suno's discussion of that authority or competing authority.

Because the burden of logging privileged communications post-dating the complaint is disproportionate to the needs of the case, the production of such information is exceedingly unlikely to yield discoverable information, and any such disclosure may impinge on protected work product, Plaintiffs respectfully ask that the Court adopts their proposed ESI protocol.

### 2.   Defendant's Position

Suno advocates for a provision in the ESI protocol that requires the Parties to list all documents that would have been produced but are being withheld on the basis of attorney-client privilege or work product protection on the privilege log.  Under Plaintiffs' proposed approach, privileged communications "involving a party's counsel" that "post-date the filing of the complaint need not be placed on a privilege log."  However, Plaintiffs do not appear to dispute that relevant and responsive documents may post-date the filing of the complaint, nor that they would be required to produce such documents.  Plaintiffs' position would therefore allow a party to unilaterally decide that a responsive document that post-dates the filing of the complaint should be withheld on the basis of privilege, without having to log that document in its privilege log and, therefore, without giving the opposing party an opportunity to review and challenge its privilege decisions.[8]  Privilege logs exist to allow such review.  *See, e.g.*, *In re Grand Jury Subpoena*, 274 F.3d 563, 575 (1st Cir. 2001) (noting that Rule 45(2) requires a party resisting disclosure to produce a document index or privilege log); *Neelon v. Kruger*, No. 12-cv-11198-IT, 2015 WL 1037992, at *3 (D. Mass. Mar. 10, 2015) (noting that privilege logs must "provide information sufficient to judge whether the undisclosed documents satisfy each element required for

---

[8] Indeed, the breadth of the carve out Plaintiffs propose—communications "involving a party's counsel"—indicates that the Parties may have distinct views on the appropriate scope of the attorney-client privilege.

protection" (citation and quotation marks omitted)).   Because the scope of discovery extends beyond the date of the filing of the complaint, the scope of the privilege logs must as well.

IV.   **LOCAL RULE 16.1 TOPICS**

      **1.   Consent to trial by magistrate judge**

The parties do not consent to trial by magistrate judge.

      **2.   Filing of motions**

The parties do not request a departure from the Court's rules on motions at this time.

      **3.   Certifications**

The certifications required under Local Rule 16.1(d)(3) are attached hereto as **Exhibit G** and **Exhibit H**.

Dated: October 9, 2024

Respectfully submitted,

*s/* Rajan S. Trehan
Moez M. Kaba (*pro hac vice*)
Mariah N. Rivera (*pro hac vice*)
Alexander R. Perry (*pro hac vice*)
**HUESTON HENNIGAN LLP**
1 Little West 12th Street
New York, New York 10014
Telephone: (646) 930-4046
Facsimile: (888) 775-0898
mkaba@hueston.com
mrivera@hueston.com
aperry@hueston.com

Robert N. Klieger (*pro hac vice*)
Rajan S. Trehan (*pro hac vice*)
**HUESTON HENNIGAN LLP**
523 West 6th Street, Suite 400
Los Angeles, California 90014
Telephone: (213) 788-4340
Facsimile: (888) 775-0898
rklieger@hueston.com
rtrehan@hueston.com

Daniel J. Cloherty
Alexandra Arnold
**CLOHERTY & STEINBERG LLP**
One Financial Center, Suite 1120
Boston, Massachusetts 02110
Telephone: (617) 481-0160
Facsimile: (617) 848-0830
dcloherty@clohertysteinberg.com
aarnold@clohertysteinberg.com

*Counsel for Plaintiffs*

*s/* Brittany N. Lovejoy
Steven N. Feldman (*pro hac vice*)
Nathan Taylor (*pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
steve.feldman@lw.com
nathan.taylor@lw.com

Andrew M. Gass (*pro hac vice*)
Brittany N. Lovejoy (*pro hac vice*)
**LATHAM & WATKINS LLP**
505 Montgomery Street
Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
andrew.gass@lw.com
brittany.lovejoy@lw.com

Sarang V. Damle (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
sy.damle@lw.com

*Counsel for Defendant Suno, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those identified as non-registered participants on October 9, 2024.

*/s/ Rajan S. Trehan___*