**Britt Lovejoy**
Direct Dial: +1.415.646.8329
britt.lovejoy@lw.com

505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Tel: +1.415.391.0600  Fax: +1.415.395.8095
www.lw.com

## LATHAM & WATKINS LLP

| | |
|---|---|
| FIRM / AFFILIATE OFFICES | |
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Silicon Valley |
| Hong Kong | Singapore |
| Houston | Tel Aviv |
| London | Tokyo |
| Los Angeles | Washington, D.C. |
| Madrid | |

March 19, 2025

**<u>VIA CM/ECF</u>**

The Honorable Paul G. Levenson
United States District Court, District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 2300
Boston, Massachusetts 02210

Re: *UMG Recordings, Inc., et al. v. Suno, Inc., et al.*, No. 1:24-cv-11611-FDS (D. Mass)

Dear Judge Levenson:

Pursuant to this Court's Order, *see* Dkt. No. 69, the parties write jointly to inform the Court of a dispute related to Defendant Suno, Inc.'s ("Defendant" or "Suno") first set of Requests for Production ("RFPs").

Suno served these requests on Plaintiffs on September 13, 2024.  Plaintiffs served their Responses and Objections on October 14, 2024.  Though the parties met and conferred at length via videoconference and by email over the following months,[1] including following the February 14, 2025, conference before this Court, they are at an impasse as to the requests identified below.  This dispute is therefore ripe for Court intervention.

### <u>Suno's Opening Position</u>

#### *Preliminary Statement*

Suno is a cutting-edge company that allows individuals to create new music using a transformative artificial-intelligence tool.  By applying advanced neural network technology to vast amounts of data, Suno's tool is able to develop a deep understanding of various musical styles

---

[1] The parties first met and conferred concerning these requests via videoconference on October 22, 2024.  Following that meeting, the parties exchanged their positions via email on November 1 and 25, 2024, on January 14, 2025, and on February 5, 2025.  The parties conferenced with Judge Levenson on February 14, 2025, after which the Court ordered the parties to submit this joint letter outlining their respective positions on the discovery disputes for which they seek a ruling from the Court no later than March 19, 2025.  *See* Dkt. No. 69.  Following the conference, Suno provided an updated position statement on February 19, 2025.  In response, Plaintiffs provided updated position statements with respect to certain requests on February 21, 2025.  The parties then submitted a joint letter to the Court regarding the status of negotiations on February 21, 2025.  The Plaintiffs provided an updated proposal for agreements with provisions pertaining to sound recordings registered as works for hire on February 26, 2025.  Suno provided a response on March 4, 2025.

LATHAM&WATKINS LLP

and genres.  The tool draws on this understanding to respond to user prompts, empowering those users to create original songs in the style and genre they choose.  Developing a tool that promotes artistic, musical expression is a quintessential fair use under copyright doctrine.  *See* Answer, Dkt. No. 28, at 5.  Plaintiffs are a group of music labels that collectively controls a substantial amount of music recordings streamed, purchased, and listened to by U.S. consumers.  Plaintiffs allege that Suno's tool ingested some of their sound recordings—which Plaintiffs have identified in Exhibit A to their Complaint (the "Asserted Works")—during its training process, which they believe constitutes copyright infringement.  *See* Dkt. 1-2.

Throughout discovery, Suno has consistently demonstrated its commitment to advancing this litigation.  As part of this commitment, Suno agreed to provide extensive discovery, including allowing Plaintiffs to inspect its source code and training data.  The first of these inspections, of Suno's source code, has already taken place.  The data Plaintiffs have access to through these processes are among the most sensitive documents in Suno's possession and are highly sought after by Suno's competitors, as they are central to the development and operation of Suno's AI music-generation tool.  Suno nevertheless granted Plaintiffs access to this information in order to move this case forward.  But despite Suno's willingness to engage in comprehensive discovery, Plaintiffs continue to stonewall Suno's efforts to obtain the most basic and essential discovery related to the works Plaintiffs claim are infringed.

Suno's discovery requests seek to obtain basic information regarding Plaintiffs' Asserted Works.  Though Plaintiffs have agreed to provide some of the information Suno has requested, they have refused to provide responsive documents concerning the deposit copies of any of Plaintiffs' Asserted Works and agreements establishing Plaintiffs' ownership of Asserted Works that are works made for hire.  This information is crucial for determining (1) whether Plaintiffs own the works at the heart of their copyright case, and (2) what those works consist of.  Given the relevance and necessity of this information, Suno respectfully requests that the Court grant its motion to compel and require Plaintiffs to produce the requested information about the works-in-suit.

### *Discussion*

Suno seeks foundational discovery regarding the Asserted Works—i.e., the discrete works Plaintiffs asserted in this litigation, which are detailed in an Exhibit attached to Plaintiff's Complaint, see Dkt. No. 1-2 (listing each Asserted Work)—in order to establish that Plaintiffs own those works and to confirm what those works consist of.  Suno first served these RFPs in September 2024.  *See* Ex. A at 8-9 (Suno's RFPs).  In their responses and objections, during the parties' subsequent meet and confer, and in subsequent email communications, Plaintiffs repeatedly refused to respond to the RFPs as written.  Not only did Plaintiffs take the position that they should be permitted to *delay* their production of ownership-related information until after they have an opportunity to inspect Suno's training in an attempt to discover additional works, they also refused to produce certain categories of information Suno sought.  *See, e.g.*, Ex. B (A. Perry Nov. 25 email) (refusing to produce deposit copies, chain-of-title information, documents to show the dates of publication, or indexes for pre-1972 works).  Accordingly, pursuant to Judge Levenson's instruction at the parties' November 18, 2024 conference, Suno requested a conference with Judge Levenson to discuss this dispute.  *See* Ex. C (B. Lovejoy Jan. 30 email).

LATHAM&WATKINS LLP

The parties met with Judge Levenson on February 14, 2025. *See* Dkt. No. 64. During this conference, the Court rejected Plaintiffs' attempts to delay production of ownership information they had agreed to produce at some point, including copyright registration certificates and indexes. *See* Ex. D at 3:24-4:22 (Feb. 14 Hr'g Tr.). Following the conference, Plaintiffs therefore agreed to produce documents responsive to a number of Suno's requests. Ex. E (A. Perry Feb. 21 email). However, Plaintiffs still have refused to produce certain categories of ownership information—namely, the deposit copies for their Asserted Works and agreements that establish their ownership of Asserted Works whose registration information identifies them as works made for hire.[2] Plaintiffs' refusal is inconsistent with the burden they bear as copyright plaintiffs and should be rejected.

### 1. Deposit Copies

Plaintiffs have alleged that Suno infringed their copyright rights in the specific works identified in Exhibit A of their Complaint. *See* Dkt. No. 1-2. To establish infringement, Plaintiffs bear the prima facie burden of proving, for each of the works at issue, "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). In other words, if Plaintiffs cannot prove that they own "a valid copyright," their "suit for copyright infringement cannot go forward." *Nat'l Ctr. for Jewish Film, Inc. v. Goldman*, 943 F. Supp. 113, 119 (D. Mass. 1996); *see also, e.g.*, *Motta v. Samuel Weiser, Inc.*, 768 F.2d 481, 484 (1st Cir. 1985) (noting that "[i]t is beyond dispute that" copyright plaintiffs bear the burden of proving copyright ownership and affirming dismissal of case where the plaintiffs failed to do so); *Flo & Eddie, Inc. v. Sirius XM Radio Inc.*, 80 F. Supp. 3d 535, 543 (S.D.N.Y. 2015) ("A party alleging copyright infringement *always has to prove that he owns the copyright he is asserting*, it is an element of his claim!" (emphasis added)).

In order to determine whether Plaintiffs own any particular sound recording that they may find in Suno's training data, it is necessary to compare that alleged copy against the copyright-registered versions of the Asserted Works—as reflected in their respective deposit copies—i.e., the recordings submitted to the U.S. Copyright Office when the works were registered. *Cf. Structured Asset Sales, LLC v. Sheeran*, 120 F.4th 1066, 1075 (2d Cir. 2024) (affirming the district court's exclusion of evidence about anything outside "the four corners of the Deposit Copy"); *Morisky v. MMAS Research LLC*, No. 21-cv-1301, 2024 WL 4136492, at *8 (W.D. Wash. Aug. 20, 2024) (ordering production of deposit copy, finding that "[w]ithout providing the required discovery related to the copyright deposit and source code, [party] should not be permitted to purs[u]e copyright infringement claims and defenses"); 5 *Intellectual Property Counseling & Litigation* § 65.07 (noting that because "[c]opyright certificates obtained from the Copyright Office do not include a copy of the 'deposit,'. . . inspection of the certificate alone does not enable the court to determine the subject matter of the copyright" and advising "copyright owner[s] to keep copies in [their] files of the deposit submitted to the Copyright Office *so that in [their] moving papers such copies can be submitted with the certificate itself*" (emphasis added)).

---

[2] Plaintiffs have agreed to produce chain-of-title information for the pre-1972 Asserted Works and the post-1972 Asserted Works for which the copyright registration does not identify Plaintiffs as an author or owner of the work. *See* Ex. E. Suno's request for work-for-hire agreements is accordingly limited to the Asserted Works for which Plaintiffs are listed as an author or owner on the registration but that are listed as works for hire.

LATHAM&WATKINS LLP

Although a deposit copy may not be required for copyright *protection* to attach under later versions of the Copyright Act, a deposit copy is still required for a copyright plaintiff to *bring suit*. The 1976 Copyright Act, which appears to apply to most of the Asserted Works, makes clear that copyright registration is a prerequisite for bringing an infringement suit, *see* 17 U.S.C. § 411(a); among the requirements of copyright registration is a deposit copy of the work in question submitted to the U.S. Copyright Office, *see* 17 U.S.C. § 408(b). The deposit copy requirement is not merely a statutory formality. Rather, deposit copies are necessary for a copyright defendant to *ascertain what the plaintiff has registered, and how it might compare to an allegedly infringing work*. *Cf. Structured Asset Sales*, 120 F.4th at 1075 ("One cannot fairly be liable for infringement without the ability to understand the contours of a prior creator's rights. That is why the 'deposit (and accompanying registration) requirement was *(as it still is)* a condition precedent to the right to bring an infringement action.'" (emphasis added) (quoting 2 *Nimmer on Copyright* § 7.16 [A][2][b] (2024))); 2 *Nimmer on Copyright* § 7.16[B][1][a] (2024) ("If plaintiff cannot prove that the item in suit corresponds to a registered work, the cause of action fails."). As the First Circuit explained in *Airframe Systems v. L-3 Communications Corp.*, 658 F.3d 100 (1st Cir. 2011), a plaintiff alleging copyright infringement must prove "'(a) that the defendant actually copied the work as a factual matter,' and '(b) that the defendant's copying of the copyrighted material was so extensive that it rendered the infringing and copyrighted works 'substantially similar.'" *Id.* at 105 (quoting *Situation Mgmt. Sys., Inc. v. ASP. Consulting LLC*, 560 F.3d 53, 58 (1st Cir. 2009)). "Substantial similarity between the copyrighted work and the allegedly infringing work 'is assessed by comparing the protected elements of the plaintiff's work as a whole against the defendant's work.'" *Id.* (quoting *Situation Mgmt.*, 560 F.3d at 59). "However, before the foregoing comparison can take place, *the plaintiff must necessarily establish the content of the copyrighted work that it contends was infringed*." *Id.* (emphasis added). Deposit copies provide that information.

To be clear, Suno is not seeking deposit copies to determine whether the asserted works are protectable. Suno seeks deposit copies in order to determine what actual sound recordings Plaintiffs have registered with the Copyright Office and how those recordings compare with any audio file in Suno's training data that Plaintiffs may argue reflects an unlawful "copy" of one of their Asserted Works. Indeed, it is quite possible that there are multiple sound recordings associated with a particular musical composition that are owned by different rightsholders.[3] Deposit copies will identify the particular works actually at issue in this litigation.

Rather than produce their deposit copies, Plaintiffs instead propose that Suno use identifying metadata, such as International Standard Recording Code ("ISRC") codes, to itself

---

[3] Taylor Swift's recent re-recording of her prior catalog in order to create recordings that she owns is illuminating. While there is just one copyright registration for the composition of her song "Love Story," for example (that is, the musical arrangement and lyrics), the original recording of the song from the album "Fearless" is owned by Shamrock Holdings, whereas the more recently released "Love Story (Taylor's Version)" is owned by Taylor Swift. Thus, Shamrock Holdings may have rights in one version of "Love Story" but not in another, similar-sounding recording by the same artist. Like Shamrock Holdings, Plaintiffs here hold the rights to some recordings but may not hold the rights to similar-sounding recordings of the same compositions. Plaintiffs contend Audible Magic is technically equipped to identify such sound recordings as distinct, but that does not address Suno's fundamental concern: it does not know what sound recordings Plaintiffs provided to Audible Magic and whether they differ from those Plaintiffs deposited with the Copyright Office.

LATHAM&WATKINS LLP

locate publicly available copies of Plaintiffs' Asserted Works.  *See* Ex. E.  This proposal evades, rather than addresses, the core issue.  Assuming Suno locates publicly available copies, what then?  Are Plaintiffs proposing that Suno purchase those works for production into the record in this case—in lieu of Plaintiffs simply producing the deposit copies that are in their possession or that they can request from the Copyright Office?  And why should Suno have to take label representatives at their word that the sound recordings they released to the public are one and the same as those submitted to the Copyright Office?  Discovery into basic information concerning whether Plaintiffs own the works at the basis of their copyright case—and, even more critically, *what those works are*—should not be controversial: ownership of the Asserted Works is one of two elements of Plaintiffs' prima facie case, and Suno is entitled to documents that would tend to prove or disprove that element.

Plaintiffs have also indicated that they intend to use Audible Magic, a content identification program, to determine whether works in Suno's training data match works they purportedly own.  Yet without access to deposit copies, Suno has no way to confirm what sound recordings have been provided to Audible Magic or whether those recordings are the same "versions" as the ones Plaintiffs submitted to the Copyright Office alongside their registration applications.  Suno should not have to simply take Plaintiffs' representatives at their word.  Because the deposit copies of the Asserted Works define the scope of Plaintiffs' ownership, Plaintiffs need to establish, and Suno needs to be able to test, that the deposit copies—and not some other recordings or versions of the works—are identical to works in Suno's training data.  Accordingly, Plaintiffs must produce deposit copies of their Asserted Works.  *Cf. Airframe Sys.*, 658 F.3d at 107 (finding that the plaintiff "ha[d] failed to create a genuine issue of material facts as to its claim of copyright infringement" because it "ha[d] presented no evidence sufficient to prove the content of its registered source code versions" and therefore "cannot show that any of its registered works is substantially similar to the allegedly infringing M3 program"); *see also Antonick v. Elec. Arts, Inc.*, 841 F.3d 1062, 1066 (9th Cir. 2016) (affirming district court decision that "[t]he jury [] could not compare the works to determine substantial similarity" because the works that were purportedly infringed were not in evidence); *Ferdman v. CBS Interactive, Inc.*, 342 F. Supp. 3d 515, 525–29 (S.D.N.Y. 2018) (ordering sanctions when the plaintiff repeatedly refused to produce deposit copies).

Plaintiffs do not dispute the relevance of the deposit copies.  Instead, Plaintiffs' argument is based on the alleged burden of responding to this request: they claim that deposit copies would be "extremely difficult to collect and produce."  Ex. E.  As an initial matter, Plaintiffs' blanket refusal to produce deposit copies is inconsistent with the Court's instruction at the parties' last conference that Plaintiffs consider producing a sample of the deposit copies at issue as at least a first step—which Plaintiffs described as a "reasonable approach."  Ex. D at 10:09-12:10.  When, following that conference, Suno reached out to Plaintiffs to request their sampling proposal (reserving all rights with respect to whether a mere sample would be sufficient to satisfy Plaintiffs' prima facie burdens), Plaintiffs reversed course and indicated that the "exercise of obtaining the deposit copies they submitted to the Copyright Office" was overly burdensome as to *any one* of

the Asserted Works. *See* Ex. E.[4] In addition to being inconsistent with their previous commitment, Plaintiffs' claim of burden is surprising: as record labels, Plaintiffs' entire businesses revolve around the rights they hold in sound recordings, and Plaintiffs are serial copyright litigants asserting those rights. Plaintiffs also have not explained why they cannot satisfy their discovery obligations by simply requesting their deposit copies from the Copyright Office. *See* Ex. F (U.S. Copyright Office, Circular 6: Obtaining Access to and Copies of Copyright Office Records and Deposits (2019)) (explaining that, in response to requests, the Copyright Office will provide a "proximate reproduction" of phonorecord deposits on request); *see also, e.g.*, *Ferdman*, 342 F. Supp. 3d at 528 (critiquing the plaintiff for not explaining "why [he] did not produce the [deposit copies the defendant sought] during discovery," including after "represent[ing] that he did not have a copy of what was submitted to the Copyright Office"). Moreover, Plaintiffs do not explain how or why production of this basic information would be *unduly* burdensome when balanced against the criticality of the information to the case. Having brought this action, Plaintiffs have an affirmative obligation to produce identifying information regarding the Asserted Works, *including* the deposit copies that establish what they have registered with the Copyright Office and what those Works actually consist of.

### 2. Works Made for Hire

Plaintiffs also oppose Suno's request for artist-label agreements for Asserted Works where the copyright registration identifies a work as a work "made for hire."

Initially, Plaintiffs refused to provide Suno with any chain-of-title type information for any Asserted Work—Plaintiffs offered only certificates of registration or "a sworn declaration by an individual with knowledge attesting to ownership of the work." Ex. B. Plaintiffs recently agreed to provide chain-of-title documentation, but only for pre-1972 works and post-1972 works in which Plaintiffs *do not* appear on the registration. *See* Ex. E. Plaintiffs' chain-of-title compromise would not provide any information regarding Asserted Works in which Plaintiffs *are* listed as owners or authors on the registration *but* which the registration makes clear are works made for hire—that is, works have been authored by another party under contract with Plaintiffs. Plaintiffs have now proposed an "illustrative sampling approach," by which Plaintiffs would produce work-for-hire agreements for 10% of the Asserted Works, with Suno selecting 5% of the sound recordings and Plaintiffs selecting the other 5%. *See* Ex. G (A. Perry Mar. 7 email). But Plaintiffs have not produced the copyright registrations that would allow Suno to assess how many of Plaintiffs' Asserted Works are registered as works for hire—a fact critical for Suno to meaningfully assess the necessity and appropriateness of Plaintiffs' proposed sampling approach.[5]

The artist-label agreements Suno seeks are necessary to test whether works in this category were created by an employee of Plaintiffs or were "specially commissioned" works, which are the

---

[4] Though Suno is open to considering a sampling approach, as stated at the conference, *see* Ex. D at 14:01-11, Suno reserves all rights regarding whether a sample of some deposit copies would be sufficient to establish that Plaintiffs own and Suno copied the specific Asserted Works at issue.

[5] Plaintiffs have represented that the parties would *select* their samples after Plaintiffs have produced registration information for the Asserted Works. *See* Ex. G. But Suno cannot assess whether a sampling approach is appropriate at all–and cannot agree to Plaintiffs' proposal–without understanding the scope of the relevant works.

LATHAM&WATKINS LLP

*only* two ways they could properly qualify as works for hire under the Copyright Act. *See* 17 U.S.C. § 101.[6]  If the works fall into neither category, then the authors of those works, not Plaintiffs, own those works—and Plaintiffs do not have standing to bring this lawsuit. *In re Napster Inc. Copyright Litigation*, 191 F. Supp. 2d 1087 (N.D. Cal. 2002), provides useful guidance.  In that case, the court ordered record label plaintiffs "to produce all documentation relevant to their ownership of the works listed as 'works for hire,'" including contracts between the plaintiffs and artists, for review by a Special Master, after which "the court w[ould] order further discovery as necessary," noting that refusing to permit such discovery would improperly create an irrebuttable presumption in the plaintiff's favor. *Id.* at 1100; *see Motta*, 768 F.2d at 484 ("If a plaintiff is not the author of the copyrighted work then he or she must establish a proprietary right through the chain of title in order to support a valid claim to the copyright."); *cf. Int'l Media Films, Inc. v. Lucas Ent., Inc.*, 703 F. Supp. 2d 456, 463 (S.D.N.Y. 2010) ("[T]ransferee plaintiff in a copyright infringement action must prove that the copyright was properly transferred to the plaintiff."); *Peer Int'l Corp. v. Latin Am. Music Corp.*, 161 F. Supp. 2d 38, 45 (D.P.R. 2001) ("[T]o establish prima facie ownership . . . a person that obtained an assignment of rights prior to registration . . . needs only to show the registration and evidence of his or her chain of title."); *Tapscan, Inc. v. Friberg*, No. 04-cv-696, 2005 WL 8174972, at *2 (D. Utah June 21, 2005) (ordering the plaintiff to respond to an interrogatory asking to identify "all documents which refer or relate in any way to any transfer, assignment or license of all or any portions of any Omega Software for which you claim you own the copyright").

The same outcome is appropriate here with respect to the Asserted Works that are listed as works made for hire.  Moreover, the *Napster* litigation likewise implicated large numbers of sound recordings: at the time of the court's opinion, the plaintiffs had already asserted 213 works, but both the court and the plaintiffs anticipated that the number of works at issue would expand into the thousands.  *Napster*, 191 F. Supp. 2d at 1100 n.9.  Nevertheless, the *Napster* court held Plaintiffs to their burden, ordering production of "all documentation relevant to the ownership of the works listed as 'works for hire.'"  *Id.* at 1100.

Plaintiffs claim that it will be burdensome to produce this information because the "agreements are commercially sensitive, and their production would require Plaintiffs to find and collect each relevant agreement as part of a go-get collection."  Ex. G. These concerns do not justify Plaintiffs refusing to produce basic ownership information.  Suno has agreed to provide much of its most commercially sensitive information as part of this litigation, including its source code, training data, and business plans, and the Parties have entered a Protective Order to ensure

---

[6] In fact, a sound recording likely cannot be a "specially commissioned" work under the Copyright Act, since it is not one of the nine types of work specifically enumerated in the Act.  *See In re Napster Inc. Copyright Litigation*, 191 F. Supp. 2d 1087, 1097-98 (N.D. Cal. 2002); *see also* 17 U.S.C. § 101 (enumerating works that may be "work[s] made for hire"); *Ballas v. Tedesco*, 41 F. Supp. 2d 531, 541 (D.N.J. 1999) (finding that sound recordings do not qualify as works for hire under the Copyright Act); *Bucciarelli-Tieger v. Victory Records, Inc.*, 488 F. Supp. 2d 702, 709 (N.D. Ill. 2007) (finding that, because sound recordings are not on the list of works that can be specially commissioned, "the only way [they] can be a work for hire" is if the author is an employee); *cf. Warren Freedenfeld Assocs. v. McTigue*, 531 F.3d 38, 48 (1st Cir. 2008) (ruling that an architectural drawing did not qualify as a "work for hire" because "[f]or one thing, the Copyright Act enumerates certain types of works encompassed by the work for hire doctrine, *see* 17 U.S.C. § 101, and architectural drawings do not fit within that taxonomy").  Accordingly, the Asserted Works can be considered works for hire only if their authors were Plaintiffs' employees.

that this information remains confidential.  Plaintiffs cannot insist that Suno produce commercially sensitive information while refusing to produce clearly relevant information under the guise of commercial sensitivity.  As to Plaintiffs' claim that the request "would require Plaintiffs to find and collect each relevant agreement," Plaintiffs are simply explaining the requirements of document discovery.  While collecting responsive documents may place some burden on Plaintiffs, the relevant question under Rule 26(b) is not whether Plaintiffs will be burdened.  Rather, the question is whether any burden is disproportionate or undue in light of the needs of the case.  *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case.").  Plaintiffs have not explained why any burden would be undue, particularly since the category of works implicated here is a narrow one: Plaintiffs need only produce artist-label agreements for works registered as works made for hire.  Though Suno does not know how many of the Asserted Works are registered as works made for hire (because Plaintiffs have not yet produced copyright registrations for the Asserted Works), Suno's initial investigation suggests that a good number of them were not so registered and can be excluded from the scope of this discovery request.  Moreover, the number of artist-label agreements that Plaintiffs need to collect is further limited by the fact that a single agreement between a label and artist may cover multiple works, and Plaintiffs' list of Asserted Works implicates fewer than 50 artists total.  Plaintiffs' claims of burden simply do not hold up when measured against the scope of the information Suno seeks.

*          *          *

At bottom, Plaintiffs brought this copyright infringement action on the basis of a discrete number of Asserted Works.  Suno is entitled to discovery into what those works are and whether Plaintiffs in fact own them.  Suno respectfully requests that the Court compel Plaintiffs to produce deposit copies for all Asserted Works and, for Asserted Works where Plaintiffs are listed as the author or owner of a work, but the copyright registration identifies the work as a "work made for hire," the agreements that establish Plaintiffs' ownership of those works.

**<u>Plaintiffs' Response</u>**

***Preliminary Statement***

Defendant Suno, Inc. ("Defendant" or "Suno") operates an AI-powered music generation service that generates audio files in response to plain English text prompts entered by its users.  Plaintiffs UMG Recordings, Inc. and Capitol Records, LLC (collectively "UMG"); Sony Music Entertainment ("Sony"); Atlantic Recording Group LLC, Rhino Entertainment LLC, The All Blacks U.S.A., Inc., Warner Music International Services Limited, and Warner Records Inc. (collectively "Warner," and together with UMG and Sony, "Plaintiffs"), are record companies that, together, own or exclusively control copyrights in a great majority of the most commercially valuable sound recordings in the world.  In developing the AI model that powers its service, Suno made unauthorized copies of an untold number of Plaintiffs' copyrighted sound recordings and used them to train its AI model to create audio outputs that compete with the sound recordings on which it trained.  The core issue presented in this case is whether Suno's founding of its competing business on extensive copying of Plaintiffs' protected sound recordings qualifies as fair use.

Try as Suno may to deflect the focus from its own conduct, this litigation is about what Suno has done (and continues to do) with Plaintiffs' copyrighted sound recordings. Though there is no serious question that Plaintiffs own or exclusively control the asserted works, Suno misstates the relevant law and portrays Plaintiffs as evading their obligation to establish ownership. This is false. Plaintiffs have, in fact, agreed to produce all of the information necessary to satisfy their burden to prove that they own the works that currently form the basis of their copyright infringement claims, including copyright registration, index, and certain chain-of-title information for the 662 copyrighted sound recordings alleged in the operative Complaint. Beyond this, Suno demands two unnecessary categories of discovery: (1) deposit copies of every asserted work; and (2) the agreements associated with any copyrighted sound recording registered as a work for hire. As described below, these requests are unnecessary, unduly burdensome, and disproportionate to the needs of the case, especially considering the ownership information Plaintiffs already agreed to produce.

Plaintiffs allege infringement on an immense scale, based on Suno's indiscriminate copying of perhaps the entirety of Plaintiffs' catalogs of protected sound recordings. Suno's demand for additional, unnecessary ownership discovery suggests that Suno envisions conducting a host of mini trials into whether Plaintiffs, in fact, own or exclusively control every asserted work it allegedly infringed. This is impractical and unnecessary. Suno already admitted that it trained on Plaintiffs' sound recordings and that Plaintiffs own a significant majority of the recordings that U.S. consumers listen to today. *See* Answer at 8 ("It is no secret that the tens of millions of recordings that Suno's model was trained on presumably included recordings whose rights are owned by the Plaintiffs in this case."); *see also id.* at 4 (noting that Plaintiffs collectively "likely control[ ] well over 75% of the recordings that U.S. consumers tend to listen to today."). As Suno's admissions establish, this case will not boil down to whether Plaintiffs own this or that particular sound recording. Yet, as a diversion to distract from the central issues in this case, Suno seeks discovery in preparation for a fishing expedition into ownership deficiencies regarding a subset of the numerous asserted works that are (and may be) asserted in this case. Suno's demand for additional ownership discovery is a sideshow designed to frustrate Plaintiffs' pursuit of their claims.

The true scope of Suno's infringement is soon to come to light, once Plaintiffs have an opportunity to inspect Suno's training data and identify the torrent of copyrighted works they unlawfully exploited. In the meantime, Plaintiffs have agreed to produce all the evidence required to establish their ownership of the 662 works presently asserted in the Complaint. Because the remainder of what Suno seeks is unnecessary and disproportionate to the needs of the case, the Court should deny Suno's motion to compel.

### *Discussion*

Suno's motion to compel is based on the false premise that Plaintiffs seek to shirk their duty to identify and prove they own the asserted works. To the contrary, Plaintiffs consistently sought to proceed with discovery in an expedient manner that accounts for the tremendous breadth

**LATHAM&WATKINS**LLP

of Suno's infringing conduct (and Suno's attempts to conceal the same).[7]  As detailed in the Complaint, the scope of Suno's infringement likely extends orders of magnitude beyond the 662 sound recordings that comprise the current list of works in suit.  Given their allegations of mass infringement, Plaintiffs initially proposed producing ownership discovery after they fix the universe of asserted works and have a clear sense of the burdens associated with producing such discovery.  Suno rejected this proposal.

Since then, Plaintiffs agreed to produce the following information to establish their ownership of the current universe of asserted works:

- Documents from the U.S. Copyright Office reflecting registrations for each of the post-1972 works listed in Exhibit A of the Complaint;

- U.S. copyright indexes for the pre-1972 works listed in Exhibit A of the Complaint;

- Chain-of-title information for the pre-1972 works asserted in Exhibit A of the Complaint, and the post-1972 works asserted in Exhibit A of the Complaint for which the copyright registration does not identify Plaintiffs as an author or owner of the work; and

- Documents sufficient to show that the pre-1972 works asserted in Exhibit A of the Complaint are not in the public domain.

The only remaining areas of dispute relate to Suno's requests seeking (1) deposit copies for every asserted work; and (2) all agreements regarding copyrighted sound recordings registered as works for hire.[8]  The Court should deny Suno's motion to compel on both issues.

### 1. Deposit Copies

Generally speaking, to register a copyright in a published work, the owner must deposit two copies of the work with the Copyright Office.  *See* 17 U.S.C. § 408(b)(2); *see also* 37 C.F.R.

---

[7] Suno characterizes Plaintiffs' initial proposal as designed to delay necessary discovery, while Suno has all the while been "willing[ ] to engage in comprehensive discovery."  Suno Statement at 2.  This is a caricature of the record, as Suno has persistently prolonged discovery by withholding information that could facilitate progress in discovery negotiations and commencing negotiations with flatly unreasonable positions only to later walk them back.  This pattern of evasion started even before Plaintiffs filed suit, when Suno disingenuously told Plaintiffs that their concerns over Suno's extensive unauthorized use of their protected sound recordings were "premised on a highly speculative assumption about the content of Suno's training data."  Suno has characteristically backed away from this feeble attempt to conceal its use of Plaintiffs' sound recordings, having since admitted in its Answer that it copied Plaintiffs' works to train its AI model.  *See* Answer at 8-10.

[8] Since the inception of this litigation, Plaintiffs indicated their expectation that the universe of asserted works will dramatically expand once they inspect Suno's training data and shine light on the full scope of Suno's infringement.  As Plaintiffs are not yet certain as to the number of asserted works they will add when they amend their Complaint, they are not presently in a position to assess the burden associated with producing all of the materials Suno is requesting for all of the works that may ultimately be asserted in this case.  Accordingly, Plaintiffs agree to meet and confer following their anticipated amendment to their pleadings to discuss a workable approach to ownership discovery that is proportional to the needs of the case.

**LATHAM&WATKINS**LLP

§ 202.20(c).[9]  To obtain a copyright registration for a sound recording, a rightsholder must deposit the recording with the Copyright Office in either a physical medium (*e.g.*, in the form of CDs or vinyl records) or a digital medium.[10]

Suno seeks to compel the production of deposit copies for every asserted work, or, in the alternative, a sample of those works identified in Exhibit A of the Complaint.  During the February 14 discovery conference, the Court recognized that "broadly speaking, we need to get underway with" some form of ownership discovery, but asked to hear from the parties about "the particular burdens."  Ex. D at 4:15-18.  Plaintiffs explained that "there would be specific burdens connected with the production of the deposit copies for millions of recordings," and "it's unclear exactly [to] what end we would be engaging in that exercise" because "[i]t seems unlikely at best to think that there would be a trial in this case in which the jury would be listening to millions of deposit copies and comparing them against the copies that are in Suno's . . . training data."  *Id.* at 7:17-25.  In response, the Court proposed a "sampling" approach, whereby the parties would agree on a set of sound recordings for which Plaintiffs would produce deposit copies.  *Id.* at 10:9-12:4.  Counsel for Plaintiffs stated that they would appreciate the opportunity to confer with their clients regarding that approach.  *Id.* at 12:5-13:12.  Upon further investigation, it has become clear that while a sampling approach may be reasonable for the other categories of ownership information Suno is seeking, deposit copies are not required to demonstrate Plaintiffs' ownership of the asserted works, and therefore a sampling is not necessary.[11]

To establish infringement, Plaintiffs will need to demonstrate "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  Contrary to Suno's contentions, Plaintiffs will be able to establish both elements without producing deposit copies.

*First*, Plaintiffs will be able to demonstrate that they own the sound recordings asserted within the operative Complaint by producing documents from the U.S. Copyright Office reflecting registrations.  "A certificate of registration satisfies the requirements for [bringing an infringement suit] . . . regardless of whether the certificate contains any inaccurate information."  17 U.S.C. § 411(b)(1).  Plaintiffs only need to produce the registrations, which "create[] a presumption of validity, and compliance with statutory requirements," including the deposit copy requirement. *Eng'g & Software Sys. Sols., Inc. v. Cusatis*, 2024 WL 1363578, at *8 (N.D. Ill. Mar. 29, 2024) (citing 17 U.S.C. § 410(c)).

Once the registrations are produced, Suno will be able to "determine what actual sound recordings Plaintiffs have registered with the Copyright Office" (Suno Statement at 4), as the

---

[9] There is no deposit copy requirement for pre-1972 sound recordings.  *See* 17 U.S.C. § 1401(f)(5) (outlining requirement that a rights holder file with the Copyright Office "a schedule that specifies the title, artist, and rights owner of the sound recording . . .").

[10] *See* Ex. H, Copyright Registration for Sound Recordings, Circular 56 (Mar. 2021), https://www.copyright.gov/circs/circ56.pdf.

[11] Plaintiffs are willing to agree to a sampling approach for producing commercially available versions of their sound recordings, which, as explained below, are the same recordings submitted to the Copyright Office for deposit.

LATHAM&WATKINSLLP

registrations contain identifying information that allows the public to identify the copyrighted work. For instance, UMG often obtains and includes in their registrations an International Standard Recording Code ("ISRC"), a Universal Product Code ("UPC"), and/or a unique Catalog Number corresponding to the registered work. Ex. I, Declaration of Tegan Kossowicz ("Kossowicz Decl.") at ¶ 4; *see also* Ex. J (Copyright Registration for Blink-182 listing UPC). "ISRC is a standard identifying code that can be used to identify sound recordings and music video recordings so that each such recording can be referred to uniquely and unambiguously." International ISRC Registration Authority, *International Standard Recording Code (ISRC) Handbook* (4th ed. 2021).[12] Similarly, UPC is a standardized product identification system managed by the Global Standards Organization (GS1). *See* GS1, EAN/UPC Barcodes, https://www.gs1.org/standards/barcodes/ean-upc. Consumers can input these identifiers into publicly available databases to find the particular sound recordings reflected in the copyright registrations.[13] Sony, too, has a practice of including a unique Catalog Number in certain of their copyright registration applications when submitting deposit copies of sound recordings in a physical medium. Ex. K, Declaration of David Castagna ("Castagna Decl.") at ¶ 4; *see also* Ex. L (Copyright Registration for Michael Jackson listing Catalogue Number). And Warner has filed copyright registrations that include excerpted UPCs, or "U.S. Selection Numbers." Ex. M, Declaration of Jennifer Romeo ("Romeo Decl.") ¶ 4; *see also* Ex. N (Copyright Registration for Michael Buble listing U.S. Selection Number). The point here is simply that Plaintiffs need not introduce the deposit copies into the record to establish the identity of the asserted works, when Suno can simply reference any number of publicly available sources (including, presumably, the source from which it accessed Plaintiffs' works when compiling its training dataset) to achieve this end.

Suno's reliance on *Ferdman v. CBS Interactive, Inc.*, 342 F. Supp. 3d 515 (S.D.N.Y. 2018) is misplaced. In that case, the plaintiff photographer could not rely on printouts of photographs from Shutterstock in place of deposit copies to prove that his certificate for registration covered the photographs in question because "none of the designations on the photographs produced by Plaintiff during discovery match[ed] the designations on the Certificate of Registration." *Id.* at 530. Specifically, the "image numbers," on the Shutterstock images did "not match the image numbers listed in the Certificate of Registration." *Id.* at 526. In contrast, the designations on Plaintiffs' registrations for their sound recordings align with identifiers on the commercially

---

[12] ISRCs are more than mere metadata; they are assigned to particular audio files through an application process that involves, among other things, payment of an application fee. *See* Obtaining Code, International Standard Recording Code, *available at* https://usisrc.org/about/obtaining_code.html. Once assigned, an IRSC remains permanently associated with the particular audio content, and the Copyright Office encourages applicants to include ISRC numbers with registration applications, when applicable. *See* Standard Application Help: Publication/Completion, U.S. Copyright Office ("If your work has an ISRC number, give it in the space provided."), *available at* https://www.copyright.gov/eco/help-publication.html. Moreover, an ISRC can be permanently encoded into a product, and most music streaming services require an ISRC be included with a recording for it to be included on their platforms. *See* Frequently Asked Questions, International ISRC Database, *available at* https://isrcsearch.ifpi.org/. ISRC numbers are thus eminently more reliable than whatever "unspecified metadata of unknown veracity" Suno plans to make available with its training data. *See* Ex. E at 1 (A. Perry Jan. 21, 2025 Email).

[13] *See, e.g.*, International Federation of the Phonographic Industry, International ISRC Database, *available at* https://isrcsearch.ifpi.org/; Barcode Lookup (searchable UPC database), *available at* https://www.barcodelookup.com/api; Discogs (searchable Catalog Number database), *available at* https://www.discogs.com/search/advanced.

LATHAM&WATKINSLLP

available versions.  Thus, there is no question that Plaintiffs' registrations match commercially available versions of their sound recordings.[14]

*Second*, Plaintiffs will be able to identify the sound recordings they own within Suno's training data with precision.  Plaintiffs will establish that, as a matter of course, Plaintiffs submit the same sound recordings to the Copyright Office that are commercially released to the public. *See* Kossowicz Decl. ¶ 3; Castagna Decl. ¶ 3; Romeo Decl. ¶ 3.  Thus, Plaintiffs will be able to demonstrate that the official versions of the asserted sound recordings available on, for instance, YouTube or Spotify are, in fact, the same sound recordings they own and deposited with the Copyright Office.  Furthermore, Plaintiffs are not "proposing that Suno purchase those works for production into the record in this case." Suno Statement at 5.  Instead, Plaintiffs are willing to produce a sample of their commercially available sound recordings from their commercial feeds.

Plaintiffs also plan to use industry-standard audio fingerprinting technology from Audible Magic to confirm which sound recordings in Suno's training data belong to them.  Audible Magic's technology works by "tak[ing] audio 'fingerprints'" of sound files "and compar[ing] them to a database of copyrighted content provided by copyright holders." *UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1012 (9th Cir. 2013); *see also Arista Records LLC v. Lime Wire LLC*, 06 Civ. 05936 (KMW), 2010 WL 10031251, at *6 (S.D.N.Y. Aug. 9, 2010) (defining "Fingerprinting Technology," which is "available from commercial vendors such as Audible Magic," as "the most effective available means of content-recognition filtering based on recognizing the unique content of an underlying audio-visual work and detecting and preventing copying of that content").  Plaintiffs systematically ensure that the sound recordings they upload to Audible Magic's content database are the same sound recordings they deposited with the Copyright Office.  *See* Ex. O, Declaration of Kim Beauchamp ("Beauchamp Decl.") ¶ 6; Ex. P, Declaration of Dong Jang ("Jang Decl.") ¶ 6; Ex. Q - Declaration of Courtney-Anne Duchardt ("Duchardt Decl.") ¶ 5.

In short, Plaintiffs will be able to satisfy their burden of proof on copying by establishing that (1) the sound recordings they deposit with the Copyright Office are the same sound recordings they release for commercial consumption; (2) the sound recordings they commercially release are the same sound recordings they provide to Audible Magic; and (3) Audible Magic can match audio files in Suno's training data to Plaintiffs' sound recordings.  Thus, Plaintiffs have a complete evidentiary chain linking the copyrighted sound recordings they deposited with the Copyright Office to the audio files in Suno's training data.  *See, e.g.*, *Accusoft Corp. v. Quest Diagnostics, Inc.*, 2015 WL 10718481, at *19-20 (D. Mass. Oct. 1, 2015) (expert testimony established that the

---

[14] Nor did the Court in *Ferdman* sanction plaintiff merely for refusing to produce deposit copies.  *Accord* Suno Statement at 5-6.  Rather, the Court sanctioned plaintiff for attempting to rely on the deposit copies as evidence in support of his motion for summary judgment despite repeatedly failing to produce them in discovery, without explanation. *See, e.g.*, *Ferdman*, 342 F. Supp. 3d at 528-29 ("Plaintiff has offered no explanation for his failure to produce copyright application-related materials during discovery.").  And the sanction was precluding Plaintiff from relying on the deposit copies as evidence.  *Id.* at 529-530.  By contrast, Plaintiffs here have ample reasoning to resist producing the deposit copies, *see infra*, and do not intend to rely on the deposit copies to make their prima facie case.

LATHAM&WATKINS LLP

source code "produced to Defendants in discovery corresponds with enumerated versions of ['immutable' object code] that Accusoft registered with the Copyright Office.").

This is not a novel means of proving copying in a mass copyright infringement case involving sound recordings. *See, e.g.*, *UMG Recording, Inc. v. Escape Media Group, Inc.*, 2014 WL 5089743, at \*15, 17 (S.D.N.Y. Sept. 29, 2014) ("Audible Magic's methods of analysis are not a secret and have been relied upon in various similar copyright litigations."). For instance, in *UMG Recordings, Inc. v. Grande Communications Networks, L.L.C.*, a mass infringement defendant sought to overturn an adverse jury verdict by arguing that "because Plaintiffs did not introduce the copyrighted songs at issue into evidence, the jury could not conduct a side-by-side comparison of the works, and thus could not find that the allegedly infringing works were substantially similar to the works owned by Plaintiffs." 118 F.4th 697, 709 (5th Cir. 2024). The Fifth Circuit rejected this argument, explaining that even though Plaintiffs did not place the deposit copies into evidence, "Plaintiffs introduced extensive, forensically reliable evidence proving that the files . . . downloaded were exact copies of Plaintiffs' sound recordings" and "[t]he jury was entitled to rely on the record generated by Audible Magic, which themselves evinced a 'side-by-side comparison" between Plaintiffs' copyrighted sound recordings and [the infringing] downloads." *Id.* at 710.[15]

Suno's motion centers on its contention that a close analysis of the actual deposit copies submitted to the Copyright Office is the only way to establish that the sound recordings Suno copied for inclusion in its training data are substantially similar to those owned by Plaintiffs. *See* Suno Statement at 4. Suno is simply incorrect as a matter of law.[16] While introducing deposit copies is certainly one way for a copyright plaintiff to satisfy its burden of proof, it is not the *only* way. *See, e.g.*, *Ross-Nash v. Almond*, 2020 WL 6947691, at \*2 (D. Nev. Oct. 28, 2020) (rejecting argument that plaintiffs needed deposit copy because "the lack of a . . . copy [of the infringed work] is not dispositive because there is direct evidence of copying in this case"); *United States v. Cassim*, 693 F. Supp. 2d 697, 703 (S.D. Tex. 2010) ("[T]he Court cannot conclude that the Government's decision not to present the recordings deposited with the United States Copyright Office renders its evidence of Registration legally insufficient or inadmissible."). And Suno is also wrong that deposit copies define the metes and bounds of copyrighted works under the Copyright Act of 1976. While Suno cites *Structured Asset Sales, LLC v. Sheeran*, 120 F.4th 1066 (2d Cir. 2024), to suggest that a copyright emanates from the deposit copy, that case involved a

---

[15] Suno cannot distinguish *UMG* solely on the basis that it arises in the post-trial context. While the deposit copies may be relevant under Rule 26, *UMG* demonstrates that deposit copies are not *critical* to proving infringement, thus diminishing their importance in discovery. And as further explained below, the burden of producing them far outweighs their relevance in this case.

[16] *Airframe Sys. v. L-3 Commc'ns Corp.*, 658 F.3d 100 (1st Cir. 2011), is not to the contrary. There, the plaintiff submitted a declaration comparing defendant's program "to the updated 2009 version of the [plaintiff's] source code" as evidence of copying, including substantial similarity. *Id.* at 106. The First Circuit found this evidence insufficient because "[w]hile this would support a finding of substantial similarity between [defendant's] program and Airframe's 'current' source code . . . , there is no claim that the 2009 source code was itself registered or that the 2009 version is the same as the one of Airframe's earlier registered versions." *Id.* Indeed, the declaration "said nothing about similarities between the [current] version and Airframe's earlier registered . . . versions," and the plaintiff even "admitte[d] that they are not in fact the same." *Id.* at 106-07.

LATHAM&WATKINSLLP

work protected under the Copyright Act of 1909, which did require depositing a work with the Copyright Office to generate a protectable copyright. This is not the case under the 1976 Act, which expressly provides that a work is entitled to copyright protection "upon fixation . . . in a tangible medium . . . meaning mandatory deposit remains unnecessary to gain copyright." *Valancourt Books, LLC v. Garland*, 82 F.4th 1222, 1233 (D.C. Cir. 2023); *see also Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 275 (2020) ("Unlike other forms of intellectual property, copyright protection is both instant and automatic. It vests as soon as a work is captured in a tangible form, triggering a panoply of exclusive rights that can last over a century.").

Moreover, this case is nothing like *Structured Asset Sales*, in which there was an actual question about whether Ed Sheeran's "Thinking Out Loud" was sufficiently similar to Marvin Gaye's "Let's Get it On," such that the former infringed the latter's copyrighted musical composition. 120 F.4th at 1075. In that case, the two songs at issue had such manifest differences, including with respect to melody, lyrics, and overall feel, that substantial similarity was a determinative issue in the case. *Id.* at 1081. But here, Plaintiffs allege systematic direct copying based on Suno's scraping of Plaintiffs' sound recordings from commercially available sources. *See, e.g.*, Compl. ¶¶ 9, 41-49. Accordingly, there will be no need for an involved substantial similarity analysis because the sound recordings in Suno's training data will be identical in every respect to Plaintiffs' copyrighted sound recording. *See Accusoft Corp.*, 2015 WL 10718481 at *19 ("Although a finding of substantial similarity is usually left to the factfinder, summary judgment is appropriate if a court can conclude that no reasonable jury could view the evidence differently."); *see also, e.g.*, *Segrets, Inc. v. Gillman Knitwear Co., Inc.*, 207 F.3d 56, 62 (1st Cir. 2000) (granting summary judgment to plaintiff on substantial similarity because "other than color, it is indeed difficult to find any articulable difference between [plaintiff's] and [defendant's] design[s]. The geometric patterns, the stitching, and the number and arrangement of the buttons all appear identical."); *id.* (noting "[t]he designs are virtually identical, the sole noticeable difference being the colors. Gillman cannot copy the intricate patterns and juxtapositions of the Blanket Stitch design virtually line-for-line and then escape liability for infringement merely by changing the color and saying this necessarily destroys any substantial similarity.").

Suno attempts to gin up confusion regarding the possibility of multiple variations of sound recordings embodying the same musical composition. This is a red herring. The Copyright Act defines sound recordings as "works that result from the fixation of a series of musical, spoken, or other sounds," and endows sound recording rightsholders with the exclusive "right to prepare a derivative work in which the actual sounds fixed in the sound recording are rearranged, remixed, or otherwise altered in sequence or quality." 17 U.S.C. §§ 101, 114(b). This means that remasters, remixes, or other reproductions of the *same* sound recording would all be encompassed within a singular copyright registration. Suno cites the example of Taylor Swift re-recording her own musical compositions, which represents an entirely new fixation of musical sounds that is entitled to a distinct sound recording copyright than the original recording. However, to the extent the differences between the two versions of Ms. Swift's recordings may not be immediately discernable to the naked ear, Audible Magic can bridge this gap. The precise value of its fingerprinting technology lies in its ability to accurately identify distinct sound recordings, regardless of audible similarities. Accordingly, Plaintiffs will introduce evidence that definitively establishes the sound recordings in Suno's training data matches to their own copyrighted works.

LATHAM&WATKINS LLP

Besides being unnecessary, collecting and producing deposit copies for the sound recordings that were deposited physically poses an immense burden and expense. Plaintiffs do not maintain deposit copies for every copyrighted sound recording they own, as they uniformly release to the public the same sound recordings deposited with the Copyright Office. Moreover, neither UMG nor Warner store in their offices deposit copies for copyrighted sound recordings submitted to the Copyright Office in physical form. *See* Kossowicz Decl. ¶¶ 5-6; Romeo Decl. ¶ 5. While UMG stores physical copies of submitted sound recordings, it houses them in offsite vaults that are not organized for easy search and retrieval. Kossowicz Decl. at ¶¶ 5-6. UMG does not have, for instance, a central repository or catalog to indicate which deposit copies may be located at the offsite vault. *Id.* ¶ 6. Thus searching for any particular deposit copy would likely entail manually searching through tens of thousands of uncategorized boxes of archival records, without knowing for certain whether the deposit copy exists in that location. *Id.* Similarly for Sony and Warner, retrieving and searching for physical deposit copies would be a manual process that would entail a significant burden. Castagna Decl. ¶ 5; Romeo Decl. ¶ 5. In any event, even if Plaintiffs were to locate the physical versions of the sound recordings they deposited with the Copyright Office, they would simply be providing a physical copy of the same recording that is commercially available. Kossowicz Decl. ¶ 6; Castagna Decl. ¶ 5.

Requesting deposit copies from the Copyright Office would also be a pointless, and expensive endeavor. The Copyright Office Circular that Suno cites regarding deposit copies makes clear that the "Copyright Office does not retain all works deposited for copyright registration." Ex. F at 3; *see also id.* ("If you request a reproduction of a deposit not retained under the Control of the Copyright Office, the Office will inform you of this fact."). And with respect to sound recordings, specifically, the Copyright Office Circular notes that if "you request a reproduction of a phonorecord, such as an audiotape, cassette, CD, or diskette, in which . . . a sound recording . . . is embodied, the Copyright Office will provide *proximate reproduction*" of the work and that "[b]ecause of the characteristics of available sound reproduction, all frequencies contained in the original phonorecord may not be reproduced." *Id.* (emphasis added). In other words, even the Copyright Office would have to make a replica of the physical deposit copy upon request, which is no different than what Plaintiffs have made commercially available. *See* Kossowicz Decl. ¶ 3; Castagna Decl. ¶ 3; Romeo Decl. ¶ 3. Furthermore, in response to such requests, the "Copyright Office will provide the title and the registration number of the phonorecord," which is information Plaintiffs have already provided to Suno. *Id.*

Further, the cost of requesting deposit copies from the Copyright Office would be prohibitive. For each sound recording, Plaintiffs would need to submit a signed litigation statement on Form LS, with each form costing $100. *See* 37 C.F.R. § 201.2(d)(2)(ii); *Compendium of U.S. Copyright Office Practices* § 2407.1(D)(2) at 16 (3d ed. Jan. 28, 2021), https://www.copyright.gov/comp3/chap2400/ch2400-office-services.pdf; *accord* Litigation Statement Form LS, available at https://www.copyright.gov/forms/formlitigation.pdf; *see also* 37 C.F.R. § 201.3(d)(15); Ex. R, U.S. Copyright Office, Circular 4: Copyright Office Fees at 8 (2024), https://copyright.gov/circs/circ04.pdf. The Copyright Office charges $200 per hour to search for and certify each of the deposit copies, 37 C.F.R. § 201.3(c)(21), with an additional $500 per hour surcharge for expedited processing, *id.* § 201.3(d)(14). *See also* Ex. R at 8. And finally, Plaintiffs would also incur a $45 per deposit copy mailing fee. 37 C.F.R. § 201.3(d)(17); Ex. R at 8. Thus,

LATHAM&WATKINSLLP

these unnecessary costs could easily run into the millions of dollars given the large number of works at issue in this suit.

At bottom, Suno's demand that Plaintiffs produce deposit copies for all—or even a sample—of their asserted works is unnecessary, unduly burdensome, and entirely disproportionate to the needs of the case. Plaintiffs have clear means to satisfy their burden of proof on ownership and substantial similarity. Accordingly, the Court should deny Suno's motion to compel production of deposit copies.

### 2.    Agreements Pertaining to Registered Works for Hire

Suno also requests that Plaintiffs produce all contracts evidencing their ownership of any asserted work registered as a work for hire that lists Plaintiffs as an owner or author. Given the chain-of-title information Plaintiffs have already agreed to produce, there is no additional benefit to forcing Plaintiffs to collect and produce a suite of agreements that are unlikely to possess evidentiary value. Nevertheless, in an effort at compromise, Plaintiffs have offered an illustrative sampling approach pursuant to which Plaintiffs would produce agreements with provisions pertaining to sound recordings registered as works for hire for approximately 10% of the asserted works currently listed in Exhibit A to the Complaint. Under Plaintiffs' proposal, Suno would identify half of the sound recordings for which Plaintiffs would produce such materials and Plaintiffs would select the remainder.[17] Plaintiffs explained during conferral with Suno that there will be substantial similarities among the relevant provisions of these agreements, including clauses that ensure that all rights in the work remain with the commissioning party. If, after Plaintiffs produce this sample, Suno were to identify any further issues that might warrant a broader production, Plaintiffs offered to meet and confer on such issues.

This proposal is tailored to the needs of the case. As noted above, Plaintiffs already agreed to produce chain-of-title information for any sound recordings with copyright registrations that do not reflect one of the Plaintiff entities as the author or owner of the work. Plaintiffs also agreed to produce chain-of-title information for all pre-1972 sound recordings. Thus, the area in dispute is relatively narrow: agreements related to sound recordings designated as works for hire with registrations indicating that Plaintiffs are the owner or author the work. This is a category of information that is exceedingly unlikely to bear relevance to this dispute.

Possession of a certificate of registration made within five years after first publication of the copyrighted work provides its holder with a rebuttable presumption of ownership of a valid copyright, as well as a rebuttable presumption that all facts stated in the certificate are true. *Brown v. Latin Am. Music Co*., 498 F.3d 18, 23 (1st Cir. 2007). Suno claims that these contracts are necessary to confirm that Plaintiffs own their registered works for hire, but it will be readily apparent from the sampling of agreements Plaintiffs produce that their typical practice is to include "belt-and-suspenders" assignment clauses in their agreements, which expressly assign them all

---

[17] Plaintiffs envision this process taking place after they produce the copyright registrations such that Suno will be able to identify the works that fall into this category. Pursuant to this sampling proposal Plaintiffs would produce agreements associated with up to approximately 66 of the current list of asserted works (*i.e.*, 10% of 662).

LATHAM&WATKINS LLP

rights in the work, irrespective of work-for-hire status.[18]   Suno is apparently hoping to develop evidence for the purpose of embarking on mini trials challenging these transfers between Plaintiffs and a third-party regarding each registered work for hire and the validity of the applicable registrations.  Again, this approach is impractical given the massive scope of Suno's infringement and implicates the additional issue that Suno "does not have standing to challenge the presumption of ownership when Plaintiffs claim ownership by assignment."  *In re Napster, Inc. Copyright Litig.*, 191 F. Supp. 1087, 1097 (N.D. Cal. 2002) (citing *Magnuson v. Video Yesteryear*, 85 F.3d 1424 (9th Cir.1996)); *see also John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 186 F. Supp. 2d 1, 12-13 (D. Mass. 2002) ("What the law makes clear is that, when an author and a transferee do not dispute the ownership of a copyright interest, a third party may not raise the issue of copyright ownership as a defense to a claim that it infringed the copyright."); *Homeowner Options for Mass. Elders, Inc. v. Brookline Bancorp, Inc.*, 789 F. Supp. 2d 242, 244 (D. Mass. 2011) ("[Plaintiff] filed for and received copyright registration which has not been disputed by any of the other possible owners.  [Plaintiff] enjoys a presumption of validity in its ownership status as stated in that registration.  Indeed, 'it would be unusual and unwarranted to permit a third-party infringer' to challenge copyright ownership or a transfer thereof." (internal citations omitted)).

Given the volume of works Plaintiffs anticipate being at issue in this case, this proposed sampling approach is a sensible means to allow Suno to test the validity of Plaintiffs' copyrights in registered works for hire, while cabining the burden associated with producing potentially hundreds of highly sensitive artist contracts that are, for the most part, far afield from the claims asserted in this action.  If, after Plaintiffs produce a sample of such agreements, Suno identifies any specific issues or works for which it believes it requires additional information, Plaintiffs are willing to meet and confer to discuss those concerns.  In the absence of any basis to believe that the sought-after agreements will shed light on any disputed issue, Suno's request for every agreement pertaining to each of their sound recordings registered as a work for hire is disproportionate to the needs of the case.  The Court should deny Suno's motion to compel.

### Suno's Reply

### *Preliminary Statement*

Plaintiffs' opposition to Suno's requests for deposit copies and work-for-hire agreements for the Asserted Works is as notable for what it omits as for what it includes.  Though Plaintiffs claim that this information is "unnecessary," Plaintiffs do not disagree that, to establish infringement, they must show that they own the Asserted Works and that Suno infringed those Works and that the requested information is relevant to both of those prongs of their prima facie

---

[18] In addition, artists themselves are time-barred from bringing claims challenging the works-for-hire status of works for which the registration was filed more than three years ago.  *See, e.g., Aday v. Sony Music Entertainment*, 1997 WL 598410, at *4 (S.D.N.Y. Sept. 25, 1997) (holding that plaintiffs' copyright claim, which involved a challenge to whether band was an "employee for hire," was time-barred because it was not "brought within three years of the accrual of the claim").  It defies common sense to allow Suno to challenge the work-for-hire status of works where the artists themselves could not do so.

LATHAM&WATKINS LLP

*case*. To the contrary, they have *admitted* that the deposit copies at least "may be relevant under Rule 26." *Supra* at 14 n.15.

Plaintiffs' true objection to complying with Suno's discovery requests is made clear in their preliminary statement: Plaintiffs believe that "there is no serious question" as to either their ownership or Suno's infringement and that they will offer evidence on both of these elements at trial. *See supra* at 8 (stating that "the core issue presented in this case" is whether Suno's "extensive copying of Plaintiffs' protected sound recordings qualifies as a fair use"); *supra* at 9 (stating, without support, that "there is no serious question that Plaintiffs own or exclusively control the asserted works"); *see also supra* at 15 (stating that "there will be no need" for a substantial similarity analysis). This has been Plaintiffs' position throughout this litigation. First in their effort to bifurcate discovery so that discovery into fair use would occur prior to any other discovery on Plaintiffs' claims or Suno's defenses (which this Court rejected, *see* Ex. S at 3:22-4:11(Oct. 28 Hr'g Tr.)), then in their initial position that, if they produced any ownership information, they would do so only after they inspected Suno's training data (which they withdrew following a hearing before this Court, *see* Ex. E), Plaintiffs have consistently treated their prima facie infringement case as a foregone conclusion. But that is not how the law works, and it is not how discovery works. As Suno has already explained—and Plaintiffs do not dispute—Plaintiffs, having brought this infringement action, bear the burden of proving by a preponderance of the evidence both that they own each one of the Asserted Works and that Suno has infringed each one of those Works. *See supra* at 3; *see also Flo & Eddie*, 80 F. Supp. 3d at 543 ("A party alleging copyright infringement *always has to prove that he owns the copyright he is asserting*, it is an element of his claim!" (emphasis added)). Suno, in turn, is entitled to discovery relevant to whether Plaintiffs can satisfy their burden and that will allow Suno to test Plaintiffs' claims. The deposit copies and work-for-hire agreements Suno seeks are indisputably relevant to whether Plaintiffs can establish ownership and copying. Their production is neither "unnecessary" nor unduly burdensome.

Plaintiffs cannot will their discovery obligations away with one-sided statements about what is or is not a "serious question"; while Plaintiffs may believe that there is no "serious question" as to their prima facie case, Suno disagrees and is not obligated to take Plaintiffs' word for it. This Court should therefore grant Suno's Motion to Compel.

### *Discussion*

### 1. **Deposit Copies**

For over six months, Suno has requested that Plaintiffs produce deposit copies for their Asserted Works.[19] After repeatedly refusing to produce this information, Plaintiffs, when

---

[19] Suno has also sought additional ownership information, including copyright registrations and chains of title. For months, Plaintiffs refused to provide any of this foundational information until after they inspect Suno's training data. *See supra* at 2. Though Plaintiffs state that "Suno rejected this proposal," *supra* at 10, this statement is incomplete. The Court, too, rejected Plaintiffs' attempts to avoid their discovery obligations, and it was only after the February 14 hearing that Plaintiffs withdrew a number of their objections. *See supra* at 3.

LATHAM&WATKINS LLP

questioned by the Court at the parties' February 14 conference, claimed that they would be open to producing a sample of deposit copies as "a reasonable approach" to the parties' dispute. *See* Ex. D at 12:04-10. Following the conference, however, Plaintiffs reverted to their original position: that they refuse to produce deposit copies for any of the Asserted Works. Plaintiffs claim that their reversal is because, "[u]pon further investigation, it has become clear that . . . deposit copies are not required to demonstrate Plaintiffs' ownership of the asserted works." *Supra* at 11.[20] To begin, this position is not one that required any "further investigation": it is the same legal argument that Plaintiffs have been making for months in both this case and in the parallel case *UMG Recordings, Inc. et al. v. Uncharted Labs, Inc. et al.*, No. 1:24-cv-04777 (S.D.N.Y.). *See, e.g.*, Exs. B. & C; *Uncharted Labs*, No. 1:24-cv-04777, Dkt. 80 at 3-4. But more importantly, Plaintiffs' arguments are meritless: deposit copies are both relevant under Rule 26 to determine whether Suno actually copied the Asserted Works (as Plaintiffs themselves acknowledge, *see supra* at 14 n.15) and proportional to the case, particularly where Plaintiffs can easily request the copies from the Copyright Office.

It is helpful to clarify why, exactly, the deposit copies are necessary—and to correct a number of Plaintiffs' misstatements. Plaintiffs characterize Suno as arguing that "deposit copies are [] required to demonstrate Plaintiffs' ownership of the asserted works." *Supra* at 11. But this is not the purpose of Suno's request. As Suno has explained, "it is necessary to compare" the deposit copies of the Asserted Works to any works found in Suno's training data "to determine whether Plaintiffs own any particular sound recording that they may find" there. *Supra* at 3. Plaintiffs claim that they own the Asserted Works—that is, the works identified solely by title, artist name, and registration number in Exhibit A of the Amended Complaint. They also claim that Suno's training data contains copies of those Works. To substantiate their claims, Plaintiffs must show that any recordings they find in Suno's training data match the Asserted Works they have registered with the Copyright Office. The deposit copies–that is, the recordings Plaintiffs submitted alongside their copyright registration applications–are what will allow Suno to determine what, exactly, the Asserted Works *are* and whether those specific Works are, in fact, in Suno's training data.

Plaintiffs claim that deposit copies do not "define the metes and bounds of copyrighted works under the Copyright Act of 1976." *Supra* at 14. This is inaccurate. Plaintiffs are confusing

---

Plaintiffs have also suggested that, if they amend their complaint to add additional works, they may not agree to produce the information they have agreed to for the current Asserted Works. To be clear, Plaintiffs' obligation to provide basic discovery concerning their prima facie claims does not depend on the number of works they assert. If Plaintiffs decide to assert additional works, Suno is entitled to ownership information as to those works.

[20] In their opposition statement, Plaintiffs now claim, for the first time, that they "are willing to produce a sample of their commercially available sound recordings from their commercial feeds." *Supra* at 13. But as discussed below, producing the commercially available recordings–whether all of those recordings or only a sample–does not address the core issue that Plaintiffs have not established that the commercially available recordings are the same as the deposited works.

Suno also reiterates its position that it is entitled to and is requesting deposit copies for all of Plaintiffs' Asserted Works, not simply a sample of them. While Suno remains open to considering a sampling approach should Plaintiffs propose one (which they thus far have refused to do), Suno reserves all rights with respect to the evidentiary and legal sufficiency of Plaintiffs producing only some of the relevant deposit copies.

**LATHAM&WATKINS**LLP

the question of *copyrightability*, which is available for any "original work[] of authorship fixed in any tangible medium of expression" and does not require filing a deposit copy, 17 U.S.C. 102, and *copyright registration*, which requires the owner to register the work and file a deposit copy of that work with the Copyright Office, 17 U.S.C. 408(b), 411(a) (listing the deposit copy requirements for registered works); *see supra* at 4. While an owner may hold copyright rights in an unregistered work, it must have a registration to sue for infringement—and that registration and the accompanying deposit copy, in turn, determine what the allegedly infringed work is. 2 *Nimmer on Copyright* § 7.16[B][1][a] (2024) ("If plaintiff cannot prove that the item in suit corresponds to a registered work, the cause of action fails.").[21] Indeed, Plaintiffs' own cited case, *Accusoft Corporation v. Quest Diagnostics, Inc.*, No. 12-cv-40007, 2015 WL 10718481 (D. Mass. Oct. 1, 2015), confirms this position. There, the court found that, "as the plaintiff, Accusoft is required to prove substantial similarity *between the source code it registered with the Copyright Office* and the object code Defendants copied." *Id.* at *19. To do so, the "plaintiff must first introduce evidence of the material it deposited when the copyrighted work was registered, and then provide evidence allowing the factfinder to draw the inference of similarity." *Id.* at *19. Deposit copies are thus necessary to confirm what, exactly, the Asserted Works are.

Finally, Plaintiffs, relying on two cases, argue that deposit copies are not "the only way" "for a copyright plaintiff to satisfy its burden of proof." *Supra* at 14. While Plaintiffs are entitled to attempt to satisfy their burden of proof without deposit copies (and Suno expects that Plaintiffs will produce all evidence on which they intend to rely), it does not follow that Plaintiffs can also dictate how and whether Suno can test their alternative evidence. Regardless of what form Plaintiffs' evidence takes, it does not alter their obligation to produce documents that would allow Suno to challenge Plaintiffs' preferred method of proof—especially where that proof comes in the form of witness testimony. In any event, neither case Plaintiffs cite is at all analogous. In *Ross-Nash v. Almond*, No. 19-cv-957, 2020 WL 6947691 (D. Nev. Oct. 28, 2020), the defendant admitted that she owned and copied an "original and authentic" copy of Red Thread (the book at issue), and there was "no genuine dispute that Red Thread [was] the work that [she] copied." *Id.* at *2. Here, in contrast, Suno has made no such admission. *United States v. Cassim*, 693 F. Supp. 2d 697 (S.D. Tex. 2010), meanwhile, was a criminal conspiracy case, and, on that basis, the court declined to adopt the Defendant's "extremely well-articulated and thoughtful argument as to the insufficiency of the Government's evidence," reasoning that "the holdings related to civil enforcement of copyright law are inapplicable." *Id.* at 703.

Indeed, Plaintiffs' description of the other evidence on which they intend to rely demonstrates why deposit copies are necessary. Plaintiffs claim that Suno can "identify the copyrighted work[s]" through ISRCs and UPCs, which some of the Plaintiffs list on some of their copyright registrations—apparently by seeking them out from commercial providers and

---

[21] It is because of this distinction (which Suno explained in its opening position statement and which Plaintiffs have not challenged) that the holding in *Structured Asset Sales*, 120 F.4th 1066, still provides useful guidance. Though Plaintiffs are correct that Structured Asset Sales involved the Copyright Act of 1909, under which deposits are necessary for copyright *protection*, the Copyright Act of 1976 maintains that deposits, as a precondition for registration, are necessary to sue for copyright *infringement*. In effect, then, deposit copies remain necessary for any copyright plaintiff, and the deposit copies define the scope of the work being asserted. Thus, as in *Structured Asset Sales*, Plaintiffs' claims must be limited to "the four corners of the Deposit Copy." *Id.* at 1075.

LATHAM&WATKINS LLP

purchasing them.[22]  Plaintiffs also represent that they intend to rely on declarations from their employees representing that "Plaintiffs submit the same sound recordings to the Copyright Office that are commercially released to the public" and on Audible Magic, which they claim has been provided Plaintiffs' commercial recordings and thus can "confirm which sound recordings in Suno's training data belong to them."  *Supra* at 13.  All three of these proposals suffer from the same fundamental problem:  Plaintiffs are asking Suno to simply take their word for it that the recordings that they have made commercially available (and uploaded to Audible Magic) are the *same* as those deposited with the Copyright Office.  Plaintiffs have not cited a single authority supporting their position that Suno is required to rely on their say-so and on their *own* preferred evidence without access to necessary evidence to challenge Plaintiffs' representations.  Indeed, Suno cannot assess, let alone cross-examine, a label declarant's or witness' representation that the label registers the exact same sound recordings it makes commercially available if it doesn't have access to any of Plaintiffs' deposit copies.[23]

Plaintiffs argue that *UMG Recordings, Inc. v. Grande Communications Networks, L.L.C.*, 118 F.4th 697 (5th Cir. 2024), supports their refusal to produce deposit copies because they intend to rely on Audible Magic. Yet *Grande* concerned an entirely different issue.  There, a copyright defendant filed a post-trial renewed motion for judgment as a matter of law, arguing that proving infringement requires "a side-by-side comparison" of the works asserted and the allegedly infringing works and that the plaintiffs had not met their burden through witness testimony identifying the plaintiffs' works and Audible Magic results.  *Id.* at 709.  The Fifth Circuit rejected this argument, holding that the jury was "entitled to rely" on the plaintiffs' evidence.  *Id.* at 710.  But the issue currently before this Court is not whether evidence that Plaintiffs have already presented to a jury is sufficient to prove their claims.  Rather, the issue is what discovery Suno is entitled to as "relevant" to Plaintiffs' claims or Udio's defenses.  *See* Fed. R. Civ. P. 26(b)(1); *cf. Green v. Cosby*, 152 F. Supp. 3d 31, 34 (D. Mass. 2015) (noting that "the limits set forth in Rule 26 must be construed broadly").  Regardless of whether Plaintiffs can or cannot satisfy their prima facie burden in this case without putting their deposit copies in the record, surely those records are "relevant" to the claims and defenses in this case.  Moreover, a review of the district court docket in *Grande* makes clear that the defendant never sought to compel production of deposit copies.

---

[22] Plaintiffs have stated that they "are willing to produce" an undefined "sample of their commercially available sound recordings," *supra* at 13, but apparently expect Suno to purchase the remainder.  Plaintiffs also have not confirmed that all or even most of the Asserted Works list ISRCs and UPCs on their registrations; the most they do is state that one Plaintiff "often" includes ISRCs, another includes "unique Catalogue Number[s]" in "certain" of their registrations, and a third "has filed" registrations with UPCs.  *Supra* at 12.

[23] *Accusoft Corporation v. Quest Diagnostics, Inc.*, 2015 WL 10718481, is not to the contrary.  There, the court found that there was a genuine dispute of material fact precluding summary judgment for either party where the plaintiff relied on a "thin" employee declaration to establish that the versions of code produced in discovery matched the versions registered with the Copyright Office.  *Id.* at *20.  In that case, the plaintiff actually produced versions of the asserted work, and the employee's statement was based on his actual review of the deposit copies.  *Id.*  Here, by contrast, plaintiffs have refused to produce any version of all of their Asserted Works, and, per their own arguments, their employees will apparently be unable to review the deposit copies.  *See supra* at 15-16 (explaining the apparent difficulties and, in some cases, impossibility of accessing deposit copies).

LATHAM&WATKINS LLP

Grande thus provides no insight at all into how the Fifth Circuit or any other court would assess a discovery request seeking this information.[24]

Not only have Plaintiffs failed to justify their refusal to produce documents that would allow Suno to test their claims that the Asserted Works are in its training data, they have also failed to establish that simply producing the deposit copies would impose an undue burden. Though Plaintiffs claim that collecting and producing deposit copies of their asserted works "poses an immense burden and expense," *supra* at 15, their claim falls apart upon inspection. First, Plaintiffs argue that they "do not maintain deposit copies for every copyrighted sound recording they own" and that "retrieving and searching for physical deposit copies would be a manual process that would entail a significant burden." *Id.* To begin, it bears noting that Plaintiffs collectively "own or exclusively control copyrights in a great majority of the most commercially valuable sound recordings in the world," *supra* at 8, consider licensing these recordings their "core" business, Dkt. 1 at p 77, and regularly engage in copyright litigation regarding their recordings. It is somewhat surprising that Plaintiffs lack the internal organization and capacity to locate deposit copies for the Asserted Works, which are by some of history's most famous and popular artists, particularly when Plaintiffs bear the burden of establishing ownership of such works in any copyright infringement suit. Moreover, Plaintiffs have offered only conclusory and general statements regarding the alleged burden of searching for the deposit copies—and have not provided any indication that they have actually *tried* to search for the copies. *See* Romeo Decl. 5 ("Any such deposit copies of physical product that Warner maintains would be extremely burdensome to search and retreive."); Castagna Decl. 5 ("To the extent Sony maintains copies of physical product it submitted to the Copyright Office during the registration process, retrieving and searching such product would entail a manual, time-consuming process.").

Regardless, Plaintiffs have a straightforward option to locate and produce the deposit copies without resorting to an allegedly arduous search of their internal repositories: requesting these deposit copies from the Copyright Office. Their counterarguments that this request would be "pointless" and cost-prohibitive, *see supra* at 16, are unavailing.

Plaintiffs first argue that requesting deposit copies from the Copyright Office would be "a pointless, and expensive endeavor" because the Copyright Office would provide a "proximate reproduction" of requested phonorecords, which may not reproduce "all frequencies contained in the original phonorecord." *Id.* (citing Ex. F). They then argue that this "replica" produced by the Copyright Office "is no different than what Plaintiffs have made commercially available." *Id.* Neither objection justifies Plaintiffs' refusal to request and produce the deposit copies possessed by the Copyright Office. While the sound recordings provided by the Copyright Office may not be exact duplicates of the deposit copies, down to the last frequency, there is no reason to believe that they are materially different from the actual deposit copies, particularly where the Copyright Office manual Plaintiffs cite make clear that any differences are a matter of "frequencies." Notably, Plaintiffs also have not established that the "commercially available" recordings they favor are exact matches. In sum, Plaintiffs cannot show that the Copyright Office

---

[24] Plaintiffs object that "Suno cannot distinguish UMG solely on the basis that it arises in the post-trial context." *Supra* at 14 n.15. This is not Suno's argument, as explained above.

LATHAM&WATKINSLLP

reproductions are so different from the deposit copies that they will not provide proof of the scope of the Asserted Works, which is the critical issue at hand. Deposit copies provided by a neutral, third-party government entity, even in the form of a proximate reproduction, provide greater assurances than representations from Plaintiffs' executives.[25]

Plaintiffs also argue that "the cost of requesting deposit copies from the Copyright Office would be prohibitive" and even alleged that "costs could easily run into the millions of dollars given the large number of works at issue in this suit." *Id.* This estimate is difficult to take seriously. By Plaintiffs' own accounting, each deposit copy can be obtained at the price of $145 – $100 for a signed litigation statement on Form LS, *see* 37 C.F.R. § 201.2(d)(2)(ii), 37 C.F.R. § 201.3(d)(15), plus $45 for a mailing fee, *see* 37 C.F.R. § 201.3(d)(17) – plus the cost the Copyright Office charges to search for and certify the copy. In order for the cost to produce Plaintiffs' 662 Asserted Works to reach even $1 million, the Copyright Office would need to spend over 4500 hours searching for these deposit copies—nearly seven hours locating and certifying each individual work. *See id.* at § 201.3(c)(22)(ii) (stating that the hourly cost of "retrieval or search" is $200). Even assuming that every single hour of searching was subject to a $500 surcharge for expedited processing, the Copyright Office would need to spend nearly 1300 hours searching, or nearly two hours per Asserted Work, to reach this figure. Plaintiffs have failed to provide any explanation of why they believe the process would be so burdensome for the Copyright Office— and their unwillingness to justify their estimate of "millions of dollars" is perhaps an indication that this figure has no basis. While Plaintiffs will likely incur some expense in requesting the deposit copies, costs are an unavoidable part of discovery, an expensive undertaking at the heart of litigation. What Plaintiffs have failed to show is how this expense could even approach their asserted figure, nor how the *actual* expense of producing these deposit copies constitutes an undue burden.[26] Moreover, any expense Plaintiffs incur is attributable to their apparent failure to maintain deposit copies of the Asserted Works, which are by "some of the most prolific and well-known recording artists in the world" and in which Plaintiffs "have made substantial investments." Dkt. 1 at p 17.

At core, Plaintiffs' only actual objections to producing deposit copies are: 1. That they are entitled to prove that the Asserted Works are in Suno's training data in another way, and 2. That they do not want to pay the Copyright Office to request the copies. As to the first point, the evidence Plaintiffs intend to use at trial has no bearing on whether Suno is entitled to deposit copies in discovery and does not change that the deposit copies are relevant, proportional, and not unduly burdensome under Rule 26. As to the second point, Plaintiffs are multimillion dollar companies that "own or exclusively control copyrights in a great majority of the most commercially valuable sound recordings in the world." They have chosen to file this suit, and they, like Suno, must accept the ordinary burdens of discovery—including relatively modest expenses in a case in which

---

[25] Plaintiffs' claim that, "in response to such requests, the 'Copyright Office will provide the title and registration number of the phonorecord,' which is information Plaintiffs have already provided to Suno," *supra* at 16, is puzzling. While it may be the case that the Copyright Office will provide this information, it will also, more importantly, provide reproductions of the deposit copies. *See* Ex. G.

[26] In an effort to alleviate any meaningful burden, Suno has made clear that it is open to considering a sampling approach. *See* Ex. D at 10:21-11:02; 13:23-24. Yet Plaintiffs, in spite of their representations to the contrary at the parties' February 14 conference, have refused to propose one. *See supra* at 11.

LATHAM&WATKINS LLP

Plaintiffs seek nearly *$100 million* in statutory damages alone. Dkt. 1 p. 32. Plaintiffs' self-serving determination that "there is no serious question" about their prima facie case does not exempt them from discovery, and they have no basis to refuse to produce deposit copies for the Asserted Works.

### 2.  Works Made for Hire

Suno has requested the work-for-hire agreements for what Plaintiffs acknowledge is a "relatively narrow" category of works, *supra* at 17: works designated as works for hire with registrations indicating that Plaintiffs are the owner or author of the work. As Suno has explained, these agreements are necessary to determine whether works in this category were created by an employee of Plaintiffs or were "specially commissioned" works, which are the *only* two ways they could properly qualify as works for hire under the Copyright Act—and the only two situations in which Plaintiffs could prove their ownership. *See supra* at 6-7. Plaintiffs do not dispute that they bear the burden of proving that they own the works in question, nor do they disagree with Suno's review of the governing law. Instead, Plaintiffs spend their response defending their counterproposal, which is inadequate and unwarranted by any alleged burden, and raising red herring arguments regarding standing. Neither justifies their refusal to respond to this narrow discovery request.

Beyond vague references to "burden" (discussed below), Plaintiffs' main objection to providing the narrow category of information at issue is that Suno intends to "embark[] on mini trials" for each work—and that their proposed sampling approach will avoid such "mini trials." To be clear, Suno does not intend to challenge Plaintiffs' ownership unnecessarily or without basis. But the reality is that Plaintiffs bear the burden of proving that they own each one of the Asserted Works. Where a work is listed as a work for hire, Plaintiffs have a valid claim to ownership *only* if the artist is an employee—a fact-specific inquiry determined under established common-law agency principles, *see Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751 (1989)—or if the work is "specially commissioned"—a designation that specifically excludes sound recordings, *see supra* at 7 n.6. 17 U.S.C. § 101. If the works at issue do not fall into one of these two categories, Plaintiffs cannot support their claim that they own them as works for hire. The agreements Suno seeks, which purportedly establish the work-for-hire or employment arrangements between Plaintiffs and the artists,[27] are thus not part of a "mini trial," but are central to whether Plaintiffs can prove their prima facie claims in *this trial*. Plaintiffs cannot avoid their burden by proving that they own some, but not all, of the works in question and expecting Suno to take their word for it for the rest. This expectation is particularly unwarranted where Plaintiffs have access to complete ownership information for each of the Asserted Works yet have crafted a proposal by which they can selectively choose the works for which they will provide work-for-hire agreements.

Indeed, Plaintiffs' own opposition statement illustrates the necessity of producing the artist contracts for each work in this category. Plaintiffs allege that their artist contracts "expressly

---

[27] If Plaintiffs' claim is that the works at issue are works for hire because the artists are Plaintiffs' employees, Plaintiffs must produce any additional documents that demonstrate the artists' employment status.

LATHAM&WATKINS LLP

*assign* them all rights in the work, irrespective of work-for-hire status." *Supra* at 17 (emphasis added).[28] This description suggests that the registration information for the works listed as works for hire may be inaccurate, and Plaintiffs' claim of ownership may instead come through an assignment of title—meaning that Plaintiffs' registrations are incorrect and thus not entitled to any presumption of validity, a salient fact in and of itself.[29] The ambiguity of Plaintiffs' position as to how they own the works at issue lays bare the problem with relying on their say-so concerning the agreements that purportedly establish their ownership of the works at issue in this case. Ultimately, it is undisputed that Plaintiffs bear the burden of proving that they own the Asserted Works, and it is undisputed that the work-for-hire agreements are relevant to ownership. Plaintiffs' objection to "mini trials" boils down to a complaint that Suno is holding them to the burden that they will bear at the actual trial; that is an insufficient reason to refuse relevant discovery.

Plaintiffs raise the additional argument that Suno does not have standing to challenge their ownership of the Asserted Works. Yet Plaintiffs distort the cases on which they purportedly rely. In *Napster*, the court *rejected* the plaintiffs' argument that the defendant did "not have standing to challenge" the plaintiffs' ownership of the asserted works, finding that the cases the plaintiffs cited "are more limited than [they] suggest" and that the "third-party standing doctrine does not preclude this court from considering Napster's argument that the Schedule A Works are not 'works for hire.'" *Napster*, 191 F. Supp. 2d at 1097. *John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 186 F. Supp. 2d 1 (D. Mass. 2002) and *Homeowner Options for Mass. Elders, Inc. v. Brookline Bancorp, Inc.*, 789 F. Supp. 2d 242 (D. Mass. 2011), meanwhile, involved *defendants* who argued that the *plaintiffs* did not have standing to sue for infringement because of an invalid transfer of ownership from another party. *See John G. Danielson*, 186 F. Supp. 2d at 10–13; *Homeowner Options*, 789 F. Supp. 2d at 243–44. Suno is not, at this juncture, challenging Plaintiffs' standing to sue; rather, this information is relevant to whether Plaintiffs can meet their prima facie burden of proving ownership. Moreover, in both *John G. Danielson* and *Homeowner Options*, the court pointed to evidence that "the other possible owners" did not dispute the plaintiffs' ownership, *John G. Danielson*, 186 F. Supp. 2d at 13 (limiting its finding to situations in which "an author and a transferee do not dispute the ownership of a copyright interest"); *Homeowner Options*, 789 F. Supp. 2d at 244 (noting that the plaintiff's ownership had "not been disputed by any of the other possible owners"). Here, Plaintiffs have offered no such evidence from the artists whose works are at issue.[30] Just as there is no dispute that Plaintiffs must

---

[28] This "belt-and-suspenders" approach may reflect Plaintiffs' uncertainty as to ownership under the work-for-hire doctrine. As discussed, because a sound recording cannot be a "specially commissioned" work under the Copyright Act, *see supra* at 7 n.6, Plaintiffs' claim to ownership would have to be based on the artists in question being employees, rather than independent contractors—which would require Plaintiffs to satisfy the multifactor factual inquiry set forward in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989).

[29] To be clear, if Plaintiffs' position is that their ownership of any of the works listed as works for hire for which they are listed as the authors or owners derives from an *assignment* of rights, Suno expects Plaintiffs to produce all documents demonstrating the chain of title. If Plaintiffs claim to protect their copyrights through "belt and suspenders," Suno is entitled to discovery into both the belt and the suspenders.

[30] Plaintiffs additionally argue that "artists themselves are time-barred from bringing claims challenging the works-for-hire status of works for which the registration was filed more than three years ago." *See supra* at 17 n.18 (citing

LATHAM&WATKINS LLP

prove that they own the Asserted Works, there is no dispute that Suno is entitled to challenge their ownership as part of its defense. Plaintiffs' argument to the contrary should be rejected out of hand.

Plaintiffs' final argument is that their proposal, under which Plaintiffs would produce work-for-hire agreements for 10% of the Asserted Works, with Suno selecting 5% of the sound recordings and Plaintiffs selecting the other 5%, is necessary to alleviate the burden of producing fully responsive information. Though Plaintiffs spend the majority of their response attempting to justify this proposal, they neither address Suno's explanation of why this proposal is insufficient nor explain why it is necessary. *First*, Plaintiffs' approach would have them produce work-for-hire agreements for 10% of the total Asserted Works—not 10% of the works within the category of works actually at issue. Under this approach, Plaintiffs could use their 5% for works for which there *is* no work-for-hire agreement (because Plaintiffs' claim to ownership comes through transfer of title), meaning they would produce nothing. Though Suno has repeatedly raised this obvious issue, Plaintiffs have refused to modify the terms of their proposal. Plaintiffs say that they "envision this process taking place after they produce the copyright registrations such that Suno will be able to identify the works that fall into this category," but this explanation does not change the basic fact the proposal, by its own terms, is based on the universe of "Asserted Works," not works in "this category," and is therefore not properly tailored. Moreover, Plaintiffs would have Suno agree to Plaintiffs' approach before they have produced a single registration. As Suno has explained, it cannot assess whether Plaintiffs' proposal is necessary or appropriate without an understanding of how many works are registered as works for hire. Plaintiffs' arguments in favor of their preferred approach fail to address this fundamental issue.

*Second*, Plaintiffs' attempt to replace the information Suno seeks with an alternative proposal of their own design is not justified by any burden they have been able to articulate. Notably, Plaintiffs' *only* argument as to burden is an unelaborated reference to "the burden associated with producing potentially hundreds of highly sensitive artist contracts." *Supra* at 18.[31] Yet Plaintiffs have not explained why they believe that this request would involve "potentially hundreds" of agreements, particularly when both parties agree that the request targets a "narrow" category. And even assuming the request would involve hundreds of agreements, Plaintiffs have not articulated why it would be burdensome or difficult at all to collect and produce

---

*Aday v. Sony Music Entertainment*, No. 96-cv-991, 1997 WL 598410, at *4 (S.D.N.Y. Sept. 25, 1997)). But it is not the case that artists are time-barred from bringing causes of action when "the registration was filed more than three years ago": both Plaintiffs' cited case and the First Circuit recognize that the three-year statute of limitation begins to run only when the plaintiff knows or should have known of the allegedly infringing conduct. *See Aday*, 1997 WL 598410, at *4; *Warren Freedenfeld Assocs., Inc. v. McTigue*, 531 F.3d 38, 44 (1st Cir. 2008). And in *Aday*, the court found that the plaintiffs knew or should have known of the work-for-hire status of the works at issue because of contracts whose terms the plaintiffs were aware of—not copyright registrations. *Aday*, 1997 WL 598410, at *4-5. Additionally, the one copyright infringement case Plaintiffs cite does not support their claim that an artist "could not" challenge a work-for-hire agreement under contract law more than three years after it was entered.

[31] Plaintiffs have not presented to the Court the argument they made to Suno that they will be burdened because "the "agreements are commercially sensitive, and their production would require Plaintiffs to find and collect each relevant agreement as part of a go-get collection." *See* Ex. G. As Suno explained in its opening statement, this alleged burden is no more than the burden of complying with discovery—and is particularly unconvincing considering the significant volume of commercially sensitive information Suno has already agreed to produce. *See supra* at 7-8.

LATHAM & WATKINS LLP

those agreements.[32]  Indeed, there is reason to believe that collection and production would not, in fact, be difficult: the Asserted Works are by some of the most popular recording artists in the United States, such as the Beatles, Michael Jackson, and Ed Sheeran.  Moreover, from Suno's initial investigation of publicly available documents, it appears that more recent works are more likely to be listed as works for hire with Plaintiffs listed as the authors or owner.  It strains credulity to suggest that Plaintiffs do not have ready access to their work-for-hire (or employment) agreements with some of their most popular and commercially successful artists—and, indeed, Plaintiffs' claim that there are "substantial similarities" among the agreements indicates that Plaintiffs have been able to find and review them during this litigation.  Finally, as Suno has already stated, "the number of artist-label agreements that Plaintiffs need to collect is further limited by the fact that a single agreement between a label and artist may cover multiple works, and Plaintiffs' list of Asserted Works implicates fewer than 50 artists total." *Supra* at 8.  Plaintiffs' inability to articulate any burden, much less an undue or disproportionate burden, associated with this request makes their counterproposal unnecessary.  Plaintiffs should simply produce the documents Suno has requested, which are relevant, proportionate, and not unduly burdensome.

\*　　　　　\*　　　　　\*

The discovery Suno seeks is plainly relevant to the core issues of whether Plaintiffs own the Asserted Works and whether those Works are present in Suno's training data.  Though Plaintiffs complain of burden and propose alternative methods by which they will establish ownership and copying, they have not shown any undue burden beyond the burdens inherent to discovery and cannot rely on the evidence *they* plan to present to curtail Suno's ability to obtain relevant discovery for itself.  Suno therefore respectfully requests that the Court compel Plaintiffs to produce deposit copies for all Asserted Works and, for Asserted Works where Plaintiffs are listed as the author or owner of a work but the copyright registration identifies the work as a "work made for hire," the agreements that establish Plaintiffs' ownership of those works.

---

[32] Plaintiffs' silence on this topic is in notable contrast to their arguments regarding deposit copies, where they offered an explanation of the alleged difficulty of locating the deposit copies in their records.

**LATHAM&WATKINS**LLP

Dated March 19, 2025                              Respectfully submitted,

*s/ Moez M. Kaba*                                *s/ Brittany N. Lovejoy*
Moez M. Kaba (*pro hac vice*)                     Shlomo Fellig (BBO# 699643)
Mariah N. Rivera (*pro hac vice*)                 **LATHAM & WATKINS LLP**
Alexander R. Perry (*pro hac vice*)              200 Clarendon Street
**HUESTON HENNIGAN LLP**                          Boston, MA 02116
1 Little West 12th Street                         Telephone: (617) 948-6000
New York, New York 10014                          Facsimile: (617) 948-6001
Telephone: (646) 930-4046                         shlomo.gellig@lw.com
Facsimile: (888) 775-0898
mkaba@hueston.com                                 Andrew M. Gass (*pro hac vice*)
mrivera@hueston.com                               Brittany N. Lovejoy (*pro hac vice*)
aperry@hueston.com                                **LATHAM & WATKINS LLP**
                                                  505 Montgomery Street, Suite 2000
Robert N. Klieger (*pro hac vice*)                San Francisco, CA 94111-6538
Rajan S. Trehan (*pro hac vice*)                  Telephone: (415) 391-0600
**HUESTON HENNIGAN LLP**                          Facsimile: (415) 395-8095
523 West 6th Street, Suite 400                    andrew.gass@lw.com
Los Angeles, California 90014                      brittany.lovejoy@lw.com
Telephone: (213) 788-4340
Facsimile: (888) 775-0898                         Steven N. Feldman (*pro hac vice*)
rklieger@hueston.com                              Nathan Taylor (*pro hac vice*)
rtrehan@hueston.com                               **LATHAM & WATKINS LLP**
                                                  1271 Avenue of the Americas
Daniel J. Cloherty                                New York, NY 10020
Alexandra Arnold                                  Telephone: (212) 906-1200
**CLOHERTY & STEINBERG LLP**                      Facsimile: (212) 751-4864
One Financial Center, Suite 1120                  steve.feldman@lw.com
Boston, Massachusetts 02110                       nathan.taylor@lw.com
Telephone: (617) 481-0160
Facsimile: (617) 848-0830                         Sarang V. Damle
dcloherty@clohertysteinberg.com                   **LATHAM & WATKINS LLP**
aarnold@clohertysteinberg.com                     555 Eleventh Street, NW
                                                  Suite 1000
*Counsel for Plaintiffs*                          Washington, D.C. 20004-1304
                                                  Telephone: (202) 637-2200
                                                  Facsimile: (202) 637-2201
                                                  sy.damle@lw.com

                                                  *Counsel for Defendant Suno, Inc.*

cc: All Counsel of Record (via CM/ECF)