# EXHIBIT D

```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3   UMG RECORDINGS, INC., et al.,      )
                                        )
 4                    Plaintiffs        )
                                        )   No. 1:24-CV-11611-FDS
 5   vs.                                )
                                        )
 6   SUNO, INC., et al.,                )
                                        )
 7                    Defendants.       )
                                        )
 8                                      )
                                        )
 9


10


11          BEFORE THE HONORABLE PAUL G. LEVENSON
                 UNITED STATES MAGISTRATE
12             Hearing (Digital Recording)


13


14


15        John Joseph Moakley United States Courthouse
                     Courtroom No. 25
16                  One Courthouse Way
                Boston, Massachusetts 02210

17


18                  February 14, 2025
                      11:03 a.m.
19


20


21            Kristin M. Kelley, RPR, CRR
                 Official Court Reporter
22     John Joseph Moakley United States Courthouse
                One Courthouse Way, Room 3209
23              Boston, Massachusetts 02210
                E-mail: kmob929@gmail.com
24
          Mechanical Steno - Computer-Aided Transcript
25
```

```
 1    APPEARANCES:

 2

 3            Rajan Trehan
                Hueston Hennigan LLP
 4            523 W 6th St
                Suite 400
 5            Los Angeles, CA 90014
                408-876-0529
 6            rtrehan@hueston.com
                for Plaintiffs.

 7

 8            Alexander Perry
                Mariah Rivera
 9            Hueston Hennigan LLP
                1 Little W. 12th St.
10            Ste 2nd Floor
                New York, NY 10014
11            212-715-1121
                aperry@hueston.com
12            mrivera@hueston.com
                for Plaintiffs.

13

14

                Brittany N. Lovejoy
15            Latham & Watkins
                505 Montgomery Street
16            Suite 2000
                San Francisco, CA 94111
17            415-391-0600
                britt.lovejoy@lw.com
18            for Defendants.

19

20

21

22

23

24    ** Proceedings recorded by sound recording and produced by
        computer-aided stenography. **
25
```

PROCEEDINGS

THE CLERK:  The United States District Court for the District of Massachusetts is now in session, the Honorable Paul G. Levenson presiding.  Today is February 14, 2025, UMG Recordings, Inc., et al. versus Suno, Inc., et al., Docket No. 24-CV-11611.

Counsel, please identify yourselves for the record.

MR. TREHAN:  Good morning, your Honor.  My name is Rajan Trehan from the law firm Hueston Hennigan, and I represent the plaintiffs.

THE COURT:  Good morning.

MR. TREHAN:  I'm also joined by Jacob Tracer from the RAA and Alexander Perry and Mariah Rivera from my firm.

THE COURT:  Okay.  Good morning.

MS. LOVEJOY:  Good morning, your Honor.  Brit Lovejoy of Latham & Watkins for defendant Suno.

THE COURT:  Good morning.

So thank you very much for the email sort of sneak preview of the issues.  It was very well put together and both succinct and informative and helps me review on unreported decisions on other people's discovery disputes.  I'm struck by the fact that we're in some newish territory here, so it's interesting issues.

I guess to take things in reverse order, in terms of the request for production of documents showing copyright

1    ownership and so forth, I think most of this has really been

2    decided by Judge Saylor's decision not to bifurcate.  So I'm

3    sort of left with the open question that, yes, there are

4    probably going to be, I would say it's a two step, but it's

12:01  5    probably more than two steps involved in sort of identifying

6    new, as discovery goes forward, if new published works are

7    identified, that's going to be need to be produced.  I suspect

8    there's a little bit of an iterative loop there in the sense

9    that it may well be that plaintiffs identify and choose to

12:01 10    proceed based on works that are readily documented.  So there

11    may be a certain amount of I don't know whether it's ambitious

12    or virtuous cycle, but there may be some feedback loop in that

13    that may, as a practical matter, simplify disclosures going

14    forward.

12:02 15         I think, broadly speaking, we need to get underway

16    with this.  The real question that I'd like to hear from the

17    parties on and remaining to brief, but let's just start by

18    hearing what are the particular burdens.  I mean, is this --

19    assuming the broad principle is we have to get underway with

12:02 20    this, Miss Lovejoy, are there particular burdens that you want

21    to address or ways that you would prefer slicing this up to

22    make sure we're staying proportional to the needs of the case?

23         MS. LOVEJOY:  To that end, your Honor, I think, from

24    our view, if they were in a working suit, we need to know what

12:03 25    that sound recording is.  Without the deposit copy, for

example, we don't know what the registration covers.  There are

masters and remasters of sound recordings, so in order to

understand what's at issue, our view is we need those deposit

copies for every work in suit.  We think the law supports that

12:03  request.

With respect to chain of title information, I think

there's a way that we could potentially work with plaintiffs to

narrow that to instances where the copyright registration

doesn't provide sufficient information or there is sort of a

12:03  work made for hire arrangement that requires additional

documentation.  But I think consistent with the principles we

outlined in the email briefing, I think there are potentially

ways to narrow that discovery.

THE COURT:  And your view is the registration copy, I

12:04  have no idea what the industry practice is, but where there are

commercially available, say, remasterings of recording, which

is very common in the last 30 years, is it typical practice do

you know to submit registration copies on each remastering?

How does that tend to work?

12:04  MS. LOVEJOY:  Well, the remastering indeed could be

owned by someone else entirely.  I think the most famous

example is Taylor Swift's re-recordings of her masters.

THE COURT:  That's not -- that's a separate recording

and I suppose raises interesting questions about which or both

12:04  were part of the teaching set.

6

                    MS. LOVEJOY:  Right, which is, to our view, if we're

going to be proceeding in some exercise of matching materials

and are trading data to works owned by plaintiffs, we need to

make sure we've got the right match.

12:05          THE COURT:  Right.

                    Mr. Trehan, what do you say to this?  Assuming we're

going to go forward in light of Judge Saylor's rulings on

rejecting the rule of bifurcation, are there aspects of this

that you think need particular attention from the Court?  How

12:05  do we slice this up?

                    MR. TREHAN:  I appreciate that, your Honor.  First of

all, with respect to your initial comments regarding Judge

Saylor's order on bifurcation, I do think that this issue does

present a slightly distant flavor because the question is not

12:05  simply whether or not they'd ever obtain this information.

It's simply one of timing.

                    Consistent with that and what you address, the cycle

that may occur once we actually know what is in the defendant's

training data, Suno's training data, of course there may be

12:06  works that are added, and we expect that there will likely be

many works given that Suno has admitted that it trained on tens

of millions of different recordings, and the likelihood is that

most of those belong to our clients, the plaintiffs in this

case.

12:06                    Given that, we think in terms of sequencing there's a

1   logic to this and it would be proportional to conduct this all

2   at once, especially if some of those works may fall out of the

3   case.

4           Setting that issue aside and addressing the specific

12:06   5   burden issue and the burden issue that we highlighted in our

6   email, that concerns the deposit copies.  Case law across

7   numerous courts is quite clear on this point that unlike works

8   that may have been subject to the Copyright Act of 1909,

9   recordings under the Copyright Act of 1976 are entitled to

12:07  10   copyright protection on fixation in the tangible medium,

11   meaning that mandatory deposit is unnecessary to gain

12   copyright.

13           THE COURT:  But isn't registration still required in

14   connection with suit?

12:07  15           MR. TREHAN:  And we're not disputing whether or not we

16   would provide copyright certificates, to be clear.  That is not

17   something which we are objecting to, but we do believe there

18   would be specific burdens connected with the production of the

19   deposit copies for millions of recordings and, also, to the

12:07  20   proportionality point, it's unclear exactly to what end we

21   would be engaging in that exercise.  It seems unlikely at best

22   to think that there would be a trial in this case in which the

23   jury would be listening to millions of deposit copies and

24   comparing them against the copies that are in Suno's data,

12:08  25   training data.  So it's a little bit unclear both from a legal

1    necessity point of view but also a practical point of view why

2    we would go down this path.

3            THE COURT:  Miss Lovejoy, what do you say to that?  As

4    a practical matter, what is it -- I mean, I get that it is a

12:08  5    legal requirement at some point to identify the deposit copy,

6    but as a practical matter, what is the process you have in

7    mind?  What do you want to do with this information now?

8            MS. LOVEJOY:  Well, frankly, your Honor, it is the

9    plaintiffs' burden to figure out how they are going to do this

12:08  10    process of matching some of the recordings that they are

11    asserting in this case to the sound recordings in our training

12    data.  We have some understanding from other related

13    negotiations in this case that they intend to be using

14    third-party sound recording matching technology for that

12:09  15    process.  However, the defendants still need an opportunity to

16    test that process to understand what are the sound recordings

17    you're using as track A that you're going to be matching to the

18    works in our suit, like, what are we litigating here, what is

19    the sound recording we're litigating here.

12:09  20            And I'm not sure absent some evidence of what the

21    sound recording in suit is how we would have the opportunity to

22    challenge whatever process they have in mind for how they're

23    going to go about proving their prima facie burden of

24    establishing that a copy of a sound recording in Suno's

12:09  25    training data is indeed the one that they own and the one that

1    they, in fact, registered with the copyright office.

2        THE COURT:  I get that they've got the burden and

3    they've got to make that connect, but my question to you is,

4    what do you want to do with this?  In other words, at this

12:10 5  phase of discovery, typically, people are saying, I want this,

6    and the other side is saying, it's a pain in the neck to

7    produce it.  The issue that I tend to focus on is what do you

8    want it for now.

9        So is there some process you have in mind?  Are you

12:10 10 planning to use a third-party comparison service to compare

11   what they produce to your data set and identify which matches

12   and which don't?  What do you want this data for?

13       MS. LOVEJOY:  Sure.  I think there's two things.

14       One is that the most pressing is that defendants are

12:10 15 issuing discovery requests asking us to admit that certain

16   sound recordings are in our training data, and we're not able

17   to do that, make those sorts of admissions until we can hear

18   the sound recordings and compare them.  So that's the most

19   pressing need.  They are asking for admissions from us that we

12:11 20 can't really make until we know what the sound recordings at

21   issue are.

22       THE COURT:  What do the requests for admissions look

23   like?  Is there another way to get this done?  In other words,

24   is this millions of sound recordings you're being asked for

12:11 25 admissions on, dozens, somewhere in between?

1    MS. LOVEJOY:  They are asking for an admission that

2 copyrighted sound recordings belonging to them are in their

3 training data, and we don't know --

4    THE COURT:  Some are.  They're looking for an

12:11 5 admission that, among the millions of songs, some of them are

6 copyrighted.

7    MS. LOVEJOY:  Some of them are theirs that they

8 asserted in this case.

9    THE COURT:  All right.  Could you perhaps identify a

12:11 10 small sampling, say, you know, 500 of the greatest hits, 500

11 songs?  Does it make sense to identify a shared set to sample

12 from both sides and say, all right, you know, if some, you

13 know, if none of them turn out to be the identified works

14 likely owned by plaintiffs, then that's a pretty good sign that

12:12 15 they don't have much to work with?  If some of them do, then it

16 seems like an admission might be in order.

17    Is there some way short of saying, you know, they say

18 there's salt in the ocean and you say, well, then we need the

19 whole ocean before we can test it and find out if there's salt

12:12 20 in there?

21    MS. LOVEJOY:  Sure.  We're entitled to explore some

22 sort of sampling approach in the first instance to deal with

23 this discovery that is directed at us, but I think subsequent

24 to that we still need an ability either through our own

12:13 25 independent consultant or expert to test whatever it is that

1  they intend to do in order to match sound recordings from --

2  and I don't know what they're intending to do.

3          Expert discovery is not underway, but our expert

4  needs -- we are not in possession of what they claim are their

12:13  5  sound recordings and are asserting in this case.  I'm not sure

6  how we would test their expert work.

7          THE COURT:  So, you know, I'm tossing, taking us in a

8  somewhat different direction than the conversation started, and

9  there's several risks.

12:13 10          One is everybody, I assume everybody, on this call

11  knows more about the details of this case than I do because you

12  live with it.  So I could just be off in the wrong direction.

13          The second is, I'm the least well situated to gauge

14  the practicalities of it, but it is striking me that some kind

12:13 15  of sampling approach makes sense because, I mean, by

16  definition, we're talking about data sets and data that favors

17  the human imagination in terms of just coping with it, dealing

18  with it, making sense of it.  At least as to this point of do

19  you have enough to respond to admissions, it seems like in the

12:14 20  microcosm of the case could provide a definitive and usable

21  answer to that question.

22          How to choose that microcosm, I mean, my first thought

23  is to say, put it on plaintiff to identify a proposed set of

24  workable but large enough that plaintiff has an interest in

12:14 25  picking a large enough set that, you know, just throw one dart

```
       1   and hope it lands but it has an interest in picking a small

       2   enough set that they can live with the burden of working

       3   through it and identifying it.

       4          Mr. Trehan, is that a workable approach to this?

12:15  5          MR. TREHAN:  Yes, your Honor.  I believe that's a

       6   reasonable approach that would address both of the concerns

       7   that defendant has articulated, both with respect to their

       8   ability to test sort of these recordings and to respond to our

       9   requests for admission.  So we're certainly amenable to

12:15 10   identifying a set.

      11          THE COURT:  And, Miss Lovejoy, would that also --

      12   would it make sense for present purposes to see if there's an

      13   agreeable sort of working set that could also be the focus of

      14   your requests for documentation and registration copies?  In

12:15 15   other words, can we roll all of this together, the request for

      16   admission and the registration copy issue?

      17          MS. LOVEJOY:  I think we are probably entitled to

      18   registration certificates for all of the asserted works, and I

      19   don't think that's particularly a burdensome exercise in the

12:16 20   way that maybe obtaining deposit copies are.  In terms of chain

      21   of title or similar information, I think we can attempt to

      22   negotiate a more narrow set.

      23          THE COURT:  Can you remind me what's the total number?

      24   Is there a total number of asserted works at this point?

12:16 25          MR. TREHAN:  In our initial complaint, there's 662
```

1    asserted works.

2           THE COURT:  What about this question of separating out

3    chain of title from registration copies since it does seem to

4    me that chain of title goes straight to standing at least as to

12:17  5    the particulars?  Miss Lovejoy has suggested that's a more

6    practicable issue.  If the data set is 662 works, is that

7    doable?

8           MR. TREHAN:  Your Honor, I believe that's something

9    that we could work with Miss Lovejoy on.  I do think that's

12:17 10    probably a reasonable set for us to start with, but the devil

11    may be in the details with that, so I'd appreciate the

12    opportunity to consult with my client.

13           THE COURT:  All right.  So my inclination from what

14    I'm hearing now is to throw you guys back into Rule 36 to see

12:17 15    if you can rework this.  I am concerned to not kicking the can

16    down the road if you need a ruling from the Court to get this

17    resolved.  I want to be available for that.

18           So what's a reasonable time to get a report back from

19    both of you as to whether this is an issue you have been able

12:18 20    to resolve or whether you need a Court decision on this point?

21           MR. TREHAN:  I fully expect that we would be able to

22    report to the Court within a week's time.

23           THE COURT:  Miss Lovejoy, does that seem reasonable?

24           MS. LOVEJOY:  Yes, your Honor.

12:18 25           One further comment for the record.  Whatever I think

|       |    |                                                                            |
|-------|----|----------------------------------------------------------------------------|
|       | 1  | we are able to reach agreement on with respect to discovery,               |
|       | 2  | for the record, Suno is not waiving any argument that what                 |
|       | 3  | plaintiffs have done here is sufficient or insufficient with               |
|       | 4  | respect to their burden of proof.  So I think, as a matter of              |
| 12:18 | 5  | law, we believe strongly that it's plaintiffs' burden for each             |
|       | 6  | work in suit to identify the deposit copy, what they                       |
|       | 7  | registered, identify the connection between that deposit copy              |
|       | 8  | and whatever tool they used to match with our work.  So the                |
|       | 9  | choice is theirs in terms of the way they litigate the case but            |
| 12:19 | 10 | we're not waiving arguments with respect to the sufficiency of             |
|       | 11 | those choices.                                                             |
|       | 12 |        THE COURT:  I want to make sure -- I think you have                  |
|       | 13 | stated your reservation of rights and you've probably stated it            |
|       | 14 | better than I will ever phrase it, but as I take it, what I'm              |
| 12:19 | 15 | hearing is, for purposes of discovery and being able to get                |
|       | 16 | experts to work on both sides analyzing what in an engineering             |
|       | 17 | concept might be called proof of concept, you're comfortable               |
|       | 18 | with this, but when it comes to putting opposing party to its              |
|       | 19 | proof at trial, you might well be interposing objections that              |
| 12:19 | 20 | say, all right, if this is truly a trial, you're going to need             |
|       | 21 | to show up with something that is identifiably the registration           |
|       | 22 | copy or at least you are reserving your right to assert that.              |
|       | 23 | Is that a fair understanding?                                              |
|       | 24 |        MR. TREHAN:  Yes, your Honor.                                        |
| 12:20 | 25 |        THE COURT:  All right.                                              |

1       So, working backwards on the list, the issues, I'm

2   having trouble understanding why the pitch to investors is

3   either burdensome or irrelevant.  Wouldn't that be at least one

4   fair take on how are people thinking about and they must have

12:20  5   been thinking about the intersection between technological

6   innovation and the buzzword here is always disruption?  Who

7   knows whether that's -- I can't imagine an investor startup

8   pitch for an investor that doesn't have disruption buried

9   somewhere in the pitch documents.

12:20 10       Isn't that pretty close to the Court question of

11   trying to -- I mean, nobody ever says, our intention here is to

12   willfully violate copyright and -- well, maybe some of the

13   Napster people did back in the day but, for the most part, at

14   least when serious money is on the line, these things get

12:21 15   pitched in much more oblique terms about disrupting an

16   industry, finding new sources of value.  I have no idea what

17   buzzwords were but there were buzzwords.  I feel confident.

18       Why isn't that one of the sort of rules of information

19   that would be relevant to trying to make sense of the state of

12:21 20   mind that you, Miss Lovejoy, will argue as being unfairly

21   attributed to your clients and Mr. Trehan will argue is a

22   window into their souls?

23       MS. LOVEJOY:  Sure.  So I want to separate out two

24   concepts from sort of what may be in communications with

12:22 25   investors under plaintiffs' argument.

          1              One is kind of just what is the product and what does

          2    it do and, two, what did Suno and its investors think about the

          3    legality of that product.  I think with respect to the former,

          4    we think that is not proportionate to the needs of the case.

12:22     5    They're going to see what the product is and does in

          6    investigating the product itself and will have all of the

          7    internal materials that describe that.

          8              With respect to the latter concept, I think it's

          9    speculative to say that, you know, Suno is chained to its

12:22    10    investors, seeking their investment in an unlawful product, but

         11    if your Honor is inclined to offer discovery here, I think we

         12    would be amenable to working out an agreement on the latter

         13    issues that confined to sort of this willfulness concept versus

         14    every communication that Suno had with its investors about this

12:23    15    product.

         16              THE COURT:  Well, let me ask you this because it does

         17    strike me that if I'm pitching investors on a new product, on

         18    an investment and venture that's going to develop a new

         19    product, it's not just the specific or explicit references to

12:23    20    the existing regulatory or legal regime in which that product

         21    may operate.  It may well also be the description of the

         22    product itself.  I'm sure the word was transcend rather than

         23    violate, but we will transcend conventional boundaries of our

         24    sister creation in past embodiments and tap into a market for

12:24    25    interest in artists' styles and combinations of artists and

1    styles never before heard.

2         I suspect that, in Mr. Trehan's eyes, he would say,

3    that's all nice but let's, you know, where he is there's a

4    difference in transcend that will violate.  Where he is,

12:24  5    there's a difference in creating something new and cashing on

6    existing stuff.

7         I mean, isn't that going to be one piece of at least

8    the Fair Use to make here?

9         MS. LOVEJOY:  Well, I think that our view of the way

12:24 10   that factor four, which is of the Fair Use test, which I think

11   is what you're getting at here, which is the impact of the use

12   of the work on the market for plaintiffs' works, the question

13   is what is the use of the work here.

14        In this litigation, the use of the work is using these

12:25 15   works to build a model.  Plaintiffs do not have output related

16   claims about these works.  They are not arguing that what comes

17   out of the model violates their rights.

18        So then the question is, what is the impact of Suno's

19   use of this work to train the model on plaintiffs' licensing

12:25 20   opportunities?  Would they have an opportunity to license these

21   works for these sorts of models and is the failure to license

22   here impacting that potential market?

23        So whether this tool writ large will compete with

24   plaintiffs' sound recordings, we don't think it's a relevant

12:25 25   inquiry.  In fact, non-infringing work outputted by the model

competing with works existing in the marketplace is, frankly,

just fair competition.  So we're not sure why discovery into

the question of whether we are creating new music for the

marketplace is really relevant to the Fair Use inquiry here.

12:26    That said, if your Honor were to make some finding

otherwise, I think we could explore search terms that would get

at that concept, that factor four concept, you know,

substitution or competition.  That's more narrowly tailored

than what plaintiffs are presently asking for.

12:26    THE COURT:  Mr. Trehan, what do you think on these

points?  I'm hearing Miss Lovejoy dividing it into two

categories.

    Bucket one is essentially if we were talking about the

existing regulatory regime with investors.  That's closer to

12:26    the heart of the issue and would be more generally

discoverable, although I didn't hear Miss Lovejoy to be saying

it's open season exactly, so we may need to put a firmer point

on that, but then she says really a separate thing to talk

about how does this product look in the marketplace as opposed

12:27    to what is the input.

    Do you see it the same way given the state of the

claims in your compliant?

    MR. TREHAN:  Your Honor, unfortunately, I have to say

that we don't see it the same way with respect to this issue.

12:27    I do think that, you know, treatment of it is representative of

1  defendants' position with respect to multiple of the disputes

2  that are teed up for you today.

3          THE COURT:  They have a view that -- I mean, I think I

4  understand their point of view.  Whether I'm persuaded, it's

12:27 5  not my job right now and it would be foolish for me to try to

6  decide what I or Judge Saylor or a jury or anyone else might be

7  persuaded by ultimately, but the question for right now is, am

8  I persuaded that their framing of the case is sufficient to

9  allow appropriate discovery on the matter.

12:28 10          So maybe if you could walk me through a little bit

11  about how you framed it differently and how that fits in with

12  the question of both scope of discovery, and it may go back to

13  Miss Lovejoy for the question of burden.  If you would want to

14  outline how you would frame the issues at stake at this point

12:28 15  as we're scoping out discovery.

16          MR. TREHAN:  Absolutely, your Honor.  So, first of

17  all, to address one of the points that Miss Lovejoy made, this

18  is not purely a speculative issue.  We know for a fact that one

19  of Suno's investors made public comments in which he said that

12:28 20  the risk of being sued by copyright owners was, quote, the risk

21  we had to underwrite when we invested in the company.  So we

22  know that there was knowledge of this risk, there likely were

23  discussions of this risk, and this is not merely hypothetical.

24  It's obviously highly relevant and understanding the nature of

12:29 25  the use that they've undertaken here but also the willfulness

        1    with which they decided to engage in the alleged infringement.

        2         Now --

        3         THE COURT:  That's basically bucket two.  That's the

        4    what did you talk about the copyright regime and how it affects

12:29   5    your investment decision.

        6         What about bucket one?  Do you have a different frame

        7    on how your infringement claims relate to this product in the

        8    marketplace?

        9         MR. TREHAN:  I do.  So with respect to that first

12:30  10    bucket, the defendant is trying to disaggregate the potential

       11    licensing of our recordings as training data from how the

       12    outputs that their model creates would potentially compete with

       13    our recordings.  So it's trying to separate out those two

       14    things.

12:30  15         That is just simply not something that can be done

       16    under the Fair Use analysis.  That is the contextual analysis,

       17    and you have to consider what the purpose of the training was

       18    in analyzing the potential impacts on the market.  So the idea

       19    that you can just somehow slice off the, you know, potential

12:30  20    market for training data from the potential market for the

       21    outputs that the model is going to be creating, it's not

       22    realistic under the Fair Use analysis.

       23         Furthermore, even if you were to just look at the

       24    market for the training data, there's no reason to believe that

12:31  25    there wouldn't be relevant and responsive documents in the

communications that they had with their investors.  Indeed, if

you have an investor saying that we needed to make the decision

to proceed with the company that was not going to pay for a

license for those recordings, perhaps part of what was

12:31  informing that decision was an analysis of what it would cost

to license those recordings.

So the idea that if we just look at it from the aspect

of what is the potential market for the training data, that

would eliminate the relevance of this inquiry, it's simply not

12:31  the case.

THE COURT:  I have to say that, as a matter of

discovery, my first reflex is to say that where both of these

are plausible theories -- in other words, if I can -- I don't

mean to -- I just want to make sure I'm conceptualizing this.

12:32  The idea is that defendants are marketing a much new

and better meat grinder that makes sausage, and plaintiffs are

in the business of selling meat.  The two questions are, well,

if you're not paying for the meat that plaintiffs are offering,

then that's one relevant issue, your impact on the market, what

12:32  can you get for free, what do you have to pay for with the

inputs to the sausage factory.  Then the second issue is, at

some point you're selling sausages competing again with, you

know, is there a second sausage market or is there, in fact, a

market for meat products that include sausage and steak and all

12:32  the other meats that go into the intake end of the sausage

maker.

It strikes me that the discovery phase both are sufficiently plausible that it makes sense to allow some discovery about both aspects of it. I could imagine a plausible claim that says these folks decided that they could make a lot of money selling sausage, and there are two pieces to that.

One aspect is essentially not licensing the output but rather the sausage maker. It's the machine. The machine is attractive to people if you can use it without having to pay royalties to get your sausage in.

The other end is the market is informed by or maybe created by the existing market in which copyright materials are available and in demand and desired and commercially valuable.

So I guess I'm not ruling on whether this is a viable theory ultimately, but it does strike me as sufficiently plausible that discovery on both sides make sense.

I'm happy to receive briefing on this. I know this is a ruling that could be significant in the case, but I'm giving you at least a preliminary impression and I'm raising, I guess with you, Miss Lovejoy, are there practical or proportionality concerns that would be implicated by this? I have no idea as I sit here what the scale of investor communication is. You know, is this three pitch decs and somebody wrote a check? Is this months or years of interaction with hundreds or thousands

1    of investors or somewhere in between?  I have no idea.  Is this

2    a couple of angels?  I have no idea.

3         So I'd certainly want to listen to questions about how

4    burdensome this is, but at least if I'm thinking about the

12:35  5    scope of discovery, which is broad, inherently broader, it's

6    not narrowed by, for example, admissibility at trial or even

7    strict relevance at trial per se.  So if I'm looking at the

8    potential discovery broadly, the next question I tend to get to

9    is, well, is it proportional.

12:35 10        So do you want to weigh in on that, Miss Lovejoy?

11        MS. LOVEJOY:  I thank you, your Honor, for the

12    guidance, and I think it's useful in furthering the parties'

13    negotiations on this topic.

14         I wonder if we could discuss potential search terms

12:35 15    that would cover that factor four issue in both parties' view

16    of the world and willfulness, and then if we were able to

17    negotiate search terms that seemed proportional, I think that

18    would be a useful next step.  There are a lot of investors,

19    including just like friends and family members.

12:36 20        THE COURT:  I've always loved that term, family

21    investors who are neither friends or family.

22        MS. LOVEJOY:  There are certain investors that are

23    neither friends or family but there are also truly friends and

24    families that are investors.

12:36 25        THE COURT:  It's usually a term of art in an early

1   offering of a round.  It's very nice.  It sounds very friendly.

2   It's not that friendly on the other end.

3       MS. LOVEJOY:  Yes.  So I think if we're able to

4   negotiate -- the burden of collection will be large, but I

12:36  5   think we're willing to -- I'm willing to speak with my client

6   about undertaking it if we're able to negotiate some

7   proportional search terms that make this feel directed at the

8   things that we've discussed today, accepting your Honor's

9   ruling except for factor four that we need to credit view of

12:37 10  both parties' world there.

11      THE COURT:  I think -- I would be surprised if either

12  party is prepared to adopt my sausage analogy, but I think we

13  all get the concept that there's inputs and outputs and there

14  may be different markets for both of those.

12:37 15      Mr. Trehan, what do you think?  Is that enough to work

16  with Miss Lovejoy to see if there's shareable terms?

17      MR. TREHAN:  Absolutely, your Honor.  I will say that,

18  you know, we haven't seen any evidence that would substantiate

19  a particularized burden with respect to that request, but

12:37 20  certainly we are very willing to negotiate search terms and do

21  so in a reasonable manner.

22      THE COURT:  All right.  Can we put this on the time

23  frame that you guys will look at this over the next week and

24  report back to the Court if you need further input on sorting

12:37 25  out?  I'm well aware that the devil is often in the details,

1    although I suppose if enough issues are put in place, people

2    can start horse trading, which can often move things along as

3    well.

4        All right.  So I think that gets you guys homework.

12:38  5    I'm putting all the homework back on you, which on the other

6    hand seems ungenerous, but on the other hand, the work will be

7    done better by you than with me.  Sometimes there are court

8    decisions that reflect the judge's view of the evidence and

9    both parties are scratching their heads as to how he or she got

12:38  10    it that wrong.  So there may be advantages to having the work

11    back on your desks.

12        So then we get to the definition of AI models

13    question.  A quick look at *Anthropic*, I don't know if I'd

14    consider it controlling but it's an interesting slice at some

12:39  15    similar issues.  Is there --

16        Well, let me hear first from plaintiffs because, and

17    let me tell you what I'm going to be listening for.  I'm

18    looking for a limiting principle and how I get it that

19    successive models, AI models, may well involve working with

12:39  20    lessons learned with prior, for lack of a better term, prior

21    calibration as the theory evolves.  But how do we draw a line

22    that doesn't say, we want everything you've ever done since you

23    guys started working together and if you only recently formed

24    consideration, we want to go back to prior?  What's the

12:40  25    limiting principle here?

1          MR. TREHAN:  Your Honor, I'm happy to address that in

2     the first instance.

3          I do think that we are amenable to drawing lines that

4     are similar to what the Court drew in the *Anthropic* case.

12:40  5     Those lines would include whether or not a model was trained on

6     our copyrighted recordings.  Unfortunately, through the course

7     of the control process, we haven't been able to gather

8     information from Suno regarding the models that did or did not

9     train on our copyrighted recordings.  Indeed, they haven't

12:40 10     shared any information regarding the specifics of these models,

11     which we first learned numbered in the hundreds when they

12     provided their portion of the joint summary for the Court on

13     Wednesday.

14          So, in that vacuum of information, it is a little bit

12:40 15     difficult for us to understand, first of all, whether or not

16     there is a significant burden that would be involved in

17     allowing discovery into those other models or, really, their

18     relevance.  They haven't disclaimed that these other models

19     that were publicly released weren't trained on our copyrighted

12:41 20     recording.  So the idea that they can make a unilateral

21     decision to carve them out of the case without sharing any

22     information about them simply doesn't seem appropriate.

23          THE COURT:  Miss Lovejoy, at least from your

24     submission, I see some suggestion that the narrowing aspects of

12:41 25     the *Anthropic* case ruling makes some sense to you.  Is that a

1    fair reading of your position?  I realize it's not your first

2    choice.  Assuming you don't get your first choice, is that a

3    place to work from in terms of -- it seems to me the concept

4    they're working from is parent of parent of parent of parent

12:42  5    but it has to be a line of succession between the models.

6                MS. LOVEJOY:  So, accurate, not my first choice, but I

7    actually have the benefit of being counsel of record in the

8    *Anthropic* litigation and plaintiffs are misreading that order.

9    It doesn't say simply because a predecessor model was trained

12:42  10   on the plaintiffs' works in that litigation is within the scope

11   of the discovery.  It has a subsequent prong.

12               Number two, and the model was used to train publicly

13   released models or being used to train not yet released

14   versions.  And what the Court means by that is the model

12:42  15   weights from those prior versions are incorporated into the

16   subsequent versions.  So the limiting principle is not solely

17   does it have the same training data set.  It is also that the

18   model weights were being used from a predecessor internal model

19   in the publicly released or soon to be released version.  So I

12:43  20   think we need to be careful about what the *Anthropic* decision

21   stands for.  That said, I think it is useful guidance for the

22   Court.

23               THE COURT:  Mr. Trehan, what do you say to this idea,

24   and this may tie us back to some of the discussion about the

12:43  25   nature of the infringement that's at issue here in the

1    principle -- I'm struggling for words because I've kind of

2    bridged two separate ideas about this.

3        What I hear Miss Lovejoy saying is, look, if the

4    training data -- I use the crude term of sort of direct descent

12:44  5    but the idea being if the weighting and the model adjustments

6    are coming from -- are leading to the commercial product, then

7    that is arguably the more relevant or -- Miss Lovejoy, what is

8    the more relevant -- I'm leaving that more open for the time,

9    more relevant timing of development.  I think she might say, to

12:44 10    the extent people were doing training on models that were

11    abandoned or didn't feed into a next generation leading to a

12    commercial product, I assume she would be saying, you can

13    interrupt me if I've got this wrong, that that's classic Fair

14    Use, that's pure research essentially, and not a commercial

12:44 15    use.

16        Is that roughly?

17        MS. LOVEJOY:  That's right.  I think if the Court

18    wants to explore that subsequent to the commercial models, we

19    can get into that, but I think for proportionality our

12:45 20    recommendation would be to start with the commercial models,

21    which I think are a more difficult question before we talk

22    about the use for internal research only models.

23        THE COURT:  What do you think, Mr. Trehan, about that

24    distinction between sort of the line of descent leading to

12:45 25    commercial models as distinguished from all models that people

1   tinkered with along the way?

2         MR. TREHAN:  Well, your Honor, I guess I'm curious at

3   this idea that seems to be underlying the argument that the

4   defendant is presenting here, that there may have been numerous

12:45 5   models that were being worked on by this small startup company

6   that would have had no impact or no influence and never were

7   intended to inform the way in which they were developing the

8   public model.

9         That strikes me as curious.  It certainly doesn't seem

12:46 10   as though that would be consistent with the for profit business

11   that they're running.  That said, I'm not sure that even if

12   they were just being used for research purposes, if they were

13   trained on our copyrighted recordings, that they aren't

14   relevant and wouldn't be the subject of discovery in this case.

12:46 15         As Miss Lovejoy pointed out, the *Anthropic* court did

16   specifically say that models not yet released to the product

17   were within the scope of discovery.  We don't know, certainly

18   based on the information that we have right now, the degree to

19   which or how exactly any of these models that weren't yet

12:46 20   released to the public may have impacted models that were

21   released to the public and, frankly, we can't be in a position

22   where we're simply accepting the say so of Suno as to why or

23   how they may have used those models to inform their public

24   product.

12:47 25         This certainly could be relevant information.  And

1    when we think about the broad scope of discovery, it certainly

2    is within the scope of discovery if they were utilizing our

3    copyrighted sound recordings to train their model that

4    presumably was not just for an academic research purpose.

12:47   5         And I'm aware of the fact that Suno has taken the

6    position that, oh, if ultimately we're found to have a valid

7    Fair Use defense with respect to our commercial use, we would

8    certainly have one with respect to our research use.  That

9    certainly is putting the cart before the horse.  We're not at

12:47  10   the point, and they objected to the idea that we should first

11   make a conclusion as to Fair Use or appropriateness of the Fair

12   Use defense.  So the idea that we could somehow use that to

13   limit discovery doesn't feel appropriate.

14        THE COURT:  Well, let me ask you a slightly different

12:48  15   question, which is closer to the what do we need to do now

16   because at some point it does seem to me that proportionality

17   concerns come in.  In fact, I'm sure I'm wrong, but I have a

18   generalized image of, and it's vague and ill-informed I will

19   acknowledge, that there's a fair amount of forensic data and

12:48  20   effort involved in identifying and tracing and producing the

21   sequence of movement from one model to another as weights or

22   other aspects of the model get adjusted.  I could be wrong, but

23   it sounds to me like the kind of thing where the documentation

24   is going to be complicated and perhaps expensive to identify.

12:49  25        I'm just wondering, does it potentially make sense --

1    it strikes me that the burden would be on Miss Lovejoy and her

2    client if they want to go with the here are the ancestors of

3    the product.

4         I'm not sure who that is.  I think we have a second

12:49  5    microphone in the courtroom that isn't muted, Miss Dumoulin.

6         THE CLERK:  Yes.

7         THE COURT:  Thanks.

8         I'm sorry.  I'm taking a minute to think this through.

9         I hear Miss Lovejoy saying, look, we're giving you the

12:49  10    ancestors and antecedents of the training model that informed

11    weights that went into the next model and the next model, but

12    if things were dead ends, we'd like to not have those

13    (inaudible).

14         My question is, assuming that the burden would be on

12:50  15    Miss Lovejoy to identify and explain in a way that makes sense

16    to you, because I'm taking your point, Mr. Trehan, that you're

17    not necessarily going to want to just take the word of the

18    defendant that these are the only models that ever had -- have

19    a currently living progeny, put the burden a little bit on the

12:50  20    defendants to say, here's how we can show you that, here's how

21    we can represent that, here's how we can reflect that.

22         MS. LOVEJOY:  May I make a recommendation, your Honor,

23    as to how we proceeded in *Anthropic* after receiving this order

24    from Magistrate Judge Van Keulen?  Plaintiffs issued an

12:51  25    interrogatory that asked *Anthropic* to identify the models that

1    would fall within the scope of this order where the prior

2    predecessor model weights were incorporated into a subsequent

3    commercially released model.  So that is one way that we could

4    proceed here.  It would be a verified interrogatory response

12:51 5    and would perhaps address Mr. Trehan's concern about not taking

6    my word for it.

7            THE COURT:  Does that make sense at least as a Step 1

8    on this?  I'm not sure we're going to avoid having to open this

9    can of worms again, but it would strike me that if this

12:51 10    discovery yields as it plausibly could, a long history of

11    long -- not long.  Long is sort of not a relevant word in tech

12    development anymore.  This pace has accelerated in ways that

13    were previously unimaginable, but a history with many

14    iterations of working from, perhaps, copyrighted input as a

12:52 15    learning set or data teaching set and then follow on

16    adjustments.

17            If Suno is to produce such a family tree that you

18    might well find yourself with ample material on which to build

19    arguments about whether either at the beginning of the tree or

12:52 20    at each branch or at each set, each leaf, there's what your

21    clients would consider a copyright violation, it seems like

22    there's just a lot you could get from that that is short of, it

23    wouldn't satisfy you that you've seen everything that's there,

24    but it might well constitute a very heavy body of information

12:53 25    that would allow you to develop your claims.

|     |     |                                                          |
|-----|-----|----------------------------------------------------------|
|         | 1  | Does that seem plausible? |
|         | 2  | MR. TREHAN:  Your Honor, I think the sharing of some |
|         | 3  | information with respect to these models is something that |
|         | 4  | we've long desired and asked for during the conferral.  I don't |
| 12:53   | 5  | know that it makes sense to require us to do so by an |
|         | 6  | interrogatory that would build in insignificant delay and allow |
|         | 7  | potential further delay of discovery with respect to a number |
|         | 8  | of matters just because this definition, as you might expect, |
|         | 9  | pervades many of them are discoverable. |
| 12:53   | 10 | THE COURT:  I get that.  I guess I'm wondering if we |
|         | 11 | could address the time frame issue though.  What Miss Lovejoy |
|         | 12 | is saying is, okay, let's start by an exercise that isn't |
|         | 13 | necessarily -- we'd still like to use the term document |
|         | 14 | production even though it's a little bit antiquated, but if we |
| 12:54   | 15 | start from some interrogatories or the equivalent or just |
|         | 16 | disclosures as a way of explaining, here's what we're turning |
|         | 17 | over and here's how it relates so that there is some pros or |
|         | 18 | representation from the defendant to order and make sense of |
|         | 19 | what data has been produced and allow you to reserve your right |
| 12:54   | 20 | should it be necessary to broaden discovery. |
|         | 21 | I mean, Miss Lovejoy, do you see ways to move this |
|         | 22 | along promptly because Mr. Trehan certainly raises a fair |
|         | 23 | concern about sort of if we're working with the federal rules, |
|         | 24 | which are delightful in many respects but mostly slow and |
| 12:55   | 25 | cumbersome?  Is there a faster way to figure out how to get |

1   representations from your clients about here's the family tree

2   and, therefore, here's what we're producing?  Can this be done

3   in an abbreviated number of steps to move that part along?

4          MS. LOVEJOY:  As your Honor recognized, it requires

12:55  5   some forensic investigation on our side about sort of the

6   relationship between various models.  So without speaking to my

7   client, I can't put a week on it at this point, but we are not

8   intending to delay this process.

9          And I think the other thing I'll say is I suspect

12:55  10  Mr. Trehan is maybe adverse to having to use an interrogatory

11  for this, but they are the ones that are asking for discovery

12  and for every single of our hundreds of models, and this will

13  be a work for my client to investigate these relationship

14  issues.  So not hearing an alternative delineation of how we

12:56  15  would make this discovery proportional, I think it's

16  appropriate for them to issue an interrogatory on this.

17         THE COURT:  Okay.  What if we said that they will

18  issue an interrogatory by next Wednesday and you will respond

19  as soon as practicable, so not under 30 days or any of that,

12:56  20  and that you will report back to them, if not by the end of

21  next week, by the end of the week after?  How long it's going

22  to take you to give them what I'm loosely calling -- I'll let

23  you think about how you guys want to draw this up, but is my

24  loose use of the term "family tree" intelligible to you?  I'm

12:57  25  sure it's not the word you want to use.  But do we have a

1    shared understanding of what we're trying to get at there?

2              MS. LOVEJOY:  Yes, your Honor.

3              MR. TREHAN:  The one thing I would want to clarify is

4    we would certainly expect they'd identify any of their models

12:57  5    on training of our recordings.  So if that would be included in

6    our development tree, yes.  I think I understand what's being

7    proposed, and we do think that would be helpful.

8              THE COURT:  I'm hearing that as a separate matter.

9              MS. LOVEJOY:  Your Honor --

12:57 10              THE COURT:  In other words, I understand --

11              Miss Lovejoy, I don't want to interrupt you, but I

12    think I may be addressing -- I'm hearing two different issues,

13    which is what are all the models that Suno may have

14    experimented with, worked on, attempted to develop it may have

12:57 15    used any of the protected intellectual property.

16              I'm hearing Miss Lovejoy saying, that's very expansive

17    and potentially burdensome, how about we limit it along the

18    lines of *Anthropic*, saying we'll produce to you the sequence of

19    models.  We'll identify for you the sequence of models that we

12:58 20    can trace as being true genitors of the model that we

21    ultimately released commercially.  So I can see those as two

22    different cuts at this pool of data.

23              My question to you, Mr. Trehan, is recognizing that

24    there could be additional infringements depending on what

12:58 25    theory of infringement is ultimately adopted by the Court, does

1    it make sense to proceed with discovery that focuses on the

2    piece or the chain of development that led to the commercial

3    product and figure that -- I guess this is where I'm making

4    some gross assumptions, that if --

12:59 5    I mean, you've got Miss Lovejoy's take, which is if

6    that doesn't infringe, nothing does, which is plausible or,

7    conversely, if I'm jumping to a slightly different conclusion,

8    which is, if that does infringe, most of the damage, most of

9    harm, most of the information needed to assess the full extent

12:59 10    of damage and harm could be either evident or derivable from

11    that information.

12    So, in other words, if, ultimately, Mr. Trehan's side

13    is successful and they say, all right, here's how protecting

14    material was used at each step, several steps, multiple steps,

12:59 15    first step, whatever it turns out to be, of development, and if

16    that is found to be infringing, the question of, all right,

17    what would be the licensing rights, what are the damages and

18    penalties that might be associated with other uses that may

19    have occurred but not led to the commercial product just seems

01:00 20    like an easier problem to solve.

21    So what I'm proposing here is to narrow the inquiry

22    beyond the outer limits of relevance to what seems like it may

23    be the more promising and financially valuable piece of it.

24    Sorry I've taken a while to articulate.

01:00 25    Mr. Trehan, understanding it's not the same thing

1    you're asking for, is it a sensible way to move forward with

2    discovery here?

3            MR. TREHAN:  I do think, your Honor, that we would

4    need and be entitled to information regarding any models that

01:01  5    were trained on our works.  And, frankly, if we think about

6    this in the way in which discovery disputes are to be resolved,

7    if the assertion here is by Suno that they cannot do so or

8    there's some extensive burden that would be involved in

9    identifying those models, they would need to substantiate that

01:01 10    burden.

11            At this point, they haven't substantiated any burden

12    with just respect to identifying models that trained on our

13    works.  Now, I do think it's possible that that wouldn't mean

14    that we seek discovery with respect to each of those models and

01:01 15    with respect to your proportionality concerns.  It may very

16    well be that, based on the information they provide in response

17    to these requests, we determine that it's not a worthwhile

18    exercise for us to seek discovery as to each of those models.

19            But at this first step where they're objecting to our

01:02 20    definition of AI models based on burdensome argument, it's our

21    view it's their burden actually to establish that there is a

22    real burden here, and they haven't done so.

23            THE COURT:  So I see a couple of ways forward here.

24            Miss Lovejoy, I'm sorry.  You may have --

01:02 25            MS. LOVEJOY:  Sure.  Just briefly, your Honor.

1          First, the assumption that we are able to identify

2     which models were trained on their asserted works again brings

3     us full circle to the fact that we still don't know what those

4     are, so that is an investigatory exercise that would be

01:02  5     burdensome.

6          And if they're saying all of the models that were

7     trained on music, then that's going to be a lot of models.

8     That's why I'm not sure that principle is sufficiently

9     practicable for either party here.

01:02  10     THE COURT:  We've got a doozy of a chicken and egg

11     problem.  I guess I'm going to overlay on that a sort of

12     ontological problem with a similar practicable one, which is

13     time.  We teed this up for a June discovery deadline.  That

14     strikes me as, in some respects, optimistic and, in other

01:03  15     respect, important.  I think both were, for lots of reasons --

16          I'll share with you my philosophy, but I think it is

17     very often the case that how long it takes cases to get

18     resolved negatively affects the quality of justice that comes

19     out, that we'd be better off -- there's an awful lot of cases

01:03  20     where I think we'd be better off getting them decided quickly

21     rather than waiting for perfect information before making

22     decisions.  This strikes me as potentially one of those cases.

23     So I am interested in seeing if there's a way short of --

24          I guess, Mr. Trehan, this is the point which is I

01:04  25     understand why you assert that your right is to the full amount

1    of information or at least anything they trained on potentially

2    copyrightable material.

3          The challenge is that leads us back into this

4    conundrum of who's identified it and how thoroughly have you

01:04  5    identified it, and then we're back into formal interrogatory

6    practice and production.  I'm just concerned that by the

7    time -- if you want to fight about this, it could take a while.

8    I'm certainly happy to entertain the fight and make rulings as

9    they go.

01:04  10          So I guess my question is, if time is of the essence,

11    is it worth settling on a compromised view that would allow

12    this to move forward and more promptly even if it would not

13    provide you with as complete a picture of all of the models

14    that Suno may have used along the way.

01:05  15          I hear Miss Lovejoy to be offering to identify and

16    provide appropriate productions in connection with the sequence

17    of models that were used to culminate in commercially available

18    products.  There's a fair amount of work from Miss Lovejoy and

19    her client, I think, to identify that and to do so in a way

01:05  20    that replying is confident, signing under the pains and

21    penalties of perjury that, yes, we have identified the

22    sequence.

23          It does leave out other models they may have trained

24    on with data that your clients would say they should have paid

01:05  25    for.  I'm just wondering if it's the more practicable way

forward.

What do you think?

MR. TREHAN:  Thank you, your Honor.  I think we would
be amenable to move forward with that in the interim.  We share
your concerns about moving this case forward quickly.  It's
long been our view.  We do think that there's been unnecessary
delay with respect to this issue.

THE COURT:  There always is.  I'm cutting you off and
I know it's rude but I'm cutting you off intentionally because
when I sit on discovery disputes, that is always a central
topic, and the usual topic is whose fault is it.  It's always a
central topic because the federal rules are a little cumbersome
and slow and the whose fault of it is one of those topics that
is very rarely all one person's fault or another and not the
fault of the system.  It's the nature of the process.

So I get it.  Everybody gets frustrated.  In that
frustration, everybody is aware of other things the other side
could be doing to make their lives easier.  Usually I don't do
anything with those discussions because it just doesn't move
cases along.

MR. TREHAN:  I appreciate that, your Honor.  I guess
my one final request would be, in so far as they do provide an
interrogatory response, we would request that it actually be a
substantive response, and we would request that it would be
made within two weeks.  If there's reason they think it's not

feasible, consistent with our other reports we will be making

at the end of next week, they provide briefing as to why that's

not reasonable and a realistic time frame for them to do so.

THE COURT:  Let me change this up a little bit since

we're stepping out of some of the usual formalities.  Can I --

is it feasible for you, the lawyers, to confer about the

wording of an interrogatory that will both be acceptable to

plaintiffs as gathering a fair definition of, all right, what

are the immediate progenitors of the commercial product and

workable?

Miss Lovejoy is going to be looking at it from the

perspective of is this something we can answer, is it clear

enough so we can answer it in a way that we can make sense of

it and move practicably to respond.

So this just strikes me as one of those areas where

the wording may be challenging and a great deal of time could

be spent lobbing proposals back and forth.  I'm just wondering

if it makes sense to put the cart before the horse here and

start by saying, why don't you guys confer, bring some ideas to

the table about what this would look like, and see if you can

hammer out a mutually agreeable form of inquiry that is going

to be designed both to adequately, and I'm using the word

adequately on purpose, a word higher than adequate may be lost,

but that adequately reflect plaintiffs' interest in getting a

cogent description of how did the models, the sequence of

1    models relate to one another so plaintiff can trace how and

2    where along the development process its intellectual property

3    may have been used.

4         And, conversely, Miss Lovejoy has a strong interest in

01:09 5    having it be a question that is answerable given the way her

6    client keeps data, maintains data, and has to develop it.

7         Is that workable to within the week to have an

8    agreement about the terms of the interrogatory and an agreement

9    about the timing of what it will take to respond?

01:10 10        MS. LOVEJOY:  Yes, your Honor.

11        MR. TREHAN:  Yes, your Honor.

12        THE COURT:  All right.  So let's plan on that.

13        Now, I'm not clear, and this is in no respect -- I

14    appreciate very much the work you both did and giving me a

01:10 15    clear summary of the issues to be addressed.  I'm very

16    impressed with the practicality that both sides have brought to

17    bear on this.

18        That said, I still -- this may be purely my ignorance,

19    but the sort of Item 2, the requests related to Suno's training

01:10 20    data, my first thought is that that is tied fairly closely to

21    request one.  First you have to figure out which models are

22    involved before you can even begin to answer question two.

23        Am I misunderstanding how those relate to each other?

24        MR. TREHAN:  Your Honor, there are some differences.

01:11 25    I certainly appreciate the fact that you may have had some

1    questions as to exactly what the scope of that second bucket of

2    requests covered.  We did try to consolidate multiple requests

3    and categorize them under that heading.

4         The requests include RFPs that seek documents and

01:11  5    communications concerning the training data, including how that

6    training data was identified, collected, copied, and also

7    included requests directed to how, in fact, they obtained the

8    sound recordings that were used in the training data where they

9    downloaded those from, how they were copied and reproduced, and

01:12 10   also documents related to their efforts to obtain the training

11   data.  So that would include any efforts to retain that,

12   whether licensed or not.

13        So the models that are impacted certainly, you know,

14   as we just discussed, we think the models would be those models

01:12 15   that utilized our recordings as part of the training data for

16   purposes of these requests.

17        The issues and what has been raised as a dispute is

18   somewhat different.  It concerns whether or not Suno is

19   permitted to kind of make sufficient to show production

01:12 20   regarding its technical processes involved in both collecting

21   as training data and then training its models or whether it, in

22   fact, does need to produce all of its internal documents and

23   communications regarding those subjects.

24        We think these requests, which really go to the issues

01:13 25   at the heart of the case concerning how Suno obtained and

copied our sound recordings and trained its models, really are
at the heart of the case.  As such, Suno should be allowed to
pick and choose what they think, you know, is a document that
may be relevant.  They certainly haven't established any
particularized burden with respect to these requests.  We
haven't heard anything about the number of documents that would
be implicated by these requests, and they're squarely within
the scope of relevant discovery, so we think we're entitled to
full responses.

        THE COURT:  Miss Lovejoy, can I preempt you a little
bit on your response?

        MS. LOVEJOY:  Sure.

        THE COURT:  I understand, and please correct me if I'm
getting it wrong, but I understand that part of the problem
here, is that there are two aspects to your response.  Part of
it is any and all documents relating to training data are sort
of a rewarding thing of, okay, if that's truly what you're
asking, that's the extent of the universe and that's slightly
burdensome.  Is that one your arguments?

        MS. LOVEJOY:  Yes, your Honor.

        THE COURT:  And then I see a second one, which is
closer to or actually mirrors some of our discussions
previously, but investor representations, which is essentially
Suno saying, look, if you're talking about that the engineers
were worried that they're breaking copyright law, you've got

1    that covered elsewhere, and assuming I can't get all the way to

2    that position, I think that's a little too narrow.

3         Then I think plaintiffs are entitled to something and

4    try to find out what the working limiting principle is what I'm

01:15  5    wrestling with here, something that says, all right, how did

6    you get the copyright material, what were your sources, what

7    was your process of downloading it or requiring it.  That

8    strikes me as highly relevant for just getting a sense of -- I

9    have to assume, unless your client can stream faster than I can

01:15  10   from Spotify, it's a little more sophisticated than setting a

11   party playlist and letting it run for the next 10,000 years.

12        So it strikes me offhand that there's some meaningful

13   questions that can and should be asked about, okay, how did you

14   do it.  It does strike me that those fit, or they may or may

01:16  15   not fit closely with the family tree of the existing commercial

16   model.

17        In other words, if the arguably protected -- well,

18   there's no argument that it's protected.  The question is in

19   what context.  If the intellectual property was ingested all at

01:16  20   once before any experiment started, you could end up with all

21   our work on question one saying, let's have a family tree.  You

22   could end up with a gap, at least conceivably, in where this

23   stuff comes in.

24        Am I making sense that sort of the -- and I'm going to

01:16  25   ask each of you in turn, Mr. Trehan, that a critical piece of

what you're looking for and if you had to narrow this, am I

correct in understanding that you'd be narrowing it to, look,

we want to know how you got it, where you got it, and how did

you ingest it, and how did you upload it.

01:17      Is that the most important aspect of that?

MR. TREHAN:  There's a couple additional aspects.  One

of them would be, what exactly did you do with it, right?  So

that's -- that is a component of, you know, once you obtained

this training data, how was it used, how was it fed into your

01:17  model.  I think that's key.

But certainly those aspects you listed are principal

aspects of these requests.  So both how did you obtain the

data, how did you copy it, where did you obtain it from, but

then how did you manipulate it, so what use were you making of

01:17  it.

THE COURT:  That last one strikes me as both, as you

articulate it, makes complete sense.  On the other hand, it

strikes me as potentially big enough to swallow almost

everything else we're doing since.  If I'm understanding the

01:18  subject matter of the lawsuit, how did you use it is

everything.  So I'm having trouble thinking about how you turn

how did you use it into workable search terms or workable

issue.

So let's start with the first two and then get to

01:18  that.

1          Miss Lovejoy, does it make sense to you that, you

2     know, where did you get it, what was your source, how did you

3     physically download, upload, move it, is that part workable?

4          MS. LOVEJOY:  Yes, your Honor.  I think it's that

01:18   5     second part that's a bit more opaque to us and potentially

6     broad.  The first part I think where we can reach agreement on.

7          The concern about the second part too is, how you use

8     it is a question of how did the model use it, which is derived

9     at by looking at the source code.  That's a technical process.

01:19 10     If they want every communication between every engineer about

11     building the model that uses that technical process, I'm just

12     not sure what they're going to do with an email from one

13     engineer to another engineer about another slice of code.  I

14     don't know that's the most sufficient way to get at

01:19 15     understanding that technical process.

16          THE COURT:  And you guys have protocols in place as

17     far as source code sharing and how you're moving forward on

18     that?

19          MS. LOVEJOY:  Yes.  I think we've entered our source

01:19 20     code inspection protocol and we're negotiating our training

21     data inspection protocol.

22          THE COURT:  Okay, because it does strike me that this

23     question of how do you use it is intimately tied up in those

24     questions that I just wonder whether we're better off hunting a

01:20 25     little bit on what are the document requests that best pertain

1    to this in saying, all right, let's find out what we learn from

2    that because I think that might encompass a large portion of

3    it.

4        Mr. Trehan, since it's your aux getting gorged, I'll

01:20  5    hear from you on that, but does that make sense?  It just

6    strikes me as a hard mix between the tool we're using of

7    document production and the information you're trying to get

8    at.

9        MR. TREHAN:  Well, your Honor, I actually think that

01:20 10    it's a process that needs to proceed on dual track.

11        THE COURT:  Okay.

12        MR. TREHAN:  There is a certain set of information

13    that can be learned from a source code review.  I will note

14    that we've submitted our proposed source code.  It has yet to

01:20 15    be entered by the Court.

16        THE COURT:  Is that on me or Judge Saylor?

17        MR. TREHAN:  Unclear.  I think it was submitted to

18    Judge Saylor, your Honor.

19        THE COURT:  If it's on me, I think his intention was

01:21 20    to be delegating most of the discovery and he may have it in

21    that bucket.  Can I ask you to resubmit it?  If you guys can

22    live with my signature rather than his, I can get you my

23    signature if not today or next week and move it along.

24        MR. TREHAN:  Yes, your Honor.

01:21 25        THE COURT:  He and I are both very much in agreement

1     that, if possible, we don't want the Court to be the bottleneck

2     in moving this thing forward.  So why don't we see if we can

3     get that done.

4           MR. TREHAN:  Thank you, your Honor.  Yes.  We'll

01:21  5   certainly submit that today for your signature.  I appreciate

6     that.

7           As I was explaining, when we conduct the source code

8     review, we need to have some understanding as to what was

9     informing the decisions with respect to that model, and that

01:21  10  really can only be obtained through review of the internal

11    documents and communication regarding development of the model.

12          Specifically, one of those questions is why.  So why

13    did they choose to use, you know, our clients recordings and

14    why was it necessary for them to use millions of our recordings

01:22  15  for the development of the model.  That's relevant to the Fair

16    Use analysis.

17          THE COURT:  Well, I get that it's relevant.  I'm still

18    having trouble figuring out what's a limiting principle.  You

19    know, Miss Lovejoy, as I would expect, is saying, well, does

01:22  20  that mean every communication among each engineer who's worked

21    on any part of this?  And, if not, what does it mean?  How

22    would we find?  Are there search terms that get at this?

23          It's the parties' choice what discovery tools they

24    use, but it strikes me as a great deposition question:  Why did

01:23  25  you need to go about it that way?  Why couldn't you just enter

1    some combination of, you know, some type data that would have

2    been, here are the notes of the scale, here are the timbres of

3    the different instruments that can produce it, here are some

4    voices and build from that?

01:23  5         Presumably, there's a very good engineering reason why

6    somebody doesn't build a product that says let's start from

7    very first principles of music and instead says let's start

8    from a data set that encompasses what has proven to be pop,

9    commercial, and familiar to the market.

01:23 10         It feels like a deposition question much more than

11   a -- I don't know.  Maybe engineers have changed over the

12   years.  I'm just not picturing two engineers waxing

13   philosophical about what they're up to, but I am picturing lots

14   of back and forth on, you know, we've still got some problems

01:24 15   with this module or this bit of code, which sounds both bulky

16   and not terribly compelling.

17         MR. TREHAN:  Your Honor, if I may make a suggestion as

18   to how we might cut through this?

19         THE COURT:  Yes.

01:24 20         MR. TREHAN:  I appreciate opposing counsel's

21   representation that they're amenable as to providing full

22   responses with respect to how they obtained and identified and

23   copied the training data.

24         I think we can craft search terms regarding that

01:24 25   second bucket regarding how they then used those recordings as

1  part of their model.  And certainly we're amenable to proposing

2  search terms, negotiating search terms, and reaching a

3  reasonable set of documents with respect to that request.

4          THE COURT:  All right.  So it sounds like this is --

01:24  5     Miss Lovejoy, are you amenable to that as well?  It's

6  not clear to me there's an agreement in principle on this.  On

7  the other hand, there is enough on the table that the pragmatic

8  side of me says, all right, you've got enough things that

9  you're both unhappy about that you may be able to horse train

01:25 10  some of them.

11          MS. LOVEJOY:  We don't have an agreement in principle,

12  but we're amenable to exploring whether search terms can be a

13  path forward here.

14          THE COURT:  All right.  Why don't we put that on the

01:25 15  same one week schedule.  If you find -- on most of the others,

16  I think we're closer to agreement in principle, although I know

17  there will be challenges in sorting it out.  This one I'm

18  feeling a little guilty about leaving it unresolved.  It's not

19  one I'm seeing a quick and easy resolution on.  If there's a

01:25 20  way to side step, it may be worth exploring, but let's set a

21  time limit on it.

22          Is that something you guys think you could add that to

23  your to-do list for next week?

24          MR. TREHAN:  Yes, your Honor.

01:25 25          THE COURT:  Just report back.  If we need a ruling on

1    this, I don't mean to be ducking my responsibility to actually

2    decide things as opposed to tossing them back at you.  So if

3    that's needed, I can be available, again, on very short notice,

4    or we can see if it needs full briefing.

01:26  5              MR. TREHAN:  Thank you, your Honor.

6              THE COURT:  Any other issues we can usefully try and

7    move along today?

8              MR. TREHAN:  Nothing from plaintiffs.

9              MS. LOVEJOY:  No, your Honor.

01:26  10             THE COURT:  All right.  Well, thank you both.  I will

11   thank you both for teeing this up in this way.  I think it is a

12   more efficient way than sort of the cross briefing, but it does

13   require patience on both of your parts, if nothing else, to put

14   up with a judge who's occasionally thinking aloud or trying to

01:26  15   get his head around issues that you know better than I do.  So

16   I think this is an efficient way to proceed.  If at some point

17   you decide it isn't, I'm certainly willing to revert to more

18   traditional briefing.

19             MR. TREHAN:  We appreciate your thought and

01:27  20   consideration and input on these issues.

21             THE COURT:  Of course you had to say that.  It's what

22   you say behind my back.  Thank you.  I assume Miss Lovejoy will

23   add to the love fest.

24             MS. LOVEJOY:  Yes, yes, thank you, your Honor.

01:27  25             MR. TREHAN:  It is Valentine's Day, after all.

1         THE COURT:  All right.  Well, thank you both.  I

2    appreciate I've left you with a fair amount of work to do.  I

3    look forward to hearing a report next week.

4         MS. LOVEJOY:  Thank you, your Honor.

01:27  5         MR. TREHAN:  Thank you, your Honor.

6         THE COURT:  We'll be in recess.

7         THE CLERK:  Thank you.  We're now in recess.

8         (Adjourned, 12:31 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4   UNITED STATES DISTRICT COURT )

 5   DISTRICT OF MASSACHUSETTS    )

 6

 7

 8          I, Kristin M. Kelley, certify that the foregoing

 9   transcript is a true and correct transcript of the

10   audio-recorded proceedings held in the above-entitled matter to

11   the best of my skill and ability.

12

13

14       /s/ Kristin M. Kelley              February 21, 2025

15       Kristin M. Kelley, RPR, CRR              Date
         Official Court Reporter
16

17

18

19

20

21

22

23

24

25
```