Moez M. Kaba

mkaba@hueston.com
D: 213 788 4543
T: 213 788 4340
F: 888 866 4825

523 West 6th Street
Suite 400
Los Angeles, CA 90014

# HUESTON HENNIGAN LLP

March 19, 2025

**VIA ECF**

Hon. Paul G. Levenson
Room 25, 7th Floor
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 2300
Boston, MA 02210

Re:   *UMG Recordings, Inc. et al. v. Suno, Inc.*, No. 24-cv-11611-FDS (D. Mass.)

Dear Magistrate Judge Levenson:

Pursuant to the Court's instructions provided during the February 26, 2025 hearing, the parties jointly write to bring to the Court's attention the one outstanding dispute related to Plaintiffs' first sets of discovery requests.

Plaintiffs served their First Set of Requests for Production, First Set of Requests for Admission, and First Set of Interrogatories on Suno on August 19, 2024. Suno served its Responses and Objections for each set of discovery on September 18, 2024. The parties have met and conferred at length over the subsequent months.[1] While the parties were able to reach agreement on the scope of many of the discovery requests, one remains.[2]

## I.   Preliminary Statement

### A. Plaintiffs' Statement

Plaintiffs are a group of record companies that collectively own or exclusively control copyrights in many of the most historically important and commercially valuable sound recordings in the world. Defendant Suno, Inc. ("Defendant" or "Suno") operates an AI-powered music generation service that permits users to generate audio files using, for example, text prompts that describe various aspects of the desired musical output in plain English. Plaintiffs filed this lawsuit because, in order to develop its model, Suno copied untold

---

[1] The parties met and conferred via videoconference on October 2, 2024, for approximately two hours. Rajan Trehan, Mariah Rivera, and Alexander Perry attended on behalf of Plaintiffs, and Brittany Lovejoy, Lydia Franzek, and Grace McLaughlin attended on behalf of Suno. Over the subsequent weeks, the parties continued to confer via email and held an additional meet and confer via videoconference on January 8, 2025. Following a February 14, 2025 discovery conference with the Court, the parties again exchanged emails between February 19 and March 19, 2025.

[2] Plaintiffs previously informed the Court of a dispute concerning the appropriate definition of AI Models. *See* Dkt. 66. After further conferral efforts, the parties have reached agreement regarding this dispute. Plaintiffs expressly reserve their rights to revisit this issue and seek additional source code material during the course of discovery. Defendant likewise reserves its rights to object to such additional requests from Plaintiffs.

# HUESTON HENNIGAN LLP

numbers of Plaintiffs' copyrighted sound recordings without authorization for the purpose of creating a product designed to output audio files that directly compete with the sound recordings on which it trained.

Consistent with the allegations in the Complaint, Plaintiffs have propounded discovery requests to determine the extent to which Suno built its business on copying Plaintiffs' copyrighted sound recordings. Plaintiffs' discovery requests are also intended to explore, among other things, the basis for Suno's fair use defense, which Suno has already asserted as its principal defense to Plaintiffs' claims. *See* Answer at 13.

In response to Plaintiffs' first sets of discovery requests, Suno served initial Responses and Objections, which refused to produce even *a single* document and offered only to meet and confer with respect to a few limited requests.

Despite having now agreed to make productions in response to certain of Plaintiffs' requests, Suno continues to resist producing critical categories of information that bear directly on its use of Plaintiffs' copyrighted sound recordings, its fair use defense, the willfulness of its infringement, and the financial relief to which Plaintiffs' believe they are entitled. In particular, Suno purports to limit disclosure of information concerning the information Suno disclosed to its investors regarding its legal, financial, and business risks, and the manner and extent to which Suno has profited from its exploitation of Plaintiffs' copyrighted sound recordings to build its AI music generation service.

A party accused of widespread copyright infringement cannot obstruct discovery concerning the breadth of its copying of protected works or withhold information about how it has deployed those works to build a multimillion-dollar business. The discovery rules do not allow Suno to selectively pick and choose the categories of discovery it will reveal. Because Plaintiffs' requests are relevant—indeed, essential—to a proper adjudication of this dispute and proportional to the needs of the case, the Court should compel Suno to produce information fully responsive to the following requests.

### B. Suno's Statement

Defendant Suno, Inc. ("Suno") is an artificial intelligence-powered tool that allows people to use plain English descriptions of genres, styles, and other musical elements to create new music. The technological foundation of Suno's tool is an underlying model of how music works. The model is a type of computer program known as a "neural network." It was constructed by showing the program tens of millions of instances of different kinds of recordings. From analyzing their constitutive elements, the model derived a complex collection of statistical insights about the auditory characteristics of those recordings—in other words, what types of sounds tend to appear in which kinds of music. Through extensive further refinements, Suno's engineers were able to provide a tool for virtually anyone to harness the power of that model in the service of generating new music.

Plaintiffs are a collection of the largest record labels in the world, which collectively dominates the music industry. They have asserted direct and indirect copyright infringement claims against Suno. But the model underpinning Suno's service is not a library of pre-existing content, outputting a collage of "samples" stitched together from existing recordings. Rather, it is a vast store of information about what various musical styles consist of, used to generate altogether new creations in those styles. For that reason, Plaintiffs' claims are limited to *inputs*: that is, Suno's copying of sound recordings for purposes of training its model. *See* Compl. ¶ 50 (disclaiming any allegation "that [Suno's] outputs themselves infringe" the Asserted Works). Their claims are about copies never heard or seen by anyone, made solely to analyze

# HUESTON HENNIGAN LLP

the sonic and stylistic patterns of the universe of pre-existing musical expression.  But what Plaintiffs really do not want is competition.  Where Suno sees individuals using a new tool to create original music, the labels see a threat to their market share.

Plaintiffs' initial discovery requests were wildly excessive.  For example, RFP No. 3 sought "all documents and communications concerning [Suno's] AI model."  Suno's whole business is its AI model.  By way of another example, RFP Nos. 48 and 49, at issue here, initially sought every communication with, presentation to, or documents exchanged with any of Suno's actual or potential investors, regardless of subject matter.  Nevertheless, the parties have met and conferred repeatedly and, with the Court's assistance, have narrowed the existing disputes considerably.  The remaining investor discovery dispute is, on one level, a simple disagreement about the appropriate search terms Suno should use to identify potentially responsive documents. The parties further disagree on the degree to which Suno should be permitted to review the documents that hit on search terms for relevance or responsiveness.  Plaintiffs' sweeping view that all investor-related communications bearing on whether Suno's use of the Plaintiffs' sound recordings is "of a commercial nature" are relevant would do little, if anything, to narrow the scope of RFP No. 48 or 49.  Because Suno has made every effort to cooperate to provide proportional discovery, and Plaintiffs continue to push for "all" investor-related materials, the Court should deny Plaintiffs' motion. In the alternative, the Court should adopt Suno's proposed compromises.

## II.    Requests Related to Suno's Investors (RFP Nos. 48, 49)[3]

### A.  Plaintiffs' Position

Plaintiffs served Requests for Production that seek the identity of Suno's investors, and the information Suno shared with these investors about its training data, use of copyrighted sound recordings, and overall business model.[4]  Suno initially refused to produce any documents responsive to these requests, on the basis that such information is "irrelevant to the copyright claims alleged in the Complaint."  Ex. B (B. Lovejoy Oct. 13, 2024 Email) at 6-7.  Suno has since walked away from its position that investor communications are entirely irrelevant and now argues that other sources are more likely to yield relevant

---

[3] As indicated in their position statement in reply, Plaintiffs are no longer pursuing their motion to compel with respect to Request No. 47.  See *infra* n.20.

[4] Plaintiffs' Document Request Nos. 47, 48, and 49 state, in full:

> **Req. No. 47**: Documents sufficient to identify all Persons who invested in or financially backed Suno.
>
> **Req. No. 48 (as narrowed)**: All Documents and Communications between You and Any investors, venture capital backers, seed funders, or any other potential investors in SUNO, including but not limited to Lightspeed Venture Partners, Nat Friedman and Daniel Gross, Matrix, Founder Collective, 3LAU, Aaron Levie, Alexandr Wang, Amjad Masad, Andrej Karpathy, Aravind Srinivas, Brendan Iribe, Flosstradamus, Fred Ehrsam, Guillermo Rauch and Shane Mac, regarding Your Training Data, Sound Recordings, copyright law, and/or business risks.
>
> **Req. No. 49**: All Documents and Communications Relating To investor presentations and meetings, including but not limited to pitch decks to investors and potential investors.

Ex. A (Plaintiffs' First Set of RFPs) at 18.

**HUESTON HENNIGAN LLP**

information.  *See* Ex. C (Feb. 13, 2025 Pre-Conference Joint Email) ("There is no basis to compel intrusive investor discovery in order to discover evidence that is more likely to be contained in Suno's internal files (if it exists)."). But Suno is not permitted to withhold relevant discovery based on a unilateral assessment of what evidence Plaintiffs should use to make their case.  Nor does Suno have any legal or factual basis to withhold documents and communications responsive to other of Plaintiffs' requests for production on the grounds that such materials involve Suno's investors or financial backers.  *Cf. In Re First Chi. Corp.*, 1988 WL 74989, at *4 (S.D.N.Y. July 8, 1988) ("There is no privilege for communications between an investment adviser and its client.").

Recognizing the relevance of investor communications, Suno suggested during the discovery conference with the Court that the parties exchange search terms to assist Suno in identifying responsive investor materials.  *See* Feb. 14, 2025 Tr. at 23:14-18.  Plaintiffs subsequently proposed search terms designed to yield information responsive to these requests and also asked Suno to confirm that it would produce documents sufficient to identify its investors and financial backers.  Specifically, Plaintiffs proposed search terms that were designed to capture Suno's formal pitches or presentations to investors, as well as informal communications with or about investors pertaining to Suno's training data, its legal and business risk, and the market for sound recordings more generally.  *See* Ex. D (M. Rivera Feb. 19, 2025 Email).  In response, Suno argued that investor discovery should be cabined to the issues of willfulness and the parties' competing conceptions of the fourth fair use factor.  *See* Ex. E (B. Lovejoy Feb. 21, 2025 Email) (stating that investor discovery should be focused on: "(1) willfulness—e.g., discussions of the legality of the product as a matter of copyright law—and (2) the impact of the product on the market for Plaintiffs' works, either the market for their works as training data . . . or on the market for their works more generally . . ."). Suno thus proposed an alternative set of narrowed search terms ostensibly geared toward its conception of appropriate investor discovery.  But Suno's manufactured limits on the scope of investor discovery are inappropriate, as the relevance of investor communications transcends the issues Suno has identified.  For the reasons described below, the Court should compel Suno to respond in full to these requests, so the parties can negotiate appropriate search terms that reflect the full scope of relevance of Suno's investor materials.

As an initial matter, Suno appears to have abandoned its argument that its communications with investors are entirely irrelevant to this litigation.  And for good reason.  As alleged in the Complaint, Plaintiffs have a strong basis to believe that Suno discussed the risk of copyright liability when soliciting investments. For instance, one of Suno's earliest investors, Antonio Rodriguez, a partner at the venture-capital firm Matrix Partners ("Matrix"), has made clear that he invested in Suno with full knowledge that Suno trained its AI model on a corpus of copyrighted sound recordings and that this conduct posed a risk of copyright liability. *See* Complaint ¶ 47.[5]  It is unfathomable that a sophisticated investment firm like Matrix did not discuss copyright risk with Suno or conduct due diligence into the legal risks associated with Suno's business before investing.  It hardly stretches the imagination that others contemplating an investment in Suno would also inquire into the legal and financial risks associated with Suno's business, as these are ordinary topics of due diligence in any financial transaction.  As Suno now seems to realize, Plaintiffs are entitled to, at the very least, all information that Suno exchanged with its actual and potential investors on these points.

---

[5] *See also* Brian Hiatt, *A ChatGPT for Music Is Here. Inside Suno, the Startup Changing Everything*, Rolling Stone (March 17, 2024) (quoting Antonio Rodriguez as stating "[h]onestly, if [Suno] had deals with labels when this company got started, I probably wouldn't have invested in it.  I think that they needed to make this product without the constraints.").  Plaintiffs also served a third-party subpoena on Matrix.  As Suno did initially, Matrix has wholesale objected to producing documents responsive to Plaintiffs' requests on relevance grounds.

# HUESTON HENNIGAN LLP

No longer disputing wholesale the relevance of its communications with investors, Suno seeks to narrow the scope of relevance to the issues of willfulness and the fourth fair use factor (that is, the impact of the product on the market for Plaintiffs' works). But Suno's communications with its investors are relevant to more than just these issues. As Plaintiffs have repeatedly explained during conferral, *see, e.g.*, Ex. F (M. Rivera Oct. 29, 2024 Email), these requests target information that bears on the first fair use factor as well, namely "whether [Suno's] use of [Plaintiffs' copyrighted sound recordings] is of a commercial nature" and whether Suno "stands to profit from exploitation of the copyrighted material without paying the customary price." *Haberman v. Hustler Mag., Inc.*, 626 F. Supp. 201, 208, 211 (D. Mass. 1986); *see also* 17 U.S.C. § 107(1) (articulating the first fair use factor as "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes.").

The First Circuit has explained that "the commercial-noncommercial distinction the law draws centers on whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 61 (1st Cir. 2012) (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985)); *see also Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 532-33 (2023) ("If an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use."). The value proposition that Suno presented to investors is likely to provide compelling evidence of Suno's potential to profit from its exploitation of Plaintiffs' copyrighted works for the purpose of generating sound files that compete with those works. And there is every reason to believe that Suno shared its vision to monetize its AI music generation service with various investors in the process of raising the $125 million it had accrued by May 2024.[6] This is why Plaintiffs proposed several search terms geared toward Suno's investor pitch decks, presentations, meetings, and proposals. *See* Ex. D. Suno rejected these search terms, in favor of more narrowly crafted terms that are unlikely to capture how Suno pitched its product. *See* Ex. E.

To the extent Suno contends that these requests are unnecessary to establish its commercial purpose for its unauthorized copying, it misapprehends the discovery standard. Discovery need only be "*relevant* to any party's claim or defense," as set forth in Rule 26(b)(1), and "[r]elevance is broadly construed at the discovery stage." *Solamere Cap. v. Dimanno*, 621 F. Supp. 3d 152, 159 (D. Mass. 2022). Nor can Suno vitiate the relevance of this evidence by simply stipulating to a commercial purpose because "relevance" is not "affected by the availability of alternative proofs." *Old Chief v. United States*, 519 U.S. 172, 179 (1997). That is why, for instance, the court in *BP Sports, LLC v. ThermoLife International LLC* rejected a defendant's attempt to limit the scope of discovery through an admission. *See* 2021 WL 2583493, (S.D. Fla. Feb. 25, 2021) (noting that "to judicially admit alter ego liability does not change the scope of the discovery as to the underlying licensing agreement."); *cf. Smith v. Summers*, 334 F. Supp. 3d 339, 345 & n.6 (D.D.C. 2018) (observing that "[a] party is not required to accept a judicial admission of his adversary, but may insist on proving the fact" and noting that "[t]ry as Defendant may to stipulate away the parties' contractual relationship, it remains foundational to Plaintiff's claim").

But even accepting Suno's view that this evidence only pertains to the fourth fair use factor and willfulness, its proposed limitations are untenable. Starting with fair use, the fourth factor addresses "the effect of the use upon the potential market for or the value of the copyrighted work." 17 U.S.C. § 107(4). It

---

[6] *See* Press Release, *Suno has raised $125 million to build a future where anyone can make music*, Suno (May 21, 2024) (Suno is "excited to announce [it has] raised $125 million to build a future of music where technology amplifies, rather than replaces, our most precious resource: human creativity.").

# HUESTON HENNIGAN LLP

is "the single most important element of fair use," *Harper & Row Publishers*, 471 U.S. at 566, and considers "(1) the degree of market harm caused by the alleged infringer's actions, and (2) whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original," *Gregory*, 689 F.3d at 64 (internal quotation marks omitted).

The parties have a fundamental disagreement regarding the appropriate scope of the fourth fair use factor. Suno has previewed its argument that because Plaintiffs' claims center on Suno's use of sound recordings as training inputs, the only relevant market is the market for sound recordings as training data. *See* Feb. 14 Tr. at 17:9-18:4 ("So whether this tool writ large will compete with plaintiffs' sound recordings, we don't think it's a relevant inquiry."). Suno's view is legally unsound because it erroneously separates the act of training an AI model from the model's purpose (here, to create outputs that will inevitably compete with Plaintiffs' copyrighted recordings). The First Circuit has been clear that the fourth fair use factor is equally "concerned with secondary uses that, by offering a substitute for the original, usurp a market that properly belongs to the copyright holder." *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 24 (1st Cir. 2000); *see also Thomson Reuters Enter. Ctr. GMBH v. Ross Intel. Inc.*, — F.Supp.3d —, 2025 WL 458520, at *9-10 (D. Del. Feb. 11, 2025) (in suit involving copyright infringement claims against AI legal research company for training on copyrighted content, determining with respect to the fourth fair use factor that it "must consider not only current markets but also potential derivative ones that creators of original works would in general develop or license others to develop." (internal quotation marks omitted)). In any event, the Court need not make a definitive ruling on which theory of the fourth fair use factor should prevail on this motion, because Plaintiffs' theory is "sufficiently plausible that discovery on both sides make[s] sense." Feb. 14 Tr. at 22:16-17.

While Suno has subsequently acknowledged that Plaintiffs should get discovery into how Suno's product impacts the market for Plaintiffs' sound recordings more generally, Suno's proposal appears to exclude communications concerning Suno's impact on market for sound recordings, unless they contain specific mention of one of the Plaintiff entities or their sound recordings. But what Suno may have said about its impact on the overall market for sound recordings remains squarely relevant, irrespective of any mention of a particular record label or a particular label's sound recordings. As Suno has acknowledged Plaintiffs "likely control[ ] well over 75% of the recordings that U.S. consumers tend to listen to today," Answer at 4, so any communications Suno had regarding the overall market for sound recordings necessarily implicates the market for their works. Indeed, Suno's proposed search terms seem designed to leave out large swaths of communications that bear on its impact on the relevant market. It is unreasonable to expect that Suno would have communicated with investors about its potential competition with or impact on sales for Plaintiffs' specific sound recordings, as opposed to its impact on the market for sound recordings more generally. This is why Plaintiffs included terms such as "recording," "song," "audio," and "music" in their proposed search strings. But Suno excised these terms from its proposal, thereby excluding prominent examples of the general topics that Suno likely discussed with its investors concerning the effect that Suno's AI music generation service will have on the market for sound recordings.[7] To leave out such materials would deprive Plaintiffs of information highly relevant to the fourth fair use factor.

---

[7] Suno's proposed search strings are overly restrictive in several other respects, as well. For instance, Suno's search terms would require that a document specifically reference a market impact, rather than merely speak to the potential target market. *See* Ex. E (proposing in response to RFP 49: ((disrupt* OR compet* OR substitu* OR supplant* OR revolution* OR transform* OR innovat* OR redefin* OR impact* OR affect*) /5 ("music industry" OR "labels" OR streaming OR "digital service platform*" OR DSP OR market))"). By requiring responsive documents to include terms such "disrupt*" or "compete*" or "substitu*," Suno would exclude from its production obligations documents that reference the target market for Suno's products and AI-generated outputs. Plaintiffs are entitled to such documents

# HUESTON HENNIGAN LLP

To provide a concrete example, one of Suno's co-founders, Mikey Shulman, has publicly stated that he "envison[ed] a billion people worldwide paying 10 bucks a month to create songs with Suno."[8] Shulman recognized that Suno's business model depends, at least in part, on the rapid proliferation of AI-generated music, which is fueled by the AI model Suno built using Plaintiffs' copyrighted sound recordings. Plaintiffs are entitled to know the details of how Suno pitched its business to investors, including the extent to which Suno advertised the possibility that music generated by its AI service would compete with, reside alongside, or even replace human-created sound recordings. But Suno's proposed search terms would not capture documents or communications of this sort because they do not specifically mention the "music industry" or "labels" or "digital service platforms." Ex. E. Suno's approach to investor discovery simply does not reflect the full scope of relevance as to the fourth fair use factor.

Turning to willfulness, these requests also seek information central to Plaintiffs' determination of whether to pursue statutory or actual damages for Suno's infringement, including but not limited to Suno's state of mind with respect to its infringement and the benefits Suno reaped from its infringement. Section 504 of the Copyright Act permits a district court, in its discretion, to award between $750 and $30,000 for each copyright infringed, the upper bound of which can be increased to $150,000 per infringed work if the court finds willful infringement. 17 U.S.C. § 504(c)(1)-(2). Factors courts consider when determining the amount of statutory damages to award for copyright infringement, include "(1) expenses saved and profits reaped by the defendant, (2) revenues lost by the plaintiffs, (3) the deterrent value of the award, and (4) whether the infringement was willful or innocent." *Polygram Int'l Pub., Inc. v. Nevada/TIG, Inc.*, 855 F. Supp. 1314, 1335 (D. Mass. 1994); *see also Bryant v. Media Rights Prods., Inc.,* 603 F.3d 135, 144 (2d Cir. 2010) (outlining statutory damages considerations including, *inter alia*, "the infringer's state of mind" and "the conduct and attitude of the parties").

Whether Suno told investors about the materials comprising its training data and acknowledged the risk of copyright infringement suits, and evaluated the potential financial exposure resulting from such suits would, at the very least, provide evidence of Suno's "state of mind." *Curet-Velazquez*, 656 F.3d at 58 (noting that "state of mind of the infringers" is one of the factors a court may consider). Such communications could also demonstrate Suno's willfulness. *See Homeowner Options for Mass. Elders, Inc. v. Brookline Bancorp, Inc.*, 789 F. Supp. 2d 242, 244 (D. Mass. 2011) ("Infringement is willful if the defendants knew or should have known that their conduct constituted copyright infringement, or acted in reckless disregard of the copyright holder's rights."). Yet Suno's proposed search terms targeting the issue of willfulness omit any reference to sound recordings or the act of training. Ex. E.[9] Even basic questions from investors about

---

and to use them as evidence of Suno's intended impact on the relevant markets.

As another example, Suno's proposed search terms regarding the market for training data would require specific reference to the terms "training data" or "training dataset." *Id.* (proposing in response to RFP 49: ((licens* OR deal*) /5 ("training data" OR "training dataset" OR "training data set" OR catalog* OR "label*"))). But this string would exclude materials that refer to licenses for "recordings" or "songs" or "music." Suno cannot impose such undue limitations on the documents deemed responsive.

[8] *See* Hiatt, *supra* note 9.

[9] *See, e.g.*, Ex. E (proposing the following search terms in response to RFP 48: "(invest* OR equity OR fundrais* OR rais* OR round* OR venture OR capital* OR seed* OR sponsor* OR stakeholder* OR benefactor* OR shareholder* OR partner* OR debt* OR note* OR bond* OR convertible OR securit* OR interest OR share* OR stock OR offer* OR option* OR warrant*) AND (copyright OR infring* OR lawsuit* OR liab* OR litigat* OR sue* OR suit* OR risk*)").

# HUESTON HENNIGAN LLP

where Suno's training data came from are relevant because investors likely asked such questions to evaluate the legality of the company. The search terms must reflect the relevance of these discussions concerning Suno's training data.

Moreover, Suno's communications with investors may also reflect on Suno's "intent" with respect to its infringing conduct. *Daggs v. Bass*, 2012 WL 5878670, at *5 n.3 (D. Mass. Nov. 20, 2012) ("Intent *is* relevant to the question of whether infringement was willful."). To the extent Suno questions the basis for Plaintiffs' belief that it would expressly market its product to investors as illegal, Suno need not explicitly acknowledge the illegality of its use to make its communications with investors relevant to this dispute. Indeed, Suno likely made all sorts of representations about the potential for its AI music generation service to disrupt, upend, or revolutionize the music industry, and Plaintiffs are entitled to present evidence about the permissible inferences that can be drawn from what Suno told its investors. *Cf. John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 298 F.R.D. 184, 187 (S.D.N.Y. 2014) ("[I]nformation about [employee's] interactions with suppliers may demonstrate whether Defendants have continued to purchase from known counterfeiters—a fact that would tend to show willful copyright infringement." (internal quotation marks omitted)).

It is understandable why Suno wishes to shield from discovery evidence that would confirm that it pitched its commercial product to the marketplace clear-eyed about the risks of building a business around the infringement of Plaintiffs' copyrighted sound recordings. Sophisticated investors, like those who funded Suno, would have been keenly interested in this risk, and Plaintiffs are entitled to know what Suno shared or learned on this point. That is why Plaintiffs have propounded document requests seeking to confirm the identity of Suno's investors (RFP 47) and the information Suno shared with investors about its training data, use of copyrighted sound recordings, and its overall business model (RFPs 48 and 49). Yet Suno's proposed search terms reflect a much too narrow conception of why these Requests are relevant and would exclude documents and communications containing pertinent information simply for not using specific words or phrases. Suno has no basis for this limitation, as it has not articulated any appreciable burden with collecting and searching for investor communications. The Court should compel Suno to respond to these requests in full.

  **B. Suno's Position:**

RFP Nos. 48 and 49 seek invasive, cumulative, and overly broad discovery regarding Suno's investors. Specifically, Plaintiffs seek *all* documents and communications between Suno and any investors or potential investors (RFP 48), and *all* documents and communications relating to investor presentations and meetings, including pitch decks to actual or potential investors (RFP 49). During the Court's February 14 discovery conference, Plaintiffs identified two issues to which this discovery might be relevant: (1) willfulness, as relevant to statutory copyright damages, and (2) the impact of Suno's product on the market for Plaintiffs' works, as relevant to Factor Four of the fair use analysis. *See* Feb. 14, 2025 Tr. at 19:16–20:14. While Suno continues to believe that the full scope of discovery sought by Plaintiffs in these RFPs is wildly intrusive and not proportional to the needs of this case, after receiving Judge Levenson's preliminary impressions on Plaintiffs' theories of relevance, Suno agreed to discuss potential search terms targeted to those two topics. Feb. 14, 2025 Tr. at 24:3-21. But when Suno received Plaintiffs' proposed search strings, it became clear that Plaintiffs were simply asking Suno to search for the same unreasonably broad scope of discovery they requested in the first place. For example, Plaintiffs proposed search strings that would have swept in investor documents and communications involving the words "song" or "music"—*i.e.*,

**HUESTON HENNIGAN LLP**

essentially *all* investor materials, as it is difficult to see how Suno could describe its business without using one of those words. *See* Ex. D.[10]  In good faith, Suno responded with revisions to Plaintiffs' search terms intended to target the narrower set of documents and communications that might be relevant to (1) willfulness; or (2) Factor Four of the fair use analysis (under either side's theory of the relevant "market" for purposes of that factor). *See* Ex. E.

Rather than continue to negotiate search terms—despite the vanishingly small delta between the parties' conceptual positions—Plaintiffs wholly rejected Suno's counterproposal and opted to bring this dispute to court. *See* Pls.' Statement at 2-3. As an initial matter, the relief Plaintiffs seek is unclear. Plaintiffs ask the Court to compel Suno to respond to RFPs 48 and 49 "in full," "so that the parties can negotiate appropriate search terms." *Id.* at 18. That makes no sense. The whole point of applying search terms is to narrow the "full" set of potentially responsive materials to a subset of those documents most likely to contain responsive information. That is exactly what Suno proposed and Plaintiffs rejected. Plaintiffs have apparently reverted back to the untenable position that they are entitled to *all* presentations, meetings, and other communications with anyone who has ever expressed an interest in investing in Suno, regardless of whether or not they did invest in Suno, and regardless of the connection between those communications and one of Plaintiffs' relevance theories.[11] The Court should reject that position.

As a threshold matter, Plaintiffs have no basis to demand *all* investor-related materials and communications. Plaintiffs argue that the "relevance of investor communications transcends the issues Suno has identified." Pls.' Statement at 3. But these issues (Factor Four and willfulness) are the issues that *Plaintiffs* specifically identified during the February 14 hearing. *See* Feb. 14, 2025 Tr. at 19:24–20:18. The only additional relevance ground Plaintiffs identify to justify the expansive discovery they seek is Factor One of the fair use analysis. Specifically, Plaintiffs assert they need discovery to discern whether Suno's use of Plaintiffs' sound recordings is "of a commercial nature" or whether Suno's use "stands to profit from exploitation of the copyrighted material without paying the customary price." *See* Pls.' Statement at 4 (first citing *Haberman v. Hustler Mag., Inc.*, 626 F. Supp. 201, 208, 211 (D. Mass. 1986), then citing 17 U.S.C. § 107(1) (articulating the first fair use factor as "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes.")). But investor discovery is surely not necessary to establish whether Suno's "use is of a commercial nature or is for nonprofit educational purposes"—Suno has admitted that it is a for-profit corporation. *See* Answer ¶ 7 ("Suno [. . .] admits that it charges many of its users monthly fees to use its product and produce digital files"). And Suno has agreed

---

[10] Plaintiffs' full proposed search string was: (Invest* OR equity OR fundrais* OR rais* OR round* OR venture OR capital* OR seed OR sponsor* OR stakeholder* OR benefactor* OR shareholder* OR partner* OR debt* OR note* OR bond* OR convertible OR securit* OR interest OR share* OR stock OR offer* OR option* OR warrant*) AND (train* OR recording* OR song* OR label* OR audio OR music OR catalog* OR track* OR copyright OR infring* OR lawsuit* OR liab* OR litigat* OR sue* OR suit* OR risk*), and an alternative using specific investors' names. *See id.*

[11] Plaintiffs' other proposed search string was: (Invest* OR equity OR fundrais* OR rais* OR round* OR venture OR capital* OR seed OR sponsor* OR stakeholder* OR benefactor* OR shareholder* OR partner* OR debt* OR note* OR bond* OR convertible OR securit* OR interest OR share* OR stock* OR offer* OR option* OR warrant*) AND (pitch OR deck OR present* OR meeting* OR propos*), and an alternative using specific investors' names. Ex. G.

# HUESTON HENNIGAN LLP

to produce financial information that will confirm the same.  *See* Ex. J (Nov. 8, 2024 G. McLaughlin Email) (agreeing to produce documents sufficient to show its profits on a monthly basis in response to Plaintiffs' RFP No. 50).  Seeking *all* communications with Suno's investors, pitch decks, and presentations, purportedly to determine whether or not Suno's business is "of a commercial nature" (or whether Suno had the "potential to profit," or planned "to monetize its AI music generation service," Pls.' Statement at 4) is cumulative of the evidence Suno has already agreed to produce that is relevant to Factor One, and grossly disproportionate to the needs of the case.

Plaintiffs also continue to argue that all investor-related documents are relevant to Factor Four of the fair use test: "the effect of the use on the potential market for or value of the copyrighted work."  17 U.S.C § 107(4).  As discussed during the February 14 conference, Suno and Plaintiffs disagree on the proper framing of this issue.  Plaintiffs have not asserted a claim regarding any potential copyright infringement by Suno's outputs: that is, the music created by Suno.  *See* Compl. ¶ 50.  The only alleged unlawful "use" here, and the subject of Suno's fair use defense, is Suno's alleged "use" of Plaintiffs' sound recordings as part of a back-end process to train its model.  *See*, *e.g.*, *Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) (fair use to copy all of the books in numerous university libraries in order to create a commercial, full-text searchable index of the assembled corpus); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) (fair use to copy essentially all of the images on the open internet and show thumbnail versions to users, in the service of creating an image-search functionality).

But more importantly, *the Court need not reach these issues.*  Even accepting Plaintiffs' (incorrect) view of the law, and assuming at least part of the relevant inquiry is the degree to which the output from Suno's model might substitute for Plaintiffs' works, it is unclear why investor-related discovery is the appropriate source of information about that topic.  The mere fact that Suno's platform creates new music that has the potential to compete with Plaintiffs' sound recordings is plainly ascertainable from the product itself.  And, regardless, *Suno offered to produce responsive, non-privileged investor communications bearing on the impact of Suno's use on the "market"—defined to include both Suno's and Plaintiffs' theory of the relevant market*.  *See* Feb. 14, 2025 Tr. at 23:15; *see also* Ex. E.

Suno in fact  proposed search terms that adequately capture both parties' view of Factor Four of the fair use analysis issue.  For example, Suno suggested searching for investor-related terms and "disrupt*," "compet*," "substitu*," "supplant*," "revolution*," "transform*," "innovat*," "redefin*," "impact*," or"affect*" within five words of "music industry," "labels," "streaming," "digital service platform," "DSP," or "market."  *See* Ex. E.[12]  These terms surely would hit on documents that contain "representations about the potential for

---

[12] Suno's full proposed search string is:  (invest* OR equity OR fundrais* OR rais* OR round* OR venture OR capital* OR seed* OR sponsor* OR stakeholder* OR benefactor* OR shareholder* OR partner* OR debt* OR note* OR bond* OR convertible OR securit* OR interest OR share* OR stock* OR offer* OR option* OR warrant*) AND ((disrupt* OR compet* OR substitu* OR supplant* OR revolution* OR transform* OR innovat* OR redefin* OR impact* OR affect*) /5 ("music industry" OR "labels" OR streaming OR "digital service platform*" OR DSP OR market)), and an alternative using specific investors' names.  *See* Ex. E.

# HUESTON HENNIGAN LLP

its AI music generation service to *disrupt*, upend, or *revolutionize* the music industry."[13]  Pls.' Statement at 7.  Plaintiffs object that Suno's terms would not capture documents showing "the extent to which Suno advertised the possibility that music generated by its AI service would *compete* with, reside alongside, or even replace human-created sound recordings."  Pls. Statement at 6.  But Suno's proposed search strings *would* hit upon, by way of hypothetical example, an investor pitch deck advertising the possibility that music generated by Suno's AI service would "compete with the market for existing sound recordings" or provide an "innovative source of new content for streaming platforms."  Suno's search term proposal is targeted to find the documents, if they exist, that Plaintiffs purport to need; it is Plaintiffs' search terms—designed to find every investor pitch deck (e.g., (invest* AND (pitch or deck))—that are not.  *See supra* n.23.  And if Plaintiffs had identified specific deficiencies with the phrases Suno chose, the appropriate response would be to suggest an alternative or modified search term.   Indeed, Suno is happy to add the following terms to its search string, which should address Plainitffs' concerns:   ((disrupt* OR compet* OR substitu* OR supplant* OR revolution* OR transform* OR innovat* OR redefin* OR impact* OR affect* OR replace* OR upend*) /5 ("music industry" OR "labels" OR streaming OR "digital service platform*" OR DSP OR market OR song* OR "sound recording"* OR music*)).

Next, Plaintiffs claim that investor documents and communications are relevant to uncover evidence of willfulness and Suno's state of mind[14] because Suno might have "told investors about the materials comprising its training data and acknowledged the risk of copyright infringement suits, and evaluated the potential financial exposure resulting from such suits."  Pls.' Statement at 7.  But once again, the search terms proposed by Suno are more than adequate to capture such discussions with Suno's investors.  *See* Ex. E (proposing search terms including "invest*" or "equity" and "(copyright OR infring* OR lawsuit* OR liab* OR litigat* OR sue* OR suit* OR risk*)").[15]  Plaintiffs suggest that Suno's proposed search terms "omit any reference to sound recordings or the act of training."  As discussed above, however, terms like "song" or "recording" or "train*" are so broad that they will potentially sweep in all investor communications about Suno's product, obviating the need for search terms.  Plaintiffs speculate that the purpose of a basic diligence question such as "where does Suno's training data come from?" would be to evaluate the legality of the company.  But even if that were true, the relevant information would be, hypothetically, a *response*

---

[13] Suno is and has always been willing to add additional terms to its search string—it would willingly add "upend" if requested.  But the fact that two terms Plaintiffs use to describe the documents they are looking for are in Suno's search string indicate that the parties seem to be norming around the language likely to be used in purportedly relevant documents.

[14] Importantly, this inquiry would be relevant only to damages, not liability.  *See, e.g.*, 17 U.S.C. § 504(c) (listing willfulness as relevant in determining statutory damages); *see also MJ Int'l, Inc. v. Hwangpo*, No. 8:01CV201, 2002 WL 386356, at *2 (D. Neb. Mar. 13, 2002) ("The defendant's intent is relevant *only* to the issue of damages . . . but cannot affect liability.") (emphasis added).

[15] Suno's full proposed search string was:  (invest* OR equity OR fundrais* OR rais* OR round* OR venture OR capital* OR seed* OR sponsor* OR stakeholder* OR benefactor* OR shareholder* OR partner* OR debt* OR note* OR bond* OR convertible OR securit* OR interest OR share* OR stock OR offer* OR option* OR warrant*) AND (copyright OR infring* OR lawsuit* OR liab* OR litigat* OR sue* OR suit* OR risk*).  Suno also proposed a similar string with the names of particular investors identified by Plaintiffs.  *See* Ex. E.

# HUESTON HENNIGAN LLP

*from Suno* reflecting some belief that its training data exposed the company to a risk of copyright infringement suits. *See* Pls.' Statement at 7 (explaining that an alleged *infringer*'s state of mind may be relevant to the willfulness inquiry). And this information is already captured by Suno's proposed search terms. *See supra* n.27.

Plaintiffs complain that Suno has not articulated any "appreciable" burden associated with collecting and searching for investor communications. But Suno has a large number of investors, and a demand for "all documents and communications relating to investor presentations and meetings," including with "potential investors" is, on its face, overbroad and disproportionate to Plaintiffs' needs. Moreover, Suno's hit count on Plaintiffs' proposed search terms showed that Plaintiffs' proposed terms would require Suno to review more than *86,000* additional documents.

Finally, Plaintiffs' request for the identities of *all* of Suno's investors, without limitation, is simply a harassing fishing expedition.[16] Given the limited relevance of such information, courts have often recognized the impropriety of such discovery into investor identities. *See, e.g., Oliver v. Meow Wolf, Inc.*, No. 20-cv-237, 2021 WL 4171574, at *3 (D.N.M. May 17, 2021) ("[I]nvestment information [] has little relevance to those [copyright] claims."); *Blast Motion, Inc. v. Zepp Labs, Inc.*, 2015 WL 12564315, at *3 (S.D. Cal. Dec. 2, 2015) (denying motion to compel request for information regarding the identity of a party's investors); *Umbach v. Carrington Inv. Partners (US), LP,* No. 08-cv-484, 2009 WL 3287537 at *3 (D. Conn. Oct. 9, 2009) ("[P]laintiff's discovery into the identity of all investors, and the amounts of their investments . . . is overly broad and unduly burdensome, even if such sensitive information was limited under the stipulated protective order to 'attorney's eyes only.'" (emphasis added)); *Buckeye Ventures, Inc. v. Trafalgar Cap. Specialized Inv. Fund, Luxembourg*, 2009 WL 10667900, at *2 (S.D. Fla. Dec. 7, 2009) (ruling that where the defendant has repeatedly informed Plaintiff of the limited relevance of investor discovery, inquiry into investors' specific identities "only serves to harass and to oppress [the defendant]."). Suno offered to search for and review documents and communications with investors that hit upon Suno's proposed search terms, and to produce documents and communications relating to willfulness and Factor Four—those communications will reveal on their face the identity of any investors Suno communicated with regarding the topics Plaintiffs argue are relevant. Plaintiffs' request that Suno *also* identify (and produce communications with) investors with whom Suno did not communicate about these topics is unnecessarily intrusive and not proportional to Plaintiffs' needs.[17]

For the reasons set forth above, the Court should deny Plaintiffs' motion. In the alternative, if the Court is inclined to compel Suno to collect, review, and produce non-privileged documents in response to RFP Nos. 48 and 49, Suno requests that the Court order that Suno use the search terms identified in Exhibit

---

[16] In this case, such concern is more than hypothetical. Plaintiffs have already served a third-party subpoena on one of Suno's investors.

[17] This paragraph of Suno's position statement was intended to oppose Plaintiffs' motion to compel production of documents responsive to RFP No. 47, which seeks investor identities. Plaintiffs informed Suno on the morning of March 19 (after Suno exchanged its position statement) that they are no longer pursuing their motion to compel with respect to RFP No. 47.

# HUESTON HENNIGAN LLP

E to identify the set of materials to review, and produce documents that bear upon willfulness and Factor Four—the topics Plaintiffs argued were relevant at the February 14 hearing. Suno has also offered to produce any documents from this set of materials that are responsive to any of Plaintiffs' other requests for which Suno has agreed to produce documents. The Court should not, however, require Suno to identify investors with whom Suno did not discuss these topics, or produce sensitive investor documents and communications with no bearing on the issues in dispute.

### C. Plaintiffs' Reply Position

Suno wrongly frames the parties' dispute regarding the appropriate scope of investor communications as a quibble over specific search terms. But this framing masks the parties' fundamental disagreement regarding the appropriate scope of relevance with respect to investor documents and communications, and the implications of that relevance. While Plaintiffs are, of course, willing to continue negotiating appropriate search terms with Suno as to the relevant requests, reaching a mutual understanding as to the scope of relevance is foundational to these negotiations.

The primary dispute that remains is whether Plaintiffs are entitled to discovery into Suno's investor communications as relevant to the first fair use factor—that is, the purpose and character of the allegedly infringing use, including whether such use is of a commercial nature. *See* 17 U.S.C. § 107(1). As a corollary issue, Suno has proposed further limiting its production of investor materials to those that Suno unilaterally determines are related only to the issues of willfulness or the fourth fair use factor, irrespective of whether such documents hit on the parties' agreed-upon search terms. *See* Ex. G (J. Cammack Mar. 18, 2025 Email).[18] But Suno should not be permitted to filter the documents it produces based on its own legal conclusions as to whether particular documents bear on a unilaterally selected subset of relevant issues. Suno's communications with its investors are squarely relevant to the first fair use factor, *as well as* willfulness and the fourth fair use factor, and the Court should compel Suno to produce investor communications reflecting the full scope of their relevance.[19] Only once this foundational relevance issue is resolved can the parties agree on a focused, mutually acceptable set of search terms that would lend assurance that Suno is not improperly restricting its production to materials that fit its unilateral conception

---

[18] After receiving Suno's updated proposal for search terms for Requests Nos. 48 and 49, Suno Statement at 11, Plaintiffs requested clarification as to "whether Suno is proposing to produce all non-privileged documents that hit on these search terms, or whether Suno intends to limit its production of documents that hit on these search terms to those Suno determines are related to willfulness or the fourth fair use factor," Ex. H (A. Perry Mar. 17, 2025 Email). Suno responded that it was "not proposing (and will not agree) to produce *all* non-privileged documents that hit on the parties' agreed search terms," and confirmed that "contingent on reaching an agreement on narrower search terms . . . Suno would agree to produce non-privileged documents that hit on those search terms and that Suno determines are related to willfulness, Factor Four of the fair use inquiry, or are responsive to any other RFP for which Suno has agreed to produce responsive documents." Ex. G. Plaintiffs replied, indicating their disagreement that Suno may further filter its productions based on its own conception of whether materials relate only to the specific issues of willfulness and the fourth fair use factor. *See* Ex. I (A. Perry Mar. 19, 2025 Email).

[19] The parties appear to agree that Suno must produce investor documents and communications that bear on the issues of willfulness and the fourth fair use factor.

**HUESTON HENNIGAN** LLP

of a subset of the relevant legal issues. Accordingly, Plaintiffs respectfully request that the Court compel Suno to produce documents fully responsive to Request Nos. 48 and 49. [20]

As an initial matter, Suno incorrectly claims that during the February 14th hearing, *Plaintiffs* identified that the fourth fair use factor and willfulness are the only two topics to which investor documents and communications are relevant. See Suno Statement at 8. But this is *Suno's* framing of the scope of relevance. Plaintiffs, in fact, made clear both before and during the discovery hearing that they do not agree that the relevance of Suno's investor documents and communications is limited to just these two issues. *See* Feb. 14, 2025 Tr. at 18:10-24 ("THE COURT: I'm hearing Miss Lovejoy dividing it into two categories. . . . Do you see it the same way given the state of the claims in your complaint? MR. TREHAN: Your Honor, unfortunately, I have to say that we don't see it the same way with respect to this issue."); *see also* Ex. C at 3 (explaining relevance of investor communications to willfulness, as well as fair use factors one and four).

Rather, as Plaintiffs explained above, the investor documents and communications that Plaintiffs seek are also relevant to the first fair use factor: the "purpose and character of the use, including whether such use is of a commercial nature[.]" 17 U.S.C. § 107(1); *see also* Pls' Statement at 5. Critically, the first fair use factor must be viewed in full context and on a spectrum that demands evidence beyond a simple admission of copying for a commercial purpose. *See Andy Warhol*, 598 U.S. at 525 ("[T]he first fair use factor instead focuses on whether an allegedly infringing use has a further purpose or different character, which is a matter of degree, and the degree of difference must be weighed against other considerations, like commercialism."); *see also Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580 (1994) (explaining that "the extent of [a parody's] commerciality [ ] loom[s] larger" if the "commentary has no critical bearing on the substance or style of the original composition"). Suno cannot claim that investor communications are not relevant to the first fair use factor. Its offer of a simple admission that Suno "is a for-profit corporation" comes nowhere close to giving Plaintiffs the contextual information to which they are entitled regarding the purpose and character of Suno's use of Plaintiffs' sound recordings, including the degree of transformativeness as weighed against its commerciality. Suno Statement at 10. Indeed, the manner in which Suno pitched its emergent product to investors is likely to be the most probative evidence on these points, and Suno's search terms do not reflect this fundamental point.

In an attempt to justify its unreasonably narrow conception of relevance, Suno cites several unpublished, out-of-circuit cases for the notion that "courts have often recognized the impropriety of . . . discovery into investor identities." Suno Statement at 12. None of Suno's cited cases arose in even remotely comparable circumstances or addressed investor discovery in the context of a fair use defense to allegations of an emergent company's mass copyright infringement. At the start, several of these cases are not copyright infringement suits at all. *See, e.g.*, *Umbach v. Carrington Inv. Partners (US) LP*, 2009 WL 3287537, at *1-2 (D. Conn. Oct. 9, 2009) (securities class action); *Buckeye Ventures, Inc. v. Trafalgar Cap. Specialized Inv. Fund, Lux.*, 2009 WL 10667900, at *2 (S.D. Fla. Dec. 7, 2009) (usury claim alleging that "specific loan agreements between [parties] are usurious"); *see also Blast Motion, Inc. v. Zepp Labs, Inc.*, 2015 WL 12564315, at *3 (S.D. Cal. Dec. 2, 2015) (patent infringement suit). And the one copyright infringement suit Suno does cite involved a plaintiff asserting claims based on an artist collective's breach of its promise to pay an artist for a contributed artwork. *See Oliver v. Meow Wolf, Inc.*, 2021 WL 4171574, at *1 (D.N.M. May 17, 2021). Having already determined that the plaintiff had "not stated a claim for a

---

[20] Plaintiffs are no longer pursuing their motion with respect to Request 47. *See* Ex. I.

# HUESTON HENNIGAN LLP

revenue share" of the artist collective, the court determined that the plaintiff's request for "Complete lists of everyone who ever attended a Meow Wolf promotional event and comprehensive information about all persons who have ever invested in Meow Wolf are over-broad." *Id.* at *3. In short, none of these cases speaks to the present circumstances where Plaintiffs well-pleaded allegations reflect that a startup company pitched a novel, disruptive product to investors knowing that the underlying technology was predicated on the unauthorized use of copyrighted works.

Plaintiffs are further concerned with Suno's apparent intent to impose its inappropriately narrow conception of relevance by withholding documents responsive to Request Nos. 48 and 49 based on its own inherent legal determination as to which documents bear on particular legal issues. Plaintiffs cannot agree to search terms without assurance that the parties are aligned that Suno will use these search terms to identify and produce the full scope of materials to which Plaintiffs are entitled.[21] To that end, Suno's stated intention to produce only "non-privileged documents that hit on [applicable] search terms *and that Suno determines are related to willfulness [and] Factor Four of the fair use inquiry*" is inappropriate. Ex. G (emphasis added). Suno's contemplated "responsiveness" review goes far beyond what is typical in an ordinary search term exchange process. Rather than applying objective criteria to determine whether a particular document is encompassed within a particular discovery request, Suno's proposal would allow Suno to make inherent legal conclusions regarding whether particular materials pertain to Suno's unilaterally selected subset of legal issues. The Court should reject Suno's attempt to further limit its obligation to produce responsive investor materials, and rule that the materials called for in Request Nos. 48 and 49 are relevant to the first fair use factor, as well as willfulness and the fourth fair use four.

For the foregoing reasons, Plaintiffs respectfully request that the Court compel Suno to produce documents responsive to Request Nos. 48 and 49.

---

[21] For the first time in its opposition, Suno claims that "Plaintiffs' proposed terms would require Suno to review more than *86,000* additional documents." Suno Statement at 12 (emphasis in original). But Suno has not provided any context for this number, such as the hit count for its proposed search strings or which search terms may be pulling in an inordinate number of documents. Indeed, Suno failed to provide a hit count when it first objected to Plaintiffs' proposed search terms on February 21, 2025, despite being required to do so by the Parties' Stipulated ESI Discovery Protocol. *See* Dkt. 55 ¶ 10. As noted above, Plaintiffs are willing to further negotiate an appropriate set of search terms for the requests in dispute, but the parties must do so with a shared understanding of the scope of relevance of the materials that Suno must produce.

**HUESTON HENNIGAN LLP**

Respectfully submitted,

Dated: March 19, 2025

| | |
|---|---|
| s/ Moez M. Kaba | s/ Brittany N. Lovejoy |
| Moez M. Kaba (*pro hac vice*) | Steven N. Feldman (*pro hac vice*) |
| Mariah N. Rivera (*pro hac vice*) | **LATHAM & WATKINS LLP** |
| Alexander R. Perry (*pro hac vice*) | 1271 Avenue of the Americas |
| **HUESTON HENNIGAN LLP** | New York, NY 10020 |
| 1 Little West 12th Street | Telephone: (212) 906-1200 |
| New York, New York 10014 | Facsimile: (212) 751-4864 |
| Telephone: (646) 930-4046 | steve.feldman@lw.com |
| Facsimile: (888) 775-0898 | |
| mkaba@hueston.com | Andrew M. Gass (*pro hac vice*) |
| mrivera@hueston.com | Brittany N. Lovejoy (*pro hac vice*) |
| aperry@hueston.com | **LATHAM & WATKINS LLP** |
| | 505 Montgomery Street |
| Robert N. Klieger (*pro hac vice*) | Suite 2000 |
| Rajan S. Trehan (*pro hac vice*) | San Francisco, CA 94111-6538 |
| **HUESTON HENNIGAN LLP** | Telephone: (415) 391-0600 |
| 523 West 6th Street, Suite 400 | Facsimile: (415) 395-8095 |
| Los Angeles, California 90014 | andrew.gass@lw.com |
| Telephone: (213) 788-4340 | brittany.lovejoy@lw.com |
| Facsimile: (888) 775-0898 | |
| rklieger@hueston.com | Sarang V. Damle (*pro hac vice*) |
| rtrehan@hueston.com | **LATHAM & WATKINS LLP** |
| | 555 Eleventh Street, NW |
| Daniel J. Cloherty | Suite 1000 |
| Alexandra Arnold | Washington, D.C. 20004-1304 |
| **CLOHERTY & STEINBERG LLP** | Telephone: (202) 637-2200 |
| One Financial Center, Suite 1120 | Facsimile: (202) 637-2201 |
| Boston, Massachusetts 02110 | sy.damle@lw.com |
| Telephone: (617) 481-0160 | |
| Facsimile: (617) 848-0830 | *Counsel for Defendant Suno, Inc.* |
| dcloherty@clohertysteinberg.com | |
| aarnold@clohertysteinberg.com | |
| | |
| *Counsel for Plaintiffs* | |