# EXHIBIT C

# Alexander Perry

| | |
|---|---|
| **From:** | Mariah Rivera |
| **Sent:** | Thursday, February 13, 2025 1:26 PM |
| **To:** | Rose Dumoulin; Alexander Perry; Britt.Lovejoy@lw.com |
| **Cc:** | Rajan Trehan; Moez M. Kaba; Katharine Ross; dcloherty_clohertysteinberg.com; aarnold@clohertysteinberg.com; Robert N. Klieger; Andrew.Gass@lw.com |
| **Subject:** | RE: UMG RECORDINGS, INC., et al., v. SUNO, INC., et al., No. 1:24-CV-11611-FDS |

Dear Magistrate Judge Levenson:

The parties jointly submit the following summary of the disputes to be discussed at the upcoming zoom conference.

**Background**

Plaintiffs are a group of record companies that collectively own or exclusively control copyrights in a vast number of important and commercially valuable sound recordings. Defendant Suno, Inc. ("Defendant" or "Suno") operates an AI-powered music generation service that permits users to generate music using text prompts that describe the desired musical output in plain English. Plaintiffs have brought copyright infringement claims against Suno based on Suno's allegedly unauthorized copying of Plaintiffs' sound recordings to train its AI model.

The parties have met and conferred at length over the months since Plaintiffs served their first set of discovery on August 19, 2024, and Suno served its Responses and Objections on September 18, 2024, and since Suno served its first set of discovery on September 13, 2024 and Plaintiffs served their Responses and Objections on October 14, 2024. While the parties were able to reach agreement on the scope of many of the discovery requests, several disputes remain.

**Disputes Re: Plaintiffs' First Set of Requests for Production of Documents**

1. **Definition of AI Models**

   *Plaintiffs' Position:* Plaintiffs are moving to compel Suno to produce documents and communications regarding *all* of the AI models Suno has developed using Plaintiffs' copyrighted sound recordings. Suno seeks to limit the universe of relevant AI models to only "music-generative AI models built on the architecture that Plaintiffs put at issue in the Complaint" and has said this encompasses four of its models. In order to have fully informed negotiations regarding this topic, Plaintiffs have inquired about the AI models that Suno would be excluding from that group, but Suno has refused to provide additional information**.** This has left Plaintiffs in the dark regarding the full scope of materials Suno is refusing to produce. Regardless, Plaintiffs maintain that there is no basis for Suno to limit discovery to only a select subset of its AI models. Plaintiffs allege widespread, active, and ongoing infringement of Plaintiffs' copyrighted works as part of the process by which Suno trained its AI models. Accordingly, any of Suno's AI models that have been or are being trained using Plaintiffs' copyrighted sound recordings are relevant to this dispute, and Plaintiffs are entitled to discovery into the full scope of Suno's infringing conduct. *See Concord Music Grp. Inc. v. Anthropic PBC*, No. 24-cv-03811-ELK (SVK), Dkt. 273 at 1-2 (N.D. Cal. Nov. 26, 2024) (ordering discovery into all versions of AI defendant's technology that trained on plaintiffs' copyrighted works and were "used to develop or integrated into" defendant's public model, including both those that "may not have been publicly released" and those "currently under development").

*Suno's Position*: Suno has agreed to provide discovery into the "Suno" music-generative AI models it has released to the public, because that is the subject of Plaintiffs' complaint. Plaintiffs' Rule 11 basis for alleging that their works are among Suno's training data is that they were able to generate output that they allege is similar to their sound recordings using a commercially available version of "Suno". Any other AI tool Suno has publicly released but that Plaintiffs have *not* alleged produced similar-sounding works—or have otherwise established a Rule 11 basis to allege were trained on their sound recordings—are beyond the scope of discovery. Similarly, discovery into Suno's internal, research-only models would be burdensome and is disproportionate to the needs of the case. The company has created hundreds of never-released internal research models. Collecting and producing documents associated with each research model, as well as each model's code and training data would be incredibly time- and labor-intensive. Such efforts are particularly disproportionate at this juncture in the case; if Suno's use of Plaintiffs' sound recordings for its *commercial* product were to be deemed a fair use, surely its use for *research* purposes would be as well. *See, e.g.*, 17 U.S.C. § 107 (noting "research" as a favored use for purposes of the fair use inquiry). Other courts have denied similarly expansive requests in copyright infringement cases involving generative AI companies. *See, e.g., Authors Guild, et al. v. OpenAI Inc., et al.,* No. 23-cv-8292, Dkt. No. 293, at 2 (S.D.N.Y. Dec 6, 2024) (denying request for discovery into unreleased research models and models still in development, where the defendant argued production would require undertaking a "massive forensic exercise"). And Plaintiffs overstate the *Anthropic* court's holding. The court found only a narrow scope of unreleased predecessor models potentially relevant: predecessor models "where both: (1) the [plaintiffs' works] were included in the training data for the model; **and** (2) the model was **used to train publicly released** *[. . .] models*" or was "**being used to train** not-yet-released" versions—i.e., incorporated model weights from the predecessor model. *See Concord Music Grp. Inc.*, No. 24-cv-03811-ELK (SVK), Dkt. 273 at 3 (N.D. Cal. Nov. 26, 2024) (emphasis added). Moreover, the court did not "order discovery into" models trained on the Plaintiffs' works; it made a preliminary finding that discovery into certain models was likely to be relevant and deferred ruling on burden.

2. **Requests Related to Suno's Training Data**

*Plaintiffs' Position:* Plaintiffs are moving to compel Suno to produce all documents and communications responsive to a series of requests relating to how Suno developed and trained its AI Models. This would include, for example, documents and communications concerning (i) Suno's training data, (ii) downloading, copying, and/or reproduction of sound recordings, and (iii) identification and access to copyrighted sound recordings to use as training data. Suno has refused to respond in full to these requests and, instead, has offered several inadequate proposals, including producing documents "sufficient to show" in response to these requests. Suno cannot selectively withhold information into the key elements of Plaintiffs' copyright claims, including how it accessed the copyrighted works at issue for inclusion in its training dataset and how it used them to develop its AI Model. These requests are essential subjects in this litigation, and Plaintiffs are entitled to all responsive materials, not merely Suno's curated selection. In order to establish their asserted direct copyright infringement claims, rebut Suno's fair use defense, and demonstrate Suno's willful infringement, Plaintiffs must be able to draw on the full context surrounding Suno's training data and AI models, which demands a full response to these requests.

*Suno's Position*: Plaintiffs' demand for production of "all documents and communications" regarding Suno's training data are overbroad and disproportionate to the needs of this case. Plaintiffs will have the opportunity to inspect Suno's source code and training data, and Suno has agreed to produce documents sufficient to show Suno's training process—and also expressed a willingness to provide even broader discovery with respect to particular technical aspects of that process, if Plaintiffs inquired more specifically about what information they were interested in. But Plaintiffs' requests as drafted impose an undue and disproportionate burden. *See e.g.*, RFP No. 3 (ALL DOCUMENTS and COMMUNICATIONS concerning the contents of YOUR AI MODEL or RELATING TO the manner in which YOU trained YOUR AI

MODEL) (as *narrowed*). Responding to Plaintiffs' requests as currently written would require Suno to collect, review, and potentially produce tens of thousands of communications that have no connection at all to the topics Plaintiffs have identified as relevant—including, for example, ad hoc communications between engineers concerning minute revisions.

To the extent Plaintiffs seek specific additional "context" relevant to their infringement claims and fair use defense, more targeted document requests—in addition to depositions and interrogatories—would better balance Plaintiffs' need for relevant information with the burden imposed on Suno. And insofar as Plaintiffs are fishing for some document or communication indicating that a Suno engineer had concerns about the legality of Suno's training process—to the extent such a document even exists— Suno has already agreed to provide it in response to RFP No. 44, which (as narrowed per the parties' agreement) calls for internal documents and communications "relating to [Suno's] consideration of potential legal or financial risks relating to the training of [Suno's] AI service using sound recordings."

3.  **Requests related to Suno's investors**

    *Plaintiffs' Position:* Plaintiffs are moving to compel Suno to produce communications with its investors on the topic of Suno's decision to train on copyrighted sound recordings without a license and Suno's possible exposure to copyright liability stemming therefrom. Beyond being relevant, such communications are <u>central</u> to several issues in the case. *First*, these requests target information that bears on the first fair use factor, namely "whether [Suno's] use of [Plaintiffs' copyrighted sound recordings] is of a commercial nature" and whether Suno "stands to profit from exploitation of the copyrighted material without paying the customary price." *Haberman v. Hustler Mag., Inc.*, 626 F. Supp. 201, 208, 211 (D. Mass. 1986). The value proposition that Suno presented to investors is likely to provide compelling evidence of Suno's potential to profit off its exploitation of Plaintiffs' copyrighted works. Second, responsive documents will also bear on the fourth fair use factor—*i.e.*, the effect of the use upon the potential market for or value of the copyrighted work. It is evident that Suno's investors considered—indeed, were motivated by—the potential impact that Suno's AI music generation service will have on the market for sound recordings and the music industry. Plaintiffs are entitled to know the details of how Suno pitched its business to investors, including the extent to which Suno advertised the possibility that music generated by its AI service would replace human-created sound recordings. *Third*, these requests also seek information central to Suno's willfulness. Whether Suno told investors about the materials comprising its training data and whether Suno acknowledged the risk that it could be sued for copyright infringement stemming from its unauthorized use of copyrighted sound recordings would provide evidence of Suno's state of mind. And, as alleged in the Complaint, Plaintiffs have reason to believe that Suno discussed the risk of copyright liability when soliciting investments. *See* Complaint ¶ 47 (quoting Suno investor saying "[H]onestly, if we had deals with labels when this company got started, I probably wouldn't have invested in it. I think they needed to make this product without the constraints."). Sophisticated investors, like those who have funded Suno, would have been keenly interested in this risk, and Plaintiffs are entitled to know what Suno shared or learned on this point.

    *Suno's Position*: There is no basis to compel intrusive investor discovery in order to discover evidence that is more likely to be contained in Suno's internal files (if it exists). *First*, with respect to Factor 1 of Suno's fair use defense, Suno has agreed to provide the primary source evidence of how it may have used Plaintiffs' works: Plaintiffs will have access to both its training data and model source code. And, of course, Plaintiffs can investigate the publicly-available tool themselves. Further, while the best evidence of what its model does is the model itself, Suno has also agreed to produce internal documents and communications relating to the intended, expected, and unexpected use cases of its service. Moreover, investor discovery is surely not necessary to establish whether Suno's "use is of a commercial nature"—Suno does not dispute that its publicly-released models are used commercially, and has offered to produce documents sufficient to show its monthly profits. *See* Answer ¶ 7 ("Suno [. . .] admits that it charges many of its users monthly fees to use its product and produce digital files"); *see*

*also* Nov. 8, 2024 B. Lovejoy Email (agreeing to produce documents sufficient to show its profits on a monthly basis in response to Plaintiffs' RFP No. 50).  *Second*, evidence of "the extent to which Suno advertised the possibility that music generated by its AI service would replace human-created sound recordings" is irrelevant to the Factor 4 inquiry in this case.  Plaintiffs have not asserted a claim regarding any potential copyright infringement by Suno's outputs: that is, the music created by Suno.  The only alleged unlawful "use" here, and the subject of Suno's fair use defense, is Suno's alleged "use" of Plaintiffs' sound recordings as part of a back-end process to train its model.  Accordingly, the documents or communications potentially relevant to the effect of Suno's "use" on the market under Factor 4 of the fair use test would relate to the market for training data.  *See Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1179 (9th Cir. 2013) (If an allegedly infringing use "does not substitute for the original and serves a 'different market function,' [the fourth] factor weighs in favor of fair use.").  And Suno has already agreed to produce documents related to its "licensing or contemplation of potential licensing" of training data." *Third*, with respect to willfulness (which is a matter of damages, not liability), as an initial matter, the salient inquiry here is not whether Suno knew it was training on copyrighted sound recordings, but whether Suno believed its conduct constituted infringement, or might be covered by the fair use doctrine.  *See Fitzgerald v. CBS Broad., Inc.*, 491 F. Supp. 2d 177, 190 (D. Mass. 2007) ("A defendant's good faith belief that its use of copyrighted material is fair use is enough to defeat a finding of willfulness. If a defendant believed it was engaging only in fair use, it cannot be said to have known that it was infringing.").  Regardless, Suno has agreed to produce internal documents relating to potential legal risks relating to training the model using sound recordings—the more likely source of any document bearing on Suno's "state of mind."  What Suno's *investors* may have thought about the legality of Suno's training process is not relevant to any claim or defense in this litigation.

**Dispute Re: Suno's First Set of Requests for Production of Documents**

1. **Documents Regarding the Asserted Works**

    *Suno's Position*:  The parties have a dispute regarding Suno's RFP Nos. 1, 2, 3, 5, and 6, which are requests for documents related to whether Plaintiffs own the works at the basis of their copyright case—and even more critically, what those works *are*, including copyright registrations, deposit copies, chain of title documents, and similar identifying information for pre-1972 sound recordings.  Ownership of the asserted works is one of two elements of Plaintiffs' *prima facie* case for copyright infringement, and Suno is entitled to documents that would prove or disprove that element.  Plaintiffs do not appear to dispute that these requests are relevant to the claims and defenses at issue.  Nor could they.  Production of copyright registrations is normal course discovery in a copyright litigation.  And, where Plaintiffs are listed as neither the author nor the owner on the copyright registration, as is the case for many of the works in dispute and for all of the works created prior to 1972 (which have no copyright registrations because they predate federal copyright law), or where the work was made for hire, chain-of-title information is necessary to establish that Plaintiffs own all of the asserted works.  *See, e.g.*, *Motta v. Samuel Weiser, Inc.*, 768 F.2d 481, 484 (1st Cir. 1985) ("If a plaintiff is not the author of the copyrighted work then he or she must establish a proprietary right through the chain of title in order to support a valid claim to the copyright."); *In re Napster, Inc. Copyright Litig.*, 191 F. Supp, 2d 1087, 1101 (N.D. Cal. 2002) (ordering plaintiffs to produce "all documentation relevant to their ownership of the works listed as 'works for hire'" and chain of title documentation where plaintiffs were not listed as authors).  Deposit copies of all of the asserted works, meanwhile, are required to compare the specific registered versions of the sound recordings (*i.e.*, the ones reflected in the respective deposit copies) against any alleged copy found in Suno's training data to determine if any infringement occurred.  *See Structured Asset Sales, LLC v. Sheeran*, 120 F.4th 1066, 1075 (2d Cir. 2024) (explaining that the scope of copyright protection for a given work is "limited to the four corners of the deposit copy").  That is not a concept limited to the Copyright Act of 1909—though a deposit copy may not be required for copyright *protection* to attach, it is required to *bring suit*, and is required for a copyright defendant to *ascertain what the plaintiff has registered, and how it might compare to allegedly infringed work*.  *See id.* ("This

4

understanding complies with the principle of fair notice that led to public registration of copyrights in the first place. . . One cannot fairly be liable for infringement without the ability to understand the contours of a prior creator's rights. That is why the 'deposit (and accompanying registration) requirement was *(as it still is)* a condition precedent to the right to bring an infringement action.'") (quoting 2 Nimmer on Copyright § 7.16 [A][2][b] (2024) (emphasis added). And *UMG Recordings, Inc. v. Grande Commc'ns Networks, L.L.C.*, 118 F.4th 697 (5th Cir. 2024), is distinguishable. There, the court denied the defendant's post hoc demand for deposit copies *in a motion for a new trial* where the plaintiff had provided "forensically reliable evidence" establishing that the third-party company that detected the infringement at issue had used "exact copies of Plaintiffs' sound recordings." *See id.* at 710. Plaintiffs here have made no such offer of evidence in the parties' meet and confer discussions, nor have they explained how Suno could meaningfully test that evidence without access to Plaintiffs' deposit copies.

Though these documents are indisputably relevant to Plaintiffs' prima facie case, Plaintiffs take the position that they should be permitted to delay their production until they have had the chance to review Suno's training data, potentially discover additional works, and amend their Complaint. In the meantime, they expect Suno to bear the full burden of discovery. Not only do Plaintiffs have no justification for avoiding basic discovery related to the claims they themselves have brought, but they have already tried to stall their affirmative discovery obligations in their attempt to seek bifurcated discovery. Judge Saylor denied their request then, and Your Honor should overrule similar objections now, and order Plaintiffs to respond to Suno's requests without further delay.

*Plaintiffs' Position*: To be clear, Plaintiffs have agreed to produce all necessary ownership information for each of the asserted works in this action. At minimum, this will include copyright registration certificates, where available, and index information for pre-1972 recordings for which registration certificates are not available. The issue Suno raises is merely a matter of timing, *i.e.,* whether Plaintiffs should have to undergo the burdensome exercise of gathering and producing ownership information twice and without a full picture of the universe of copyrighted works that are being asserted. Plaintiffs have set forth in their complaint a good-faith basis to believe that Suno has engaged in massive copyright infringement by training its AI Model on untold amounts of Plaintiffs' copyrighted sound recordings. For this reason, Plaintiffs made clear that the list of sound recordings presently asserted in the Complaint is an illustrative, non-exhaustive sampling of the sound recordings that Suno unauthorizedly took from Plaintiffs and that "Plaintiffs intend to amend the Complaint at an appropriate time to provide an expanded list of works that Suno has infringed." Complaint ¶ 27. As Suno presents this issue, Plaintiffs will "potentially" identify additional works they own after reviewing Suno's training data, but that is a gross understatement. It is all but certain that Plaintiffs will find numerous works they own in Suno's training data, a fact that Suno has essentially admitted in this litigation. *See* Answer 3, 10 (acknowledging that Suno has trained on "tens of millions of different kinds of recordings," and many of Plaintiffs' recordings "probably were" included in its training data). And Plaintiffs do not expect the delay to be long, as the parties are actively working on a training data inspection protocol that will give Plaintiffs access to Suno's training data, and Plaintiffs intend to amend their complaint promptly after identifying the works they own in Suno's training data.

Nor is the particular discovery Suno seeks as essential as it claims. Take, for instance, Suno's request for deposit copies of each and every asserted work. As an initial matter, many of the copyright registrations that Plaintiffs have already agreed to produce will contain sufficient identifying information to permit Suno to ascertain the corresponding copyrighted sound recordings on its own. Unlike copyrights afforded to works protected under the Copyright Act of 1909, which required depositing with the Copyright Office to be entitled to any copyright protection, sound recordings under the Copyright Act of 1976 are entitled to copyright protection "upon fixation . . . in a tangible medium . . . meaning mandatory deposit remains unnecessary to gain copyright." *Valancourt Books, LLC v. Garland*, 82 F.4th 1222, 1233 (D.C. Cir. 2023); *see also Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 275 (2020) ("Unlike other forms of intellectual property, copyright protection is both instant and automatic. It vests

5

as soon as a work is captured in a tangible form, triggering a panoply of exclusive rights that can last over a century."). Contrary to Suno's representation, deposit copies are not "required" to identify the copyrighted works. *See, e.g., UMG Recordings, Inc. v. Grande Commc'ns Networks, L.L.C.*, 118 F.4th 697, 710 (5th Cir. 2024) (accepting plaintiffs' identification of their sound recordings based on "extensive, forensically reliable evidence proving that the files Rightscorp downloaded were exact copies of Plaintiffs' sound recordings"). Suno's cited case, *Structured Asset Sales, LLC v. Sheeran*, is not controlling, as it pertained only to works protected under the Copyright Act of 1909. *See* 120 F.4th 1066, 1075 (2d Cir. 2024) ("[T]he scope of a copyright in a musical work registered under *the Copyright Act of 1909* [] is limited to the elements found in the copy of the work deposited with the Copyright Office.") (emphasis added); *see also Kadrey v. Meta Platforms, Inc.*, No. 23-cv-03417-VC (TSH), Dkt. 315 (N.D. Cal. Dec. 6, 2024) (stating Meta's argument that deposit copies define the boundaries of what is copyrighted is wrong, and that it is "telling that Meta's argument . . . relies on two cases that applied the Copyright Act of 1909," including *Structured Asset Sales*). As Plaintiffs have told Suno repeatedly, they are willing to discuss the production of additional ownership and registration information, including deposit copies and chain-of-title documents, once the full universe of works at issue in this matter is established.

In short, it is simply not possible for Plaintiffs to fully assess the burden associated with producing all of the ownership materials Suno requests while the universe of asserted works remains in flux. This is not, as Suno claims, an attempt to "avoid[] basic discovery," as Plaintiffs have every intention of satisfying their burden of proof on every work they assert. Plaintiffs will be able to discern exactly how they will do that in a manner that is proportional to the needs of the case once the universe of asserted works is set.

**Mariah Rivera**
D: 646.891.5049

---

**From:** Rose Dumoulin <Rose_Dumoulin@mad.uscourts.gov>
**Sent:** Friday, February 7, 2025 2:19 PM
**To:** Mariah Rivera <mrivera@hueston.com>; Alexander Perry <aperry@hueston.com>; Britt.Lovejoy@lw.com
**Cc:** Rajan Trehan <rtrehan@hueston.com>; Moez M. Kaba <mkaba@hueston.com>; Katharine Ross <kross@hueston.com>; dcloherty_clohertysteinberg.com <dcloherty@clohertysteinberg.com>; aarnold@clohertysteinberg.com; Robert N. Klieger <rklieger@hueston.com>; Andrew.Gass@lw.com
**Subject:** RE: UMG RECORDINGS, INC., et al., v. SUNO, INC., et al., No. 1:24-CV-11611-FDS
**Importance:** High

Good afternoon,

I have listed the courts availability for next week. Please confer amongst yourselves and in a joint email provide 3 dates/times that work for all parties.

The court is also looking a brief email describing the nature of the dispute (or brief summaries of the parties' differing views).

February 11th at 10am or 12pm or 2pm
February 12th at 12pm or 2pm
February 13th at 10am or 12pm or 2pm
February 14th at 11am or 12pm or 2pm

Rose Dumoulin
Courtroom Deputy Clerk to the Honorable Paul G. Levenson
United States District Court for the District of Massachusetts
One Courthouse Way, Suite 2300
Boston, MA 02110
Rose_Dumoulin@mad.uscourts.gov
Office: 617-748-9814

---

**From:** Mariah Rivera <mrivera@hueston.com>
**Sent:** Friday, February 7, 2025 12:48 PM
**To:** Alexander Perry <aperry@hueston.com>; Britt.Lovejoy@lw.com; Rose Dumoulin <Rose_Dumoulin@mad.uscourts.gov>
**Cc:** Rajan Trehan <rtrehan@hueston.com>; Moez M. Kaba <mkaba@hueston.com>; Katharine Ross <kross@hueston.com>; dcloherty_clohertysteinberg.com <dcloherty@clohertysteinberg.com>; aarnold@clohertysteinberg.com; Robert N. Klieger <rklieger@hueston.com>; Andrew.Gass@lw.com
**Subject:** RE: UMG RECORDINGS, INC., et al., v. SUNO, INC., et al., No. 1:24-CV-11611-FDS

**CAUTION - EXTERNAL:**

Dear Ms. Dumoulin,

We write to follow up regarding our previous correspondence. The parties appeared before Chief Judge Saylor who instructed that Judge Levenson will hear discovery disputes. Plaintiffs reiterate our request for a Zoom conference to discuss the parties' outstanding disputes, and are generally available next week. Thank you.

Best,
Mariah

**Mariah Rivera**

---

**HUESTON HENNIGAN** LLP

D: 646.891.5049
mrivera@hueston.com
Biography

---

**From:** Alexander Perry <aperry@hueston.com>
**Sent:** Thursday, January 30, 2025 12:46 PM
**To:** Britt.Lovejoy@lw.com; rose_dumoulin@mad.uscourts.gov
**Cc:** Rajan Trehan <rtrehan@hueston.com>; Moez M. Kaba <mkaba@hueston.com>; Katharine Ross <kross@hueston.com>; Mariah Rivera <mrivera@hueston.com>; dcloherty@clohertysteinberg.com; aarnold@clohertysteinberg.com; Robert N. Klieger <rklieger@hueston.com>; Andrew.Gass@lw.com
**Subject:** RE: UMG RECORDINGS, INC., et al., v. SUNO, INC., et al., No. 1:24-CV-11611-FDS

Dear Ms. Dumoulin,

I represent Plaintiffs in UMG Recordings Inc. v. Suno, Inc. No. 1:24-CV-11611-FDS.

Defendant failed to note that the parties have a conference before Chief Judge Saylor this afternoon, at which Plaintiffs intend to seek clarity regarding the scope of the order of referral to Magistrate Judge Levenson. At present, the order of referral to Judge Levenson refers only to resolution of the parties' Joint Statement at Dkt. 39, not to discovery disputes more generally. Assuming Chief Judge Saylor confirms that the referral order extends to all discovery disputes, Plaintiffs would also like to request a Zoom conference with Judge Levenson next week to discuss three disputes that have crystalized with respect to Suno's responses to Plaintiffs first set of requests for production of documents.

Best,
Alex

**Alexander Perry**
D: 212.715.1121

**From:** Britt.Lovejoy@lw.com <Britt.Lovejoy@lw.com>
**Sent:** Thursday, January 30, 2025 12:33 PM
**To:** rose_dumoulin@mad.uscourts.gov
**Cc:** Rajan Trehan <rtrehan@hueston.com>; Moez M. Kaba <mkaba@hueston.com>; Katharine Ross <kross@hueston.com>; Alexander Perry <aperry@hueston.com>; Mariah Rivera <mrivera@hueston.com>; dcloherty@clohertysteinberg.com; aarnold@clohertysteinberg.com; Robert N. Klieger <rklieger@hueston.com>; Andrew.Gass@lw.com
**Subject:** UMG RECORDINGS, INC., et al., v. SUNO, INC., et al., No. 1:24-CV-11611-FDS

Ms. Dumoulin:

I represent Defendant Suno, Inc. in UMG RECORDINGS, INC., et al., v. SUNO, INC., et al., No. 1:24-CV-11611-FDS.

At the parties' November 18, 2024 conference, Judge Levenson instructed that "if it looks like you need to go to motion practice again, contact Rose Dumoulin, my courtroom deputy, to set up a brief conference just to make sure we're briefing the issues as narrowly as we reasonably can." Nov. 18 Hr'g Tr. at 41:15-19; *see also id*. at 17:21-25 ("It's the kind of thing where my preference is to do a brief Zoom call before parties start writing. It's a prejudice of mine, but I just see so much paper and so much expense being spent on discovery issues that often can be narrowed.").

Suno has crystallized a dispute regarding discovery into Plaintiffs' works and would like to request a conference with Judge Levenson at his convenience next week.

Regards,

Britt Lovejoy

**Britt Lovejoy**

**LATHAM & WATKINS LLP**
505 Montgomery Street | Suite 2000 | San Francisco, CA 94111-6538
D: +1.415.646.8329 | M: +1.510.366.1829

_____

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at [www.lw.com](www.lw.com).

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system. Thank you.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.