**Britt Lovejoy**
Direct Dial: +1.415.646.8329
britt.lovejoy@lw.com

505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Tel: +1.415.391.0600 Fax: +1.415.395.8095
www.lw.com

## LATHAM & WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

October 3, 2025

Honorable Paul G. Levenson,
United States Magistrate Judge
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 2300
Boston, Massachusetts 02210

Re: *UMG Recordings, Inc., et al. v. Suno, Inc. et al.*, No. 24-cv-1161-FDS (D. Mass.)

Dear Judge Levenson:

This letter describes a discovery dispute brought by Defendant Suno, Inc. that the parties have been unable to resolve. The parties present this dispute in a separate document, rather than by email, for ease of review.

The parties have met and conferred at length regarding this issue. Suno respectfully requests a Zoom conference so that the Court may provide the parties with guidance.

*          *          *

***Suno's Position:*** As explained in the parties' previously submitted Discovery Dispute Statement, Suno's Answer "alleges two forms of anticompetitive activity in support of its copyright misuse defense, both of which are aimed at the same bottom line—preventing generative AI companies from gaining traction in the marketplace." Specifically, Suno alleges:

> (1) that Plaintiffs orchestrated a concerted refusal to license their recordings to generative AI companies like Suno, likely through their trade organization the Recording Industry Association of America; and

> (2) that the individual Plaintiff record labels have attempted to leverage their arsenals of copyrighted sound recordings to pressure their licensees—including digital streaming services and social media companies—not to partner with AI companies or host the outputs of generative AI models on their platforms.

**LATHAM&WATKINS**LLP

The parties' previous dispute concerned the latter theory of misuse. Suno now seeks to compel discovery relevant to the *former theory*—Plaintiffs' refusal to deal.[1] Suno has alleged, upon information and belief, that Plaintiffs engaged in a concerted refusal to license their recordings to generative AI companies like Suno, likely orchestrated through their trade organization the Recording Industry of America ("RIAA"). Answer at 12.

The basis for Suno's allegation is both Suno's understanding of discussions in the industry and the application of basic economic principles to the facts: under competitive conditions, record labels would vie against each other to monetize this new technology going forward. The opposite has transpired here. Indeed, nascent licensing discussions Suno engaged in prior to this litigation were suddenly thwarted, evidently by agreement between Plaintiffs, who are putative competitors, to collectively refuse to enter any go-forward licensing deal with Suno.



[2]

Plaintiffs' "concerted refusal to license copyright programming . . . is a boycott that, if proven, violates the Sherman Act." *Primetime 24 Joint Venture v. Nat'l Broadcasting, Co., Inc.*, 219 F.3d 92, 100 (2d Cir. 2000); *see Downtown Music Publishing LLC v. Peloton Interactive, Inc.*, 436 F. Supp. 3d 754, 763–64 (S.D.N.Y. 2020) (finding that a concerted agreement on behalf of music publisher plaintiffs to refuse to license their musical compositions to Peloton gave rise to an antitrust claim under the Sherman Act). For the same reason, their refusal is also textbook copyright misuse, which "prevents copyright holders from leveraging their limited monopoly to allow them control of areas outside the monopoly," *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001).

In correspondence, Plaintiffs have attempted to avoid the clear implication of this alleged course of conduct by arguing that Suno did not attempt to license sound recordings before using them as training data and by gesturing toward settlement conversations that have occurred since Plaintiffs filed suit. These arguments have no bearing on Suno's copyright misuse defense. There was a period before this suit was filed in which the three record companies who are the Plaintiffs here plainly coordinated between and among each other to jointly cut off ongoing conversations with

---

[1] Suno has not waived or abandoned its right to relevant discovery on the second form of copyright misuse. When Suno first informed Plaintiffs that it would raise the parties' dispute on both forms of misuse to the Court, Plaintiffs made various baseless arguments concerning the second form of misuse and "encourage[d]" Suno's counsel "to discuss this with [their] client." Suno's counsel carefully considered Plaintiffs' arguments and confirmed they lack merit.

[2] Material in gray is marked either Confidential or Highly Confidential – Attorney's Eyes Only.

**LATHAM&WATKINS**LLP

Suno that were intended to yield forward-looking license agreements with respect to future conduct. That is the copyright misuse at issue, and it is not somehow erased if the labels subsequently agreed to once again conduct individualized negotiations after they sued. *Cf. SD3, LLC v. Black & Decker (U.S.), Inc.*, 801 F.3d 412, 427–28 (4th Cir. 2015) (rejecting defendants' claim that they had not engaged in a collective boycott because "some licensing negotiations continued after the conspiracy formed" and recognizing that the defendants "could have achieved their alleged objective of keeping [the plaintiff] off the market in a number of ways," including while pursuing licensing negotiations); *see also Cascades Computer Innovation LLC v. RPX Corp.*, No. 12-cv-1143, 2013 WL 6247594, at *3–4 (N.D. Cal. Dec. 3, 2013) (permitting antitrust claim where the plaintiff and the defendants had engaged in negotiations that ultimately failed); *Downtown Music Publ'g*, 436 F. Supp. 3d at 764 (same).

Suno requested discovery from Plaintiffs related to their concerted refusal to deal with Suno and other generative AI companies (RFP Nos. 27, 28, 29, and 30). Plaintiffs refused to produce documents responsive to these requests, instead proposing "compromises" that write around the highly relevant documents Suno seeks.

For instance, RFP No. 27 seeks all documents "concerning ***whether or not*** to license Your Sound Recordings to train any Generative AI model, for use in the outputs of any Generative AI model, or for any other purpose relating to Generative AI."[3] As written, this request would cover both internal and external documents regarding whether Plaintiffs have ever been willing to license their sound recordings for generative AI—and, if so, to whom and under what conditions. Notably, over the course of multiple communications regarding this request, Plaintiffs never argued that the request seeks irrelevant documents or imposes some undue burden. Yet Plaintiffs refused to produce internal documents and communications concerning their willingness to license their works to generative AI companies or any communications with other Plaintiffs regarding the same. All that Plaintiffs have agreed to produce are: (1) "studies, surveys, or formal analyses, or formal reports" concerning licensing to AI companies for training and output; and (2) "executed or potential licenses, including drafts, related to the use of sound recordings to train any generative AI or for use in the outputs of any generative AI model." In other words, Plaintiffs' proposal deliberately excludes the very documents that might be relevant: internal communications and

---

[3] Consistent with Plaintiffs' proposal, Suno is willing to limit this request to all documents and communications "concerning whether or not to license Your Sound Recordings to train any Generative AI model or for use in the outputs of any Generative AI model"—only insofar as Plaintiffs do not intend to rely on any licenses, contemplated licenses, or licensing strategies that involve other uses of Generative AI or other AI partnerships. Suno will similarly agree to remove "for any other purpose relating to Generative AI" from RFP Nos. 29 and 30, on the same condition. As discussed *supra*, however, it appears that ███████████████████████████████ ████████████████████████████████████████; if Plaintiffs intend to rely on such partnerships, Suno cannot agree to so limit these RFPs. Suno also cannot agree to the additional limitations Plaintiffs have attempted to impose.

LATHAM&WATKINS LLP

communications between and among Plaintiffs concerning a *refusal* to deal with generative AI companies.

Plaintiffs proposed similar improper narrowings for RFP Nos. 29, and 30, which seek documents and communications concerning actual or potential license agreements to use Plaintiffs' recordings for generative AI.[4]  Plaintiffs seek to limit the scope of this request to communications "with third parties" on this topic, thereby excluding any internal communications.  Plaintiffs' determination to exclude relevant internal and communications from the scope of discovery tends only to suggest that responsive communications exist.  Plaintiffs have not articulated and cannot articulate any defensible rationale for their proposals and should be required to respond to these RFPs as written.[5]

In addition to these requests, Suno also sought in RFP 24: "All Documents and Communications concerning this Action, including any exchanged with another Plaintiff, the Recording Industry of America, any Artist, or any Person or Company, either directly or through a third party."  Plaintiffs refused to respond to this RFP as written, agreeing to produce only documents and communications relating to: "1) Suno's use of copyrighted sound recordings; and 2) Whether or not to enter into a go-forward licensing arrangement with Suno, including in lieu of filing this lawsuit."  In the interest of minimizing the parties' disputes, Suno agreed to this compromise as to Plaintiffs' production obligations.  While Plaintiffs may argue that this proposal provides adequate coverage for the types of inter-Plaintiff communications Suno seeks in connection with RFP Nos. 27 through 30, they are mistaken.  Plaintiffs' narrowing—which limits production to documents and communications concerning *Suno*—ignores that Suno has alleged that Plaintiffs have engaged in copyright misuse by collectively refusing to deal with some generative AI companies, *including but not limited to Suno*, in an attempt to exclude those companies from the marketplace and stifle potential competition.  *See* Answer at 12.  The scope of relevant discovery is therefore not limited

---

[4] RFP No. 29 seeks "All Documents and Communications concerning any executed or potential license or agreement, including Drafts, related to the use of Your Sound Recordings to train any Generative AI model, for use in the outputs of any Generative AI model, or for any other purpose relating to Generative AI, regardless of whether a license or agreement was ultimately executed;" RFP No. 30 seeks "All Documents concerning any discussion or negotiation between You and any Company concerning any potential agreement or license, including Drafts, related to the use of Your Sound Recordings to train any Generative AI model, for use in the outputs of any Generative AI model, or for any other purpose relating to Generative AI, regardless of whether a license or agreement was ultimately executed."

[5] Similarly, RFP No. 28 seeks documents concerning a letter sent by Plaintiff Sony Music to hundreds of companies in which Sony warned against the use of its recordings to train generative AI tools.  *See* Mia Sato, *Sony Music Warns AI Companies against 'Unauthorized Use' of Its Content*, THE VERGE (May 17, 2024) https://www.theverge.com/2024/5/17/24158887/sony-music-ai-training-letter; *see also, e.g.,* ▮▮▮▮▮▮▮▮.  Here, too, Plaintiffs have refused to produce responsive documents, instead offering only "copies of each letter" and "communications with letter recipients in response to and concerning the letter."  This proposed compromise excludes communications within or between Plaintiffs—the very documents likely to be probative of misuse.

LATHAM&WATKINS LLP

to documents about whether or not to license with Suno, but instead includes Plaintiffs' discussions and negotiations with other companies regarding AI licensing, which would confirm the extent to which Plaintiffs colluded to create market conditions favorable to them when faced with this emerging technology. *Cf. Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.*, 342 F.3d 191 (3d Cir. 2003) ("To defend on misuse grounds, the alleged infringer need not be subject to the purported misuse."); *Lasercomb America, Inc. v. Reynolds*, 911 F.2d 970 (4th Cir. 1990) ("[T]he defense of copyright misuse is available even if the defendants themselves have not been injured by the misuse. . . .  The question is whether Lasercomb is using its copyright in a manner contrary to public policy, which question we have answered in the affirmative.").[6]  Plaintiffs' proposal for RFP No. 24 thus does not negate the relevance or necessity of the information requested in RFP Nos. 27 through 30.

Plaintiffs' proposal for RFP No. 24 is also independently problematic.  Though Suno agreed to narrow its  request for the purposes of Plaintiffs' document *production*, Suno cannot agree to this narrowed version for the purposes of Plaintiffs' *privilege logging obligations*.  Suno maintains that Plaintiffs must log all documents and communications between and among Plaintiffs (and the RIAA) "concerning this Action."  Suno is entitled to evaluate the propriety of Plaintiffs' privilege claims related to such communications—particularly given that the distinction between a communication between and among Plaintiffs "concerning this Action," (which Plaintiffs do not agree to log) and a coordinated agreement not to "enter into a go-forward licensing arrangement with Suno" either in lieu of filing suit or as a settlement of asserted claims may not be bright line.  Suno can meaningfully assess Plaintiffs' privilege claims only if it has access to information about the timing of a communication and the participants in it—information that will not be available to Suno if Plaintiffs are excused from logging responsive communications.

Any claim of undue burden associated with logging these communications is overblown.  Over Suno's initial objection, the parties' ESI Protocol allows that "privileged communications that post-date the filing of the Complaint" need not be logged, "so long as such privileged communications involve the parties' outside counsel."  Dkt. 55.  With that provision in place, the only categories of responsive documents that Plaintiffs will need to log are: (1) documents and communications between and among Plaintiffs/the RIAA that pre-date the litigation and (2) documents between and among Plaintiffs/the RIAA that post-date the filing of the Complaint and concern this Action but *do not involve litigation counsel*.  The former category involves a critical

---

[6] When Suno informed Plaintiffs that it would raise this dispute with the Court, Plaintiffs claimed for the first time that Suno "is attempting to use discovery in this case to obtain information about discussions with Suno's competitors."  This attack is neither supported nor persuasive.  Suno is entitled to discovery relevant to its defenses, which is exactly what these requests seek.  Suno vehemently denies Plaintiffs' accusation—made in an attempt to avoid Plaintiffs' own discovery obligations—that it is using discovery in order to obtain a competitive advantage.  Indeed, Plaintiffs' own discovery requests require Suno to disclose documents concerning sensitive licensing negotiations Suno has had with the individual Plaintiffs, who are meant to be competitors to each other.  To the extent any party is concerned with the confidentiality of documents produced in this litigation, the Protective Order allows for the production of documents classified as Highly Confidential – Attorneys' Eyes Only.

LATHAM&WATKINS LLP

period in which Suno believes a concerted refusal to deal may have occurred. The latter, meanwhile, is not only unlikely to involve large numbers of documents, but are the very sorts of communications that warrant close scrutiny, since it is unclear what reason Plaintiffs would have to communicate between and among themselves about this case without litigation counsel's involvement.

Suno respectfully requests that the Court compel Plaintiffs to produce the documents requested by RFP Nos. 27, 28, 29, and 30, log any documents responsive to these RFPs that they redact or withhold on the basis of any privilege, and log all documents responsive to RFP No. 24 as written that they redact or withhold on the basis of any privilege. *See Covetrus, Inc. v. Actian Corp.*, No. 21-cv-00097, 2024 WL 4581285, at *2 (D. Me. Oct. 25, 2024) (permitting discovery relating to plaintiffs' copyright misuse defense to defendant's counterclaim).

***Plaintiffs' Position***:

The present dispute is the second time in two months Suno has come to the Court seeking expansive discovery to support its legally infirm copyright misuse defense. This time, Suno is seeking expansive discovery in pursuit of its theory that Plaintiffs have engaged in a collective boycott of generative AI companies, "likely" orchestrated through the Recording Industry Association of America. *See* Suno Statement at 1-2. Suno premises this theory on its "understanding" of unspecified "discussions" in the "industry" and "the application of basic economic principles to the facts." *Id.* at 2. But these vague, unfounded allegations come nowhere close to justifying Suno's intrusive and highly burdensome demand for *all* documents and communications—including purely internal documentation—concerning Plaintiffs' consideration of licensing sound recordings for generative AI purposes. To limit the scope of Suno's clearly overbroad requests into this topic, Plaintiffs have agreed to produce the following categories of information:

- any studies, surveys, formal analyses, or formal reports concerning whether or not to license their sound recordings to train any generative AI model;

- communications with third parties concerning any executed or potential license or agreement, including drafts, related to the use of sound recordings to train any generative AI model or for use in the outputs of any generative AI model; and

- documents and communications between Plaintiffs and/or the Recording Industry Association of America, to the extent they exist, concerning whether or not to license sound recordings to any company for the purpose of using sound recordings to train any generative AI model or for use in the outputs of any generative AI model, subject to agreed-upon search terms.[7]

_____

[7] Suno incorrectly claims that Plaintiffs have refused to produce communications between and among Plaintiffs that would reflect Suno's hypothesized concerted refusal to deal with generative AI companies. Plaintiffs' agreement to produce "documents and communications with third

This information is more than sufficient for Suno to fully adjudicate its "concerted refusal to deal" theory, which renders Suno's demand for the full universe of Plaintiffs' internal communications concerning generative AI licensing vastly disproportionate to the needs of the case.[8]  If Plaintiffs did engage in a concerted refusal to deal, as Suno posits, there would almost certainly be an email reflecting such coordination.  And Plaintiffs have already agreed to produce such communications, to the extent they exist.  The fact of the matter is they do not, and Suno's request is merely a fishing expedition that is not tailored to seek information relevant to the case.  The Court should thus deny Suno's motion to compel additional, sweeping discovery into Plaintiffs' internal communications in search of evidence that does not exist.

        In previous briefing submitted to the Court, Plaintiffs explained that Suno's copyright misuse defense is not legally cognizable in this Circuit.  *See* July 10, 2025 Position Statement at 3; *see also Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 65 (1st Cir. 2012) ("This court has not yet recognized misuse of a copyright as a defense to infringement."); *e-STEPS, LLC v. Ams. Leading Fin., LLC*, 2021 WL 1157024, at *9 (D.P.R. Mar. 24, 2021) (same).  During the July 31, 2025 discovery conference, the Court expressed skepticism regarding the viability of Suno's copyright misuse defense, noting that it "feels a little quaint in the context of the present dispute."  *See* July 31, 2025 Hr'g Tr. at 23:13-14.  Thus, at the threshold, the Court should be wary of Suno's request to seek sweeping discovery implicating Plaintiffs' internal communications concerning numerous third party licensees beyond just Suno for the purpose of pursuing a defense that is of questionable validity.[9]  As just noted, what Plaintiffs have already agreed to produce strikes the appropriate balance between Suno's need for discovery and the needs of the case.

---

parties concerning any executed or potential license or agreement" includes communications between and among Sony, UMG, and Warner on this topic.  This is because each Plaintiff considers the other Plaintiffs to be third parties.  Taking UMG as an example, Sony and Warner are "third parties," so any communications UMG may have had with Sony or Warner  are encompassed in this production offer.  The same goes for all of the other Plaintiffs.  Accordingly, if there are responsive communications that include two or more of the Plaintiffs, then they have been produced.

[8] To be clear, Suno's requests are disproportionate to the needs of the case as the burden of producing the requested documents is not commensurate with their (at most) limited relevance.  *See Doe v. Town of Stoughton*, 2025 WL 580941, at *5 (D. Mass. Feb. 21, 2025) (narrowing scope of response for request concerning relevant records "to ensure proportionality").  Given that Suno's copyright misuse theory is premised on a "concerted refusal to license . . . to generative AI companies" purportedly coordinated "*through their trade organization* the Recording Industry Association of America," Plaintiffs have already agreed to produce the full spectrum of documents that—if they existed—could potentially be relevant to these allegations.  That is sufficient.

[9] As further described below, Plaintiffs have already agreed to produce documents, including internal documents, concerning whether or not to enter a go-forward licensing agreement with Suno, to the extent such documents exist.  *See infra* at 11.

LATHAM&WATKINS LLP

 Despite the unavailability of this defense, Suno persists in seeking expansive discovery into Plaintiffs' AI licensing practices, seemingly bent on transforming this case into a referendum on Plaintiffs' overall licensing strategy. This is improper, and Suno's two-part motion is a prime example of the perverse implications associated with recognizing Suno's broad conception of copyright misuse. Suno has already moved the Court for comprehensive discovery into Plaintiffs' negotiations with myriad licensees concerning contractual terms restricting the use of AI. In response, the Court has already indicated that a balanced approach is needed to address this issue, and that such an approach likely should not implicate Plaintiffs' internal communications concerning uninvolved third parties. *See id.* at 23:15-19 (questioning "how much documentation is needed to adequately present [Suno's copyright misuse defense] so that a court can rule on it in a meaningful way" and expressing "skeptic[ism] that the prehistory of each of these contract clauses is ultimately going to bear much on that point or be worth the effort."). Suno's present motion reaches even further beyond restrictive AI terms to encompass comprehensive discovery into Plaintiffs' overall AI licensing strategy, including Plaintiffs' internal communications concerning licensing negotiations with *any* AI company. As Suno would have it, its own theft of Plaintiffs' copyrighted works entitles it to unfettered discovery into Plaintiffs' licensing strategy and internal discussions concerning all actual or potential AI licensees, some of whom are Suno's closest competitors in the AI space. This is unnecessary and disproportionate, considering Plaintiffs have already agreed to produce their communications with third-party AI licensees. If Suno is correct that Plaintiffs acted in concert to boycott the entire AI industry, surely their communications with each other or the RIAA—which Plaintiffs have already agreed to produce— would reflect these efforts. Moreover, the communications with AI companies Plaintiffs have already produced undercut Suno's posited refusal to deal.

 Suno argues that Plaintiffs' production offers in response to the subject discovery requests are designed to "write around the highly relevant documents Suno seeks" to substantiate its alleged concerted refusal to deal. Not so. The categories of information Plaintiffs have agreed to produce are the ones that will bear most directly on Suno's theory. Suno conveniently ignores the fact that Plaintiffs have agreed to produce communications between Plaintiffs and/or the RIAA concerning whether or not to license sound recordings to any company for the purpose of using sound recordings to train any generative AI model or for use in the outputs of any generative AI model.[10] This is directly responsive to most of what Suno seeks with respect to RFP Nos. 27, 29, and 30. Thus, Suno's claim that Plaintiffs have somehow gerrymandered their production offers to omit "internal documents and communications concerning their willingness to license their works to generative AI companies or any communications with other Plaintiffs regarding the same" is simply false. Plaintiffs *have* agreed to produce communications between and among Plaintiffs or

---

[10] Plaintiffs extended this offer in response to Suno's RFP No. 33, which seeks "All Documents and Communications between You, any other Plaintiff, or the Recording Industry Association of America, either directly or through any third party, concerning whether or not to license Your Sound Recordings to Defendant or any Company for any purpose relating to Generative AI." *See* May 19, 2025 email from A. Perry to G. McLaughlin.

**LATHAM&WATKINS**LLP

the RIAA that would reflect a concerted refusal to deal, but Plaintiffs' diligent search has confirmed that no such inter-Plaintiff communications or communications with the RIAA exist.[11]

Further highlighting the disproportionate nature of Suno's request, Suno's allegations concerning Plaintiffs' alleged refusal to deal are implausible. There is copious evidence showing that Plaintiffs, rather than refusing to deal, have embraced discussions with AI companies.

By way of example, Plaintiffs have produced documents indicating that each has engaged in good faith licensing discussions with AI companies. *See, e.g.*, ███████████████

███████████████

███████████████████████[12] In fact, some of these discussions were successful and resulted in deals that certain labels have publicly touted. *See, e.g.*, *Endel and Universal Music Group to Create AI-Powered, Artist-Driven Functional Music, Designed to Support Listener Wellness*, Universal Music Group (May 23, 2023), *available at* https://www.universalmusic.com/endel-and-universal-music-group-to-create-ai-powered-artist-driven-functional-music-designed-to-support-listener-wellness/; Murray Stassen, *Warner Joins $14M Funding Round in AI Music Startup Lifescore, Founded by Siri Co-Inventor Tom Gruber*, Music Business Worldwide (Mar. 7, 2022), *https://www.musicbusinessworldwide.com/warner-joins-11m-funding-round-in-ai-music-startup-lifescore-founded-by-siri-co-inventor-tom-gruber1/.* This evidence fatally undermines Suno's alleged refusal to deal.[13]

In response, Suno admits that its refusal to deal allegations are based on its "understanding of discussions in the industry and the application of basic economic principles to the facts." Suno Statement at 2. This is hardly a sufficient basis to justify the sweeping discovery Suno now seeks. *See Arthur v. Allen*, 459 F.3d 1310, 1311 (11th Cir. 2006) ("[G]ood cause for discovery cannot arise from mere speculation" and "discovery cannot be ordered on the basis of pure hypothesis.").

███████████████████████

---

[11] Plaintiffs' diligent search—reviewing tens of thousands of documents after months of negotiations over search terms—has identified no responsive communications *between or among the Plaintiffs* or with the RIAA. There are, unsurprisingly, thousands of *internal*, purely intra-label documents from certain of Plaintiffs' seventeen custodians (many of whom have roles that are narrowly focused on issues surrounding AI) that relate to potentially licensing sound recordings to generative AI companies, but for the reasons articulated herein, these internal communications specific to a particular label are neither relevant nor proportional to the needs of the case.

[12] Plaintiffs' productions on this topic are not yet complete, as they expect to produce additional documents concerning their AI licensing negotiations forthwith.

[13] Suno's claim that it cannot determine if these various licensing partnerships are with "other companies offering tools like Suno's" is bizarre. A simple Google search can provide any necessary information in that regard. For instance, LifeScore is an "AI-powered music generation in service of artists and rights holders," which allows users to use "generative techniques" to remix an original track or album. *See* https://lifescoremusic.com/technology.

**LATHAM&WATKINS**LLP

███████  *See* Suno Statement at 2. Suno concludes based on this sequence of events that the only possible explanation for ██████████████████████ was an "agreement between Plaintiffs, who are putative competitors, to collectively refuse to enter any go-forward licensing deal with Suno." *Id.* But the referenced correspondence—██████████████████████— contains no indication of any collusion with other record labels. Suno baldly asserts that these discussions were "suddenly thwarted" by Plaintiffs' collective decision not to deal with Suno, but that inference hardly follows from the mere fact that ██████████████████████ ██████ *Id.*

The much more straightforward and reasonable inference based on the available evidence is that each of the Plaintiffs independently determined that Suno's willful infringement and disregard for their intellectual property rights was an impediment to productive licensing negotiations. Notably, Suno has not claimed, let alone demonstrated, that it had any desire or intention to license Plaintiffs' content at the time it ingested reams of their copyrighted sound recordings for use as training data. All indications are that the opposite is true. The record is clear that Suno heedlessly copied Plaintiffs' works without authorization and made the deliberate decision not to seek a license before doing so. *See* July 31, 2025 Hr'g Tr. at 33:2-8 (describing Suno's business model as "say[ing] if we grab all [Plaintiffs' recordings] at once, nobody's even going to be able to figure out and trace out the mechanicals as they show up in any given digital pastiche that comes back out, and therefore, … we'll have slipped … the gravitational bonds of traditional copyright law"). Suno's brazen theft is no secret, as one of Suno's chief investors, Antonio Rodriguez, celebrated the fact that Suno was unconstrained by licenses for its training data. *See* Brian Hiatt, *A ChatGPT for Music is Here. Inside Suno, the Startup Changing Everything*, Rolling Stone (Mar. 17, 2024) (quoting Antonio Rodriguez: "Honestly, if we had deals with labels when this company got started, I probably wouldn't have invested in it. I think that they needed to make this product without the constraints."). This alone reveals that Suno's argument is without merit.

Suno contorts Plaintiffs' decision to not acquiesce in its theft to imply that the only conceivable reason Plaintiffs declined to license their works to Suno was collusion. This is absurd. The fact that each Plaintiff independently declined to contract with an entity that admitted to infringing their works is common sense, not evidence of a nefarious, anticompetitive plot to exclude that entity from the marketplace. Even before this case was filed, Plaintiffs, through counsel, spoke with Suno's outside counsel and invited Suno to make a concrete licensing proposal. Plaintiffs informed Suno that it welcomed serious discussions but reasonably requested that Suno identify which of their recordings Suno took without permission. ██████████████████

██████████████  While Suno may assert that some of those talks are subject to FRE 408, Suno may not use the settlement privilege as both a sword and shield. *See, e.g., Medtronic, Inc. v. Axonics Modulation Techs., Inc.*, 2024 WL 5316310, at *1-2 (C.D. Cal. Sept. 9, 2024) (Rule 408 may not be used "as both a sword and a shield"); *see also McInnis v. A.M.F., Inc.*, 765 F.2d 240, 248 (1st Cir. 1985); *Hamilton v. Partners Healthcare Sys., Inc.*, 209 F. Supp. 3d 397, 406 n.6 (D. Mass. 2016).

10

**LATHAM&WATKINS**LLP

Suno's cited authority does not revive Suno's flatly implausible claims or entitle it to more discovery into this already discredited theory. For instance, Suno cites several antitrust opinions for the proposition that a concerted refusal to deal for the purpose of preventing competition constitutes a violation of § 1 of the Sherman Antitrust Act. *See, e.g.*, *Primetime 24 Joint Venture v. Nat'l Broad., Co.*, 219 F.3d 92, 102–03 (2d Cir. 2000); *Downtown Music Publishing LLC v. Peloton Interactive, Inc.*, 436 F. Supp. 3d 754, 764-65 (S.D.N.Y. 2020). But the facts of these cases did not involve the type of implausible, discredited allegations Suno presents here. Furthermore, these cases do not address what degree of factual inference is necessary to justify additional discovery on a particular subject matter, which is the actual issue before the Court. These cases cut against Suno's expansive demands for additional discovery to the extent they stand for the proposition that an antitrust plaintiff must offer more than mere speculation to substantiate a thinly plead refusal to deal. *See Downtown Music Publishing*, 436 F. Supp. 3d at 764 (explaining that "to prove the existence of a conspiracy, parallel action is not, by itself, sufficient" and that "the existence of additional circumstances, often referred to as 'plus factors' . . . when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy). The grand sum of Suno's evidence of parallel action is ███████████████, which is not a "plus factor" that lends credence to its debunked claim of a group boycott. Nor could Suno allege any "plus factors," as each of the Plaintiffs have clearly shown themselves willing to engage Suno and other AI companies in good faith licensing negotiations. Moreover, Suno's primary copyright misuse case, *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1027 (9th Cir. 2001), does not support Suno's claim for expansive discovery. As Plaintiffs explained in their prior briefing, the Ninth Circuit affirmed the district court's dismissal of Napster's markedly similar theory of copyright misuse, as well as the lower court's decision to limit discovery into this defense. *See id.* at 1026-27 & n.7.

Suno also takes issue with Plaintiffs' offer with respect to RFP No. 24, which seeks "All Documents and Communications concerning this Action." Suno neglects to mention that Plaintiffs' agreement to produce documents and communications concerning (1) Suno's use of copyrighted sound recordings; and (2) whether or not to enter into a go-forward licensing arrangement with Suno, including in lieu of filing this lawsuit, was an offer that *Suno originally proposed*. *See* Jan. 14, 2025 email from J. Barnett. This offer is perfectly sensible, as it targets the primary subject matter of this litigation (*i.e.*, Suno's use of Plaintiffs' copyrighted sound recordings), as well as the materials that could conceivably support Suno's concerted refusal to deal theory (*i.e.*, documents concerning whether to license sound recordings to Suno). Plaintiffs have not carved out from this offer documents between and among Plaintiffs or the RIAA, and they have already searched for such materials. Thus, any such communications that might exist have already been produced or will be included on Plaintiffs' forthcoming privilege log, consistent with the agreed-upon ESI Protocol.

Despite originating the very proposal it now claims is insufficient, Suno demands that Plaintiffs include in their privilege log all documents "concerning this Action" because the distinction between communications concerning this Action and those reflecting a coordinated agreement not to license with Suno "may not be bright line." Again, this is pure speculation that is not grounds for requiring Plaintiffs to undergo the burden and expense of logging additional documents in response to a request that seeks definitionally privileged information. Plaintiffs

LATHAM&WATKINS LLP

agreed to Suno's original offer because it appropriately carved out litigation-specific communications from the ambit of the request. This is an appropriate limit and the Court should not entertain Suno's attempt to impose yet another burdensome obligation on Plaintiffs to expand their privilege log.

Because Suno's requests are legally impermissible and factually unsupported, Plaintiffs respectfully request that the Court deny Suno's motion to compel in its entirety.

**Suno's Reply:**

There is no question that there has been concerted action between and among the major record labels to try to put Suno out of business: they are suing Suno together, seeking precisely that result. The only real question—which Plaintiffs conspicuously ignore—is whether that concerted action has in fact been limited to conduct that is immunized from antitrust liability by the *Noerr-Pennington* doctrine, or whether it also encompasses something more. The strand of Suno's misuse defense at issue in this motion is predicated on the straightforward contention that the labels' concerted action has indeed encompassed more—more than just suing, more than a series of three unilateral decisions to forego and, ███████████, abruptly cut off discussions regarding forward-looking licensing arrangements. It defies credulity to suggest not only (a) that these three "complementary oligopol[ists]"[14] scrupulously limited every conversation about Suno they've ever had to just litigation strategy, when all available evidence points to the inference that they are coordinating with respect to prospective business decisions as well, but also (b) that Suno is not even entitled to document discovery or even a privilege log to probe the veracity of that improbable position.

Across five pages of their opposition, Plaintiffs at no point seriously argue that the documents Suno seeks and that Plaintiffs refuse to produce—particularly internal conversations about whether to license—are irrelevant to Suno's asserted copyright misuse defense. Nor do they provide any concrete account of the supposed burden of searching for and producing these relevant documents.[15] Instead, Plaintiffs' opposition relies on two arguments: (1) that copyright misuse is

---

[14] *See* Copyright Royalty Board, *Determination of Royalty Rates and Terms for Ephemeral Recording and Webcasting Digital Performance of Sound Recordings (Web IV)*, 81 Fed. Reg. 26316, 26368 (holding that "the Majors could utilize their combined market power to prevent price competition among them by virtue of their complementary oligopoly power").

[15] Plaintiffs refer to "thousands" of potentially responsive documents, presumably across all three Plaintiffs' files, "that relate to potentially licensing sound recordings to generative AI companies." To date, Plaintiffs *collectively* have produced only 1,946 custodial documents, while Suno has produced over 37,000 documents—and has reviewed tens of thousands more. That Plaintiffs may be compelled to produce additional documents, which they have apparently already reviewed, does not constitute an undue burden, particularly where these documents are central to Suno's copyright misuse defense. Moreover, as discussed in more detail below, these documents are also highly relevant to fair use—which Plaintiffs have described as "the heart of this dispute," Dkt. 39 at 2.

**LATHAM&WATKINS**LLP

"not legally cognizable" and (2) that Suno's allegations of misuse are "implausible." The first argument is simply incorrect, while the second distorts both Federal Rule of Civil Procedure 26 and the already-existing record. Not only did Suno's Answer plausibly assert a specific course of conduct, based on the information available to it at the time, that would constitute copyright misuse, but Plaintiffs' produced documents to date further corroborate Suno's allegations. Through RFP Nos. 27 through 30, Suno seeks documents squarely relevant to its well-pleaded and subsequently corroborated defense of copyright misuse—and also squarely relevant to Suno's fair use defense. Suno is entitled to this discovery, and Plaintiffs cannot avoid their obligations merely by providing a counternarrative to explain their conduct.

Plaintiffs' first argument—that Suno cannot seek discovery related to copyright misuse because the defense is not "legally cognizable in this Circuit"—has already been rejected by this Court. Plaintiffs made the same claim in attempting to resist discovery relevant to Suno's other theory of misuse (that individual Plaintiffs conditioned licensing agreements on their licensees promising not to partner with AI companies or host the outputs of generative AI models on their platforms). As Suno explained then, neither the First Circuit nor any appellate court to have considered the defense has rejected it as a matter of law, and district courts within the First Circuit have recognized it. *See Covetrus, Inc. v. Actian Corp.*, No. 21-cv-00097, 2024 WL 4581285, at *2 (D. Me. Oct. 25, 2024). This Court then ordered Plaintiffs to search for and produce documents relevant to Suno's misuse defense, rejecting the argument that the defense is not legally supported. July 31, 2025 Hr'g Tr. at 10:08–19; 16:10–17. Nothing has changed in the ensuing weeks, and Plaintiffs' continued attempts to challenge Suno's asserted defense remain without merit.

Plaintiffs spend the majority of their opposition on their second argument: that Suno's allegations are "implausible." To start, this argument distorts the purpose and rules of federal discovery. In its Answer, Suno not only asserted a copyright misuse defense, but also provided specific allegations describing a concerted refusal to deal that would constitute misuse. *See* Answer at 12. Suno made these allegations on information and belief, as the documents and information that would be able to verify Plaintiffs' concerted refusal are in the custody and control of Plaintiffs. Now that the parties are in discovery, Suno is entitled to explore this defense, seeking documents that would support it. This is the express purpose of discovery. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."); *Anvik Corp. v. Samsung Elecs.*, No. 07-cv-818, 2009 WL 10695623, at *2 (S.D.N.Y. Sept. 16, 2009) (noting "Rule 26's liberal and expansive purpose of unearthing facts in support of claims and defenses"). Plaintiffs are not entitled to circumvent this process through self-serving dismissals of Suno's allegations.

Moreover, while the well-pleaded assertions in Suno's Answer would, on their own, justify discovery into Plaintiffs' concerted refusal to deal, the documents produced in discovery—documents produced by Suno, as Plaintiffs continue to refuse to produce responsive documents or add appropriate custodians—confirm that Suno's allegations are not "implausible." ███████

---

Any incremental burden of producing these documents is entirely proportionate, given their centrality to two of Suno's primary defenses.

**LATHAM&WATKINS**LLP



Plaintiffs obviously acted together to send their demand letter and eventually file suit; there is no question that their litigation strategy is the product of a concerted effort. But ████████ ████████████████████ supports the *additional* conclusion that, in furtherance of their concerted litigation strategy, Plaintiffs collectively decided not to engage in go-forward business discussions with Suno—████████████████████[16] Plaintiffs' claim—i.e., that the "more straightforward and reasonable inference" is that "each of the Plaintiffs independently determined" that Suno's alleged infringement "was an impediment to productive licensing negotiations"—is the implausible one.

Plaintiffs' alleged course of conduct, if established through discovery, would plainly violate antitrust law—and therefore constitute copyright misuse. *Cf., e.g.*, *Downtown Music Publ'g*, 436 F. Supp. 3d at 764. Plaintiffs' only attempt to distinguish the multiple factually analogous cases Suno cited supporting the conclusion is that those cases involved more "[]plausible" allegations. It is not for Plaintiffs to decide that Suno's well-pleaded, subsequently corroborated allegations are "implausible" and refuse to engage in discovery on that basis. And, contrary to Plaintiffs' assertions, Suno's allegations are highly similar to those in the cases it cited. For example, in *Downtown Music Publishing*, the court found that Peloton had "plausibly alleged"

---

[16] Perhaps unintentionally, Plaintiffs in their opposition refer to themselves as a single entity in their dealings with AI companies. *See supra* ("If Suno is correct that Plaintiffs acted in concert to boycott the entire AI industry, surely *its* communications with AI companies would reflect these efforts." (emphasis added)).

**LATHAM&WATKINS**LLP

a violation of the Sherman Act where it attempted negotiations with individual music publishers, those publishers "cut off the discussions simultaneously and abruptly," and one month later their trade organization initiated litigation. 436 F. Supp. 3d at 764. The timing of those events "suggest[ed]" that the abandoned negotiations were not the result of "coincidence" and "support[ed] the inference that the Music Publishers decided together that they would refuse to negotiate with Peloton. *Id.* The plaintiffs there attempted similar arguments to Plaintiffs in this case, claiming that the "copyright infringement lawsuit . . . was an obvious reason to discontinue further negotiations with Peloton." *Id.* But the issue at this stage is not whether the evidence "rule[s] out the possibility that" each Plaintiff was acting independently, *id.* at 765; rather, Suno is entitled to pursue its defense based on its plausible allegations of concerted effort.

Plaintiffs' references to their purported deals with other AI companies and to their own history of negotiations with Suno do not alter this conclusion. *First*, Plaintiffs point to assorted communications with other AI companies and to "publicly touted" deals they have entered with those companies and claim that these documents "fatally undermine[] Suno's alleged refusal to deal." But Plaintiffs' deals with other AI companies—whose terms Suno cannot assess, as Plaintiffs have not produced those actual or draft agreements—do not undermine the allegation that Plaintiffs collectively refused to deal with *Suno* or other companies offering tools like Suno's. Nor have Plaintiffs made any argument that these AI companies or their tools are comparable to Suno or its tool, or that Plaintiffs' "publicly touted" deals at all resemble the kind of go-forward licensing arrangements at issue here.[17] *Second*, that Suno did not attempt to seek a license before allegedly copying Plaintiffs' works is irrelevant to the defense of copyright misuse. Suno's misuse allegations do not turn on when the parties could have engaged in licensing conversations. Rather, as explained in Suno's initial statement, the misuse is Plaintiffs' collective refusal to deal with Suno at a time when they could have—



*Third*, Plaintiffs claim that,

*Cf. SD3, LLC v. Black & Decker (U.S.), Inc.*, 801 F.3d 412, 427–28 (4th Cir. 2015) (rejecting defendants' claim that they had not engaged in a collective boycott because "some

---

[17] Plaintiffs' claim that Suno can understand the terms of these deals through "[a] simple Google search" is inaccurate. For example, Plaintiffs' description of LifeScore as an "AI-powered music generation" says nothing about how LifeScore uses sound recordings, what its AI tool does, or what sort of licensing arrangement Plaintiffs entered with it. Indeed, the few relevant documents Plaintiffs have produced to date confirm that these partnerships may be markedly different than a go-forward partnership with Suno. In a press release, Plaintiff UMG described Klay, much like LifeScore, as offering a "foundational model for AI generated music." *See Universal Music Group Enters into a Strategic Collaboration with Ethical AI Music Company, Klay*, UNIVERSAL MUSIC GROUP (Oct. 28, 2024), https://www.universalmusic.com/universal-music-group-enters-into-a-strategic-collaboration-with-ethical-ai-music-company-klay/.

**LATHAM&WATKINS**LLP

licensing negotiations continued after the conspiracy formed" and recognizing that the defendants "could have achieved their alleged objective of keeping [the plaintiff] off the market in a number of ways," including while pursuing licensing negotiations); *see also Cascades Computer Innovation LLC v. RPX Corp.*, No. 12-cv-1143, 2013 WL 6247594, at *3–4 (N.D. Cal. Dec. 3, 2013) (permitting antitrust claim where the plaintiff and the defendants had engaged in negotiations that ultimately failed).

The question at this stage of the case is not whether Suno has already proven that Plaintiffs engaged in a concerted refusal to deal. Just as Plaintiffs are not required to prove copyright infringement in order to obtain discovery relevant to their causes of action, Suno is not required to prove misuse in order to obtain discovery. *Cf. Downtown Music*, 436 F. Supp. 3d at 764 ("At the pleading stage, a plaintiff must allege enough facts to support the inference that a conspiracy existed" or to "suggest that an agreement was made"). Under Rule 26, Plaintiffs are obligated to produce proportional discovery "relevant" to Suno's asserted defense of copyright misuse (a defense whose plausibility has been confirmed through discovery). The documents and communications sought through RFP Nos. 27 through 31 are both relevant and proportional for this defense, requesting documents likely to reveal whether Plaintiffs agreed not to license their sound recordings to Suno or other AI companies. Plaintiffs therefore have no grounds to refuse Suno's requests.

Nor can Plaintiffs satisfy their obligations through the improper narrowing they have proposed, which excludes all internal communications on whether or not to license sound recordings for purposes related to AI. Plaintiffs have confirmed that such internal documents communications exist[18] and do not appear to deny that they would be probative of this misuse theory. Plaintiffs' position appears to be that they should not be required to produce these documents and communications, because their communications with AI companies and/or with each other are likely to be responsive. But even if such communications would be relevant to Suno's misuse defense, that does not relieve Plaintiffs of their obligation to produce *internal* responsive documents as well, and Plaintiffs have provided no argument for why those communications specifically are likely to be irrelevant, duplicative, or unduly burdensome to produce. To the contrary, Plaintiffs' communications with other AI companies are not likely to reveal Plaintiffs' strategy decisions regarding whether or not to license to such companies and on what terms. And Plaintiffs are likely to assert common interest privilege over communications with each other and/or the RIAA.[19] While Suno intends to assess Plaintiffs' claims of privilege

---

[18] ███████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████

[19] Plaintiffs also claim that they have conducted a "diligent search" and confirmed that no "inter-Plaintiff communications or communications with the RIAA exist." Plaintiffs' dispute statement was the first time Suno was made aware of any such search: Plaintiffs have not cited the email in which they purportedly made this agreement, nor anything outlining the scope of their "diligent search." Without this information, Suno cannot assess the scope and parameters of Plaintiffs' search. In any event, it is facially implausible that Plaintiffs, who are jointly suing Suno ████████

**LATHAM&WATKINS**LLP

carefully, Plaintiffs cannot in the meantime refuse to produce responsive documents about Plaintiffs' internal business decisions, which are equally relevant and less likely to be privileged. Plaintiffs also have not articulated any undue burden associated with reviewing and producing these documents, other than their argument that communications between Plaintiffs or with third parties should suffice.[20]  Yet Suno has explained why such communications are inadequate. Plaintiffs' attempted narrowing has no basis, and they should be compelled to produce all documents responsive to these RFPs, including any internal communications.[21]

Plaintiffs' general allegations of burden are particularly unpersuasive because the documents sought by RFP Nos. 29 and 30 in particular, including Plaintiffs' internal communications, are relevant not only to Suno's copyright misuse defense, but also to Factor Four of Suno's fair use defense.[22]  Plaintiffs have described this defense as "the heart of this dispute," Dkt. 39 at 2, and any incremental burden of searching for and producing documents related to this defense is thus justified by their relevance to a key issue in this litigation.  Factor Four concerns "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. 107(4); *see also Andy Warhol Found. for the Visual Arts, Inc.*, 598 U.S. 508, 536 n.12 (2023). Here, the copyright infringement Plaintiffs have alleged is through Suno's purported use of the Asserted Works to train its AI tool.  See Compl. ¶¶ 41–47, 98–108; Answer at 4–5.  Plaintiffs do not allege that outputs created through Suno infringe their works.  Accordingly, the issue under Factor Four is whether Suno's alleged infringement through the use of Plaintiffs' works as training data has had an effect on the market for the Asserted Works as *training data*—and whether such a market even exists.  *See, e.g., Bartz v. Anthropic PBC*, No. 24-cv-5417, Dkt. 23 at 27–28 (N.D. Cal. June 23, 2025) (explaining that the relevant market where the plaintiffs had accused the

---

███████████████████████████████████████████████████████████, have never discussed whether they would continue in licensing discussions.

[20] Plaintiffs claim that a "diligent search" has identified "thousands of *internal*, purely intra-label documents" that would be responsive to these requests.  Again, Plaintiffs have not disclosed any information about their supposedly diligent search.  Moreover, to the extent Plaintiffs are burdened, this burden is justified by the central relevance of these documents and is a normal part of litigation—Suno, for instance, has already reviewed hundreds of thousands of potentially responsive documents during the course of discovery.

[21] Plaintiffs are incorrect that the Court, in its ruling on the RFPs related to Suno's other theory of copyright misuse, found that discovery "should not implicate Plaintiffs' internal communications concerning uninvolved third parties."  To the contrary, the Court directed the parties to propose a search methodology that would allow them to determine the population of potentially responsive documents and the burden of reviewing those documents.  *See* July 31, 2025 Hr'g Tr. at 22:24–24:18.  While Suno is amenable to proposals that would alleviate any undue burden (assuming Plaintiffs can articulate such a burden), it cannot agree to a wholesale exclusion of internal documents—and the Court's earlier order does not require or even support such a result.

[22] Plaintiffs' claim that Suno has somehow "broaden[ed]" these RFPs by explaining their connection to Factor Four is inaccurate.  RFP Nos. 29 and 30 have not changed since Suno served them.  That they seek documents material to additional, central issues in dispute in this litigation further supports their relevance and proportionality, but it does not change their scope.

LATHAM&WATKINS LLP

defendant of using their works to train generative AI was "an emerging market for licensing their works for the narrow purpose of training [large language models]").[23]  Suno expects that, in support of their Factor Four argument, Plaintiffs will point to their licensing agreements with other AI companies, arguing that these agreements show the feasibility of such a licensing market.  That is, Plaintiffs will use the existence of such licenses to argue that Suno's use of their works interferes with an established licensing market for the sort of use Suno allegedly engaged in.

But those licenses, on their own, paint an incomplete picture—and internal communications about any such licenses are critical to establish whether they prove the existence of a licensing market for training data for purposes of Factor Four.  Plaintiffs' communications about the licenses are likely to contain highly relevant information, including why Plaintiffs were willing to license their recordings, their assessment of the nature, quality, and use cases of the AI tools at issue, what kinds of third parties Plaintiffs were willing to do deals with, and whether the generative AI tools of those third parties are at all similar to Suno's product.  These assessments will reveal whether any other AI companies with which Plaintiffs have licensed are in fact comparable to Suno, either in their capacities or in how they use existing sound recordings.  If (as Suno suspects) there are material differences between these companies and Suno, those differences would tend to support Suno's position that there is no realistic music licensing market for a use like Suno's—and, as a consequence, Factor Four weighs in Suno's favor.  Suno is entitled to support this defense through document discovery.  *Cf. In re Mosaic LLM Litig.*, No. 24-cv-1451, 2025 WL 2294910, at *4 (N.D. Cal. Aug. 8, 2025) (rejecting argument that "executed [licensing] agreements" are all that is relevant for the fourth fair use factor and compelling discovery into related documents and communications, which "shed light on the nature of the market: what terms and prices parties initially proposed, negotiations regarding valuation, alternative licensing structures that were proposed and rejected, and why Microsoft or other parties ended negotiations").[24]

---

[23] For purposes of the Factor Four analysis, Suno treats the relevant "market for . . . the copyrighted work" as the market for licensing the Asserted Works as training data, as that is the purported market with which Suno's use interfered.  However, at least one court has expressed doubt as to whether this sort of potential market is appropriate to consider under Factor Four (assuming *arguendo* that market exists); as that court explained, doing so would render the factor four analysis circular since it would allow a plaintiff to defeat a fair use defense in nearly every event, even where the use is wholly transformative under Factor One.  *See Kadrey v. Meta Platforms, Inc.*, No. 23-cv-03417, 2025 WL 1752484, at *16 (N.D. Cal. June 25, 2025) (noting the tautology that, "in every fair use case, the 'plaintiff suffers a loss of a potential market if that potential [market] is defined as the theoretical market for licensing' the use at issue in the case."); *In re Mosaic LLM Litig.*, No. 24-cv-1451, 2025 WL 2294910, at *4 (N.D. Cal. Aug. 8, 2025) (noting that this approach "raises a circularity issue," because "[i]f the potential market is defined as the market for licensing a copyrighted work for the very use employed by the alleged infringer, then factor four would always weigh in favor of the copyright holder" (citations and quotation marks omitted)).

[24] To the extent Plaintiffs suggest that the *Mosaic* court ordered discovery only into external communications regarding licensing agreements, they are incorrect.  In fact, the court ordered

**LATHAM&WATKINS**LLP

The documents Plaintiffs have produced to date, though minimal, illustrate the relevance of such internal discussions. ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████ █ █████████████████████████████████████

████████████████████████████████████████████████████████

                                                                    Six months later, UMG announced a partnership with Klay, stating that Klay offers an opportunity to "advanc[e] generative AI technology in ways that are . . . respectful of copyright." See Daniel Tencer, *Universal Music Group Enters into Strategic Partnership with AI Music Startup Klay*, MUSIC      BUSINESS      WORLDWIDE      (Oct.      28,      2024), https://www.musicbusinessworldwide.com/universal-music-enters-into-strategic-partnership-with-ai-music-startup-klay1/. This announcement reveals almost nothing about the terms of this license or Plaintiffs' assessment thereof. ██████████████████████████

████████████████████████████████████

Plaintiffs have already made clear that they will rely on partnerships like UMG's with Klay to demonstrate the alleged existence of an exploitable music training data licensing market for purposes of Factor Four. In fact, Plaintiffs claim they have "*already* produced substantial discovery directly relevant to the alleged market for sound recordings as training data," in the form of external communications regarding a number of potential deals. However, contrary to Plaintiffs' opposition, the documents Plaintiffs point to do *not* "provide . . . the sort of evidence" necessary to determine whether a market exists for licensing the large quantity of work necessary to train a sophisticated AI tool like Suno's: Even assuming the unsigned term sheets and pitch decks Plaintiffs cite do in fact reflect agreements Plaintiffs reached, ██████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

Moreover, the draft term sheets and emails with other companies Plaintiffs have produced offer incomplete insight into *how* Plaintiffs view any licensing market for training data. It is in

---

Microsoft to produce both "communications with" *and* "documents *regarding* the entities with which it entered into licensing agreements for AI Training Data[.]" *See Mosaic*, 2025 WL 2294910, at *4.

**LATHAM&WATKINS**LLP

internal communications, rather than arm's-length negotiations with potential deal partners, that Plaintiffs would discuss their AI licensing strategy.  For instance, Plaintiffs' internal communications may say, "we won't license our full catalogue to a company for training a generative AI tool that allows end users to create new radio-quality songs" (as Suno's does), or "we'll license our catalogue to this company because it *isn't* such a product."  That evidence would be highly relevant to the Factor Four issue of whether a feasible market exists for Suno's alleged use of the Asserted Works, and in particular to rebutting any attempt by Plaintiffs to use deals with other AI companies as exemplars of such a market.  And that is in *addition* to being relevant to Suno's copyright misuse defense, especially where the internal communication indicates that such business decisions were the product of an agreement between Plaintiffs or where the timing of the communication or other evidence in the record might ultimately demonstrate the same.  Plaintiffs cannot rely on their supposed "interest in engaging ethical AI companies" or any other AI companies as proof of either (1) their willingness to license to generative AI companies like Suno or (2) the existence of market to license their works to train a generative AI tool like Suno's if those AI companies do not actually build AI products capable of producing radio-quality music.  And, without internal communications, Suno will not be able to assess the scope, aims, and, importantly, limits, of Plaintiffs' engagement with so-called these other AI companies.  Thus Plaintiffs' internal communications about their AI licensing agreements are plainly relevant to both Suno's copyright misuse defense *and* its fair use defense, and Plaintiffs should be compelled to respond to RFP Nos. 29 and 30 as written.

With respect to RFP No. 24, Plaintiffs' only argument is that logging all documents "concerning this Action" would be burdensome.[25]  Plaintiffs completely ignore Suno's explanation of why any burden would be minimal and would be significantly outweighed by the benefits of such logging: the parties' ESI Protocol allows that "privileged communications that post-date the filing of the Complaint" need not be logged, "so long as such privileged communications involve the parties' outside counsel."  Dkt. 55.  Thus, the only categories of responsive documents that Plaintiffs will need to log are: (1) documents and communications between and among Plaintiffs/the RIAA about this Action that pre-date the filing of the Complaint and (2) documents between and among Plaintiffs/the RIAA that post-date the filing of the Complaint and concern this Action but *do not involve litigation counsel*.  The former category involves a critical period in which Suno believes a concerted refusal to deal may have occurred.  Moreover, Plaintiffs' recently produced privilege log includes entries from before the Complaint describing communications ██████████████████████████████████████████████████████████████████████████  Such entries confirm that at least some documents from this time period simultaneously concern the Action and the possibility of go-forward licensing deals, corroborating Suno's concern that the distinction between the two "may not be a bright line."  The latter category, meanwhile, is unlikely to involve large numbers of documents, but any documents it does involve are likely to warrant closer scrutiny, since it is unclear what reason Plaintiffs would have to communicate about this case without litigation counsel's involvement.  Finally, it is worth noting that Suno agreed to produce

---

[25] Plaintiffs emphasize that Suno initially proposed a narrowed version of RFP No. 24, which Plaintiffs accepted.  Suno's proposal, which it offered in an attempt to come to a compromise, extended to Plaintiffs' production obligations, not their logging obligations.

**LATHAM&WATKINS**LLP

all documents concerning or related to Plaintiffs—with no "carve[] out for litigation-specific documents." Inevitably, Plaintiffs' request involved a number of privileged documents about this Action, which Suno had to review and log. Plaintiffs cannot avoid their burden of logging clearly relevant documents, particularly where that burden was already anticipated and addressed by the terms of the ESI.

Plaintiffs have failed to meet their burden of establishing that Suno's discovery requests are either irrelevant or unduly burdensome. Accordingly, Suno respectfully requests that the Court compel Plaintiffs to produce the documents requested by RFP Nos. 27, 28, 29, and 30, log any documents responsive to these RFPs that they redact or withhold on the basis of any privilege, and log all documents responsive to RFP No. 24 as written that they redact or withhold on the basis of any privilege.

***Plaintiffs' Surreply***:

Suno's new "fair use" theory should be rejected out of hand. Not once during months of negotiations or weeks of drafting this position statement did Suno contend that Requests 29 and 30 were relevant to Factor Four. Only now—after Plaintiffs have responded to its misuse arguments—does Suno attempt to repackage the same discovery requests as supposedly central to fair use.

In any event, Plaintiffs have already produced substantial discovery directly relevant to the alleged market for sound recordings as training data. Plaintiffs have produced not only executed agreements with third parties, but also draft agreements and extensive communications concerning negotiations with potential licensees. For example, Plaintiffs have produced communications and draft agreements  among others. Many of those documents include internal communications forwarding and/or discussing emails from third parties in the context of negotiations. These materials provide precisely the sort of evidence Suno claims it needs: direct contemporaneous proof that there is a growing market for sound recordings as training data. Indeed, third-party outreach regarding potential licensing arrangements are the most probative evidence of the existence of market demand—far more so than any hypothetical internal discussions Plaintiffs might have about such a market. The negotiation correspondence and executed agreements Plaintiffs have produced provide Suno with the level of detail regarding these partnerships that it claims to need.

Suno cites an internal discussion ██████████████████ as somehow supporting its argument that Plaintiffs must produce *all* internal communications concerning AI licensing writ large. But Suno's sweeping and burdensome demand hardly follows from the discussion reflected in this document. Plaintiffs produced this document because ████████████████

**LATHAM&WATKINS**LLP

████████████████████████████████████████████████████████
████████████████████████████  UMG_SUNO_00000049-50.  Not only does this document undermine Suno's concerted refusal to deal theory, it also lends no further insight into the existence of an exploitable market for licensing sound recordings as AI training, beyond the publicly known fact that UMG has a demonstrated interest in engaging ethical AI companies that are not predicated on rampant copyright infringement.  This document does not lend credence to Suno's strained argument that a comprehensive exploration of Plaintiffs' internal licensing AI strategies is relevant to the fourth fair use factor or necessary or proportional to the needs of this case.

Suno's reliance on *In re Mosaic LLM Litigation*, 2025 WL 294910 (N.D. Cal. Aug. 8, 2025), is misplaced.  *Mosaic* did not hold that internal communications were discoverable.  Rather, the court compelled production of "documents regarding Microsoft's negotiations with third parties" because such negotiations illuminate whether a licensing market is "normal, reasonable, or likely to be developed."  *Id.* at *5.[26]  Plaintiffs have already produced exactly the sort of third-party negotiations *Mosaic* deemed relevant.  Suno has not explained why additional internal communications—beyond those already produced in connection with third-party outreach—are necessary to understand the market.  Suno's last-minute effort to shoehorn new discovery demands into Factor Four is nothing more than an improper attempt to broaden RFPs originally framed solely around copyright misuse.  The Court should reject this tactic and deny Suno's request.

In addition, Suno is incorrect that Plaintiffs' production offer excludes communications between Sony, UMG, and Warner.  As noted above, when Plaintiffs agreed to produce "documents and communications with third parties concerning any executed or potential license or agreement," they were considering Sony to be a "third party" to UMG, for example, and vice versa.  Plaintiffs' agreement to produce "documents and communications with third parties concerning any executed or potential license or agreement" includes documents and communications between Sony, UMG, and Warner.  To the extent they exist, any responsive communications that include two or more of the Plaintiffs have been produced.

---

[26] Suno is also wrong to suggest *Mosaic* "express[ed] doubt" about whether training-data markets are cognizable under Factor Four.  Suno Reply at 17 n.19.  To the contrary, the court recognized that "[a]s generative AI proliferates, the right to license one's creative work to train generative AI may arguably become—or may already be—something copyright owners rightly expect to control."  *Mosaic*, 2025 WL 294910, at *4 (N.D. Cal. Aug. 8, 2025) (internal quotation marks omitted).  Moreover, Plaintiffs' theory of market harm is not limited to licensing for training data.  As explained in prior statements, Plaintiffs also allege harm to established markets, including streaming and synchronization.

October 3, 2025
Page 23

LATHAM & WATKINS LLP

Thus, this dispute is only about each Plaintiffs' internal documents and communications about executed or potential licenses or agreements relating to generative AI.  For the reasons stated above, any additional search for and production of internal documentation on top of what Plaintiffs have already done is plainly burdensome and disproportionate to the needs of the case.

*/s/ Brittany N. Lovejoy*