UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

UMG RECORDINGS, INC. ET AL,

    *Plaintiffs,*

v.

SUNO, INC.,

    *Defendant.*

No. 24-cv-11611-FDS

---

**ORDER REGARDING DISCOVERY DISPUTES**

LEVENSON, U.S.M.J.

INTRODUCTION

On March 12, 2026, I held a discovery conference with the parties, in keeping with Local Rule 37.1. Docket No. 197. During that conference, counsel addressed various issues in discovery disputes that they had previously outlined in detailed emails to the Court.

As set forth on the record during the March 12, 2026, conference, some of the issues that the parties raised are ripe for immediate resolution, while others are the subject of ongoing discussions between the parties. I write here to clarify which issues have been resolved, and which remain open, and to provide a record, upon which either party might rely, to seek review by Judge Saylor of any rulings that are clearly erroneous or contrary to law. [1]

---

[1] I have listed my rulings by roman numeral headings. The first eight address Suno's discovery requests, the remaining four address Plaintiff's requests. **I–VI** below correspond to issues raised by Defendant Suno ("Suno") in the January 23, 2026, email from Paris Sanders (labeled 1–6 in file *2026.01.23 Suno Discovery Dispute Statement.pdf*); **VII and VIII** correspond to issues raised by Suno in the March 6, 2026, email from Jessie A. Cammack (labeled 1–2 in file *2026.03.06 Suno Discovery Dispute Statements.pdf*); **IX** corresponds to the issue raised by Plaintiffs in the January 26, 2026, email from Mariah Rivera (in file *2026-01-26 Pltfs' Discovery*

*Footnote continues on following page.*

I.    **Discovery Related to Unexecuted AI License Agreements**

Suno seeks documents and communications regarding post-complaint unexecuted AI licensing agreements, that is, documentation reflecting unconsummated negotiations between plaintiffs and prospective licensees post-dating the complaint.

The primary argument that Suno offers in favor of delving into Plaintiffs' current and ongoing business affairs is a "copyright abuse" theory, which is premised on the notion that a copyright holder might improperly "leverage" its legal monopoly over protected intellectual property in such a way as to restrain commerce in such manner or to such a degree that a Court might limit or reject the copyright holder's claim of copyright violation. *See Primetime 24 Joint Venture v. Nat'l Broadcasting, Co., Inc.*, 219 F.3d 92 (2d Cir. 2000); *see Downtown Music Publishing LLC v. Peloton Interactive, Inc.*, 436 F. Supp. 3d 754, 763–64 (S.D.N.Y. 2020). No court in the First Circuit has yet adopted the theory. *See Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 65 (1st Cir. 2012) ("This court has not yet recognized misuse of a copyright as a defense to infringement."); *MMAS Rsch. LLC v. Children's Hosp. Corp.*, 2025 WL 2323522, at *5 n.2 (D. Mass. Aug. 12, 2025) ("the First Circuit has neither affirmatively adopted nor rejected copyright misuse as a defense").

In this case, Suno hypothesizes that Plaintiffs could or will attempt to destroy or stifle AI-based innovations in the music industry by concertedly refusing to deal with any AI companies. *2026.03.06 Suno Discovery Dispute Statements.pdf* at 1 (referring to "the weaponization of their copyrights to stifle generative AI"). On this basis, Suno contends, Suno should be permitted to discover materials that might support such a hypothesis. Plaintiffs have responded, in part, by

---

*Dispute.pdf*); and **X–XII** correspond to issues raised by Plaintiffs in the March 9, 2026, email from Mariah Rivera (labeled I–III in file *2026-03-09 Suno - Plaintiffs' Discovery Dispute Summaries.pdf*).

pointing out that they have in fact entered into various licensing agreements with different AI developers and Plaintiffs have substantiated this contention by supplying copies of agreements they have reached.

Suno contends that, by producing only consummated agreements, Plaintiffs may be hiding the ball: that evidence of an ongoing attempt at copyright abuse might be lurking in Plaintiffs' internal conversations and deliberations about unfruitful licensing discussions.

Suno also contended at oral argument that discovery into Plaintiff's approach to prospective licensing agreements could provide insight into Plaintiffs' AI licensing strategy, which would be relevant to Suno's copyright abuse and fair use (specifically factor four) defenses. *See generally* 17 U.S.C. § 107 (listing four factors for consideration in "fair use" contentions).

Plaintiff argues that the unconsummated agreements are commercially sensitive, largely irrelevant, and disproportionate to the needs of the case. Furthermore, Plaintiffs contend that Plaintiff's disclosure of multiple consummated agreements with AI companies adequately dispels any supposition that Plaintiffs have abused their copyrights in the manner Suno intimates.

***Denied.***

Federal Rule of Civil Procedure 26(b)(1) permits "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Additional discovery into Plaintiffs' AI licensing strategy is unlikely to advance any significant issue in this case.

As noted above, Suno's proposed defense based on copyright abuse relies on a legal theory that has not been adopted in this circuit. More to the point, even if such a defense were theoretically viable, Plaintiffs' demonstration that there exist a non-zero number of consummated licensing agreements goes a long way toward extinguishing any notion that Plaintiffs are

engaged in some sort of anti-AI blockade. The evidence already produced makes it vanishingly unlikely that expanded discovery in this arena will yield persuasive factual support for any viable defense. The materials in question are confidential, and production would be burdensome and disproportionate to the needs of the case.

## II.    General Post-Complaint Discovery

Suno seeks post-complaint documents and communications through at least February 2025, in the following categories:

    A.  Documents and communications about Suno;

    B.  Communications between and among Plaintiffs and/or the RIAA concerning market harm, *i.e.* the impact of generative AI on the sound recordings market;

    C.  Plaintiffs' own use and development of generative AI tools for the creation of music; and

    D.  Documents concerning the cause of any potential reduction in Plaintiffs' market share and/or listenership on social media platforms and streaming services.

### A.    *Post-Complaint Documents and Communications about Suno*

Suno seeks post-complaint documents reflecting communications or discussions regarding Suno. Plaintiffs respond that many such materials are privileged, that they have already produced non-privileged materials up to the date the complaint was filed, and that further production will be unduly burdensome and disproportionate to the needs of the case.

### *Denied*

The potential significance of these documents is marginal. It is, of course, conceivable that Plaintiffs' (and their agents and employees) have carried on non-privileged conversations about Suno that would bear on this litigation—but that's a matter of speculation.

4

On the other side of the scale: the effort required to sort privileged from nonprivileged discussions about one's adversary in an ongoing litigation would be substantial. Privilege disputes regarding communications between and among parties to an ongoing lawsuit regarding the opponent in that lawsuit are thorny. Discussions between non-lawyers about an adversary in ongoing litigation are likely to be admixed with legal advice and with the gathering of information for the purpose of obtaining legal advice. Sorting out the limits of privilege and work product protections in such circumstances can consume untold hours of litigant and Court time. Such efforts are, of course, sometimes warranted. But there's nothing to suggest that the game is worth the candle in this instance. There is no particular reason—beyond sheer speculation—to suppose that post-complaint discussions about Suno would bear meaningfully on the merits of the present lawsuit. This request is disproportionate to the needs of the case per Rule 26(b)(1).

### B.    *Communications between and among Plaintiffs and/or the RIAA concerning market harm, i.e. the impact of generative AI on the sound recordings market;*

Post-complaint communications regarding market harm tie to the more general dispute about the parameters for discovery regarding causes of Plaintiff's alleged harm, which I do not rule on at this time. See section III below.

### C.    *Plaintiffs' own use and development of generative AI tools for the creation of music*

***Denied***

Plaintiff's post-complaint use of AI tools for the creation of music is really encompassed in the more general dispute about Plaintiff's use or development of AI products, which I discuss in section VI below.

> ### D.   Documents concerning the cause of any potential reduction in Plaintiffs' market share and/or listenership on social media platforms and streaming services.

Post-complaint communications regarding market harm tie to the more general dispute about the parameters for discovery regarding causes of Plaintiff's alleged harm, which I do not rule on at this time. See section III below.

## III.   Discovery Concerning Alternative Causes of Plaintiffs' Alleged Harm

My impression from counsels' comments at the discovery conference is that the parties are in the process of formulating their respective positions regarding the nature, and expected proof, of claimed harm. The parties indicated that they will pursue further negotiations regarding the parameters for discovery on this issue. Accordingly, I do not rule on this dispute at this time.

## IV.   Additional Custodians (Sony/UMG)

Suno argues that Plaintiffs' custodial productions have been insufficient and proposes to add four individuals to Plaintiffs' record custodians, two from Sony (Rob Stringer, CEO; and Geoff Taylor, Executive Vice-President, Artificial Intelligence & AI Governance Officer), and two from UMG (Lucian Grainge, CEO; and Nicola Levy, Executive Vice-President, Digital Business Affairs). Plaintiffs respond that custodial files for the additional individuals are largely privileged and overlap with those from existing custodians and that the existing custodians manage licensing, digital business, and strategic functions.

> ### Denied

Suno offers no persuasive argument that further broad custodial searches are likely to produce materials of significance. At this point in the case, follow-up requests should be in the nature of narrowly tailored "go-gets" aimed at fleshing out particularly identified conversations or correspondence. This request is disproportionate to the needs of the case per Rule 26(b)(1).

## V.    Plaintiff's Prompting Efforts

Plaintiffs assert in the complaint that Plaintiffs' investigators were able to use Suno's product to create soundalike outputs that mimicked Plaintiffs' copyrighted materials. Suno now seeks to explore just how the investigators went about producing such outputs. The theory seems to be that, even if the investigators managed to summon soundalike outputs, they may have had to put some effort into figuring out how to do that. The argument would be that, if it's difficult—albeit not impossible—to use Suno's product to create soundalikes, that would be relevant to the fair-use inquiry. To that end, Suno seeks the username(s) and email address(es) that the investigators used to create soundalike outputs with Suno's product. They assert, correctly, that the login information of Plaintiffs' investigators is not privileged.

Plaintiffs have already provided the outputs and corresponding prompts that were included in the complaint. Plaintiffs argue that additional discovery regarding the pre-complaint prompting efforts impinges on protected attorney work product.

Tucked in with this dispute is a separate, but related issue: Suno seeks communications and agreements with a non-testifying consulting expert—someone who has views or information about the ease of prompting soundalike outputs with Suno's product.

Plaintiffs argue that the communications with this individual are protected work product and thus protected under Rule 26(b) which protects "facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial." Fed. R. Civ. P 26(b)(4)(D).

### *Denied*

Although Suno's request for the email/log-in information of investigators employed by Plaintiffs would not directly require Plaintiffs to disclose their work product, it has the identical

effect. The request is aimed at identifying the work—performed by the investigators—that it took to prompt Suno's product to produce a "soundalike" output. On the one hand, the prompting efforts are plainly protected work product. These were information-gathering efforts in anticipation of litigation. On the other hand, to the extent that the investigators were entering prompts into Suno's app, they can hardly claim any particular expectation of confidentiality.

Suno has equal—and presumably superior—access to the pertinent underlying factual information (i.e. the ease or difficulty of producing soundalike outputs) at issue here. So, there is no call for breaching work product protections. Suno presumably has myriad ways of demonstrating how difficult it would be for an ordinary user to utilize their AI-tool to create soundalike outputs. In short, Suno fails to show "substantial need" for such materials, let alone to demonstrate that Suno cannot "without undue hardship, obtain their substantial equivalent." Fed. R. Civ. P. 26(b)(3)(A)(ii).

That said, there is nothing to stop Suno from reverse-engineering prompts in order to figure out what Plaintiffs' investigators may have done. Nor, for that matter, is there anything in the discovery rules (I make no comment on any other contractual or legal constraints) to stop Suno from examining its own user logs to see if it can identify footprints left behind by Plaintiffs' investigators. Court-ordered discovery is unwarranted.

As for Plaintiffs' initial correspondence with an individual, which led to the hiring of that individual as a non-testifying consultant, this is plainly work product. The communications leading up to the consultant's engagement, and the agreements with the consulting expert are protected work-product under Rule 26(b)(3) and Suno has not made a showing that warrants lifting this protection.

## VI.   Documents Concerning Plaintiffs' Own Use or Development of AI Products

Suno seeks discovery into Plaintiffs' actual or potential use of third-party generative AI products, purportedly for the purpose of determining whether any dilution in Plaintiffs' market share might be partly attributed to Plaintiffs' own use of AI tools. Plaintiffs argue that Suno's request is irrelevant, overbroad, and disproportionate.

### Denied

It is conceivable that documents regarding Plaintiffs' own use of AI tools could generate discovery that would be pertinent to this case. But this is speculative. Assuming some such use of AI tools has occurred, the relevance of such use is tangential. As owners of the copyrights at issue, Plaintiffs' own uses are unlikely to implicate the kinds of copyright and fair use issues at stake in this litigation. On the other side of the scale, any potential evidentiary value is outweighed by the undue burden of identifying and collecting such information, not to mention the unnecessary intrusion into ongoing business activities of a potential competitor.

## VII.   Discovery Concerning Labels' Licensing Practices

Suno seeks production of: (a) internal documents and communications concerning Plaintiffs' efforts to impose "no AI" terms; and (b) communications with licensees regarding such provisions. Suno claims that it is entitled to learn about Plaintiffs' efforts to stem the market harm that Plaintiffs claim Suno may cause and, more generally, to understand how Plaintiffs leveraged their catalogs to obtain "no AI" terms.

### Denied

This dispute involves essentially the same questions as dispute I discussed above. That is, Suno seeks an open window into Plaintiffs' business operations on an ongoing basis. Suno's position rests largely on its legally tenuous, and factually unsupported "copyright abuse" theory and, to a lesser extent, on a generalized interest in understanding the nature of the "potential

9

market for or value of the copyrighted work[s]." 17 U.S.C. § 107. As discussed, the first premise is untenable in this case. The second premise is not sufficiently substantial to warrant an open-ended inquisition into Plaintiffs' business practices, in hopes of garnering some insight into Plaintiffs' views about the relevant "potential market." As such, this request is disproportionate to the needs of the case per Rule 26(b)(1).

## VIII.    Plaintiffs' Search Terms

Suno requests discovery into Plaintiffs' AI licensing strategy through ESI search terms that would include communications that do not mention "training" or "outputs." Plaintiffs argue that Suno's search terms will identify communications with and regarding non-generative AI companies, and provisions within agreements related to non-generative AI.

### *Denied*

Like dispute VII, the rationale for this request is largely the same as for dispute I. Suno proposes to deploy yet another broad net in order to dredge up a large amount of materials, presumably in hopes that among the dross would be some nuggets of value. For the reasons set forth with respect to I and VII , this request is disproportionate under Rule 26(b)(1); it would impose an open-ended production obligation implicating highly sensitive materials.

## IX.    Suno's Collection Start Date (Labeled "Relevant Temporal Scope of Collection")

Plaintiffs seek to expand Suno's collection start date from December 1, 2022, to January 1, 2022 for materials that concern obtaining and using copyrighted material as training data for generative AI models. Suno argues that this discovery may include discussions of data that Suno acquired in the past for different purposes and that, as such, it is not relevant to determining the legality of Suno's current music generative AI business model.

10

*Allowed in part, denied in part*

As with Suno's proposals to dredge a large quantity of materials in hopes of spotting nuggets of value, the request as proposed is disproportionate to the needs of the case under Rule 26(b)(1). That said, as noted at the hearing, there are specific topics that appear appropriate for targeted "go-get" discovery, without time limits. For instance, Plaintiff is entitled to pursue documents that refer to gathering information "legally" (whether in connection with Suno's current products or not) or that contrast such "legal" methods with other methods, such as "scraping like via You Tube."

## X.    Suno's Collection Cutoff

Plaintiffs seek to expand Suno's document production collection date to the present day for four categories of discovery materials:

A.  Suno's licensing of training data following its licensing agreement with Warner Music Group, as well as Suno's settlement agreement with Warner Music Group;

B.  The market for Suno's AI music generation service;

C.  The market for outputs generated using Suno's AI music generation service; and

D.  Suno's use of sound recordings to develop its AI models, including its most recently released commercial models v4.5, v4.5+, and v5.

Plaintiffs argue that there are substantial relevant materials postdating February 2025 relating to central topics in this litigation, and that they are proportional to the needs of the case because: (i) Suno continues to profit from unauthorized use of Plaintiffs' copyrighted works; (ii) Suno has developed or refined its AI technology using Plaintiffs' copyrighted works; and (iii) Suno has engaged in efforts to license other copyrighted works for training data.

11

Suno responds that it has already agreed to perform some additional discovery beyond the already completed collections, but that repeating discovery collection and review for the past twelve months is not proportional to the needs of the case.

At the discovery conference, I ruled on one category of information (evidence regarding Suno's settlement and licensing agreements with Warner Music Group) and left the remaining issues for further discussion by the parties

### A.      *Suno's settlement agreement with Warner Music Group*

### *Denied*

Plaintiff's request for documents regarding the Warner Music Group settlement and associated licensing is denied. F.R.E. 408 is not an absolute bar, but the relevance of this information is marginal and the potential for chilling settlements—in this and other cases—is high. As Suno argues, settlements of litigation have little persuasive bearing on identifying and characterizing markets for intellectual property.

### *Open for Ongoing Discussion by the Parties (B through D)*

The parties have indicated that they are continuing to discuss—and may seek further guidance from the Court regarding—the following issues:

B. The market for Suno's AI music generation service;

C. The market for outputs generated using Suno's AI music generation service; and

D. Suno's use of sound recordings to develop its AI models, including its most recently released commercial models v4.5, v4.5+, and v5.

I note that the open topics above do appear relevant. But it is not clear whether the best way forward is to repeat the entire process of discovery collection and review, or whether some other form of "go-get" discovery is the best mechanism for gathering the requested information. I leave this for the parties to sort out among themselves as they sort out the various open

12

discovery issues.  The parties are free to revisit the issue with the Court if further guidance, or a determinative ruling, is needed.

## XI.    Additional Custodians (Suno)

Plaintiffs seek to add two individuals to Suno's record custodians (Helena Caldwell, Head of Social Media; and Franklin Yang, Head of Growth). Plaintiffs contend that these individuals possess non-duplicative documents that will provide a window into Suno's efforts to impact and influence the market for its AI music generation services. Suno counters that the additional requests are a fishing expedition, and the additional custodians will not yield uniquely relevant, non-duplicative materials.

### *Denied.*

As I noted above with respect to *Suno*'s proposal to commence broad searches for documents held by additional custodians, Plaintiffs offer no persuasive argument that further custodial searches are likely to produce materials of significance. Follow-up requests should at this point be more in the nature of narrowly-tailored "go-gets" to flesh out particularly-identified conversations or correspondence. If Suno "is promoting itself as a service for users to generate outputs that compete with Plaintiffs' copyrighted works," Plaintiffs should be able to ascertain that fact from publicly available materials. Internal documents would be cumulative at best, and do not warrant adding additional custodians beyond those that Suno has already designated. This request is disproportionate to the needs of the case per Rule 26(b)(1).

## XII.    Suno's Responses to Plaintiffs' Third Set of Document Requests

Plaintiffs seek to require Suno to supplement search strings for four RFPs within their third set of RFPs. Plaintiffs contend that their proposed supplemental search strings will identify discrete promotional, marketing, and partnership activities. In particular, Plaintiffs seek to focus on Suno's marketing efforts in, and tracking of, various social media outlets. Plaintiffs also seek

13

information about a "collaboration" between Suno and producer/singer/songwriter Timbaland. Suno's primary objection is that the proposed search strings are duplicative of other productions, will yield much irrelevant material, and will be unduly burdensome.

At the March 12, 2026, discovery conference, I did not hear from counsel regarding the details of the search string controversy. Accordingly, I am not prepared to make a final ruling on the point.

I note that Suno appears to concede that many of the materials sought via the proposed search strings fall within the ambit of existing, uncontested, discovery requests. For example, Suno writes: "Documents related to use of paid partnerships to market Suno's AI service are necessarily included within 'All documents and communications relating to the marketing' of Suno's AI service. Indeed, Plaintiffs admit that RFP 97 is a 'narrowly focused' version of what RFP 32 already covers." *2026-03-09 Suno - Plaintiffs' Discovery Dispute Summaries.pdf* at 37–38. The gist of Suno's argument seems to be that, because search terms were previously agreed upon with respect to marketing materials, Plaintiffs shouldn't be allowed to come back and ask for more-particularly identified materials. *Id.* This species of "no backsies" logic doubtless has some force in discussions between the parties, but it has scant persuasive force for the Court, which is required to weigh discovery questions under Rule 26. Fed. R. Civ. P. 26.

There is no serious dispute that Suno's marketing—whether through social media or through "collaborations" with particular artists—is relevant. The mere fact that initially-agreed search strings may have failed to capture such particular kinds of marketing efforts does not change their relevance and discoverability. Whether a revised search string or some other form of "go-get" discovery is the best mechanism for gathering the requested information, I leave for

the parties to sort out among themselves. They are free to revisit the issue with the Court if further guidance, or a determinative ruling, is needed.

CONCLUSION

While the foregoing includes determinative rulings on several of the parties' discovery disputes (as to which an aggrieved party may seek review),[2] it does not resolve all open issues. As contemplated by Local Rule 37.1, the parties are encouraged to continue to confer, in order to narrow or eliminate open issues. The parties should—jointly, if possible—contact the Courtroom Deputy Clerk to schedule a further discovery conference, as needed.

/s/ Paul G. Levenson
Paul G. Levenson
U.S. MAGISTRATE JUDGE

Dated: April 6, 2026

---

[2] The parties are advised that under Rule 72(a) of the Federal Rules of Civil Procedure and Rule 2(b) of the Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts, any party seeking review by a district judge of these determination(s) and order(s) must serve and file any objections within fourteen days of being served a copy of this order, unless a different time is prescribed by the magistrate judge or the district judge. *See* Fed. R. Civ. P. 72(a). Such objections must specifically designate the order, or part, to be modified or set aside and the basis for objection. The district judge will set aside any portion of the magistrate judge's order that is found to be clearly erroneous or contrary to law. The parties are further advised that failing to follow the objection procedures of Rule 2(b) may preclude further appellate review. *See Phinney v. Wentworth Douglas Hosp.*, 199 F.3d 1, 4 (1st Cir. 1999); *Sunview Condo. Ass'n v. Flexel Int'l, Ltd.*, 116 F.3d 962, 964–65 (1st Cir. 1997).