# Exhibit 2

**Britt Lovejoy**
Direct Dial: +1.415.646.8329
britt.lovejoy@lw.com

505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Tel: +1.415.391.0600  Fax: +1.415.395.8095
www.lw.com

# LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

March 6, 2026

Honorable Paul G. Levenson,
United States Magistrate Judge
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 2300
Boston, Massachusetts 02210

Re: *UMG Recordings, Inc., et al. v. Suno, Inc. et al.*, No. 24-cv-1161-FDS (D. Mass.)

Dear Judge Levenson,

Suno respectfully requests to discuss the two discovery disputes summarized below at the parties' upcoming March 12 discovery conference. If the Court would prefer, Suno will work with Plaintiffs to promptly submit joint dispute statements before the discovery conference is scheduled.

## 1.  Discovery Concerning Labels' Licensing Practices

**Suno's Position:** Plaintiffs refused discovery into the weaponization of their copyrights to stifle generative AI, claiming Suno's allegations were unfounded. But UMG's Chief Digital Officer, Michael Nash, recently confirmed UMG leveraged its catalog to pressure licensees not to host outputs from generative AI models. Dkt. 28 at 12; Dkt. 150-1. UMG removed its catalog from TikTok (for traditional social media uses) until TikTok abandoned a plan allowing "AI content on the TikTok platform [to] get paid on the same basis as artists' [music]." *See* UMG's Chief Digital Officer Talks Udio Deal, Suno Lawsuit — And What Really Happened With TikTok in 2024.

████████████████████████████████████████████████████████

█████████████████ *See, e.g.,* UMG_SUNO_00022668 (████████████████████████████████████ [1]); UMG SUNO 00022763 (████████████████████████████████

███████████████████████████████████████████████████████████);
SONY_SUNO_00018020 (████████████████████████████████████████████████████

███ ███████ █████ ████████ ██████). These provisions are not limited to "unauthorized" AI models.  UMG SUNO 00022668 (████████████████████████

████████████████████████████████████████████████████

█████████); UMG_SUNO_00022763 & SONY_SUNO_00018020 (similar). ████████

---

[1] Materials highlighted in grey have been designated "Highly Confidential – Outside Counsel Only" under the Protective Order.

**LATHAM&WATKINS**LLP



Regarding takedown provisions, the parties may have a legal dispute about whether requiring licensors to remove *non-infringing* music generated by unlicensed AI models from their platforms constitutes copyright misuse. But Plaintiffs cannot preclude *discovery* because of that dispute. ████ ███ ████ ████ ████ ████ ████ ████ ████ ██ ████ ██ *See, e.g.,* UMG_SUNO_00017616 (

Plaintiffs' productions reveal they demanded restrictions on AI content as the price of licenses for their licensees' traditional uses.  Suno will establish that this constitutes copyright misuse at summary judgment, but it certainly justifies discovery.  *Cf.* 7/31/2025 Hr'g Tr. at 23:21-24:21 (ordering Plaintiffs to produce agreements containing a "No AI" provision and leaving the door open to further discovery).  These restrictions are also relevant as they prevent alleged market "dilution" from AI-generated outputs—Plaintiffs' theory of harm under the fourth fair use factor— as Plaintiffs' statements confirm.  *See infra* (referring to provision as "a measure to address UMG's longstanding concerns regarding dilution").  Despite Plaintiffs' argument that Suno has all the discovery it needs about these provisions, Suno is entitled to communications confirming the agreements eradicate the very market harm Plaintiffs claim or revealing how Plaintiffs leveraged their catalogs to obtain these terms.  Suno respectfully requests the Court order production of: (a) internal documents/communications concerning Plaintiffs' efforts to impose "no AI" terms; and (b) communications with licensees regarding such provisions.

Suno also requests documents and communications regarding whether and under what conditions Plaintiffs will license their catalog to train a generative AI model.  Nash's statements reveal that UMG will not license its works to generative AI companies like Suno, which is relevant to Suno's defenses. [UMG's Chief Digital Officer Talks]("[g]etting platforms to agree to a 'walled garden' approach, meaning that users…can play with AI music in the service, but cannot take it out of the service'"; "walled garden" is "kind of a hat-hanger in" discussions regarding licensing *to Suno*). Where Plaintiffs disclose these strategies to the press and competitors, any claim that discovery into this topic is too "sensitive" should be rejected.  Further, that UMG has chosen to disclose its licensing strategies to Sony is itself relevant to Suno's concerted refusal to deal theory.  *See United States v. Apple Inc.*, 952 F. Supp. 2d 638, 650–53 (S.D.N.Y. 2013) (defendants used public announcements of policies to pressure competitors to collude).

UMG's communications with Billboard concerning Nash's interview are separately responsive to Suno's request for "Communications between [Plaintiffs] and members of the press . . . regarding Suno and/or this Litigation."  Suno respectfully requests the court also order their production.

**Plaintiffs' Position:** The Court should deny Suno's requests because it has already considered and rejected substantially identical requests into Plaintiffs' licensing negotiations on two separate

**LATHAM&WATKINS** LLP

occasions. Nothing Suno now offers constitutes a changed circumstance warranting reconsideration.

The Court has twice rejected Suno's requests for expansive discovery into Plaintiffs' negotiations over AI restrictions. Last summer, the Court expressed skepticism that "the prehistory of each of these contract clauses is ultimately going to bear much . . . or be worth the effort," and conditioned any further discovery on Plaintiffs' productions revealing something warranting further inquiry. July 31, 2025 Hr'g. Tr. at 23:17-23. Then in the fall, the Court voiced concern that Suno was "hypothesizing generally" about "a massive antitrust conspiracy while proposing to ingraft a rather wide ranging antitrust … inquisition" into a "discrete civil case," based on "very open-ended inquiries" with "tremendous potentially offsetting concerns regarding otherwise confidential business strategy that's going to be intertwined with litigation strategy[.]" Oct. 10, 2025 Hr'g Tr. at 4:10-17, 12:16-18. Suno's latest bite at the apple does not warrant a different outcome.

Suno's reliance on Michael Nash's interview does not constitute a changed circumstance meriting reconsideration. UMG publicly disclosed its negotiating position with TikTok in a January 30, 2024 open letter identifying "protecting human artists from the harmful effects of AI" as one of three critical issues and specifically objecting to the platform being "flooded with AI-generated recordings" and "massively dilut[ing] the royalty pool for human artists." UMG has also produced the agreement that resulted from these negotiations. Nash's interview merely restates positions UMG has publicly maintained for over two years and that are reflected in documents Suno already possesses. A public reiteration of UMG's known position is not a revelation that warrants revisiting prior rulings. Suno has ample information to probe UMG's negotiations with TikTok, without burdening UMG to search for and produce additional sensitive negotiation communications.

Suno mischaracterizes Plaintiffs' licensing agreements to manufacture a basis for sweeping discovery, but their plain language refutes Suno's claim that Plaintiffs have imposed blanket "no AI" restrictions on licensees.

LATHAM&WATKINS LLP

Suno's other purported justifications for this discovery are equally unavailing. Suno cites *United States v. Apple Inc.*, 952 F. Supp. 2d 638 (S.D.N.Y. 2013) for its "concerted refusal to deal" theory, but *Apple* involved extensive direct evidence of coordinated conduct. *Id.* at 650-53, 674. Suno has identified nothing remotely comparable here. Suno's continued speculation regarding copyright misuse rests on little more than statements voicing UMG's well-known priorities about protecting human artistry from unlicensed AI training.

Likewise, Suno's fair use argument fails. Suno suggests that any restrictive AI provisions bear on market dilution under the fourth fair use factor. Even if we were to accept Suno's premise, it does not warrant expansive discovery into the negotiation history of these provisions. Suno has the provisions themselves, as well as Plaintiffs' catalog-wide consumption metrics, royalty payouts, and market share data on DSPs. Suno thus has all the materials necessary to assess the efficacy of any mitigation efforts, though Plaintiffs do not believe that such efforts have any bearing on the fourth fair use factor. Nor has Suno explained the relevance of UMG's communications with Billboard about a public interview.

Finally, the breadth of Suno's requests would impose an open-ended production obligation implicating highly sensitive materials, while Suno continues to refuse to update its own custodial document productions beyond February 2025.

Consistent with its prior rulings, the Court should deny Suno's requests in their entirety.

## 2. Plaintiffs' Search Terms

**Suno's Position:** Plaintiffs' discovery tactics follow a consistent pattern: nominal agreement to produce relevant documents, followed by strategic limitations (including with search terms) to withhold the most damaging materials. This pattern is particularly acute—and particularly prejudicial to Suno—with respect to AI licensing discovery. While theoretically agreeing to produce documents responsive to Suno's RFPs regarding AI licensing, Plaintiffs have gerrymandered their discovery positions to exclude highly relevant documents. As discussed in issue 1, supra, they have improperly refused to produce crucial internal communications regarding AI licensing. And, as Suno's January 23, 2026 letter details, Plaintiffs have refused to produce all post-Complaint communications relating to unsuccessful AI deals (while producing an additional 17 months of executed deals Plaintiffs intend to rely on) and rejected Geoff Taylor (Sony) and Nicola Levy (UMG) as custodians—despite identifying them as individuals with principal responsibility for negotiating AI licensing deals, and despite actually collecting responsive documents from them through targeted collections. Plaintiffs also refuse to agree to reasonable ESI search terms related to AI licensing. As discussed above and elsewhere, these materials are crucial to Suno's copyright misuse and fair use defenses, especially Suno's argument that there is no market to license training data for a music-generative AI model like Suno's (and, therefore, that Suno's use cannot have harmed Plaintiff' market, *see* 17 U.S.C. § 107(4)). If the Court agrees that Plaintiffs have improperly withheld documents and communications related to AI licensing, it should also require Plaintiffs to expand their search terms to capture relevant materials.

The present search terms dispute underscores Plaintiffs' dilatory tactics. After a year of negotiations, Plaintiffs agreed in November to propose new search terms to identify documents

**LATHAM&WATKINS**LLP

and communications related to AI licensing (including finally dropping their insistence that "AI" be within two words of "generative")—but then failed to do so for months. *See* Nov. 6, 2025 A. Perry Email. Even now, Plaintiffs continue to insist on including a (w/10 (train* or output*)) term. Plaintiffs' argument that Suno's proposal would capture communications about "non-generative AI companies" misses the point: as the Court recognized last July, Plaintiffs themselves do not distinguish between generative and non-generative AI in internal communications. Plaintiffs' improper exclusion of communications that do not mention "training" or "outputs" creates the same problem: this does not reflect how Plaintiffs actually discuss AI deals. *See, e.g.,* UMG_SUNO_00016633 (mentioning "▬▬▬▬▬"); UMG_SUNO_00022936 (email stating "▬▬▬▬▬▬▬▬▬▬")[2] And Plaintiffs refuse to negotiate further, claiming they have completed their production. Plaintiffs' proposals and Suno's counterproposals are below.

| Plaintiffs' Proposal | Suno's Proposal |
|---|---|
| ((AI OR "artificial intelligence" OR genAI OR "machine learning" OR "machine intelligence")<br><br>w/10 (train* OR output*))<br><br>w/10 (licens* OR agreement* OR contract* OR deal* OR settle* OR partner* OR negotiat* OR draft* OR "term sheet" OR termsheet) | ((AI OR "artificial intelligence" OR genAI OR "machine learning" OR "machine intelligence")<br><br>w/10 (licens* OR agreement* OR contract* OR deal* OR settle* OR partner* OR negotiat* OR draft* OR "term sheet" OR termsheet) |
| (("Suno" OR AI OR "artificial intelligence" OR genAI OR "machine learning" OR "machine intelligence")<br><br>w/10 (song* OR output*))<br><br>w/10 (apple OR spotify OR soundcloud OR tidal OR deezer OR youtube OR amazon OR TikTok OR distributor OR DistroKid OR "streaming service*" OR "streaming platform" OR "digital service provider" OR DSP*) | (("Suno" OR AI OR "artificial intelligence" OR genAI OR "machine learning" OR "machine intelligence")<br><br>w/10 (song* OR output* OR track* OR music* OR upload* OR content* Or catalog* OR audio*))<br><br>w/10 (apple OR spotify OR soundcloud OR tidal OR deezer OR youtube OR amazon OR TikTok OR distributor OR DistroKid OR "streaming service*" OR "streaming platform" OR "digital service provider" OR DSP*) |

Suno stands ready to discuss additional narrowing proposals, including excluding obviously irrelevant terms (e.g., "daily clips") or discussing a narrower connector for particular terms. But

---

[2]  Suno is not back for another bite at the apple; Suno accepted Plaintiffs' "w/10" connector.

LATHAM&WATKINS LLP

high hit counts alone do not constitute an undue burden, particularly given the centrality of these documents to Suno's defenses and Plaintiffs' acknowledgment that AI licensing discovery is warranted. *Cf.* Fed. R. Civ. P. 26(b)(1) (factors to consider in assessing proportionality); *see also United Ass'n Nat'l Pension Fund v. Carvana Co.*, 2026 WL 266600, at *5 (D. Ariz. Feb. 2, 2026) (requiring term with  81,000 hits because it reflected the language used  internally).  Indeed, the high hit counts confirm that there are far more potentially responsive documents than Plaintiffs have produced.

**Plaintiffs' Position:** Suno previously submitted a dispute to the Court focused on Plaintiffs' search strings, including variations of the two found above.  *See* July 10, 2025 Letter from B. Lovejoy. Suno raised multiple "issues", including the "generative" limiter for documents discussing AI, and the use of "w/10" connectors.  During the July 31, 2025 hearing, the Court stated that the "generative AI" restriction was too narrow, and Plaintiffs amended their search strings accordingly.  *See* July 31, 2025 Hr'g Tr. at 22:5-7.  In contrast, the Court did not make the same ruling regarding Plaintiffs' use of connectors.[3]  Yet, Suno has decided to re-raise this dispute months later to get another bite at the apple, like several other disputes that are currently pending. Suno's request should be denied.

As an initial matter, Suno has clearly framed this dispute as a request to expand Plaintiffs' search terms *only if* Plaintiffs are ordered to produce additional discovery into their AI licensing practices. If Plaintiffs are not so ordered, then this request must also be denied.  But even if Suno is successful and Plaintiffs are ordered to expand discovery, Suno's broad search strings are not necessary or proportionate to the needs of the case.

The first search string identified by Suno was crafted by Plaintiffs to identify documents responsive to RFP 29, including documents and communications with third parties concerning any executed or potential license or agreement, including drafts, related to the use of sound recordings to train any generative AI model or for use in the outputs of any generative AI model.  If Plaintiffs are ordered to produce the categories of documents identified by Suno, including (i) internal communications, (ii) documents post-dating the Complaint, or (iii) documents from additional custodians, this search string is clearly sufficient for these purposes.

In contrast, Suno's proposal effectively seeks all documents and communications relating to Plaintiffs' licensing practices as a whole.  Specifically, the search is crafted to identify all documents that mention the term "AI" and terms related to dealmaking, including "agreement" "deal" and "negotiate."   This is clearly overbroad, as it will identify documents and communications with or about non-generative AI companies, and provisions within agreements related to non-generative AI.  Suno offers no explanation as to what documents relevant to its

---

[3] Suno's claims regarding "dilatory tactics" is without merit.  Suno itself essentially raised this very dispute in *July of 2025* yet notably failed to raise this particular aspect of the dispute during the hearing, even when provided the opportunity.  This conduct reflects a recurring pattern in which Suno requires the parties to fully brief discovery disputes that are never ultimately submitted to the Court for resolution, a waste of time and resources.

**LATHAM&WATKINS**LLP

defenses would not be captured by Plaintiffs' search string, or why expanding Plaintiffs' search this significantly is proportionate to the needs of the case.

With respect to the second disputed search string, the main focus is proportionality. This search string was crafted to identify documents responsive to RFP 49, or documents and communications related to users publishing Suno-generated outputs on music streaming services. While the presence of AI-generated outputs on streaming services is an aspect of Plaintiffs' rebuttal to Suno's fair use defense, the relevant information on this subject is not likely to reside within the files of Plaintiffs' custodians. Indeed, the majority of the documents that Plaintiffs have produced in response to this RFP have been news articles. Plaintiffs have already reviewed approximately 13,000 documents using their search string. This is more than sufficient for the purposes of the Plaintiffs in this case.

To be clear, this search string is not related to Plaintiffs' AI licensing practices, and thus Suno has articulated no reason why Plaintiffs' proposal is insufficient or what responsive documents it believes Plaintiffs' string excludes. In addition, it is notable that the only two documents that Suno has cited in support of its request to expand the scope of discovery significantly relate to or were produced by UMG. Accordingly, Suno has not offered any support for its contention that Plaintiffs' search terms are insufficient with respect to Sony.

| Suno's Proposal | Additional Documents |
|---|---|
| String 1 | Suno's requested search term hits on approximately 29,026 documents in *addition* to those which Plaintiffs have already reviewed. This number will be much greater if Plaintiffs are ordered to expand the relevant timeframe. |
| String 2 | Suno's requested search term hits on approximately 6,720 documents in *addition* to those which Plaintiffs have already reviewed. This number will be much greater if Plaintiffs are ordered to expand the relevant timeframe. |

*/s/ Brittany N. Lovejoy*