**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UMG RECORDINGS, INC., CAPITOL RECORDS, LLC, and SONY MUSIC ENTERTAINMENT,<br><br>    Plaintiffs,<br><br>vs.<br><br>SUNO, INC., and JOHN DOES 1-10,<br><br>    Defendant. | Case No. 1:24-cv-11611-FDS |

## JOINT DISCOVERY DISPUTE STATEMENTS

7354215

| | **RAJAN S. TREHAN** | rtrehan@hueston.com<br>D: 213 788 4543<br>T: 213 788 4340<br>F: 888 866 4825 | 523 West 6th Street<br>Suite 400<br>Los Angeles, CA 90014 |
|---|---|---|---|

# HUESTON HENNIGAN LLP

January 26, 2026

Honorable Paul G. Levenson
United States Magistrate Judge
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 2300
Boston, Massachusetts 02210

Re:    *UMG Recordings, Inc. v. Suno, Inc.*, No. 24-cv-11611-FDS (D. Mass)v

Dear Judge Levenson:

I represent Plaintiffs in *UMG Recordings Inc. v. Suno, Inc.*  No. 1:24-CV-11611-FDS. Plaintiffs would like to request a conference to discuss several discovery disputes. Please find below a brief summary of the first dispute.  For the Court's awareness, Plaintiffs intend to raise four additional disputes within the next few days.  If the Court would prefer, Plaintiffs can work with Suno to prepare and promptly submit full joint position statements before the conference is scheduled.

**Relevant Temporal Scope of Collection:**

**Plaintiffs' Position:**
Thus far, Suno has limited its production to documents dated after December 1, 2022.  Suno claimed that this date represented the beginning of the technical development and ideation of Suno's "music-generative AI models built on the architecture that Plaintiffs put at issue in the Complaint."  But discovery has demonstrated that this start date is likely to omit highly relevant information pertaining to issues at the heart of the case.  Plaintiffs obtained several documents from one of Suno's early investors, Founder Collective, that summarize discussions they had with Suno's co-founders, going back to at least June 2022 (that is, approximately six months before Suno's current collection start date).  In one such document, ███████████████████████████████████████████████████████████████████████████████ FC0005906.   This document confirms that as early as mid-2022, Suno was communicating with potential investors about the legality of using copyrighted material as training data for generative AI models.  It also demonstrates that at some point between June 2022 and December 2022, Suno reversed its approach to data sourcing and apparently deemed it appropriate to stream-rip reams of Plaintiffs' copyrighted works from YouTube.  Shortly after discovering this evidence, Plaintiffs requested that Suno expand its collection to January 1, 2022,

0

Judge Levenson
January 26, 2026
Page 2

# HUESTON HENNIGAN LLP

to ensure that Suno has identified and produced all responsive documents, but Suno has refused without asserting any specific burden that would result from Plaintiffs' request. Because documents and communications reflecting Suno's knowledge and beliefs regarding the legality of using sound recordings to train a generative AI model, and Suno's change of heart concerning the unauthorized acquisition and use of Plaintiffs' sound recordings are plainly relevant and responsive to Plaintiffs' discovery requests, Suno must expand its collection timeframe to January 1, 2022.

To be clear, Plaintiffs are not requesting that Suno identify documents and communications from this expanded timeframe that concern the ideation or creation of Suno's earlier models, which were not music-generative AI models and not trained on Plaintiffs' copyrighted works. Rather, Plaintiffs are requesting that Suno collect and produce documents and communications for the time period beginning on January 1, 2022 that concern obtaining and using copyrighted material as training data for generative AI models, including specifically scraping from YouTube, or Suno's determination that it could not develop an AI service that creates desirable outputs without using such material.[1] Such a limited scope ensures proportionality given the importance of the issues at stake, including obtaining the necessary discovery to establish willfulness. *See* Fed. R. Civ. P. 26(b)(1) (Proportionality depends on "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."). Plaintiffs' request is thus both narrowly tailored and proportional to the needs of the case.[2]

While Suno repeatedly mentions how many documents it has produced throughout this letter, Plaintiffs must clarify that, based on their review, Suno has only produced approximately 4,300 internal email chains and 3,000 substantive Slack discussions. More than half of the email chains are sent by internal listservs, which appear to be focused on providing information regarding communications sent by Suno customers. The vast majority of the documents that Suno has produced appear to be random communications sent by users of their service, mostly regarding billing issues. The present dispute is targeted to matters likely to result in the production of additional internal communications that focus on the topics at the heart of the case.

**Suno's Position:**

---

[1] Plaintiffs are entitled to discovery into the methods by which Suno obtained the copyrighted materials that it infringed, regardless of the Court's ruling on Plaintiffs' pending motion for leave to amend the Complaint to add a claim for violation of Section 1201 of the Digital Millenium Copyright Act.

[2] While not relevant to this dispute, Plaintiffs' must clarify Suno's claims regarding their collection efforts. Plaintiffs have already agreed to expand their collection for several categories of documents, including documents and communications related to several third-party licensing agreements. The parties are also continuing to confer regarding expanding both parties' collections for additional categories of documents. Thus far, Plaintiffs have produced approximately 7,300 documents, with an additional 1,500 being produced this week.

## HUESTON HENNIGAN LLP

For Plaintiffs to be making any complaint about the temporal scope of Suno's productions is astounding given that Plaintiffs unilaterally cut their own production off at the date of the Complaint while reserving the right to supplement the record with any documents created thereafter that they intend to rely on—to say nothing of the fact that each Plaintiff has produced only a few thousand custodial documents (UMG 3,225 and Sony 4,785). Against that backdrop, Plaintiffs' challenge to Suno's long-disclosed and well-founded discovery start date is particularly unreasonable. Indeed, Suno has collected documents beginning in December 2022, more than a year before its public launch, and has produced nearly 37,600 documents.

As Suno explained to Plaintiffs, the single document they cite in their position statement, FC0005906, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As Plaintiffs note, "Suno is a young business." It is unsurprising that a startup tried multiple endeavors before finding its footing. Because of this, the parties have long agreed that documents and communications about Suno's previous endeavors that do not involve music generative AI models are not relevant to this litigation. *See* J. Cammack March 18, 2025 Email to A. Perry (noting, as a proposal to resolve a pending motion to compel, that for the purposes of document discovery Suno interprets "AI Models" to involve public and non-public "music-generative AI models" (emphasis added)); A. Perry March 19, 2025 Email to J. Cammack (stating that "Plaintiffs are amenable to Suno's proposal concerning the dispute over the definition of AI Models").

Plaintiffs insist that they are solely seeking documents concerning "Suno's knowledge and beliefs regarding the legality of using sound recordings to train a generative AI model," but this explanation does not add up because FC0005906 is not about training a generative AI model. Rather, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Notably, the document also isn't about Suno's beliefs about the legality of scraping speech data from YouTube—the quote above is a statement made by an investor evaluating Suno's product, on an email thread Suno is not even participating in. This document thus cannot justify an additional eleven months of discovery to search for hypothetical documents about Suno's beliefs regarding the legality of scraping data from YouTube to train a music generative AI model (an issue not even presently before the Court, *see infra*), particularly when the scope of Suno's collection already stretches back more than a year before its product at issue here launched.

Indeed, contrary to Plaintiffs' position, the purpose for which data was acquired matters to the scope of discovery. Data that may have been acquired in the past for a wholly different purpose is not relevant to determining the legality of Suno's current music generative AI business model, which is the only subject of Plaintiffs' Complaint. *See Andersen v. Stability AI Ltd.*, No. 23-cv-00201, Dkt. 314 at 1 (N.D. Cal. June 27, 2025) (rejecting Plaintiffs' request for training data set not identified in Plaintiffs' complaint because the request "is at odds with the scope of the operative complaint"); *see*

Judge Levenson
January 26, 2026
Page 4

# HUESTON HENNIGAN LLP

*also Kadrey v. Meta Platforms, Inc.*, No. 23-cv-03417, 2025 WL 1752484, at *12 (N.D. Cal. June 25, 2025) (concluding when analyzing the first fair use factor that the nature and purpose of data acquisition must be considered together with the ultimate end use of the data). Insofar as this discovery is directed at Plaintiffs' proposed claim that Suno's alleged method for obtaining training data from YouTube violated Section 1201 of the Digital Millenium Copyright Act, that is a claim Plaintiffs have not yet successfully added to this case. *See* Dkts. 126 (Plaintiffs' motion for leave to amend their Complaint to add a DMCA claim); 131 & 157 (Suno's opposition and sur-reply). Indeed, Plaintiffs admit that they are seeking information about Suno's views on "scraping from YouTube" unrelated to Suno's efforts to build a music generative AI model—the conduct that is the target of Plaintiffs' current operative complaint.

Further, the hypothetical existence of an email where Suno's non-lawyer founders comment on the legality of obtaining training data in the context of an entirely different product does not justify extending the discovery cutoff date back another eleven months, such that the start date for discovery is two years before Suno launched its music generative AI product. Any non-privileged documents and communications regarding Suno's perspective on the legality of acquiring data to create a music generative AI model, the business practice at the core of this litigation, are already captured by the existing discovery timeframe—which Plaintiffs do not dispute.

Finally, Plaintiffs' generalized argument that Suno somehow hasn't produced enough documents in this litigation is wrong on both facts and reasoning: as Plaintiffs concede, Suno has produced over 7,000 *internal* documents, a number which actually belies the amount of content produced since that "document" count includes lengthy Slack discussions covering 24-hour periods. Plaintiffs, on the other hand, have produced fewer than 5,000 emails *total*—with UMG producing 1,680 and Sony producing 2,357 only—far fewer when accounting for only internal emails that are not newsletters.[3] And anyway, Plaintiffs are not entitled to additional discovery unrelated to the business model and alleged infringement at issue simply because the amount of produced documents in this case has not hit whatever arbitrary, one-sided, and unstated number Plaintiffs deem sufficient.

Sincerely,

Rajan S. Trehan

---

[3] Plaintiffs' custodians do not appear to use Slack, and so Plaintiffs' production does not contain the sort of voluminous, day-long Slack threads that Suno's does, each of which is counted as a single "document."

0

**MOEZ M. KABA**

mkaba@hueston.com
D: 213 788 4543
T: 213 788 4340
F: 888 866 4825

523 West 6th Street
Suite 400
Los Angeles, CA 90014

# HUESTON HENNIGAN LLP

March 9, 2026

Honorable Paul G. Levenson
United States Magistrate Judge
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 2300
Boston, MA 002210

Re:     *UMG Recordings, Inc. et al. v. Suno, Inc. et al.*, No. 24 Civ. 11611 (FDS) (D. Mass)

Dear Judge Levenson:

The parties write jointly to bring to the Court's attention three discovery disputes.  The parties have met and conferred extensively regarding each dispute, but have reached an impasse and request an informal Zoom conference to seek the Court's guidance.

## I.     <u>Suno's Collection Cutoff</u>

### A.     **Plaintiffs' Position**

Within the past three months alone, Suno has executed at least one agreement to license sound recordings as training data, touted to investors that its users generate a Spotify catalog's worth of outputs every two weeks, and raised $250 million at a valuation of $2.45 billion. These recent, salient events (and others of a similar nature) are indisputably relevant to the issues presented in this litigation, including the fundamental issue on which this case will turn—whether Suno's unauthorized use of Plaintiffs' works to train its AI models is fair use. Yet, Suno has insisted that it need not collect documents beyond its current cutoff date of February 2025. Suno's position is untenable and deprives Plaintiffs of critically relevant evidence pertaining to, among other things, Suno's ongoing use of Plaintiffs' sound recordings as training data, currently operative AI models, efforts to license copyrighted works as training data, and ongoing market impact. Because Suno cannot artificially truncate the record using an arbitrary collection cutoff, the Court should direct Suno to supplement its document productions through present day (as Plaintiffs have offered to do for several pertinent topics) and produce information responsive to the following four categories:

1. Suno's licensing of, or contemplated licensing of, training data, including sound recordings, including but not limited to Suno's plans to alter its business and/or AI music generation service following its licensing agreement with Warner Music Group, as described here: https://www.wmg.com/news/warner-music-group-and-suno-forge-groundbreaking-partnership;

2. The market for Suno's AI music generation service, including but not limited to any metrics, projections, forecasts, or analyses relating to Suno's business performance or the use of Suno's AI music generation service;

# HUESTON HENNIGAN LLP

3. The market for outputs generated using Suno's AI music generation service, including but not limited to Suno's most popular outputs, Suno's most popular users, and documents reflecting the presence of Suno outputs on music streaming services and social media platforms; and

4. Suno's use of sound recordings to develop its AI models, including but not limited to Suno's source code, training data, training runs, model weights, and model checkpoints for its most recently released commercial models v4.5, v4.5+, and v5.

In assessing whether Suno should expand its document production timeframe, the Court should be guided by the principles of relevance and proportionality set forth in Federal Rule of Civil Procedure 26(b)(1). *See, e.g., Parker Waichman LLP v. Salas LC*, 328 F.R.D. 24, 26 (D.P.R. 2018) ("If there is some legitimate relevance to the requested information and if no cognizable privilege attaches, it ought to be discoverable- at least in the absence of some countervailing consideration, e.g., that production would be disproportionately onerous or burdensome, that unfair prejudice would result, or the like."). Here, there can be no doubt that Suno possesses substantial relevant materials postdating February 2025 relating to various central topics in this litigation. Updating Suno's documents productions is also proportional to the needs of the case, in light of the wealth of recent evidence indicating that Suno has continued to leverage and profit off its unauthorized use of Plaintiffs' copyrighted works, made significant developments in its AI technology using Plaintiffs' copyrighted works, and engaged in active efforts to license copyrighted works as training data.

*First*, it is clear that Suno has been tracking—indeed, promoting—the market impact of its AI music generation service through present day. By way of example only, recent public reporting postdating Suno's collection cutoff reflects that Xania Monet, an AI-generated artist using Suno's service, signed a $3 million record deal (https://www.ebony.com/xania-monet-ai-artist-record-deal/) and the Velvet Sundown, another AI-generated artist using Suno, went viral and amassed more than 1 million streams on Spotify in a matter of weeks (https://www.theguardian.com/technology/2025/jul/14/an-ai-generated-band-got-1m-plays-on-spotify-now-music-insiders-say-listeners-should-be-warned). These materials are central to assessing the fourth fair use factor, pertaining to "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4); *see also Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985) (describing the fourth fair use factor as "undoubtedly the single most important element of fair use"). Plaintiffs filed the instant copyright infringement lawsuit within six months of the launch of Suno's AI music generation service. Plaintiffs took this swift action, in part, out of concern that Suno's unlawful use of their works would empower commercial AI models capable of generating competing musical outputs at a dizzying rate. Those concerns have been realized, as the available evidence suggests Suno's market presence has grown in the approximately year and a half since Plaintiffs initiated this suit and that Suno's users are deliberately generating outputs that compete with Plaintiffs' copyrighted works on various platforms. Suno is keenly aware of the impact it is having on the market and has advertised its recent performance and business trends to investors as part of active fundraising efforts. As just an example, Suno emphasized in a recent pitch deck that its AI music generation service presently ███████

███████████████████████████████████████████████████████████████████████████████████

███████████ Notably, Plaintiffs did not receive this deck from Suno itself; rather, they received it from Menlo Ventures (one of Suno's investors) in response to a third-party subpoena. Suno cannot evade its obligation to produce responsive materials and shift the burden of production onto other third parties.

# HUESTON HENNIGAN LLP

*Second*, Suno has been actively developing and updating its AI model technology since February 2025. To date, Suno has agreed to produce documents regarding its commercial AI models only up to v4, which was released in November 2024. Since then, Suno has released three additional AI models (v4.5, v4.5+, and v5) that it trained using Plaintiffs' sound recordings, each of which Suno maintains is outside the bounds of discovery merely because Suno released them after the date it first collected documents. Suno's release of these new commercial models are material events that trigger Suno's ongoing obligation to supplement its document productions. *See* Fed. R. Civ. P. 26(e) (stating that a party "*must* supplement or correct its disclosure" if it "learns that in some material respect the disclosure is incomplete or incorrect"); *see also Virtek Vision Int'l Inc. v. Assembly Guidance Sys., Inc.*, 344 F.R.D. 141, 149 (D. Mass. 2023) ("[T]he duty to supplement applies to responsive documents that are created after a party has served a response to a discovery request"). Suno's position is also highly prejudicial because it inhibits Plaintiffs' ability to understand how Suno used Plaintiffs' recordings to train and refine the AI models underpinning the currently operative version of its commercial service. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████ Plaintiffs are entitled to discovery into the reasons for this policy change, which Suno made mid-stream during this litigation, including whether ████████████████████████████████████████████ . Additionally, Suno could have used Plaintiffs' copyrighted works in any number of distinct ways to develop its most recent commercial models, including training on *more* of Plaintiffs' copyrighted works or affording more weight to Plaintiffs' works in training these models. Suno's position effectively forecloses discovery into the specifics of Suno's recent and ongoing use of Plaintiffs' copyrighted works.

Suno argues that expanding discovery to encompass its most recent commercial models would not facilitate the efficient and orderly progress of this matter. But Suno's position cannot be squared with its supplementation obligations under Rule 26(e) or with Plaintiffs' current request, considering they presently seek only information about the commercial AI models Suno has deployed during the course of this litigation. Plaintiffs are not pursuing discovery regarding any internal-only, research-only, or non-public models Suno may have developed in this process. Suno has represented to Plaintiffs that its model development process is "highly iterative" and that for each publicly-available model "there may be ██████████████ that were never released to the public." *See* March 14, 2025 Declaration of Georg Kuscko ¶ 7. Mindful of the need to progress discovery forward, Plaintiffs are not currently asking Suno for comprehensive information into the iterative process Suno underwent to develop its commercial models (though Plaintiffs do not waive their rights to seek further information if the circumstances warrant). Plaintiffs simply seek to ensure that discovery in this matter captures the full scope of Suno's commercial use of Plaintiffs' copyrighted works, which has meaningfully continued since February 2025.

*Third*, Suno is also withholding critical information about its recent efforts to license copyrighted works to train its AI models. Suno's initial decision to steal the copyrighted works on which it trained is, of course, the misconduct at the heart of this case. In service of its fair use defense, Suno has argued throughout this litigation that there is no viable market for licensing sound recordings as training data. Suno has also argued that Plaintiffs should not be permitted to enforce their copyrights in the asserted works because they supposedly engaged in a group boycott of Suno and other AI companies. Yet, in November 2025, Suno participated in the very market it claims does not exist when it struck a deal with Warner Music Group (a former Plaintiff in this case) to license sound recordings to train new AI models. Any licensing fee reflected in this agreement necessarily bears on the value for licensing sound recordings as training data, which has implications for both the fourth fair use factor and Plaintiffs' damages claims. Suno's dealings

# HUESTON HENNIGAN LLP

with Warner also raise critical questions about Suno's theory of copyright misuse predicated on a supposed concerted refusal to deal amongst the Plaintiffs.

Thus, Suno's agreement to license copyrighted works as training data is another material event that triggers Suno's supplementation obligations under Rule 26(e).  *See Virtek Vision*, 344 F.R.D. at 140.  Yet, when Plaintiffs asked Suno for discovery regarding this deal, Suno refused on the basis that discovery into the agreement is "overly burdensome and disproportionate to the needs of the case."  P. Sanders Jan. 9, 2026 Email.  Suno adopted this astounding position despite simultaneously seeking comprehensive information about Plaintiffs' own efforts to license sound recordings to train generative AI models, including with respect to unexecuted licensing agreements.  The parties discussed Suno's request for extensive licensing materials during the October 10, 2025 discovery hearing, during which the Court recognized that Suno's "open-ended inquiries" into Plaintiffs' licensing strategy came with "tremendous potentially offsetting concerns regarding otherwise confidential business strategy[.]"   Oct. 10, 2025 Hr'g Tr. 12:15-19.  Nevertheless, to strike the appropriate balance, Plaintiffs have since produced through present day all executed agreements to license sound recordings as training data for generative AI models, as well as all associated third-party communications regarding the negotiations of these executed agreements.  Having argued that all of Plaintiffs' licensing communications with any AI company are relevant to assessing the viability of the market for licensing sound recordings as training data, it is inconceivable that Suno can withhold all materials regarding its own efforts to license training data for this same purpose, including with respect to the agreement it struck with Warner in late November 2025.

The Court should also disregard Suno's argument that its licensing agreement with Warner Music Group is undiscoverable because it implicates Federal Rule of Evidence 408.  This argument is meritless, as FRE 408 governs the admissibility of settlement agreements at trial for specific purposes.  This evidentiary rule does not govern discovery, and it is well-established "that courts can allow the discovery of information contained in and related to confidential settlement agreements." *Atchison Casting Corp. v. Marsh, Inc.*, 216 F.R.D. 225, 226 (D. Mass. 2003); *see also Valiante v. VCA Animal Hospitals, Inc.*, 2011 WL 219672, at *2 (D. Conn. Jan. 20, 2011) ("While Rule 408 of the Federal Rules of Evidence limits the introduction at trial of evidence regarding settlement negotiations, it only applies to the admissibility of evidence at trial, not to discovery"). Suno further ignores the salient fact that this agreement has a go-forward component that extends beyond the settlement of Warner's copyright infringement claim against Suno based on prior unlicensed training.

Because they are centrally relevant to several core issues in this litigation, Suno must produce all materials regarding its efforts to license training data, including with respect to its executed agreement with Warner, through present day.

*     *     *

In sum, Suno's refusal to expand its collection cutoff beyond February 2025 ignores the copious relevant evidence that has developed in the intervening eleven months.  Suno operates in a fast-paced, dynamic environment that has changed substantially in the year and a half since Plaintiffs initiated this lawsuit.  Though Plaintiffs agree with Suno that discovery must at some point come to an end, Suno's discovery obligations did not cease in February 2025, and Plaintiffs have correspondingly offered to expand their collection cutoff for several categories of information.  The central point is that Suno's current cutoff date does not capture the full scope of Suno's relevant conduct or the way in which Suno has impacted the market in recent months.  Accordingly, Plaintiffs respectfully request that the Court order Suno to expand

# HUESTON HENNIGAN LLP

its collection timeframe and produce documents responsive to the five foregoing categories through present day.

### B.    Suno's Position

Plaintiffs' opening sentence alone illustrates the impropriety of their demands. Within the past two months, Suno entered into a Rule 408 protected *settlement of claims* with one of the former plaintiffs in this case.  And whatever the number of outputs Suno generated and its financial status might be, Suno has *already agreed to provide* that information to present.   Plaintiffs say the "heart of this case" is "Suno's initial [training data] decision." *Supra* at 3.  But Plaintiffs' effort to expand discovery wholesale through the present is unreasonable and excessive.  Suno has already provided source code and training data for an additional model released after this lawsuit was filed, and produced responsive documents through Suno's February 2025 collection without regard for which model they related to.  Yet Plaintiffs now demand additional discovery into Suno's model development through the present, without explaining what non-cumulative information they expect to find that would materially influence any core legal issue before the Court.  And as their Reply makes clear, Plaintiffs' supposedly narrow categories for expanded discovery are in fact so broad and ill-defined as to potentially encompass much of Suno's business—and at least two thirds of the parties' *74* previously agreed-upon search strings.  Fact discovery must end at some juncture; engaging in a sweeping re-collection, review, and production of discovery materials will further delay this case's orderly progress to summary judgment.[1]

As Plaintiffs acknowledge, the proper timeframe for discovery in this case should be dictated by the ordinary rules of relevance *and proportionality*.  Courts routinely limit the temporal scope of discovery — even where that limitation may exclude some relevant documents—if the request is not proportional to the needs of the case or will interfere with the "just, speedy, and inexpensive" determination of the action.  *See, e.g.*, *Doe v. Town of Stoughton*, 2025 WL 580941, at *5 (D. Mass. Feb. 21, 2025) (limiting temporal scope of discovery request to ensure proportionality); *Sustainable Sourcing, LLC v. Brandstorm, Inc.*, 2017 WL 217747, at *2 (D. Mass. Jan. 18, 2017) (same); *see also Wai Feng Trading Co. Ltd v. Quick Fitting, Inc.*, 2016 WL 4184014, at *1 (D.R.I. June 14, 2016) (noting that courts ruling on discovery motions should be "guided by Federal Rule of Civil Procedure 1's lodestar mandate that '[t]hese rules ... should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action'").

Plaintiffs' demand for a broad expansion of Suno's productions would require significant additional document collection, production, and review, as well as technical inspections.  This will necessarily result in the fact discovery deadline being extended even further—even though the additional discovery Plaintiffs seek is cumulative and unlikely to materially influence the resolution of any claim or defense in this case.  It has already taken the parties more than twelve months to collect, produce, and review the materials already in-scope.  Suno collected documents in February 2025 and has reviewed and ultimately produced more than 65,000 documents responsive to 74 search strings.  Unlike Plaintiffs, Suno did not limit any of its productions to the date of the Complaint, but produced all responsive documents in its possession as of the

---

[1] Plaintiffs argue that Suno "concedes it is deliberately withholding substantial materials that are relevant to core issues in this litigation."  This is a mischaracterization.  Suno does not concede relevance of any particular category of documents or discovery requests addressed herein—some of which Suno objected to on relevance grounds but agreed to produce in response to in order to limit the scope of disputes before the Court.

# HUESTON HENNIGAN LLP

date of collection.  And Suno made source code and training data available through one version beyond that identified in the Complaint, which Plaintiffs' experts have spent 48 days inspecting.  Suno's collection of source code through v4 was, likewise, the latest version at the time of collection.

Repeating this process for twelve months of additional discovery is not proportional to the needs of the case.  It is unclear what Plaintiffs expect to learn from that additional discovery which would change the parties' forthcoming summary judgment briefing on the core issue before the court:  whether Suno's alleged use of Plaintiffs' copyrighted sound recordings to train a music-generative AI model is a fair use.

### 1.    Suno has already agreed to additional *proportional* discovery post-dating its collections

In an effort to reach reasonable compromises, Suno is willing to produce additional documents and data to present where Plaintiffs' requests are directed at *specific categories* of information that do not require a burdensome full-scale re-collection and review.

For example, Suno has already agreed to produce documents sufficient to identify the number of outputs generated by Suno on a monthly basis, Suno's revenues and profits on a monthly basis, and the 100 most popular Suno outputs through the present.  *See* January 9, 2026 P. Sanders Email.  Likewise, Suno has already agreed to produce documents sufficient to show the number of users that have used Suno and the number of plays or downloads of Suno outputs on a monthly basis through the present, as well as performing a targeted collection of financial projections maintained in the ordinary course of business through the present.  *See* February 13, 2026 J. Cammack Email.

The information and materials Suno has already agreed to produce are more than sufficient to meet Plaintiffs' demand for discovery related to Factor Four of the fair use inquiry.[2]  The parties reached an agreement more than a year ago regarding the scope of data Suno would produce relating to the number of outputs, plays, and downloads associated with Suno's service.  And Suno has already agreed to expand production of that data through the present.  To be clear, Suno does not control and thus cannot record data about how its users distribute the music they generate on Suno.

To the extent Suno's users' creations have harmed the market for Plaintiffs' works, Suno expects that evidence of that harm would be in *Plaintiffs*' possession.  Indeed, notwithstanding Plaintiffs' contention they need additional discovery of Suno to account for "the rate of AI-generated music penetrating music streaming services" (*see infra* at 19), UMG's EVP and chief digital officer Michael Nash explained on an earnings call just days ago that UMG had evaluated evidence in its possession regarding market dilution due to generative AI.  Interestingly, based on that data, UMG concluded there had been *no* dilution to its revenue, nor would there likely be such dilution in the future.  Mr. Nash stated: "**the aggregate organic**

---

[2] Plaintiffs' preferred theory of market harm (their "market dilution" theory) is legally infirm.  *See Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1031–32 (N.D. Cal. June 23, 2025) (holding that copying for purposes of training an AI model "did not and will not displace demand for copies of Authors' works" for purposes of the Factor Four analysis, "or not in the way that counts under the Copyright Act," because the harm alleged—an "explosion" of AI-generated works competing with the plaintiffs'' works—is "not the kind of competitive or creative displacement that concerns the Copyright Act"); *see also* 4 Patry on Copyright § 10:155.40 (calling the "market dilution" theory "nuts").  But the Court need not decide that issue now.

# HUESTON HENNIGAN LLP

**consumption of AI content by actual consumers is less than 0.5% based on the best available data**" and "**we're seeing no indication that AI royalty dilution is a material issue for UMG from a revenue perspective**."  Universal Music Group N.V. (UNVGY) Q4 2025 Earnings Call Transcript (Mar. 5, 2026), available at https://seekingalpha.com/article/4879107-universal-music-group-n-v-unvgy-q4-2025-earnings-call-transcript (emphasis added); *see also id.* ("Some commentators say, 'That's right now. What about the future?' We don't have to theorize about the future of AI saturation as it's become a marketplace reality with 60,000 AI tracks being uploaded a day at present. What impact is any streaming of these tracks having on our revenue? . . . we're seeing no indication that AI royalty dilution is a material issue for UMG from a revenue perspective").  In fact, Mr. Nash specifically *rejected* the very data UMG's lawyers cite below as evidence of market dilution, explaining that most of the AI-generated content on Deezer is "slop or fraud better associated with royalty diversion schemes": "85% of the AI streams on . . . Deezer were identified as fraud and then excluded from royalty pool allocation."  *Id.*  At bottom, Mr. Nash's statements are wholly inconsistent with what his lawyers are saying in this litigation to support their demand for *twelve more months of discovery* from Suno and, further, indicate that the evidence Plaintiffs need to assess the dilutive impact of Suno's product—which Mr. Nash disputes the existence of—is already in Plaintiffs' hands.

But even if additional discovery were necessary, the information Plaintiffs seek is in the possession of Internet platforms or AI artists, not Suno.  Plaintiffs have already issued subpoenas to those third parties, including Hallwood Media (Xania Monet's record label) and Spotify (where Plaintiffs say AI artist The Velvet Sundown went viral).  Though, again, it bears note that despite what Plaintiffs' lawyers say here, UMG told its investors that "consumption of th[e] top 10 [AI generated tracks] has been immaterial" and that "misunderstandings have resulted from anecdotal press reports that AI-generated content has somehow overtaken the charts. **Nothing could be further from the truth**."  *Id.*

Plaintiffs also argue on reply that expanded "market impact" discovery is required because it might "reflect [Suno's] *awareness* of trends" relating to the expanded popularity of music generated using AI tools.  Plaintiffs have not articulated why Suno's internal communications regarding its employees' *awareness* of market trends would be probative of the actual (or potential) impact of Suno's use on the market for Plaintiffs' works.  Even if there is some minimal relevance to this information, it would not justify the vast expansion of discovery Plaintiffs now seek.  The best evidence of "market trends" would not be documents reflecting *Suno's* awareness of them, but the data Plaintiffs have sought from third parties regarding the number of Suno works on their platforms and whether consumers are listening to them—again, data it appears Plaintiffs also have in their possession.  *See* Earnings Call Tr. (asserting that "[i]n the aggregate, the most prominent AI content barely registers even in the leading market for this English language repertoire, totaling less than . . .  0.015% of the streams of the top 50,000 artists in the U.S. last year.").  Plaintiffs' argument that they need to know "*how* Suno is tracking, promoting, and profiting from its growing market presence" is also puzzling.  Plaintiffs know that Suno operates on a subscription model, and Suno has already agreed to produce through the present documents sufficient to show its subscription tiers and numbers of users in each tier.  Suno has also agreed to provide financial data through present.  There is no need for an expansion of discovery to understand how Suno promotes itself; that information is publicly available.  This is not a sound justification to expand discovery for an additional twelve months.

Plaintiffs are wrong that Suno has refused to engage reciprocally in a temporal expansion of licensing-related discovery.  Suno has no responsive post-February-2025 licenses to produce.  Suno has not entered into agreements to license training data, only the settlement agreement discussed herein.  For the reasons discussed below, Suno should not be required to produce that agreement and related

# HUESTON HENNIGAN LLP

communications.  However, Suno has offered to use the parties' agreed-upon search strings for Plaintiffs' RFP No. 16 to identify and produce any additional non-privileged documents and communications related to any efforts by Suno to license sound recordings for use as training data through present (separate from any potential settlement agreement with any Plaintiff in this case).  Suno's offer is contingent on Plaintiffs' making an equivalent production of their own documents and communications—including *internal* documents and communications—related to their licensing efforts through present, including documents and communications related to *unexecuted* licenses.  *See* Suno's January 23, 2026 Dispute Summaries at 1–12.  Put simply, Suno has no other executed agreements to produce; what Plaintiffs are demanding *is recent internal licensing strategy communications and external communications about unexecuted licenses—the very thing Plaintiffs themselves refuse to produce*.

These agreements demonstrate Suno's willingness to engage in targeted, proportional discovery beyond the date of collection.  In contrast, it bears note that Plaintiffs' own production agreements are deliberately designed to cut off Plaintiffs' own discovery obligations on especially unfavorable topics at the date of the Complaint, creating a one-sided record (as Suno's January 23, 2026 dispute statement explains). Plaintiffs have refused to provide post-Complaint discovery on a number of topics, including on the basis that expanding production beyond the date of the Complaint—a full seven months before Suno's own collection cutoff—would be unduly burdensome.  *See* Suno's January 23, 2026 Dispute Summaries at 11– 12.  Those topics include documents and communications related to unexecuted AI licensing deals, documents and communications about Suno, and communications among Plaintiffs or the Recording Industry Association of America concerning the impact of generative AI on the market for sound recordings—all topics that are highly relevant to Suno's potential impact on the market for Plaintiffs' sound recordings.

> **2.      Additional supplemental discovery is not proportional to the needs of the case**

Expanding the discovery period for Plaintiffs' remaining categories would not be proportional to the needs of the case.  Suno has produced thousands of documents and Plaintiffs have already spent weeks inspecting Suno's source code and training data.  Yet Plaintiffs demand still more productions related to Suno's model development.  Plaintiffs further demand Suno's settlement agreement with a former party to this litigation, a highly improper request, and sweeping discovery into ill-defined "markets" without any indication of what information, in particular, they seek beyond specific exemplars of data that Suno has largely already to provide.  Granting Plaintiffs' requests would not lead to a more robust record on the core issues before the Court, but instead would simply further delay resolution of this case for little benefit to either Party and cost hundreds of thousands of dollars in additional collection, review, and inspections. Plaintiffs' requests should be denied.

> **a.   On-going discovery into Suno's model development would be cumulative and delay the orderly progression of this litigation—as other courts overseeing AI litigations have concluded**

Plaintiffs seek document discovery into Suno's use of Plaintiffs' sound recordings to develop Suno's service for three additional recently released commercial models: v4.5, v4.5+, and v5.  Plaintiffs appear to seek both additional source code and training data *and* additional custodial document review and production.  This demand would massively expand the scope of discovery in this case and upend the case schedule.  Suno already collected and produced training data and source code for not only the model version identified in Plaintiffs' Complaint, but the version released thereafter.  Suno has also agreed to

# HUESTON HENNIGAN LLP

supplement its interrogatory responses through v5, which will provide additional information about the training data, model architecture, guardrails, and other topics relating to models v4.5, v4.5+, and v5 that Plaintiffs insist they need.  These supplemental responses will address Plaintiffs' concerns of any "recent change in Suno's product."  Suno has *also* produced thousands of documents and communications related to Suno's model development through February 2025—without regard for which model version was being discussed (inclusive of v4.5, which was in development at that time).  Nonetheless, Plaintiffs are requesting that Suno replicate that process for an additional year of product development, without explaining what additional non-duplicative or cumulative information they expect to obtain.

Model discovery with no end date is impractical and disproportionate—as other courts overseeing similar claims have recognized.  For example, in *Authors Guild v. OpenAI, Inc.*, the court rejected the plaintiffs' demand to expand the scope of discovery to encompass post-complaint models.  *See Authors Guild v. OpenAI, Inc.*, No. 23-cv-10211, Dkt. 293 (S.D.N.Y. Dec. 6, 2024).  The court instead limited discovery to models that had been released when the complaint was filed, as well as models "made available through [OpenAI's] commercial products," through the date of the operative complaint.  *Id.*; *see also id.*, Dkt. 281.  Subsequently, the district court overseeing the *In re OpenAI* multi-district litigation imposed the same limitation on the claims in the MDL.  Judge Stein denied the  plaintiffs' repeated efforts to expand their claims to encompass models released after the time the complaint was filed.  *See* May 22, 2025 Hr'g Tr. at 45:13–16, *In re OpenAI, Inc. Copyright Infringement Litigation*, No. 25-md-03143, Dkt. 80 (S.D.N.Y. May 30, 2025) (noting that models identified in earlier ruling would limit scope of model claims and discovery).  Specifically, the court reasoned that the cases before it were ultimately likely to "resolve themselves on the fair use defense" and that it was "in the interest of all the parties and the Court, that . . . discovery be closed when appropriate; that there be cross-motions -- that there be motions for summary judgment."  *Id.* at 37:3–14.  The court explained that the amendments adding, *inter alia*, new model versions "are not getting us there[.]"  *Id.* at 37:15-16; *see also In re OpenAI*, No. 25-md-03143, Dkt. 707 (S.D.N.Y. Oct. 27, 2025) (granting motion to strike allegations in Consolidated Class Action Complaint regarding GPT-4V, GPT-5, and "derivatives" and "successors" of any models identified in the complaint as they were beyond the scope of the litigation); *In re OpenAI*, 2025 WL 3635559 (S.D.N.Y. Dec. 15, 2025) (granting motion to stay Ziff Davis complaint "as to the o1, o1 mini, o1-pro, GPT-4.1, GPT-4.5, o3, o3-mini, o4-mini, and GPT-5 models" as "such an expansion of the scope of discovery in this MDL at this time would be contrary to the interests of the Court, non-parties, and the public in a speedy resolution of the core copyright issues in this MDL").

The same principles apply here.  Plaintiffs have themselves argued that the resolution of Suno's fair use defense at summary judgment is core to this dispute.  *See, e.g.*, Dkt. 39 (Plaintiffs arguing fair use is "the heart of this dispute").  Just as in *In re OpenAI*, a broad-based expansion of model discovery will "not get[] us there."  *See In re OpenAI* May 22, 2025 Hr'g Tr. at 37:15-16.  Suno has produced its source code for the models released through the date of the Complaint, as well as an additional model, for inspection.  Suno has permitted Plaintiffs live access (in an inspection environment) to its training data repository.  Suno has provided extensive document discovery regarding its model development through February 2025, inclusive of models beyond those commercially available as of the date of Complaint.  That is more than sufficient to resolve the question of whether Suno's model training is a fair use.  Suno cannot be expected

## HUESTON HENNIGAN LLP

to re-start discovery each time it releases a new model, or collect and produce its model development materials in real time.  Discovery would never come to an end.[3]

This is not to say that Plaintiffs are without recourse in terms of obtaining *proportional* discovery into Suno's further model development.  Suno has agreed to supplement its interrogatories through v5 to explain, *inter alia*, "the steps [Suno] took to develop its AI model," including its use of sound recordings, and "the contents of [Suno's] training data."  Further, as Plaintiffs themselves concede in their discussion of Mr. Won's deposition testimony (which is not as Plaintiffs describe), Plaintiffs can obtain information from Suno witnesses about any further product developments at deposition.  And, of course, Suno's product is *publicly available*—product changes are therefore accessible to Plaintiffs.  Insofar as Plaintiffs seek discovery about some *particular* new product feature, Suno is happy to consider targeted requests for discovery into that matter.  But Plaintiffs have not and cannot justify the wholesale production of additional source code, training data, and internal documents and communications about Suno's model development, which would effectively re-start the clock on fact discovery in this case.

Indeed, Plaintiffs have not pointed to any major change in Suno's functioning that warrants such discovery.  Plaintiffs rely on a distorted reading of Mr. Won's testimony to argue for their requested expansion—a request the testimony does not support.  As Mr. Won testified, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Deposition of Minz Won ("Won Dep.") at 119:15-18, Jan. 21, 2026.  Rather, as Mr. Won explained, any artist names entered into Suno's "Simple Mode" are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Won Dep. at 120–27.  Far from being ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ a public feature Plaintiffs were able to identify and ask Mr. Won about.  *See* Won Dep. at 135-36.  Plaintiffs' assertion that these prompts can be used to generate outputs that "sound like the artist" is also not supported by, and in fact inconsistent with, Mr. Won's testimony.  *See* Won Dep. at 125:1-7 ("So if you played the audio . . . I would not say the voice will sound like [Lauryn Hill] at all because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[4]  But, regardless, to the extent Plaintiffs had additional questions about this product feature, they had the opportunity to present these questions to Mr. Won. and can ask these questions in subsequent depositions as well.

---

[3] Plaintiffs gesture vaguely to the magic words "multidistrict litigation" to distinguish from *OpenAI* in their Reply.  But the court's reasoning in *OpenAI* is equally applicable to this case.  There is no need for endless model discovery for this Court to resolve the "core copyright issues" in this case, just as the *OpenAI* court concluded.  *See* 2025 WL 3635559, at *10.

[4] To the extent Plaintiffs mean the outputs include elements characteristic of the genre in which a particular artist works, Suno emphasizes that Plaintiffs have no copyright in those elements.  *See Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1069 (9th Cir. 2020) (Copyright does not "extend to 'common or trite' musical elements [. . .] or 'commonplace elements that are firmly rooted in the genre's tradition. [. . .] These building blocks belong in the public domain and cannot be exclusively appropriated by any particular author.") (citations omitted).  Plaintiffs cannot assert a claim based on outputs in the same genre as Plaintiffs' copyrighted works.

# HUESTON HENNIGAN LLP

Finally, Plaintiffs' argument that they need additional document discovery because they are unsatisfied with Mr. Won's—a 30(b)(1) witness's—answers to their inquiries regarding specific details about this particular change to Suno's prompt pipeline is without merit. Plaintiffs may ask other witnesses about Suno's prompt pipeline—indeed, during Mr. Won's deposition he identified another witness who might possess different and additional information about the particular subjects of Plaintiffs' inquiry. *See* Won Dep. at 127:6–8. Plaintiffs are also wrong to suggest that Suno somehow breached its discovery obligations by failing to supplement its interrogatory responses with relevant information. Suno clearly stated in its interrogatory responses and objections that its definition of "AI model" was limited to music-generative model versions through v4. *See, e.g.*, Suno's Second Amended Responses and Objections to Plaintiffs' First Set of Interrogatories. Regardless, Suno has now agreed to supplement its interrogatory responses through v5, which addresses any concerns Plaintiffs may have regarding product changes.

More fulsome additional inspections and document discovery into Suno's model development is not proportional to the needs of the case.

### b. Plaintiffs' demand that Suno provide discovery into its settlement with a former Plaintiff in this case is improper

Plaintiffs' demand for Suno's settlement agreement with a former plaintiff in this case—as well all related communications—should be rejected. This demand is as improper as it is audacious: Plaintiffs are asking the Court to let them peer behind the curtain of a resolution reached by a party standing alongside them in this very case. Plaintiffs Sony and UMG brought this case alongside the settling party, Warner, in a single complaint asserting identical claims. Permitting the remaining Plaintiffs to access Suno and Warner's settlement agreement would give them a blueprint to Suno's settlement strategy, which would violate the basic principle underlying Rule 408—that parties who know their settlement agreements might be used against them are less likely to enter into those settlement agreements. *See, e.g.*, *Portugues-Santana v. Rekomdiv Int'l*, 657 F.3d 56, 63 (1st Cir. 2011) (explaining that Rule 408 broadly bars admission of settlement agreements because admitting such evidence "would discourage settlements").[5] While Rule 408 is not an absolute bar to discovery, here, Plaintiffs have not shown that any purported relevance of the agreement overcomes the risks associated with its production—particularly where the agreement cannot ultimately be used as evidence in this case.

As discussed above, Suno is willing to use the parties' agreed-upon search strings for Plaintiffs' RFP No. 16 to identify and produce additional non-privileged documents and communications, made outside the context of threatened or ongoing litigation, related to any efforts by Suno to license sound recordings for use as training data through the present (contingent on Plaintiffs' own reciprocal agreement). However, Suno does not agree to produce documents and communications related to its confidential *settlement agreement* with former plaintiff Warner Music Group. While evidence need not be admissible to be discoverable, the irrelevance of these materials, coupled with their likely inadmissibility under Rule 408 and

---

[5] Under the parties' current Protective Order, Suno's negotiations with Warner and its internal settlement-related communications could be disclosed to certain in-house counsel at Sony and UMG. *See* Dkt. 180 at ¶ 6. The settlement agreement itself can be withheld from in-house counsel only if Warner invokes the parties' agreed-upon Outside Counsel Only provision—and even then, Plaintiffs' current litigation counsel would have access to Suno's settlement agreement with Plaintiffs' competitors. *See id*.

# HUESTON HENNIGAN LLP

their acute sensitivity, warrant a high degree of caution and weigh heavily against compelling production. At a minimum, they require a careful proportionality analysis under Rule 26(b)(1)—which this request fails.

### i. Suno's settlement with Warner is of limited relevance

Suno's settlement agreement with Warner is of limited relevance to any claim or defense in this case. Contrary to Plaintiffs' arguments, it does not tend to show that Suno could have trained its model using only licensed materials, and it cannot be used to establish the value of a license to use sound recordings as training data.[6]

*First*, Plaintiffs are incorrect that Suno's settlement agreement with Warner is probative of Suno's argument that there is no viable market for training data. Certainly, the fact of Suno's settlement with one company, reached after more than a year of expensive litigation, is not probative of whether Suno could have licensed a sufficient training corpus to enable Suno to build a state-of-the-art generative AI model using entirely licensed training materials.

In contrast, arm's-length agreements between AI companies and Plaintiffs—of which Plaintiffs have agreed to produce only a subset—are the proper evidence to test whether there is a reasonable market for licensing Plaintiffs' works as training data.[7] Curiously, these are the very types of materials that *Plaintiffs have resisted producing*. Most notably, Plaintiffs refuse to produce post-Complaint documents and communications related to *unexecuted* licensing discussions, documents likely to show that the remaining Plaintiffs have been broadly unwilling to license their sound recordings for a use like Suno's. Plaintiffs also refuse to produce internal communications regarding AI licensing deals—even as they demand that Suno produce its own internal licensing strategy discussions. Given their own refusal to engage in discovery on this matter, their demand for Suno's *settlement agreement* with their former co-plaintiff rings hollow.

*Second*, insofar as Plaintiffs are seeking the "licensing fee" in Suno's settlement because it "bears on the value for licensing sound recordings," that is a use of a settlement agreement to establish the "amount of a disputed claim," and thus is expressly prohibited by Rule 408. Fed. R. Evid. 408; *see also infra*.[8] But

---

[6] Plaintiffs claim that Suno's settlement with Warner raises "critical questions" about Suno's copyright misuse defense. It does not. Where one competitor breaks from an alleged conspiracy, that does not disprove the existence of an on-going concerted refusal to deal, much less indicate that a broader conspiracy did not previously exist.

[7] Suno notes that harm to this "market" is likely not cognizable under the Copyright Act. This is because "[i]n every fair use case, the plaintiff suffers a loss of a potential market if that potential [market] is defined as the theoretical market for licensing." *Kadrey v. Meta*, 788 F.Supp. 3d 1026, 1052 (N.D. Cal. June 25, 2025). As a result, "to prevent the fourth factor analysis from becoming circular and favoring the rightsholder in every case, harm from the loss of fees paid to license a work for a transformative purpose is not cognizable." *Id*; *see also Bartz*, 787 F.Supp. 3d at 1032 ("Authors next contend that training LLMs displaced (or will) an emerging market for licensing their works for the narrow purpose of training LLMs . . . [e]ven so, such a market for that use is not one the Copyright Act entitles Authors to exploit."). Plaintiffs are not "legally entitled to monopolize" a transformative market. *Kadrey*, 788 F. Supp. 3d at 1052.

[8] The cases Plaintiffs cite for the proposition that settlements may sometimes be probative of a reasonable royalty do not address the disconnect between their holdings and Rule 408, perhaps because in both cases

Hon. Paul G. Levenson
March 9, 2026
Page 13

# HUESTON HENNIGAN LLP

it is also inconsistent with prevailing case law on the value of settlement agreements to assessing reasonable royalties. A strong consensus of courts have held that "license fees negotiated in the shadow of a litigation threat" are not reliable to determine reasonable royalties and excluded their use. *See, e.g.*, *University v. Hewlett-Packard Co.*, 2008 WL 11274580, at *2–4 (N.D.N.Y. May 14, 2008) (collecting cases and excluding the use of settlements as evidence of a reasonable license fee/the value of the patent); *Yue v. Chordiant Software, Inc.*, 2010 WL 11575579 (N.D. Cal. Apr. 22, 2010) ("Settlements offered, negotiated, or made under threat of litigation are generally not considered probative of a reasonable royalty because in the usual course they do not provide an accurate reflection of what a willing licensor would do in an arm's length transaction."); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F. Supp. 2d 147, 159 (D.R.I. 2009) ("[S]ettlements offered, negotiated or made under threat of litigation are generally not considered probative of a reasonable royalty because in the usual course they do not provide an accurate reflection of what a willing licensor would do in an arm's length transaction."); *see also Mickowski v. Visi-Trak Corp.*, 36 F. Supp. 2d 171, 181 (S.D.N.Y. 1999), *aff'd.*, 230 F.3d 1379 (Fed. Cir. 2000) ("[A] license entered into in settlement of litigation may not accurately reflect the royalty that the parties would have negotiated prior to commencement of litigation.").

This is logical: a settlement reached in the wake of litigation is fundamentally distinct from an arm's-length license, and the terms and scope of any such settlement are shaped by litigation pressures and risk allocation. In pursuit of settlement, parties often exchange concessions or enter collateral business arrangements that do not reflect upon the value of a license.

Plaintiffs' additional relevance arguments—raised for the first time on Reply—are also unfounded. Plaintiffs contend that Suno's settlement with Warner might lead to the discovery of other admissible evidence. But Plaintiffs do not identify *what* additional evidence they believe the Warner settlement might lead them to. The only plausible use for this discovery is for Plaintiffs to rely on it in summary judgment briefing.

Plaintiffs also argue that discovery into Suno's settlement with Warner is necessary to provide "context" to any product changes Suno might make following the settlement. Even if the Court agrees to Plaintiffs' overbroad demand to expand Suno's collection and review of documents into 2026, there would be no need for Suno to produce a highly sensitive and confidential settlement agreement with a former Plaintiff in this case to provide "context" for any post-settlement product changes. And Suno announced that it would make product changes as a result of the settlement on its website in the very blog post Plaintiffs cite. *See* Mikey Shulman, A new chapter in music creation, Suno (Nov. 25, 2025), available at: https://suno.com/blog/wmg-partnership. If by "context" Plaintiffs mean the *discussions* Suno had with Warner about what product changes Suno would make in order to resolve Warner's claims and why, that is the very type of information that Rule 408 shields from use in litigation.

Finally, Plaintiffs offer no explanation for their assertion that they need discovery into Suno's settlement with Warner to "test" their (incorrect) argument that the settlement agreement indicates there was never any concerted refusal to deal. It is a public fact that Suno reached a settlement with Warner. To the extent Plaintiffs wish to argue that the fact of the settlement shows that Warner was no longer engaged

---

the party relying on the settlement as evidence of a reasonable royalty was the same party who might have objected to admission of the settlement under Rule 408.

# HUESTON HENNIGAN LLP

in a concerted refusal to deal after the settlement, the fact of the settlement should be sufficient to allow the parties to resolve that legal dispute.

### ii. The settlement agreement is inadmissible and, given its sensitivity and limited relevance, it would be disproportionate to the needs of the case to require Suno to produce it

Compelling production of such sensitive documents would also be disproportionate to the needs of the case, given their limited relevance and evidentiary value: Plaintiffs cannot rely on the settlement agreement even if it were produced. Rule 408 prohibits the use of settlement communications to prove or disprove the validity or amount of a disputed claim. *See* Fed. R. Evid. 408; *see also Portugues-Santana*, 657 F.3d at 63 (explaining that Rule 408 broadly bars admission of settlement agreements because admitting such evidence "would discourage settlements"); *Crigger v. Fahnestock & Co*., 2005 WL 857368, at *1 (S.D.N.Y. Apr. 14, 2005) ("Rule 408 excludes evidence of compromises or compromise negotiations tending to prove liability for, or invalidity of, a claim. This rule is applicable regardless of which party offers the evidence . . . [and] applies with equal force whether the settlement involves the litigants or a litigant and a third party."). Yet that is precisely what Plaintiffs seek to do here: they concede that they seek this agreement for the purpose of proving "the value for licensing sound recordings as training data." Because these highly sensitive materials would not be admissible, allowing their discovery would be disproportionate and unduly burdensome. *Cf. Valiante v. VCA Animal Hosps., Inc.*, 2011 WL 219672, at *2 (D. Conn. Jan. 20, 2011) (limiting discovery into settlement agreement because it was not likely to result in admissible evidence).

Requiring Suno to produce its settlement agreement and related documents and communications—including negotiations with Warner, a competitor of the remaining Plaintiffs, and Suno's own internal communications to the extent they are not protected by attorney-client privilege—would give the remaining Plaintiffs unfair insight into Suno's settlement strategies. And the terms of the agreement itself would give Plaintiffs insight into what financial and other terms Suno might be willing to settle for—insight to which Plaintiffs are surely not entitled for purposes of this litigation.

Balancing the sensitivity of these documents (high) against the likelihood they will help resolve the issues in this case (very low, considering their marginal relevance and likely inadmissibility for any relevant purpose), requiring production of Suno's settlement agreement and related communications would not be proportional to the needs of this case.

### c. To the extent Plaintiffs demand additional document review and production, that is unreasonably burdensome relative to the needs of this case

Finally, to the extent Plaintiffs demand Suno search for and produce documents related to the "market for Suno," the "market for outputs," and the "development" of Suno's more recent models, that demand is unduly burdensome and unlikely to result in the production of meaningful additional relevant documents; it should be denied.

Plaintiffs have not made clear what, exactly, they seek related to the market for Suno, the market for outputs, or the development of Suno's later models. These categories are not tied to specific requests for production or ESI search terms, and could potentially encompass approximately two thirds of the ESI

# HUESTON HENNIGAN LLP

search strings that the parties previously agreed Suno would use to identify responsive documents. Extrapolating from Suno's previous search for documents using those strings, this could require Suno to review *at the very least* tens of thousands of additional documents—Suno's very rough estimate is approximately 65,000.  On reply, Plaintiffs provide a "a sampling" of the RFPs for which they expect Suno to expand its production.  But even that "sample" is problematic.  It includes an RFP about "marketing" for example.  Even accepting Plaintiffs' overbroad and legally infirm theory of market harm, how Suno markets its product is publicly-available information.   Internal documents about Suno's marketing strategy—for example, what it posts on social media—is unlikely to move the needle one direction or another at summary judgment.  Suno agreed to provide discovery on such peripheral topics using carefully negotiated search terms based on hit counts using Suno's existing collection.  Suno did not agree to provide discovery into this and other fringe topics on an ongoing basis into the foreseeable future.

This review would be time consuming and expensive and could not be completed ahead of even the parties' proposed extended document production deadline.  Suno has already engaged in an extensive search for and production of documents from the time period during which Suno conceived of, developed, and released the first two commercial versions of its music-generative AI model.  Documents from later time periods are less likely to be probative of either Plaintiffs' copyright infringement claims or Suno's fair use and other defenses.  Suno's model was conceived of, developed, and trained more than two years ago.  Its basic function—generating new, radio quality music—has not changed, as Plaintiffs well know given that the service is publicly-available.  Given the diminishing likelihood that additional collection and review would reveal meaningfully additive evidence, it would be disproportionate to require Suno to incur the cost of further review, and improper to further delay this case's timely progression to summary judgment.

*                    *                    *

Suno has already produced responsive documents through the date of collection.  Suno has also agreed to additional targeted collections through present.  By contrast, Plaintiffs continue to refuse to produce documents post-dating the Complaint, except where they have determined it might be to their benefit to do so.  *See* Suno's January 23, 2026 Dispute Summaries at 11–12.  But even putting aside Plaintiffs' indefensible positions on their own discovery obligations, compelling Suno to expand its productions to present will only delay this case without benefit; Plaintiffs have not identified any key non-cumulative information that the burdensome expansion of discovery that they demand would unearth. Plaintiffs' demand should be rejected.

## C.      Plaintiffs' Reply

Suno concedes it is deliberately withholding substantial materials that are relevant to core issues in this litigation, including the development of new AI models, the market impact of its infringement, and its efforts to license copyrighted works as training data.  Suno's sole basis for this refusal is that supplementing its productions beyond February 2025 would be disproportionate to the needs of the case.  When confronted with publicly available indication that its current productions do not capture highly salient events, Suno deflects and nakedly claims that Plaintiffs' request for discovery into current events is somehow "inconsistent with reality."  Suno Opp. at 5.  But the reality is that over the past year, Suno has taken aggressive steps to expand its market impact, touted its business success in fundraising pitches to investors, and executed a licensing deal that, according to public reporting, involves decommissioning Suno's unlicensed models in favor of licensed ones.  Suno's efforts to further entrench its business and strike additional licensing deals continue today.  For instance, within just the past two weeks, Suno announced the hiring of its new Chief

# HUESTON HENNIGAN LLP

Commercial Officer Jeremy Sirota, whose prior role as CEO of an organization that negotiates licensing deals for independent record labels reflects Suno's clear intentions to engage in future dealmaking. *See* Kristin Robinson, *Suno Hires Former Merlin CEO Jeremy Sirota as Chief Commercial Officer*, Billboard (Feb. 23, 2026). Even more recently, Suno announced that it reached $300 million in annual recurring revenue, with 2 million paid subscribers, suggesting that most of its users subscribe to Suno's offering permitting the commercial use of outputs. *See* Murray Stassen, *Suno: We've Hit 2M Paid Subscribers and $300M Annual Revenue*, Music Business Worldwide (Feb. 26, 2026). And, in a since-deleted tweet, one of Suno's principal investors recently admitted that she had personally "shifted most of my listening to Suno" because she was "so tired of Spotify giving me the same overplayed recommendations," indicating that Suno is serving as a substitute for streaming services that host Plaintiffs' music. *Id.* Suno's arbitrary collection cutoff date improperly forecloses discovery into all these events.

Plaintiffs do not advocate for a wholesale refresh of Suno's document productions; rather they request only that Suno supplement its document productions with case-critical information about its licensing activities, market impact, and continued unauthorized use of Plaintiffs' copyrighted works. To be sure, Plaintiffs agree that the orderly and efficient progression of this case is of paramount importance and that fact discovery must, at some point, come to a close. However, the temporal line Suno has drawn is inappropriate and would deprive Plaintiffs and the Court of a complete record on summary judgment of Suno's relevant conduct and market impact. Accordingly, Plaintiffs respectfully request that the Court compel Suno to update its productions regarding the four categories of information listed in Plaintiffs opening statement.

### 1.   Category 1: Suno's Ongoing Efforts to License Training Data

Suno must update its documents productions with information pertaining to its ongoing efforts to license copyrighted works as training data. Suno's position with respect to this category is deficient in two material respects because it is (1) improperly conditioning its production of responsive materials based on Plaintiffs' own productions of irrelevant and disconnected materials; and (2) refusing all discovery into its executed licensing deal with Warner Music Group. Neither position is tenable.

*First*, Suno apparently will agree to update its production of licensing-related documents and communications, so long as Plaintiffs agree to produce documents and communications into their own licensing efforts.[9] Suno's attempt to extract irrelevant discovery from Plaintiffs in exchange for its adherence to its basic discovery obligations is improper. There can be no doubt that Suno's communications regarding licensing copyrighted works as training data are relevant to several issues in the case, including the viability of the training data licensing market (which Suno claims does not exist), the willfulness of Suno's infringement (insofar as Suno's licensing activity reflects its recognition that licenses are required), Suno's copyrighted misuse defense (premised in significant part on Warner's involvement in a supposed concerted refusal to deal). Suno cannot premise its production of core evidence undermining its fair use defense on Plaintiffs' own internal communications regarding unexecuted deals that have no bearing on Suno's conduct. Though Plaintiffs will not rehash all their arguments in opposition to Suno's wildly overbroad

---

[9] The request at issue is Plaintiffs' RFP No. 16, which seeks "All Documents and Communications Related to licensing or contemplation of potential licensing of Any Training Data, including but not limited to licensing of any Sound Recordings included in Your Training Data." On October 13, 2024, Suno agreed to produce materials responsive to this request, without condition on Plaintiffs own discovery obligations. *See* B. Lovejoy Oct. 13, 2024 Email.

# HUESTON HENNIGAN LLP

requests for licensing discovery, Plaintiffs emphasize that *they have already produced* through December 2025 their agreements to license sound recordings as training data for AI models and associated external communications relating to these agreements.  Suno, for its part, has withheld all documents pertaining to its licensing efforts since February 2025.  Suno is the party who has refused to engage in reciprocal licensing-related discovery.

*Second*, Suno's wholesale refusal to permit discovery into the context and details of its licensing agreement with Warner Music Group is predicated on a misapplication of evidentiary rules that do not govern the scope of discovery.  In addition, Suno focuses exclusively on the settlement component of this agreement yet entirely ignores the aspects that set forth the terms of Suno's go-forward license to use Warner's copyrighted sound recordings as training data for AI models.  Furthermore, to the extent Suno intends to make arguments regarding how its decision to implement licensed AI models affects any issue in this case, Suno cannot withhold discovery into the facts and circumstances of this decision.

In refusing discovery into the Warner agreement, Suno relies heavily on Federal Rule 408.  This reliance is misplaced because it "conflate[s] the standard for admissibility of evidence at trial and the much broader standard for relevancy for discovery." *Intellectual Ventures I, LLC v. Lenovo Grp. Ltd.*, 2019 WL 9096048, at 2 (D. Mass. Dec. 6, 2019) (citation omitted).  The law is clear that Rule 408 is not a bar of discovery into relevant settlement evidence.  To the contrary, courts routinely permit discovery where, as here, "the relevancy of the settlement agreement for discovery purposes is self-evident" and "once produced, the settlement agreement could reasonably be expected to lead to the discovery of other admissible evidence." *Atchison Casting Corp.*, 216 F.R.D. at 226; *Valiante*, 2011 WL 219672, at *2 (ordering party to "produce documents and respond to questions at her deposition that relate to [litigation] settlements" to the extent relevant to the issues in the case).  Suno's cited authority undermines its position that settlement-related information is not discoverable, as the First Circuit in *Portugues-Santana* determined the district court erred in failing to consider relevant information in a settlement agreement.  *See Portugues-Santana v. Rekomdiv Intern.*, 657 F.3d 56, 63 (1st Cir. 2011) ("[W]e conclude that the district court erred by not considering the settlement agreement in connection with the defendants' post-trial motion for an offset of the damages award.").

Suno's agreement to license copyrighted sound recordings from Warner is self-evidently relevant, for reasons entirely apart from the settlement of past claims.  Suno itself described the agreement in a press release as "a new partnership" designed to "create a paradigm shift in how music is made, consumed, experienced and shared[.]"  Mikey Shulman, *A New Chapter in Music Creation*, Suno (Nov. 25, 2025).  Suno further stated that "[t]his partnership has implications on how our product will evolve," including by "enabl[ing] us to build a new generation of Suno models using high-quality licensed music," and "introducing content from WMG artists who opt in for the use of their names, images, likenesses, voices, and compositions to be used in new AI-generated music."  *Id.*  Warner also announced that Suno's "current models would be deprecated" and replaced with "more advanced and licensed models" to be launched sometime in 2026.  Press Release, Warner Music Group and Suno Forge Groundbreaking Partnership (Nov. 25, 2025).  Thus, not only is the agreement relevant as evidence of a viable market for licensing sound recordings as training data for generative AI models, it also provides the necessary context for significant changes to Suno's business and commercial AI models.  Moreover, to the extent Suno plans to argue that its decision to implement licensed models should bear on the fair use analysis or limit Plaintiffs' damages claims, Suno cannot foreclose the discovery necessary to understand these changes.[10]

---

[10] There is no merit to Suno's stated concerns regarding the sufficiency of the protections outlined in the

# HUESTON HENNIGAN LLP

Suno's remaining arguments against discovery into its licensing deal with Warner only underscore the need for this discovery. For instance, Suno claims that its negotiations with Warner have no relation to its copyright misuse defense, because it is possible for one alleged co-conspirator to break away from a group boycott, while the remaining members continue to advance the conspiracy. Though Plaintiffs maintain Suno's allegations regarding a concerted refusal to deal are facially unbelievable, Plaintiffs are entitled to test this line of argumentation. Suno cannot seek broad discovery under the guise of this vaguely asserted, legally deficient defense, while at the same time block the discovery that will discredit the defense.

Nor do any of Suno's cited cases suggesting that litigation may undermine the arms-length nature of licensing negotiations weigh against discovery of Suno's licensing deal with Warner. As an initial matter, three of Suno's four cited cases for this proposition (*University*; *Yue*; and *Uniloc*) arose in the context of motions *in limine*, where the licensing materials at issue *were produced in discovery*. The fourth case (*Mickowski*) was an opinion following a bench trial discussing the appropriate weighing of settlement evidence that was presented at trial. Moreover, the analysis in these cases focused on the probative weight to be given to litigation-driven licenses to ascertain what a reasonable royalty might be in the absence of infringement. Here, Suno's license with Warner is relevant to several additional contested issues, including the existence and viability of a market for licensing sound recordings as training data, the willfulness of Suno's infringement, and Suno's copyright misuse defense. But even in the context of the cases Suno cites, the law is clear that in certain circumstances, a license that "arose out of litigation" may in fact be "the most reliable" evidence available. *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010) (emphasis added); *see also In re MSTG, Inc.*, 675 F.3d 1337, 1348 (Fed. Cir. 2012) ("Our cases appropriately recognize that settlement agreements can be pertinent to the issue of reasonable royalties."). Plaintiffs are entitled to determine whether that may be the case in these circumstances.

## 2.    Categories 2 & 3: The Market for Suno's Service and Suno's Outputs

Suno is also withholding recent materials regarding the market for Suno's AI music generation service and Suno's outputs. These issues are central to the inquiry into the fourth fair use factor, and Suno's persistent refusal to update its document productions regarding these highly relevant topics risks prejudicing Plaintiffs by artificially circumscribing the record to a point in the past that does not capture Suno's evolving market impact. Suno exists in a dynamic environment, and it has taken aggressive steps within the past year to seize momentum and market its business. One need not look further than Suno's recent $2.45 billion valuation, a nearly fivefold increase from its $500 million valuation the year prior. *Compare* Shulman, *The Future of Music is Already Here*, Suno (Nov. 19, 2025), *with* Daniel Tencer, *AI Music Generator Suno Raises $125M, Valuing Company at $500M*, Music Business Worldwide (May 21, 2024). Suno's current stance on updating its document productions would leave Plaintiffs largely in the dark concerning Suno's significant efforts to advance its market position, entrench its business, and monitor its market impact over the past year.

---

operative protective order regarding discovery into Suno's licensing agreement and negotiations with Warner. Indeed, subject to the protective order, Plaintiffs have already produced *thousands* of documents reflecting their highly sensitive negotiation communications with AI licensing counterparties. However, if the Court believes materials regarding Suno's negotiations with Warner warrant further protections than those currently available under the operative protective order, Plaintiffs are willing to meet and confer with Suno to cooperatively resolve this issue.

Hon. Paul G. Levenson
March 9, 2026
Page 19

# HUESTON HENNIGAN LLP

To approximate the rapid pace of Suno's development over the past year, Deezer (a French music streaming platform) reported in November 2025 that its AI detection tool found that more than 34% of Deezer's total daily uploads are fully AI-generated. *See* Deezer, *Deezer/Ipsos survey: 97% of people can't tell the difference between fully AI-generated and human made music* (Nov. 12, 2025). This represented a market increase from the 28% Deezer reported in September 2025, the 18% Deezer reported in April 2025, and the 10% reported in January 2025. *See* Deezer, *28% of All Music Delivered to Streaming is Now Fully AI-Generated* (Sep. 11, 2025). In other words, since Suno's arbitrary collection cutoff in February 2025, the rate of AI-generated music penetrating music streaming service has increased more than threefold. Suno is undoubtedly aware of this trend of users increasingly commercializing outputs on music streaming services and elsewhere. Yet, Suno is refusing discovery that would reflect its awareness of such trends, how these trends factor into its overall business proposition, and other ways Suno may be fostering users to commercialize and popularize Suno outputs.[11]

Suno's reliance on selective statements from UMG's Q4 2025 earnings call is misplaced and, if anything, underscores the need for the discovery Plaintiffs seek. As an initial matter, Mr. Nash's general remarks about UMG's current revenue picture say nothing about whether Suno's use has harmed—or is likely to harm—the *potential* market for Plaintiffs' works, which is what the fourth fair use factor actually examines. *See* 17 U.S.C. § 107(4); *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994) (factor four requires analysis of "adverse impact on the potential market" for the original). Mr. Nash's own acknowledgement that 60,000 AI tracks are being uploaded daily and that UMG is actively monitoring the phenomenon confirms that AI-generated content is proliferating at a pace warranting serious concern, regardless of whether it has already translated into measurable revenue loss for a single rightsholder.

Moreover, Suno's attempt to wield Mr. Nash's statements as a sword while simultaneously shielding its own internal analyses of the very same market trends is untenable. Mr. Nash's commentary reflects an assessment of certain data available to UMG—it says nothing about how *Suno* is tracking, analyzing, and leveraging the growth of AI-generated music on streaming platforms, which is the subject of Plaintiffs' discovery request. If Suno's internal analyses state that AI-generated content poses no competitive threat, Suno should have no reason to resist producing them.[12] If, on the other hand, Suno's internal metrics tell a

---

[11] Though the Court need not resolve this issue on the present motion, Plaintiffs strenuously disagree with Suno that the harm posed by the rapid proliferation of AI-generated outputs on music streaming services is not cognizable under the fourth fair use factor. The Copyright Act clearly contemplates any "effect" "upon the potential market for or value" of the asserted works, a proposition endorsed by at least one court and the U.S. Copyright Office. *See Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1055 (explaining that "the concept of market dilution becomes highly relevant" where, as here, the allegedly infringing use has "the potential to flood the market with competing works"); *see also* U.S. Copyright Office, Copyright & Artificial Intelligence, Part 3: Generative AI Training at 65 (May 2025, Pre-Publication Version) (observing that "[t]he speed and scale at which AI systems generate content pose a serious risk of diluting markets for works of the same kind as in their training data" and endorsing market dilution as a cognizable form of market harm under the fourth fair use factor).

[12] Suno's argument that such information is in the possession of third parties is a red herring. That some relevant evidence may be in third parties' possession does not discharge Suno's obligation to produce relevant evidence in its own possession. *See Haber v. ASN 50th St., LLC*, 272 F.R.D. 377, 380 (S.D.N.Y. 2011)("Though Defendants may be in possession of documents regarding Haber's residency (such as copies of lease agreements with ASN and rental payments made by him), this does not relieve Haber of his

# HUESTON HENNIGAN LLP

different story—for instance, that Suno is tracking the displacement of human-created music as a measure of its own success—those documents are plainly relevant and discoverable.  Either way, an earnings-call transcript is no substitute for the internal documents and communications that will reveal Suno's own understanding of its market impact.

Suno's contention that its internal awareness of market trends is irrelevant to the fourth fair use factor fundamentally misconstrues the scope of that inquiry. The question under § 107(4) is not limited to measuring actual damages already inflicted; it extends to the *effect* of the use on the *potential* market for the copyrighted works—an inquiry that necessarily encompasses evidence of what a defendant knew about the competitive dynamics its product was creating and how it responded to that knowledge.  *See Campbell*, 510 U.S. at 590; *see also Harper & Row*, 471 U.S. at 563 (weighing evidence that the defendant "knowingly exploited a purloined manuscript").  Internal analyses, projections, and investor communications reflecting Suno's understanding of AI-generated music's growing presence on streaming platforms are probative of the nature and foreseeability of market harm—evidence that bears directly on the weight the Court should afford Suno's fair use defense at summary judgment. The Menlo Ventures pitch deck, which Plaintiffs obtained only through third-party discovery, already demonstrates that Suno tracks and trumpets these very trends.  Plaintiffs should not be forced to reconstruct Suno's understanding of its own market impact through subpoenas to third parties when the most probative evidence—Suno's own internal assessments—sits in Suno's files.

Nor is Suno correct that its subscription model and agreed-upon financial data render further discovery unnecessary.  Knowing that Suno operates on a subscription model tells Plaintiffs nothing about how Suno internally evaluates the competitive positioning of its outputs relative to human-created music, what metrics Suno uses to measure market penetration, how Suno's projections of future growth account for (or depend on) the displacement of copyrighted works, or what Suno communicates to investors about these dynamics.  These are not peripheral concerns.  They go to the core of the fourth factor fair use inquiry. And Suno's suggestion that Plaintiffs can learn "how Suno promotes itself" from publicly available materials misses the point entirely.  Plaintiffs are not asking how Suno advertises on social media; rather, Plaintiffs are asking what Suno knows internally about the market impact of its product, how it uses that knowledge to shape its business, and how it presents that information to the investors funding its continued operations. That information is, by definition, not publicly available.

Suno complains that Plaintiffs' requests for discovery relating to the market for its AI music generation service and its outputs are untethered to any specific requests.  This is simply incorrect.  Indeed, Suno previously agreed to produce discovery in response to several categories of requests that closely map onto the present request.  To provide just a sampling, Suno previously agreed to produce documents responsive to the following Requests:

- **RFP No. 32 (as narrowed through conferral):** All Documents and Communications Relating to the marketing of Your AI Service or Outputs.

- **RFP No. 40:** All Documents and Communications Relating to the market for Outputs, including but not limited to Any Documents Concerning their potential competition with other Sound Recordings.

- **RFP No. 42:** All Documents and Communications Relating To the market for Your AI Service,

obligation to provide responsive documents also in his possession, custody, or control.")

# HUESTON HENNIGAN LLP

including but not limited to Any projections or forecasts.

To the extent Suno has any legitimate concerns about the burden associated with updating its production of materials relating to the market for its service or outputs, these can be addressed through reasonable adjustments to the search terms the parties have already agreed to use to identify responsive materials in Suno's possession.

        3.      <u>Category 4: Suno's Recent AI Models and Continued Use of Plaintiffs' Sound Recordings</u>

Finally, Suno is refusing to produce documents and information relating to its continued use of Plaintiffs' sound recordings to develop new public-facing AI models that power its commercial AI music generation service (namely materials relating to its v4.5, v4.5+, and v5 models).[13]  Contrary to Suno's mischaracterization, Plaintiffs are not seeking "[m]odel discovery with no end date"; rather they seek source code and training data for only these three public models, as well as associated documents and communications that will reflect, for instance, the extent to which Suno used *more* of Plaintiffs' works to train its recent AI models or that Suno afforded Plaintiffs' greater weight when training these models.[14]

Suno suggests that this Court should take its cue from decisions regarding the appropriate scope of model discovery in the pending multidistrict litigation involving copyright infringement allegations against the generative AI defendant OpenAI.  But MDLs are governed by unique considerations, which often militate in favor of narrower discovery than an individual plaintiff might otherwise be entitled to.  *See Warren v. Pataki*, 823 F.3d 125, 144 (2d Cir. 2016) ("Because of the number of defendants, the number of people involved in the case, and the breadth of its subject matter, the district court's eagerness to keep the discovery process on a tight leash is easily understood."). At the start, the court in the OpenAI case has had to make careful decisions about the orderly administration of multidistrict litigation involving plaintiffs across the country who sought to bring various claims against OpenAI.  By contrast, this Court need not mediate against any such considerations regarding coordinating multiple cases across multiple parties located across multiple jurisdictions.  Moreover, Plaintiffs' present request is significantly more tailored than what the parties were seeking in the *OpenAI* MDL, as that court was also considering a request from certain parties to inject additional antitrust claims into the litigation, which stood to dramatically expand the scope of discovery and invite further motion practice.  *See In re: OpenAI, Inc. Copyright Infringement Litig.*, No. 1:25-md-3143, Dkt No. 80 at 37:15-19 ("These amendments, including the antitrust amendment, are not getting us there."). Plaintiffs' current request invites no disruption of this sort.

Suno is also wrong that Plaintiffs have not identified any recent change in Suno's product that calls for further discovery.  To the contrary, Suno apparently concedes that its recent policy change ███████

---

[13] That Suno has agreed to supplement certain interrogatories relating to the development of its AI models does not address this issue.  Absent a corresponding document production, Plaintiffs would have no way to verify Suno's characterizations of this important information.  And the fact that Suno already produced source code data for the initial period betrays that such information is not merely duplicative of their interrogatory responses.

[14]  Plaintiffs expressly reserve their rights to seek additional discovery into any subsequently released models using licensed works that Suno affirmatively intends to rely on in the litigation.

## HUESTON HENNIGAN LLP



██████████████████████████████████████████████████ is relevant to the litigation.  Despite issuing an RFP targeted at precisely this issue, ████████████████████████████████████████████████████████████████████ .[15] ████████████████████████████████████████████████████████████████████ Further compounding the issue, after implementing this change, Suno failed to comply with its obligation to correct its flatly inconsistent Interrogatory response representing that, ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Second Amended and Supplemental Response to Amended Interrogatory No. 6.  Even Suno's response, above, attempts to muddle this issue by stating that users are not allowed to prompt with artist names.  The fact is that Suno *does* now allow a user to prompt with an artist's name and receive Suno-generated outputs that sound like that artist.  Suno's ongoing refusal to recognize that confirms the need for further discovery, including by calling into question what other important changes Suno has made and failed to disclose.

Suno's response on this point only compounds the problem. Suno now contends that ███████ ██████████████████████████████ and that the Simple Mode feature therefore does not represent a meaningful product change.  *Supra* at 10.  But whether Suno's model processes artist names █████████ ██████████████████████████████████████████████████ is a distinction without a difference from the user's perspective—and from the perspective of market impact.  A user who enters "Lauryn Hill" and receives an output informed by the musical attributes associated with Lauryn Hill has used Suno to generate music based on a specific copyrighted artist, regardless of the intermediate technical steps.  Suno's assertion that such an output would not "sound like" the prompted artist, *see* Won Dep. at 125:1–7, is a contested factual claim not suitable for resolution in connection with a discovery dispute.

Suno's further argument that Plaintiffs' document requests are unwarranted because Plaintiffs had the opportunity to question Mr. Won at deposition mischaracterizes both the record and the basis for Plaintiffs' request.  Plaintiffs are not seeking documents because Mr. Won's answers were unsatisfying; they are seeking documents because Suno failed to supplement its Interrogatory responses to disclose a material product change, and Mr. Won's deposition revealed a gap that Suno's own productions should have filled.  Mr. Won himself identified another Suno employee who "might possess different and additional information" about the feature, Won Dep. at 127:6–8, confirming that relevant information exists within Suno that has not been produced.  Nor does Suno's belated agreement to supplement Interrogatory responses through v5 moot the need for underlying documents and communications.  Interrogatory responses describe what happened; documents reveal when the decision was made, who was involved, what motivated the change, and whether Suno's internal analyses reflected an expectation that users would use the feature to generate outputs resembling specific copyrighted artists.  Suno's suggestion that its prior interrogatory definition of "AI model" was always limited to versions through v4 only reinforces the point: Suno chose a definition that excluded its newer models from supplementation obligations, and Plaintiffs are entitled to discovery that captures the product changes that definition was designed to obscure.

---

[15] RFP No. 20 seeks, "All Documents and Communications Relating To Your AI Model's creation, whether intentional or not, of Outputs that copy, mimic, imitate, simulate, contain, replicate, or resemble any aspects or elements of Sound Recordings included in Your Training Data."

# HUESTON HENNIGAN LLP

The upshot is that Plaintiffs are not privy to all of Suno's development initiatives from the past year implicating their sound recordings, but it is evident Suno has made relevant changes in this regard. Plaintiffs are, nevertheless, entitled to information pertaining to any of Suno's recent product development efforts that implicate Suno's continued use of Plaintiffs' sound recordings and increase the likelihood that Suno's AI models will generate outputs that resemble their copyrighted works. Plaintiffs' request that Suno update its source code and training data productions for its recent commercial models is expressly targeted at the materials that will permit Plaintiffs to ascertain the extent to which Suno made any changes to its product that reflect Suno's continued use of or emphasis on Plaintiffs' copyrighted works.

## II.      Suno's Custodian List

### A.      Plaintiffs' Position

To date, Suno has agreed to search the custodial files of its four co-founders, four individuals who have knowledge of its AI models and training data, Suno's Head of Music, and Suno's Head of Product (both of whom joined the company after this litigation began). It is clear, however, that Suno's current custodians do not possess the full universe of information that is relevant to this case and responsive to Plaintiffs' discovery requests. Plaintiffs' investigation into Suno has revealed two additional individuals who likely possess unique, non-duplicative documents that go to core issues in this case, namely Suno's initiatives to impact and influence the market for its AI music generation services. These individuals are: (1) Helena Caldwell (Head of Social Media); and (2) Franklin Yang (Head of Growth). Given the turnover among Suno's co-founders and the rapid growth of Suno's business over the past year, adding these two individuals as custodians would particularly fill an existing hole in the record regarding Suno's recent marketing initiatives over the past year.

Plaintiffs' present request is a modest one, as they seek to add just two of Suno's department heads relating to an important issue in the case. Ms. Caldwell rose Suno's ranks to become its Head of Social Media, after starting as Suno's first marketing hire in January of 2024.[16] She launched and grew Suno's social media accounts on TikTok, Instagram, YouTube, X (formerly Twitter), and LinkedIn.[17] Social media is a critical marketing channel for Suno—indeed, Suno initially launched its AI music generation product exclusively on the social media network Discord. On Instagram alone, Suno has approximately 330,000 followers and collaborates with influencers to promote its AI models. Ms. Caldwell has also led social media campaigns for Suno's product-related launches, including its collaborations with music producer Timbaland and DJ Flosstradamus.[18] Mr. Yang started as a Product Manager at Suno in May of 2024, and was

---

[16] The fact that Ms. Caldwell has recently left the company has no bearing on this dispute. She was employed and head of the social media department during the relevant time period.

[17] *See* LinkedIn, Helena Caldwell, *available at* https://www.linkedin.com/in/helena-caldwell/.

[18] It has come to Plaintiffs' attention that in or around September 2024, Suno partnered with Flosstradamus to coordinate a remix contest encouraging users to remix a Flosstradamus sound recording based on stemmed audio that Flosstradamus uploaded to Suno. *See* Keenan Freyberg, Suno Remix Contest (feat. Flosstradamus), Suno (Sept. 10, 2024). Suno's collaboration with Flosstradamus is particularly relevant to Plaintiffs' claims, as it appears to represent an unauthorized commercial use of a sound recording likely owned by a Plaintiff-affiliated record label to encourage the creation of infringing remixes. At the very least, this remix contest represents Suno's attempts to usurp the market for remixing sound recordings.

# HUESTON HENNIGAN LLP

promoted to Head of Growth in January of 2025. In his capacity as Head of Growth, Mr. Yang is tasked with leading advertising, branding, and influencer marketing. *See* SUNO_00096972 (Head of Growth Hiring Plan). He also appears to manage third-party marketing agencies focused on social media and content creation. *See* SUNO_00165123. As the heads of two marketing-focused departments, Ms. Caldwell and Mr. Yang have unique documents pertaining to Suno's marketing initiatives and attempts to impact the market, which Suno has not yet collected or produced. For example, Plaintiffs are aware based on documents Suno produced to date that Suno has an ongoing relationship with ████████████████ ████████████. *Id.* Though Plaintiffs know that Suno is making investments to target a particular demographic audience, Suno has produced fewer than 10 emails between it and Dime. This is likely because Mr. Yang is not a custodian.

Plaintiffs served targeted discovery requests concerning Suno's marketing, partnerships, and social media, for the purpose of informing their analysis of the market for Suno's AI service and outputs, as relevant to the fourth fair use factor. As Suno currently does not have a custodian focused on marketing, its current custodian list omits a key category of personnel necessary to ensure a reasonable search and collection of responsive materials on the subject of marketing. In refusing Plaintiffs' request for a marketing-related custodian, Suno incredibly stated that "[h]ow Suno marketed its product is of minimal relevance to this litigation." J. Cammack Dec. 5, 2025 Email. Contrary to Suno's contention, marketing is of central relevance to this dispute because Suno's efforts in this regard relate squarely to the creation, development, and market impact of the generative AI music service Suno built using Plaintiffs' copyrighted sound recordings. More specifically, Mr. Yang's and Ms. Caldwell's marketing activities and efforts to increase Suno's visibility and traction in the marketplace are highly relevant to, at least, the first and fourth fair use factors. *See Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 525 (2023) ("[T]he first fair use factor . . . focuses on whether an allegedly infringing use has a further purpose or different character, which is a matter of degree, and the degree of difference must be weighed against other considerations, like commercialism."); *see also Harper & Row*, 471 U.S. at 566 (explaining that market impact and the fourth fair use factor is "undoubtedly the single most important element of fair use").

Plaintiffs are entitled to a full picture of Suno's marketing and promotional activities as they are probative of the commercial purpose underpinning Suno's unauthorized use of Plaintiffs' copyrighted sound recordings, as well as the market impact, both current and future, stemming from Suno's infringement. That is why they selected just two of Suno's department heads as proposed custodians. Plaintiffs are not seeking by this request every marketing-related document from every member of Suno's growth and social media departments. Plaintiffs do, however, need to know the full context for how Suno is promoting and marketing its AI music generation service to assess the actual and potential market impact of Suno's infringement, including whether and how it is promoting itself as a service for users to generate outputs that compete with Plaintiffs' copyrighted works. *See Hachette Book Grp, Inc. v. Internet Archive*, 115 F.4th 163, 190 (2d Cir. 2024) (discussing the defendant's advertising as part of fourth fair use analysis). The addition of Mr. Yang and Ms. Caldwell is particularly important to understand Suno's recent marketing efforts and initiatives. As discussed above, Suno has invested significant effort to advance its market position over the course of the past year. It is vital that Plaintiffs have access to the documents and communications from the individuals leading the departments actively involved in these efforts. Given the substantial growth of Suno's business during this recent timeframe, it strains credulity to believe that Suno's co-founders (the only custodians even conceivably relevant to marketing) have day-to-day oversight of the company's marketing discussions and decisions. And importantly, Mr. Yang did not become Suno's Head of Growth until 2025, the same year Keenan Freyberg (one of Suno's co-founders) left the company.

# HUESTON HENNIGAN LLP

Under Rule 26(b)(1), Suno bears the burden of showing discovery is improper once relevance is established.  *Close v. Acct. Resol. Servs.*, 557 F. Supp. 3d 247, 250 (D. Mass. 2021).  Suno has made no such showing, as "[t]he mere existence of overlap and some duplication is insufficient to preclude the discovery sought." *Thomas v. City of N.Y.*, 336 F.R.D. 1, 2 (E.D.N.Y. 2020); *see also* Fed. R. Civ. P. 26(b)(1) (the court may limit discovery where it is "*unreasonably* cumulative or duplicative") (emphasis added).  None of Suno's custodians operates in a role that is fully focused on marketing like Mr. Yang and Ms. Caldwell. While the co-founders may have some oversight of portions of Suno's marketing efforts, Suno hired Ms. Caldwell and Mr. Yang as heads of two marketing-focused departments for a reason.  If added, Ms. Caldwell and Mr. Yang would be the only two custodians whose roles are fully focused on Suno's marketing.[19]  The addition of these custodians would particularly fill the gaps in the record regarding Suno's marketing initiatives for the 2025-2026 timeframe.

Plaintiffs thus request an order requiring Suno to add these two custodians and search their ESI using Plaintiffs' proposed search terms.

## B.    Suno's Position

Suno has already identified a robust and comprehensive custodian list that addresses the categories of documents Plaintiffs claim to seek.  That list includes Suno's four co-founders (who together conceived of, developed, marketed, and built Suno's model and product), Suno's Chief Music Officer, Suno's Chief Product Officer (to whom both Mr. Yang and Ms. Caldwell reported), and four additional machine-learning engineers.  This dispute represents only what remains after Suno already agreed—in the spirit of compromise—to add two additional custodians (Tony Tong and Christian Steinmetz) whom Plaintiffs previously sought. Yet even that accommodation has not satisfied Plaintiffs, who continue to seek additional custodians despite having no basis to believe they would yield non-duplicative, relevant materials.

Indeed, Suno has already produced thousands or tens of thousands of internal documents related to marketing—already far more than is proportional, considering that Suno's internal marketing strategy is unlikely to be probative of the actual or potential impact of Suno's use on the market for Plaintiffs' works. *Cf.* 17 U.S.C. § 107(4).  Those documents have come from the files of Keenan Freyberg, the Suno co-founder with the greatest responsibility for marketing and product questions in the early days of the company, and from Martin Camacho and Jack Brody, the two Suno employees with current primary responsibility for marketing.  Suno will also produce materials from the files of Suno's Chief Music Officer, Paul Sinclair, who is likewise heavily involved in setting Suno's marketing and social media strategy.  The

---

[19] Suno argues that that the existing custodians' documents are sufficient to show Suno's "overall marketing strategy."  But, as discussed above, Plaintiffs are not only seeking information on the "overall marketing strategy"—Plaintiffs are interested in seeing the full context of Suno's promotion and marketing of its service and how marketing discussions and decisions developed over time.  And, as discussed above, it is unlikely that the "ultimate decisionmakers" at Suno were involved in the day-to-day marketing decisions that Plaintiffs are seeking to review.  Accordingly, Ms. Caldwell and Mr. Yang "possess unique relevant information not already obtainable from the custodians already designated." *Abiomed, Inc. v. Enmodes GmbH*, 23 Civ. 10087 (DJC), 2024 WL 4028295, at *4 (D. Mass. Sept. 3, 2024).

# HUESTON HENNIGAN LLP

custodians Suno has already selected, as well as the materials Suno has already produced, are more than sufficient to meet the limited need for marketing materials in this case.

The inquiry when assessing whether to add new document custodians is whether the new custodians would possess "uniquely relevant" materials. *Servicios Funerarios GG, S.A. de C.V. v. Advent Int'l Corp.*, No. 23-cv-10684-IT, 2023 WL 7332836, at *3 (D. Mass. Nov. 7, 2023), *aff'd*, No. 1:23-CV-10684-IT, 2024 WL 2748348 (D. Mass. May 29, 2024). Consistent with that standard, Plaintiffs' further custodian requests are designed to facilitate a fishing expedition, not to obtain uniquely relevant, non-duplicative materials. Suno's internal communications regarding marketing strategy are not the documents most likely to shed light on how Suno advertises itself—Suno's public advertising materials are. Moreover, to the extent Plaintiffs are interested in Suno's overall marketing strategy, those materials will be captured in the files of the ultimate decisionmakers on these issues—Mr. Yang's and Ms. Caldwell's current and former supervisors, who are already custodians.

Plaintiffs' argument that custodial "turnover" among Suno's co-founders justifies adding Mr. Yang and Ms. Caldwell is a red herring. The one co-founder who has left Suno—Keenan Freyberg—is already a custodian, and Plaintiffs have already received more than 33,000 documents from his files. In addition, Plaintiffs have subpoenaed Mr. Freyberg for additional documents and testimony. Thus, Plaintiffs are already receiving the files of the departed co-founder *in addition to* all remaining co-founders, four machine-learning engineers, the Head of Product (to whom both Mr. Yang and Ms. Caldwell reported), and the Chief Music Officer. There is no "hole" for Mr. Yang and Ms. Caldwell to fill—their files would be either irrelevant (e.g., internal discussions of day-to-day social media posts) or wholly duplicative of what is already in the files of their supervisors and other current custodians.

In light of the extensive, cross-functional productions Suno has already made, adding Mr. Yang and Ms. Caldwell as custodians would be needlessly duplicative and disproportionate to the case. Plaintiffs point to no actual deficiencies in Suno's marketing productions to date. Courts in this district have declined to disturb a party's choice of ESI custodians unless that choice is "manifestly unreasonable" or the opposing party "demonstrates that the resulting production is deficient." *Servicios Funerarios*, 2023 WL 7332836, at *2 (citations omitted). "This is because the party responding to the discovery requests is typically in the best position to know and identify those individuals within its organization likely to have information relevant to the case." *Id*.

Plaintiffs' desire for additional "context" about Suno's marketing is an inadequate basis to demand Suno expand its custodian list, particularly where there is no live dispute about the commercialism of Suno's use and where Suno's actual marketing materials are publicly available. The fourth fair use factor examines "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). As discussed above, even if how Suno ultimately marketed its product had some marginal relevance to potential market impact, that can be surmised through Suno's publicly-available marketing. Indeed, Plaintiffs' citation to *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 176 (2d Cir. 2024), only reinforces this point. There, the court found the defendant's actual, external-facing advertising relevant, not the defendant's internal advertising strategy. *Id.* If Suno "is promoting itself as a service for users to

# HUESTON HENNIGAN LLP

generate outputs that compete with Plaintiffs' copyrighted works," Plaintiffs should be able to ascertain that fact from publicly-available materials. Thus, internal documents would be cumulative at best, and certainly do not warrant adding additional custodians beyond the several Suno has already designated.

**Franklin Yang** need not be added as a custodian because his work overlaps substantially with that of existing custodians, and his custodial file is therefore unlikely to contain non-cumulative relevant materials. Specifically, Mr. Yang's role—as a product manager from May to December 2024 and now as Suno's Head of Growth—encompasses product management and growth marketing functions. In other words, Mr. Yang sits at the intersection of product and marketing. But his responsibilities overlap significantly with functions carried out previously by Keenan Freyberg and Martin Camacho and now by Jack Brody and Mr. Camacho—all of whom are custodians in this case. Mr. Freyberg is the Suno co-founder who had primary responsibility for marketing and partnerships until January 2025—seven months after the complaint was filed in this case. Mr. Brody has been Suno's Chief Product Officer since November 2024. And Mr. Camacho is a Suno co-founder who led product for the company until Mr. Brody joined, and who now leads Suno's brand, software engineering, and user growth workstreams. As Mr. Yang's former or current supervisors, Mr. Brody, Mr. Camacho, and Mr. Freyberg are the individuals responsible for making strategic decisions—and their files, not Mr. Yang's, are therefore more likely to contain documents reflecting those decisions. Plaintiffs are thus incorrect that Suno does not have a marketing custodian as three different custodians already cover this function. Suno has already produced *more than 33,000 documents* from Mr. Freyberg's custodial file, 5,000 from Mr. Camacho, and 1,200 from Mr. Brody. Suno has also produced more than 1,200 Slack threads in which Mr. Freyberg, Mr. Camacho, or Mr. Brody participated.

Plaintiffs' suggestion that "Mr. Yang did not become Suno's Head of Growth until 2025, the same [year] Keenan Freyberg (one of Suno's co-founders) left the company" is both misleading and irrelevant. Plaintiffs appear to imply that Mr. Yang somehow "took over" Mr. Freyberg's responsibilities, but that is incorrect. Mr. Freyberg's departure did not result in Mr. Yang assuming Mr. Freyberg's role—rather, Mr. Freyberg's various responsibilities were absorbed by other executives, including Mr. Brody (Chief Product Officer) and Mr. Camacho (co-founder), both of whom are already custodians. Plaintiffs know this, having already received over 33,000 documents from Mr. Freyberg's custodial files and having subpoenaed him directly for additional materials.

Given the volume of documents already produced from these custodians, adding Mr. Yang would be cumulative and unnecessary. To the extent Plaintiffs are also interested in Suno's decisionmaking regarding how Suno's product should function and how that product might drive growth, again, Mr. Camacho's and Mr. Brody's files are more likely to contain documents reflecting Suno's strategic decisionmaking because as Chief Product Officer and a co-founder leading product, respectively, Mr. Brody and Mr. Camacho set Suno's product strategy. Mr. Yang, reporting to them, only implements it. It is further unclear what relevant information Plaintiffs expect to learn from Mr. Yang's communications with a marketing agency that they cannot learn from Mr. Yang's communications with his supervisor about Suno's

# HUESTON HENNIGAN LLP

relationship with Dime.  In any event, Plaintiffs have already indicated that they intend to depose Mr. Yang, and can certainly ask him more about Suno's relationship with Dime then.

**Helena Caldwell**, Suno's former Head of Social Media Strategy, need not be added as a custodian because her work—growing Suno's social media presence and managing community engagement initiatives like a teachers' program and youth exposure to Suno—was neither probative of actual market harm nor likely to yield non-cumulative documents.  Even assuming Suno's marketing activities have some bearing on the market impact, the relevance of internal deliberations about what to post on social media is highly attenuated.  And as a threshold matter, Ms. Caldwell is no longer employed by Suno. Plaintiffs' insistence on adding a departed social media employee as a custodian, when they have already received extensive productions from her former supervisors, underscores the disproportionate nature of their request.

Moreover, Plaintiffs have not cited a single document suggesting that Ms. Caldwell possesses uniquely relevant materials.  For example, Plaintiffs point to the Flosstradamus partnership as justification for adding Ms. Caldwell, but Keenan Freyberg—not Ms. Caldwell—was intimately involved with that partnership.  Again, Ms. Caldwell's materials are likely to be cumulative of other custodians' files.  Mr. Freyberg oversaw Ms. Caldwell's work from her hiring until approximately January 2025, and since then her work has overlapped with that of Mr. Camacho and of Mr. Sinclair (beginning in July 2025) until her departure in September 2025.  Any substantive strategic decisions regarding social media would have been made by—and reflected in the files of—her supervisors, not Ms. Caldwell.  And to the extent Plaintiffs seek Suno's actual social media communications or posts, those are publicly available.

In short, Suno's custodian list is not "manifestly unreasonable," nor have Plaintiffs demonstrated that Suno's productions (of more than 65,000 documents, plus source code and training data) have been "deficient."  Plaintiffs' request to add Mr. Yang and Ms. Caldwell is nothing more than a fishing expedition dressed up as a targeted request. Accordingly, Suno's already robust list of custodians should not be disturbed.

## III.    Suno's Responses to Plaintiffs' Third Set of Document Requests

### A.    Plaintiffs' Position:

On September 10, 2025, Plaintiffs served their Third Set of Requests for Production of Documents.  These requests generally seek documents related to (1) Suno's promotion of its AI music generation service; and (2) users' uploading of outputs to streaming services.  Suno has been actively engaged on both subjects, which are highly relevant to Suno's fair use defense.  Suno objected to these requests primarily on the basis that they were duplicative of other requests previously served by Plaintiffs.  The parties met and conferred regarding these requests on October 20, 2025, after which Suno outlined the earlier requests and agreed-upon search strings that it believes already capture the materials sought by Plaintiffs' third set of requests.  After reviewing Suno's list, Plaintiffs maintain that Suno's objections based on duplicativeness are meritless and that their third set of requests seeks unique documents that are not captured by prior requests.  Nevertheless, in the spirit of compromise, Plaintiffs

# HUESTON HENNIGAN LLP

asked Suno to conduct a targeted supplemental review of documents in responsive to a subset of Plaintiffs' third set of requests.  Suno has refused.  The Court should require Suno conduct the narrow supplemental review outlined below.

*First*, Plaintiffs requested that Suno perform a targeted re-review of documents that have not been produced or logged using the search strings that Suno identified as likely capturing documents responsive to Plaintiffs' third set of RFPs.  The purpose of this targeted re-review was for Suno to identify any documents responsive to Plaintiffs' third set of RFPs that were not captured by Plaintiffs' first and second sets of RFPs.  Suno has refused to do so, despite the fact that documents Suno previously deemed non-responsive to earlier requests may be responsive to Plaintiffs' third set of RFPs.  Irrespective of any potential overlap between Plaintiffs' third set of RFPs and their prior requests, it is clear that Plaintiffs' third set of RFPs— which seek materials concerning discrete promotional, marketing, partnership activities—are not fully captured by their earlier-served requests.  Accordingly, Suno's refusal to conduct this narrow re-review is likely to deprive Plaintiffs of responsive documents Suno tagged as non-responsive to other requests.  The Court should direct Suno to review its collected documents for materials responsive to Plaintiffs' third set of RFPs using the set of search terms Suno, itself, identified.

*Second*, Plaintiffs requested that Suno run a set of narrow, supplemental search strings designed to target documents responsive to Plaintiffs' third set of RFPs that are not otherwise captured by the previously agreed-upon search strings that Suno identified.  Suno only agreed to use search strings that Plaintiffs proposed for two of the RFPs in their third set, without offering hit counts or counter-proposals for the remaining search strings.  This is insufficient.  Plaintiffs are entitled to discover materials relevant to their claims and Suno's defenses, and the supplemental search strings proposed by Plaintiffs are narrow and targeted so as to minimize any burden on Suno.  Suno cannot refuse to meaningfully respond without demonstrating the requests are burdensome or disproportionate to the needs of the case[20].

Plaintiffs have narrowed their original request and are now ask the Court to direct Suno to supplement its search strings for just four RFPs, as follows:

---

[20] Suno simultaneously claims that "discussion of burden is [not] ripe," while also asserting that Plaintiffs' request "would be unduly burdensome."  To the extent that Suno is relying on burden objections, it has failed to substantiate such burden, including by refusing to provide hit counts for any proposed search strings.  "It is well settled that the party resisting production bears the burden of establishing lack of relevancy or undue burden. The mere statement by a party that the [request] was overly broad, burdensome, oppressive and irrelevant is not adequate to voice a successful objection.  On the contrary, the party resisting discovery must show specifically how each [request] is not relevant or how each question is overly broad, burdensome or oppressive." *Vazquez-Fernandez v. Cambridge Coll., Inc.*, 269 F.R.D. 150, 155–56 (D.P.R. 2010) (cleaned up).  Thus, Suno's objections should be overruled.

Hon. Paul G. Levenson
March 9, 2026
Page 30

# HUESTON HENNIGAN LLP

| Request for Production | Agreed-Upon Search Terms | Proposed Search Terms |
|---|---|---|
| **RFP 96**: All Documents and Communications Related to Your use of Copyrighted Sound Recordings to market, promote, or otherwise publicize Your AI Service, including by @Sunomusic on TikTok. | (Suno OR model* OR product OR service OR output* OR music) /15 (marketing* OR "public relation*" OR advertis* OR promot* OR publiciz*)<br><br>(Suno OR model* OR product OR service OR output*) /10 (market*)<br><br>(Suno /5 PR)<br><br>(model* OR product OR service OR output* OR music) /5 PR | Plaintiffs request that Suno add the following search string to ensure it is identifying responsive documents, particularly documents focused on Suno's social media accounts:<br><br>(Post* OR share* OR upload* OR promot* OR advertis*) w/15 (Instagram OR Twitter OR X OR TikTok OR Snapchat OR Reddit OR Facebook)<br><br>The agreed-upon search strings are focused on Suno's marketing efforts more generally, while the proposed search string is narrowly focused on Suno's use of social media—which appears to be Suno's main marketing tool.  While Plaintiffs can see for themselves publicly available advertising and collaborations with influencers, internal information regarding Suno's plans for social media and communications with influencers are key to establishing the markets that Suno is and plans to disrupt. Suno's argument that social media is a "subset" of broader marketing misses the point. The current search strings do not encompass specific social media platforms, like Instagram, Snapchat, or TikTok. Specificity matters for ESI searches and Suno provides no support or explanation for why Plaintiffs are not entitled to discover documents that discuss its use of social media platforms without explicitly using the terms "marketing" or "public relations".  Plaintiffs remain willing to consider any counterproposal that Suno wants to provide. |

# HUESTON HENNIGAN LLP

| | | |
|---|---|---|
| **RFP 97**: All Documents and Communications Related to Your use of Paid Partnerships to market, promote, or otherwise publicize Your AI Service. | (Suno OR model* OR product OR service OR output* OR music) /15 (marketing* OR "public relation*" OR advertis* OR promot* OR publiciz*) | Plaintiffs request that Suno add the following search string to ensure that it is identifying responsive documents, particularly documents focused on Suno's paid partnerships:<br><br>(collab* OR demo* OR "partner*" OR relationship*OR affiliat* OR campaign OR advertis* OR market* OR promot* OR public*) AND (artist* OR producer* OR musician* OR singer* OR industry OR label* OR creator* OR influenc* OR ambassador* OR advocate* OR spokesperson* OR sponsor*)<br><br>The agreed-upon search string is focused on Suno's marketing efforts more generally, while the proposed search string is narrowly focused on Suno's collaborations with influencers and music industry participants.  While Plaintiffs can see for themselves publicly available advertising and collaborations with influencers, internal information regarding Suno's plans for social media and communications with influencers are key to establishing the markets that Suno is and plans to disrupt. Plaintiffs understand that Suno has agreements with third parties who are tasked with assisting Suno with campaigns focused on creators and influencers, but Suno has not produced a meaningful set of communications with these third parties.  For example, Suno has produced less than 10 emails between it and ███████<br><br>[21] SUNO_00165123. |

**HUESTON HENNIGAN LLP**

| | | |
|---|---|---|
| | | Suno's argument that paid partnerships are a "subset" of broader marketing misses the point. The current search strings do not specifically encompass paid partnerships. Specificity matters for ESI searches and Suno provides no support or explanation for why Plaintiffs are not entitled to discover documents that discuss its use of paid partnerships without explicitly using the terms "marketing" or "public relations". Plaintiffs remain willing to consider any counterproposal that Suno wants to provide. |

---

[21] The lack of responsive documents is also likely due to the fact that Franklin Yang is not a custodian.

# HUESTON HENNIGAN LLP

| RFP 98: All Documents and Communications Related to the uploading of Outputs to Streaming Services by Users, including comments from Users on Social Media. | (Suno OR model* OR product OR service OR output* OR music) /15 (marketing* OR "public relation*" OR advertis* OR promot* OR publiciz*)<br><br>"terms of service" OR "terms of use" OR TOU or TOS) AND (("paid tier" OR "premier tier" OR "pro tier") /10 output)<br><br>((upload* OR publish* OR share* OR post* OR export* OR output*) w/30 (output* OR song* OR generat* OR track* OR record* OR music)) w/30 (Apple OR Spotify OR Soundcloud OR tidal OR deezer OR youtube OR amazon OR streaming OR DSP* OR TikTok OR Distrokid)<br><br>Output* AND (revenue OR royalt* OR licens* OR monetiz* OR commercializ* OR sampl* OR sell* OR buy* or purchas* OR market*)<br><br>(Suno OR model* OR product OR service OR output*) /10 (market*) | Plaintiffs request that Suno add the following search string to ensure that it is identifying responsive documents, particularly documents focused on notable comments left on Suno's social media accounts:<br><br>((song* OR output* OR track*) AND (comment* OR post* OR tag*)) w/15 (Instagram OR Twitter OR X OR TikTok OR Snapchat OR Reddit OR Facebook)<br><br>The agreed-upon search string is focused on Suno's general discussions regarding the commercialization of outputs, while the proposed search string is narrowly focused on Suno's discussions concerning comments by users on social media.  Users leave public comments on Suno's TikTok, Instagram, Facebook and Twitter/X accounts, and on Reddit regarding their user of Suno, including uploading their outputs to streaming services, and new features that they would like to see implemented.  Suno's communications discussing these comments, in particular, communications regarding implementing proposed new features, are directly relevant to the fourth factor analysis.  This RFP explicitly requests documents and communications related to comments from users on social media, so Suno's claims regarding "post hoc justification[s]" should be rejected.  None of the search strings that Suno cites include the term "comment," which is the focus of this request and Plaintiffs' proposal. Plaintiffs remain willing to consider |

**HUESTON HENNIGAN LLP**

| | | any counterproposal that Suno wants to provide. |
|---|---|---|

# HUESTON HENNIGAN LLP

| RFP 104: All Documents and Communications Related to Your partnership with Timbaland, including Stage Zero and the Output Generator TaTa. | (Suno OR model* OR product OR service OR output* OR music) /15 (marketing* OR "public relation*" OR advertis* OR promot* OR publiciz*) (Suno OR model* OR product OR service OR output*) /10 (market*)<br><br>(Suno /5 PR)<br><br>(model* OR product OR service OR output* OR music) /5 PR (Suno OR model* OR product OR service OR output* OR music) /15 (marketing* OR "public relation*" OR advertis* OR promot* OR publiciz*) | Plaintiffs requested that Suno add the following search string to ensure that it is identifying responsive documents, particularly documents focused on Suno's partnership with Timbaland:<br><br>("Timbaland" OR "Stage Zero" OR "TaTa")<br><br>The agreed-upon search strings are focused on Suno's marketing efforts more generally, while the proposed search string is narrowly focused on Suno's collaboration with music producer Timbaland and his AI-focused entertainment company, Stage Zero. Timbaland is more than a collaborator, he is described by Suno as  SUNO_00078012. SUNO_00078012. Stage Zero "relies on a collaborative process with Suno," and "TaTa" is an "AI artist" that is "signed" to Stage Zero and created using Suno, who has been described as "the first artist of a new generation."[22] Suno's communications with Timbaland and Stage Zero, particularly communications regarding Suno's potential and current and future "AI artists," are directly relevant to its impact on the market for copyrighted sound recordings. While Suno attempts to reframe Plaintiffs' requests as fishing into a |

# HUESTON HENNIGAN LLP

| | | "private citizen's business," Plaintiffs are, of course, only seeking documents and communications within *Suno's* possession, custody, or control.  Plaintiffs remain willing to consider any counterproposal that Suno wants to provide. |
|---|---|---|

### B.    Suno's Position

The Parties have already extensively negotiated 74 search strings for Suno to use to identify documents responsive to Plaintiffs' first and second set of RFPs.  Plaintiffs' Third Set of RFPs is an improper attempt to relitigate those already-settled search terms by recasting them as "new RFPs."  To the extent the new requests are not entirely duplicative, the delta covers information with minimal or no relevance to this case. Suno should not be required to engage in a burdensome, duplicative, and wasteful re-review of previously reviewed documents.   As Plaintiffs acknowledge, their discovery requests are limited by relevance.  Although Plaintiffs assert that Suno has failed to provide hit counts for Plaintiffs' Requests, Suno has repeatedly explained that its objections are grounded in relevance and duplicativeness—threshold issues that must be resolved before any discussion of burden is ripe.  *See* C. Amanze December 4, 2025 Email to S. Givertz ("We do not agree to run a general review with old or new search terms.  As stated in our responses and objections, and then explained again in the meet and confer, we objected to this set of requests on the basis of, among other issues, duplicativeness, relevance, over-broadness, ambiguity, and burden …").

Plaintiffs' RFPs 96 and 97 are entirely duplicative of existing RFP 32, for which search terms have already been extensively negotiated and settled, and thus there is no need to add new search terms. Plaintiffs' RFPs 98 and 104 are mostly duplicative of existing RFPs, and to the extent they are not, any delta seeks information with minimal or no relevance.

| Subject Matter Sought | Existing Coverage | Existing Search Strings | Explanation |
|---|---|---|---|
| **RFP 96:** All documents and communications related to your use of copyrighted sound recordings to market, promote, or otherwise publicize your AI Service, including by @Sunomusic on TikTok. | **RFP 32**: All documents and communications relating to the marketing of your AI Service or outputs. | (Suno OR model* OR product OR service OR output* OR music) /15 (marketing* OR "public relation*" OR advertis* OR promot* OR publiciz*)<br><br>(Suno OR model* OR product OR service OR | Existing RFP 32 already covers all marketing materials (including social media).  Plaintiffs' request for a new RFP that is "narrowly focused on Suno's use of social media—which appears to be Suno's main marketing tool" is |

---

[22] *See* Mandy Dalugdug, *Timbaland Launches AI Music Company Stage Zero, With First AI Artist, Tata,* Music Business Worldwide (June 9, 2025); Sheldon Pearce, *Timbaland's AI Music Project Is a Ghost in a Misguided Machine*, NPR (June 17, 2025).

## HUESTON HENNIGAN LLP

| Subject Matter Sought | Existing Coverage | Existing Search Strings | Explanation |
|---|---|---|---|
| | | output*) /10 (market*) <br><br> (Suno /5 PR) <br><br> (model* OR product OR service OR output* OR music) /5 PR | necessarily duplicative, because social media marketing is a subset of all marketing. <br><br> Plaintiffs' request now appears to be nothing more than an attempt to renege on the parties' agreement and to renegotiate an already resolved search string. <br><br> Plaintiffs have not explained the category of responsive documents they seek in response to RFP 96 that is not already covered by RFP 32. This is because there is none. Documents and communications related to Suno's use of copyrighted sound recordings to market Suno's Service are already included within "All documents and communications relating to the marketing of your AI Service or outputs." |
| **RFP 97**: All documents and communications related to your use of paid partnerships to market, promote, or otherwise publicize your AI Service. | **RFP 32**: All documents and communications relating to the marketing of your AI Service or outputs. | (Suno OR model* OR product OR service OR output* OR music) /15 (marketing* OR "public relation*" OR advertis* OR promot* OR publiciz*) | Like with RFP 96, RFP 97 is duplicative of existing RFP 32 because it merely seeks a subset of marketing materials. Documents related to use of paid partnerships to market |

Hon. Paul G. Levenson
March 9, 2026
Page 38

# HUESTON HENNIGAN LLP

| Subject Matter Sought | Existing Coverage | Existing Search Strings | Explanation |
|---|---|---|---|
| | | | Suno's AI service are necessarily included within "All documents and communications relating to the marketing" of Suno's AI service.  Indeed, Plaintiffs admit that RFP 97 is a "narrowly focused" version of what RFP 32 already covers.  There is thus no cause to re-open search term negotiations that have already been settled.

Tellingly, Plaintiffs have offered no explanation regarding what additional material their new Request for Production would provide that is not already covered by RFP 32—because there is none.  Plaintiffs reference communications with Dime, but marketing communications with Dime are already covered by RFP 32. And Plaintiffs' complaint that Suno somehow hasn't produced *enough* emails with Dime is not a basis to add new search terms, particularly where those terms are not even targeted at Dime. |

## HUESTON HENNIGAN LLP

| Subject Matter Sought | Existing Coverage | Existing Search Strings | Explanation |
|---|---|---|---|
| **RFP 98:** All documents and communications related to the uploading of outputs to streaming services by users, including comments from users on social media. | **RFP 3:** All documents and communications concerning the contents of your AI Model or relating to the manner in which you trained your AI Model.<br><br>**RFP 11:** All documents and communications related to your belief that your AI Service allows users to "create new songs that didn't and often couldn't previously exist," as alleged on page 1 of the Answer.<br><br>**RFP 34:** All documents and communications relating how you intended, expected, or predicted that users would use your AI Service, including but not limited to all documents and communications relating to any NY perceived or observed deviation from your intentions, expectations, or predictions.<br><br>**RFP 38:** All documents and communications relating to users' ability to upload outputs to streaming music services (e.g., Spotify, Apple Music, and Soundcloud), including | (Suno OR model* OR product OR service OR output* OR music) /15 (marketing* OR "public relation*" OR advertis* OR promot* OR publiciz*)<br><br>"terms of service" OR "terms of use" OR TOU or TOS) AND (("paid tier" OR "premier tier" OR "pro tier") /10 output)<br><br>((upload* OR publish* OR share* OR post* OR export* OR output*) w/30 (output* OR song* OR generat* OR track* OR record* OR music)) w/30 (Apple OR Spotify OR Soundcloud OR tidal OR deezer OR youtube OR amazon OR streaming OR DSP* OR TikTok OR Distrokid)<br><br>Output* AND (revenue OR royalt* OR licens* OR monetiz* OR commercializ* OR sampl* OR sell* OR buy* or purchas* OR market*)<br><br>(Suno OR model* OR product OR service OR output*) /10 (market*) | RFP 98 seeks documents and communications related to user uploading of outputs to Streaming Services, a broad topic almost entirely covered by RFPs 38 and 30. Plaintiffs now claim this RFP actually seeks something different: Suno's internal discussion of "notable comments" (which Plaintiffs do not define) and "proposed new features." But these topics are separate from third-party uploading of outputs to streaming services, and are no basis for RFP 98's broad language.<br><br>Furthermore, even this post hoc justification is pretextual. Plaintiffs offer no support for their speculation that internal discussions about random public comments posted on social media by individuals unconnected to Suno are relevant to analyzing the market for Plaintiffs' asserted works. In any case, existing RFPs 3, 11, and 34 already cover information about Suno features, and existing RFPs 20 and 21 |

# HUESTON HENNIGAN LLP

| Subject Matter Sought | Existing Coverage | Existing Search Strings | Explanation |
|---|---|---|---|
| | but not limited to the names and number of outputs uploaded to streaming services.. | | already cover internal conversations related to mimicking existing artists or works. These are more than sufficient for factor four analysis. |
| | **RFP 30**: All documents and communications relating to your policy of assigning to users who "subscribed to the paid tier of the Service" all of the "right, title and interest in and to any Output owed by Suno and generated from Submissions made by" such user, as referenced in your terms of service. | | |
| **RFP 104**: All documents and communications related to your partnership with Timbaland, including Stage Zero and the output generator TaTa. | **RFP 32**: All documents and communications relating to the marketing of your AI Service or outputs.<br><br>**RFP 43**: All documents and communications relating to your AI Service's impact or effect on the music industry.<br><br>**RFP 44**: All documents and communications relating to your consideration of potential legal or | (Suno OR model* OR product OR service OR output* OR music) /15 (marketing* OR "public relation*" OR advertis* OR promot* OR publiciz*)<br><br>(Suno OR model* OR product OR service OR output*) /10 (market*)<br><br>(Suno /5 PR)<br><br>(model* OR product OR service OR output* OR music) /5 PR<br><br>(Suno OR model* OR | One of the very articles Plaintiffs cite in support of RFP 104 undermines the request: it explicitly notes that Stage Zero operates *separately* from Suno.[23] The "collaborative process" between Suno and Stage Zero referenced in the article — and overstated by Plaintiffs — consists of nothing more than Timbaland using Suno in the same manner as any other user: uploading tracks into Suno for |

---

[23] *See* Mandy Dalugdug, *Timbaland Launches AI Music Company Stage Zero, With First AI Artist, Tata*, Music Business Worldwide (June 9, 2025) (stating that "Stage Zero operates separately from Suno …").

# HUESTON HENNIGAN LLP

| Subject Matter Sought | Existing Coverage | Existing Search Strings | Explanation |
|---|---|---|---|
| | financial risks relating to the training of your AI Service using sound recordings. | product OR service OR output* OR music) /15 (marketing* OR "public relation*" OR advertis* OR promot* OR publiciz*) | processing. *See* Mandy Dalugdug, *Timbaland Launches AI Music Company Stage Zero, With First AI Artist, Tata*, Music Business Worldwide (June 9, 2025). Suno's partnership with Timbaland does not extend to Stage Zero, so there is no basis to specifically target Stage Zero documents.<br><br>To the extent any *relevant* documents concerning Suno's partnership with Timbaland exist—such as those relating to marketing efforts or music industry advising—they are already captured by RFPs 32, 43, and 44. And to the extent Plaintiffs seek information about how musicians and producers use Suno's platform, any such documents would also be captured by RFP 43 as well as by publicly available articles like in this very instance. There is no need to create a new, Timbaland-specific search—particularly where information about aspects of Suno's |

**HUESTON HENNIGAN** LLP

| Subject Matter Sought | Existing Coverage | Existing Search Strings | Explanation |
|---|---|---|---|
| | | | partnership with Timbaland unrelated to marketing, such as any potential investment, is both highly sensitive and irrelevant to this litigation.  RFP 104 is thus duplicative at best. At worst, it is an inappropriate fishing expedition into the unrelated business endeavors of a private citizen.  The inappropriateness of RFP 104 is further underscored by Plaintiffs' proposed search terms, which call for documents related to Timbaland's *private* business efforts with which Suno is not involved.  Leveraging discovery in this litigation to glean insight into a private individual's unrelated business ventures is improper. |

Since it served its October 10, 2025 Responses and Objections, Suno has consistently maintained that Plaintiffs' new RFPs seek duplicative and/or irrelevant information.  Plaintiffs never substantively engaged with those objections or explained what additional relevant information their new RFPs would capture.  *See, e.g.*, C. Amanze November 1, 2025 Email to S. Givertz (noting that "Suno maintains all of its General and Specific Objections, including any objections raised in addition to duplication"); S. Givertz November 25, 2025 Email to C. Amanze (requesting a "re-review" without addressing Suno's objections).  Plaintiffs' position statement again sidesteps this fundamental question.  Plaintiffs' requested re-review using their new search strings would be unduly burdensome, requiring review of at least 52,000 documents (not including documents from recently-added custodians), for minimal, if any, additional benefit.