**Britt Lovejoy**
Direct Dial: +1.415.646.8329
britt.lovejoy@lw.com

# LATHAM&WATKINS LLP

505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Tel: +1.415.391.0600  Fax: +1.415.395.8095
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

January 23, 2026

Honorable Paul G. Levenson,
United States Magistrate Judge
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 2300
Boston, Massachusetts 02210

Re: *UMG Recordings, Inc., et al. v. Suno, Inc. et al.*, No. 24-cv-1161-FDS (D. Mass.)

Dear Judge Levenson,

Suno writes with serious concerns about the sufficiency of Plaintiffs' document production and broad refusal to produce discovery that would support Suno's well-pleaded affirmative defenses.

Suno respectfully requests a conference to discuss the discovery disputes summarized below.  If the Court would prefer, Suno will work with Plaintiffs to promptly submit joint dispute statements before the discovery conference is scheduled.

1. <u>**Plaintiffs' Refusal to Produce Discovery Related to Unexecuted AI License Agreements**</u>

**Suno's Position:** Nearly a year ago, Plaintiffs told Suno that they would produce documents and communications regarding both executed AI agreements and ***potential*** AI licensing agreements that may not have been ultimately executed.  *See* March 11, 2025 M. Rivera Email.  And they argued in briefing before this Court that external licensing communications provided a sufficient window into Plaintiffs' AI licensing strategy in order to avoid discovery into their internal licensing documents and communications.  *See* Dkt. 150-1 at 6 (emphasizing promise to produce

LATHAM&WATKINS LLP

"communications with third parties concerning any executed or potential license or agreement, including drafts, related to the use of sound recordings to train any generative AI model or for use in the outputs of any generative AI model."). But what Plaintiffs didn't say to the Court—or even make clear to Suno until recently—is that the scope of their commitment is limited to ***pre-complaint licensing discussions.***

Plaintiffs' position is improper. As an initial matter, the pertinent inquiry is whether Suno's requested discovery is *relevant*—not whether Suno will prevail on its fair use at summary judgment defense or whether Plaintiffs have demonstrated that a viable licensing market in fact exists. Materials related to Plaintiffs' unsuccessful license agreements are plainly relevant to Factor Four of Suno's fair use defense (under Plaintiffs' theory of that factor) under Rule 26's broad scope, and Plaintiffs must produce them. These communications may demonstrate the infeasibility of licensing training data for a generative AI product like Suno's, as they may show one or both parties concluding that a deal would be impracticable—for example, because the label could not supply the AI company with a sufficient volume of data to train its model, because the AI company determined it could not secure the necessary corollary publishing rights for the sound recordings, particularly at the scale needed to train its model effectively, and so on. Such communications are also relevant to Suno's copyright misuse defense insofar as they demonstrate a then industry-wide refusal to engage with companies offering products like Suno's. Because Suno was among the first music generative AI models to market and Plaintiffs' Complaint swiftly followed, by cutting off production of communications related to *unsuccessful* deals at the date of the complaint—while simultaneously producing *successful* deals through to present (and beyond, *see infra*)—Plaintiffs are creating a one-sided record, and withholding documents that are plainly relevant to Suno's fair use defense. Plaintiffs cannot produce evidence related to executed deals they believe may support the existence of a licensing market while withholding contrary evidence that may show that Plaintiffs are unwilling to license a transformative music-generative AI model like Suno's without substantial product modifications—modifications that potentially go to the very core of the product. Plaintiffs have not indicated that they have explored but unsuccessfully negotiated training data or output licenses with *so many* AI companies that production would be disproportionately burdensome—let alone quantified that burden. And, further, Suno previously offered that, "[i]f Plaintiffs were willing to stipulate that they will not introduce any evidence in this litigation that post-dates the filing of the Complaint," Suno would consider standing down on its request for post-complaint discovery. *See* G. McLaughlin August 26, 2025 Email.

Plaintiffs' arguments in defense of their refusal to produce post-Complaint discovery are not persuasive. That Suno recently entered into an FRE-408 protected settlement with one former Plaintiff in this case after nearly eighteen months of litigation does not establish that it could have built its product from the ground-up using solely licensed training data. Suno also firmly disputes the notion that Plaintiffs have produced "executed deal[s] that resemble[] Suno and its AI music generation product"—thereby "demonstrat[ing] that Plaintiffs are participating in this active and viable market." Suno will show at summary judgment that the deals UMG and Sony have entered into are for products that look nothing like Suno, and thus do not speak to whether there is a viable market for training data to train the music generative AI product at bar. Indeed, what the appropriate scope of the relevant market is for purposes of Factor 4 is an issue for *summary*

LATHAM&WATKINS LLP

*judgment*.  And, so too, is the question of whether that market is ultimately viable or not.[1]
Plaintiffs' attempts to pre-litigate those questions in order to deny Suno *discovery* should be
rejected.  Suno is entitled to communications related to instances in which a label/AI deal fell
apart, particularly where Plaintiffs are seeding the record with executed post-complaint deals that
they believe support the existence of a licensing market.  Plaintiffs also mischaracterize the Court's
position during the parties' October 10 discovery conference.  Indeed, the Court's "skepticism"
concerned Suno's request for *internal* communications about Plaintiffs' licensing strategy—
precisely *because Plaintiffs had already agreed to produce* "communications with third parties
concerning any executed *or potential license or agreement, including drafts*, related to the use of
sound recordings to train any generative AI model or for use in the outputs of any generative AI
model" without identifying the limitation they've now expressed.  The Court in fact acknowledged
that licensing strategy documents may be necessary to counter a "'gosh, we were nice to other
people, we just didn't like Suno' defense." Oct. 10 Hr'g. Tr. at 32:14–18.  Plaintiffs have made
clear they intend to make that *exact* argument.  *See infra* ("the successful deals Plaintiffs have
disclosed with generative AI companies demonstrate that Plaintiffs are participating in this active
and viable market.").

Given that Plaintiffs have refused to provide Suno with any *internal* communications that might
speak to the practicability of a licensing market[2]—including what kinds of AI products Plaintiffs
are willing to license and which they are not—Plaintiffs should not be permitted to renege on a

---

[1] In fact, whether the loss of an opportunity to license the asserted works as training data is even a
legally cognizable harm is an issue in dispute, and which will be addressed at summary judgment.
*See, e.g., Kadrey v. Meta Platforms, Inc.*, 788 F.Supp.3d 1026, 1052 (N.D.Cal., 2025) (noting "[i]n
every fair use case, the plaintiff suffers a loss of a potential market if that potential [market] is
defined as the theoretical market for licensing" and "to prevent the fourth factor analysis from
becoming circular and favoring the rightsholder in every case, harm from the loss of fees paid to
license a work for a transformative purpose is not cognizable."); *Bartz v. Anthropic PBC*, 787
F.Supp.3d 1007,1032 (N.D.Cal., 2025) ("Authors next contend that training LLMs displaced (or
will) an emerging market for licensing their works for the narrow purpose of training
LLMs…[e]ven so, such a market for that use is not one the Copyright Act entitles Authors to
exploit.").  Plaintiffs are correct that Suno pointed out in a discovery hearing that this may be the
only factually relevant market under Factor Four, given that the alleged unauthorized use of the
works at issue is to train a generative AI model that Plaintiffs do not (and cannot) allege produced
output that infringes their rights in the asserted sound recordings.  But Suno has repeatedly made
its position clear that lost licensing opportunities for a transformative use are not a *legally*
cognizable harm.  *See, e.g.,* Suno 10/3/2025 Discovery Dispute Statement at 18; J. Barnett
9/10/2025 Email.  Regardless, none of these legal questions need to be resolved for Suno to obtain
relevant discovery.

[2] Suno reserves rights to pursue internal licensing documents.  With the Court's guidance, the
parties previously agreed that Plaintiffs would produce agreements and communications
concerning the AI deals that they intend to rely on, which Suno could then evaluate to determine
whether any internal discovery was necessary to further elucidate those agreements or Plaintiffs'
licensing strategy more broadly.  To date, Plaintiffs have not completed that production.

January 23, 2026
Page 4

**LATHAM&WATKINS**LLP

commitment that they made months ago to produce documents and communications exchanged with third parties regarding contemplated AI licensing agreements.

**Plaintiffs' Position:** Suno is wrong that Plaintiffs have reneged on their commitment to produce materials concerning AI licensing. At the beginning of discovery, Suno propounded a facially overbroad request for effectively all documents and communications concerning Plaintiffs' AI licensing strategy. As a compromise, Plaintiffs offered in March to produce documents and external-facing communications concerning potential or executed license agreements related to the use of sound recordings to train generative AI models or for use in the outputs of any generative AI model. Consistent with this agreement, Plaintiffs collected, reviewed, and produced documents from their designated custodians up to the date of the Complaint, using agreed-upon search strings designed to capture the documents and third-party licensing communications Plaintiffs agreed to produce on this subject. As a result, Plaintiffs have already produced various draft agreements and third-party communications concerning contemplated or potential AI licensing deals that predate the filing of the Complaint. ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████[3] This satisfies the production offer Plaintiffs made in March.

Suno erroneously suggests that Plaintiffs somehow concealed their position that they offered to produce information concerning unconsummated AI licensing deals consistent with their previously disclosed collection cutoff. This unfounded accusation is belied by the record, which reflects that Plaintiffs have steadfastly maintained that their production of highly commercially sensitive AI licensing communications must be tailored to the needs of the case, including with respect to the appropriate timeframe. Plaintiffs made no representation to the contrary, including in connection with Suno's prior dispute focused on its defunct concerted refusal to deal theory—which had nothing to do with Plaintiffs' collection cutoff.

Because Plaintiffs have complied with their discovery commitments, Suno's argument amounts to a demand that Plaintiffs supplement their production of AI licensing materials for an expanded timeframe. But even on this score, the dispute is narrow, as Plaintiffs have already agreed to produce *all* executed agreements to license sound recordings as training data for generative AI models up to present day, as well as external communications regarding the negotiation of such agreements. *See* M. Rivera Dec. 5, 2025 Email. In light of this offer, the only remaining question is whether Plaintiffs must further supplement their production to include external communications regarding unexecuted or potential AI licensing agreements that postdate the Complaint. The answer is no.

---

[3] Information highlighted in grey is designated Confidential or Highly Confidential pursuant to the Amended Protective Order entered in this case.

LATHAM&WATKINS LLP

Suno's push for additional information concerning *unconsummated* deals with generative AI companies that postdate the Complaint seeks information that is irrelevant and disproportionate to the needs of the case.  On the issue of fair use, Suno posits that Plaintiffs' post-complaint communications about unexecuted deals may demonstrate the impracticability of licensing training data for a generative AI product like Suno's.  At best, this argument is disingenuous and belied by the fact that Suno itself recently signed a deal with Warner Music Group (a previous Plaintiff in this case) to license sound recordings as training data for AI music models.  *See* Mikey Shulman, A New Chapter in Music Creation, Suno (Nov. 25, 2025) (announcing Suno's partnership with Warner Music Group "to build a new generation of Suno models using high-quality licensed music").[4]  In other words, Suno is pursuing intrusive discovery for information that could conceivably demonstrate the infeasibility of licensing sound recordings as training data, even though Suno itself has struck the very kind of deal it suggests may be infeasible.

Suno mounts the curious argument that its own agreement to license training data from Warner Music Group does not indicate the existence of a viable market for licensing sound recordings as training data.  According to Suno, this agreement does not reflect that Suno "could have built its product from the ground-up using solely licensed training data."  This proposition is both unbelievable and legally irrelevant.  The relevant inquiry for purposes of the fourth fair use factor is not whether a market exists for licensing sound recordings to build a product that functions precisely like Suno's illegal product; rather, it is whether Suno's infringement risks usurping the market for licensing sound recordings to train AI models.  *See, e.g.*, *Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 64 (1st Cir. 2012) (noting that the fourth fair use factor is "concerned with secondary uses of works that, by offering a substitute for the original, usurp a market that properly belongs to the copyright holder" (quoting *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 24 (1st Cir. 2000)).  Suno itself has acknowledged this basic legal principle in a prior submission to the Court.  *See* Suno's Position re: Dispute 3, Feb. 13, 2025 Joint Email Submission to the Court ("Accordingly, the documents or communications potentially relevant to the effect of Suno's 'use' on the market under Factor 4 of the fair use test *would relate to the market for training data*." (emphasis added)).  Suno's deal with Warner (as well as Plaintiffs' various other executed AI licensing agreements) is clear evidence that such a market exists.[5]

---

[4] Notably, Suno has refused to permit discovery into its agreement with Warner Music Group.  Suno apparently intends to argue that the agreement is undiscoverable because it is "FRE-408 protected."  This argument is meritless, and it is well-established "that courts can allow the discovery of information contained in and related to confidential settlement agreements." *Atchison Casting Corp. v. Marsh, Inc.*, 216 F.R.D. 225, 226 (D. Mass. 2003); *see also Valiante v. VCA Animal Hospitals, Inc.*, 2011 WL 219672, at *2 (D. Conn. Jan. 20, 2011) ("While Rule 408 of the Federal Rules of Evidence limits the introduction at trial of evidence regarding settlement negotiations, it only applies to the admissibility of evidence at trial, not to discovery").  Moreover, Suno ignores the salient fact that this agreement has a go-forward component that extends beyond mere settlement of Warner's copyright infringement claims against Suno based on prior unlicensed training.

[5] Suno additionally asserts that the market for licensing sound recordings as training data may not be a cognizable market for purposes of the fourth fair use factor.  Yet, Suno has adopted the precise

LATHAM&WATKINS LLP

Moreover, Suno's argument that it could not have built its product using licensed data is belied by its own announcement that it will be deprecating its existing AI models after launching "a new generation of Suno models using high-quality licensed music" that "will surpass [Suno's currently operative] v5." Shulman *supra*; *see also* Press Release, Warner Music Group and Suno Forge Groundbreaking Partnership, Warner Music Group (Nov. 25, 2025). Put differently, Suno has publicly touted that it will be able to create a *better* product using licensed training data.

Plaintiffs are not, as Suno contends, curating a one-sided record. Plaintiffs have already produced 10 agreements to license sound recordings to train generative AI music models. As of today, this represents the full universe of Plaintiffs' executed deals for this purpose. Suno thus cannot argue that Plaintiffs have selectively disclosed the agreements with the best commercial terms, while withholding those with less favorable terms, because Suno has all the agreements. In light of this comprehensive production of executed AI licensing agreements, there is no need for Plaintiffs to undertake the burden of collecting, reviewing, and producing the full universe of negotiation communications with their myriad potential AI licensing partners. Suno nevertheless claims it requires all of Plaintiffs' communications regarding unconsummated AI licensing deals to "show that Plaintiffs are unwilling to license a transformative music-generative AI model like Suno's without substantial product modifications[.]" Plaintiffs disagree that these supposed "substantial product modifications" have any bearing on the analysis because it is an incontrovertible fact that Plaintiffs have entered into several agreements to license their sound recordings to train generative AI music models. But even assuming Plaintiffs would demand certain product modifications as a condition of licensing sound recordings to train a commercial AI model, Plaintiffs' executed deals and associated communications reflect the contours of any purportedly necessary modifications. Furthermore, to the extent Suno intends to argue that these agreements are not analogous to Suno's unauthorized use of Plaintiffs' sound recordings to train a commercial generative AI music model, it already has all of the materials it needs to do so, including the terms of Plaintiffs' executed agreements, the associated third-party communications, in addition to Plaintiffs' pre-Complaint communications concerning a host of unexecuted deals.

Nor are Plaintiffs' post-Complaint communications regarding unexecuted deals relevant to Suno's concerted refusal to deal theory. As discussed in the parties' October 3 joint submission to the

---

opposition position at other points in this litigation, arguing that the *only* relevant market for purposes of the fourth fair use factor is the market for licensing copyrighted sound recordings as training data. *See* Feb. 14, 2025 Hr'g Tr. 17:14-22 ("In this litigation, the use of the works is using these works to build a model . . . . So then the question is, what is the impact of Suno's use of this work to train the model on plaintiffs' licensing opportunities? Would they have an opportunity to license these works for these sorts of models and is the failure to license here impacting that potential market?"). Suno cannot have it both ways by espousing a conception of the fourth fair use factor that would effectively eliminate all possible markets from the analysis. This position is particularly problematic, considering the growing evidence indicating the existence of a vibrant market for licensing copyrighted works as training data. *See, e.g.*, *In re Mosaic LLM Litig.*, 2025 WL 2294910 at *3-4 (N.D. Cal. Aug. 8, 2025) ("As generative AI proliferates, the right to license one's creative work to train generative AI models may arguably become—or may already be— something copyright owners rightly expect to control.") (internal quotation marks omitted).

**LATHAM&WATKINS**LLP

Court, Suno's sole concrete allegation to support this alleged group boycott was ███████ ████████████████████████████████████████████████████ ████████████████████████████████████ This was never a sufficient basis to support Suno's intrusive discovery demands, a conclusion that has become even more apparent since Warner and Suno have in fact entered into a licensing agreement. Suno's concerted refusal to deal theory has also been thoroughly discredited by the copious evidence Plaintiffs have already produced demonstrating their active engagement in the market for licensing sound recordings to train generative AI models. Moreover, Plaintiffs' negotiation communications about unconsummated deals shed virtually no light on how Plaintiffs may have influenced the relevant market—after all, these materials largely pertain to unsuccessful negotiations that have not resulted in an actual deal. Plaintiffs have already agreed to produce all agreements and associated external communications regarding executed licensing agreements to present day, which will provide Suno with everything it needs to understand and contextualize how Plaintiffs have engaged generative AI companies (including those that resemble Suno) and how their negotiation tactics may have influenced this licensing market. At the same time, Plaintiffs' production of pre-Complaint communications regarding both executed and unexecuted deals necessarily reflect all relevant facts and circumstances concerning Suno's allegations of a concerted refusal to deal prior to the initiation of this lawsuit. Anything more is disproportionate to the needs of the case.

For many of these same reasons, the Court has already expressed skepticism regarding Suno's demand for the entire universe of materials reflecting Plaintiffs' AI licensing strategy. *See* Oct. 10, 2025 Hr'g Tr. at 7:5-12 ("But, fundamentally, you're asking to find out what does UMG think about licensing strategy, and that seems awfully close to a core business function that it would be highly sensitive and closely linked to their litigation strategy, closely linked to stuff that really doesn't seem like the kind of thing -- seems like the kind of thing you and your client would be delighted to be nosing around in but isn't necessarily germane to this lawsuit."); *see also id.* at 12:15-19 ("It just -- these strike me as very open-ended inquiries that have some arguable -- I should say colorable legal significance and tremendous potentially offsetting concerns regarding otherwise confidential business strategy[.]"). To mitigate against these concerns, the Court directed Plaintiffs during the last discovery conference to disclose to Suno which of their agreements they intend to rely on to support their position on fair use. Plaintiffs did so on November 11, 2025, and disclosed 10 AI licensing agreements—a set that currently comprises the full universe of Plaintiffs' executed agreements to license sound recordings to train generative AI models. *See* A. Perry Nov. 11, 2025 Email. Accordingly, Plaintiffs have agreed to provide Suno with information concerning every executed deal that resembles Suno and its AI music generation product. Even setting aside Suno's own deal with Warner, the successful deals Plaintiffs have disclosed with generative AI companies demonstrate that Plaintiffs are participating in this active and viable market. In other words, Plaintiffs have already produced ample information permitting Suno to rebut the argument that Plaintiffs' unsuccessful negotiations with Suno somehow evidenced an industry-wide concerted refusal to deal. *See* Oct. 10, 2025 Hr'g. Tr. at 32:14-18 (paraphrasing Plaintiffs' anticipated argument as "gosh, we were nice to other people, we just don't like Suno[ ]").

Suno cites Plaintiffs' position in the parties' October 3 joint submission regarding Suno's failed attempt to seek expansive discovery to support its concerted refusal to deal theory of copyright

LATHAM&WATKINS LLP

misuse. *See* Dkt. 150-1. In that briefing, Plaintiffs argued that their agreement to produce, among other categories of information, communications with third parties concerning any executed or potential AI licensing agreements "is more than sufficient for Suno to fully adjudicate its 'concerted refusal to deal' theory[.]" *Id.* at 6-7. As is to be expected in the dynamic context of generative AI, Plaintiffs—and even Suno itself—have struck agreements in recent months reflecting the viability of a market for licensing sound recordings for training generative AI models. These agreements and associated communications, which Plaintiffs have agreed to produce, not only eviscerate Suno's concerted refusal to deal theory, but also will furnish Suno with all materially relevant information.

### 2. Plaintiffs' One-Sided Approach to Post-Complaint Discovery

**Suno's Position:** Plaintiffs have produced only a handful of custodial documents: **Sony has produced 2,403 custodial documents and UMG only 2,064** (excluding automated email newsletters)—as compared to **Suno's 49,293.** Plaintiffs' meager productions are due, in part, to Plaintiffs' unilateral decision to exclude from their document productions any document created after the date they filed the complaint in this case, June 24, 2024. That is a wholly arbitrary production cut-off—a fact both illustrated and exacerbated by the exception Plaintiffs make to that rule: Plaintiffs refuse to produce post-Complaint discovery *except* where they've determined that production of later-created documents might be beneficial to their case.

While Plaintiffs refuse to produce post-Complaint documents concerning potential, *unexecuted* AI deals, they simultaneously "reserve the right" to produce post-Complaint deals that they intend to rely on, even where these deals have *not yet been executed*. *See* A. Perry Nov. 22, 2025 Email. But because Suno was among the first music generative AI models to market and Plaintiffs' Complaint swiftly followed, Plaintiffs' position allows them to unilaterally decide what information about the potential market for licensing their works as training data will be a part of the record in this case. Further, Plaintiffs have in effect given themselves a blank check to drop licensing discovery on Suno at any time, including on the eve of a deposition or, worse, after the close of fact discovery. That is not a practicable path forward.

Plaintiffs are likewise producing certain post-Complaint financial data that they will presumably rely on in support of their Factor Four and damages arguments, but have otherwise refused to provide post-Complaint discovery necessary to explore the *reason* for any reduction in Plaintiffs' royalties after the date of the Complaint. *See also infra* Dispute No. 3.

To be sure, Suno is not suggesting that Plaintiffs be held to a continuing obligation to produce discovery, particularly after the close of fact discovery. (That is in contrast to Plaintiffs' position— though the parties are approaching the close of fact discovery, and though Suno produced all responsive documents created as of the date of its document collection last spring, Plaintiffs recently demanded that Suno update nearly all of the discovery it has produced through the present). In order for the case to proceed in a timely and organized manner there must be some reasonable document production cutoff. However, Plaintiffs' arbitrarily imposed date-of-complaint cutoff is not appropriate. Suno therefore requests that:

**LATHAM&WATKINS**LLP

1. Plaintiffs produce all post-complaint AI licensing documents and related communications—including regarding *potential* agreements that were not ultimately executed—created on or before November 28, 2025. *See supra*. Because the rolling production of later-created AI agreements—particularly after depositions have been taken—would not allow for the orderly progression of this case, Plaintiffs should not be permitted to supplement the record thereafter.

2. Plaintiffs produce the following categories of discovery that they previously withheld, through at least February 2025:

   - Documents and communications about Suno;

   - Communications with other Plaintiffs and/or the RIAA concerning the impact of generative AI on the market for sound recordings;

   - Plaintiffs' own use and development of generative AI tools for the creation of music (subject to the Court's resolution of the dispute raised below); and

   - Documents probative of the cause of any potential reduction in Plaintiffs' market share and/or listenership on social media platforms and streaming services (subject to the Court's resolution of the dispute raised below).

Plaintiffs have no basis to continue to withhold post-Complaint materials in any of these categories. Suno addresses Plaintiffs' arguments regarding post-complaint licensing materials *supra*. Plaintiffs' argument that post-Complaint documents and communications about Suno will necessarily be privileged simply because the communications happened after the lawsuit was filed is inaccurate—and raises grave concerns about Plaintiffs' privilege designations in this case. Regardless, the parties' ESI stipulation excuses logging of post-Complaint privileged communications involving outside counsel, reducing any burden associated with reviewing privileged documents.

Plaintiffs' argument that they are only producing certain post-Complaint materials because Suno asked for them is preposterous: Suno has asked for post-Complaint materials responsive to *all* of its RFPs, yet Plaintiffs have only *agreed* for some. And Suno served these RFPs in order to assure that it would have full-scope access to the categories of quantitative and qualitative evidence *Plaintiffs* are sure to rely on for their claims of market harm, underscoring why Plaintiffs should not be allowed to engage in a piecemeal production of post-Complaint discovery.

Finally, Plaintiffs' argument that requiring additional review would be disproportionately burdensome should be disregarded. For nearly all of these categories of discovery, Suno merely requests that Plaintiffs update their productions to the date that they collected materials in this case instead of excluding post-complaint documents from their productions. In the case of licensing materials, Suno merely requests that Plaintiffs' production cutoff date be applied in an even-

LATHAM&WATKINS LLP

handed manner: as explained above, Plaintiffs should not be permitted to rely on executed deals after the date of the Complaint while withholding evidence of unsuccessful post-Complaint deals..[6]

**Plaintiffs' Position:** There is no merit to Suno's suggestion that Plaintiffs have self-servingly produced only the post-Complaint information that is beneficial to their case.[7] Each category of information Plaintiffs agreed to produce that postdates the Complaint was in response to *Suno's* demands regarding particular discovery requests.[8]

Take, for instance, Plaintiffs' production of executed agreements that prohibit, restrict, limit, or otherwise control a third party's use or offering of AI, which was not limited to pre-Complaint agreements. Plaintiffs produced these materials solely in response to Suno's discovery requests relating to its asserted copyright misuse defense, which Plaintiffs have maintained throughout this

---

[6] Plaintiffs' December 31 proposal was not a meaningful compromise—Plaintiffs demanded that Suno refresh its collection in six broad categories, as well as provide source code and training data for inspection for new Suno models, while limiting their own offer to three narrow categories and continuing to unevenly apply an arbitrary cutoff to other categories. And the parties are not on equal footing to begin with. Suno has already produced discovery on model V4, which was released five months after the date of the Complaint—as well as discovery responsive to all of Plaintiffs' requests for production through February 2025—eight months after the Complaint was filed. Nevertheless, Suno remains willing to consider expanding its own collection period for particular categories, and it has already agreed to provide certain user and financial metrics through present.

[7] Nonetheless, in a good faith effort at compromise and to moot this dispute, Plaintiffs offered to produce information up to December 31, 2025 relating to: (1) Suno's use of copyrighted sound recordings; (2) whether or not to enter into a go-forward licensing arrangement with Suno, including in lieu of filing or continuing to pursue the present lawsuit; and (3) communications with other Plaintiffs and/or the RIAA concerning the impact of generative AI on the market for sound recordings. Plaintiffs made this offer on the condition that Suno concomitantly expand its collection timeframe for several pertinent categories of information.

Suno rejected this proposal, thereby foreclosing document discovery into critical issues in this case, including Suno's rapid expansion of its business and recent agreement to license training data from a former Plaintiff in this case. *See, e.g.,* Shulman, *supra*; *see also* Kristin Robinson, *Suno Creates an Entire Spotify Catalog's Worth of Music Every Two Weeks, Says Investor Pitch Deck for $250M Fundraise,* Billboard (Nov. 24, 2025). Suno's own one-sided approach to post-Complaint discovery will be the subject of Plaintiffs' forthcoming discovery dispute.

[8] Suno attempts to minimize Plaintiffs' discovery efforts by arbitrarily discounting the voluminous ownership-related documents Plaintiffs have produced, including copyright registrations, digital copies of the Asserted Works, chain of title documentation, and artist-label agreements. The Court should disregard Suno's false narrative that Plaintiffs have not meaningfully participated in reciprocal discovery.

LATHAM&WATKINS LLP

litigation is unavailable as a matter of law.  Plaintiffs did not produce this category of agreements for any affirmative purpose.

Suno also suggests that Plaintiffs somehow cherry-picked the financial data they produced that extends beyond the date of the Complaint.  This is a perplexing objection, because the scope of Plaintiffs' data productions was the result of protracted negotiations between the parties prompted by *Suno's* own discovery requests.  As one salient example, Plaintiffs have expended significant effort to compile and produce revenue data reflecting the performance of their sound recordings on various music streaming and social media platforms because *Suno asked for this data*.  Plaintiffs have also compiled granular data reflecting the revenue Plaintiffs earned on various music streaming platforms for each specific asserted work—again because Suno asked for this information.

That Plaintiffs agreed to produce certain categories of documents postdating the Complaint does not mean Suno is entitled to a more sweeping date range across the board.  To be clear, Plaintiffs did not strategically select these expanded productions but agreed to make them following lengthy negotiations with Suno, which took into consideration the burden and proportionality of Suno's requests.  These exceptions do not supply the rule for other categories of documents, including the specific categories for which Suno seeks an expanded collection:

- **Category 1:** Plaintiffs have already produced *all* communications with their negotiating counterparties concerning the executed AI licenses they disclosed.  There is thus no dispute concerning these communications.  Plaintiffs have not agreed to produce materials concerning unexecuted or potential agreements that postdate the Complaint, which is the subject of Dispute No. 1, *supra*.

- **Category 2:**

  - *Documents and Communications re: Suno:* As Plaintiffs explained in prior briefing, they have agreed to produce documents and communications concerning (a) Suno's use of copyrighted sound recordings; and (b) whether or not to enter into a go-forward licensing arrangement with Suno, including in lieu of filing this lawsuit. Dkt. 150-1 at 11.  Plaintiffs have been in ongoing litigation with Suno for approximately 18 months, so any discussions about Suno or these topics that postdate the Complaint are privileged.  There is no merit to Suno's baseless contention that Plaintiffs' position with respect to this category of information "raises grave concerns" about their privilege designations.  Even though communications concerning a live litigation adversary are overwhelmingly likely to be privileged, Plaintiffs nevertheless offered to expand the timeframe for their production of materials concerning Suno's use of copyrighted sound recordings and whether or not to enter into a go-forward licensing arrangement with Suno, so long as Suno does the same for relevant categories of documents.  *See supra* note 4.

  - *External Communications re: Impact of Generative AI*: This request is unduly burdensome and disproportionate to the needs of the case.  As described, *infra* Dispute No. 3, Plaintiffs have already agreed to perform additional review within

**LATHAM&WATKINS**LLP

their existing collection timeframe for materials pertaining to the market harm caused by generative AI more generally.  This has entailed reviewing more than 10,000 documents.  This is more than sufficient to satisfy Plaintiffs' discovery obligations.

- o *Plaintiffs' Own Use of Generative AI:* This category of information is subject to an ongoing dispute, *see* Dispute No. 6, *infra*.

- o *Alternative Causes of Market Harm:* This category of information is subject to an ongoing dispute, *see* Dispute No. 3, *infra*.

3. **Plaintiffs' Refusal to Produce Discovery Concerning Alternative Causes of Plaintiffs' Alleged Harm**

**Suno's Position:** Plaintiffs' core theory of harm in this case is that non-infringing outputs from Suno's generative AI tool are likely to flood streaming services and social media platforms and erode their market share.  Suno expects that Plaintiffs' expert will attempt to establish this through evidence that each of the Plaintiffs' market share has declined on various streaming services and social media platforms following the advent of generative AI.

But a declining market share figure does not alone tell a complete story.  In fact, Plaintiffs have been complaining about the impact of the growing surplus of music on streaming platforms on their market share since well before the advent of generative AI.  Before AI, Plaintiffs' competitive target was the growing number of independent artists and distributors providing their content directly to these platforms.  *See In the Matter of: Determination of Rates and Terms for Digital Performance of Sound Recordings and Making of Ephemeral Copies to Facilitate those Performances* (*Web VI*), SoundExchange Joint Petitioners' Corrected Proposed Findings of Fact and Conclusions of Law, eCRB No. 23-crb-0012, ¶ 171, https://app.crb.gov/document/download/58496 (claiming "a decline in the Majors' share of plays on streaming services," due to "[t]he rise of [music] aggregators," which "directly plac[e]" the music of independent artists on streaming services).

Suno is entitled to explore whether any decline in Plaintiffs' market share is in fact caused by Suno's AI tool, or instead, would have occurred even in the absence of AI-generated music.  *See Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 35 (2021) (noting courts must "consider not just the amount but also the source of the loss" and holding that a jury could have found that the plaintiff "was poorly positioned to succeed in the mobile phone market" regardless of the defendant's entry into that market).

Yet Plaintiffs refuse to produce *any* documents that would undermine the causal connection between declining market share and Suno's product, including documents discussing the known *reasons* for any decline in their royalties or listenership, reports and analyses regarding the same, and documents concerning the rise of competing music labels, aggregators, and distributors.  Without this information, Plaintiffs would be able to simply argue that there has been a decline in their market share in recent years and blame *only Suno*, without giving Suno a chance to challenge that causal link.  Plaintiffs' argument that "Plaintiffs have no intention of arguing that Suno is

LATHAM&WATKINS LLP

responsible for *all* market declines or trends that began prior to Suno's launch, rendering any preexisting market trends entirely beside the point" is a strawman. There is one metric at issue here—platform market share—not "all market declines or trends." Unless Plaintiffs are disclaiming an intent to rely on platform market share data in this case, a fact finder is entitled to review evidence that might suggest that any diminution in platform market share that Plaintiffs point to is not actually appropriately attributable to generative AI.

Plaintiffs' reliance on *In re OpenAI, Inc., Copyright Infringement Litig.*, 2025 WL 1652110 (S.D.N.Y. May 30, 2025) is misplaced. It is a basic tenet of adversarial litigation—across diverse claims and subject matters—that where a plaintiff points to one source of harm, the defendant is entitled to discovery to disaggregate that alleged harm from other potential causal factors. Nor can Plaintiffs pursue actual damages without proving a "direct causal connection" between the harm and the alleged infringement. *See Getaped.Com, Inc. v. Cangemi*, 188 F. Supp. 2d 398, 403 (S.D.N.Y. 2002). Suno is entitled to discovery that tests that purported connection. Indeed, Judge Stein recognized that "[t]o measure that particular harm, relevant evidence examines whether defendants' use, as opposed to some other factor, caused the particular harm." *In re OpenAI, Inc., Copyright Infringement Litig.*, No. 23-cv-08292, 2025WL 1652110, at *6 (S.D.N.Y. May 30, 2025). Here, Suno's requests are specifically directed to the "particular harm" Plaintiffs allege, *see id.*: *Plaintiffs' purported declining market share on streaming services and social media platforms due to generative AI.* Where Plaintiffs assert dilution of their market share through volume, any alternative phenomena that create market surplus as well as any deal structures that Plaintiffs may already have in place to address competition from the long-tail are plainly relevant. For these reasons, Plaintiffs' offer to produce "documents that concern market harm caused by generative AI tools" alone is insufficient. Nor are Plaintiffs executed agreements with music streaming services and social media platforms sufficient, as these deals would neither (a) identify the *sources* of potential harm to any decrease in Plaintiffs' market share such as the rise of content from third-party distributors, aggregators, and independent labels on these platforms, nor (b) provide any insight as to *why* any particular deal terms were adopted as a result. Plaintiffs cannot be permitted to create such a one-sided record. Having made clear that they intend to make a market dilution argument in this case, Plaintiffs cannot withhold the documents necessary for Suno to contextualize any evidence Plaintiffs may rely on regarding diminution of their market share, including whether market forces predating generative AI are responsible.

**Plaintiffs' Position:** Plaintiffs intend to demonstrate that Suno's service—built on a foundation of unauthorized copying of Plaintiffs' copyrighted works—has and will continue to flood the market with AI-generated outputs, thereby causing market harm and diminishing the value of Plaintiffs' works. Suno, however, seeks intrusive discovery concerning any conceivable cause of market harm to Plaintiffs on music streaming services or social media platforms. This fundamentally misconstrues Plaintiffs' allegations of market harm and ignores that Plaintiffs have no intention of arguing that Suno is responsible for *all* market declines or trends that began prior to Suno's launch, rendering any preexisting market trends entirely beside the point. Despite Plaintiffs' particular allegations of market harm stemming from Suno's unlawful training on their copyrighted works, Suno seeks expansive discovery into Plaintiffs' analysis of risks to core components of their businesses that Suno concedes are distinct from the harm associated with

**LATHAM&WATKINS**LLP

Suno's alleged infringement. There is no reason to explode the scope of discovery to permit Suno to engage in a *frolicking* detour into *other* causes of market harm not at issue in the case.

Suno claims it requires discovery into alternative causes because it is "entitled to explore whether any decline in Plaintiffs' market share is in fact caused by Suno's AI tool, or instead, would have occurred even in the absence of AI-generated music." To date, the only court to have considered this argument has rejected it. *See In re OpenAI, Inc., Copyright Infringement Litig.*, 2025 WL 1652110 (S.D.N.Y. May 30, 2025). In that case, the court denied the generative AI defendant's request for similarly expansive discovery into alternative causes of market harm because the New York Times did "not alleg[e] that defendants' conduct is the *only* cause of harm to their works, or that they would suffer *no* harm but for defendants' conduct. Rather, they contend that defendants are causing them a *particular* harm that would not occur but for defendants' conduct. To measure that particular harm, relevant evidence examines whether defendants' use, as opposed to some other factor, caused the particular harm." *See id.* at *6 (emphases in original). In other words, expansive discovery into alternative causes was inappropriate because the pertinent inquiry is whether the particular infringement at issue has and will cause market harm, not whether that infringement is the sole cause of such harm. Following *In re OpenAI's* logic, the discovery referee in parallel copyright infringement litigation against Udio (a competing AI music generation service that similarly trained on Plaintiffs' copyrighted works without authorization) recommended against permitting this same discovery.

Just as in *OpenAI*, Plaintiffs here have alleged that they have and will suffer a *particular harm* based on *Suno's infringement*. This does not require investigating "*any* change in [Plaintiffs'] revenue whatsoever, which would fail to shed light on whether or not those metrics were impacted by [Suno's] conduct." *Id*. Suno argues that it is entitled to disaggregate the alleged harm stemming from its infringement from other potential causal factors. But this ignores the critical context that Plaintiffs filed this lawsuit within six months of the launch of Suno's AI music generation service, so Plaintiffs' theory of market harm will, out of necessity, focus predominantly on *prospective* market impact, which is cognizable under the fourth fair use factor. *See Hachette Book Grp.*, 115 F.4th at 192 ("[T]he impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor."); *see also* 17 U.S.C. § 107(4) (directing courts to consider as part of the fair use analysis "the effect of the use upon the *potential market* for or value of the copyrighted work" (emphasis added)). But even if alternative causes have materially impacted Plaintiffs' businesses, they do not negate the prospective harm posed by Suno's infringement, because Plaintiffs are "not alleging that [Suno's] conduct is the *only* cause of harm to their works, or that they would suffer *no* harm but for [Suno's] conduct." *See In re OpenAI*, 2025 WL 1652110, at *6. *OpenAI* is on all fours, and Suno's demand for additional voluminous discovery into non-alleged causes of harm is an inappropriate sideshow.

Without conceding the relevance of any alleged alternative cause of market harm, Suno already possesses ample material to explore such causes during depositions and in the expert phase of this case, should it choose to pursue this irrelevant line of argumentation. For instance, Suno posits that "any alternative phenomena that create market surplus as well as any deal structures that Plaintiffs may already have in place to address competition from the long-tail are plainly relevant." But Plaintiffs have already provided Suno with their agreements with eight major music streaming

LATHAM&WATKINS LLP

services and social media platforms, which outline the "deal structures" Suno claims may be contributing to harm to Plaintiffs' businesses. Suno's requested discovery is further unnecessary in light of the copious discovery Plaintiffs have agreed to produce to establish the contours of the markets they allege Suno is diluting, including (1) royalty, consumption, and market share data on these eight music streaming services and four social media platforms dating back to 2019; (2) documents concerning lost revenues and lost royalties for specific asserted works as a result of outputs generated by Suno's AI service; and (3) documents Plaintiffs intend to rely on to show the harm they suffered from the conduct alleged in the Complaint.[9]

Plaintiffs also recently agreed to conduct additional collection and review of documents that concern market harm caused by generative AI tools more generally. *See* A. Perry Nov. 14, 2025 Email. That review is underway. Therefore, contrary to Suno's claims, Plaintiffs have agreed to produce broad categories of documents related to Plaintiffs' theory of market harm, which is more than sufficient to allow Suno to "explore" the extent to which Plaintiffs' alleged market harm is caused by Suno's AI tool.

### 4. Custodians

**Suno's Position:** Suno has long expressed concern with the adequacy of Plaintiffs' custodial collections; in response, Plaintiffs repeatedly assured Suno that the custodians they identified would possess the full scope of responsive documents and communications and that additional custodians would be duplicative. Suno took Plaintiffs at their word, but Plaintiffs' paltry productions (*fewer than 2,500* custodial documents from either Plaintiff)—which are allegedly "substantially complete"—have confirmed Suno's suspicion that Plaintiffs crafted their custodian list to withhold responsive documents. Suno cannot defend itself if Plaintiffs refuse to produce relevant documents, and it is clear that many of those documents are not in the possession of Plaintiffs' existing custodians. Accordingly, Suno has revisited its demand that Plaintiffs add the four custodians identified below.

#### Sony

- Rob Stringer (Chief Executive Officer)
- Geoff Taylor (Executive Vice-President, Artificial Intelligence & AI Governance Officer)

#### Universal

- Lucian Grainge (Chief Executive Officer)
- Nicola Levy (Executive Vice-President, Digital Business Affairs)

---

[9] In addition, Suno has served its own third-party subpoenas on several music streaming platforms and social media companies, seeking information regarding Plaintiffs' performance on these platforms. To the extent Suno is searching for information about the overall volume of content on these platforms, that information is not likely to be within Plaintiffs' possession, custody, or control.

LATHAM&WATKINS LLP

Plaintiffs do not dispute that these individuals would possess responsive documents and communications; indeed, Plaintiffs' productions and public statements have revealed that these individuals have communicated about issues directly relevant to the litigation. For example, Lucian Grainge has been described as responsible for "setting up AI deals with Endel, SoundLabs, and BandLab," as well as working with YouTube on its "music AI incubator," a program that brings together talent from Universal to gather insights for YouTube's generative AI research. *See* Dan Whateley, "UMG Goes on the Offensive as AI Washes Over Music Industry," Business Insider (Oct. 24, 2024) https://www.businessinsider.com/lucian-grainge-umg-ai-power-list-2024; *see also* John Seabrook, "Inside the Music Industry's High-Stakes A.I. Experiments," The New Yorker (Jan. 29, 2024) https://www.newyorker.com/magazine/2024/02/05/inside-the-music-industrys-high-stakes-ai-experiments ("Grainge *himself* entered the [AI] market, when UMG announced a partnership with Endel that would allow UMG artists to use A.I. to make functional versions of their songs, has called for 'a new "artist-centric" model that would value legitimate artists at a higher rate,' and has lobbied the Copyright Office on generative AI." (emphasis added)); UMG_SUNO_00005325



; *see also* SONY_SUNO_00003863

*see also* SONY_SUNO_00001280

UMG_SUNO_00005357

Nonetheless, Plaintiffs refuse to search these individuals' documents simply because they are "high level executives" or lawyers. Notably, Suno has produced thousands of documents from "high level executives," including its chief executive officer. Plaintiffs' refusal to produce on the basis that certain requested custodians are "lawyers" ignores the fact that Mr. Taylor does not hold active bar registrations in any jurisdiction and does not work in a legal role—and that Plaintiffs designated multiple other lawyers as custodians, including Jeff Walker, Wade Leak, and Alasdair McMullan. As those designations acknowledge, the fact that an individual is a lawyer does not make them an improper custodian where, as here, they are likely—if not certain—to possess relevant, non-privileged communications or are "principally responsible" for key issues in the litigation. Indeed, Plaintiffs concede that they have already selectively produced hundreds of non-privileged documents from Mr. Taylor's and Ms. Levy's custodial documents, including numerous documents where Plaintiffs' existing custodians are not copied. *See, e.g.,* SONY_SUNO_00018960

;

LATHAM&WATKINS LLP

██████████████████████████████████████████████

██████████████████████████████████████. For this reason, Plaintiffs' argument that Mr. Taylor's custodial files substantially overlap with Mr. Walker's, for example, is simply unfounded. Plaintiffs cannot reasonably claim that further searches of their custodial files will not result in responsive documents. Nor do they get to unilaterally decide which of these individuals' relevant documents and communications should be produced. Suno cannot "be assured" it will receive all responsive documents and communications if Plaintiffs are refusing to run the parties' agreed-upon search terms across these individuals' complete files.

Suno respectfully requests that Plaintiffs be compelled to add Grainge, Levy, Stringer, and Taylor as document custodians.

**Plaintiffs' Position:** The custodians Plaintiffs designated are those who actually manage licensing, digital business, and strategic functions—*i.e.*, those employees most likely to have and best positioned to provide responsive documents. Suno now demands that Plaintiffs expand their custodian list, not with targeted additions based on identified gaps, but rather with CEOs and attorneys whose files would yield primarily duplicative documents and privilege logs. This is not proportional discovery; it is Suno's strategy to impose maximum burden for minimal benefit.

Discovery must be "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The responding party "is entitled to select the custodians most likely to possess responsive information" and unless those choices are "manifestly unreasonable" or "the requesting party demonstrates that the resulting production is deficient," then "the court should play no role in dictating the design of the search." *Mortgage Resolution Serv., LLC, v. JP Morgan Chase Bank, N.A.*, 2017 WL 2305398, at *2 (S.D.N.Y. May 18, 2017). To compel additional custodians, the moving party must demonstrate that "the additional requested custodian would provide *unique* relevant information not already obtained." *Servicios Funerarios GG, S.A. de C.V. v. Advent International Corp.*, 2023 WL 7332836, at *2 (D. Mass. Nov. 7, 2023) (emphasis in original). Suno cannot clear this hurdle as to any of the additional custodians it seeks.

*First*, the Court should deny Suno's request to include Plaintiffs' CEOs—Rob Stringer and Lucian Grainge—as document custodians because Suno has not (and cannot) show that these individuals are likely to have unique, non-duplicative discovery in their custodial files. "The Federal Rules... do not require [a responding party] to embark on an unrestricted search through the ESI of every senior executive employee in the hopes we may find additional potentially relevant material, especially where, as here, it has almost certainly already been gathered, processed and reviewed." *Newman v. Associated Press*, 2024 WL 4433465, at *5 (S.D. Fla. Oct. 4, 2024) (citation omitted). Suno attempts to present UMG's and Sony's CEOs as similarly situated to its own high-level executives for purposes of discovery, but this analogy fails at the outset. UMG and Sony are multinational music companies with thousands of employees, while Suno began as a startup within the past two years and employs a small fraction of UMG's and Sony's workforces. Suno's co-founders are necessary custodians because they possess unique knowledge of Suno's business and issues relevant to this litigation. By contrast, UMG's and Sony's CEOs sit atop large corporate structures and provide high-level, strategic direction to lower-level personnel (including, in

**LATHAM&WATKINS**LLP

relevant part, Plaintiffs' current custodians). Because Plaintiffs' CEOs are not unique sources of relevant information, they are not appropriate custodians.

Suno's own citations purportedly supporting its request to add the CEOs actually defeat it: each cited document demonstrates that each CEO's role was limited to receiving briefings from other employees and that neither CEO was involved in granular strategy or decision-making regarding the relevant topics. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ Suno also points to news articles purportedly supporting its position. Even setting aside the potential unreliability and inaccuracy of third-party publications, these articles neither contradict the scope of each CEO's role demonstrated by Plaintiffs' document production nor provide a basis for believing that these CEOs are likely to have unique discovery on responsive topics.

*Second*, the Court should deny Suno's request to add Geoff Taylor and Nicola Levy, both senior executives and attorneys, as custodians. As an initial matter, Plaintiffs have collected and produced documents from Mr. Taylor and Ms. Levy relating to Plaintiffs' third-party negotiation communications for certain of the executed AI licensing agreements they disclosed. *See supra* Dispute No. 1. Thus, to the extent Mr. Taylor or Ms. Levy were the principal negotiators for any of these executed AI licensing agreements, Suno already has their communications with those third parties. For instance, ███████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ █████████ Plaintiffs have done the same for Ms. Levy for instances in which she was the principal negotiator for any deal discussions and thus is a unique source of responsive information for those deals.

Searching for any additional materials in Mr. Taylor's or Ms. Levy's custodial files is disproportionate to the needs of the case and unlikely to yield discoverable information. Mr. Taylor's role at Sony is Executive Vice President, Artificial Intelligence. In this capacity, he reports directly to Sony's General Counsel and often functions as part of the legal department. That third parties occasionally copy him on business emails or that he is at times involved in discussions regarding business partnerships does not transform him into a business executive. His communications regarding artificial intelligence are largely legal in nature, and also frequently concern foreign jurisdictions irrelevant to this case. Similarly, as Universal's EVP of Digital Business Affairs, Ms. Levy negotiates contracts in her capacity as a lawyer. The communication Suno cites—UMG_SUNO_00005357—merely shows a third party copying her on a draft, not that she personally generated primarily non-privileged, discoverable content. Contrary to Suno's claim, courts routinely reject efforts to compel discovery from lawyers where the exercise would

LATHAM&WATKINS LLP

yield predominantly privileged material. *See*, *e.g.*, *Dale v. Deutsche Telekom AG*, 2024 WL 4416761, at \*3 (N.D. Ill. Oct. 4, 2024) (denying motion to compel from attorneys, emphasizing that "[t]here would be a privilege log for each lawyer" and "[e]ach privilege log would undoubtedly be huge"). Indeed, Plaintiffs' existing privilege logs already include many entries reflecting advice from these individuals; adding them as custodians would only multiply privilege entries without adding substantive discovery.

Nor does Plaintiffs' inclusion on their custodian list of other attorneys who hold different roles mean that Mr. Taylor or Ms. Levy are appropriate custodians. For instance, Plaintiffs' primary motivation for nominating Mr. Leak and Mr. McMullan as custodians is because of the likelihood they would have responsive information regarding Plaintiffs' ownership of the sound recordings in their respective catalogs. Plaintiffs separately nominated Mr. Walker as a custodian because of his involvement in licensing discussions with third-party AI companies (meaning his custodial file overlaps substantially with any conceivably discoverable information from Mr. Taylor). Notwithstanding the significant amount of privileged information these other attorneys possess, Plaintiffs made the informed decision to include them as custodians because of the subset of unique, responsive, and discoverable information they were likely to possess. Indeed, that Plaintiffs included these attorneys on their custodian list makes it particularly inappropriate to add as custodians the two additional attorneys Suno now seeks.

### 5. Plaintiffs' Prompting Efforts

**Suno's Position:** To support their claim that the purpose of Suno's AI tool is to generate soundalike outputs that compete with Plaintiffs' asserted works (*see, e.g.*, Compl. ¶¶ 73-74, 77), Plaintiffs intend to rely on outputs *they themselves created*. While Plaintiffs newly claim that they used these outputs merely to satisfy pleading requirements, they have repeatedly refused to disavow further reliance on these outputs (and other self-generated outputs not disclosed in the Complaint) in the litigation. *See, e.g.*, G. McLaughlin May 2, 2025 Email (asking Plaintiffs to confirm they are "disclaiming, in full, reliance on any [] outputs [Plaintiffs have generated]," to which Plaintiffs never responded). It is thus clear that Plaintiffs still intend to put the supposed ease with which such alleged "soundalike" outputs can be created at issue in the litigation—as they did in their Complaint. *See* Compl. ¶¶ 54-62.

Nonetheless, Plaintiffs have refused to provide the *usernames and email addresses* associated with their prompting efforts so that Suno can investigate the lengths Plaintiffs went to generate the output that they rely on in this case, on attorney work product grounds. But the usernames and email addresses used by Plaintiffs or their agents in connection with efforts to "test" Suno's product are not work product at all: they are facts, which are discoverable. Insofar as Plaintiffs assert this information allows Suno to subsequently access prompts and outputs and that those materials reflect attorney work product, that argument fails. The underlying prompts Plaintiffs entered into Suno's AI tool and their subsequent outputs are at most factual and technical information, for which work product protection is thin, if available at all. *See In re: Grand Jury Subpoenas*, 179 F. Supp. 2d 270, 291 (S.D.N.Y. 2001). Moreover, to the extent these materials were ever privileged, Plaintiffs waived any work product protection in these materials by entering them into *Suno's "public facing" tool* and by selectively relying on their prompting efforts in this

LATHAM&WATKINS LLP

litigation. *In re Grand Jury Subpoena*, 348 F.3d 16, 24 (1st Cir. 2003) (finding parties may not rely on privilege as "both a sword and a shield" by selectively disclosing information subject to the privilege). Plaintiffs cannot have it both ways: if Plaintiffs intend to rely on any self-generated Suno outputs that allegedly sound like Plaintiffs' works, Plaintiffs must provide discovery necessary to evaluate whether those outputs were obtained through repeated, abnormal, and/or iterative prompting efforts that do not reflect the behavior of the average user. Finally, unlike many of the plaintiffs in the out-of-circuit AI cases Plaintiffs point to, Plaintiffs here have repeatedly refused to disavow further reliance on their self-generated outputs in the litigation (for example, as evidence of the "purpose" of Suno's AI tool in connection with the first fair use factor). The New York Times repeatedly emphasized that it does not intend to rely on the example outputs cited in its complaint—or presumably other output generated by its agents—at summary judgment or trial, representing that it would instead rely on expert analysis to show how users interact with the AI tool at issue in that case. *The New York Times*, No. 23-cv-11195, Dkt. 125 at 2 (S.D.N.Y. May 28, 2024); *see also Authors Guild v. OpenAI, Inc.*, No. 23-cv-08292, Dkt. 203 at 59:8–11, 60:4–6, 61:13–17 (S.D.N.Y. Sept. 18, 2024) (transcript of omnibus status conference for *Authors Guild* and *New York Times* cases). Plaintiffs have, in contrast, repeatedly *refused* to make a similar representation here. *See, e.g.*, G. McLaughlin May 2, 2025 Email.

Accordingly, Suno respectfully requests the Court direct Plaintiffs to either (1) produce the usernames and associated email addresses for any accounts used by Plaintiffs or their agents to prompt Suno for purposes of this case, or (2) confirm that they will not rely on any self-generated outputs in this litigation. Suno also reserves the right to search its own files for evidence of Plaintiffs' prompting efforts, to the extent it is able to identify them.

Suno also seeks Plaintiffs' communications and agreements with Ed Newton Rex—a third-party who wrote an op-ed about Suno—regarding Newton-Rex's efforts to generate "soundalike" outputs from Suno's tool. Several of the prompts cited in Plaintiffs' Complaint were disclosed in the op-ed Newton-Rex wrote months before the Complaint was filed. Plaintiffs refuse to produce this discovery pursuant to Rule 26(b)(4)(d). ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████. *See Maine Woods Pellet Co., LLC v. W. World Ins. Co.*, No. 17-cv-4446, 2020 WL 5096941, at *4 (D. Me. Aug. 28, 2020) (denying Rule 26(b)(4) protection to materials prepared in an investigation in the ordinary course of business "long before litigation was reasonably anticipated," even though the drafter was later deemed an expert). Plaintiffs have no basis to refuse production of documents or communications exchanged with Newton-Rex from before that date.

**Plaintiffs' Position:** Plaintiffs used Suno's public-facing music generation service before filing the Complaint only because Suno refused to disclose what training data it used. Though they reserve their rights to rely on these outputs for other issues in the litigation, Plaintiffs' express purpose for incorporating these outputs in their pleading was to "confirm as an evidentiary matter that Suno has copied specific" sound recordings owned or exclusively controlled by Plaintiffs "into

LATHAM&WATKINS LLP

its training data to build its service." Compl. ¶ 50.[10]  For every Suno output referenced in the pleadings, Plaintiffs provided a link to access the output, as well as the prompt used to generate it.[11]  Despite already possessing all prompt and output combinations for the outputs cited in the Complaint, Suno nevertheless demands additional discovery into the circumstances and details of Plaintiffs' pre-Complaint investigation into Suno's AI music generation service, ███████ ████████████████████████████████████████████████████████  Having put Plaintiffs in the position of having to develop this evidence themselves, Suno claims it is now entitled to discovery into these efforts simply because Plaintiffs used Suno's service.  This is facially unreasonable, and the requested discovery is improper.

*First*, Plaintiffs' pre-Complaint prompting efforts are attorney work product, and in substantial part opinion work product, because they reflect counsel's mental impressions and strategy regarding how to probe Suno's system for evidence of copying.  Courts addressing nearly identical requests in AI copyright cases have held that litigation-driven prompts and testing methodologies are protected work product and "virtually undiscoverable" absent a compelling need, which Suno has not demonstrated.  *Tremblay v. OpenAI*, 2024 WL 3748003 at *2 (N.D. Cal.  Aug. 8, 2024); *accord Concord Music Grp. v. Anthropic*, 2025 WL 1482734 at *2 (N.D. Cal.  May 23, 2025).  Plaintiffs' pre-complaint prompting efforts are also privileged insofar as Plaintiffs' agents prompted Suno's service for the purpose of obtaining legal advice regarding whether to assert copyright infringement claims for unauthorized training.  Suno already has all the prompts and outputs cited in the Complaint and, as the system owner, has far superior access to its own logs, back-end systems, and analytics to explore how easy or difficult it is to generate "soundalike" outputs.  Suno's desire to reverse-engineer Plaintiffs' investigative strategy does not constitute "substantial need," particularly where Suno's own refusal to disclose its training data is what forced Plaintiffs to test the service in the first place.  Furthermore, it is clear Suno does not need more than what Plaintiffs have already disclosed to understand how its own AI models and AI music generation service work.  Consistent with these principles, the discovery referee in the parallel Udio litigation also recommended against granting this same discovery.

*Second*, there has been no waiver.  Plaintiffs did not "voluntarily disclose" work product to an adversary merely by entering prompts into an automated user interface that Suno itself now claims

---

[10] Suno's contention that Plaintiffs "*newly* claim" that they used these outputs to satisfy pleading requirements is bewildering.  Plaintiffs expressly noted this usage in the Complaint and reiterated it several times since, including in prior briefing to the Court.  *See* July 28, 2025 Dispute Statement at 1 ("As a result of Suno's intransigence, Plaintiffs had no choice but to turn to Suno's AI music generation service to develop evidence of the contents of its training data based on outputs that resembled components of their copyrighted works.").

[11] Plaintiffs do not presently have any intention of relying on other self-generated outputs from Suno's service that were not cited in the Complaint.  To the extent they later make the decision to rely on such outputs, Plaintiffs will provide Suno with the same information they provided for each output referenced in the Complaint, *i.e.*, the prompt used to generate the output and a link to access the output.

January 23, 2026
Page 22

**LATHAM&WATKINS**LLP

it cannot reliably tie to Plaintiffs. Nor does Plaintiffs' decision to cite certain outputs in the Complaint open the door to a sweeping subject-matter waiver for every other prompt or account used in their investigation. Though Plaintiffs reserve the right to use these outputs in the litigation to demonstrate Suno's capacity to generate soundalikes, it hardly follows that Plaintiffs must disclose every other prompt and output combination they input into Suno's service during their pre-Complaint investigation.[12] Insofar as the outputs reflect Suno's capacity to generate outputs that resemble known sound recordings in the training data, the outputs speak for themselves, and further discovery into other, different outputs will not shed light on this fact.

*Third*, Suno's request for Plaintiffs' communications with Mr. Newton-Rex should be denied.



For these reasons, Plaintiffs respectfully submit that the Court deny Suno's request for discovery into Plaintiffs' pre-complaint investigation, including any identifiers, unrelied-on prompts and outputs, and communications with Mr. Newton-Rex.

### 6. Plaintiffs' Use of AI

**Suno's Position:** As discussed above, Plaintiffs' core theory of market harm is that non-infringing generative AI outputs either compete with or dilute the market for Plaintiffs' asserted works on streaming services and social media platforms. But if Plaintiffs plan to argue that any market dilution has been caused by generative AI and, further, hold *Suno* responsible for all AI-based dilution, Suno must be allowed discovery into Plaintiffs' own contributions to that dilution.

Specifically, Suno is entitled to basic discovery to determine whether any dilution in any given Plaintiff's market share might actually be attributed to (in whole or in part) *another Plaintiff's own use of AI tools* to create new music or to otherwise make the music creation process faster and more efficient, including through partnerships with other AI companies. *Cf. Am. Broad. Companies, Inc. v. Aereo*, Inc., No. 12-cv-80300, 2013 WL 1508894, at *4 (N.D. Cal. Apr. 10, 2013) ("Under the broad definition of relevance in Rule 26(b), Plaintiffs' argument that the information can establish market harm would make the information relevant."). Yet Plaintiffs

---

[12] To the extent Plaintiffs intend to rely on the outputs cited in the Complaint to support their position on either the first or the fourth fair use factors, they intend to use these outputs to demonstrate only that it is possible for Suno to generate soundalikes. Accordingly, the prompt and output combinations Plaintiffs have already disclosed provide Suno with all the information it needs to assess the outputs for Plaintiffs' intended purpose.

LATHAM&WATKINSLLP

have limited their productions only to documents showing their use of Suno's AI tool or their own efforts to train an AI tool like Suno's.

Plaintiffs' proposal excludes all discovery into their actual or potential use of *third-party* generative AI products, the development of AI tools by third parties working at Plaintiffs' direction, and all discovery concerning Plaintiffs' artists' use of these tools. The out-of-circuit *OpenAI* decision Plaintiffs rely on is inapt. In addition to the distinguishing factors discussed above (*see supra* Dispute No. 5), the defendants in those cases did not seek this discovery to counter plaintiffs' claims of market dilution, nor did OpenAI argue that the requested discovery would be probative of whether *other plaintiffs* were responsible for any dilution of *The New York Times*' market, as could be the case here. Here, because these documents are plainly relevant to Plaintiffs' asserted theory of harm and Plaintiffs have not articulated any burden, Suno respectfully requests that the court order their production. Indeed, insofar as Plaintiffs believe any particular request is overbroad, they've indicated no willingness to entertain compromises. And with respect to RFP 40, in particular, Plaintiffs misrepresent the scope of that request. Suno requested documents and communications about Sony's public statement that "SMG has been embracing the potential for responsibly produced AI to be used as a creative tool, revolutionizing the ways... recording artists create music." In light of Plaintiffs' purported concerns about market surplus due to music-generative AI, Suno is entitled to evidence showing that Sony is itself leveraging AI to expedite or "revolution[ize]" the music creation process.

**Plaintiffs' Position:** Suno's request for broad discovery into Plaintiffs' and their artists' use of generative AI is an irrelevant sideshow. This case is about *Suno's* unauthorized copying and use of Plaintiffs' sound recordings to train its own models, not about Plaintiffs' general business practices, the creative tools Plaintiffs' employees have implemented, or Plaintiffs' own use of AI models that are not comparable to Suno's infringing models. Plaintiffs have already agreed to produce (1) documents showing their efforts to train a generative AI music model using their sound recordings and (2) documents and communications with third parties about licensing their recordings for AI training. That is all that is reasonably tied to the claims and defenses here; Suno's pursuit for more is disproportionate and untethered to any legitimate need.[13]

Courts confronting the same tactic have rejected it. In *New York Times v. OpenAI*, the court denied OpenAI's effort to compel discovery into the Times' creation, positions on, and use of generative AI, holding that "[t]his litigation is focused on defendants' allegedly infringing use of plaintiffs' works, and defendants' fair use defense is likewise grounded in that use." *In re OpenAI, Inc., Copyright Infringement Litig.*, 2025 WL 1652110, at *4 (S.D.N.Y. May 30, 2025); *see id.* at *5 ("The Times's internal use of, and opinions on, *nonparty* generative AI is not relevant to the degree to which *defendants* reasonably believed their conduct … was legally non-infringing."). The same is true here: Plaintiffs allege particular harms caused by Suno's unauthorized training and outputs;

---

[13] As the above compromise offer indicates, Suno is simply wrong that Plaintiffs have refused to entertain narrowing compromise proposals regarding these topics.

January 23, 2026
Page 24

**LATHAM&WATKINS**LLP

Suno is not entitled to rummage through all of Plaintiffs' and their artists' use of AI to facilitate Suno's misguided search for alternative causes of market harm.

Suno's RFP No. 40 underscores the overreach of the instant request.  With this RFP, Suno seeks all documents and communications concerning Sony's generic public statement that AI can be a "creative tool."  This request would sweep in broad, policy-level discussions that have nothing to do with Suno's infringement or Plaintiffs' market-dilution theory.  Nor does Suno's purported clarification of this request make it an appropriate subject for discovery.  As discussed *supra* Dispute No. 3, Plaintiffs' theory of market impact is that if Suno's unauthorized use of copyrighted works to train generative AI models is allowed to proceed without limitation, it will risk flooding the market with AI-generated outputs, thereby diluting the market for Plaintiffs' works on various music streaming and social media platforms.  Sony's generic statement that it has been "embracing the potential for *responsibly produced AI* to be used as a creative tool" in no way relates to the harm posed by AI products, like Suno's, that are built on a foundation of copyright infringement.

Because Suno's proposed discovery is irrelevant, overbroad, and disproportionate in light of what Plaintiffs have already agreed to provide, the Court should deny it.

*/s/ Brittany N. Lovejoy*