### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UMG RECORDINGS, INC., CAPITOL RECORDS, LLC, and SONY MUSIC ENTERTAINMENT,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>SUNO, INC. and JOHN DOES 1-10,<br><br>　　　　　Defendant. | Case No. 1:24-cv-11611 (FDS) |

## PLAINTIFFS' OBJECTION TO THE MAGISTRATE JUDGE'S APRIL 6, 2026 DISCOVERY RULING

Pursuant to 28 U.S.C. § 636(b)(1)(A) and Federal Rule of Civil Procedure 72(a), Plaintiffs UMG Recordings, Inc., Capitol Records, LLC, and Sony Music Entertainment (collectively, "Plaintiffs") respectfully object to the portion of Magistrate Judge Levenson's April 6, 2026 Order (the "Order") (Dkt. 206) denying Plaintiffs' request for discovery into Defendant Suno, Inc.'s ("Suno") licensing agreement with Warner Music Group ("Warner"). The present objection is narrow. The Order addressed numerous discovery disputes and ruled on requests from both parties implicating thousands of potential documents. Plaintiffs object to only one ruling concerning a single document: Suno's licensing agreement with Warner.

## I.    INTRODUCTION

For nearly two years, Suno has supported its fair use defense in this litigation by arguing that no viable market exists for licensing sound recordings as training data for generative AI models.  Yet, in November 2025, Suno entered into the very type of agreement it claims is not feasible—a licensing deal with Warner Music Group to use copyrighted sound recordings as training data for new generative AI models.  Suno itself described the agreement as "a new partnership" to build "a new generation of Suno models using high-quality licensed music."  Ex. 1.[1]  Warner similarly announced that as part of this "first-of-its-kind partnership," Suno's "current models will be deprecated" and replaced with "more advanced and licensed models."  Ex. 2. Suno's press release did not even mention the settlement of past claims.

Plaintiffs sought the agreement in discovery because it is responsive to multiple requests for production and centrally relevant to, among other issues, Suno's fair use defense.[2]  Suno

---

[1] Unless otherwise specified, all citations to "Exhibits" refer to exhibits appended to the Declaration of Rajan S. Trehan filed in support of the present objection to the Order.

[2] Before it struck a deal with Suno, Warner was a plaintiff in this case.  Because Warner is no longer a party to the litigation, Plaintiffs are unable to obtain the agreement from Warner, short of a third-party subpoena.

objected to producing the agreement or any other information concerning its ongoing efforts to license sound recordings as training data. Plaintiffs thus raised the issue with Magistrate Judge Levenson, who denied Plaintiffs' request for discovery concerning the agreement in a single paragraph, without citation to any case law. *See* Order at 12.

The Order rests on three premises, each of which is clearly erroneous or contrary to law. *First*, the Order treats the Warner agreement as little more than a "settlement" of past claims, ignoring that it is also a forward-looking commercial arrangement. Warner and Suno could have settled Warner's legal claims and moved on. But that is not what they did. They also executed a go-forward license for Suno to use Warner's copyrighted sound recordings as training data for new AI models. It is misleading for Suno to present to the Court its ongoing partnership with Warner as purely a settlement. This backward-looking frame is plainly at odds with the public record. The Order's failure to account for the go-forward nature of the partnership is clearly erroneous.

*Second*, the Order invokes Federal Rule of Evidence 408 as a basis for denying discovery, when it is black-letter law that Rule 408 governs admissibility at trial, not discoverability. Yet, even accepting for argument's sake Suno's framing of its agreement with Warner, the Order effectively treats Rule 408 as imposing a heightened relevance standard for the discoverability of settlement agreements, which the First Circuit has never required. The Order's contrary decision flouts this established precedent and is contrary to law. Even under Rule 408's admissibility rubric, the agreement is admissible because it is relevant for several purposes other than to prove the validity of Plaintiffs' claims. The inclusion of settlement terms does not negate the fact that the agreement is, at bottom, a license and forward-looking commercial arrangement that bears on multiple issues in the litigation.

*Third,* the Order's conclusion that the agreement's "relevance is marginal" ignores its relevance to a variety of issues that Plaintiffs have identified. Suno's decision to enter a go-forward training license with Warner bears directly on several issues, including the fourth fair use factor, Suno's awareness of the risks associated with forgoing a training license, damages, and Suno's copyright misuse defense, which is predicated on allegations that Plaintiffs and Warner entered into and perpetuated a concerted refusal to deal with AI companies like Suno.

The net effect of the Order is to permit Suno to argue that no licensing market exists while simultaneously shielding from discovery the very agreement that proves the existence of, and Suno's participation in, that market. This is precisely the kind of selective disclosure courts consistently reject. This Court should sustain Plaintiffs' objections to the Order and direct Suno to produce its licensing agreement with Warner. In the alternative, if the Court declines to order Suno to produce the agreement, Plaintiffs request that Suno be precluded from arguing at summary judgment or trial that no viable market exists for licensing sound recordings as training data for generative AI models.

## II.     BACKGROUND

### A.     Warner's Previous Role in this Litigation

Warner was one of the original Plaintiffs in this action, joining UMG and Sony in asserting claims against Suno for copying *en masse* their copyrighted sound recordings to train its AI models without a license. *See* Dkt. 1. In support of its fair use defense, Suno has argued throughout this litigation that there is no viable market for licensing sound recordings as training data for generative AI models, and that any such market is "circular" and not legally cognizable under the fourth fair use factor. *See* Dkt. 150-1 at 18 n.23; *see also* Dkt. 212 at 2 (suggesting training data licensing market is "impracticable" because record labels "could not supply the AI company with

a sufficient volume of data" or AI companies "could not secure the necessary corollary publishing rights for the sound recordings").  Suno has also alleged a copyright misuse defense based on (unsupported) allegations that Plaintiffs conspired with Warner to engage in "concerted refusals to deal" with generative AI companies like Suno.  Dkt. 28 at 12.

**B.    Suno's "New Partnership" with Warner Music Group**

On November 25, 2025, Suno announced a "new partnership" with Warner Music Group. Ex. 1.  Suno's CEO, Mikey Shulman, explained in a press release that "this partnership has implications on how our product will evolve," including by "enabl[ing] us to build a new generation of Suno models using high-quality licensed music" and permitting Suno to "introduc[e] content from [Warner] artists who opt in for the use of their names, images, likenesses, voices, and compositions to be used in new AI-generated music."  *Id.*  Mr. Shulman did not mention the settlement of Warner's copyright infringement claims in this press release.

Warner separately announced in a parallel press release that as part of this "first-of-its-kind partnership," Suno's "current models will be deprecated" and replaced with "more advanced and licensed models" to be launched in 2026.  Ex. 2.  Warner stated that "[t]ogether, [Warner] and Suno are committed to forging a blueprint for a next-generation licensed AI music platform."  *Id.* The agreement also included Suno's acquisition of Songkick, a live music, concert-discovery platform, which Suno "will continue to run [ ] as a successful fan destination, bringing together the power of interactive music with live performance."  *Id.*

More recently, Warner's CEO, Robert Kyncl, detailed in a March 3, 2026 shareholder letter that its deal with Suno was part of Warner's strategic initiative to "creat[e] new monetization frameworks where AI becomes a licensed, additive layer to music."  Ex. 3. Mr. Kyncl noted that the deal contains "variable economics, enabling us to grow as our partners do" and that it "set[s]

an important precedent for the conversations we are having with both emerging and established potential partners." *Id.*

These public statements make clear that Suno's agreement with Warner is not merely—or even predominantly—a settlement of past claims. Rather, it is a forward-looking agreement for Suno to use Warner's copyrighted sound recordings as training data for new generative AI models. As Suno put it, the partnership reflects its ongoing efforts to "reshape the music ecosystem" and "create a paradigm shift in how music is made, consumed, experienced, and shared[.]" Ex. 1. Having put the litigation behind them, Suno and Warner are now partners who have memorialized the terms of their prospective commercial arrangement in a written agreement.

### C.    Suno's Refusal to Produce the Agreement

Plaintiffs' First Set of Requests for Production included requests seeking documents and communications relating to Suno's contemplation of potential licensing or payment for any sound recordings included in its training data. *See* Ex. 4 (Document Requests No. 15, 16). Suno agreed to produce materials responsive to these requests. Ex. 5. Plaintiffs themselves have agreed to produce all their executed agreements to license sound recordings as training data for generative AI models through present day, as well as external communications with their contractual counterparties regarding the negotiation of those agreements. Ex. 6.

Shortly after Suno announced its deal with Warner, Plaintiffs requested that Suno update its document productions to include, among other relevant materials, information pertaining to this licensing agreement. *Id.* Suno refused, arguing that its agreement with Warner is shielded by Federal Rule of Evidence 408. Plaintiffs thereafter raised the issue with Magistrate Judge Levenson. *See* Dkt. 209-1 at 6-23.[3]

---

[3] Plaintiffs presented the issue regarding Suno's licensing agreement with Warner as part of their broader request for Suno to expand the cutoff date for several categories of document productions. *See* Dkt. 209-1

### D.     The Order

On March 12, 2026, Magistrate Judge Levenson convened a conference to discuss several discovery disputes raised by both parties, including Plaintiffs' request for Suno's licensing agreement with Warner.  Due to timing constraints, the parties did not have an opportunity to present argument regarding the Warner licensing agreement.  *See* Ex. 7 at 56:20-22.  Magistrate Judge Levenson nevertheless indicated during the conference that "I don't buy . . . that the protections of Federal Rule of Evidence 408 are necessarily absolute . . . but it strikes me as of less relevance given that the limited value of settlements in figuring out market and licensing fees the Courts have often said they are less representative of what parties might reach in a free market or what a market looks like." *Id.* at 60:14-23.  Judge Levenson concluded that "I am not prepared on the showing I've seen to order [ ] Suno to disclose the terms of its *Warner Brothers* [sic] settlement." *Id.* at 60:24-61:1.  Throughout the hearing Magistrate Judge Levenson referred to the agreement as a "settlement," even though this is not how Suno and Warner have framed it in their public statements.

Thereafter, on April 6, 2026, Judge Levenson issued the Order addressing various issues presented at the conference. Dkt. 206.  As relating to Plaintiffs' request for discovery into Suno's agreement with Warner, Judge Levenson denied Plaintiffs' request in a single paragraph, which reads in full:

> Plaintiff's request for documents regarding the Warner Music Group settlement and associated licensing is denied. F.R.E. 408 is not an absolute bar, but the relevance of this information is marginal and the potential for chilling settlements—in this and other cases—is high. As Suno argues, settlements of litigation have little persuasive

---

at 16-20 (Suno's arguments concerning the Warner agreement); *id.* at 20-23 (Plaintiffs' reply arguments concerning the Warner agreement).  With this objection, Plaintiffs are not seeking discovery into any of these other categories, and the Warner agreement is the sole issue presently before the Court.

bearing on identifying and characterizing markets for intellectual property.

*Id.* at 12.  The Order cites no case law for any aspect of this ruling.  This is the sole portion of the Order to which Plaintiffs object.

### III.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 72(a), a District Judge may "modify or set aside" any part of a Magistrate Judge's decision on a non-dispositive matter if it is "clearly erroneous or is contrary to law."  Fed. R. Civ. P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A) (codifying "clearly erroneous or contrary to law" standard of review).  Pure questions of law are reviewed *de novo*. *See Trs. of Bos. Univ. v. Everlight Elecs. Co.*, 2015 WL 3407555, at *2 (D. Mass. May 27, 2015); *see also Powershare, Inc. v. Syntel, Inc.*, 597 F.3d 10, 15 (1st Cir. 2010).  Factual findings are "clearly erroneous" when "after scrutinizing the entire record," the reviewing court forms "a strong, unyielding belief that a mistake has been made."  *Trs. of Bos. Univ.*, 2015 WL 3407555, at *2 (citation omitted). "Mixed questions of law and fact" are reviewed according to a "sliding standard of review," under which "[t]he more fact intensive the question, the more deferential the level of review (though never more deferential than the 'clear error' standard); the more law intensive the question, the less deferential the level of review."  *In re IDC Clambakes, Inc.*, 727 F.3d 58, 64 (1st Cir. 2013).

### IV.    ARGUMENT

#### A.    The Order Is Clearly Erroneous Because It Disregards the Go-Forward Component of Suno's Agreement with Warner.

The Order proceeds from the premise that the Warner agreement is primarily a "settlement" of past claims.  But this is not true.  The parties' own public statements demonstrate that the deal extends well beyond resolution of Warner's copyright infringement claims against Suno.  It is also a forward-looking commercial license, pursuant to which Suno will use Warner's copyrighted

- 8 -

sound recordings as training data for new generative AI models.  It was clear error for the Order to fail to account for the go-forward component of this partnership.

In a public press release announcing Suno's deal with Warner, Suno's CEO described the relationship as "a new partnership" designed to "create a paradigm shift in how music is made, consumed, experienced and shared." Ex. 1.  He stated that "[t]his partnership has implications on how our product will evolve," including by enabling Suno "to build a new generation of Suno models using high-quality licensed music." *Id.*  Similarly, Warner announced that pursuant to the terms of this "first-of-its-kind partnership," Suno's "current models will be deprecated" and replaced with "more advanced and licensed models." Ex. 2.  More recently, Warner's CEO wrote in a March 3, 2026 shareholder letter that its deal with Suno "set[s] an important precedent for the conversations we are having with both emerging and established potential partners." Ex. 3.

These are not indicia of a backward-looking settlement that has nothing to do with the broader market for licensing sound recordings as training data.  They describe a forward-looking partnership to "forg[e] a blueprint for a next-generation licensed AI music platform," centered on a commercial license to use copyrighted sound recordings as training data for generative AI models. Ex. 2.  The law recognizes that settlements and licenses "function differently." *Davis v. Blige*, 505 F.3d 90, 102 (2d Cir. 2007).  As the Second Circuit has explained, "[s]ettlements are generally retrospective and exclusively between the parties to the settlement," while "[l]icenses and assignments . . . are prospective; they permit use by a non-owner who would not otherwise have a right to use the property." *Id.* at 102-03.  The court cautioned that the terms "retroactive license" and "settlement" are not equivalent and that interchanging such terms "causes unnecessary confusion and potentially creates legal mischief." *Id.*  This is precisely what has occurred here: Suno has labeled an agreement that includes a prospective commercial license as

being an exclusively retroactive "settlement" to shield it from discovery, despite touting the go-forward nature of the partnership in every other setting.

Courts have likewise recognized that go-forward commercial components of settlement agreements are independently discoverable. In *Eagle View Technologies, Inc. v. Nearmap US, Inc.*, the court in a patent suit ordered production of an "integration agreement" executed contemporaneously with a settlement agreement, where the parties' own press release described the integration agreement as "part of the settlement." 2022 WL 2656752, at *1, 3 (D. Utah July 8, 2022). The court held that the integration agreement was relevant because it may inform whether the settlement amount "accurately reflects a reasonable royalty or whether it was influenced by other considerations and exchanges of value, *such as the parties' entry into an ongoing commercial relationship*." *Id.* (emphasis added). The same logic applies here: Suno's and Warner's go-forward licensing terms are independently relevant and discoverable, irrespective of whether the agreement also resolves past claims.[4] That the go-forward terms may have been executed in the shadow of a litigation settlement bears on the weight that should be afforded to the particular terms—it does not dictate relevance or discoverability. Regardless, the Order was incorrect in concluding that the agreement cannot be reflective of an arms-length transaction for licensing sound recordings. Suno and Warner were free to enter a pure settlement limited to resolving Warner's claims for past conduct. Neither party was under any compulsion to execute

---

[4] It is a basic principle of contract law that "when several writings evidence a single contract or comprise constituent parts of a single transaction, they will be read together." *F.D.I.C. v. Singh*, 977 F.2d 18, 21 (1st Cir. 1992) (citation omitted). By the parties' own public statements, Suno's agreement with Warner includes both a settlement of past claims and a go-forward license to engage in the very conduct that formed the basis of Warner's original claims. The Order's treatment of the agreement effectively reading the go-forward terms out of the agreement is contrary to the First Circuit's instruction that courts must "recogniz[e] reasonable spheres of respective applicability" when a single transaction is structured in component parts and "gives the parties and the drafters of the documents credit for coherent thinking." *Dukes Bridge LLC v. Beinhocker*, 856 F.3d 186, 191 (1st Cir. 2017).

a go-forward license, and Suno could have made the strategic decision to, instead, rely on the fair use defense it continues to advance in this litigation.

Critically, Suno made no factual showing of any kind—no evidence, declaration, or *in camera* submission—establishing that the agreement is exclusively "a Rule 408 protected *settlement of claims* with one of the former plaintiffs in this case," rather than a commercial license. Dkt. 209-1 at 5 (emphasis in original). Magistrate Judge Levenson adopted Suno's preferred framing during the discovery conference based entirely on Suno's self-serving label. *See* Ex. 7 at 60:14 (referring to the "*Warner Brothers* settlement"); *id.* at 60:24-25 (same). Magistrate Judge Levenson acknowledged during the conference that he was "not prepared on the showing I've seen" to order disclosure. *Id.* at 60:24-25. But the absence of a sufficient showing to contradict how Suno and Warner have described the go-forward partnership in public fora should have cut the other way: it was Suno's burden to establish that the agreement is shielded from discovery, and Suno failed to carry that burden. *See Baillargeon v. CSX Transportation, Inc.,* 2022 WL 1104588, at *2 (D. Mass. Apr. 13, 2022) ("When a party resists the production of evidence, it bears the burden of establishing lack of relevancy or undue burden." (internal quotation marks omitted)).

The Order's failure to consider the go-forward nature of Suno's partnership with Warner is clearly erroneous. Whatever protections may attach to the settlement of Warner's past claims, those protections do not extend to the terms of a prospective commercial license that Suno will use to build new AI models going forward. *See Eagle View*, 2022 WL 2656752, at *3.[5]

---

[5] To the extent the Court is concerned about divulging settlement-related information, Plaintiffs are willing to meet and confer with Suno about applying targeted redactions to provisions of the agreement that bear only on the settlement of past claims, and do not influence go-forward elements of the agreement. That said, Plaintiffs do not believe the law supports withholding any facet of Suno's agreement with Warner.

**B.      The Order Is Contrary to Law Because Federal Rule of Evidence 408 Does Not Bar Discovery of Settlement Agreements.**

Even assuming the Warner agreement is a pure settlement (which it is not), the Order's reliance on Rule 408 as a basis for denying discovery is contrary to well-established law.[6] This is a legal issue subject to *de novo* review. *See Powershare*, 597 F.3d at 15.

The Order acknowledges "F.R.E. 408 is not an absolute bar" but then denied discovery into the Warner agreement because "the potential for chilling settlements—in this and other cases—is high." Order at 12. By suggesting that Rule 408 is not an "absolute bar" while still treating it as something of a bar, the Order effectively imposes a heightened relevance standard for settlement agreements. The First Circuit has never imposed such a heightened standard.

The law is clear that Rule 408 governs admissibility at trial, not discoverability. Courts in this District and across the country routinely compel production of settlement agreements where, as here, "the relevancy of the settlement agreement for discovery purposes is self-evident." *Atchison Casting Corp. v. Marsh, Inc.*, 216 F.R.D. 225, 227 (D. Mass. 2003); *see also Intell. Ventures I, LLC v. Lenovo Grp. Ltd.,* 2019 WL 9096048, at *2 (D. Mass. Dec. 6, 2019) (rejecting argument that "conflate[s] the standard for admissibility of evidence at trial and the much broader standard for relevancy for discovery." (internal quotation marks omitted)). The consensus, both in this Circuit and beyond, is that ordinary principles of relevance govern the discoverability of settlement agreements and that "no heightened showing of relevance need be made to justify their disclosure." *Morgan Art Found. Ltd. v. McKenzie*, 2020 WL 3578251, at *5 (S.D.N.Y. July 1, 2020) (internal quotation marks omitted); *see also Fernandes v. Bouley*, 2022 WL 2915702, at *10

---

[6] Rule 408 provides, in relevant part, that evidence "furnishing, promising, or offering . . . a valuable consideration in compromising or attempting to compromise the claim" "is not admissible . . . either to prove or disprove the validity or amount of a disputed claim[.]" Fed. R. Evid. 408(a)(1).

(D. Mass. July 25, 2022) (applying ordinary relevance standard to discovery of dispute resolution materials); *Rocky Aspen Mgmt. 204 LLC v. Hanford Holdings LLC*, 394 F. Supp. 3d 461, 464 (S.D.N.Y. 2019) (citing a "slew of cases" applying ordinary discovery standards to settlement agreements).

The discoverability rules also appropriately account for the Order's stated concern about "the potential for chilling settlements." Order at 12. To be sure, "Congress clearly enacted Fed. R. Evid. 408 to promote the settlement of disputes outside the judicial process. However, it is equally plain that Congress chose to promote this goal through limits on the *admissibility* of settlement material rather than limits on their *discoverability*." *Bd. of Trs. of Leland Stanford Junior Univ. v. Tyco Int'l Ltd.*, 253 F.R.D. 521, 523 (C.D. Cal. 2008) (internal alterations and citation omitted). As one leading treatise aptly summarized, "a party is not allowed to use Rule 408 as a screen for curtailing his adversary's right of discovery." 2 Weinstein's Federal Evidence § 408.07 at 408–26 (2005); *accord Bd. of Trs. of Leland Stanford*, 253 F.R.D. at 523. This is precisely how Suno is using Rule 408—as a "screen" to conceal relevant discovery, particularly aspects of the agreement that do not concern the settlement of past claims.

The Order effectively imposed a heightened relevance standard by characterizing the agreement's relevance as "marginal" and weighing it against the "chilling effect." The Order's application of this heightened standard was legal error and warrants reversal.

### C.     The Warner Agreement is Relevant to Multiple Core Issues in the Case

The Order's conclusion that the Warner agreement has only "marginal" relevance is simply wrong and reflects a failure to consider the multiple grounds of relevance Plaintiffs have identified. Order at 12; *see also* Dkt. 209-1 at 21 (identifying bases of relevance). The Order's sole reasoning on relevance is that "settlements of litigation have little persuasive bearing on identifying and

characterizing markets for intellectual property." Order at 12. Evident from this ruling is a failure to address any of the multiple bases for relevance, aside from the amount of potential license fees. This failure to even consider Plaintiffs' bases of relevance is clearly erroneous.

### 1.   Fourth Fair Use Factor

The fourth fair use factor examines "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). The First Circuit has described this as "the single most important element of fair use." *Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 64 (1st Cir. 2012) (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985)).

Suno's agreement with Warner to license sound recordings as training data is direct evidence that a market for such licenses exists. *See Onan v. Databricks, Inc.*, 2026 WL 125149, at *2 (N.D. Cal. Jan. 16, 2026) (granting motion to compel training data licensing agreements, in part, because "the feasibility of technology companies assembling convenient, general-purpose libraries of works through licensing rather than copying could undercut arguments that any alleged copying was necessary for technological advancement" (internal quotation marks omitted)); *see also In re Mosaic LLM Litig.*, 2025 WL 2294910, at *3-4 (N.D. Cal. Aug. 8, 2025) ("As generative AI proliferates, the right to license one's creative work to train generative AI models may arguably become—or may already be—something copyright owners rightly expect to control." (internal quotation marks omitted)). Courts have also recognized that in appropriate circumstances a license negotiated in the context of litigation may be "the most reliable" evidence of market value. *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010).

Here, Suno's agreement with Warner is evidence that Suno's models do, in fact, rely on copyrighted sound recordings and that there exist options to satisfy Suno's need to acquire such

copyrighted works for training.  More specifically, the precise terms of the license likely reflect how Suno will utilize Warner's copyrighted works to cater to user preferences.  Such insight into how users utilize Suno's AI music generation service also bears on the market impact of Suno's unauthorized use of Plaintiffs' copyrighted works.

Suno "cannot have it both ways" by arguing that no viable licensing market exists while simultaneously refusing to produce the agreement that proves it participated in that market.  *Bd. of Trs. of Leland Stanford*, 253 F.R.D. at 523.  Indeed, Suno has made this argument a centerpiece of its argument under the fourth fair use factor, contending that the licensing market is circular and impractical because rights holders may not be able to "supply the AI company with a sufficient volume of data" or "the AI company determined it could not secure the necessary corollary publishing rights . . . at scale."  Dkt. 212 at 2.  Suno's calculated withholding of relevant evidence is precisely the kind of gamesmanship courts have consistently rejected.  *See In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.)*, 348 F.3d 16, 24 (1st Cir. 2003) (parties may not rely on privilege as "both a sword and a shield" by selectively disclosing information subject to the privilege).

Notably, Suno has insisted that Plaintiffs produce broad discovery into their own AI licensing practices, including post-complaint executed agreements through present day.  *See* Dkt. 150-1 at 1-6; Dkt. 212 at 1-3.  Having demanded comprehensive licensing discovery from Plaintiffs, Suno has no basis to withhold its own licensing agreement simply because it involved a settlement of claims.  Suno has also advocated for an impermissibly narrow conception of the fourth fair use factor, arguing in essence that the fourth fair use factor recognizes only the market for training data to train a product that looks precisely like Suno's.  *See* Dkt. 212 (previewing Suno's summary judgment argument that Plaintiffs AI licensing deals "are for products that look

nothing like Suno"). Even accepting Suno's cramped interpretation of the fourth fair use factor, its deal with Warner undermines the argument that there is no market for Suno's product.

If the Court determines that Suno may withhold its licensing agreement with Warner, Suno should be precluded from arguing at summary judgment or trial that no viable market exists for licensing sound recordings as training data for generative AI models. The law does not allow Suno to benefit from the absence of evidence it has chosen to withhold.

    2.    *Damages*

Any go-forward licensing fee included in the agreement also reflects on the value of the potential licenses Suno forewent when training its commercial AI models without Plaintiffs' authorization, and is indicative of the value Suno places on using high-quality, copyrighted works to train its AI models. Moreover, the terms of Suno's deal with Warner inform the scope of Plaintiffs' damages, as differences in how Suno's service functions under a licensed model versus an unlicensed model are relevant to assessing the value of the unauthorized use. For instance, the agreement may outline specific functions for Suno's future models that are directly tied to the use of a smaller corpus of licensed sound recordings than what it used originally. Any reduction in model capabilities due to the Warner deal will likely inform the value of incorporating Plaintiffs' works within Suno's training dataset. Furthermore, if Suno intends to make any argument that Plaintiffs' damages should be cut off or reduced once Suno implements licensed models, Suno cannot withhold the only evidence outlining Suno's obligations (insofar as they exist) to deprecate its existing models and remove any influence of training on Plaintiffs' unlicensed works.[7]

---

[7] To date, Suno has declined to produce any evidence whatsoever pertaining to its announced plans to "deprecate" its current models and replace them with "new, more advanced and licensed models." Ex. 2.

### 3.    *Copyright Misuse*

Suno has alleged in support of its copyright misuse defense that Plaintiffs, including Warner, engaged in "one or more concerted refusals to deal" with generative AI companies. Dkt. 28 at 12. The fact that Warner agreed to license its sound recordings to Suno directly undermines Suno's group boycott theory. So too do Plaintiffs' thorough production of AI licensing agreements and negotiations. Nonetheless, Suno has continued to aggressively pursue discovery into Plaintiffs' AI licensing practices in search for evidence of this alleged group boycott. *See* Dkt. 150-1; Dkt. 212 at 2. Plaintiffs are entitled to test Suno's line of argumentation through discovery, including by seeking the very agreement Plaintiffs' supposed group boycott was designed to prevent. Suno cannot withhold evidence that bears directly on the alleged concerted conduct, including how such alleged efforts unfolded over time.

### 4.    *Knowledge and State of Mind*

Suno's decision to take a license to use sound recordings may also reflect Suno's knowledge that there was always a substantial risk that using copyrighted works to train AI models for a commercial music generation service required a license. This is highly relevant to the willfulness of Suno's infringement. *See* 17 U.S.C. § 504(c)(2); *see also Homeowner Options for Mass. Elders, Inc. v. Brookline Bancorp, Inc.*, 789 F. Supp. 2d 242, 244 (D. Mass. 2011) ("Infringement is willful if the defendants knew or should have known that their conduct constituted copyright infringement."). The specific terms of the license, including but not limited to those relating to the go-forward license, are probative of Suno's understanding of the risks it took by not seeking authorization to train in the first instance. Moreover, any license terms that exist concerning guardrails that limit potential similarities between training inputs and outputs would also be suggestive of Suno's awareness of the effects of its conduct on the market for

Plaintiffs' recordings. In short, Plaintiffs are entitled to discovery into Suno's present licensing practices, as they might bear on Suno's state of mind concerning its previous infringing conduct.

**D.    There Is No Burden or Confidentiality Concern that Supports Withholding the Warner Agreement**

Plaintiffs are seeking a single document that is clearly known and accessible to Suno. There is no burden to producing it. *Wenger S.A. v. Olivet Int'l Inc.*, No. 1:20-cv-01107, Dkt. 315 (S.D.N.Y. May 6, 2024) (granting motion to compel production of settlement agreement and holding that the agreement is "proportional because there is no burden to produce it").

Insofar as Suno raises concerns about the commercial sensitivity of the Warner agreement, those concerns are fully addressed by the operative Amended Protective Order. *See* Dkt. 179. The Amended Protective Order contains a three-tier confidentiality framework permitting Suno to designate the agreement as "Highly Confidential — Outside Counsel Only." *See id.* at ¶ 6. Indeed, Plaintiffs have already produced thousands of documents reflecting their own highly sensitive negotiation communications with AI licensing counterparties, subject to the same protective order.

**V.    CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court sustain their objections, set aside the Order insofar as it denies discovery into Suno's licensing agreement with Warner, and order Suno to produce the agreement. In the alternative, if the Court declines to order production, Plaintiffs request the Court preclude Suno from arguing at summary judgment or trial that no viable market exists for licensing sound recordings as training data for generative AI models.

Dated: April 20, 2026

HUESTON HENNIGAN LLP

By: _____

Moez M. Kaba (*pro hac vice*)
Mariah N. Rivera (*pro hac vice*)
Alexander R. Perry (*pro hac vice*)
Samuel Givertz (*pro hac vice*)
**HUESTON HENNIGAN LLP**
1 Little West 12th Street
New York, New York 10014
Telephone: (646) 930-4046
Facsimile: (888) 775-0898
mkaba@hueston.com
mrivera@hueston.com
aperry@hueston.com
sgivertz@hueston.com

Robert N. Klieger (*pro hac vice*)
Rajan S. Trehan (*pro hac vice*)
**HUESTON HENNIGAN LLP**
523 West 6th Street, Suite 400
Los Angeles, California 90014
Telephone: (213) 788-4340
Facsimile: (888) 775-0898
rklieger@hueston.com
rtrehan@hueston.com

Christina V. Rayburn (*pro hac vice*)
**HUESTON HENNIGAN LLP**
620 Newport Center Drive, Suite 1300
Newport Beach, CA 92660 Telephone:
(949) 356-6412 Facsimile: (888) 775-0898
crayburn@hueston.com

Daniel J. Cloherty
Alexandra Arnold
**CLOHERTY & STEINBERG LLP**
One Financial Center, Suite 1120
Boston, Massachusetts 02110
Telephone: (617) 481-0160
Facsimile: (617) 848-0830
dcloherty@clohertysteinberg.com
aarnold@clohertysteinberg.com

*Counsel for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those identified as non-registered participants on April 20, 2026.

_____
Rajan S. Trehan