# EXHIBIT 7

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UMG RECORDINGS, INC., et al.,          )
                                       )
                    Plaintiffs         )
                                       )  No. 1:24-CV-11611-FDS
vs.                                    )
                                       )
SUNO, INC., et al.,                    )
                                       )
                    Defendants.        )
                                       )
                                       )
                                       )

BEFORE THE HONORABLE PAUL G. LEVENSON
UNITED STATES MAGISTRATE JUDGE
Status Conference
(Digital Recording)

John Joseph Moakley United States Courthouse
Courtroom No. 25
One Courthouse Way
Boston, Massachusetts 02210

March 12, 2026
11:04 a.m.

Kristin M. Kelley, RPR, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 3209
Boston, Massachusetts 02210
E-mail: kmob929@gmail.com

Mechanical Steno - Computer-Aided Transcript

APPEARANCES:


          Christina Von der Ahe Rayburn
          Hueston Hennigan LLP
          620 Newport Center Drive
          Ste 1300
          Newport Beach, CA 92660
          949-356-6412
          crayburn@hueston.com
          for Plaintiffs.


          Rajan Trehan
          Joseph Aronsohn
          Deeksha Kohli
          Lee A. Linderman
          Hueston Hennigan, LLP
          523 W 6th St
          Suite 400
          Los Angeles, CA 90014
          408-876-0529
          rtrehan@hueston.com
          jaronsohn@hueston.com
          dkohli@hueston.com
          llinderman@hueston.com
          for Plaintiffs.


          Mariah Rivera
          Samuel Givertz
          Hueston Hennigan LLP
          1 Little West 12th
          Ste 2nd Floor
          New York, NY 10014
          646-930-4046
          mrivera@hueston.com
          sgivertz@hueston.com
          for Plaintiffs.

APPEARANCES CONT'D.:


         Brittany N. Lovejoy
         Ivana Dukanovic
         Latham & Watkins
         505 Montgomery Street
         Suite 2000
         San Francisco, CA 94111
         415-391-0600
         britt.lovejoy@lw.com
         ivana.dukanovic@lw.com
         for Defendants.


         Grace McLaughlin
         Paris Sanders
         Latham & Watkins LLP
         1271 Avenue of the Americas
         New York, NY 10020
         212-906-1200
         grace.mclaughlin@lw.com
         paris.sanders@lw.com
         for Defendants.


** Proceedings recorded by sound recording and produced by computer-aided stenography. **

I'm trying to figure out where we are.

MR. ARONSOHN:  Your Honor, to respond your question, we produced that data.  That data is not at issue here.  What's at issue here is whether Suno is also permitted to go on a fishing expedition for internal communications referring to the performance of the business.

That is not -- those are not the typical inputs of a damages expert.  A damages expert, I expect, Suno's damages expert will be more than pleased with, I think, over five years of raw market data we produced in this litigation, which again had not been produced in the *Open AI* action.  It takes us well beyond the line that's there of what we've given them to sort out different market harms.

THE COURT:  All right.  Let me --

Miss Lovejoy, because I'm running out of time with a criminal matter coming up, I'm guessing that you're going to say experts can say what they want but they're real experts running this company and if they say this isn't hurting us or this won't hurt us or this is hurting us and here's how, you'd like to know what they have to say about it.  Is that?

MS. LOVEJOY:  It's a little bit that but more finite than that.  So we're getting stream shared data.  We're getting royalty data, but to your Honor's point, either side's expert can do a calculation and it goes up or it goes down there, but, like, so what will we do about that.  I think if plaintiffs are

going to put forth what their experts say, ah-hah, look, our revenues are declining or not growing as much as we thought or growing less than we thought and it's all because of AI, what are we going to have to say, actually, there are these other market trends that you're, in fact, telling other tribunals are decreasing your market share that are at play here?

And that is the thing that is the second RFP that counsel pointed to where the question is, like, has there been just a flood of content, not even AI generated content from their independent artists' competitors, from their distributor competitors, because that's what they're telling other tribunals is eroding their market share.

So I appreciate that we need limiting principles and we're happy to go back and sharpen our pencils and figure out what they are, but there has to be some analysis of causal factors that could explain a diminution in market share and revenue separate and apart from AI.

THE COURT:  Well, I'm not sure -- I'm sorry.  I'm going to cut you off because we're running out of time here.

This -- it's becoming clear to me I'm going to need more time with you guys.  I'm sorry to do this.  We've just got too much issues.  What I'd like to do -- because I think there are two different questions here.  One is what kind of data do people need to feed their experts and the other is what statements by a party opponent might be relevant potentially

and what's the time period during which to look for such statements.  And I do lean towards a cutoff on time periods and I do think those are two different animals.  So I'm going to ask the parties to think about that.

Let me roll through a couple of issues.  The defendants' request -- so I don't have a ruling in place and I think further discussion may be warranted with respect to causes of plaintiffs' alleged harm.

The request to add additional custodians among the plaintiffs' executives, I'm not seeing clear enough evidence of what else we're looking for to warrant broad-brush discovery on a custodian basis.  I do think that specific go-gets, in other words, has anybody, you know, if we're looking for statements about whether or not, and time frame being one of the items I think maybe horse traded, searches for statements that there's no threat from AI or that particular kinds of AI don't pose a threat but others may, that's arguably pertinent, but the idea of starting with a whole new set of custodians I think is off the table.

Much the same view attaches to plaintiffs' request to open up on a couple of new marketing folks as additional custodians.  Again, I think there's room to discuss are there narrowly tailored go-gets that may cover those topics of new channels.  I'm using the generic term because I'm not remembering precisely where the confidentialities are, but new

channels or new directions for future marketing I think narrowly tailored inquiries may make sense, but opening up whole new groups of custodians is just not proportional to the needs of the case.

The question regarding what kind of prompting efforts were made, you know, what did plaintiffs do to test and show that in their view it is feasible to produce sound-a-likes, I'm not going to put any restrictions on what defendants want to do on their own to try and reverse engineer or scoop through past inquiries and figure out what was done, but I'm also not going to order plaintiffs to turn over names and usernames and so forth of their investigators.

I see this as equivalent to, you know, we spent -- we sent a private detective over to look at the operation. If you spot the private detective, you can go back over CCTV footage and figure out who the private detective is, fine, but if is work product more generally, and if you can figure out somebody else's work product on your own, that's fine, but I'm not going to make them turn that over. I don't think we have an adequate showing to meet the required standard of need to get into work product.

With respect to the particular consultant, communications with that consultant, given that he was ultimately hired are almost certainly work product. While it may not be absolutely protected, I'm not seeing any showing

that warrants lifting the work product in this -- the work product protections in this case.  It's just not close enough to the heart of the matter to be worth the effort.

Dilution issues we've discussed.  I don't feel that I'm at a point to rule on those but there may be some trading you can work out.  I've expressed my concern that as long as plaintiffs are defining market either for damages or purposes of Section 4 as including the entirety of their revenue stream, it's going to be very hard to figure out limiting principles for figuring out what pieces of their revenue stream are or are not fair game for discussion.

I would urge the parties to think more in terms of have people made statements or comments that reflect views that would be useful, admissions of party's opponent rather than a generalized -- at least at this point, nobody's buying anybody else's business.  This isn't an open-ended due diligence.  So that's my take on that.

I do think, and this fits with if we get to -- I'm speaking now of the 1/26 letter, plaintiffs' request for documents relating to, if you will, expressed reservations about what I think was referred to as scraping data from YouTube.

That does strike me as the kind of specific topic area where a particularized go-get that goes back in time, I think without limitation, it's sufficiently relevant that I do think

that -- I think the parties are going to need to work out some fairly narrow search terms, but data scraping or words to that effect are probably going to be relevant.  And it's not a wholesale search for discussions in the general topic of legality or availability, but I do think that's a pertinent enough concept that going back in time is going to be essential.  So that takes you back to January 1, 2022 on that.

There's the general question of discovery collection cutoff.  I hope I've tossed back to the parties to figure out in the two weeks, in the next two weeks, if there are compromises that people can live with to sort that out, keeping in mind my view that narrower is more practicable and that a degree of arbitrariness is inevitable.

The *Warner Brothers* settlement, I don't buy that that is -- that the protections of Federal Rule of Evidence 408 are necessarily absolute or are.  Disclosure of it, on the other hand, I don't see that plaintiffs have made out a significant showing of significance in proportionality, and it may complicate things or not, but it strikes me as of less relevance given that the limited value of settlements in figuring out market and licensing fees the Courts have often said they are less representative of what parties might reach in a free market or what a market looks like.

So I am not prepared on the showing I've seen to order the Suno to disclose the terms of its *Warner Brothers*

settlement.

So that's where I am.  We've got several open issues.  And what I appreciate -- I will try to put together an order that reflects the rulings that I've announced, but if the parties can alert me, I assure you I will not take it personally, if there are some of these that you are seriously considering seeking review as clear error.  I will go ahead and put a little more on paper so that you've got a workable record explaining my reasoning.

I certainly welcome those inquiries.  You're not going to be prejudiced by saying, Judge, many of these were boneheaded but defensible and this one's indefensible.  So please write it up so we can expose your logic to another judge.

So that's where I'm intending to leave it for now.  And I do have to cut this hearing off just because of other court business, but I look to hear from the parties within two weeks, both as to whether you've found your way to workable -- workably uncomfortable comprises.  And, likewise, within the next two weeks if there are particular items that you're going to need a more developed explication from the Court in order to fully preserve your appellate rights.

With that, we'll be in recess.

MR. TREHAN:  Thank you, your Honor.

MR. ARONSOHN:  Thank you, your Honor.

(The Honorable Court exited.)

(Adjourned, 12:46 p.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )

DISTRICT OF MASSACHUSETTS     )

         I, Kristin M. Kelley, certify that the foregoing

transcript is a true and correct transcript of the

audio-recorded proceedings held in the above-entitled matter to

the best of my skill and ability.


         /s/ Kristin M. Kelley          March 13, 2026

         Kristin M. Kelley, RPR, CRR          Date
         Official Court Reporter