# EXHIBIT B

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UMG RECORDINGS, INC., CAPITOL RECORDS, LLC, SONY MUSIC ENTERTAINMENT, ~~ATLANTIC RECORDING CORPORATION, ATLANTIC~~ALAMO RECORDS ~~GROUP~~ LLC, ~~RHINO ENTERTAINMENT LLC, THE ALL BLACKS U.S.A., INC., WARNER MUSIC INTERNATIONAL SERVICES LIMITED, and WARNER RECORDS INC.,~~ARISTA MUSIC, ARISTA RECORDS, LLC, LAFACE RECORDS, LLC, RECORDS LABEL, LLC, SONY MUSIC ENTERTAINMENT US LATIN, LLC, ULTRA RECORDS, LLC, VOLCANO ENTERTAINMENT III, LLC, and ZOMBA RECORDING LLC, <br><br>       Plaintiffs, <br><br>   v. <br><br> SUNO, INC. and JOHN DOES 1-10, <br><br>       Defendant. | Case No.: 1:24-cv-11611-FDS <br><br> **[PROPOSED]  SECOND  AMENDED COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs UMG Recordings, Inc. ("UMG") and Capitol Records, LLC ("Capitol," and collectively with UMG, "Universal"); Sony Music Entertainment ("~~Sony"); Atlantic Recording Corporation ("Atlantic"), Atlantic~~SME"), Alamo Records ~~Group,~~ LLC ("~~ARG~~Alamo"), ~~Rhino Entertainment LLC ("Rhino"), The All Blacks U.S.A., Inc. ("The All Blacks"), Warner Music International Services Limited ("WMISL"), and Warner Records Inc. (~~Arista Music, Arista Records LLC ("Arista Records"), LaFace Records, LLC ("LaFace"), Records Label, LLC ("Records Label"), Sony Music Entertainment US Latin, LLC ("SME US Latin"), Ultra Records, LLC ("Ultra"), Volcano Entertainment III, LLC ("Volcano"), and Zomba Recording LLC ("Zomba" and collectively with ~~Atlantic, ARG, Rhino, The All Blacks, and WMISL,~~

"~~Warner,~~SME, Alamo, Arista Music, Arista Records, LaFace, Records Label, SME US Latin, Ultra, Volcano, and Zomba, "Sony"" and together with Universal ~~and Sony~~, "Plaintiffs"), by and through their undersigned counsel, file this Second Amended Complaint against Suno, Inc. ("Suno") and allege as follows:

## NATURE OF THE ACTION

1.      From the invention of the phonograph record, through the eras of vinyl, cassette tapes, CDs, and now streaming and social media, the recorded music industry has been at the forefront of technological advancement.  Artificial intelligence ("AI") and machine learning are the next frontier of technological development, poised to push boundaries and expand commercial opportunity.  But with AI's enormous capabilities comes an equally enormous potential for abuse, making it critical that AI technology be implemented responsibly, ethically, and legally.

2.      Most fundamentally, AI companies, like all other enterprises, must abide by the laws that protect human creativity and ingenuity.  There is nothing that exempts AI technology from copyright law or that excuses AI companies from playing by the rules.  This lawsuit seeks to enforce these basic principles.

3.      Perhaps more so than with many other technologies, there is both promise and peril with AI.  As more powerful and sophisticated AI tools emerge, the ability for AI to weave itself into the processes of music creation, production, and distribution grows.  If developed with the permission and participation of copyright owners, generative AI tools will be able to assist humans in creating and producing new and innovative music.  But if developed irresponsibly, without regard for fundamental copyright protections, those same tools threaten enduring and irreparable harm to recording artists, record labels, and the music industry, inevitably reducing the quality of new music available to consumers and diminishing our shared culture.

4.      This case concerns a generative AI service, which allows users to generate digital music files that sound like genuine human sound recordings in response to basic inputs.  The capacity for a generative AI service to produce convincing imitations of genuine sound recordings starts with copying a vast range of sound recordings.  When those who develop such a service steal

copyrighted sound recordings, the service's synthetic musical outputs could saturate the market with machine-generated content that will directly compete with, cheapen, and ultimately drown out the genuine sound recordings on which the service is built.

5.      Foundational principles of copyright law dictate that copying protected sound recordings for the purpose of developing an AI product requires permission from rightsholders. Otherwise, such AI offerings will erode the value of the artistic works that comprise the essential raw materials that allow them to function in the first place.  If left unmoored from existing and longstanding legal constraints, such products could supplant, rather than support, genuine human creativity.

6.      Plaintiffs are record companies or recorded music businesses that, together, own or exclusively control copyrights in a great majority of the most commercially valuable sound recordings in the world.  They have developed their enviable catalogs by discovering, developing, and promoting human recording artists, whose artistic contributions are the bedrock of the recorded music industry and the music we listen to today.  These artists range from promising newcomers to the most famous musicians and performers in the world to myriad other artists who may not fill stadiums but who nevertheless shape culture.  Plaintiffs have a track record of embracing innovation and have entered into voluntary free-market licensing deals that authorize the use of their protected sound recordings in emerging technologies.  Such deals include full-catalog licenses with streaming music services and user-generated content platforms, and other licenses with innovative businesses associated with social media, fitness, gaming, the metaverse, and more.

7.      Defendant Suno, Inc. is the company behind Suno AI, or simply Suno, a generative AI service that creates digital music files within seconds of receiving a user's prompts.  Building and operating a service like Suno's requires at the outset copying and ingesting massive amounts of data to "train" a software "model" to generate outputs.  For Suno specifically, this process involved copying decades worth of the world's most popular sound recordings and then ingesting those copies into Suno's AI ~~model~~models so ~~it~~they can generate outputs that imitate the qualities

of genuine human sound recordings.  And to make matters worse, Suno obtained those copies in the first instance by unlawfully "stream ripping" them from the popular streaming platform YouTube, and circumventing the technological measures designed specifically to prevent such unauthorized copying.  Suno charges many of its users monthly fees to use its product and produce digital music files, which are designed to entertain, evoke emotion, and stoke passion just like the genuine sound recordings Suno copied.

8.    Given that the foundation of its business has been to exploit copyrighted sound recordings without permission, until Plaintiffs filed this action, Suno hashad been deliberately evasive about what exactly it has copied.  This is unsurprising.  After all, to answer that question honestly would be to admit willful copyright infringement on an almost unimaginable scale.  Suno's executives instead speak publicly in exceedingly general terms.  For example, one of Suno's co-founders posted online that Suno's service trains on a "mix of proprietary and public data,"[1] while another co-founder stated that Suno's training practices are "fairly in line with what other people are doing."[2]  Piercing the veil of secrecy, an early investor admitted that "if [Suno] had deals with labels when this company got started, I probably wouldn't have invested in it.  I think that they needed to make this product without the constraints."[3]

9.    Of course, it ishas always been obvious what Suno's service is trained on.  Suno copied Plaintiffs' copyrighted sound recordings *en masse* and ingested them into its AI modelmodels.  Suno's product can only work the way it does by copying vast quantities of sound recordings from artists across every genre, style, and era.  The copyrights in many of those sound recordings are owned or exclusively controlled by Plaintiffs.  In other words, if Suno had taken efforts to avoid copying Plaintiffs' sound recordings and ingesting them into its AI modelmodels,

---

[1] @georg, Discord, Suno-General (Aug. 3, 2023).

[2] Rachel Metz, *The AI Music Era Is Here.  Not Everyone Is a Fan*, Bloomberg (May 6, 2024), https://www.bloomberg.com/news/articles/2024-05-06/suno-udio-and-more-the-ai-music-era-is-here-not-everyone-is-a-fan.

[3] Brian Hiatt, *A ChatGPT for Music is Here.  Inside Suno, the Startup Changing Everything*, Rolling Stone (Mar. 17, 2024), https://www.rollingstone.com/music/music-features/suno-ai-chatgpt-for-music-1234982307/.

Suno's service would not be able to reproduce the convincing imitations of such a vast range of human musical expression at the quality that Suno touts. Suno's service trains on the expressive features of these copyrighted sound recordings for the ultimate purpose of poaching the listeners, fans, and potential licensees of the sound recordings it copied.

10. If there were any doubt regarding Suno's unauthorized copying, Suno dispelled it by effectively conceding in pre-litigation correspondence that it copied Plaintiffs' copyrighted sound recordings. When Plaintiffs directly accused Suno of copying Plaintiffs' sound recordings to train its model, Suno did not deny or proffer any facts to undermine those allegations. It would have been simple for Suno to say that it used other, legally acquired recordings, if that were the case. Instead, Suno deflected and disingenuously asserted that its training data is "confidential business information." Suno also claimed that its large-scale copying of sound recordings is "fair use," which was telling because fair use only arises as a defense to an otherwise unauthorized use of a copyrighted work. When Plaintiffs confronted Suno with these concessions, Suno did not respond.

11. Plaintiffs could have proceeded with this action based solely on eliciting that reasonable inference of copying. Nevertheless, Plaintiffs' claims are based on much more. In particular, Plaintiffs tested Suno's product and generated outputs using a series of prompts that pinpoint a particular sound recording by referencing specific subject matter, genre, artist, instruments, vocal style, and the like. Suno's service repeatedly generated outputs that closely matched the targeted copyrighted sound recording, which means that Suno copied those copyrighted sound recordings to include in its training data. In addition, the public has observed (and Plaintiffs have confirmed) that even less targeted prompts can cause Suno's product to generate outputs that resemble specific recording artists and specific copyrighted recordings. Such outputs are clear evidence that Suno trained its ~~model~~models on Plaintiffs' copyrighted sound recordings.

12. With the benefit of discovery, Plaintiffs now have clarity regarding the scope of Suno's infringement. Plaintiffs' inspection of Suno's training data revealed that Suno collected

over ███████ *audio files* to build its training dataset.  Confronted with this staggering sum, Plaintiffs developed a process to identify their sound recordings amongst the countless audio files in Suno's training data.  This process involved using Audible Magic, an industry-standard audio content recognition tool, to determine with precision which sound recordings Suno included in its training dataset.  At the end of this process, Plaintiffs identified millions of copyrighted sound recordings in Suno's training dataset that are owned or controlled by Plaintiffs and were copied by Suno without authorization.

12.13.  Suno is not exempt from the copyright laws that protect human authorship.  Like any other market participant, Suno cannot reproduce copyrighted works for a commercial purpose without permission.  Heedless of this basic principle, Suno's unauthorized copying erodes the value and integrity of Plaintiffs' copyrighted sound recordings with rapid and devastating impact. Suno's service generates music with such speed and scale that it risks overrunning the market with AI-generated music and generally devaluing and substituting for human-created work.  Suno already has over 10,000,000 users100,000,000 users and 850,000 subscribers generating music files using its product, with some outputs amassing upwards of 2,000,0005,000,000 streams. These digital music files have been released to the public—some already finding their way onto the major streaming services—and compete with the copyrighted sound recordings that enabled their creation; yet Suno sought no permission from and gives no credit or compensation to the human artists or other rightsholders whose works fueled their creation.

13.14.  Suno also profits substantially from its infringement of Plaintiffs' copyrighted sound recordings.  Suno's latest funding round raised $125250 million, valuing the company at approximately $500 million2.45 billion.  Suno further touts a roster of high-profile backers and has monetized its service, charging users up to $2430 per month for its highest subscription tier. None of that would be possible without the vast troves of copyrighted sound recordings that Suno copied to train its AI modelmodels.

14.15.  Suno cannot avoid liability for its willful copyright infringement by claiming fair use.  The doctrine of fair use promotes human expression by permitting the unlicensed use of

copyrighted works in certain, limited circumstances, but Suno offers imitative machine-generated music—not human creativity or expression. Moreover, the Copyright Act enumerates four factors to assess whether an unauthorized use is fair, none of which favors Suno's product. These factors are: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. In these circumstances, the purpose of Suno's use of Plaintiffs' copyrighted sound recordings is quintessentially commercial and creates directly competitive digital music files that serve the same purpose as the recorded music Plaintiffs create and substitute for genuine recordings by humans; Suno copies the key expressive features of Plaintiffs' copyrighted sound recordings; those copyrighted sound recordings are at the core of copyright protection; and Suno's infringement undermines both existing and potential commercial markets for selling, licensing, and distributing sound recordings. If left unchecked, Suno risks upending whole segments of the legitimate music industry.

15.16.  At its core, this case is about ensuring that copyright continues to incentivize human invention and imagination, as it has for centuries. Achieving this end does not require stunting technological innovation, but it does require that Suno adhere to copyright law and respect the creators whose works allow it to function in the first place.

16.17.  Plaintiffs bring this action seeking an injunction and damages commensurate with the scope of Suno's massive and ongoing infringement.

## THE PARTIES

17.18.  Plaintiffs comprise the world's foremost record companies and recorded music businesses, engaged in the business of producing, manufacturing, distributing, selling, licensing, and otherwise commercializing sound recordings in the United States and the world through various media. Plaintiffs have made substantial investments in the development and promotion of some of the most prolific and well-known recording artists in the world. Plaintiffs' investments extend further to lesser-known artists as well, with an eye toward sustaining the music industry

and discovering and supporting new generations of recording artists across all genres and styles. Pursuant to their relationships with artists, Plaintiffs own or exercise exclusive control over rights in millions of sound recordings of enormous cultural significance, artistic merit, and economic value.

18.19.  Plaintiff UMG Recordings, Inc. is a Delaware corporation with its principal place of business at 2220 Colorado Avenue, Santa Monica, California 90404.  UMG owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

19.20.  Plaintiff Capitol Records, LLC is a Delaware limited liability company with its principal place of business at 2220 Colorado Avenue, Santa Monica, California 90404.  Capitol owns or exercises exclusive control over the copyrights for the sound recordings within its catalog. A non-exhaustive list of specific sound recordings owned or exclusively controlled by Universal that Suno has infringed is attached as Exhibit A (the "Universal Works").

20.21.  Plaintiff Sony Music Entertainment is a Delaware general partnership, the partners of which are citizens of New York and Delaware.  Sony's headquarters and principal place of business are located at 25 Madison Avenue, New York, New York 10010.  Sony owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.  A non-exhaustive list of specific sound recordings owned or exclusively controlled by Sony that Suno has infringed is attached as Exhibit A (the "Sony Works").

22.    Plaintiff Alamo Records, LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010.  Alamo is a subsidiary of SME.  Alamo owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

23.    Plaintiff Arista Music is a New York partnership with its principal place of business at 25 Madison Avenue, New York, New York 10010.  Arista Music is a subsidiary of SME.  Arista Music owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

21.24.  Plaintiff Atlantic Recording CorporationArista Records LLC is a Delaware

corporationLimited Liability Company with its principal place of business at 1633 Broadway25 Madison Avenue, New York, New York 10019.  Atlantic10010.  Arista Records is a subsidiary of SME.   Arista Records owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

22.25.  Plaintiff AtlanticLaFace Records Group, LLC is a Delaware limited liability company with its principal place of business at 1633 Broadway25 Madison Avenue, New York, New York 10019.  ARG10010.  LaFace is a subsidiary of SME.  LaFace owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

26.     Plaintiff Records Label, LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010.  Records Label is a subsidiary of SME.  Records Label owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

23.27.  Plaintiff RhinoSony Music Entertainment US Latin, LLC is a Delaware limited liability company with its principal place of business at 777 S. Santa Fe25 Madison Avenue, Los Angeles, California 90021.  RhinoNew York, New York 10010.  SME US Latin is a subsidiary of SME.  SME US Latin owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

24.28.  Plaintiff The All Blacks U.S.A., Inc.Ultra Records, LLC is a Delaware corporationlimited liability company with its principal place of business at 1633 Broadway25 Madison Avenue, New York, New York 10019.  The All Blacks10010.  Ultra is a subsidiary of SME.  Ultra owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

25.29.  Plaintiff Warner Music International Services Limited is aVolcano Entertainment III, LLC is a Delaware limited liability company organized and existing under the laws of England and Wales with its principal place of business at 27 Wrights Lane, London, England.  WMISL25 Madison Avenue, New York, New York 10010.  Volcano is a subsidiary of SME.  Volcano owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

26.30. ~~Plaintiff Warner Records Inc.~~Zomba Recording LLC is a Delaware ~~corporation~~limited liability company with its principal place of business at ~~777 S. Santa Fe Avenue, Los Angeles, California 90021. Warner Records Inc.~~25 Madison Avenue, New York, New York 10010. Zomba is a subsidiary of SME. Zomba owns or exercises exclusive control over the copyrights for the sound recordings within its catalog. A non-exhaustive list of specific sound recordings owned or exclusively controlled by ~~Warner~~Sony that Suno has infringed is attached as Exhibit A (the "~~Warner~~Sony Works").

27.31. ~~A~~The Original and First Amended Complaints contained a non-exhaustive, illustrative sampling of Plaintiffs' federally copyrighted sound recordings that Suno has illegally reproduced ~~is attached hereto as Exhibit A~~. Plaintiffs ~~currently commercially exploit, and at all relevant times have commercially exploited, all the sound recordings listed in Exhibit A. Plaintiffs intend~~ expressly noted in those pleadings that they intended "to amend the Complaint at an appropriate time to provide an expanded list of works that Suno has infringed." Dkt. 119 at ¶ 30. Having now analyzed Suno's training data, it is clear that Suno infringed Plaintiffs' copyrighted sound recordings on an unprecedented scale.

32. Accordingly, attached hereto as Exhibit A is an expanded non-exhaustive, illustrative sampling of Plaintiffs' federally-protected sound recordings that Suno has illegally used and reproduced. Though Plaintiffs could have asserted claims as to many more copyrighted sound recordings based on Suno's illegal copying, in the interests of efficiency and judicial economy, they have elected to assert only a subset. Plaintiffs currently commercially exploit, and at all relevant times have commercially exploited, all the sound recordings listed in Exhibit A.

28.33. Defendant Suno, Inc. is a Delaware corporation with its principal place of business at 17 Dunster Street, Cambridge, Massachusetts 02138.

29.34. Defendants John Does 1-10 are unknown parties who directly copied Plaintiffs' federally copyrighted sound recordings, worked with Suno to copy Plaintiffs' federally copyrighted sound recordings, or have knowledge of Suno's direct infringement of the copyrighted sound recordings and intentionally induced and materially contributed to the infringement by

assisting Suno's compiling, scraping, and/or copying of the copyrighted sound recordings for Suno's training data, intentionally promoted or encouraged Suno's infringing conduct ~~by providing necessary tools and resources~~or otherwise facilitated it, and/or supervised and financially benefited from Suno's infringement.

## JURISDICTION AND VENUE

~~30.~~35.  This is a civil action seeking damages and injunctive relief for infringement under the Copyright Act, 17 U.S.C. §§ 101, *et seq*., and the Music Modernization Act, 17 U.S.C. § 1401. As such, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a), based on federal question jurisdiction.

~~31.~~36.  This Court has personal jurisdiction over Defendant Suno because its principal place of business, listed as 17 Dunster Street, Cambridge, Massachusetts 02138, is in this district.

~~32.~~37.  Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant Suno resides in this district.

## FACTUAL BACKGROUND

### Sound Recordings at Issue

~~33.~~38.  Plaintiffs own or exercise exclusive control over copyrights and/or exclusive rights under federal law in and to numerous valuable sound recordings.  Exhibit A, attached hereto and incorporated herein by reference, contains a non-exhaustive, representative list of copyrighted sound recordings owned or exclusively controlled by Plaintiffs that Suno has directly infringed (the "Copyrighted Recordings").  Plaintiffs or their predecessors in interest have obtained Certificates of Copyright Registration for each of the post-1972 Copyrighted Recordings identified in Exhibit A.

~~34.~~39.  Plaintiffs own or exercise exclusive control over copyrights and/or exclusive rights in and to numerous valuable sound recordings first "fixed" before February 15, 1972, which are protected under the Music Modernization Act ("MMA"), 17 U.S.C. § 1401 *et seq.*  In enacting the MMA, Congress directed the U.S. Copyright Office to create a process for rightsholders to submit schedules of pre-1972 sound recordings so that the Copyright Office can publicly index the

recordings.   17 U.S.C. § 1401(f)(5)(A)(ii).   Once the Copyright Office indexes a work, a rightsholder who sues for infringement of that work can recover statutory damages and attorneys' fees just like any other copyright owner, pursuant to 17 U.S.C. §§ 504 and 505.  For each of the pre-1972 Copyrighted Recordings listed in Exhibit A, Plaintiffs have filed with the Copyright Office schedules containing all information specified in 17 U.S.C. § 1401.

### Suno Launches in 2023

35.40.  In July 2023, a group of individuals who collaborated at Kensho Technologies, an AI solutions business, launched a "beta" version of Suno's AI music generation service.  Suno's stated vision is to "build[ ] a future where anyone can make great music.  Whether you're a shower singer or a charting artist, [Suno] break[s] barriers between you and the song you dream of making."[4]

36.41.  Suno initially engaged users to generate AI music files through its channel on the social media website Discord, and later rolled out a web interface to expand the reach of its music generation product.  In December 2023, Suno announced a strategic partnership with Microsoft by which Suno's service would be integrated into Microsoft's AI chatbot Copilot.[5]

37.42.  Whether using Suno's website interface or Microsoft's Copilot, Suno's product allows users to enter text prompts to generate digital music files.  Users can prompt Suno's service with a description of the music they want to generate, which can include specifying the genre, lyrics, story direction, and themes to serve as inspiration.  Within seconds, Suno's service processes the user's prompt and generates a digital music file (Suno's website generates two files per prompt, whereas Copilot's Suno plug-in generates one).  Suno's customization options then allow users to adjust elements of the files, including tempo, mood, and genre.

38.43.  Suno offers both free and paid versions of its product.  Under the free plan, users are given 50 credits per day, equivalent to 10 music files.  According to Suno's terms of service,

---

[4] Suno, About, https://suno.com/about.

[5] Microsoft, *Turn Your Ideas into Songs with Suno on Microsoft Copilot* (Dec. 19, 2023), https://www.microsoft.com/en-us/microsoft-copilot/blog/2023/12/19/turn-your-ideas-into-songs-with-suno-on-microsoft-copilot/.

free users cannot use the files they generate for commercial purposes.[6]  Users can subscribe to the Pro and Premier plans for monthly fees of $8 and $24, respectively.  The Pro plan gives users 2,500 credits per day, enough for 500 music files, while the Premier plan comes with 10,000 credits per day, enough for 2,000 music files.  Under either paid subscription, Suno allows users to utilize their digital music files for commercial purposes, such as by uploading them to YouTube or music streaming services like Spotify or Apple Music.  With this model, Suno earns revenue by encouraging users to generate digital music files and exploit them commercially.  Put simply, the more digital music files Suno's service produces for its users, the more Suno charges.

39.44.  On March 21, 2024, Suno launched a new version of its service, dubbed "v3," which it describes as its "first model capable of producing radio-quality music."[7]  v3 enables all users, free or paid, to generate digital music files up to two minutes in length virtually instantaneously.

40.45.  On May 30, 2024, Suno launched yet another version of its service, named "v3.5," which it describes as an updated version of v3.[8]  v3.5 enables all users, free or paid, to generate digital music files up to four minutes in length virtually instantaneously.  Even before the release of v3.5, Suno has announced that its next version, "v4," iswas already in development and promisespromised to continue "improving along the axes of quality, control, and speed."[9]

46.    On November 19, 2024, Suno released v4.[10]  As promised, this version provides "cleaner audio, sharper lyrics, and more dynamic song structures."[11]  v4 also introduced "Covers," which allows users to upload audio files that Suno then uses to "craft a brand-new interpretation that pays homage to the original."[12]

---

[6] Suno Blog, *Terms of Service* (Jan. 27, 2024), https://suno.com/terms.

[7] Suno Blog, *Introducing v3* (Mar. 21, 2024), https://suno.com/blog/v3.

[8] @suno_ai_, X (May 24, 2024), https://x.com/suno_ai_/status/1794145852723777559.

[9] @suno_ai_, X (Mar. 21, 2024), https://x.com/suno_ai_/status/1770857568274911449.

[10] Suno Blog, *Introducing v4* (Nov. 19, 2024), https://suno.com/blog/v4.
[11] *Id.*
[12] *Id.*

**Suno Trains its AI Using Copyrighted Recordings**

41.47. AI models are developed to flexibly perform tasks that are typically expected to require human intelligence to achieve. "Generative AI" is a kind of AI aimed at producing content such as text, images, or (in Suno's case) audio. The generative AI models rapidly advancing today, including Suno's, are based on machine learning models. These models do not employ preset rules for generating outputs, but rather deduce patterns from a large corpus of training content. They store these patterns as billions of numerical parameters. In aggregate, these parameters constitute the modelmodels. The training process adjusts the parameters so that the model producesmodels produce content that is based on the content on which the model ismodels are trained.

42.48. Upon information and belief, and consistentConsistent with the basic facts of how generative AI works, the content Suno used to "train" its AI modelmodels includes reams of Copyrighted Recordingsmillions of copyrighted sound recordings that Suno reproduced without permission from rightsholders, including Plaintiffs. Suno moreover obtained those copies by unlawfully "stream ripping" them from YouTube and circumventing technologies specifically designed to prevent such unauthorized copying. Suno could not have built a modelmodels capable of producing audio so similar to the Copyrighted Recordings without the initial act of copying those recordings. This explains why one of Suno's investors has publicly recognized that Suno's service is likely to spawn litigation and that defending lawsuits from music labels is "the risk we had to underwrite when we invested in the company."[10][13]

43.49. On information and belief, similarSimilar to other generative AI audio models, Suno trains its AI modelmodels to produce audio output by generally taking the following steps:

> a. Suno first copies massive numbers of sound recordings, including by "scraping" (*i.e.*, copying or downloading) and associated metadata by unlawfully stream-ripping them from digital sources. This like YouTube despite technologies

---

[10][13] Hiatt, *supra* n.3.

designed to prevent such piracy.  A portion of this vast collection of information forms the input, or "corpus," upon which the Suno AI ~~model is~~models are trained.

b.       Suno then "cleans" the copied recordings to remove any material, whether technical or substantive, that it does not wish to include in its AI ~~model (for instance, duplicate or low-quality data).  This step may also involve copying the recordings to convert them into a common digital audio format~~models and puts the data into standard formats.

~~Suno then processes this corpus of previously copied recordings to establish the values of the parameters that form its AI model.  This step includes additional copying of the recordings, including into computer memory, as they are further converted and divided into units, and as those units are processed.~~

c.       Suno ~~next processes the data further to "finetune" its AI model, which may require~~then makes additional ~~copying of the collected~~copies and encodes the scraped sound recordings, transforming them into formats that can be used by the AI models.

d.       Suno then ingests this corpus of previously copied recordings into its AI models to train them to create outputs.

~~44.~~50.  After undergoing this training process, Suno's service gains the capacity to generate audio output based on Suno's ~~model~~models, which, as just described, ~~is a product~~are products of the corpus of sound recordings on which ~~it is~~they are trained.  When a user prompts Suno's service with a text input (*e.g.*, make a jazz song about New York), the service generates an audio output by making generalizations about what the audio output should sound like based on the prompt and the corpus of sound recordings on which it was trained.  Certain features of the outputs from Suno's ~~model~~models betray that ~~it was~~they were trained on particular data—in this case, the Copyrighted Recordings.  In particular, Suno's product frequently generates outputs with strong resemblance to the Copyrighted Recordings, a telltale sign that such recordings were included in its training data.

45.51.  In technical terms, by generating outputs that mimic sound recordings in its training corpus, Suno's ~~model reflects~~models reflect the machine-learning phenomenon known as "overfitting."  An AI model is "overfitted" when it is too closely adapted to the data on which it was trained, making it difficult for the model to generalize to new data sets.  One symptom of overfitting is a model that replicates portions of its training data.  To take a simplified example, if a user inputs the prompt "a jazz song about New York" into an overfitted AI model, the model may output a file that closely resembles one of the jazz tracks on which it trained.  As the myriad examples discussed below reflect, Suno's ~~model~~models obviously ~~was~~were trained on the Copyrighted Recordings.   This infringement cannot be cured by simply loosening the ~~model's~~models' fit or by implementing technical guardrails that make it less likely that outputs will match excerpts of the Copyrighted Recordings.  In other words, modifying Suno's offering in a way that better conceals its training data would not alter the fact that Suno infringed the Copyrighted Recordings the moment it copied them to create its ~~model~~models.

46.52.  The basic point is that Suno's ~~model requires~~models require a vast corpus of sound recordings in order to output synthetic music files that are convincing imitations of human music.  Suno's corpus includes the body of recorded music that people listen to in their everyday lives.  Because of their sheer popularity and exposure, the Copyrighted Recordings had to be included within Suno's training data for Suno's ~~model~~models to be successful at creating the desired human-sounding outputs.

47.53.  ~~One~~Prior to the filing of the Original Complaint, one of Suno's earliest investors ~~has~~ all but admitted that Suno's service trains on Plaintiffs' sound recordings.  Antonio Rodriguez, a partner at the venture capital firm Matrix Partners, explained that his firm invested in the company with full knowledge that Suno might get sued by copyright owners, which he understood as "the risk we had to underwrite when we invested in the company."[11][14]  Rodriguez pulled the curtain back further when he added that "honestly, if we had deals with labels when this company

---

[11][14] *Id.*

got started, I probably wouldn't have invested in it.  I think they needed to make this product without the constraints."[1215]  By "constraints," Rodriguez was, of course, referring to the need to adhere to ordinary copyright rules and seek permission from rightsholders to copy and use their works.  Rodriguez's message was clear: he was willing to "underwrite" the costs of the lawsuits relating to Suno's large-scale intellectual property theft because he expected his investment in Suno to be accretive despite the damages owed to copyright owners.

48.54.  Around its launch, Suno's unlawful copying of the Copyrighted Recordings into its training data haswas not been lost on even casual users of Suno's product.  Indeed, many observers have drawndrew this obvious conclusion, expressing alarm over the scope of Suno's unauthorized copying.  To provide just a sample:

- "Though neither company will directly confirm or deny it, there is substantial reason to believe that . . . Suno . . . w[as] trained on copyrighted music, without permission[.]"  Brian Hiatt, *AI-Music Arms Race: Meet Udio, the Other ChatGPT for Music*, Rolling Stone (Apr. 10, 2024).

- "While details about the data that trained these AI tools are sparse, there is plenty of reason to believe that they are trained on copyrighted music."  Sharon Goldman, *AI Music May be Having a Moment, But Human Songwriters Would Like a Word*, Fortune (May 17, 2024).

- "Although Suno hasn't revealed what music has been used to train its music-generation models, it seems almost certain that the startup has used materials without the explicit consent of their creators.  For one thing, many of its musical outputs are somewhat similar to popular songs."  Mike Wheatley, *Generative AI Music Maker Startup Suno Raises $125M in Funding*, SiliconAngle (May 21, 2024).

---

[1215] *Id.*

- "To create music as convincing as some of the examples generated by Suno and other platforms using AI algorithms means training those algorithms on existing music, and lots of it.  And that's where copyright comes into play, because it's become plainly obvious that many AI models have been built by ingesting enormous quantities of copyrighted material." Daniel Tencer, *Suno Could Get Sued By The Record Business.  Who's Backing it With $125M?*, Music Business Worldwide (May 28, 2024).

49.55.  When directly accused of using Plaintiffs' sound recordings, Suno dodged and did not even try to dispute Plaintiffs' allegations.  Beyond this effective concession, Suno obfuscated and claimed that its training data is "confidential business information."

## Suno Scraped Copyrighted Recordings from YouTube

56.    Suno acquired many (if not all) of the copyrighted sound recordings in its training data by illicitly downloading them from YouTube using a notorious method of music piracy known as "stream ripping."

50.57. YouTube is a popular platform for sharing audiovisual content with users. YouTube allows users to "stream" content—playing it as it is retrieved—but, as set forth below, it is not designed to allow and actually prohibits making permanent, unrestricted copies of the



(Added)

content it streams. Plaintiffs upload certain of their copyrighted sound recordings to the Official YouTube Channels for specific artists on YouTube. When doing so, Plaintiffs include information in the description for each copyrighted recording conspicuously identifying their copyrighted status, including the name of the record label that provided the recording, the copyright owner, and the unmistakable "P in a circle," ℗, the international symbol for a copyrighted sound recording.

58.    Like many other music streaming services, YouTube's Terms of Service generally prohibit the unauthorized use of recordings available on its platform.[16] *See Green v. United States Dep't of Just.*, 111 F.4th 81, 89 (D.C. Cir. 2024) ("[M]any subscription-based video or music streaming services protect their copyrighted . . . music from unauthorized access by . . . encrypting the accessed media to prevent unauthorized copying."). While YouTube facilitates streaming music and offers a substantially restricted download feature for paying subscribers, it does not permit downloading and making permanent, unrestricted copies of the content on the platform. In fact, YouTube employs enhanced technological measures to protect against unauthorized downloading and copying of licensed content, such as Plaintiffs' sound recordings. Specifically, YouTube employs a "rolling cipher" encryption measure to control access to such content, preventing external sites or services from directly downloading protected media files. YouTube maintains two different URLs for any given video: the page URL, visible to the user, is for the webpage where the video playback occurs, and the file URL, not visible to the user, is for the video file itself that is played within the page. The file URL is encrypted using a complex and periodically changing algorithm—the "rolling cipher"—that is designed to impede external access to the underlying YouTube video files, thereby preventing or inhibiting any downloading, copying, or distribution of the videos. In simple terms, the rolling cipher effectively controls a user's access to copies of copyrighted works uploaded to the platform and prevents an ordinary user from creating a permanent, unrestricted download of a sound recording made available on YouTube only for streaming and restricted downloading.

---

[16] Youtube, "Terms of Service," https://www.youtube.com/static?template=terms.

59.    Even though YouTube periodically revises the rolling cipher by design, there are illicit tools and services that circumvent the encryption, download audiovisual content available on YouTube, and create copies that can be downloaded and further distributed by users without restriction.  This process is commonly known as scraping or "stream ripping."  The use of digital tools to circumvent YouTube's rolling-cipher measure and download unrestricted copies of copyrighted content made available on YouTube only for streaming and restricted downloading independently violates copyright law.  *See UMG Recordings, Inc. v. Kurbanov*, 2021 WL 6492907, at *9 (E.D. Va. Dec. 16, 2021), *report and recommendation adopted*, 2022 WL 20417526 (E.D. Va. Feb. 10, 2022) (noting that "[m]ultiple courts have found that [a] Defendant's Websites are illegal for their stream-ripping functionality.").

60.    Nevertheless, Suno utilized such tools—in particular, tools known as YT-DL and YT-DLP—to circumvent YouTube's encryption and scrape copyrighted recordings from YouTube.[17]  Indeed, this unlawful step of stream-ripping is the key means by which Suno engages in its first infringing act of reproducing Plaintiffs' sound recordings.

61.    Suno's scraping was made public on September 2, 2025, after the ICMP shared evidence with *Billboard*, specifically, private datasets that demonstrate the illegal scraping of copyrighted sound recordings from YouTube by Suno.[18]

62.    Suno's unauthorized extraction, copying, and storage of Plaintiffs' Copyrighted Recordings from YouTube for use in its training data was accomplished by Suno's unlawful circumvention of YouTube's rolling cipher and any other technological measures YouTube may have implemented to prevent the downloading and copying of licensed content.

63.    Suno's actions constitute a breach of the Copyright Act's anti-circumvention provisions, which state, among other things, that "[n]o person shall circumvent a technological

---

[17] Defendant Suno, Inc.'s Supplemental Responses and Objections to Plaintiffs' Interrogatories (Nos. 2, 3, 6, and 12) at Third Amended and Supplemental Response to Interrogatory No. 3.

[18] R. Smirke, *'The Largest IP Theft in Human History': Breaking Down the Years-Long Investigation Into How AI Firms are Stealing Music*, Billboard (Sept. 9, 2025), *available at* https://www.billboard.com/pro/ai-firms-steal-music-scrape-copyright-icmp-investigation/.

measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A).

**Suno's Outputs Confirm Copying and Ingestion of Plaintiffs' Copyrighted Recordings**

51.64. The fact that Suno's product generates digital music files that mimic readily identifiable features of the Copyrighted Recordings supports the conclusion that Suno is using the Copyrighted Recordings in training its AI modelmodels. To be clear, Plaintiffs are not presently alleging that these outputs themselves infringe the Copyrighted Recordings unless discovery reveals that they directly or indirectly recapture portions of the Copyrighted Recordings. These outputs confirm as an evidentiary matter that Suno has copied specific Copyrighted Recordings into its training data to build its service.

52.65. Before they initiated the present action, Plaintiffs designed a test that sometimes revealsrevealed some of the Copyrighted Recordings that Suno copied into its training data. Plaintiffs found that certain patterns of prompts can cause Suno's product to generate digital music files that contain melodic and stylistic similarities to well-known copyrighted sound recordings. As further explained below, those similarities betray that the model wasmodels were trained on the Copyrighted Recordings.

53.66. Specifically, Plaintiffs discovered that using targeted prompts that include the characteristics of popular sound recordings—such as the decade the sound recording was released, as well as the topic, genre, and descriptions of the artist—can cause Suno's product to generate music files that strongly resemble the Copyrighted Recordings related to the descriptions in the prompt. In performing this test, Plaintiffs specified the lyrics for the output, so as to more easily surface the underlying melodic or rhythmic similarities with specific Copyrighted Recordings. This approach was designed to identify specific, copyrighted sound recordings that are likely in Suno's training data, since Suno has attempted to conceal the recordings on which it has trained. The results confirm that Suno has copied for training purposes the Copyrighted Recordings, because this degree of similarity in output would be impossible if Suno were not training on the Copyrighted Recordings.

54.67.  As described below, the outputs from Suno's product share indisputable similarities with the Copyrighted Recordings, which results from training on the Copyrighted Recordings. One need only listen to hear the resemblance.[1319]

55.68.  For instance, Suno's service has generated 29 different outputs that contain the style of Chuck Berry's "Johnny B. Goode" (the copyright in which is owned by UMG).  Using the prompt, "1950s rock and roll, rhythm & blues, 12 bar blues, rockabilly, energetic male vocalist, singer guitarist" and the lyrics from the original, one output titled "Deep down in Louisiana close to New Orle" replicates the highly distinctive rhythm of the original's chorus, and uses the same melodic shape on the phrases "go Johnny, go, go."  These similarities are further reflected in the side-by-side transcriptions of the musical scores for the Suno file and the original recording.[1420]  These similarities are only possible because Suno copied the Copyrighted Recordings that contain these musical elements.

---

[1319] Accompanying this Complaint and designated as Exhibit C is a thumb drive that contains all the Suno outputs referenced herein and in Exhibit B.  In the event Suno seeks to remove this evidence of its infringing conduct from public view, the examples cited herein are preserved on this medium.

[1420] Plaintiffs include the transcriptions of select Suno outputs and the Copyrighted Recordings they resemble to illustrate the technical, musical similarities between the two.  To facilitate comparison of Suno's output and the original Copyrighted Recording, each copyrighted song transcription has been transposed into the key and/or vocal register of the relevant Suno output.  Red markings in the transcriptions indicate notes that are the same as the original in both pitch and rhythm, where orange markings indicate notes that use either the pitch or the rhythm of the original, but not both.  Notes in Suno's output that use the same scale degree as the corresponding note in the original copyrighted song but where the modality is changed from major to minor or vice versa (*e.g.*, a major third becoming a minor third) are represented as the same pitch in the transcriptions.

**Score: Deep down in Louisiana close to New Orle (Suno)**



**Score: Johnny B. Goode (Chuck Berry)**

56.69. Another output also titled "Deep down in Louisiana close to New Orle" uses a melody on the first two lines that is virtually identical to the original, the only differences being a change in modality and two slight rhythmic changes.  The 27 other outputs (included in Exhibit B) also include melodies in the verse and/or chorus that exhibit similarities with the original.

**Score: Deep down in Louisiana close to New Orle (Suno)**



**Score: Johnny B. Goode (Chuck Berry)**

57.70. Similarly, Suno's service has generated 10 different outputs that resemble Bill Haley & His Comets' "Rock Around the Clock" (the copyright in which is owned by UMG). To illustrate, one of these recordings, titled "One, Two, Three O'Clock, Four O'Clock, r," was generated using Suno's service with the prompt "1954 rock and roll bill haley comets" and lyrics from the original. As the audio and transcriptions reflect, the output contains four lines at the beginning that are very similar to the original, with identical pitches and rhythm in many places. It also uses a melody later in the output on the phrase "we're gonna rock around the clock tonight," which is virtually identical to the melody of the original.

**Score: One, Two, Three O'Clock, Four O'Clock, r (Suno)**





**Score: Rock Around the Clock (Bill Haley & His Comets)**





58.71. The nine other outputs (included in Exhibit B) also include clear stylistic and melodic elements of the original sound recording.

59.72. As another example, Suno's product generated an output that replicates the style and melody of James Brown's "I Got You (I Feel Good)" (the copyright in which is owned by UMG). In the Suno output titled "Wow! I feel good, I knew that I would no," the phrase "I knew that I would now" uses the same melody as the original.

**Score: Wow! I feel good, I knew that I would no (Suno)**



**Score: I Got You (I Feel Good) (James Brown)**



60.73. Suno's product has also generated 10 different outputs that contain a melody similar to one found in Jerry Lee Lewis' "Great Balls of Fire" (the copyright in which is owned by UMG). One example, titled "You shake my nerves and you rattle my br," was created with the original lyrics and the prompt "1950s rock and roll, jerry lee lewis, sun studio." The output includes the well-known, characteristic large vocal leap up to the word "great" in the line "Goodness gracious,

great balls of fire."  This line also replicates the rhythm of the original and follows a similar melodic shape.  The nine other outputs contain a similar large vocal leap up to the word "great."

**Score: You shake my nerves and you rattle my br (Suno)**



**Score: Great Balls of Fire (Jerry Lee Lewis)**



61.74.  Suno's service has also generated six different outputs that contain portions of B.B. King's "The Thrill is Gone" (the copyright in which is owned by UMG).  One example, also titled "The Thrill is Gone," was generated with the prompt "slow minor blues, west coast blues, 12-bar blues, king of the blues, electric guitar, gritty confident voice, 1969" and the original lyrics.  The first phrase in the output, "the thrill is gone," uses identical pitches to those used in the third occurrence of this phrase in the original sound recording.  The second phrase, "the thrill has gone away," is also very similar to the same phrase in the original.

**Score: The Thrill is Gone (Suno)**



**Score: The Thrill is Gone (B.B. King)**



62.     ~~As yet another example, Suno's product generated a digital music file with portions that have striking resemblance to Michael Bublé's hit "Sway" (the copyright in which is owned by Warner Records Inc.).  Using the prompt "canadian smooth male singer 2004 jazz pop buble sway latin mambo minor key" as well as lyrics from the original, Suno's service created "When marimba rhythms start to play," a file that contains an identical version of the distinctive opening on the words "when marimba rhythms," virtually identical rhythm throughout, and repeated instances of the original's characteristic three note descending figure.  Suno's service generated 11 additional files that resemble "Sway," which are listed in Exhibit B.~~

~~**Score: When marimba rhythms start to play (Suno)**~~

(Deleted)



**Score: Sway (Michael Bublé)**

63.75. Suno's service has also generated audio outputs that contain vocals that are instantly recognizable due to their resemblance to those of famous recording artists.  For example, even the biggest ABBA fan would have trouble distinguishing between sound recordings created by the real band and the vocals in the Suno outputs "Prancing Queen" and "Dancing in the Moonlight."  Suno's service generated the former using the prompt, "70s pop" and the latter via the prompt "disco abba pop."

64.76. Further evidencing Suno's unauthorized copying of specific Copyrighted Recordings, Suno's product has generated outputs that include recognizable producer tags.  A producer tag is a short, distinctive sound that certain artists or producers include in their sound recordings to identify their affiliation with a particular recording.  Producer tags are designed to



be unique and instantly recognizable by fans.  That certain Suno outputs replicate recognizable producer tags strongly suggests that Suno's service trained on the protected sound recordings of a given producer.

65.77. For instance, the Suno output "Rains of Castamere" begins with the

"CashMoneyAP" producer tag, even though the prompt used to generate this digital music file in no way referenced this producer. This output indicates a high likelihood that Suno's service trained on sound recordings affiliated with the music producer CashMoneyAP, whose producer tag can be heard in the Copyrighted Recordings by artists such as Da Baby and Pop Smoke.

66.78. The artist Jason Derulo is known for singing his own name at the beginning of his sound recordings.[15][21] Suno has also replicated this tag. For example, Jason Derulo's name is repeated at the beginning of the Suno-generated digital music file aptly titled "Jason Derulo," in a manner exceedingly similar to how Jason Derulo tags his recordings. Again, Suno's reproduction of this tag strongly suggests that Suno included Copyrighted Recordings by Jason Derulo in its training data.

67.79. These similarities between outputs of Suno's product and the Copyrighted Recordings are not a coincidence. In fact, Suno co-founder Mikey Shulman admitted that Suno already has the ability to produce outputs that replicate real artists' vocals and genuine sound recordings, but Suno is holding back from allowing users to generate such replicas until "the licensing . . . climate is a little less uncertain."[16][22] Suno's capacity to replicate the vocals of human recording artists and other aspects of genuine sound recordings is only possible if Suno copied and trained its modelmodels using these artists' copyrighted sound recordings.[17][23]

68.80. Additional outputs of Suno's product that resemble the Copyrighted Recordings and specific recording artists can be found in Exhibit B.

---

[15][21] G. Garner, *Jason Derulo Reveals Why He Started Singing His Name at the Beginning of His Songs Again: 'I Had to Bring That Back'*, Daily Mail (Oct. 16, 2020), https://www.dailymail.co.uk/tvshowbiz/article-8849659/Jason-Derulo-reveals-started-singing-songs-bring-back.html.

[16][22] @mignano, X at 43:55-44:53 (Mar. 8, 2024), https://x.com/mignano/status/1766151562299163030.

[17][23] *See* Joe Coscarelli, *An A.I. Hit of Fake 'Drake' and 'The Weeknd' Rattles the Music World*, N.Y. Times (Apr. 19, 2023), https://www.nytimes.com/2023/04/19/arts/music/ai-drake-the-weeknd-fake.html (explaining that "A.I. imitations of brand-name artists" have been created "using tools that had 'learned' from existing music and produced a similar effect."); Jem Aswad, *What Would It Take for an AI-Generated Song to Qualify for a Grammy?*, Variety (Oct. 17, 2023), https://variety.com/2023/music/news/grammys-ai-drake-weeknd-awards-1235758275/ ("Ghostwriter used generative AI to create Drake and Weeknd lyrics and melodies with no conscious input from those artists. He was able to do this by loading multiple copyrighted songs by those artists into a computer — ingesting data for machine learning, in technical terms — which is where the legal issues come in.").

**Discovery Confirms the Astounding Scale of Suno's Infringement**

81.      Plaintiffs now have clarity regarding the scale of Suno's infringement.   In discovery, Plaintiffs have been able to inspect Suno's source code and training data in a controlled environment in secured rooms located within the office of Suno's outside counsel.  Upon obtaining such access, Plaintiffs discovered that Suno's training data comprises over ███████ audio files.  Given the extraordinary volume of data at issue, Plaintiffs developed a systematic process for identifying their specific copyrighted works within Suno's training dataset.  This process involved employing Audible Magic, an industry-standard audio fingerprinting technology widely used to identify copyrighted audio content.

82.      Courts have recognized Audible Magic as a reliable means of identifying copyrighted audio content, and have described its technology as "the most effective available means of content-recognition filtering based on recognizing the unique content of . . . [a recording] and detecting and preventing copying of that content."  *Arista Records LLC v. Lime Wire LLC*, 2010 WL 10031251, at *6 (S.D.N.Y. Aug. 9, 2010).  In fact, Suno's website includes a blog entry by Team Suno that describes a partnership between Suno and Audible Magic.  That blog entry both acknowledges that Audible Magic is a trusted partner for copyright compliance and claims that Suno's use of Audible Magic's technology will ensure that Suno remains what it describes as a trusted and vibrant community.[24]

83.      Audible Magic functions by comparing an unidentified audio file (*e.g.*, audio files Suno scraped to compile its training data) to a database of audio fingerprints—in essence, mathematical representations or digital signatures—derived from sound recordings that have been provided to Audible Magic by copyright holders.  Each archived fingerprint in the Audible Magic database is unique to a particular sound recording.  To identify unknown audio files, users of Audible Magic produce fingerprints of the unknown files and compare those fingerprints to the archived fingerprints stored in Audible Magic's content recognition database.  If the audio

---

[24]  Suno, *Ensuring Content Integrity: Suno Partners with Audible Magic for User Uploads*, https://suno.com/blog/suno-partners-with-audible-magic.

fingerprint associated with an unknown audio file matches an archived fingerprint in Audible Magic's database, then the unknown audio file reproduces (and matches with) the sound recording from which the archived fingerprint was derived.  In the ordinary course of business, Plaintiffs regularly provide their copyrighted sound recordings to Audible Magic to be fingerprinted and used in its content recognition database; and Audible Magic has been provided with a copy of each of the Copyrighted Recordings.

84.     In the discovery process, Plaintiffs created audio fingerprints of the audio files within Suno's training data and transmitted those fingerprints to Audible Magic to analyze whether they match fingerprints stored in the content recognition database.  Using this process, Plaintiffs identified millions of audio files in Suno's training data that matched sound recordings that Universal, Sony, or their affiliates own or control, including without limitation the Copyrighted Recordings.

85.     Plaintiffs reviewed these voluminous Audible Magic match results from Suno's training data and identified a subset of works for which they assert claims in this action.  To be clear, Plaintiffs have a sufficient basis to assert claims against Suno as to *all* the works they own or control that returned match results within Suno's training data.  However, in the interest of ensuring the orderly progress of this litigation and facilitating swift resolution of the key issues, Plaintiffs have elected to prosecute Suno's use and reproduction of approximately 60,304 works – the Copyrighted Recordings that are listed in Exhibit A, representative of only a fraction of Suno's illegal activity.

**Suno Cannot Claim Fair Use**

69.86.  When Plaintiffs raised these issuesthe suspected infringement with Suno in written correspondence, Suno attempted to justify its pervasive illegal copying of Plaintiffs' sound recordings by claiming fair use.  This, itself, is a tacit admission of Suno's illegal copying, as fair use only comes into play when an unauthorized use of a copyrighted work needs to be justified.

70.87.  The fair use doctrine has been coined an "equitable rule of reason" that balances various contextual factors to determine whether an unauthorized use of a copyrighted work is

"fair." *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 448 (1984). But Suno cannot launder its conscious stealing of the Copyrighted Recordings for commercial gain with an appeal to equitable principles. Suno understands that what it is doing is wrong and inequitable, which explains why it refused to even acknowledge the extent of its unauthorized use of Plaintiffs' sound recordings, and why it tries to cover its tracks when users publicize outputs that clearly reflect training on their recordings. And, in any event, fair use is not a defense for breach of the Copyright Act's anti-circumvention provisions. *See Green v. United States Dep't of Just.*, 111 F.4th 81, 98 (D.C. Cir. 2024) ("Fair use has never been held to be a guarantee of access to copyrighted material in order to copy it by the fair user's preferred technique or in the format of the original." (citation and internal quotation mark omitted)).

71.88. Suno's conduct violates the very purposes of the copyright law and runs contrary to the purpose animating the fair use doctrine. The Copyright Act codifies the common-law doctrine of fair use in 17 U.S.C. § 107, which identifies examples of the types of uses that may qualify as fair, including "criticism, comment, news reporting, teaching . . . scholarship, or research." These paradigmatic fair uses reflect the policy of ensuring public availability of "literature, music, and other arts" so that other humans can draw on those works to create new ones. Suno's wholesale copying of countless recordings serves none of these purposes. Suno's service does not offer "commentary" or "scholarship" or promote human authorship. Rather, Suno's service copies and ingests copyrighted works to create computer-generated imitations of human expression that do not merit copyright protection. Suno's motive is brazenly commercial and threatens to displace the genuine human artistry that is at the heart of copyright protection.

72.89. Moreover, applying the statutory fair use factors set forth in § 107 demonstrates that Suno's conduct fails to qualify as fair use. These factors are: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107.

73.90.  The first fair use factor focuses on "the problem of substitution—copyright's bête noire."  *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 528 (2023). "The use of an original work to achieve a purpose that is the same as, or highly similar to, that of the original work is more likely to substitute for . . . the work," and thus is less likely to constitute fair use.  *Id.*

74.91.  Suno claims its product can produce "radio-quality music,"[1825] and encourages paid users to post their outputs to "platforms expressly designed to commercialize music."[1926]  In furtherance of this objective, Suno copies Plaintiffs' catalogs of sound recordings and generates digital music files that are designed to entertain, evoke emotion, and stoke passion, just like the genuine sound recordings on which Suno was trained.  Suno feeds the Copyrighted Recordings into its AI modelmodels not merely to deconstruct their expressive content, but with the explicit aim of imitating these expressive features in digital music files that could serve as substitutes for and compete with the original recordings.

75.92.  The use here is far from transformative, as there is no functional purpose for Suno's AI modelmodels to ingest the Copyrighted Recordings other than to spit out new, competing music files.  That Suno is copying the Copyrighted Recordings for a commercial purpose, and is deriving revenue directly proportional to the number of music files it generates, further tilts the first fair use factor against it.  *See id. at 532–33Andy Warhol Found. for the Visual Arts, Inc.*, 598 U.S. at 532-3 ("If an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use, absent some other justification for copying.").

76.93.  The second fair use factor also favors Plaintiffs.  This factor recognizes that "certain 'works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied.'"  *TCA TV Corp. v.*

---

[1825] Suno Blog, *Introducing v3* (Mar. 21, 2024), https://suno.com/blog/v3.

[1926] @keenan, Discord (Oct. 1, 2023).

*McCollum*, 839 F.3d 168, 184 (2d Cir. 2016) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994)).  There is no doubt that the Copyrighted Recordings are the type of "creative expression for public dissemination [that] falls within the core of the copyright's protective purposes."  *Hachette Book Grp., Inc. v. Internet Archive,* 664 F. Supp. 3d 370, 387 (S.D.N.Y. 2023) (quoting *Campbell*, 510 U.S. at 586).

77.94.  So too does the third fair use factor weigh against fair use.  "A finding of fair use is more likely when small amounts . . . are copied than when the copying is extensive, or encompasses the most important parts of the original."  *Authors Guild v. Google, Inc.*, 804 F.3d 202, 221 (2d Cir. 2015).  It is abundantly clear that Suno copies (at least) the most important partsentirety of the protected sound recordings it sweeps into its training data, as demonstrated by its ability to recreate, for instance, some of the most recognizable musical phrases, hooks, and choruses in popular music history.  Suno then uses these copies of key elements of protectable expression to generate audio outputs that resemble the Copyrighted Recordings it ingests.

78.95.  Turning to the fourth factor, Suno's use of Copyrighted Recordings poses a significant threat to the market for and value of the Copyrighted Recordings.  Licensing is at the core of Plaintiffs' businesses, and Plaintiffs license the Copyrighted Recordings for myriad purposes, including for use in emerging technologies such as streaming services, user-generated content platforms, and other innovative technologies.  Suno's unauthorized use of the Copyrighted Recordings threatens to eliminate the existing market for licensing sound recordings, as well as the future market for licensing sound recordings to generative AI companies.  Rather than license copyrighted recordings, potential licensees interested in licensing copyrighted recordings for their own purposes could generate an AI-soundalike at virtually no cost.  This is an especially aberrant result when the replacement audio file is generated using an AI music service, like Suno's, that produced the soundalike by infringing the copyrighted recording that would otherwise have been licensed.

79.96.  Moreover, Suno's product has the potential to generate directly competing digital music files at such speed that it risks overrunning the market for human-made sound recordings,

including the Copyrighted Recordings on which it was trained.  This competition is ramping up at a breathtaking pace.  At the time Plaintiffs asserted this action, Suno has claimed that over 10,000,000 people havehad already created digital music files using its service.[2027]  Suno's Terms of Service authorize the use of outputs generated on the platform by users who have subscribed to the paid tier for commercial purposes.[2128]  Users have taken this cue by publishing Suno-generated outputs on music streaming services, where they will compete for plays against real, copyrighted sound recordings.

80.97.  Enticed by the prospect of exponential growth, Suno continues to circumvent the ordinary rules and steal vast amounts of copyrighted recordings to train its AI modelmodels.  Suno's efforts are "directly aimed at replacing the work of human artists with massive quantities of AI-created 'sounds' . . . that substantially dilute the royalty pools that are paid out to artists."[2229]

81.98.  The harm Suno is causing goes far beyond these immediate economic consequences.  Suno's wholesale theft of the Copyrighted Recordings threatens the entire music ecosystem and the numerous people it employs.  It also degrades the rights of artists to control their works, determine whether future uses of their works align with their aesthetic and personal values, and decide the products or services with which they wish to be associated.  And it propagates the destructive theory that copyrighted music is free for the taking whenever a new technology claims that seeking and obtaining permission is just too cumbersome.  In other words, Suno's conduct is a frontal attack on the very purpose of copyright law to reward authors and promote their incentives to continue creating copyrighted works.

82.99.  There is room for AI and human creators to forge a sustainable, complementary relationship that promotes human creativity and facilitates the human creations that shape culture, excite the public, and resonate with consumers.  This can and should be achieved through the well-

---

[2027] Mikey Shulman, *Suno Has Raised $125 Million to Build a Future Where Anyone Can Make Music*, Suno Blog (May 21, 2024), https://suno.com/blog/fundraising-announcement-may-2024.

[2128] Suno, Terms of Service, https://suno.com/terms.

[2229] Artist Rights Alliance, *200+ Artists Urge Tech Platforms: Stop Devaluing Music*, Medium (Apr. 1, 2024), https://artistrightsnow.medium.com/200-artists-urge-tech-platforms-stop-devaluing-music-559fb109bbac.

established mechanism of free-market licensing that ensures proper respect for copyright owners. Like the other AI technologies that have struck licensing deals with copyright owners, copyright law mandates that Suno do the same if it wishes to build a business using the Copyrighted Recordings.

~~83.~~100. Since the day it launched, Suno has flouted the rights of copyright owners in the music industry as part of a mad dash to become the dominant AI music generation service. Neither Suno, nor any other generative AI company, can be allowed to advance toward this goal by trampling the rights of copyright owners.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

**(Direct Copyright Infringement of Post-1972 Copyrighted Recordings)**

~~84.~~101. Plaintiffs repeat, reallege, and incorporate the allegations in paragraphs ~~1–82~~1–100 as if fully set forth herein.

~~85.~~102. Plaintiffs UMG and Capitol own or exercise exclusive control over rights in the Universal Works, which are an illustrative and non-exhaustive list of some of Universal's works infringed by Defendant through its development of Suno's service. Universal has duly registered each of the Universal Works.

~~86.~~103. Plaintiff Sony owns or exercises exclusive control over rights in the Sony Works, which are an illustrative and non-exhaustive list of some of Sony's works infringed by Defendant through its development of Suno's service. Sony has duly registered each of the Sony Works.

~~87.    Plaintiffs Atlantic, ARG, Rhino, The All Blacks, WMISL, and Warner Records Inc. own or exercise exclusive control over rights in the Warner Works, which are an illustrative and non-exhaustive list of some of Warner's works infringed by Defendant through its development of Suno's service. Warner has duly registered each of the Warner Works.~~

~~88.~~104. Suno has knowingly infringed Plaintiffs' exclusive rights in copyrighted sound recordings, including but not limited to the Universal Works~~,~~ and the Sony ~~Works, and the Warner~~ Works, by reproducing them in violation of 17 U.S.C. § 106(1).

89.105.Suno does not have authorization, permission, license, or consent to reproduce or otherwise use the Universal Works, or the Sony Works, or the Warner Works.

90.106.Upon information and belief, Suno used the reproductions of the Universal Works, and the Sony Works, and the Warner Works to train its generative AI modelmodels.

91.107.Each of Suno's acts of infringement of the Universal Works, and the Sony Works, and the Warner Works is a willful violation of 17 U.S.C. § 106.

92.108.As a direct and proximate result of Suno's infringement of Plaintiffs' exclusive rights, Suno has caused and will continue to cause irreparable injury to Plaintiffs for which Plaintiffs have no adequate remedy at law.  Plaintiffs are therefore entitled to injunctive relief and to either actual damages and Suno's profits or statutory damages pursuant to 17 U.S.C. § 504(c), together with Plaintiffs' costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

## SECOND CAUSE OF ACTION

### (Direct Copyright Infringement of Pre-1972 Copyrighted Recordings)

93.109.Plaintiffs repeat, reallege, and incorporate the allegations in paragraphs 1–821–100 as if fully set forth herein.

94.110.Plaintiffs UMG and Capitol own or exercise exclusive control over rights in the Universal Works, which are an illustrative and non-exhaustive list of some of Universal's works infringed by Defendant through its development of Suno's service.  All of the pre-1972 Universal Works have been submitted to and publicly indexed by the U.S. Copyright Office pursuant to 17 U.S.C. § 1401.

95.111.Plaintiff Sony owns or exercises exclusive control over rights in the Sony Works, which are an illustrative and non-exhaustive list of some of Sony's works infringed by Defendant through its development of Suno's service.  All of the pre-1972 Sony Works have been submitted to and publicly indexed by the U.S. Copyright Office pursuant to 17 U.S.C. § 1401.

96.    Plaintiffs Atlantic, ARG, Rhino, The All Blacks, WMISL, and Warner Records Inc. own or exercise exclusive control over rights in the Warner Works, which are an illustrative and non-exhaustive list of some of Warner's works infringed by Defendant through its development

of Suno's service.  All of the pre-1972 Warner Works have been submitted to and publicly indexed by the U.S. Copyright Office pursuant to 17 U.S.C. § 1401.

97.112.Suno has knowingly infringed Plaintiffs' exclusive rights in copyrighted sound recordings, including but not limited to the Universal Works, and the Sony Works, and the Warner Works, by reproducing them in violation of 17 U.S.C. §§ 106(1) and 1401(a)(1).

98.113.Suno does not have authorization, permission, license, or consent to reproduce or otherwise use the Universal Works, or the Sony Works, or the Warner Works.

99.114.Upon information and belief, Suno used the reproductions of the Universal Works, and the Sony Works, and the Warner Works to train its generative AI modelmodels.

100.115.　　　Each of Suno's acts of infringement of the Universal Works, and the Sony Works, and the Warner Works is a willful violation of 17 U.S.C. § 106.

101.116.　　　As a direct and proximate result of Suno's infringement of Plaintiffs' exclusive rights, Suno has caused and will continue to cause irreparable injury to Plaintiffs for which Plaintiffs have no adequate remedy at law.  Plaintiffs are therefore entitled to injunctive relief and to either actual damages and Suno's profits or statutory damages pursuant to 17 U.S.C. § 504(c), together with Plaintiffs' costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

<strong>THIRD CAUSE OF ACTION</strong>

<strong>(Circumvention of Technological Measures)</strong>

117.　　Plaintiffs repeat, reallege, and incorporate the allegations in paragraphs 1–100 as if fully set forth herein.

118.　　Plaintiffs UMG and Capitol own or exercise exclusive control over rights in the Universal Works, which UMG and Capitol have uploaded to YouTube.

119.　　Plaintiff Sony owns or exercises exclusive control over rights in the Sony Works, which Sony has uploaded to YouTube.

120.　　By "stream ripping" audio files from YouTube, Suno circumvented technological measures implemented by YouTube that effectively control access to copyrighted works in violation of 17 U.S.C. § 1201(a).  Specifically, Suno employed code to access, extract, copy, and

download audio files of the Universal Works and the Sony Works from YouTube without the authorization of Plaintiffs or YouTube, and in violation of YouTube's Terms of Service.

121.    Plaintiffs have been harmed by Suno's violations of 17 U.S.C. § 1201(a), including because Suno's circumvention of YouTube's technological measures has facilitated Suno's ongoing and mass-scale infringement of Plaintiffs' copyrights through its unauthorized use of the Universal Works and the Sony Works in its training data.

122.    Suno's conduct in violation of 17 U.S.C. § 1201(a) as described herein was and is willful, intentional, and purposeful, in disregard of the rights of Plaintiffs.

123.    As a direct and proximate result of Suno's violations of 17 U.S.C. § 1201(a), Plaintiffs are entitled to either the maximum statutory damages pursuant to 17 U.S.C. § 1203(c)(3)(A) or, in the alternative, their actual damages pursuant to 17 U.S.C. § 1203(c)(2), including Suno's profits from circumvention in amounts to be proven at trial, together with Plaintiffs' costs and reasonable attorneys' fees pursuant to 17 U.S.C. §§ 505 and 1203(b)(4), (5).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request a judgment in their favor and against Suno as follows:

A.    For a declaration that Suno has willfully infringed Plaintiffs' protected sound recordings, including the Universal Works, and the Sony Works, and the Warner Works.

B.    For such equitable relief under Title 17, Title 28, and/or the Court's inherent authority as is necessary to prevent or restrain infringement of Plaintiffs' protected sound recordings, including a preliminary and permanent injunction requiring that Suno and its officers, agents, servants, employees, attorneys, directors, successors, assigns, licensees, and all others in active concert or participation with any of them, cease circumventing YouTube's technological measures and infringing, or causing, aiding, enabling, facilitating, encouraging, promoting, inducing, or materially

contributing to or participating in the infringement of any of Plaintiffs' exclusive rights under federal law, including without limitation in the sound recordings in Exhibit A;

C.    For statutory damages pursuant to 17 U.S.C. § 504(c), in an amount up to the maximum provided by law, arising from Suno's willful violations of Plaintiffs' rights, including in an amount up to $150,000 per work infringed; or, in the alternative, at Plaintiffs' election, Plaintiffs' actual damages and/or Suno's profits from infringement pursuant to 17 U.S.C. § 504(b), in an amount to be proven at trial;

D.    For statutory damages pursuant to 17 U.S.C. § 1203(c)(3)(A), in an amount up to the maximum provided by law, arising from Suno's willful circumvention of technological measures in furtherance of its violations of Plaintiffs' rights, including in an amount up to $2,500 with respect to each act of circumvention; or, in the alternative, at Plaintiffs' election pursuant to 17 U.S.C. § 1203(c)(2), Plaintiffs' actual damages and/or Suno's profits from its circumvention, in an amount to be proven at trial;

D.E.    For an award of Plaintiffs' costs and disbursements in this action, including reasonable attorneys' fees, pursuant to 17 U.S.C. §§ 505 and 1203(b)(4), (5);

E.F.    For an award of pre-judgment and post-judgment interest, to the fullest extent available, on any monetary award made part of the judgment against Suno; and

F.G.    For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims for which trial by jury is proper.

Dated:    May 21, 2026

       New York, New York

By: _____

Moez M. Kaba (*pro hac vice)*
Mariah N. Rivera (*pro hac vice*)
Alexander R. Perry (*pro hac vice*)
Samuel Givertz (*pro hac vice*)
**HUESTON HENNIGAN LLP**
1 Little West 12th Street
New York, New York 10014
Telephone: (646) 930-4046
Facsimile: (888) 775-0898
mkaba@hueston.com
mrivera@hueston.com
aperry@hueston.com
sgivertz@hueston.com

Robert N. Klieger (*pro hac vice*)
Rajan S. Trehan (*pro hac vice*)
**HUESTON HENNIGAN LLP**
523 West 6th Street, Suite 400
Los Angeles, California 90014
Telephone: (213) 788-4340
Facsimile: (888) 775-0898
rklieger@hueston.com
rtrehan@hueston.com

Daniel J. Cloherty
Alexandra Arnold
**CLOHERTY & STEINBERG LLP**
One Financial Center, Suite 1120
Boston, Massachusetts 02110
Telephone: (617) 481-0160
Facsimile: (617) 848-0830
dcloherty@clohertysteinberg.com
aarnold@clohertysteinberg.com

*Counsel for Plaintiffs*

Dated: June 24, 2024          HUESTON HENNIGAN LLP

By:    Moez M. Kaba (to be admitted *pro hac vice*)
          Mariah N. Rivera (to be admitted *pro hac vice*)

Alexander R. Perry (to be admitted *pro hac vice*)
HUESTON HENNIGAN LLP
1 Little West 12th Street
New York, New York 10014
Telephone: (646) 930-4046
Facsimile: (888) 775-0898
mkaba@hueston.com
mrivera@hueston.com
aperry@hueston.com

Robert N. Klieger (to be admitted *pro hac vice*)
HUESTON HENNIGAN LLP
523 West 6th Street, Suite 400
Los Angeles, California 90014
Telephone: (213) 788-4340
Facsimile: (888) 775-0898
rklieger@hueston.com

Daniel J. Cloherty (BBO #565772)
CLOHERTY & STEINBERG LLP
One Financial Center, Suite 1120
Boston, Massachusetts 02110
Telephone: (617) 481-0160
Facsimile: (617) 848-0830
dcloherty@clohertysteinberg.com

*Attorneys for Plaintiffs*
*UMG Recordings, Inc., Capitol Records,*
*LLC, Sony Music Entertainment, Atlantic*
*Recording Corporation, Atlantic Records*
*Group LLC, Rhino Entertainment LLC, The*
*All Blacks U.S.A., Inc., Warner Music*
*International Services Limited, and Warner*
*Records Inc.*