**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| UMG RECORDINGS, INC., CAPITOL RECORDS, LLC, and SONY MUSIC ENTERTAINMENT,<br><br>　　　　Plaintiffs,<br>vs.<br><br>SUNO, INC. and JOHN DOES 1-10,<br><br>　　　　Defendant. | Civil Action No. 1:24-cv-11611 (FDS) |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR LEAVE TO AMEND COMPLAINT**

## TABLE OF CONTENTS

**Page(s)**

I.     INTRODUCTION ...................................................................................................1

II.    BACKGROUND ...................................................................................................2

      A.     Suno Launches and Refuses to Disclose Information Regarding
its Training Data ........................................................................................2

      B.     Plaintiffs File the Complaint With a Limited Number of Asserted Works ..............3

      C.     Plaintiffs Investigate the Entirety of Suno's Training Data in Discovery ...............4

      D.     Plaintiffs Diligently Work to Identify Works to Assert ...........................................7

      E.     Plaintiffs Promptly Take Action to Amend ..................................................9

III.   LEGAL STANDARD ...................................................................................................9

IV.    ARGUMENT .......................................................................................................9

      A.     Plaintiffs' Proposed Amendment Is Not Futile .......................................................10

      B.     Good Cause Exists ...................................................................................10

            1.     Plaintiffs Have Demonstrated Diligence in Identifying
Their Recordings Within Suno's Training Data .........................................10

            2.     Suno Will Not Be Unfairly Prejudiced by Plaintiffs'
Amendment ..................................................................................13

      C.     Judicial Economy ...................................................................................16

V.     CONCLUSION.....................................................................................................16

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abiomed, Inc. v. Maquet Cardiovascular LLC,*
2020 WL 10500362 (D. Mass. June 24, 2020)........................................................................ 13

*Abiomed, Inc. v. Maquet Cardiovascular LLC,*
2020 WL 3868803 (D. Mass. July 9, 2020) ............................................................................ 17

*Amyndas Pharmaceuticals, S.A. v. Zealand Pharma A/S,*
48 F.4th 18 (1st Cir. 2022) ............................................................................................... 12, 14

*Arista Records LLC v. Lime Wire LLC,*
2010 WL 10031251 (S.D.N.Y. Aug. 9, 2010)........................................................................... 8

*Astellas Inst. for Regenerative Med. v. ImStem Biotechnology, Inc.,*
2019 WL 9096049 (D. Mass. Aug. 21, 2019) ......................................................................... 19

*Bridgeport Music, Inc. v. Universal Music Grp., Inc.,*
248 F.R.D. 408 (S.D.N.Y. 2008)............................................................................................. 14

*Guest-Tek Interactive Ent. Inc. v. Pullen,*
731 F. Supp. 2d 80 (D. Mass. 2010)........................................................................................ 13

*In re Body Sci. LLC Pat. Litig.,*
2012 WL 5449667 (D. Mass. Nov. 2, 2012) ........................................................................... 17

*InMode Ltd. v. BTL Indus., Inc.,*
774 F. Supp. 3d 263 (D. Mass. 2025)...................................................................................... 17

*O'Connell v. Hyatt Hotels of P.R.,*
357 F.3d 152 (1st Cir. 2004).............................................................................................. 12, 16

*Palmer/kane LLC v. Scholastic Corp.,*
2015 WL 8491041 (S.D.N.Y. Dec. 10, 2015) ......................................................................... 14

*Parkhurst v. Superior Drywall, Inc.,*
2022 WL 36475 (D. Mass. Jan. 4, 2022).................................................................................. 19

*Picker Intern., Inc. v. Leavitt,*
128 F.R.D. 3 (D. Mass. 1989) ................................................................................................. 15

*Somascan, Inc. v. Philips Med. Sys. Nederland, B.V.,*
714 F.3d 62 (1st Cir. 2013)...................................................................................................... 12

- ii -

*Steir v. Girl Scouts of the USA*,
   383 F.3d 7 (1st Cir. 2004)................................................................................................ 16

*Town of Wolfeboro v. Wright-Pierce*,
   2013 WL 4500676 (D.N.H. Aug. 20, 2013).................................................................... 17

*UMG Recordings, Inc. v. Shelter Cap. Partners LLC*,
   718 F.3d 1006 (9th Cir. 2013) .......................................................................................... 8

**Rules**

Fed. R. Civ. P. 15............................................................................................................... 12

Plaintiffs respectfully submit this Memorandum of Law in Support of their Motion for Leave to File a Second Amended Complaint pursuant to Rule 15(a)(2) and Rule 16(b)(4) (the "Motion").[1]

## I.    INTRODUCTION

Plaintiffs are record companies that collectively own or exclusively control copyrights in many of the most historically significant and commercially valuable sound recordings in the world. Dkt. No. 1 ("Complaint" or "Compl.") ¶ 6.  Defendant Suno, Inc. ("Defendant" or "Suno") operates an artificial intelligence ("AI") music-generation service that lets users create audio files from text prompts.  *Id*. ¶ 7.

"Building and operating a service like Suno's requires at the outset copying and ingesting massive amounts of data to 'train' a software 'model' to generate outputs."  *Id.*  Accordingly, when Suno officially launched in 2023, Plaintiffs suspected that Suno had copied large numbers of their protected sound recordings to use to train its model.  *Id*. ¶¶ 7-9, 35.  Plaintiffs thus sent Suno a letter on April 25, 2024, requesting that Suno provide a complete list of all of the materials that it used to develop its AI models.  Declaration of Rajan S. Trehan ("Trehan Decl." at ¶ 2).  Suno refused.  *Id*.

Plaintiffs were forced to bring this lawsuit to vindicate their rights.  To identify a sampling of their copied sound recordings for inclusion in an initial Complaint, Plaintiffs engaged in a highly manual and burdensome process.  In short, they used "targeted prompts" in Suno's service that included the characteristics of popular sound recordings.  Compl. ¶¶ 51-52.  If those targeted prompts caused Suno's service to generate outputs that closely resembled those particular sound recordings, then Plaintiffs understood that Suno had copied those sound recordings for inclusion

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

in its training data.  *Id.*  Of course, this process could not have been followed for every one of Plaintiffs' millions of copyrighted sound recordings.  This is particularly so because accurate and comprehensive information about what works Suno used to train its model resided with Suno.  For this reason, Plaintiffs' initial Complaint asserted "[a] non-exhaustive, illustrative sampling of [560 of] Plaintiffs' federally copyrighted sound recordings that Suno has illegally reproduced."  *Id*. ¶ 27.  Plaintiffs also reserved the right to "amend the Complaint at an appropriate time to provide an expanded list of works that Suno has infringed."  *Id.*

In its Answer to Plaintiffs' Complaint, Suno admitted that "the tens of millions of recordings that Suno's model was trained on presumably included recordings whose rights are owned by the Plaintiffs in this case."  Dkt. 28 ("Answer") at 8.  But it continued to refuse to identify the sound recordings it had used to train.  Thus, since the inception of this case, Plaintiffs have sought discovery from Suno regarding the works Suno included in its training data.  Suno has resisted and slowed this process at every turn, forcing Plaintiffs to undergo extreme burden and expense to identify the works Suno copied.  Regardless, that process has now come to a close.  Through discovery, Plaintiffs have learned that Suno used *millions* of their copyrighted sound recordings in training its own service.  Plaintiffs now seek leave to amend their Complaint to add only a small fraction of those sound recordings—61,026 works—to this case.  There is good cause to do so.  Indeed, *not* allowing Plaintiffs to do so would reward Suno for its obstructionism.

## II.    BACKGROUND

### A.    Suno Launches and Refuses to Disclose Information Regarding its Training Data

Suno officially launched in July 2023.  Compl. ¶ 35.  Since Suno's launch, Plaintiffs have sought to determine which of their sound recordings Suno copied and used to train its AI models. As with other generative AI models, it was clear since its launch that Suno's AI models are able

to generate audio files by deducing patterns from a large corpus of training content, which necessarily includes real sound recordings. *Id*. ¶¶ 41-42. Suno's training data, however, is not public.

Given the sheer volume of data required to train AI models of the kind deployed by Suno, Plaintiffs reasonably inferred that Suno's training dataset must have included their copyrighted sound recordings. *Id*. On April 25, 2024, Plaintiffs sent a letter to Suno requesting that it: (1) cease and desist from copying or otherwise using their copyrighted sound recordings; and (2) provide a complete list of all of the materials that it used to develop its AI models, including copyrighted sound recordings. Trehan Decl. at ¶ 2. Suno refused to provide Plaintiffs with any information regarding the source or substance of its training data. *Id*.

**B.      Plaintiffs File the Complaint With a Limited Number of Asserted Works**

Plaintiffs initiated this action on June 24, 2024, alleging Suno engaged in copyright infringement by using Plaintiffs' copyrighted sound recordings without authorization to train its AI models. Compl ¶ 9. As alleged in the Complaint, Suno's and its investors' public statements, along with outputs that mimicked many aspects of Plaintiffs' recordings, indicated that Suno had used Plaintiffs' works to train its AI models. *Id.* ¶¶ 47, 51-52. Specifically, Plaintiffs were able to determine that certain very-specific patterns of prompts could sometimes cause Suno's product to generate digital music files that contain melodic and stylistic similarities to well-known copyrighted sound recordings. *Id*. ¶ 51-52. For example, Plaintiffs discovered that using targeted prompts that include the characteristics of popular sound recordings—such as the decade the sound recording was released, as well as the topic, genre, and descriptions of the artist—could cause Suno's product to generate music files that strongly resemble copyrighted sound recordings related to the descriptions in the prompt. *Id*. ¶¶ 51-61; *see also id* Ex. B. Using this method, Plaintiffs

were able to create a representative list of 560 copyrighted sound recordings that Plaintiffs plausibly inferred Suno directly infringed.  *Id*. ¶ 33; *id*., Ex. A.[2]

Although Plaintiffs suspected that Suno infringed on a large scale, they could not identify each specific recording in Suno's training data or otherwise reasonably substantiate their claims without the benefit of discovery.  From the outset, therefore, Plaintiffs stated that they intended to amend the Complaint once they had a clearer picture of Suno's training data.  *Id*. ¶ 27.

Notably, Suno did not challenge Plaintiffs' allegations in the Original Complaint.  Instead, Suno filed its Answer to the Complaint, explicitly acknowledging, for the first time, that it had copied millions of sound recordings into its training data.  Answer at 8 (admitting that "[i]t is no secret that the tens of millions of recordings that Suno's model was trained on presumably included recordings whose rights are owned by the Plaintiffs in this case").

### C.      Plaintiffs Investigate the Entirety of Suno's Training Data in Discovery

Because Suno declined to offer any transparency outside of the discovery process, Plaintiffs were forced to undertake a costly and burdensome review of Suno's voluminous training data to vindicate their rights.  At the outset of discovery, Plaintiffs served requests seeking Suno's code for its AI models and its training data.  Trehan Decl. ¶ 3.  Those requests led to lengthy negotiations over protocols governing Plaintiffs' inspections of the code and data.  Dkt Nos. 63, 76.  The Stipulated Source Code Protocol was finally so-ordered on February 18, 2025 and Plaintiffs' first inspection of Suno's source code began on February 26, 2025, eight months after Plaintiffs filed their Complaint.  Dkt. 63; Declaration of Daniel Delorey ("Delorey Decl.") ¶ 2. The Joint Stipulation and Order Regarding Training Data Inspection Protocol (the "Protocol") was

---

[2] The original list of asserted works also included copyrighted sound recordings owned or controlled by record labels affiliated with Warner Music Group.  The Warner entities are no longer Plaintiffs in this action.  *See* Dkt. 183.

so-ordered on March 31, 2025, and Plaintiffs' first inspection of Suno's training data began on April 15, 2025, nearly ten months after Plaintiffs filed their Complaint.  Dkt. 76; Delorey Decl. ¶ 2.  Under the Protocol, Suno made its training data available for inspection in a secure room at its outside counsel's office.  Dkt. 76 ¶ 3.

During the Protocol negotiations, Plaintiffs developed a plan to analyze the millions of audio files Suno had scraped to identify Plaintiffs' recordings in the training data.  This plan involved the use of Audible Magic.  Audible Magic is industry-standard audio fingerprinting technology that works by "tak[ing] audio 'fingerprints'" of sound files "and compar[ing] them to a database of copyrighted content provided by copyright holders."  *UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1012 (9th Cir. 2013); *see also Arista Records LLC v. Lime Wire LLC*, 2010 WL 10031251, at *6 (S.D.N.Y. Aug. 9, 2010) (defining "Fingerprinting Technology," which is "available from commercial vendors such as Audible Magic," as "the most effective available means of content-recognition filtering based on recognizing the unique content of an underlying audio-visual work and detecting and preventing copying of that content").[3]  In the ordinary course, Plaintiffs regularly provide Audible Magic with metadata and sound recordings for inclusion in its content-recognition database.  Dkt. Nos. 70-15 ¶ 6; 70-16 ¶ 6.  As a result, Audible Magic can recognize Plaintiffs' sound recordings.

The Protocol states that Plaintiffs may "use the Audible Magic tool to analyze the audio files identified in Suno's Training Data for the initial purpose of ascertaining the audio files in the

---

[3] Suno's website includes a blog entry by Team Suno that describes a partnership between Suno and Audible Magic.  That blog entry both acknowledges that Audible Magic is a trusted partner for copyright compliance and claims that Suno's use of Audible Magic's technology will ensure that Suno remains what it describes as a trusted and vibrant community.  Suno, *Ensuring Content Integrity: Suno Partners with Audible Magic for User Uploads* (Oct. 18, 2024) https://suno.com/blog/suno-partners-with-audible-magic.

Training Data and facilitating the identification of works that may belong to Plaintiffs." Dkt.76 ¶ 7. The Protocol also states that "[t]he Parties agree to negotiate in good faith regarding the technical details of how Plaintiffs will use Audible Magic to analyze the audio files in Suno's Training Data. The Plaintiffs shall not utilize Audible Magic to analyze Training Data until such details have been resolved." *Id*. ¶ 8.

Plaintiffs sent Suno their proposed plan for the use of Audible Magic on May 16, 2025. Trehan Decl. at ¶ 5. Plaintiffs worked with their experts to develop a two-stage procedure. Delorey Decl. ¶¶ 4–5. In Stage 1, Plaintiffs would create a digital "fingerprint" (i.e., unique encoded summary) of each audio file in Suno's training data. *Id*. ¶ 4. In Stage 2, Plaintiffs would transmit those fingerprints to Audible Magic to analyze whether they generate matches for recordings stored in Audible Magic's content recognition database. *Id*. ¶ 5. On June 27, 2025, after conferral, Suno agreed to permit Plaintiffs to begin Stage 1 of the Audible Magic analysis. Trehan Decl. at ¶ 6. Suno refused to consent to Stage 2, citing security concerns. *Id.* After Plaintiffs notified Suno that their experts would travel to the code room to begin Stage 1, Suno rescinded its consent on July 8, 2025, stating that the outstanding disputes regarding Stage 2 had to be resolved first. *Id*. at ¶ 7. Because the dispute required resolution by Judge Levenson, Plaintiffs provided Suno with a position statement on July 11, 2025. *Id*.

The parties appeared before Judge Levenson on July 31, 2025. *Id*. ¶ 8. Judge Levenson expressed skepticism about Suno's security concerns and suggested a compromise under which Plaintiffs would run a subset of Suno's training data through Audible Magic. *Id*. After the conference, the parties continued negotiating and reached agreement in October 2025. *Id*.

Plaintiffs promptly began Stage 1 on November 3, 2025 while the Parties continued to confer regarding the technical details for Stage 2. *Id*. at ¶ 9. To generate the fingerprints,

Plaintiffs' experts were required to work within the secure code room—a process that necessitated two separate trips totaling two full weeks. Delorey Decl. ¶ 4. Through this effort, they created more than ██████████ fingerprints derived from the audio files contained in Suno's training data. *Id*.

The parties ultimately came to an agreement regarding the process for Stage 2 of the Audible Magic analysis. Plaintiffs' experts would obtain the full match results and work with Plaintiffs to develop a list of the unique entities that have uploaded sound recordings to Audible Magic. *Id*. ¶ 6; Trehan Decl. ¶ 9. Once that list was identified, Plaintiffs' experts would anonymize the data for non-Plaintiff matches. Delorey Decl. ¶ 6. Plaintiffs began working to complete Stage 2 on November 25, 2026. *Id*. at ¶ 5.

Given the volume of data, Plaintiffs completed Step 2 of the analysis on January 2, 2026. Delorey Decl. ¶ 5. Plaintiffs were able to match the fingerprints from Suno's training data to millions of copyrighted sound recordings that a UMG- or Sony-affiliate uploaded to Audible Magic. *Id*. ¶ 6. Plaintiffs received the final match results on January 15, 2026, after the experts removed non-Plaintiff information. Trehan Decl. at ¶ 11. The result of this process finally confirmed for the first time the specific contents of Suno's training data.

**D.** **Plaintiffs Diligently Work to Identify Works to Assert**

The Audible Magic results include the artist name, sound recording title, International Standard Recording Code ("ISRC") number, and the name of the entity that delivered the matched content to Audible Magic for each audio file. Delorey Decl. ¶ 6. Using this information, Plaintiffs have compiled an expanded list of asserted works. This required a multi-step manual process for each Plaintiff. For post-1972 sound recordings, Sony (1) identified works in the Audible Magic match results that it believed were registered with the Copyright Office; (2) compiled all the copyright registration certificates available in Sony's internal records for the artists associated with

those works; (3) manually looked up the asset listed in each copyright registration in its internal database to identify the corresponding ISRC numbers; and (4) manually compared the ISRC numbers to those contained in the Audible Magic match results.  Declaration of David Castagna ("Castagna Decl.") ¶ 8.  Sony's process with respect to pre-1972 sound recordings was similarly labor-intensive.  *Id*. ¶ 7.  Sony then further ensured it had a good faith basis to claim a U.S. ownership interest or exclusive rights in the pre-1972 and post-1972 identified works by reviewing the complete list of works and removing any for which Sony's U.S. rights had clearly expired or otherwise ceased.  *Id*. ¶ 9.

For Universal, this also required a complicated process: (1) creating lists of works that either have been asserted in prior litigation, or consist of pre-1972 sound recordings that have been included in schedules provided to the Copyright Office; (2) manually searching for and confirming the rights to a significant portion of the results; (3) manually reviewing the Audible Magic results to identify particular artists whose complete discographies could be included among the asserted works; and (4) conferring both internally and with artist representatives to confirm the accuracy of the compiled list and the inclusion of particular artists.  Declaration of Laura Pasek ("Pasek Decl.") ¶¶ 5–10.  Plaintiffs reviewed tens of thousands of audio files in this manner, which required a significant investment of time and resources.  *Id*. ¶ 11.

Although Plaintiffs could have devoted additional time to reviewing the complete set of Audible Magic results and identifying and asserting every copyrighted work infringed by Suno, they concentrated on a representative subset of approximately 61,026 copyrighted sound recordings identified within Suno's training data in order to advance the litigation without additional delay.

### E.    Plaintiffs Promptly Take Action to Amend

On May 11, 2026, Plaintiffs informed Suno that they intended to file a motion for leave to amend the Complaint to add additional asserted works. Trehan Decl. at ¶ 12. On May 15, 2026, Suno informed Plaintiffs that it opposes the Motion. *Id*. ¶ 13. This is Plaintiffs' second request for leave to amend the Complaint.

## III.    LEGAL STANDARD

In considering a motion to amend the pleadings, the Federal Rules provide that when a litigant seeks to amend a pleading, "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Under Rule 15, leave to amend is freely given "[i]n the absence of any apparent or declared reason—such as undue delay, bad faith, or dilatory motive." *Amyndas Pharmaceuticals, S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 36 (1st Cir. 2022). Where a party seeks leave to amend after the expiration of a deadline set in the Court's scheduling order, Rule 16(b)'s "good cause" standard applies. *See Somascan, Inc. v. Philips Med. Sys. Nederland, B.V.*, 714 F.3d 62, 64 (1st Cir. 2013). Under this standard, a motion for leave may be granted where "the deadline cannot reasonably be met despite the diligence of the party seeking the extension." *O'Connell v. Hyatt Hotels of P.R.*, 357 F.3d 152, 154 (1st Cir. 2004).

## IV.    ARGUMENT

Good cause for leave to amend exists because (i) Plaintiffs have asserted a viable copyright infringement claim, (ii) Plaintiffs moved without undue delay, (iii) Suno—which has had notice of the proposed amendment since the outset of the case—will not be unfairly prejudiced, and (iv) judicial economy and efficiency support Plaintiffs' request. During the Parties' conferral, Suno explained that it opposes the Motion because "it would effectively start the case over as [the parties] near depositions and the close of fact discovery" and "Suno is [] entitled to an expeditious

resolution of its fair use defense, which Plaintiffs' proposed amendments would delay for many months." Trehan Decl. at ¶ 13. Suno's objections are meritless for the reasons discussed below.

### A.     Plaintiffs' Proposed Amendment Is Not Futile

There is no dispute that Plaintiffs have pled a viable claim for copyright infringement. Plaintiffs are requesting leave to amend only to add additional copyrighted works to the list of asserted works. Plaintiffs' proposed amendment adds works to an existing, viable claim rather than introducing a new legal theory. It is thus not futile.

### B.     Good Cause Exists

#### 1.     *Plaintiffs Have Demonstrated Diligence in Identifying Their Recordings Within Suno's Training Data*

Plaintiffs have acted diligently, both in advancing this litigation and in determining which of their sound recordings Suno copied to train its AI models. As detailed above and in the Proposed Second Amended Complaint, Suno refused to answer Plaintiffs' pre-suit inquiries regarding the source and contents of its training data and required Plaintiffs to undertake a costly and burdensome review of its voluminous training data. Thus, Plaintiffs could obtain the requisite information only through discovery. Courts consistently hold that good cause exists when the proper factual basis substantiating additional claims comes to light only after the deadline to amend has lapsed. *See, e.g.*, *Guest-Tek Interactive Ent. Inc. v. Pullen* 731 F. Supp. 2d 80, 93 (D. Mass. 2010) ("Where, as here, discovery led to previously unknown facts illuminating the extent of SolutionInc and Lavigne's involvement in the alleged illegal activities, denial of the amendment is inappropriate."); *Abiomed, Inc. v. Maquet Cardiovascular LLC*, 2020 WL 10500362, at *4 (D. Mass. June 24, 2020) (including "new facts elicited in discovery" as a "valid reason for [a] delayed amendment") (citation omitted).

Any claims of undue delay are without merit. Plaintiffs' Original Complaint provided notice to both the Court and Suno that they intended to amend the Complaint to assert additional works once discovery afforded Plaintiffs with otherwise inaccessible information regarding the scope of Suno's infringement. Plaintiffs have worked diligently with this goal in mind, serving their first sets of discovery requests on August 19, 2024, specifically targeting the compilation of Suno's training data. However, Suno insisted on providing that data for inspection under only very limited circumstances, leading to lengthy negotiations over the source code and training data protocols. Once Plaintiffs finally had access to Suno's training data, they developed a novel, technically complex multi-step process that would allow them to identify their sound recordings among the millions of audio files within that data set. The process required coordination with several technical experts who traveled to the inspection room multiple times, negotiations with both Suno and Audible Magic, substantial financial investments, and analysis of petabytes of data. After completing the Audible Magic analysis, Plaintiffs reviewed the results in a multi-step process, manually selecting each sound recording included in the expanded list of asserted works and identifying the associated copyright registrations, or (for pre-72 works) confirming that each work has been indexed with the U.S. Copyright Office. These circumstances provide good cause for amendment. *See, e.g.*, *Amyndas Pharmaceuticals*, 48 F.4th at 37 ("Ascertaining whether a delay is 'undue' is not simply a matter of counting days but, rather, depends on the 'totality of the circumstances' in the particular case."); *Palmer/kane LLC v. Scholastic Corp.*, 2015 WL 8491041, at *3 (S.D.N.Y. Dec. 10, 2015) (finding good cause and granting motion to amend to assert additional infringed works where the plaintiff's "job was made difficult by the large number of Scholastic books and the limited public access to them"); *Bridgeport Music, Inc. v. Universal Music Grp., Inc.*, 248 F.R.D. 408, 414 (S.D.N.Y. 2008) (finding good cause and permitting

amendment where "Bridgeport reasonably waited until it could inquire further into the extent of MusicNet's activities with respect to Bridgeport's compositions"); *Picker Intern., Inc. v. Leavitt*, 128 F.R.D. 3, 9 (D. Mass. 1989) (granting motion to amend and finding no delay where the plaintiff "acted promptly once discovery revealed a proper factual basis for the new allegations").

In its conferral position, Suno asserted that Plaintiffs "delayed efforts to identify allegedly infringed works and amend their complaint" because they previously had a basis to assert the 560 works in the Original Complaint without requiring discovery. Trehan Decl. ¶ 13. As discussed *supra*, however, to identify those 560 recordings, Plaintiffs had to craft specific patterns of prompts that could sometimes cause Suno's AI models to generate outputs that contain similarities to copyrighted sound recordings. Compl. ¶¶ 51–52. Using this method (along with identifying soundalike outputs reported in the press), Plaintiffs were able to create that representative list of 560 copyrighted sound recordings owned or exclusively controlled by Plaintiffs that Suno directly infringed. *Id*. ¶ 33. It would have been impossible for Plaintiffs to identify every one of their copyrighted works within Suno's training data using this process. The time involved in undertaking that process on such a large scale would have undoubtedly prejudiced Plaintiffs' right to prosecute this case.

The best evidence of which of Plaintiffs' works Suno used to train was and always has been in Suno's possession. Indeed, the parties and the Court acknowledged this when entering into the Protocol. Dkt. 76. If Suno's position was that Plaintiffs were somehow obligated to use a guessing game to identify their copied works, Suno could and should have raised that argument in early 2025, when the parties were negotiating the Protocol, or in July of 2025, when Suno's delays and obstructions forced Plaintiffs to bring the ongoing Protocol discussions to the Court. Plaintiffs believe that the Court would have rejected such a position then, and it should also do so

now.  The cause of any delay was Suno's ongoing refusal to provide Plaintiffs with the data in its possession.  And that delay should not be used against Plaintiffs now, particularly after the parties have expended significant time and energy in negotiating a Protocol to address Plaintiffs' needs respecting the very amendment that is the subject of this motion.

2.      *Suno Will Not Be Unfairly Prejudiced by Plaintiffs' Amendment*

Although prejudice to the opposing party "is not the dominant criterion," *O'Connell*, 357 F.3d at 155 (citation omitted), Suno will not be meaningfully prejudiced.  The standard does not ask whether allowing amendment would be prejudicial, but whether it would be "unfairly so." *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 13 (1st Cir. 2004).

As an initial matter, it is difficult to see how the circumstances of this case could be characterized as "unfair" to Suno.  Suno has now admitted to widespread copyright infringement. As a result of that infringement, Plaintiffs were forced to bring this action to protect their rights in their copyrighted works and seek damages for the harm Suno caused.  Because Suno concealed the scope of its misconduct, Plaintiffs could only initiate this litigation by using a time-intensive, trial-and-error process to identify a minuscule portion of the works Suno had actually infringed. After undertaking a burdensome and costly review of Suno's training data—which Suno resisted and obstructed at every stage—Plaintiffs now understand the full scope of Suno's infringement. Yet, to ensure that this case continues to proceed efficiently and to demonstrate good cause, Plaintiffs seek to assert claims for only a small subset of their stolen recordings—*approximately* █.  Suno cannot plausibly claim unfairness from Plaintiffs' measured approach.  Indeed, Suno knew the massive scale of its infringement and was undoubtedly aware of the fact that Plaintiffs would only be able to identify a small subset of their infringed works through the agreed-upon Protocol, without causing excessive delay.

- 13 -

Suno may argue that Plaintiffs' requested amendment is prejudicial based on the number of newly asserted works.  But the only reason Plaintiffs have the ability to assert over 60,000 infringed works is because of the massive scope of Suno's infringement, and the only reason Plaintiffs are moving to amend at this point in the litigation is because Suno refused transparency. Denying leave to amend on that ground would effectively reward Suno for copying copyrighted works on an unprecedented scale and then hiding that copying from public view.  Further, if the Court grants Plaintiffs' motion, their copyright infringement theory and the facts underlying it will remain the same.  *See, e.g., Abiomed, Inc. v. Maquet Cardiovascular LLC*, 2020 WL 3868803, at *4 (D. Mass. June 9, 2020) ("District courts have found that a party may move to add a new or updated product without prejudicing the non-moving party if that addition does not substantially change the asserted infringement theory.") (collecting cases).  There are no new legal theories that require investigation, and Plaintiffs will not need any additional discovery from Suno.  The only expansion will be to the scope of ownership-related discovery, which is not prejudicial to Suno and can be addressed through streamlined procedures, as discussed below.  *Town of Wolfeboro v. Wright-Pierce*, 2013 WL 4500676, at *4 (D.N.H. Aug. 20, 2013) ("That additional discovery will be needed to address new claims is not a sufficient reason, standing alone, to deny a motion for leave to amend.").

Suno claims "Plaintiffs would be starting discovery from scratch with respect to the 60,000 new works they propose to add" and "Suno is also entitled to an expeditious resolution of its fair use defense, which Plaintiffs' proposed amendments would delay for many months."  Trehan Decl. ¶ 13.  But courts within the First Circuit consistently hold that delay alone is insufficient for a finding of undue prejudice.  *See, e.g., InMode Ltd. v. BTL Indus., Inc.*, 774 F. Supp. 3d 263, 265 (D. Mass. 2025) ("Delay in resolving the lawsuit is not enough by itself to constitute undue

prejudice."); *In re Body Sci. LLC Pat. Litig.*, 2012 WL 5449667, at \*3 (D. Mass. Nov. 2, 2012) ("Mere delay, without more, does not constitute undue prejudice."). While the number of asserted works will increase, Plaintiffs will endeavor to produce the necessary ownership-related documentation on a reasonably expedited basis.[4] A portion of the newly asserted works were the subject of prior litigation, and the requisite documentation for those works has already been assembled. Collection efforts for the remaining works are underway. In any case, Suno admits in its Answer that its model was trained on tens of millions of recordings for which rights are owned by Plaintiffs, so there is no reason why Plaintiffs' ownership should seriously be in dispute.

Further, as with Plaintiffs' first motion to amend, *the need to amend and extend discovery deadlines stems from Suno's refusal to disclose the recordings in its training data.* Indeed, Suno always has been best positioned to identify the sound recordings in its training data both before and after Plaintiffs filed suit. Its refusal to do so is why Plaintiffs are moving to amend at this point in the litigation. Suno has limited basis to claim prejudice when its own resistance to producing the training data precipitated the timing of this amendment.

Alternatively, if Suno's true concern is that it wants "expeditious resolution of its fair use defense," (Trehan Decl. ¶ 13), then that could be easily resolved by addressing Suno's fair use defense before completing ownership-related discovery. These are easily separable issues. Indeed, Plaintiffs submit that addressing fair use before proving their ownership of the tens of thousands of asserted works would be far more efficient for the parties, as well as the Court. To achieve these efficiencies, the Court could grant Plaintiffs' leave to amend to file the Second

---

[4] During the Parties' conferral, Suno claimed that Plaintiffs are attempting to "opt[] out of their discovery and proof burdens with respect to ownership, registration, and validity for each of the added works." Trehan Decl. ¶ 13. To the contrary, Plaintiffs fully intend to produce the necessary materials to sufficiently demonstrate their ownership or exclusive control of the newly asserted works and/or to satisfy their burden of proof.

Amended Complaint and stay ownership-related discovery with respect to the new works until after the Parties have submitted their motions for summary judgment focused on fair use. This procedure would moot any of Suno's delay-focused objections.

To the extent Suno wishes to raise ownership-related issues on summary judgment, it may do so based on the prior list of asserted works. Any remaining ownership-related disputes can be addressed after the Court resolves the fair-use defense on summary judgment.

### C.    Judicial Economy

Lastly, the Court may consider judicial economy and efficiency in evaluating a motion for leave to amend. *Astellas Inst. for Regenerative Med. v. ImStem Biotechnology, Inc.,* 2019 WL 9096049, at *5 (D. Mass. Aug. 21, 2019). This factor weighs decidedly in Plaintiffs' favor, as the proposed amendment seeks only to add additional works to the case within the framework of the existing copyright infringement claims. *See Parkhurst v. Superior Drywall, Inc.*, 2022 WL 36475, at *3 (D. Mass. Jan. 4, 2022) ("Where the claims against Kamco stem from the same incidents described in Mr. Parkhurst's original complaint and rely largely on the same facts, it is logical and efficient to allow these related claims to be litigated in one case, rather than to require Mr. Parkhurst to initiate a new, related action concerning these same incidents."). Plaintiffs should be allowed to proceed in this case rather than being forced to file a new action based on the same core theory and facts.

As explained above, Plaintiffs developed the original list of asserted works after they demonstrated that Suno's AI model created outputs that contain similarities to well-known copyrighted sound recordings. Compl. ¶¶ 51-52. Plaintiffs were constrained, however, in their ability to identify and assert copyrighted works on a larger scale, owing to Suno's deliberate secrecy and obstructionism. Plaintiffs should be permitted to assert a representative set of works that more accurately reflects the true scope and breadth of Suno's infringing conduct.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs leave to amend the Complaint.  In the interests of efficiency and the expedient adjudication of Suno's fair use defense, Plaintiffs further request that the Court stay ownership-related discovery with respect to the new works included in the Proposed Second Amended Complaint until after the Parties have submitted their motions for summary judgment focused on fair use.

Dated:  May 21, 2026

       New York, New York

HUESTON HENNIGAN LLP

By: _____

Moez M. Kaba (pro hac vice)
Mariah N. Rivera (pro hac vice)
Alexander R. Perry (pro hac vice)
Samuel Givertz (pro hac vice)
1 Little West 12th Street
New York, New York 10014
Telephone: (646) 930-4046
Facsimile: (888) 775-0898
mkaba@hueston.com
mrivera@hueston.com
aperry@hueston.com
sgivertz@hueston.com

Robert N. Klieger (pro hac vice)
Rajan S. Trehan (pro hac vice)
HUESTON HENNIGAN LLP
523 West 6th Street, Suite 400
Los Angeles, California 90014
Telephone: (213) 788-4340
Facsimile: (888) 775-0898
rklieger@hueston.com
rtrehan@hueston.com

Daniel J. Cloherty
Alexandra Arnold
CLOHERTY & STEINBERG LLP
One Financial Center, Suite 1120
Boston, Massachusetts 02110
Telephone: (617) 481-0160
Facsimile: (617) 848-0830
dcloherty@clohertysteinberg.com
aarnold@clohertysteinberg.com

Counsel for Plaintiffs

- 18 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those identified as non-registered participants on May 21, 2026.

Moez M. Kaba
*Counsel for Plaintiffs*