**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| UMG RECORDINGS, INC., CAPITOL RECORDS, LLC, and SONY MUSIC ENTERTAINMENT,<br><br>               Plaintiffs,<br><br>    v.<br><br>SUNO, INC. and JOHN DOES 1-10,<br><br>               Defendant. | Civil Action No. 1:24-cv-11611-FDS |

**DEFENDANT SUNO, INC.'S OPPOSITION TO PLAINTIFFS'**
**SECOND MOTION FOR LEAVE TO AMEND COMPLAINT**

## **TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................................ 1

II.     BACKGROUND ............................................................................................................ 4

      A.     Plaintiffs' Early Allegations of Widespread Infringement    and the Litigation Concerning Their 560 Asserted Works........................................................................ 4

      B.     Plaintiffs' Delay in Identifying the Works in Suno's Training Data ...................... 4

      C.     The Limited Remaining Discovery Period ............................................................. 8

III.    LEGAL STANDARD...................................................................................................... 8

IV.     ARGUMENT .................................................................................................................. 9

      A.     Plaintiffs Unduly Delayed in Attempting to Assert Thousands of Additional Works ...................................................................................................................... 9

      B.     Allowing Plaintiffs' Second Amended Complaint Would Unduly Prejudice Suno .............................................................................................................................. 14

      C.     Allowing Amendment Would Not Promote Judicial Economy ........................... 19

V.      CONCLUSION............................................................................................................. 20

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*After II Movie, LLC v. Grande Commc'ns Networks LLC*,
2023 WL 6367704, at *3-4 (W.D. Tex. Sept. 29, 2023), *report and
recommendation adopted*, 2023 WL 6930739 (W.D. Tex. Oct. 19, 2023) .............................16

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025) ....................................................................................1

*Bartz v. Anthropic PBC*,
No. 24-cv-05417, Dkt. 85 ..........................................................................................................5

*Bridgeport Music, Inc. v. Universal Music Grp.*,
248 F.R.D. 408 (S.D.N.Y. 2008) .............................................................................................13

*Concord Music Grp. v. Anthropic PBC*,
No. 24-cv-3811, Dkt. 474 (N.D. Cal. Oct. 8, 2025) ...................................................................1

*EMC Corp. v. Pure Storage, Inc.*,
310 F.R.D. 194 (D. Mass. 2015)........................................................................................17, 20

*Epidemic Sound, AB v. Meta Platforms, Inc.*,
No. 22-cv-4223, Dkt. 177 (N.D. Cal. Oct. 10, 2024) .................................................................2

*Epidemic Sound, AB v. Meta Platforms*,
No. 25-cv-10355, Dkt. 1 (N.D. Cal. Dec. 2, 2025).................................................................20

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991)..................................................................................................2, 9, 11, 14

*Flo & Eddie, Inc. v. Sirius XM Radio Inc.*,
80 F. Supp. 3d 535 (S.D.N.Y. 2015)...........................................................................................9

*Great Lakes Insurance SE v. Andersson*,
338 F.R.D. 424 (D. Mass. 2021)..............................................................................................12

*In re Body Sci. LLC Pat. Litig.*,
2012 WL 5449667 (D. Mass. Nov. 2, 2012) ...........................................................................17

*In re Lombardo*,
755 F.3d 1 (1st Cir. 2014)......................................................................................................9, 12

*In re OpenAI, Inc. Copyright Infringement Litigation*,
No. 25-md-03143, Dkt. 483 ........................................................................................................5

*InMode Ltd. v. BTL Indus., Inc.*,
   774 F. Supp. 3d 263 (D. Mass. 2025) ....................................................................................17

*Kader v. Sarepta Therapeutics, Inc.*,
   887 F.3d 48 (1st Cir. 2018).....................................................................................................9

*Kadrey v. Meta Platforms, Inc.*,
   788 F. Supp. 3d 1026 (N.D. Cal. 2025) ............................................................................1, 19

*Motta v. Samuel Weiser, Inc.*,
   768 F.2d 481 (1st Cir. 1985)....................................................................................................9

*Nat'l Ctr. for Jewish Film, Inc. v. Goldman*,
   943 F. Supp. 113 (D. Mass. 1996) ......................................................................................9, 18

*Novi Footwear Int'l Co. Ltd. v. Earth OpCo LLC*,
   350 F.R.D. 179 (D. Mass. 2025).............................................................................................17

*Palmer/kane LLC v. Scholastic Corp.*,
   2015 WL 8491041 (S.D.N.Y. Dec. 10, 2015) ........................................................................13

*Parkhurst v. Superior Drywall, Inc.*,
   2022 WL 36475 (D. Mass. Jan. 4, 2022) ...............................................................................20

*Somascan, Inc. v. Philips Med. Sys. Nederland, B.V.*,
   714 F.3d 62 (1st Cir. 2013)..................................................................................................8, 9

*Sony Music Ent. v. Uncharted Labs, Inc.*,
   No. 24-cv-4777, Dkt. 89 (S.D.N.Y. Apr. 8, 2025) ................................................................14

*Turner v. Liberty Mut. Ret. Benefit Plan*,
   350 F.R.D. 1 (D. Mass. 2025).................................................................................................17

*UMG et al. v. Uncharted Labs, Inc.*,
   No. 24-cv-04777, Dkt. 82 .........................................................................................................5

**STATUTES**

17 U.S.C.
   § 107......................................................................................................................................18
   § 1201(a) .................................................................................................................................3

**RULES**

Fed. R. Civ. P. 12(b)(6).................................................................................................................3

Fed. R. Civ. P. 56(d) ...................................................................................................................19

## I.    INTRODUCTION

This case has been pending for nearly two years and is finally approaching the close of fact discovery—and with it, resolution of the core question at its heart: whether Suno's alleged use of Plaintiffs' asserted sound recordings to train a music generative AI platform that creates wholly *new* music is fair use.  Rather than confront that question head on, Plaintiffs seek to delay it indefinitely.  Or, alternatively, Plaintiffs would have this Court decide fair use without any evidence regarding the works allegedly infringed, including whether Plaintiffs in fact own those works.  That proposed shortcut would lead this Court to legal error.

Plaintiffs move to amend their Complaint to assert 60,000 new works for which they have produced no discovery to date—a demand that will effectively restart the clock on Plaintiffs' discovery obligations and deprive Suno of its right to have this Court timely declare, as two others already have, that training a generative AI model is a quintessential transformative use.  *See Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1060 (N.D. Cal. 2025); *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1033 (N.D. Cal. 2025).  This is a too-familiar page from the standard playbook of aggregate music rightsholders:  file an action asserting "representative" works, let the litigation proceed through discovery for years, then attempt to expand the list of works exponentially at the close of fact discovery.  If permitted, Plaintiffs' gambit would necessitate substantial additional discovery and delay a potentially meritorious summary judgment decision on Suno's behalf.  Other courts have rightly rejected these attempts—including in other generative AI litigations—and this Court should too.  *See, e.g.*, *Concord Music Grp. v. Anthropic PBC*, No. 24-cv-3811, Dkt. 474 at 26:3-29:22 (N.D. Cal. Oct. 8, 2025) (denying motion to amend to assert additional works brought by music publishers in a generative AI case where the publishers were not diligent in identifying those works and finding that the plaintiffs should proceed on "the

complaint that they have"); *see also Epidemic Sound, AB v. Meta Platforms, Inc.*, No. 22-cv-4223, Dkt. 177 at 2 (N.D. Cal. Oct. 10, 2024) (rejecting possibility that the plaintiff could move to amend to assert additional works from its catalog because allowing amendment would require significant additional discovery and would "unduly delay [the] action even more").

As a result of Plaintiffs' lack of diligence, Plaintiffs' late-coming motion has landed on the Court's desk just as the parties are endeavoring to close out fact discovery. Despite insisting on using the third-party service, Audible Magic, to identify their sound recordings in Suno's training data, Plaintiffs failed to competently design or efficiently negotiate the inspection procedure. Plaintiffs waited nearly three months after announcing their intent to employ Audible Magic to explain how they intended to do so—and even then they failed to grapple with the technical complexity of the exercise. Worse still, Plaintiffs derailed negotiations by attempting to leverage good faith efforts by Suno to streamline the analysis through sampling (at Magistrate Judge Levenson's encouragement) into litigation concessions about Plaintiffs' ownership of unidentified works, and by trying to use the Audible Magic analysis to obtain information about competitor rightsholders. Then, once Plaintiffs completed their Audible Magic analysis, they waited another *four months* to move to amend their Complaint. This pattern of dilatory conduct is not the hallmark of a party that exercised diligence; it is the conduct of a party content to let the clock run until the eleventh hour. Plaintiffs' undue delay, standing alone, is grounds to deny their motion.

Plaintiffs' motion is not only late, it also threatens the orderly resolution of this case. Plaintiffs' proposed amendments would exponentially expand the case and require substantial additional discovery. Copyright claims are work-specific: for each asserted work, Plaintiffs bear the prima facie burden of establishing both ownership and copying. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). To satisfy their burden to prove ownership, Plaintiffs

must produce, at minimum, the work-for-hire agreements and/or title assignments between themselves and the thousands of artists whose works they assert, many of which likely go back decades. This volume of discovery cannot practicably be completed for 60,000 works without derailing the litigation—if even possible at all. Plaintiffs offer no commitments with respect to when they can complete this discovery; they state only that they will "endeavor to produce the necessary ownership-related documentation on a reasonably expedited basis." Dkt. 232 ("Br.") at 15. And the alternative Plaintiffs offer to such indefinite delay—that the parties proceed to summary judgment on fair use without conducting discovery on the newly asserted works—would result in legal error. That proposal relieves Plaintiffs of their prima facie burden to establish ownership and effectively asks the Court to render what would amount to an advisory opinion on whether Suno infringed works that Plaintiffs may not even own or have standing to assert.

After two years of extensive fact discovery, Suno is entitled to a timely consideration of its fair use defense. The Court should reject Plaintiffs' attempt to expand this case beyond what can be manageably litigated, at least without undue and indeterminate delay. To the extent Plaintiffs believe they have additional infringement claims to assert based on other works, the proper course is to file a separate action, not undertake a wholesale rewriting of this one.[1]

---

[1] In addition to the Motion filed on May 21, 2026, seeking to insert 60,000 new works into the litigation, Plaintiffs also filed a previous, still-pending Motion to Amend to assert a claim under 17 U.S.C. § 1201(a), *see* Dkt. 134. Though Plaintiffs do not reraise their Section 1201(a) arguments, the Amended Complaint proposed in the May 21 Motion includes the Section 1201(a) claim and apparently assumes that the Court will also grant the first Motion to Amend. Suno incorporates its opposition to that Motion herein. *See* Dkts. 131, 157. To the extent the Court is inclined to grant Plaintiffs' request to assert additional works, Suno respectfully requests that the Court grant the May 21 Motion while reserving judgment on the previous Motion, allow Plaintiffs to file their Proposed Amended Complaint docketed at Dkt. 231-3, and stay discovery with respect to the Section 1201(a) claim. Suno will then convert its opposition to the Section 1201(a) claim to a brief in support of Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6). This approach will allow the parties to proceed with discovery related to Plaintiffs' newly asserted works while the Court considers the parties' legal arguments concerning Section 1201.

## II.    BACKGROUND

### A. Plaintiffs' Early Allegations of Widespread Infringement     and the Litigation Concerning Their 560 Asserted Works

Suno launched its generative AI tool in July 2023.  Though Plaintiffs claim that "it is obvious" that Suno trained its tool on their sound recordings and that this training constituted copyright infringement, Dkt. 1 ¶ 9, they waited nine months before having their trade organization, the Recording Industry Association of America ("RIAA"), contact Suno with their allegations. Lovejoy Decl. ¶ 3.  As Plaintiffs note, the RIAA's letter demanded that Suno provide "a complete, detailed list of" all of the materials Suno ever used to develop its tool, including works not owned by Plaintiffs, and every copyright owner Suno ever contacted for permissions and turn over "an accounting of all revenue" Suno earned from its tool.  *Id*. ¶ 4.

In the highly competitive field of generative AI, a company's training data reflects core strategic and technical judgments regarding how the company built its AI model; accordingly, Suno keeps its training data confidential as a matter of policy.  *See* Dkt. 236 ("Kucsko Decl.") ¶¶ 6-8.  Suno refused to depart from that policy to provide the entire corpus of training data the RIAA demanded.  *See* Lovejoy Decl. ¶ 6.  Notably, the RIAA made no representation that it would keep Suno's training data confidential, and nothing would have prevented it from sharing the information widely, including with Suno's competitors. *Id*. ¶ 5.

Plaintiffs filed suit two months later.  Despite Plaintiffs alleging that "it is obvious" that "Suno copied Plaintiffs' copyrighted sound recordings *en masse*," they asserted only 560 works from their catalogs, claiming that they would "amend the Complaint at an appropriate time to provide an expanded list of works."  Dkt. 1 ¶¶ 9, 27, Ex. A.

### B. Plaintiffs' Delay in Identifying the Works in Suno's Training Data

Despite their stated intent to amend their Complaint to assert additional works identified

4

through discovery into Suno's training data, Plaintiffs took months to develop a plan for analyzing Suno's data and repeatedly stalled the parties' negotiations over that process, including through long periods of silence in which Plaintiffs failed to move the exercise forward.

From the time that it filed its Answer, Suno has been clear that Plaintiffs would "have ample opportunity to comb through" its training data "once discovery commences." Dkt. 28 at 10. Indeed, Suno has never denied that training its generative AI model required showing the model tens of millions of sound recordings, including works potentially owned by Plaintiffs given the size of their aggregated catalogs. *See id.* at 3, 8, 10. However, Suno's training data is among its most commercially sensitive assets, and disclosure of its contents to third parties could put Suno at a significant and unfair competitive disadvantage. Kucsko Decl. ¶¶ 6-8. Accordingly, as is standard in generative AI copyright litigations, Suno sought a "Training Data Inspection Protocol" that would allow Plaintiffs access to the data while ensuring that it remained confidential and secure. Lovejoy Decl. ¶ 11; *see also, e.g.*, *UMG et al. v. Uncharted Labs, Inc.*, No. 24-cv-04777, Dkt. 82; *In re OpenAI, Inc. Copyright Infringement Litigation*, No. 25-md-03143, Dkt. 483; *Bartz v. Anthropic PBC*, No. 24-cv-05417, Dkt. 85.

Suno first sent a draft Training Data Inspection Protocol for Plaintiffs' review on January 19, 2025. Lovejoy Decl. ¶ 11. When Plaintiffs responded on January 29, they inserted a provision that would allow them to use third-party Audible Magic to analyze Suno's training data to identify works that might belong to Plaintiffs. *Id.* ¶ 11. In a response, Suno warned that the parties would need to discuss how to maintain confidentiality of information disclosed to Audible Magic. *Id.* ¶ 12. Plaintiffs then delayed **nearly a month**, from February 12 to March 10, in responding to Suno's proposed revisions to the Protocol. *Id.* Their response did not include a plan for how they would use Audible Magic, other than saying that information shared with Audible Magic would

5

be covered by the Protective Order.  *Id*.  The stipulated Protocol was entered on March 31, 2025.  *See* Dkts. 75, 76.

On May 16, **nearly three months** after Plaintiffs announced their intention to use Audible Magic in the Training Data Inspection Protocol, Plaintiffs reached out for the first time with a proposal for how they would do so.  Lovejoy Decl. ¶ 13.  The parties spent the following months negotiating how Plaintiffs would use Audible Magic.  Plaintiffs' initial plans were not well conceived.  Among other issues, Plaintiffs were unable to provide the specific permissions they were asking Suno to grant them, sought broad, live access to Suno's business infrastructure, and did not confirm the level of access Suno would have to monitor the inspection.  *Id*. ¶ 13.  Plaintiffs' proposals risked causing significant disruption to Suno's business operations, opened the door to security issues by loosening Suno's typical access restrictions, and allowed Suno's training data to be transmitted from Suno's controlled environment to a third party with little visibility into the scope of data being shared.  *Id.*  Plaintiffs dismissed Suno's security concerns and, on June 26, insisted on raising the issue to Judge Levenson.  *Id.* ¶¶ 15-16.

The parties appeared before Judge Levenson on July 31; he suggested that Plaintiffs agree to an approach by which they would run a sample of Suno's training data through Audible Magic, which would minimize confidentiality concerns.  *See* July 31, 2025 Hr'g. Tr. at 55:20-56:25, 70:13-72:22.  Suno promptly followed up with a proposal on August 8.  *See* Lovejoy Decl. ¶ 17.  The negotiations were delayed, however, when Plaintiffs insisted, as a condition of their agreement, that Suno "stipulate to Plaintiffs' ownership of valid, enforceable copyrights that are eligible for statutory damages" for an unidentified number of additional works in Suno's training data.  *Id*.  In other words, Plaintiffs demanded not just that Suno agree that a certain portion of its training data consists of works Plaintiffs *claim* to own, but that Suno stipulate that Plaintiffs in fact

own those works and that the works are eligible for statutory damages.  Plaintiffs demanded over multiple rounds of negotiations that Suno essentially relieve them of their burden of proving that they own the works, just as they have proposed once again in this motion.  *See id.*

As the parties discussed this issue, Suno identified another one: in early September, Plaintiffs indicated for the first time that they intended to use Audible Magic to attempt to match Suno's training data to works associated with *other* competitor rightsholders that are not parties to the case.  *See id.* ¶ 18.  That Plaintiffs had access to Suno's training data through the litigation did not entitle them to know the portion of the data that may be associated with other entities; this information is irrelevant to Plaintiffs and would provide them with an unearned competitive advantage.  Suno raised these concerns on September 5 and proposed an approach that would appropriately limit the information Plaintiffs received from Audible Magic.  *Id.*  Yet Plaintiffs delayed again, waiting **nearly a month**, until September 30, to respond.  *Id.*  When they did so, they demanded that the parties again raise the issue to Judge Levenson.  *Id.*  On October 21, Plaintiffs sent a new version of the statement and offered for the first time a workable solution that would exclude nonparty rightsholders from their analysis.  *Id.* ¶ 20.  Suno agreed the next day.  *Id.*

Plaintiffs began their Audible Magic inspection on November 3 but did not complete it until January 2, 2026.   Dkt. 231-7 ("Delorey Decl.") ¶¶ 4-5.  Plaintiffs' expert delivered the results—which identified "recordings which Audible Magic indicated were submitted by a Universal or Sony affiliate," *id.* ¶ 6—to Plaintiffs on January 15, Dkt. 231-2 ("Trehan Decl.") ¶ 10. From there, **another four months** passed before Plaintiffs announced their intent to move to amend their complaint.  Trehan Decl. ¶ 12.

In sum, as shown below, even putting aside instances when Plaintiffs derailed or obstructed negotiations, they repeatedly delayed in obtaining discovery and identifying additional works:



*See* Lovejoy Decl. ¶¶ 12-18, 21-23.

### C.  The Limited Remaining Discovery Period

Fact discovery is currently scheduled to close on June 26, and expert reports are due less than two months later.  *See* Dkt. 188.[2]  After many months of developing the record through written and document discovery, the parties are now on the eve of fact witness depositions.  Plaintiffs have already deposed one Suno employee, and the parties are in the process of scheduling over a dozen additional depositions—including depositions of Plaintiffs' 30(b)(6) designees on topics related to the asserted works.  Lovejoy Decl. ¶¶ 9-10.  Plaintiffs would upend that schedule with their late-breaking attempt to drastically expand the scope of the litigation.

## III.    LEGAL STANDARD

Because Plaintiffs' motion comes a year and a half after the deadline for amendments to the pleadings, *see* Dkt. 42, Plaintiffs must demonstrate good cause.  *Somascan, Inc. v. Philips Med. Sys. Nederland, B.V.*, 714 F.3d 62, 64 (1st Cir. 2013) ("Our case law clearly establishes that Rule 16(b)'s 'good cause' standard, rather than Rule 15(a)'s 'freely give[n]' standard, governs motions

---

[2] On May 27, 2026, after Suno sent proposed dates for depositions to be completed by the June 26 close of fact discovery, Plaintiffs proposed an extension of the discovery schedule through August 15, "to accommodate the completion of depositions."  Lovejoy Decl. ¶ 10.  Though Suno was prepared to complete fact discovery on June 26, it agreed to Plaintiffs' request in the interest of witness convenience.  *Id.*  This modest extension of less than two months would not accommodate the amount of discovery necessary for the 60,000 new asserted works, as discussed below.

to amend filed after scheduling order deadlines have passed." (cleaned up)).  The good cause inquiry "focuses on the diligence (or lack thereof) of the moving party" in seeking to amend its pleadings.  *Id*.; *see also In re Lombardo*, 755 F.3d 1, 3 (1st Cir. 2014) (noting that "when considerable time has elapsed between the filing of the complaint and the motion to amend," the movant bears the burden of "showing some valid reason for his neglect and delay" (cleaned up)).  "[R]egardless of the context, the longer a plaintiff delays, the more likely the motion to amend will be denied," as protracted delay creates "burdens on the opponent and the court."  *Somascan*, 714 F.3d at 64.  Undue delay, "even standing alone, can provide a court with adequate grounds to deny leave" to amend.  *Kader v. Sarepta Therapeutics, Inc.*, 887 F.3d 48, 61 (1st Cir. 2018).

Plaintiffs bear the prima facie burden of proving, for each of the asserted works, "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  *Feist*, 499 U.S. at 361.  If Plaintiffs cannot prove that they own "a valid copyright," their claim for infringement of that work "cannot go forward."  *Nat'l Ctr. for Jewish Film, Inc. v. Goldman*, 943 F. Supp. 113, 119 (D. Mass. 1996); *see also, e.g., Motta v. Samuel Weiser, Inc.*, 768 F.2d 481, 4834 (1st Cir. 1985) (noting that "[i]t is beyond dispute that" copyright plaintiffs bear the burden of proving copyright ownership and affirming dismissal of case where the plaintiffs failed to do so); *Flo & Eddie, Inc. v. Sirius XM Radio Inc.*, 80 F. Supp. 3d 535, 543 (S.D.N.Y. 2015) ("A party alleging copyright infringement always has to prove that he owns the copyright he is asserting, it is an element of his claim!").

## IV.    ARGUMENT

### A.  Plaintiffs Unduly Delayed in Attempting to Assert Thousands of Additional Works

Plaintiffs' late-coming motion is a result of their lack of diligence in prosecuting their Audible Magic investigation.  Having repeatedly delayed and stalled that process, they cannot now

9

demonstrate good cause to insert 60,000 new works into the litigation at the tail end of fact discovery. Worse still, even after that investigation was complete, Plaintiffs delayed another four months before filing this motion. That delay cannot be excused by Plaintiffs' purported investigation into whether they own the works identified by Audible Magic given Plaintiffs' prior representations to the Court (in order to avoid discovery requests) that they they "systematically ensure" the works they distribute to Audible Magic for such matching functions "are the same sound recordings they deposited with the Copyright Office." Dkt. 70 at 12-13.

*First*, depite insisting on using Audible Magic to analyze Suno's training data, Plaintiffs unnecessarily delayed in designing and negotiating that process. Plaintiffs waited a month after their first training data inspection and nearly three months after announcing their intent to use Audible Magic to propose any process for doing so—and waited an additional month to respond to Suno's counterproposal during the parties' negotiations (following a similar monthlong delay in negotiations of the Training Data Inspection Protocol). *See* Lovejoy Decl. ¶¶ 12-13, 18. To make matters worse, though Plaintiffs now describe their Audible Magic process as "technically and complex" and "multi-step," Br. at 11, Plaintiffs repeatedly failed to account for these complexities when designing the investigation. As noted above, Plaintiffs' proposals did not address various key technical details, sought access to infrastructure in ways that would be disruptive to Suno's business operations, introduced security vulnerabilities, and allowed Suno's training data to be transmitted to a third party with little visibility into what would be shared and how it would be protected. *See* Lovejoy Decl. ¶ 14. The shortcomings of Plaintiffs' proposals significantly delayed negotiations and demonstrate that Plaintiffs underestimated and failed to adequately plan for the technical complexity of their proposed method of investigation.

*Second*, Plaintiffs derailed negotiations by attempting to extract unrelated concessions and

10

by demanding irrelevant information to which they are not entitled.  After Judge Levenson proposed that the parties use a sampling process for the Audible Magic Inspection, Plaintiffs' first gambit was to insist that Suno stipulate not just that a certain portion of its training data consists of works Plaintiffs *claim* to own, but "to Plaintiffs' ownership of valid, enforceable copyrights that are eligible for statutory damages" for an unidentified number of additional works.  Lovejoy Decl. ¶ 17.  Plaintiffs carry the burden of proof to establish that they in fact own a "valid, enforceable copyright[]" in any given work, *Feist*, 499 U.S. at 361, and had no basis to leverage an inspection process they insisted on to essentially relieve themselves of meeting that burden for any number of works.  Though Suno eventually proposed an alternative approach that would moot the issue, it took up several rounds of negotiation.  *See* Lovejoy Decl. ¶¶ 17-19.  Similarly, Plaintiffs initially insisted on using Audible Magic to identify works associated with their competitors.  *Id.* ¶ 18. These works have no relevance to Plaintiffs or to this litigation, and Plaintiffs eventually backed down.  *See id.*  But again, their initial insistence and demand that the parties brief the issue slowed things down still further, with no justification in the needs of the case.

*Finally*, though Plaintiffs completed their inspection in January, they waited an additional *four months*, until the final month of fact discovery, to move to amend their Complaint.  *See* Trehan Decl. ¶¶ 10-12; *see also* Lovejoy Decl. ¶¶ 22-23.  Though Plaintiffs attempt to defend this gap by claiming they were investigating whether they own the works identified by Audible Magic as belonging to them, *See* Br. at 7-8, this explanation is at odds with Plaintiffs' previous claims about how they use Audible Magic.  Earlier in the litigation, in an attempt to resist discovery into their ownership of the works asserted, Plaintiffs claimed that they "***systematically ensure that the sound recordings they upload to Audible Magic's content database are the same sound recordings they deposited with the Copyright Office***" and that they claim to own.  Dkt. 70 at 12-13 (emphasis

11

added).  Plaintiffs cannot ignore the assurances they made to avoid discovery to explain away their delay now.  Assuming Plaintiffs' representations were accurate, there is no justification for why they took four months to "confirm[]" that the works identified with Audible Magic "[were] registered with the Copyright Office," Dkt. 231-9 ¶ 7, when they apparently "systematically ensure" that this is the case.

In sum, despite being aware for years that they intended to  identify and additional works in Suno's training data and assert them in this case, Plaintiffs acted with no urgency in doing so. Plaintiffs' undue delay, standing alone, is grounds to deny their Motion.  *See, e.g.*, *In re Lombardo*, 755 F.3d at 3-4 (holding that delays of fourteen to seventeen months after the filing of the complaint require "some valid reason for [the plaintiff's] neglect and delay" and affirming denial of motion to amend where the plaintiff failed to provide one); *Great Lakes Insurance SE v. Andersson*, 338 F.R.D. 424, 427-28 (D. Mass. 2021) (denying motion to amend where the plaintiff did not diligently investigate an additional cause of action it was on notice of during discovery).

Plaintiffs cannot avoid this result by attempting to shift the blame to Suno.  Plaintiffs' primary argument appears to be that Suno "refused to answer Plaintiffs' *pre-suit inquiries*" about its training data and that Plaintiffs did not have access to the training data until discovery.  *See* Br. at 10 (emphasis added).  The makeup of Suno's training data is highly commercially sensitive.  In an industry with many competitors (including AI companies Plaintiffs have partnered with), Suno keeps its training data confidential as a matter of policy.  Kucsko Decl. ¶¶ 6-8.  Plaintiffs cite no authority supporting their position that Suno should have produced its training data to adverse parties with absolutely no protections in place before this lawsuit was even filed—or that Suno not doing so excuses Plaintiffs' pattern of dilatory conduct once the parties were in litigation.

Plaintiffs likewise attempt to fault Suno for providing its training data for inspection under

12

"limited circumstances." Br. at 11. But training data inspection protocols are common in cases involving generative AI, where the plaintiff's desire for discovery must be balanced against the competitive sensitivity of each AI companies' unique mix of training materials. *See supra* at 5. Given their prevalence, Plaintiffs could not have been surprised that similar protocols would be necessary in this case. Moreover, as explained above, to the extent the negotiations of these protocols took time, that is largely due to Plaintiffs' delayed responses and attempts to introduce unrelated issues into the negotiations.[3] *See supra* at 6-7.

Plaintiffs appear to suggest that the reason it took them two years to move to amend is because they needed discovery. *See* Br. at 10. The problem is that Plaintiffs failed to diligently pursue that discovery—which distinguishes this case from the authorities Plaintiffs rely on. *See, e.g.*, *Bridgeport Music, Inc. v. Universal Music Grp.*, 248 F.R.D. 408, 413-14 (S.D.N.Y. 2008) (allowing amendment three weeks after the plaintiff confirmed the relevant information in a deposition); *Palmer/kane LLC v. Scholastic Corp.*, 2015 WL 8491041, at *3 (S.D.N.Y. Dec. 10, 2015) (allowing amendment where the plaintiff was "diligent in her attempts to uncover any unauthorized uses of the copyrighted photographs"). Having so delayed, Plaintiffs cannot be permitted to drastically expand the scope of the litigation at the eleventh hour.

---

[3] In their recitation of facts, Plaintiffs also accuse Suno of "rescind[ing] its consent" to allow Plaintiffs to proceed with their Audible Magic analysis while the details of that analysis were still under discussion. *See* Br. at 6. Suno was under no obligation to permit Plaintiffs to collect "fingerprints" from its training data when the parties had not agreed on what Plaintiffs would be permitted to *do* with those fingerprints—and when Plaintiffs' proposals had evinced a disregard for the sensitivity of the information they would be taking into their possession. *See* Lovejoy Decl. ¶¶ 14-15. In any event, because the parties had not yet agreed to a procedure for the second phase of the Audible Magic analysis, *see* Trehan Decl. ¶ 6, Plaintiffs would not have been able to take any action with respect to the fingerprints had they collected them at that time. And once the parties had agreed upon a procedure, their experts took approximately ten days to complete their collection before proceeding to the second phase. *See* Delorey Decl. ¶ 4. Any slowdown caused by Plaintiffs not collecting the fingerprints before November 2025, therefore, lasted only ten days.

13

**B. Allowing Plaintiffs' Second Amended Complaint Would Unduly Prejudice Suno**

Plaintiffs' late motion to expand their list of asserted works by a factor of over one hundred will also unduly prejudice Suno, as it will require substantial additional discovery and delay resolution of the claims and defenses that the parties have spent two years adducing evidence for, including Suno's fair use defense. With just weeks left in a fact discovery period, Plaintiffs' Motion essentially presents this Court with two choices: 1) Let Plaintiffs prolong the litigation and forestall a fair use determination by an unspecified amount of time so they can complete the necessary discovery for tens of thousands of additional works; or 2) Allow Plaintiffs to proceed to summary judgment without establishing that they own those works—a proposal the Court already once considered and rejected, *see* Oct. 28, 2024 Hr'g. Tr. at 3:22-4:8. *See* Br. at 14-16. Either option would be significantly disruptive to the litigation and prejudicial to Suno.

Plaintiffs have only two prima facie legal obligations in this case, one of which is to prove, *for each work that they assert*, "ownership of a valid copyright[.]" *Feist*, 499 U.S. at 361. Thus, if Plaintiffs are going to claim infringement of 60,000 unique works, they must prove that they own each one of those works. *See, e.g.*, *Epidemic Sound*, No. 22-cv-4223, Dkt. 490 at 26:12-14 (N.D. Cal. Mar. 9, 2026) (noting that the plaintiff's burden of proof "isn't lessened because" it "decided to bring mass infringement cases"); *Sony Music Ent. v. Uncharted Labs, Inc.*, No. 24-cv-4777, Dkt. 89 at 3 (S.D.N.Y. Apr. 8, 2025) (in a copyright infringement action, "[e]ach copyright must be proven on its own"). Making such a showing—either at summary judgment or at trial—requires discovery on a per-work basis.

In recognition of their discovery obligations, Plaintiffs offer that they will "endeavor to produce the necessary ownership-related documentation on a reasonably expedited basis." Br. at 15. To be sure, Plaintiffs need to produce copyright registrations or indices and chains of title

14

and/or work for hire agreements for each of the asserted works.  Indeed, Plaintiffs did not create any of the 60,000 works they seek to assert; recording artists did.  Plaintiffs allegedly own these works through either work for hire agreements or assignments from other entities, which must be produced into the case.  This is not merely a box-ticking exercise without legal significance: discovery into the currently asserted works ███████████████████████████████████ ████████████████████████████[4] ████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████  *See* Lovejoy Decl. Ex. A.  Despite this, Plaintiffs' motion makes no specific commitment about what ownership discovery they will produce.  *See* Dkt. 70 at 3.  That Plaintiffs propose an indefinite extension of the discovery schedule so that they may "endeavor" to produce the materials that they have made a unilateral determination are "necessary" is reason alone to reject Plaintiffs' motion.[5]

Beyond that, there is no realistic prospect that Plaintiffs can produce the requisite ownership discovery for 60,000 additional works without blowing up the case schedule.  Notably, although the discovery is solely in their hands, Plaintiffs have offered the Court only a

---

[4] Plaintiffs claim, without citation, that "Suno admits in its Answer that its model was trained on tens of millions of recordings for which rights are owned by Plaintiffs, so there is no reason why Plaintiffs' ownership should seriously be in dispute." *See* Br. at 15.  False.  Suno explained that "the tens of millions of recordings that Suno's model was trained on presumably *included* recordings whose rights are owned by Plaintffs"—not that each of the tens of millions of recordings Suno trained its model on are *owned by* Plaintiffs.  *See* Dkt. 28 at 8 (emphasis added); *see also* Dkt. 39 at 8 (raising early questions concerning Plaintiffs' ownership of the works in suit).

[5] In fact, Plaintiffs have previously indicated that they will *refuse* to provide full ownership discovery if the list of asserted works expands.  *See* Lovejoy Decl. ¶ 7.  Any proposal by Plaintiffs that would relieve them of their obligations to prove ownership and deny Suno the opportunity to test their assertions—including a "sampling" proposal—would be unsupportable.  If Plaintiffs are permitted to assert 60,000 works, they are obligated to provide discovery for each of those works.

noncommittal representation that they will produce ownership discovery on a "reasonably expedited basis." Having previously decried the difficulty of producing ownership discovery for the much smaller number of works currently in the litigation (*see* Dkt. 70 at 17-18), Plaintiffs cannot now minimize the effort required for this discovery. There is no question that inserting 60,000 new works by thousands of different artists into the litigation will expand the fact discovery schedule and prolong the litigation. *Cf. Epidemic Sound*, No. 22-cv-4223, Dkt. 177 at 2 (N.D. Cal. Oct. 10, 2024) (noting that allowing amendment to assert additional works would require Plaintiffs to "produce all its evidence showing copyright registration, including chain of title evidence"); *After II Movie, LLC v. Grande Commc'ns Networks LLC*, 2023 WL 6367704, at *3-4 (W.D. Tex. Sept. 29, 2023), *report and recommendation adopted*, 2023 WL 6930739 (W.D. Tex. Oct. 19, 2023) (finding undue prejudice where the plaintiff sought to "add new parties and new works-in-suit" two years into the litigation, requiring additional discovery, over the plaintiff's argument that the claims arose from "the same common nucleus of facts").

Moreover, the additional discovery necessitated by Plaintiffs' motion is not limited to ownership-related materials. For instance, because Plaintiffs claim that Suno-created outputs compete with their asserted works and seek lost profits, *see, e.g.*, Dkt. 1 ¶¶ 4, 14, 73-74, royalty and consumption data for each of the asserted works—which will indicate whether the market for those works has been harmed—is both relevant and necessary. *See also infra* at 18-19. Plaintiffs have agreed to produce this information across eleven streaming services and social media platforms for the currently asserted works. *See* Lovejoy Decl. ¶ 8. Granting Plaintiffs' motion would require comparable discovery for the additional 60,000 works. Particularly as Plaintiffs' brief does not even address the necessity of collecting and producing this discovery, it is unlikely to happen on a "reasonably expedited basis."

16

Plaintiffs are wrong that the litigation delay caused by a proposed amendment cannot constitute undue prejudice—particularly where, as here, the delay is caused by the need to accommodate substantial additional discovery. *See* Br. at 14. In addition to the time required for production, expanding the works in suit will open the door to discovery disputes, balloon the record for summary judgment and trial, and increase the number of issues for the factfinder to resolve. That is why, in the context of motions to amend, courts in this Circuit regularly find that amendments that require significant additional discovery and prolong adjudication of the issues, particularly late in the fact discovery period, are unduly prejudicial to the opposing party. *See, e.g.*, *Novi Footwear Int'l Co. Ltd. v. Earth OpCo LLC*, 350 F.R.D. 179, 184 (D. Mass. 2025) (finding prejudice to opposing party and denying motion to amend where new claims would likely require additional discovery and would "further delay the case"); *Turner v. Liberty Mut. Ret. Benefit Plan*, 350 F.R.D. 1, 7-8 (D. Mass. 2025) (finding that motion to amend would "impose substantial and unfair prejudice on defendants" where amendment would require reopening discovery and "lead to further delays in the case"); *EMC Corp. v. Pure Storage, Inc.*, 310 F.R.D. 194, 201-02 (D. Mass. 2015) (finding undue prejudice where the amendment would "require revisions to the existing pretrial deadlines, increase the costs of discovery, and cause substantial delays in resolving the present dispute"). The same is true here, where Plaintiffs' proposed amendments would both delay the litigation indefinitely and "make this complicated action even more unmanageable." *Epidemic Sound*, No. 22-cv-4223, Dkt. 177 at 2.[6]

---

[6] The two cases Plaintiffs rely on concern motions to *stay* litigation, rather than motions to amend to expand the scope of a case. *See InMode Ltd. v. BTL Indus., Inc.*, 774 F. Supp. 3d 263, 265 (D. Mass. 2025); *In re Body Sci. LLC Pat. Litig.*, 2012 WL 5449667, at *3 (D. Mass. Nov. 2, 2012). This is unsurprising: the burden of putting a case on pause to accommodate external developments cannot be compared to the burden of delaying resolution of a case so the parties can engage in significantly expanded discovery.

Plaintiffs' alternative suggestion—that the Court "address[] fair use before [Plaintiffs] prov[e] their ownership of the tens of thousands of asserted works"—is not a serious proposal. It is a highly improper request that Plaintiffs be relieved of their prima facie obligations altogether. *See* Br. at 15. Plaintiffs have tried this before: at the very start of the litigation, Plaintiffs sought a bifurcated schedule that would allow them to litigate Suno's fair use defense without establishing that they own the works allegedly infringed and without addressing any of Suno's other defenses. *See* Dkt. 39 at 1-5. The Court rejected that proposal then, *see* Oct. 28, 2024 Hr'g. Tr. at 3:22-4:8, and should once more. If Plaintiffs cannot prove that they own the works they assert and that Suno copied those same works, Suno is not liable for infringing those works, regardless of whether any affirmative defense would apply. *See Goldman*, 943 F. Supp. at 119 (D. Mass. 1996) (infringement claim "cannot go forward" if Plaintiffs cannot prove that they own "a valid copyright").

It would also be legal error for the Court to assess fair use without considering evidence on the actual works in suit. The fourth fair use factor is "the effect of the use upon the potential market for or value *of the copyrighted work*" alleged to have been infringed. 17 U.S.C. § 107 (emphasis added). One of the core arguments Plaintiffs intend to advance is that Factor Four favors them because Suno-created outputs will compete with and diminish the market for their asserted works—regardless of whether Suno's outputs sound like Plaintiffs' asserted works.[7] *See, e.g.*, Dkt. 1 ¶¶ 4, 14, 73-74*; see also, e.g.*, Dkt. 212 at 13. Putting aside the legal merits of this approach to Factor Four, it requires discovery into whether Suno's outputs have or are likely to have an impact on the market for specific asserted works. But, as discussed above, Plaintiffs have not committed to produce any discovery into that question with respect to the 60,0000 additional

---

[7] As Plaintiffs acknowledge, they do not allege that any outputs (even those that allegedly sound like asserted sound recordings) infringe their works—nor could they, under the Copyright Act. *See* Dkt. 28 at 5-6.

works that they seek to add to the case.  Plaintiffs instead appear to propose that the Court make a fair use determination applicable to those 60,000 works based on the evidence they have produced for the 560 works in suit.  However, even assuming Plaintiffs could show that Suno-generated outputs impact the market for that specific set of works  (and even assuming this approach to factor four were legally supported), it does not necessarily follow that those outputs necessarily affect the market for *other* works.  The Court cannot decide fair use for all 60,000 works on an incomplete record, and at summary judgment Suno would be compelled to raise this issue and ask the Court to defer judgment.  *See* Fed. R. Civ. P. 56(d) (allowing the court to defer judgment where a nonmovant "cannot present facts essential to justify its opposition").  Another court deciding summary judgment on fair use in a generative AI case has already cautioned of the pitfalls of deciding fair use, which is a "fact-specific doctrine that requires case-by-case that is sensitive to new technologies and their potential consequences," on an underdeveloped record.  *Kadrey*, 788 F. Supp. 3d at 1059; *see also id.* at 1060 (noting that, because the plaintiffs "fail[ed] to present meaningful evidence" of the effect of AI tool on their books, the court could not actually assess market harm).  Yet Plaintiffs are asking the Court to do just that.

Plaintiffs' proposals to accommodate the obvious disruption caused by inserting 60,000 new works into a two-year-old litigation just as fact discovery is about to close are inadequate.  Plaintiffs would have Suno and this Court choose between protracted and costly additional discovery, which would delay resolution of the litigation for many months, and litigating an advisory opinion on fair use for 60,000 works before any discovery has been taken on them.  Neither option addresses or prevents the undue prejudice caused by Plaintiffs' late-coming motion.

### C.  Allowing Amendment Would Not Promote Judicial Economy

For many of the same reasons that Plaintiffs' proposed amendment would prejudice Suno, it would also unnecessarily burden the Court.  Granting the motion would require the Court to

either let this case continue to sit on its docket while fact discovery is indeterminately delayed or commit legal error by relieving Plaintiffs of their prima facie obligations.[8]  Far from promoting judicial economy, Plaintiffs' proposals add unnecessary complexity and delay to a case that has already gone on for two years.  *Cf. EMC Corp. v. Pure Storage, Inc.*, 310 F.R.D. 194, 203 (D. Mass. 2015) (finding amendment contrary to judicial economy where it would "not only prevent the parties from meeting the current deadlines and completing the litigation within the time established by this court, but it would also add further complexity to a substantial and complex case").  To the extent Plaintiffs have a basis to bring new infringement claims for additional works, the solution is for them to file a new suit, just as other music rightsholder plaintiffs have done, which the Court can relate to the current litigation.  *See, e.g.*, *Epidemic Sound, AB v. Meta Platforms*, No. 25-cv-10355, Dkt. 1 (N.D. Cal. Dec. 2, 2025) (filing separate action asserting works not brought in the first suit by the same rightsholder against the same defendant).

V.    **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' Second Motion to Amend the Complaint.

---

[8] The one case Plaintiffs rely on in urging that this factor "weighs decidedly" in their favor involved an *unopposed* amendment (brought two months after the deadline and one week after the plaintiff learned the relevant information) that sought to add a defendant that may have been responsible for supplying the products that caused the plaintiff's injuries. *See Parkhurst v. Superior Drywall, Inc.*, 2022 WL 36475, at *1-3 (D. Mass. Jan. 4, 2022).  Adding the defendant thus allowed the court to determine liability among several parties potentially responsible for the same incident. Here, there is no similar risk that litigating the claims in the current Complaint would lead to an incomplete liability determination.

Dated: June 4, 2026

Respectfully submitted,

*/s/ Brittany N. Lovejoy*
Andrew M. Gass (*pro hac vice*)
Brittany N. Lovejoy (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
andrew.gass@lw.com
brittany.lovejoy@lw.com

Shlomo Fellig (BBO# 699643)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
shlomo.fellig@lw.com

Grace McLaughlin (*pro hac vice*)
LATHAM & WATKINS LLP
1271 Avenue Of The Americas
New York, NY 10020
Telephone: (212) 906-2967
Facsimile: (212) 751-4864
grace.mclaughlin@lw.com

*Counsel for Defendant Suno, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true, unredacted version of the foregoing document was served by electronic mail on all counsel of record on June 4, 2026.

*/s/ Brittany N. Lovejoy*
Brittany N. Lovejoy

21