# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UMG RECORDINGS, INC., CAPITOL RECORDS, LLC and SONY MUSIC ENTERTAINMENT,

                  Plaintiffs,

      v.

SUNO, INC., and JOHN DOES 1-10,

                  Defendants.

Civil Action No. 1:24-cv-11611 (FDS)

## PLAINTIFFS' REPLY IN SUPPORT OF SECOND MOTION FOR LEAVE TO AMEND COMPLAINT

## I.    INTRODUCTION

Suno trained its model on many millions of sound recordings, and discovery has since confirmed that those recordings include millions belonging to Plaintiffs. Suno then refused—pre-suit and at every subsequent turn—to disclose what it had taken. Suno's opposition nonetheless casts Suno as the aggrieved party, racing toward a fair use ruling that Plaintiffs are supposedly trying to delay. But Suno is no victim. The timeline Suno now attempts to wield against Plaintiffs is a timeline of Suno's own making. If there is a "playbook" at work here, Dkt. 237 ("Opp.") 1, it is Suno's: copy at a staggering scale, conceal what was copied, and then insist that the time required to reasonably verify a portion of the truth is itself a reason to look away.

Suno's refusal to disclose what it copied has forced Plaintiffs to prove it. Through a months-long, forensic process, Plaintiffs created more than ▮▮▮▮▮ digital fingerprints from the audio files in Suno's training data and matched those fingerprints against recordings delivered by Plaintiffs and their affiliates to Audible Magic, simply to establish what Suno already knew and acknowledged in its Answer—that it had copied millions of Plaintiffs' recordings. Plaintiffs do not seek to assert all of them. They seek to add 61,026 works, a representative subset chosen to move this case forward, not to expand it without end. And the amendment changes nothing about the shape of the case. It adds works to the existing infringement cause of action, on the same facts, under the same theory, and against the same defenses; it seeks no new discovery from Suno.

Against this, Suno raises undue delay and prejudice. Neither withstands scrutiny. The only delay here was caused by Suno's dubious insistence that its theft of Plaintiffs' recordings constituted a "trade secret" and refusal to undertake the analysis necessary to respond to inquiries about its training data, forcing Plaintiffs to conduct that analysis themselves. The sole additional discovery the amendment entails (proof of Plaintiffs' ownership) is, as Suno concedes, "solely in

- 1 -

[Plaintiffs'] hands," Opp. 15, and thus that burden falls on Plaintiffs, not Suno. Suno cites cases involving amendments that added new claims, new theories, or new defendants. By contrast, Plaintiffs' proposed amendment simply adds works to an existing cause of action. Suno's real concern is not that the case has grown more complex; it is that the full scope of its unauthorized copying has come to light and must be answered for.

Suno also protests that it is entitled to a prompt ruling on its fair use defense. Plaintiffs agree, and their proposal delivers exactly that: the Court can decide fair use first, on the complete record the parties have developed, deferring proof of ownership for the newly added works. If Suno fails to demonstrate fair use, Plaintiffs will then prove ownership over the additional works.

Finally, judicial economy favors resolving causes of action that arise from the same conduct in a single action, not splintering them across duplicative suits. Far from streamlining this litigation, denying leave would reward Suno for concealing the scope of its infringement, force Plaintiffs to refile the same cause of action in a second case that would impose duplicative and unnecessary burdens on an already-busy Court, and penalize Plaintiffs for the immense undertaking Suno's obstruction made necessary. The Court should grant leave to amend.[1]

## II.    ARGUMENT

Plaintiffs have established good cause to amend at this juncture. The additional infringed works they seek to include could not have been identified earlier, as their discovery depended on

---

[1] Plaintiffs' separate, fully briefed motion for leave to assert a claim pursuant to 17 U.S.C. § 1201(a) remains ripe for decision on the existing record, and Plaintiffs do not reargue it here. (Dkt. 134.) Suno's request to stay § 1201(a) discovery if the claim is included in the operative pleading seeks affirmative relief that a footnote in an opposition cannot supply. Plaintiffs reserve their position with respect to discovery into this claim and can address any sequencing issues with Suno through meet-and-confer, as needed.

access to and analysis of Suno's training data which Plaintiffs pursued diligently throughout discovery. *See* Dkt. 232 ("Mot.") at 9-13. Suno's objections do not undermine that showing.

### A.    Plaintiffs Did Not Unduly Delay

"Ascertaining whether a delay is 'undue' is not simply a matter of counting days but, rather, depends on the 'totality of the circumstances[.]'" *Amyndas Pharms., S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 37 (1st Cir. 2022) ("[F]or delay to be 'undue,' the period of delay must be both substantial and unjustified."). Suno ignores this basic principle.

Plaintiffs identified their infringed sound recordings the only way Suno permitted: through a costly, labor-intensive review of Suno's training data conducted under a protocol that Suno demanded. It was Suno who insisted on this protocol, despite representing in its Answer that it was "no secret" that its model was trained on "tens of millions of recordings" including those owned by Plaintiffs. Answer at 8. That process was novel and technically complex, and it required Suno's cooperation and approval at every step. When stripped of its self-serving characterizations and hyperbole, Suno's mere recitation of the issues Suno demanded be addressed before Plaintiffs could proceed with the analysis refutes any claim of undue delay. Suno has failed to demonstrate that the time necessary to develop and undertake this process constitutes undue delay.

### 1.    *Plaintiffs Diligently Negotiated the Protocol and Developed a Process to Review Suno's Petabytes of Training Data*

Suno first claims that Plaintiffs unduly delayed reaching agreement on the Joint Stipulation and Order Regarding Training Data Inspection Protocol (the "Protocol") and the process for using Audible Magic. But the timeline reflects the iterative nature of negotiating a novel protocol that *Suno* required and that required *Suno's* approval. Negotiation of the Protocol unsurprisingly took time given the technical complexity and involvement of multiple parties (and their experts). The Protocol was so-ordered on March 31, 2025, Dkt. 76, and Plaintiffs promptly began inspecting

Suno's training data two weeks later after providing advance notice, Delorey Decl. ¶ 2. These inspections required Plaintiffs' experts to travel to a secure room at Suno's counsel's office on multiple occasions. *Id.* ¶ 4. Only then could Plaintiffs and their experts begin to develop a process to use Audible Magic tailored to Suno's data.

Within a month of first inspecting Suno's training data, Plaintiffs sent Suno a proposal and, consistent with the Protocol, the parties "negotiate[d] in good faith regarding the technical details of how Plaintiffs will use Audible Magic." Dkt. 76 ¶ 8. Suno complains that Plaintiffs' initial plans did not address "technical details" or meet Suno's security concerns, Opp. 6, 10, but Plaintiffs did exactly what the Protocol envisioned: they proposed a plan, negotiated, tried to address Suno's (previously unknown) security concerns, and when an impasse arose, sought guidance from Magistrate Judge Levenson. Trehan Decl. ¶¶ 6–8. Judge Levenson suggested a sampling compromise, which led to more negotiations, after which the parties reached agreement. *Id.* ¶ 8; Lovejoy Decl. ¶¶ 16–20. Suno's complaint—that Plaintiffs should have sooner proposed a better plan to fingerprint and analyze more than ███████ audio files within a secure inspection environment while navigating security constraints Suno disclosed on a seriatim basis—is untethered from the reality of this case. Opp. 10. This was uncharted territory: a forensic process to identify copyrighted works at a scale this litigation is among the first to confront. Against that reality, the time required to design and execute this novel process in the restricted environment Suno demanded was reasonable, not a substantial and unjustified delay.

Further, Suno's contention that Plaintiffs tried to "extract unrelated concessions" during these negotiations is mistaken. Opp. 6-7, 10-11. Plaintiffs took legitimate negotiating positions intended to protect their ability to expand their cause of action to reflect the scale of, and seek just compensation for, Suno's infringement. For instance, Suno complains that Plaintiffs sought a

- 4 -

stipulation regarding their ownership of copyrights for additional works after Judge Levenson proposed a sampling process. *Id.* at 11. But this proposal merely sought to ensure that, if the sample limited Plaintiffs' ability to analyze the files in Suno's training data, corresponding accommodations would facilitate Plaintiffs' identification of their works outside the randomized sample and establish their valid, enforceable copyrights in those works.[2] Ultimately, Plaintiffs diligently and in good faith reached agreement with Suno regarding the inspection and analysis of its training data. Suno has failed to demonstrate otherwise—particularly in light of the unique circumstances presented by this case. *See Gusakovs v. Johnson & Johnson*, 2023 WL 4053059, at *5 (D. Mass. June 16, 2023) ("[T]here is no delay that is *per se* undue and a district court mulling a motion to amend in a particular case must consider any alleged delay with that case's specific history in mind.") (internal quotation marks omitted).

### 2. *Plaintiffs' Ownership Review Was Necessary, Not Dilatory*

By Suno's telling, Plaintiffs sat idly by after spending an enormous amount of time and money to obtain the Audible Magic results, letting four months "pass" before moving to amend.[3] *Id*. at 7, 11-12. But Suno does not acknowledge that Plaintiffs undertook manual reviews to confirm they had a good faith basis to claim enforceable rights to the additional works. *See*

---

[2] Suno's identification of this proposal as undue delay is particularly unpersuasive, as stipulating to ownership would expedite the litigation, not delay it.

[3] That four months elapsed does not itself establish undue delay; courts routinely permit amendment after comparable intervals. *See Town of Wolfeboro v. Wright-Pierce*, 2013 WL 4500676, at *3 (D.N.H. Aug. 20, 2013) (permitting amendment where plaintiff moved to amend four months after receiving relevant discovery); *Abiomed, Inc. v. Maquet Cardiovascular LLC*, 2020 WL 3868803, at *4 (D. Mass. July 9, 2020) (permitting amendment where plaintiff moved to amend more than three months after learning of new infringing product); *Bridgeport Music, Inc. v. Universal Music Grp.*, 248 F.R.D. 408, 414 (S.D.N.Y. 2008) (noting that courts "permitted amendments where the time between a moving party's discovery of the relevant facts and the filing of the motion to amend was much longer" than three weeks, including four months). Regardless, the sheer scale of Suno's copying provides essential context for the timeline of the amendment.

Castagna Decl. ¶¶ 7-9; Pasek Decl. ¶¶ 5-11.   Instead, Suno argues that Plaintiffs previously claimed no such manual ownership review was necessary.  Opp. 11-12.  Not so.

Suno's reliance on Plaintiffs' prior representations about Audible Magic conflates two distinct tasks.  In an earlier discovery dispute, Plaintiffs represented that they "systematically ensure that the sound recordings they upload to Audible Magic's content database are the same sound recordings they deposited with the Copyright Office."  Dkt. 70 at 13.  That representation addressed file equivalence, that is, whether a recording matched by Audible Magic in Suno's training data is the same recording registered with the Copyright Office.  It did not address the distinct task Plaintiffs performed here: connecting each Audible Magic match to a specific registered copyright and reviewing relevant ownership information for that recording.  Simply put, identifying a particular audio file in Suno's training data is the first of several steps, which include, among other things, confirming registration information for all newly asserted post-1972 works. *See* 17 U.S.C. § 411.[4]

Suno offers no response to the numerous cases finding good cause exists where, as here, the factual basis for additional claims comes to light only through discovery.  *See* Mot. 10-12. Instead, Suno cites inapposite cases where the movant "provided no explanation for the seventeen-month delay . . . seeking leave to amend," *In re Lombardo*, 755 F.3d 1, 4 (1st Cir. 2014), and where the plaintiff knew relevant facts "two and a half months before the amendment deadline" and "took no action to develop or preserve the new claim . . . for more than four months," *Great Lakes Ins. SE v. Andersson*, 338 F.R.D. 424, 428 (D. Mass. 2021).  Nor does *Concord* support Suno's

---

[4] Suno's position is untenable either way.  Had Plaintiffs moved to amend immediately upon receiving the Audible Magic results—without confirming ownership or registration—Suno would have attacked them for asserting works without conducting due diligence.  Having performed that diligence, Plaintiffs should not be penalized for the time it required.

position.  There, the publishers sought leave to amend to assert an entirely new theory of liability—that Anthropic's model facilitated BitTorrent piracy of their works.  The court denied leave because the publishers "were not sufficiently diligent discovering the BitTorrenting theories of liability they now try to assert."  *Concord Music Grp., Inc. v. Anthropic PBC*, No. 24-cv-03811, Dkt. 474 at 27:6-7 (N.D. Cal. Oct. 8, 2025).  Here, by contrast, Plaintiffs could not have identified the additional works any sooner: the works were ascertainable only by analyzing the more than ███████████ audio files in Suno's training data through a stringent inspection protocol.  Having obtained the results, Plaintiffs promptly undertook extensive manual work necessary to develop a good faith basis to allege ownership or exclusive control of each recording before moving to amend.  "[I]t is clear that the timing of [Plaintiffs'] request to amend does not reflect delay, rather it reflects the developing factual record related to this litigation."  *Penobscot Nation v. Mills*, 2014 WL 442429, at *3 (D. Me. Feb. 4, 2014).

## B.    The Proposed Amendment Will Not Unfairly Prejudice Suno

Prejudice "is not the dominant criterion" in this analysis, *O'Connell v. Hyatt Hotels of P.R.*, 357 F.3d 152, 155 (1st Cir. 2004), and the standard is not whether amendment imposes a burden, but whether it is "unfairly" prejudicial, *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 13 (1st Cir. 2004).  Suno identifies no unfair prejudice.  Instead, Suno conflates delay with prejudice and recasts Plaintiffs' own production obligation as a burden on Suno.  Neither is a basis to deny leave.

### 1.    The Amendment Simply Adds Works to an Existing Cause of Action

Where an amendment "does not substantially change the asserted infringement theory," it is not prejudicial.  *Abiomed*, 2020 WL 3868803, at *4.  That is precisely the case here.  Plaintiffs' proposed amendment asserts no new cause of action, no new legal theories, and no new defendants. It merely expands the list of works within the cause of action Suno has litigated for two years, on

the same operative facts—Suno's copying of sound recordings en masse—and against the same defenses.[5]

Moreover, the proposed amendment imposes no new production obligations on Suno. As Suno concedes, any new ownership discovery is "solely in [Plaintiffs'] hands." Opp. 15. A movant's assumption of its own *prima facie* burden is not unfair prejudice to its opponent. This fundamental fact distinguishes the cases cited by Suno, each of which involved an amendment that opened a new factual front requiring discovery from *the defendant*. In *EMC Corp.*, the movant sought to add a new statutory theory resting on a factual predicate that had never been litigated and that would have required new discovery and new experts, filed after fact discovery closed. *EMC Corp. v. Pure Storage, Inc.*, 310 F.R.D. 194, 201-02 (D. Mass. 2015) ("In addition to discovery on cost, EMC would need to develop evidence regarding the issue of intent."). In *Novi Footwear*, the movant sought four new counterclaims that the court found would add "an entirely new and thus far unexplored dimension to the case," i.e., whether the plaintiff itself had committed torts. *Novi Footwear Int'l Co. Ltd. v. Earth OpCo LLC*, 350 F.R.D. 179, 184 (D. Mass. 2025). And in *Turner*, the plaintiff sought to inject a new "combined-benefits theory" nearly five years into the case, more than a year after discovery closed, and after three rounds of summary judgment and a class-certification motion. *Turner v. Liberty Mut. Ret. Benefit Plan*, 350 F.R.D. 1, 6-8 (D.

---

[5] Suno's effort to walk back the admission in its own Answer only sharpens the point. *See* Opp. 15 n.4. Suno does not deny that its training data included recordings owned by Plaintiffs, nor could it given Suno's concession that "the tens of millions of recordings that Suno's model was trained on presumably included recordings whose rights are owned by the Plaintiffs in this case." Answer at 8. Suno now responds that this language does not concede that Plaintiffs own every recording in its training data. Opp. 15 n.4. But Plaintiffs have never claimed otherwise. The point is that Suno itself had every reason to expect that Plaintiffs' recordings were among the works it copied. Against the massive corpus Suno concedes presumably contained Plaintiffs' recordings, Suno's objection to adding 61,026 works (a mere fraction of that full dataset) is not an objection based on unfair surprise or undue prejudice. It is an objection to Plaintiffs having documented the scope of copying Suno always understood had occurred.

Mass. 2025).  In contrast to each of the cases cited by Suno, Plaintiffs' proposed amendment merely expands the existing cause of action against the same defendant.

Nor does the amendment open a new discovery front.  The only additional discovery required for Plaintiffs to meet their burden is ownership documentation.  Although Suno claims there is "no realistic prospect" Plaintiffs can produce ownership discovery for the additional works "without blowing up the case schedule," Opp. 15, Suno musters only a single concrete ownership question (that Plaintiffs will resolve) among the 560 works already in suit.  That record refutes its prediction of pervasive ownership disputes.  The burden involved with Plaintiffs' production of their ownership materials is reason to sequence that discovery sensibly, not a reason to deny amendment.

### 2. Deciding Fair Use First Resolves Any Residual Concerns

Contrary to Suno's assertions, Plaintiffs' bifurcation proposal is serious, narrow, and not foreclosed by any prior ruling.  It contemplates proceeding to summary judgment on fair use—the issue this Court has said the case "turns on," Dkt. 44 ("Oct. 28, 2024 Hr'g Tr.") at 4:4)—on a complete record, while deferring proof of ownership for only the newly added works.  Suno resists this sequencing by conflating two distinct inquiries.  Ownership (*i.e.*, whether Plaintiffs hold valid copyrights or exclusive rights in particular recordings) is an element of Plaintiffs' *prima facie* case. Meanwhile, fair use is Suno's affirmative defense and turns on, among other considerations, the character of Suno's use and its effect on the market for the asserted works, not on who holds the requisite rights.  For any asserted work, Plaintiffs can supply the consumption and market evidence the fair use analysis requires without first proving ownership over that work.[6]  Deferring ownership

---

[6] Suno claims Plaintiffs "have not committed" to producing Factor Four discovery into the new works.  Opp. 18-19.  Not so.  Plaintiffs have never refused to produce that discovery if the motion

(Continued...)

proof does not affect the fair use record.  This proposal delivers what Suno claims it wants—a "timely" resolution of its fair use defense.  Opp. 3.  Suno cannot demand a prompt fair use ruling while insisting the parties first litigate ownership of more than 60,000 works.[7]

Nor has the Court rejected this approach.  The Court previously explained that it preferred "to do discovery all at once and understand the entire case[.]"  Oct. 28, 2024 Hr'g Tr. at 4:6-7. That discussion pertained to how to sequence discovery at the outset—not a ruling that fair use must be litigated only after ownership of every asserted work is proven.  The Court expressly reserved that "[i]f some other pathway after we get started seems preferable, we can do that." *Id.* at 4:10-11.  That pathway is now before the Court.  Plaintiffs' ownership of the 560 initially asserted works has been the subject of full discovery, and the question of fair use can be fully adjudicated on the present ownership record.  That fair use ruling would govern the newly asserted works, for which Plaintiffs would establish ownership before any judgment is issued as to them.

Suno frames the Court's decision as a choice between indefinite delay and an "advisory opinion."  Opp. at 3.  That is a false choice.  Deciding the common, potentially dispositive fair use question first, on a full record, with proof of ownership for the new works to follow, would be both productive and proper.  The sole reason that question reaches the Court on this posture, is Suno's mass copying, refusal to disclose what it copied, and the parties' active dispute over whether Suno's conduct constitutes fair use.

---

is granted and are willing to meet and confer with Suno about what is relevant and proportional for these purposes, including the data categories Suno identified in its opposition.

[7] Plaintiffs do not seek and have never sought to be relieved of their *prima facie* burden.  They seek only to sequence it.

### C.    Allowing the Amendment Will Promote, Not Defeat, Judicial Economy

Litigating the same conduct once, in one action, is the efficient course. Where an amendment "stem[s] from the same incidents" and "rel[ies] largely on the same facts, it is logical and efficient to allow these related claims to be litigated in one case, rather than to require [the plaintiff] to initiate a new, related action concerning these same incidents." *Parkhurst v. Superior Drywall, Inc.*, 2022 WL 36475, at \*3 (D. Mass. Jan. 4, 2022). The amendment adds works to an existing cause of action governed by the same theory, the same operative facts, the same defenses (including the same fair use defense) and the same expert record.

Suno's proposed alternative—that Plaintiffs file a separate suit—is the antithesis of judicial economy. A second action would require a duplicate complaint, duplicate expert reports on the identical fair use question, and duplicate summary-judgment briefing, all directed at the same models, the same training conduct, and the same defense. And the ownership discovery Suno decries would still be required in the new case, unaffected by a second docket. Rather than curing inefficiency, a second related action would unnecessarily burden the Court with a parallel proceeding and require the Court and the parties to adjudicate one set of facts twice.

Suno's authorities do not suggest otherwise. In *EMC Corp.*, discussed *supra*, the court denied leave where "the proposed amendment [sought] to introduce an entirely new theory of liability to the case, which arises out of a different set of facts than those that support the existing claims," 310 F.R.D. at 203, in stark contrast to Plaintiffs' proposed amendment here.

In *Epidemic Sound*, the court denied a motion to *compel* Meta to produce account data to enable the plaintiff to identify additional works to add later. *Epidemic Sound, AB v. Meta Platforms, Inc.*, No. 22-cv-04223, Dkt. 177 (N.D. Cal. Oct. 10, 2024). Unlike *Epidemic Sound*, in which the discovery burden would have been bilateral because Meta would have to "produce evidence regarding third parties," *id.* at 2, Plaintiffs have already identified the works through the

- 11 -

agreed-upon Audible Magic protocol, and the only added discovery is Plaintiffs' own ownership proof.  Suno's separate citation to the second, later-filed *Epidemic Sound* action shows only that one rightsholder chose to sue separately on works that were registered after the filing of the initial action.  *See Epidemic Sound, AB v. Meta Platforms, Inc.*, No. 25-10355, Dkt. 1 ¶ 1 (N.D. Cal. Dec. 2, 2025).  It is not authority that fragmenting into separate cases serves judicial economy.

*After II Movie* is likewise distinguishable on multiple grounds.  The denial there rested on the addition of five new plaintiff entities and a second piracy-detection system—requiring new source-code inspection, new expert testimony, and duplicative methodology motion practice—and on the fact that the new works had been registered, and were therefore knowable, before the amendment deadline.  *After II Movie, LLC v. Grande Commc'ns. Networks LLC*, 2023 WL 6367704, at *3-4 (W.D. Tex. Sept. 29, 2023) ("[N]ot only do Plaintiffs add new parties and works-in-suit, they also add additional facts to the case.").  None of that is present here.  There are no new defendants and no new detection methodology.  And Plaintiffs did not have reason to know which of their sound recordings Suno trained on until the Audible Magic analysis was complete.

Finally, Plaintiffs' bifurcation proposal is itself a judicial-economy measure. Deciding fair use first on a complete record can resolve the entire case in a single ruling and eliminate any need for ownership discovery on tens of thousands of works.  Suno's insistence on litigating ownership first guarantees the opposite.  Forcing Plaintiffs into a duplicative second suit would splinter litigation that Suno's own concealment made necessary, rewarding obstruction at the expense of the efficiency the Federal Rules are designed to serve.

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' Second Motion for Leave to Amend Complaint.

Dated:   June 11, 2026
        New York, New York

By:_____
Moez M. Kaba (*pro hac vice)*
Mariah N. Rivera (*pro hac vice*)
Alexander R. Perry (*pro hac vice*)
Samuel Givertz (*pro hac vice*)
**HUESTON HENNIGAN LLP**
1 Little West 12th Street
New York, New York 10014
Telephone: (646) 930-4046
Facsimile: (888) 775-0898
mkaba@hueston.com
mrivera@hueston.com
aperry@hueston.com
sgivertz@hueston.com

Robert N. Klieger (*pro hac vice*)
Rajan S. Trehan (*pro hac vice*)
**HUESTON HENNIGAN LLP**
523 West 6th Street, Suite 400
Los Angeles, California 90014
Telephone: (213) 788-4340
Facsimile: (888) 775-0898
rklieger@hueston.com
rtrehan@hueston.com

Daniel J. Cloherty
Alexandra Arnold
**CLOHERTY & STEINBERG LLP**
One Financial Center, Suite 1120
Boston, Massachusetts 02110
Telephone: (617) 481-0160
Facsimile: (888) 775-0898
dcloherty@clohertysteinberg.com
aarnold@clohertysteinberg.com

*Counsel for Plaintiffs*

- 13 -

- 14 -

## CERTIFICATE OF SERVICE

I hereby certify that this document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those identified as non-registered participants on June 11, 2026.

_____
Moez M. Kaba
*Counsel for Plaintiffs*

- 14 -